Darin Sands, OSB No. 106624
dsands@bradleybernstein.com
BRADLEY BERNSTEIN SANDS LLP
1211 NW Glisan St., Ste 204
Portland, OR 97209
Telephone: +1 503-734-2480

David R. Carpenter*
drcarpenter@sidley.com
Caleb J. Bowers*
cbowers@sidley.com
Alexandra T. Mushka*
amushka@sidley.com
SIDLEY AUSTIN LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213 896 6000
Facsimile: +1 213 896 6600

Gordon D. Todd*
gtodd@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736 8000
Facsimile: +1 202 736 8711

*Pro hac vice applications forthcoming

Attorneys for Plaintiff
NATIONAL ASSOCIATION OF
WHOLESALER-DISTRIBUTORS

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS,<br><br>Plaintiff,<br><br>vs.<br><br>OREGON DEPARTMENT OF ENVIRONMENTAL QUALITY; OREGON ENVIRONMENTAL COMMISSION; DANIEL A. RAYFIELD, in his official capacity, and DOES 1 through 25,<br><br>Defendants. | Case No.  3:25-cv-1334<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      Oregon's Plastic Pollution and Recycling Modernization Act (the "Act") is an unprecedented program that seeks to broadly regulate entities across the supply chain and affects virtually every aspect of commerce for products within and entering Oregon—all while delegating essential regulatory authority to a private, third-party organization. While the Act is ostensibly intended to promote sustainable life-cycle management, the Act's deeply flawed design in fact produces unreasonable, arbitrary, and crushing burdens, including on wholesalers and distributors who are essential to moving products from manufacturers to Oregon consumers.

2.      The Act requires "producers" of product packaging, food serviceware, paper products, and certain other items to join a "producer responsibility organization" (PRO). That PRO—an ostensibly private organization—is then granted wide authority to set "eco-modulated" fees associated with a vast range of materials sold or distributed into the state—including newspapers, glass jars, aluminum foil and containers, packing paper and cardboard, nearly three dozen different categories of plastic products, and wood and other organic materials. In other words, the PRO fees apply to products used in virtually every purchase of goods. As part of this program, each "producer"—e.g., a manufacturer that sells packaged products in Oregon; or a wholesaler or distributor who brings any such product into the state—must register with the PRO; enter into a non-negotiable contract with that PRO; and provide the PRO data about the materials and volumes used in its operations, which the PRO uses to assess fees. These fees may be much greater than wholesalers' or distributors' margins on a product, or even the price of the product itself.

3.      The Act has been referred to as creating an "extended producer responsibility" (EPR) program, but there has never been an EPR program like this. Typical EPR programs involve specific products that are associated with an additional fee to facilitate appropriate disposal: for example, mattress or carpet purchasers may be charged a collection and disposal fee; plastic drink bottles may include a recycling "deposit." But those are discrete products with set and transparent fees. The Act here, in contrast, has unprecedented breadth, scope, and complexity.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

4.      On its face, the Act is entrusted to the Oregon Environmental Quality Commission (EQC) and the Oregon Department of Environmental Quality (DEQ) for administration. In truth, however, despite its transformational nature, EQC and DEQ oversee its implementation and enforcement only tangentially. Rather, the vast majority of program administration is delegated to the PRO, which has been granted wide discretion to apply a confidential methodology for setting fees, to establish other criteria and incentives for certain producers, and to penalize producers of certain materials. What is more, Oregon has approved only a single PRO—the Circular Action Alliance (CAA)—meaning that CAA's terms and conditions, fees, incentives, and penalties are all mandatory.

5.      Entities that registered with the PRO started getting their first "invoices" for fees this month. For many, particularly for small and medium-sized businesses operating on thin margins, the fees were unexpected and unexpectedly high.

6.      This surprise resulted in significant part from the fact that the PRO's fee-setting methodology has been deemed confidential. It has not been publicly disclosed, debated, subjected to rule-making, or in any other respect open to inspection. Rather, it has been immunized from public scrutiny or challenge. Moreover, companies commanded to join the PRO and to pay these fees are denied any administrative or judicial process to challenge fee assessments. Instead, any individual producer questioning its assessment must engage in private arbitration with the PRO, pursuant to the terms of the contract it was directed by law to sign. Moreover, DEQ has explicitly stated that CAA may change fee schedules without review or approval. And the scheme is prone to duplication and vagueness in the PRO's assessment of fees, with no transparent mechanism for determining how fees are allocated across the supply chain.

7.      Based on these attributes and others, Oregon's program is unconstitutional because it violates:

            a.      **Nondelegation Doctrine.** Vesting authority over EPR program administration in a private entity without adequate legislative standards or procedural safeguards constitutes an unlawful delegation in violation of the

Oregon Constitution. The violation is compounded when, as here, regulatory authority is vested in an entity with an interest in the program's administration.

b.    **Federal Dormant Commerce Clause.** The EPR program discriminates against out-of-state producers, unduly burdens national markets for products and packaging, and controls commerce occurring wholly outside of Oregon in violation of the Dormant Commerce Clause.

c.    **Federal Unconstitutional Conditions Doctrine.** The program conditions access to the Oregon market and financial incentives on contracts with a third-party—the contracts that producers are required to enter with the sole PRO in Oregon (CAA)—and the terms thereof, requiring producers to waive economic liberty and due process rights.

d.    **Federal and State Due Process.** The program subjects producers to binding fee assessments and compliance obligations without adequate procedural safeguards. Producers have no meaningful opportunity to provide comment on or challenge CAA's fee determinations, material classifications, or incentive eligibility, and, for resolving disputes, are forced to either accept CAA's determination or submit to binding arbitration.

8.    Plaintiff accordingly challenges the Act and its implementing regulations as facially unconstitutional under the U.S. Constitution and Oregon Constitution, and as-applied to Plaintiff, including Plaintiff's members.

9.    To remedy these violations of Plaintiff's constitutional rights and the statutory violations that have occurred, Plaintiff requests this Court declare the Act and any regulations promulgated thereunder as void and enjoin Defendants from implementing and enforcing the requirements, and award any other appropriate relief to redress injuries and prevent further unlawful actions by Defendants.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), as the claims arise under the Constitution and laws of the United States. Plaintiff asserts multiple independent federal constitutional claims, including violations of the Dormant Commerce Clause (U.S. CONST. art. 1, § 8), unconstitutional conditions, and federal due process.

11.    This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a), including claims under the nondelegation doctrine and due process provisions of the Oregon Constitution. These claims arise from the same core set of facts and form part of the same case and controversy as the federal claims.

12.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in Oregon, and the state officials and agencies responsible for administering the challenged law are located within this district.

## PARTIES

13.    Plaintiff NAW is a national trade association whose members constitute wholesalers and distributors across the United States, including members that conduct business in Oregon. Founded in 1946, NAW comprises direct member companies and a federation of national, regional, and state associations across 19 commodity lines of trade which together include approximately 35,000 companies operating nearly 150,000 locations throughout the nation.

14.    NAW's members import, distribute, or supply packaged goods into Oregon and are subject to the requirements of the Act.

15.    NAW's members include mid-sized businesses that are integral to regional and national supply chains. These companies typically operate distribution centers, manage inventory, and coordinate logistics across state lines. As part of their operations, many use or distribute packaging materials, or products containing those materials, that fall within the scope of the Act.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

16.    NAW's members play a critical role in the supply and movement of goods nationwide, including in Oregon. These business activities require sourcing, handling, and distributing packaged products, including those produced by others, which in certain cases means that NAW's members are considered "producers" under the Act (e.g., because they introduce covered materials into the state).

17.    The classification of NAW's members as producers under the Act imposes extensive compliance responsibilities on these companies, which often have little or no control over the design or composition of the packaging they distribute, forcing them to shoulder financial and logistical obligations not aligned with their operational role in the product life cycle.

18.    Defendant EQC is a five-member commission tasked under Oregon law with adopting rules to govern DEQ's regulatory programs. Its members, as stated on Oregon's website, who are subject to change, currently include Matt Donegan, Karen Moynahan, and Mark Webb, with two currently vacant seats.[1] The EQC exercises its authority delegated by the Oregon Legislature to implement environmental policy and approved the regulations implementing the Act.

19.    Defendant DEQ is a state agency within the executive branch of the State of Oregon. DEQ is charged with administering and enforcing Oregon's environmental protection statutes, including the Act. DEQ reviews and approves producer responsibility program plans and plan amendments, and is provided authority under the Act to inspect and enforce the requirements of the Act. DEQ is headquartered in Portland and operates throughout the State of Oregon.

20.    Defendant Daniel A. Rayfield is the Attorney General of the State of Oregon and is sued solely in his official capacity. In his official capacity, he is responsible for enforcing Oregon law throughout the state, including requirements of the Act.

---

[1] Or. Dep't of Env't Quality, *Environmental Quality Commission Members*, https://www.oregon.gov/deq/about-us/eqc/Pages/EQC-members.aspx?utm_source (last visited July 20, 2025).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

21.    Plaintiff is ignorant of the true names and capacities of the Defendants sued herein under the fictitious names DOES 1 through 25 inclusive, which may include members of EQC and DEQ.  When their true names and capacities are ascertained, Plaintiff will amend this Complaint.

## FACTUAL AND LEGAL FRAMEWORK

22.    Enacted in 2021, the Act provides the framework for Oregon's EPR program, administered by DEQ through regulations approved by EQC. These regulations add little to the Act's requirements as concerns producers.

23.    For implementing the requirements of the Act, the state turns to a private third-party organization: the PRO. "Producers" covered under the Act must join an approved PRO or establish their own program, which is cost prohibitive. Indeed, establishing a program is so cost prohibitive that there is only one PRO for Oregon, CAA. As Oregon's only approved PRO, CAA sets requirements and fees for producers through its Oregon Program Plan (2025–2027) ("Program Plan").[2] The statutory and regulatory requirements, and CAA's implementation through the Program Plan, are summarized as follows.

**Statutory Framework**

24.    The Act, codified in Chapter 459A of the Oregon Revised Statutes (Reuse & Recycling), Sections 459A.860–459A.975, mandates that most producers of packaging, paper products, and food serviceware, defined as "covered products," sold into Oregon must join a PRO or develop a stand-alone compliance program. OR. REV. STAT. §§ 459A.863(6)(a), 459A.869(1) (2023).

25.    The Act defines "producers" broadly. OR. REV. STAT. §§ 459A.863(22), 459A.866. For packaged items, for example, it includes brand owners and manufacturers that sell packaged items in Oregon; wholesaler and distributors who sell packaged items into Oregon; or alternatively importers into the United States.[3] The Act exempts only the smallest producers with less than

---

[2] Circular Action Alliance, *Oregon Producer Responsibility Program Plan* (2025–2027), (Feb. 21, 2025) (approved by Or. Dep't of Env't Quality) ("Program Plan"), https://www.circularactionalliance.org/oregon.
[3] Retailers are otherwise excluded from the definition.

$5,000,000 in gross revenue or less than one ton of covered materials per year. *See* OR. REV. STAT. §§ 459A.863(32), 459A.872(1). A PRO must develop a program plan describing "how the producer responsibility organization will manage and administer a producer responsibility program to meet the organization's obligations." *See* OR. REV. STAT. § 459A.875(2)(a).

26.    The Act provides little else describing the rights and responsibilities of producers. The PRO must use "objective and measurable criteria whenever possible" in setting requirements; however, the Act fails to specify what these criteria are—and apparently leaves room for using something *other than* objective and reasonable criteria. *See id.* The Act further fails to prescribe a uniform methodology for fee calculations, leaving significant discretion to the PRO in setting and adjusting producer fees, subject only to broad statutory guidelines and limited regulatory oversight. Instead of telling producers what they must pay, the Act vests the PRO with the authority to establish and collect membership fees from participating producers. OR. REV. STAT. § 459A.884(1).

27.    The only fee methodology specified in the Act is that the PRO must provide a base fee structure that charges lower fees for recyclable covered products and higher fees for non-recyclables, with the base fee rate "approximately proportional to the covered products' relative contribution to the financial obligations of the producer responsibility organization." OR. REV. STAT. § 459A.884(3)(b). The statute mandates "eco-modulation" of fees to incentivize producers to reduce the environmental and human health impacts of their products, requiring fee adjustments for producers who make qualifying changes to their packaging. OR. REV. STAT. § 459A.884(4).

28.    Notably, the statute does not require comprehensive economic impact analysis for all affected businesses, does not provide for direct public or small business representation in PRO governance, and does not directly regulate retailers selling covered products.

29.    A recurring aspect of the statutory requirements is that the *PRO* is the entity responsible to "ensure," "provide," and "describe" the numerous components of program implementation. *See* OR. REV. STAT. § 459A.875. DEQ is the designated agency for administering the EPR program, with authority to approve or reject PRO program plans, enforce compliance,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

and impose civil penalties of up to $25,000 per day for violations. OR. REV. STAT. §§ 459A.878, 459A.962, 468.130. However, recourse for producers who disagree with the PRO is limited to binding arbitration with the PRO, as discussed further below.

30.     Beginning July 1, 2025, all obligated producers—including wholesalers and distributors—were required to begin paying program fees, which are paid to CAA as the sole PRO for Oregon. OR. REV. STAT. § 459A.875.

**Oregon Regulations**

31.     EQC is the administrative body charged with approving regulations issued under the Act, while DEQ is the regulatory agency responsible for approving PRO plans. OR. ADMIN. R. ch. 340, div. 90 (2023).

32.     The EQC-approved regulations implementing the Act are contained in OR. ADMIN. R. §§ 340-090-0600 to -0940. The regulations focus on recycling goals rather than determining the responsibilities of producers—the authority for which is abdicated to the PRO.[4]

33.     Oregon's regulations charge the PRO with setting producer membership fees based on the weight and type of covered products sold or distributed in Oregon, in short, based on "market share." OR. ADMIN. R. § 340-090-0700(1). The regulations further allow the PRO discretion to offer "other fee adjustments to its member producers." OR. ADMIN. R. § 340-090-0910(3)(c); *see also* OR. REV. STAT. § 459A.884(4). Notably, while the regulations require PROs to implement eco-modulated or graduated fees that reflect environmental impact, they do not prescribe any specific methodology, thresholds, or performance standards for how such fees must be calculated or applied, providing minimal regulatory guardrails.

---

[4] For example, the regulations set performance standards for the collection and responsible recycling of covered products (§ 340-090-0650), collection targets (§ 340-090-0660), determine what constitutes a responsible "end market" for covered products (§ 340-090-0670), and set a base fee and "waste prevention and reuse fee" that the PRO must pay (§§ 340-090-0690(2), (3)).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

34.     Likewise, during the public rulemaking process, DEQ clarified that routine adjustments to financial incentives, including individual bonuses or eco-modulation credits, do not require program plan amendments.[5]

35.     The regulations also empower the PRO to make unilateral fee adjustments—i.e., without DEQ approval. A PRO may revise fees, revise material cost allocations, and change any fee adjustments granted to individual producers, without proposing a program plan amendment for DEQ's approval. OR. ADMIN. R. §§ 340-090-0750(1), (2). The PRO must only seek DEQ approval if establishing "[a]lternate approaches" to membership fees. OR. ADMIN. R. § 340-090-0750(2).

36.     The regulations also incorporate the concept of life cycle evaluations (LCEs), which the PRO uses to provide incentives and potential reductions in fees owed to the PRO. *See* OR. ADMIN. R. § 340-090-0900 to -0930; *see also* OR. REV. STAT. § 459A.863(8). However, the burden of undertaking an LCE bars many companies from undertaking them, potentially skewing application and enforcement of the program.

37.     The Act, as well as EQC and DEQ's lack of specificity in defining program requirements, and lack of oversight related to the PRO's implementation and modification of fees charged to producers under the Act, establishes a fee structure that is both opaque and effectively insulated from regulatory scrutiny.

38.     The regulatory process lacks robust mechanisms for public input and agency oversight regarding changes to eco-modulation bonus criteria, except in cases of certain programmatic changes, such as changes to the PRO's overarching fee framework. This lack of procedural oversight limits transparency and accountability in the development and modification of incentive structures—which are key to calculating fees ultimately charged to producers. Furthermore, by permitting the PRO to make material changes to the fee schedule without

---

[5] According to DEQ, only structural changes to fee methodology or the magnitude of penalties would trigger further review. *See* Or. Dep't of Env't Quality, *Recycling Updates 2023. Rulemaking*, https://www.oregon.gov/deq/rulemaking/Pages/Recycling2023.aspx (last visited July 20, 2025).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

meaningful agency review or oversight, the Act and the regulations issued thereunder delegate authority to a private entity, CAA, without providing adequate guidance or safeguards.

39.     Indeed, in the rulemaking process, DEQ acknowledged that it was not in a position to determine the overall fiscal impacts of the EPR program; further, DEQ did not require any economic impact analysis on businesses beyond a limited assessment for small businesses. Or. Env't Quality Comm'n, Statement of Fiscal and Economic Impact, EQC 2023-11 Item G (Nov. 2023).

40.     DEQ's administration of the EPR program fails to provide meaningful procedural safeguards under the Act regarding eco-modulation bonuses and other financial incentives. In particular, CAA is permitted to adjust fee inputs and reward structures without requiring program plan amendments, unless changes are deemed "substantive." As a result, DEQ has explicitly removed itself from direct approval of most future changes to the PRO's incentive structure, and adds no safeguards that would correct the Act's deficiencies in delegating program implementation to a third party.

41.     In sum, Oregon's regulatory program fails to prescribe sufficient standards for setting fees and leaves CAA with broad discretion to define and adjust fees using internal cost modeling and various other factors determined by CAA, subject to change within CAA's discretion.

**CAA Program Plan**

42.     As discussed above, CAA, a private non-profit entity, is the only approved PRO in Oregon.

43.     The Act charges CAA with responsibility for calculating and collecting producer fees. The details of this process supposedly are provided in CAA's Program Plan. However, producers do not know all these details, because CAA has provided that its fee methodology is "confidential" for DEQ's eyes only (illustrated below).

44.     Appendix G of the Program Plan, *Detailed Fee-Setting Methodology*, "has been shared with DEQ separately":

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF



circularactionalliance.org

**Appendix G:**

## Detailed Fee-Setting Methodology
*(confidential)*

Appendix G is confidential and has been shared with DEQ separately.

45.    Producers have no recourse to challenge CAA's fee methodology—whatever that methodology is—contained in this "confidential" appendix.

46.    In joining CAA, as producers are effectively required to do, producers are bound by the terms of the Program Plan and must agree to CAA's Participant Producer Agreement ("Producer Agreement") as well as the Oregon Addendum to the Participant Producer Agreement ("Agreement Addendum"), which govern CAA's administration of the Oregon EPR program.

47.    Under Oregon's EPR program, as discussed above, CAA is empowered to:

- Administer the compliance program;
- Set and assess producer fees;
- Create packaging recyclability criteria and benchmarks;
- Manage performance incentives and penalties.

48.    The financial and logistical burdens of forming a new PRO are prohibitive, so joining CAA is the only viable option for most producers. For example, DEQ charges a $150,000 fee per plan submission, which does not include legal, consulting, or operational costs needed to develop the plan—only the fee to have DEQ evaluate it. *See* OR. ADMIN. R. § 340-090-0690. A PRO must also represent at least 10% of the total market share of covered products in Oregon to be eligible for approval. OR. REV. STAT. § 459A.869(12). And, among other responsibilities, a PRO must meet statutory obligations to finance collection, transportation, and responsible end-market processing. OR. REV. STAT. §§ 459A.890–896.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

49.    The statutory and regulatory framework provided for Oregon's EPR program, and the authority vested in CAA (as the sole PRO), creates a captive compliance environment with little to no competition or oversight.

50.    For the initial program period (2025–2027), CAA's Program Plan describes the basic fee structure imposed on producers, which includes a base fee algorithm applied across more than 60 material categories, with fees tied to the type, weight, and recyclability of each packaging material reported by producers. Program Plan at 191–198, Table 20.[6] The plan also incorporates eco-modulated adjustments, providing "bonuses" or "incentives" for select producers, including those who perform the LCE process discussed above. *Id.* at 210–215. But because the costs of performing a LCE are prohibitively high, these adjustments are scarcely accessible to NAW's members.

51.    CAA's methodology is not externally vetted and lacks DEQ-imposed constraints. *Id.* at 195.

52.    CAA's Program Plan, consistent with the program authorities discussed above, allows CAA to apply eco-modulated adjustments for packaging that it considers more environmentally burdensome (e.g., multi-layer plastic film that is not on Oregon's Uniform Statewide Collection List). *Id*. at 194. Packaging that CAA deems more burdensome incurs higher fees, while recyclables or low-impact packaging may qualify for discounts. *Id.* at 191.

53.    CAA has broad discretion to revise fee schedules, reclassify materials, and adjust cost assumptions annually. Routine changes—including updates to cost inputs and supply weights—do not require DEQ approval or public comment. *See* DEQ, *Recycling Updates 2023*, *supra* at 21.

---

[6] Specifically, CAA calculates fees using a base fee algorithm for its 60 material categories of packaging. Each material category is assigned a per-pound rate, which is intended to reflect the cost of collection, transportation, processing, and infrastructure investment. The basic calculation is: Producer Fee = (Base Rate) x (Weight of Material Supplied). Program Plan, *supra*, at 191.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

54.     Furthermore, as discussed above, the Act provides minimal constraints on PRO decision-making and fee-setting. The Program Plan and Agreement Addendum reflect CAA's discretionary authority, including the power to impose audit costs on participating producers.

55.     For instance, the Agreement Addendum provides that "CAA Oregon shall bear the cost of any such audit unless such audit reveals a discrepancy of the lower of 5% or $100,000, in which case [the] Company shall bear the reasonable, documented expenses of such audit." *See* Agreement Addendum § 4.2. This arrangement places the burden of enforcement costs on producers with little procedural protection or opportunity to contest CAA's determinations.

56.     The Producer Agreement and Agreement Addendum further bind producers while failing to provide any meaningful recourse to challenge CAA's rules, interpretations, or conclusions regarding program administration. The Program Plan and Agreement Addendum fail to provide any formal process for producers to appeal or challenge fee assessments, adjustments, or categorization. Producers are obligated to comply or face liquidated damages, audit costs, and potential enforcement referrals to DEQ. *See* Agreement Addendum §§ 4.2, 5.6.2, 6.2.8.

57.     The Agreement Addendum further provides, "**Dispute Resolution.** If resolution cannot be reached by the Parties through good faith efforts to resolve any dispute themselves or through non-binding mediation, any dispute, controversy, or claim arising out of or relating to this Oregon Addendum, including the interpretation, scope, or breach thereof or the extent of the Parties' obligations under the Oregon EPR Law, shall be resolved by binding arbitration." Agreement Addendum § 8.

58.     The final approved CAA Program Plan leaves significant discretion to CAA in setting and adjusting fees, with limited DEQ oversight of annual fee updates. Moreover, the dispute resolution and compliance processes provided are largely internal to the PRO structure, with binding arbitration the only recourse after CAA's internal remedies have been exhausted. The plan lacks robust mechanisms for ongoing public input or agency review of changes to key program elements, such as the eco-modulation criteria or the addition of new covered materials.

59.     Regional and mid-sized companies have extremely limited, if any, influence within the PRO structure. The Oregon program's complexity, lack of transparency, and concentration of authority in a single PRO create a system in which mid-sized businesses are exposed to disproportionate financial and operational burdens.

**Impacts to Plaintiff and Its Members**

60.     NAW's members include mid-sized businesses integral to regional and national supply chains. These companies operate distribution centers, manage inventory, and coordinate logistics across state lines, involving all types of packaging materials used in supply chains and by manufacturers and others—over which NAW's members have no control. Yet, these companies may still be charged with responsibility as "producers" under the Act.

61.     As producers, NAW's members are subject to the reporting, fee assessment, and packaging modification requirements imposed by Oregon's EPR program. This includes the obligation to register with CAA as the sole approved PRO, calculate and report the weights of all packaging sold into Oregon, and pay fees based on material-specific rates and environmental impact modifiers—as well as comply with any of the calculations or requirements discussed in CAA's "confidential" fee appendix to the Program Plan. The lack of publicly available information and time for coordination among regulated parties before being charged fees means, among other things, that distributors and others in the supply chain have difficulty discerning the producer for a particular product. These companies may be inappropriately charged fees as a result, or charged fees for products subsequently moved out of state by a downstream entity (i.e., unbeknownst to the distributor). Mid-sized distributors lack recourse under these rules, and have no meaningful opportunity to provide input or challenge the fee methodology, program incentives, or fee calculations to which they are subject.

62.     NAW's members include mid-sized businesses that fall above the small business exemption threshold under the Act and therefore are subject to the full requirements for producers, while lacking the scale and market leverage that large producers have to offset or adapt materials used in supply chains. Mid-sized producers must also navigate CAA's annual reporting timelines,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

invoice schedules, and packaging redesign pressures, often without internal staff or compliance infrastructure. Mid-sized producers are also functionally excluded from accessing the LCE incentives due to the technical and financial costs of participation. These same factors prohibit these companies from establishing an independent PRO.

63.    As a result, the Act imposes irreparable harm on NAW members, compelling compliance with a regulatory framework in which they face crushing burdens, exercise no consequential voice, and have no meaningful recourse.

## I.    FIRST CAUSE OF ACTION

## (VIOLATION OF NONDELEGATION DOCTRINE)

## (OR. CONST. art. 1, § XXI, art. III, § I, art. IV, § I)

64.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 63.

65.    This case presents an actual controversy between Plaintiff and Defendants EQC and DEQ concerning the constitutionality and legality of Oregon's EPR law. The Act affords the Producer Responsibility Organization—a private entity—broad authority to administer program requirements, including the authority to develop methodology for charging fees against all packaging sold or distributed in the state, award certain incentives, and levy penalties against producers.

66.    The nondelegation doctrine under the Oregon Constitution, derived from Article III, section 1; Article IV, section 1; and Article I, section 21, prohibits the state legislature from delegating its lawmaking function absent (1) clear legislative standards or policies guiding the exercise of delegated authority, and (2) adequate procedural safeguards to protect those subject to an agency's actions. *See City of Damascus v. Brown*, 266 Or. App. 416, 439–443, 337 P.3d 1019, 1031–1033 (Or. Ct. App. 2014) (summarizing Oregon nondelegation doctrine). A delegation to private individuals "further heightens the need for adequate safeguards to protect against arbitrary action." *Id*. at 450; *see also Corvallis Lodge No. 1411 Loyal Order of Moose v. Oregon Liquor Control Commission*, 67 Or. App. 15, 677 P.2d 76 (1984) (invaliding rule as an "improper delegation (or subdelegation) of governmental authority" to private actors).

67.     Here, the Act's delegation of legislative authority to a private, non-governmental entity is not constrained by clear standards or adequate safeguards, and is therefore unlawful. The Act fails to articulate sufficient standards to guide the PRO's extraction of fees from producers, allowing the PRO to adopt a fee methodology that leads to exorbitant, duplicative, and arbitrary fees.

68.     Under the Oregon Constitution, a law must contain "objective legislative standards or a fully expressed legislative policy that guides the exercise of the delegated authority." *Id.* at 441. The Act is devoid of objective standards, and cannot be said to contain a legislative policy that is fully expressed. For example, the Act prescribes no methodology for the calculation of membership fees, requiring only that fees be "sufficient to meet the financial obligations of the organization." OR. REV. STAT. § 459A.884(1).

69.     There are myriad ways under the statute by which the PRO could justify its fees, no matter how exorbitant, discriminatory, or arbitrary. Though the regulations promulgated by EQC discussed above provide certain additional fee guidelines,[7] such regulations do not cure the issues inherent in the underlying legislation nor are they specific enough to adequately constrain CAA. The Oregon legislature, by failing to define key concepts, limits, or priorities for the PRO's exercise of power under these federal programs, has therefore impermissibly ceded fundamental policymaking authority to a private entity, in violation of the Oregon Constitution's nondelegation doctrine.

70.     The Act also fails to provide sufficient procedural safeguards for producers against PRO decision-making. Among other things, the fee methodology is not publicly disclosed and thus could not be subject to public scrutiny or comment. And the legislature did not provide for judicial review of PRO fee assessments. In fact, neither the Act, subsequent regulations, nor the Program

---

[7] The regulations specify recyclable materials eligible for a reduced fee, OR. ADMIN. R § 340-090-0760, set the base fee and waste fees that a PRO must pay to Oregon, OR. ADMIN. R §§ 340-090-0690(2), (3), provide a calculation of "market share" based on item weight and type, OR. ADMIN. R § 340-090-0700(1), identify certain changes to PRO fee structures that require plan amendments, OR. ADMIN. R § 340-090-0750, and require PROs to consider equity and cost burden in setting fees, OR. ADMIN. R § 340-090-0830.

Plan provide any procedure for participating in the determination of or challenging such assessments. Producers seeking to do business in Oregon have no choice but to submit to CAA's directed method of dispute resolution—binding arbitration. *See* Agreement Addendum § 8. Fee assessments are therefore effectively insulated from judicial review, removing a significant check on the power of PROs to arbitrarily or unreasonably assess fees.

## II.        SECOND CAUSE OF ACTION

## (VIOLATION OF DORMANT COMMERCE CLAUSE)

### (U.S. Const., art. I, § 8)

71.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 70.

72.    Article 1, Section 8, Clause 3 of the United States Constitution grants Congress the ability to regulate Commerce within the States. Even in cases where Congress has not spoken, courts may invalidate State actions that discriminate against interstate commerce or otherwise unduly burden interstate commerce. *See South Dakota v. Wayfair, Inc.*, 585 U.S. 162, 172–174 (2018); *see also Oregon Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S. 93, 100 (1994) (invalidating as discriminatory the imposition of higher fees on shippers of Oregon waste). Such "burdens on interstate commerce generally result from inconsistent regulation of activities that are inherently national or require a uniform system of regulation." *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012). Courts may also invalidate regulations with "specific impermissible 'extraterritorial effect'" such as those that "deliberately 'prevent[ed] out-of-state firms] from undertaking competitive pricing' or 'deprive[d] businesses and consumers in other States of 'whatever competitive advantages they may possess.'" *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 374 (2023) (citations omitted).

73.    The Act violates the Dormant Commerce Clause because it discriminates in favor of in-state producers while imposing disproportionate compliance costs on out-of-state businesses. It also unduly burdens interstate commerce by subjecting producers to complex, non-reviewable volume-based fees and reporting obligations determined by the state-specific PRO, unnecessarily creating inconsistent obligations that disrupt the uniformity of an inherently national market.

Finally, the law has an impermissible extraterritorial effect of compelling out-of-state distributors to alter packaging design and sourcing decisions made entirely outside of Oregon.

74.     The Act also burdens interstate commerce because it functions as a state-specific regulatory regime that disrupts the uniformity of national packaging and distribution practices. By requiring tailored compliance efforts for Oregon that do not apply elsewhere and attempting to shift the types of materials used in commerce, the law creates a patchwork of state-specific requirements. This regulatory framework imposes barriers to the free flow of packaged goods across state lines, unduly burdening the operation of a market that routinely crosses state lines and is characterized by national supply chains. The burdens on distributors and other companies operating nationwide are excessive in relation to any putative local benefits, since the disruption to the market cannot be outweighed by speculative or marginal reductions to in-state waste.

75.     The Act also has impermissible extraterritorial effects in violation of the Dormant Commerce Clause because it forces out-of-state producers to make product and packaging design, sourcing, and distribution decisions in a manner consistent with the standards set by CAA. This remains the case even when products are bound for other states, given the realities of national markets and economies of scale. Oregon's program deprives firms of the ability to make competitive decisions, and its attempt to make itself the national regulator of product packing standards violates the extraterritoriality principle of the Dormant Commerce Clause.

### III.    THIRD CAUSE OF ACTION
### (UNCONSTITUTIONAL CONDITIONS)

76.     Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 75.

77.     The Act violates the federal doctrine of unconstitutional conditions as applied to producers' economic liberty and due process rights under the Fourteenth Amendment. The doctrine prohibits the government from coercing individuals into relinquishing constitutional rights in exchange for certain benefits. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) (collecting cases). Oregon's EPR program conditions access to state markets and receipt of fee-related incentives on a producer's agreement to contract with a single private

organization, thereby compelling surrender of constitutional rights such as freedom of contract and due process protections. The CAA contract obligates producers to pay annual fees, calculated by CAA using its propriety and purportedly confidential methodology. The contract provides no meaningful opportunity for members to participate in CAA decision-making or challenge fee schedules. If producers fail to comply with CAA's determinations, they face liquidated damages, audit costs, and potential enforcement referral to DEQ. *See* Agreement Addendum §§ 4.2, 5.6.2, 6.2.8. The contract further binds producers to arbitration. *Id*. at § 8.

78.    The Act therefore impermissibly conditions access to the Oregon market and the receipt of eco-modulated incentives on producers relinquishing core constitutional rights under the Fourteenth Amendment.

79.    Freedom of contract is a recognized economic liberty interest under the federal Due Process Clause. *See Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 572 (1972). The Act, by creating a monopolistic structure wherein there is only one PRO operating in the state, unreasonably restricts producers' freedom of contract. In order to access the market or receive incentives, producers must contract with CAA. Failure to comply with the conditions imposed by CAA via contract may lead to penalties and state enforcement. Producers, and, in particular, structurally disadvantaged mid-sized businesses, have no meaningful ability to negotiate contractual terms. This infringement upon freedom of contract is not rationally related to Oregon's interests in regulating packaging given that, among other things, the same interests could be effected by designing a regulatory scheme that does not effectively require all producers to sign a contract with a single private entity.

80.    The regulatory regime established under the EPR law also requires producers to waive their right to constitutionally adequate procedural protections. In *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Supreme Court established that the federal Due Process Clause affords individuals subject to deprivation of property by the state, the constitutional right to procedural safeguards. The degree of protection depends (1) on the private interest effected, (2) the risk of erroneous deprivation and the value of additional or substitute procedural safeguards, and (3) the

state's interest. *Id.* at 335. The balancing test established by *Mathews* weighs against the adequacy of procedural protections afforded to producers here.

81.     The private interest in access to the Oregon market and freedom from costly fees on the part of producers is substantial. Under the CAA contract, however, producers are provided no meaningful opportunity to opine on or challenge CAA's fee assessments. CAA members are not guaranteed the opportunity to provide comment on the development of fee schedules, and CAA is under no obligation to disclose their fee calculations—indeed, CAA retains a confidential appendix describing its fee methodology. And members must waive any opportunity to litigate disputes in court. All of these factors contribute meaningfully to the outsized risk that CAA will erroneously subject its members to unreasonable or arbitrary fees. The introduction of additional safeguards, such as the right to comment on CAA's methodology or opportunity for judicial review, would provide immense value to producers. Oregon's interest in the efficient administration of the EPR program is not enough to justify ceding, effectively, complete control over the determination of fees to a single, self-interested private organization.

## IV.    FOURTH CAUSE OF ACTION

## (VIOLATION OF DUE PROCESS)

### (U.S. CONST. amend. XIV, OR. CONST. art. I, § 10)

82.     Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 81.

83.     The U.S. Constitution prohibits states from depriving persons of property without due process of law. U.S. Const. amend. XIV. The Oregon Constitution also guarantees "justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation." OR. CONST. art. I, § 10. The procedural due process protections afforded by the "due course of law" provision of the Oregon Constitution are "essentially the same as that of the Fourteenth Amendment." *Carr v. SAIF Corp.*, 65 Or. App. 110, 115, 670 P.2d 1037, 1040 (Or. Ct. App. 1983).

84.     As described above, the regulatory regime established by the EPR law fails to provide adequate procedural protections as required by the Fourteenth Amendment and, thus, as

also required by Article I, Section 10 of the Oregon Constitution. The three-part test established by *Mathews* to assess procedural adequacy under the due process doctrine illustrates this failure. While the private interest in access to the Oregon market and freedom from costly fees on the part of producers is great, producers are afforded scant opportunity to be heard. Under the Program Plan, producers are provided no meaningful opportunity to opine on or challenge CAA's fee assessments. And members must submit to binding arbitration, removing any opportunity for judicial review. All of these factors contribute to the outsized risk that CAA will erroneously subject its members to unreasonable or arbitrary fees. The introduction of additional safeguards, such as the opportunity for notice and comment participation or judicial review, would provide immense value to producers. Oregon's interest in the efficient administration of the EPR program, on the other hand, is not enough to justify ceding, effectively, complete control over the determination of fees to a single, self-interested, private organization.

### PRAYER FOR RELIEF

85.     WHEREFORE, Plaintiff respectfully requests that the Court:

A.     Declare the Act and regulations promulgated thereunder to be invalid and unenforceable pursuant to 28 U.S.C. § 2201;

B.     Issue a permanent injunction enjoining Defendants from implementing or enforcing the Act and regulations promulgated thereunder;

C.     Award Plaintiff such costs of suit and attorney's fees to which Plaintiff may be entitled to by law, including, without limitation, 42 U.S.C. § 1988; and

D.     Award such other relief as the Court deems just and proper.

Date:  July 30, 2025                           BRADLEY BERNSTEIN SANDS LLP

                                               By: */s/ Darin Sands*

                                               Darin Sands, OSB No. 106624
                                               1211 NW Glisan St., Ste 204
                                               Portland, OR 97209
                                               Telephone: +1 503-734-2480

SIDLEY AUSTIN LLP

David R. Carpenter*
drcarpenter@sidley.com
Caleb J. Bowers*
cbowers@sidley.com
Alexandra T. Mushka*
amushka@sidley.com
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213 896 6000
Facsimile: +1 213 896 6600

Gordon D. Todd*
gtodd@sidley.com
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736 8000
Facsimile: +1 202 736 8711

*Pro hac vice applications forthcoming

Attorneys for Plaintiff
NATIONAL ASSOCIATION OF
WHOLESALER-DISTRIBUTORS

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF