Darin Sands, OSB No. 106624
dsands@bradleybernstein.com
BRADLEY BERNSTEIN SANDS LLP
1211 NW Glisan St., Ste 204
Portland, OR 97209
Telephone: +1 503-734-2480

David R. Carpenter*
drcarpenter@sidley.com
Caleb J. Bowers*
cbowers@sidley.com
Alexandra T. Mushka*
amushka@sidley.com
SIDLEY AUSTIN LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213 896 6000
Facsimile: +1 213 896 6600

Gordon D. Todd*
gtodd@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736 8000
Facsimile: +1 202 736 8711

*Pro hac vice*

Attorneys for Plaintiff
NATIONAL ASSOCIATION OF
WHOLESALER-DISTRIBUTORS

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS, <br><br> Plaintiff, <br><br> vs. <br><br> LEAH FELDON, DIRECTOR, OREGON DEPARTMENT OF ENVIRONMENTAL QUALITY, in her official capacity; MATT DONEGAN, KAREN MOYNAHAN, MARK WEBB, AND SILVIA TANNER, in their official | Case No.  3:25-cv-01334-SB <br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

capacities as members of the Oregon
Environmental Quality Commission,

      Defendants.

## INTRODUCTION

1.      Oregon's Plastic Pollution and Recycling Modernization Act (the "Act") seeks to regulate entities across the supply chain and affects virtually every aspect of commerce for products within and entering Oregon—all while delegating essential regulatory authority to a private and unaccountable third-party organization. While the Act is ostensibly intended to promote sustainable life-cycle management, its unprecedented and deeply flawed design in fact produces unreasonable, arbitrary, and crushing burdens, including on wholesalers and distributors who are essential to moving products from manufacturers to Oregon consumers.

2.      The Act mandates that "producers" of product packaging, food serviceware, paper goods, and certain other items join a "producer responsibility organization" (PRO). That PRO—a non-governmental organization—is then granted wide authority to set "eco-modulated" fees associated with a vast range of materials sold or distributed into the state—including newspapers, glass jars, aluminum foil and containers, packing paper and cardboard, nearly three dozen different categories of plastic products, and wood and other organic materials. In other words, the PRO-imposed fees apply to products used in virtually every purchase of goods. As part of this program, each "producer"—e.g., a manufacturer that sells packaged products in Oregon; or a wholesaler or distributor that brings any such product into the state—must register with the PRO; enter into a non-negotiable contract with that PRO; and provide the PRO data about the materials and volumes used in its operations, which the PRO uses to assess fees. These fees may be much greater than wholesalers' or distributors' margins on a product, or even the price of the product itself.

3.      The Act has been referred to as creating an "extended producer responsibility" (EPR) program, but there has never been an EPR program like this. Historically, EPR programs charge an additional fee to address specific products with unique downstream challenges: for example, mattress or carpet purchasers may be charged a collection and disposal fee; or plastic

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

drink bottles may include a recycling "deposit." But those are discrete products with set and transparent fees. The Act here, in contrast, has unprecedented breadth, scope, and complexity, and an utter lack of transparency.

4.      On its face, the Act is entrusted to the Oregon Environmental Quality Commission (EQC) and the Oregon Department of Environmental Quality (DEQ) for administration. In truth, however, despite the Act's transformational nature, EQC and DEQ oversee its implementation and enforcement only tangentially. Rather, the vast majority of program administration is delegated to the PRO, which has been granted wide discretion to apply a confidential methodology for setting fees, to establish other criteria and incentives for certain producers, and to penalize producers of certain materials. What is more, Oregon has approved only a single PRO—the Circular Action Alliance (CAA)—meaning that CAA's terms and conditions, fees, incentives, and penalties are all mandatory.

5.      Entities that registered with the PRO started getting their first "invoices" for fees in July 2025. For many, particularly for small and medium-sized businesses operating on thin margins, the fees were shockingly high, arbitrary, and not sustainable. Indeed, in many cases, the fees *exceed* the margins associated with the product and/or are being imposed on distributors who have neither control over the packaging nor the ability to pass the fees on to those who do.  For these reasons and others, the law has the effect of barring certain products from the Oregon market—or penalizing forms of packaging that are essential for the safe transport of goods in interstate commerce—all at the whim of a non-public entity.

6.      This surprise resulted in significant part from the fact that the PRO's fee-setting methodology has been declared confidential by CAA in its program plan that DEQ approved. It has not been publicly disclosed, debated, subjected to rulemaking, or in any other respect open to inspection. Rather, it has been immunized from public scrutiny or challenge. Additionally, the fees being imposed appear completely arbitrary. In theory, these fees are supposed to estimate, at least in substantial part, a company's share of the costs of a waste management program. But no such program yet exists, and the PRO lacks sufficient data by which to reliably estimate or allocate

those costs. On information and belief, CAA has admitted that it used "very imperfect data" in constructing the Oregon program, and DEQ has not required any reasonable substantiation of CAA's fee-setting methodology or costs.

7.     Moreover, companies commanded to join the PRO and to pay these fees are denied any administrative or judicial process to challenge fee assessments. Instead, any individual producer questioning its assessment must engage in private arbitration with the PRO, pursuant to the terms of the contract it was mandated by law to sign. Further, DEQ has explicitly stated that CAA may change fee schedules without review or approval. And the scheme is prone to duplication and vagueness in the PRO's assessment of fees, with no transparent mechanism for determining how fees are allocated across the supply chain.

8.     Based on these attributes and others, Oregon's program is unconstitutional because it violates:

a.     **Commerce Clause.** The EPR program discriminates against out-of-state producers, unduly burdens national markets for products and packaging, and controls commerce occurring wholly outside of Oregon in violation of the Commerce Clause.

b.     **Unconstitutional Conditions Doctrine.** The program conditions access to the Oregon market and financial incentives on contracts with a third-party— the contracts that producers are required to enter with the sole PRO in Oregon (CAA)—and the terms thereof, requiring producers to waive economic liberty and due process rights.

c.     **Due Process.** The program subjects producers to binding fee assessments and compliance obligations without adequate procedural safeguards. Producers have no meaningful opportunity to provide comment on or challenge CAA's fee determinations, material classifications, or incentive eligibility, and, for resolving disputes, are forced to either accept CAA's determination or submit to binding arbitration.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

     d.      **Equal Protection.** The program irrationally burdens mid-sized producers—those too large to qualify for statutory exemptions yet too small to influence CAA governance or absorb the extreme costs of creating an independent program. It also affords certain privileges to large producers. The law creates a two-tiered regulatory scheme that shields small producers and structurally advantages large producers through access to eco-modulation bonuses and internal influence, while disproportionately disadvantaging mid-sized distributors. This unequal treatment of similarly situated entities lacks any reasonable basis and is not rationally related to any legitimate state interest.

     e.      **Nondelegation Doctrine.** Vesting authority over EPR program administration in a private entity without adequate legislative standards or procedural safeguards constitutes an unlawful delegation in violation of the Oregon Constitution. The violation is compounded when, as here, regulatory authority is vested in an entity with an interest in the program's administration.

9.     Plaintiff accordingly challenges the Act and its implementing regulations as facially unconstitutional, and as-applied to Plaintiff, including Plaintiff's members.

10.     To remedy these violations of Plaintiff's and its members' constitutional and statutory rights, Plaintiff requests this Court to declare the Act and any regulations promulgated thereunder void, to enjoin Defendants from implementing and enforcing the requirements, and to award any other relief appropriate to redress injuries and prevent further unlawful actions by Defendants.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), as the claims arise under the Constitution and laws of the United States. Plaintiff asserts multiple independent federal constitutional claims, including violations of the

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Commerce Clause (U.S. CONST. art. 1, § 8), unconstitutional conditions, and federal due process and equal protection.

12.    This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a), including claims under the nondelegation doctrine and due process provisions of the Oregon Constitution. These claims arise from the same core set of facts and form part of the same case and controversy as the federal claims.

13.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in Oregon, and the state officials and agencies responsible for administering the challenged law are located within this district.

## PARTIES

14.    Plaintiff NAW is a national trade association whose members constitute wholesalers and distributors across the United States, including members that conduct business in Oregon. Founded in 1946, NAW comprises direct member companies and a federation of national, regional, and state associations across 19 commodity lines of trade which together include approximately 35,000 companies operating nearly 150,000 locations throughout the nation.

15.    NAW's members import, distribute, or supply packaged goods into Oregon and are subject to the requirements of the Act.

16.    NAW's members include mid-sized businesses that are integral to regional and national supply chains. These companies typically operate distribution centers, manage inventory, and coordinate logistics across state lines. As part of their operations, many use or distribute packaging materials, or products containing those materials, that fall within the scope of the Act.

17.    NAW's members play a critical role in the supply and movement of goods nationwide, including in Oregon. These business activities require sourcing, handling, and distributing packaged products, including those produced by others, which in certain cases means that NAW's members are considered "producers" under the Act (e.g., because they introduce covered materials into the state).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

18.    The classification of NAW's members as producers under the Act imposes extensive compliance responsibilities on these companies, which often have little or no control over the design or composition of the packaging they distribute, forcing them to shoulder financial and logistical obligations not aligned with their operational role in the product life cycle.

19.    Defendants Matt Donegan, Karen Moynahan, Mark Webb, and Silvia Tanner are members of the Oregon EQC, a five-member body tasked under Oregon law with adopting rules and policies to govern and oversee DEQ's regulatory programs, including the EPR program.[1] *See, e.g.,* OR. REV. STAT. § 468.015. Its members, as stated on Oregon's website, who are subject to change, currently include the named Defendants, with one currently vacant seat. The EQC exercises its authority delegated by the Oregon Legislature to implement environmental policy and directly approved several of the contested regulations implementing the Act.

20.    Defendant Leah Feldon is the director of the DEQ and is sued solely in her official capacity. DEQ is a state agency within the executive branch of the State of Oregon. DEQ is charged with administering and enforcing Oregon's environmental protection statutes, including the Act. DEQ reviews and approves producer responsibility program plans and plan amendments and is provided authority under the Act to inspect and enforce the requirements of the Act. DEQ is headquartered in Portland and operates throughout the State of Oregon. In her official capacity, Defendant Feldon is responsible for administering and enforcing state environmental laws.

## FACTUAL AND LEGAL FRAMEWORK

21.    Enacted in 2021, the Act provides the framework for Oregon's EPR program, administered by DEQ through regulations approved by EQC. These regulations add little to the Act's requirements as concerns producers.

22.    For implementing the requirements of the Act, the state turns to a private third-party organization: the PRO. "Producers" covered under the Act must join an approved PRO or establish their own program, which is cost prohibitive. Indeed, establishing a program is so cost

---

[1] Or. Dep't of Env't Quality, *Environmental Quality Commission Members*, https://www.oregon.gov/deq/about-us/eqc/Pages/EQC-members.aspx?utm_source (last visited October 16, 2025).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

prohibitive that there is only one PRO for Oregon, CAA. As Oregon's only approved PRO, CAA sets requirements and fees for producers through its Oregon Program Plan (2025–2027) ("Program Plan").[2] The statutory and regulatory requirements, and CAA's implementation through the Program Plan, are summarized as follows.

**Statutory Framework**

23.     The Act, codified in Chapter 459A of the Oregon Revised Statutes (Reuse & Recycling), Sections 459A.860–459A.975, mandates that most producers of packaging, paper products, and food serviceware, defined as "covered products," sold into Oregon must join a PRO or develop a stand-alone compliance program. OR. REV. STAT. §§ 459A.863(6)(a), 459.869(1) (2023).

24.     The Act defines "producers" broadly. OR. REV. STAT. §§ 459A.863(22), 459A.866. For packaged items, for example, it includes brand owners and manufacturers that sell packaged items in Oregon; wholesaler and distributors who sell packaged items into Oregon; or alternatively importers into the United States.[3] The Act exempts only the smallest producers with less than $5,000,000 in gross revenue or less than one ton of covered materials per year. *See* OR. REV. STAT. §§ 459A.863(32), 459A.872(1). A PRO must develop a program plan describing "how the producer responsibility organization will manage and administer a producer responsibility program to meet the organization's obligations." *See* OR. REV. STAT. § 459A.875(2)(a).

25.     The Act provides little else describing the rights and responsibilities of producers. The PRO must use "objective and measurable criteria whenever possible" in setting requirements; however, the Act fails to specify what these criteria are—and apparently leaves room for using something *other than* objective and reasonable criteria. *See id.* The Act further fails to prescribe a uniform methodology for fee calculations, leaving significant discretion to the PRO in setting and adjusting producer fees, subject only to broad statutory guidelines and limited regulatory oversight.

---

[2] Circular Action Alliance, *Oregon Producer Responsibility Program Plan* (2025–2027), (Feb. 21, 2025) (approved by Or. Dep't of Env't Quality) ("Program Plan"), https://www.circularactionalliance.org/oregon.
[3] Retailers are otherwise excluded from the definition.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Instead of telling producers what they must pay, the Act vests the PRO with the authority to establish and collect membership fees from participating producers. OR. REV. STAT. § 459A.884(1).

26.    The only fee methodology specified in the Act is that the PRO must provide a base fee structure that charges lower fees for recyclable covered products and higher fees for non-recyclables, with the base fee rate "approximately proportional to the covered products' relative contribution to the financial obligations of the producer responsibility organization." OR. REV. STAT. § 459A.884(3)(b). The statute mandates "eco-modulation" of fees to incentivize producers to reduce the environmental and human health impacts of their products, requiring fee adjustments for producers who make qualifying changes to their packaging. OR. REV. STAT. § 459A.884(4).

27.    Notably, the statute does not require comprehensive economic impact analysis for all affected businesses, does not provide for direct public or small business representation in PRO governance, and does not directly regulate retailers selling covered products.

28.    A recurring aspect of the statutory requirements is that the *PRO* is the entity responsible to "ensure," "provide," and "describe" the numerous components of program implementation. *See* OR. REV. STAT. § 459A.875. DEQ is the designated agency for administering the EPR program, with authority to approve or reject PRO program plans, enforce compliance, and impose civil penalties of up to $25,000 per day for violations. OR. REV. STAT. §§ 459A.878, 459A.962, 468.130. However, recourse for producers who disagree with the PRO is limited to binding arbitration with the PRO, as discussed further below.

29.    Beginning July 1, 2025, all obligated producers—including wholesalers and distributors—were required to begin paying program fees, which are paid to CAA as the sole PRO for Oregon. OR. REV. STAT. § 459A.875.

**<u>Oregon Regulations</u>**

30.    EQC is the administrative body charged with approving regulations issued under the Act, while DEQ is the regulatory agency responsible for approving PRO plans. OR. ADMIN. R. ch. 340, div. 90 (2023).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

31.    The EQC-approved regulations implementing the Act are contained in OR. ADMIN. R. §§ 340-090-0600 to -0940. The regulations focus on recycling goals rather than determining the responsibilities of producers—the authority for which is abdicated to the PRO.[4]

32.    Oregon's regulations charge the PRO with setting producer membership fees based on the weight and type of covered products sold or distributed in Oregon, in short, based on "market share." OR. ADMIN. R. § 340-090-0700(1). The regulations further allow the PRO discretion to offer "other fee adjustments to its member producers." OR. ADMIN. R. § 340-090-0910(3)(c); *see also* OR. REV. STAT. § 459A.884(4). Notably, while the regulations require PROs to implement eco-modulated or graduated fees that reflect environmental impact, they do not prescribe any specific methodology, thresholds, or performance standards for how such fees must be calculated or applied, providing minimal regulatory guardrails.

33.    Likewise, during the public rulemaking process, DEQ clarified that routine adjustments to financial incentives, including individual bonuses or eco-modulation credits, do not require program plan amendments.[5]

34.    The regulations also empower the PRO to make unilateral fee adjustments—i.e., without DEQ approval. A PRO may revise fees, revise material cost allocations, and change any fee adjustments granted to individual producers, without proposing a program plan amendment for DEQ's approval. OR. ADMIN. R. §§ 340-090-0750(1), (2). The PRO must only seek DEQ approval if establishing "[a]lternate approaches" to membership fees. OR. ADMIN. R. § 340-090-0750(2).

35.    The regulations also incorporate the concept of life cycle evaluations (LCEs), which the PRO uses to provide incentives and potential reductions in fees owed to the PRO. *See* OR. ADMIN. R. § 340-090-0900 to -0930; *see also* OR. REV. STAT. § 459A.863(8). However, the

---

[4] For example, the regulations set performance standards for the collection and responsible recycling of covered products (§ 340-090-0650), collection targets (§ 340-090-0660), determine what constitutes a responsible "end market" for covered products (§ 340-090-0670), and set a base fee and "waste prevention and reuse fee" that the PRO must pay (§§ 340-090-0690(2), (3)).
[5] According to DEQ, only structural changes to fee methodology or the magnitude of penalties would trigger further review. *See* Or. Dep't of Env't Quality, *Recycling Updates 2023. Rulemaking,* https://www.oregon.gov/deq/rulemaking/Pages/Recycling2023.aspx (last visited July 20, 2025).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

burden of undertaking an LCE bars many companies from undertaking them, potentially skewing application and enforcement of the program.

36.    The Act, as well as EQC and DEQ's lack of specificity in defining program requirements, and lack of oversight related to the PRO's implementation and modification of fees charged to producers under the Act, establishes a fee structure that is both opaque and effectively insulated from regulatory scrutiny.

37.    The regulatory process lacks robust mechanisms for public input and agency oversight regarding changes to eco-modulation bonus criteria, except in cases of certain programmatic changes, such as changes to the PRO's overarching fee framework. This lack of procedural oversight limits transparency and accountability in the development and modification of incentive structures—which are key to calculating fees ultimately charged to producers. Furthermore, by permitting the PRO to make material changes to the fee schedule without meaningful agency review or oversight, the Act and the regulations issued thereunder delegate authority to a private entity, CAA, without providing adequate guidance or safeguards.

38.    Indeed, in the rulemaking process, DEQ acknowledged that it was not in a position to determine the overall fiscal impacts of the EPR program; further, DEQ did not require any economic impact analysis on businesses beyond a limited assessment for small businesses. Or. Env't Quality Comm'n, Statement of Fiscal and Economic Impact, EQC 2023-11 Item G (Nov. 2023).

39.    DEQ's administration of the EPR program fails to provide meaningful procedural safeguards under the Act regarding eco-modulation bonuses and other financial incentives. In particular, CAA is permitted to adjust fee inputs and reward structures without requiring program plan amendments, unless changes are deemed "substantive." As a result, DEQ has explicitly removed itself from direct approval of most future changes to the PRO's incentive structure, and adds no safeguards that would correct the Act's deficiencies in delegating program implementation to a third party.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

40.    In sum, Oregon's regulatory program fails to prescribe sufficient standards for setting fees and leaves CAA with broad discretion to define and adjust fees using internal cost modeling and various other factors determined by CAA, subject to change within CAA's discretion.

**CAA Program Plan**

41.    As discussed above, CAA, a private non-profit entity, is the only approved PRO in Oregon.

42.    The Act charges CAA with responsibility for calculating and collecting producer fees. The details of this process supposedly are provided in CAA's Program Plan. However, producers do not know all these details, because CAA has provided that its fee methodology is "confidential" for DEQ's eyes only (illustrated below).

43.    Appendix G of the Program Plan, *Detailed Fee-Setting Methodology*, "has been shared with DEQ separately":



circularactionalliance.org

**Appendix G:**

**Detailed Fee-Setting Methodology**

*(confidential)*

Appendix G is confidential and has been shared with DEQ separately.

44.    Producers have no recourse to challenge CAA's fee methodology—whatever that methodology is—contained in this "confidential" appendix.

45.    Further, the public version of the CAA plan discloses only a *draft* fee schedule for different materials. To Plaintiff's knowledge, a "final" fee schedule has *never* been publicly disclosed or subject to public notice and comment and approval by DEQ.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

46.    In joining CAA, as producers are effectively required to do, producers are bound by the terms of the Program Plan and must agree to CAA's Participant Producer Agreement ("Producer Agreement") as well as the Oregon Addendum to the Participant Producer Agreement ("Agreement Addendum"), which govern CAA's administration of the Oregon EPR program.

47.    Under Oregon's EPR program, as discussed above, CAA is empowered to:

- Administer the compliance program;
- Set and assess producer fees;
- Create packaging recyclability criteria and benchmarks;
- Manage performance incentives and penalties.

48.    The financial and logistical burdens of forming a new PRO are prohibitive, so joining CAA is the only viable option for most producers. For example, DEQ charges a $150,000 fee per plan submission, which does not include legal, consulting, or operational costs needed to develop the plan—only the fee to have DEQ evaluate it. *See* OR. ADMIN. R. § 340-090-0690. A PRO must also represent at least 10% of the total market share of covered products in Oregon to be eligible for approval. OR. REV. STAT. § 459A.869(12). And, among other responsibilities, a PRO must meet statutory obligations to finance collection, transportation, and responsible end-market processing. OR. REV. STAT. §§ 459A.890–896.

49.    The statutory and regulatory framework provided for Oregon's EPR program, and the authority vested in CAA (as the sole PRO), creates a captive compliance environment with little to no competition or oversight.

*50.*    For the initial program period (2025–2027), CAA's Program Plan describes the basic fee structure imposed on producers, which includes a base fee algorithm applied across more than 60 material categories, with fees tied to the type, weight, and recyclability of each packaging material reported by producers. Program Plan at 191–198, Table 20.[6] The plan also incorporates

---

[6] Specifically, CAA calculates fees using a base fee algorithm for its 60 material categories of packaging. Each material category is assigned a per-pound rate, which is intended to reflect the cost of collection, transportation, processing, and infrastructure investment. The basic calculation is: Producer Fee = (Base Rate) x (Weight of Material Supplied). Program Plan, *supra*, at 191.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

eco-modulated adjustments, providing "bonuses" or "incentives" for select producers, including those who perform the LCE process discussed above. *Id.* at 210–215. But because the costs of performing a LCE are prohibitively high, these adjustments are scarcely accessible to NAW's members.

51.     CAA's methodology is not externally vetted and lacks DEQ-imposed constraints. *Id.* at 195.

52.     CAA's Program Plan, consistent with the program authorities discussed above, allows CAA to apply eco-modulated adjustments for packaging that it considers more environmentally burdensome (e.g., multi-layer plastic film that is not on Oregon's Uniform Statewide Collection List). *Id*. at 194. Packaging that CAA deems more burdensome incurs higher fees, while recyclables or low-impact packaging may qualify for discounts. *Id.* at 191.

53.     CAA has broad discretion to revise fee schedules, reclassify materials, and adjust cost assumptions annually. Routine changes—including updates to cost inputs and supply weights—do not require DEQ approval or public comment. *See* DEQ, *Recycling Updates 2023*, *supra* at 21.

54.     Furthermore, as discussed above, the Act provides minimal constraints on PRO decision-making and fee-setting. The Program Plan and Agreement Addendum reflect CAA's discretionary authority, including the power to impose audit costs on participating producers.

55.     For instance, the Agreement Addendum provides that "CAA Oregon shall bear the cost of any such audit unless such audit reveals a discrepancy of the lower of 5% or $100,000, in which case [the] Company shall bear the reasonable, documented expenses of such audit." *See* Agreement Addendum § 4.2. This arrangement places the burden of enforcement costs on producers with little procedural protection or opportunity to contest CAA's determinations.

56.     The Producer Agreement and Agreement Addendum further bind producers while failing to provide any meaningful recourse to challenge CAA's rules, interpretations, or conclusions regarding program administration. The Program Plan and Agreement Addendum fail to provide any formal process for producers to appeal or challenge fee assessments, adjustments,

or categorization. Producers are obligated to comply or face liquidated damages, audit costs, and potential enforcement referrals to DEQ. *See* Agreement Addendum §§ 4.2, 5.6.2, 6.2.8.

57.     The Agreement Addendum further provides, "**Dispute Resolution.** If resolution cannot be reached by the Parties through good faith efforts to resolve any dispute themselves or through non-binding mediation, any dispute, controversy, or claim arising out of or relating to this Oregon Addendum, including the interpretation, scope, or breach thereof or the extent of the Parties' obligations under the Oregon EPR Law, shall be resolved by binding arbitration." Agreement Addendum § 8.

58.     The final approved CAA Program Plan leaves significant discretion to CAA in setting and adjusting fees, with limited DEQ oversight of annual fee updates. Moreover, the dispute resolution and compliance processes provided are largely internal to the PRO structure, with binding arbitration the only recourse after CAA's internal remedies have been exhausted. The plan lacks robust mechanisms for ongoing public input or agency review of changes to key program elements, such as the eco-modulation criteria or the addition of new covered materials.

59.     Regional and mid-sized companies have extremely limited, if any, influence within the PRO structure. The Oregon program's complexity, lack of transparency, and concentration of authority in a single PRO create a system in which mid-sized businesses are exposed to disproportionate financial and operational burdens.

**Impacts to Plaintiff and Its Members**

60.     NAW's members include mid-sized businesses integral to regional and national supply chains. These companies operate distribution centers, manage inventory, and coordinate logistics across state lines, involving all types of packaging materials used in supply chains and by manufacturers and others—over which NAW's members have no control. Yet, these companies may still be charged with responsibility as "producers" under the Act.

61.     As producers, NAW's members are subject to the reporting, fee assessment, and packaging modification requirements imposed by Oregon's EPR program. This includes the obligation to register with CAA as the sole approved PRO, calculate and report the weights of all

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

packaging sold into Oregon, and pay fees based on material-specific rates and environmental impact modifiers—as well as comply with any of the calculations or requirements discussed in CAA's "confidential" fee appendix to the Program Plan. The lack of publicly available information and time for coordination among regulated parties before being charged fees means, among other things, that distributors and others in the supply chain have difficulty discerning the producer for a particular product.

62.    Oregon's program pushes responsibility for determining who should comply onto a hierarchy of "producer" companies for each product. Due to this structure and the lack of publicly available information from CAA, NAW members face significant challenges in coordinating with manufacturers, suppliers, customers, and other potential producers to determine products covered by Oregon's program and which entity should bear responsibility for reporting and fees. And that structure, along with CAA's failed implementation of the requirements, further means that companies who attempt to comply in good faith are punished when others in the supply chain shirk their obligations. This system, in turn, increases NAW members' potential liability and compliance obligations.

63.    The realities of modern interstate commerce further complicate the determination of producer responsibilities. In many cases, it is unclear whether products that arrive in Oregon remain there. Members are forced to trace (or attempt to trace) products through supply chains on an individual product, supplier, and customer basis, and to negotiate compliance with upstream and downstream entities. If others in the supply chain refuse to comply, then members are left with the impossible choice of either (a) reporting products for which they are not the primary producer in the state, with the resulting fee obligation, or (b) declining to report those products and thereby increasing the risk that DEQ or CAA will pursue enforcement against the NAW member. NAW members affected by the Act may also be inappropriately charged fees, or charged fees for products subsequently moved out of state by a downstream entity (i.e., unbeknownst to the distributor). Especially for mid-sized distributors, being left "holding the bag" of producer fees that should be paid by upstream entities—the ones who control materials and product decisions—also means

those fees may exceed profit margins or require large cost increases. These mid-sized distributors lack recourse under Oregon's rules, and have no meaningful opportunity to provide input or challenge the fee methodology, program incentives, or fee calculations to which they are subject.

64.    Since the Act took effect, companies have not received explanations of invoices and fee calculations. The lack of information and retrospective nature of EPR program fees also means that companies are unable to project and adjust costs to plan for annual fees. Members cannot calculate the program's financial impact or accrue the amounts necessary to pay fees in a given year because EPR fees are calculated based on past sales. Especially because distributors have little or no control over decisions that suppliers and customers make regarding product orders, these distributors cannot predict future sales or product mix and therefore cannot project current-year impacts or adjust pricing to ensure they can cover program costs.

65.    NAW's members include mid-sized businesses that fall above the small business exemption threshold under the Act and therefore are subject to the full requirements for producers, while lacking the scale and market leverage that large producers have to offset or adapt materials used in supply chains. There is a risk of losing customers to competitors who are exempt or have greater control over which products and materials are sold and purchased in the state. This lack of control—coupled with the hierarchical nature of Oregon's producer responsibility—also means that suppliers may invoice NAW members for EPR-related costs, forcing members to pass those fees on to customers or attempt to absorb the costs. And, mid-sized producers must navigate CAA's annual reporting timelines, invoice schedules, and packaging redesign pressures, often requiring excessive staff time in relation to these companies' staffing and compliance infrastructure. Mid-sized producers are also functionally excluded from accessing the LCE incentives due to the technical and financial costs of participation. These same factors prohibit these companies from establishing an independent PRO.

66.    NAW members are experiencing conflicting and unsustainable demands under Oregon's EPR program. Some distributors have declined to send products into Oregon because EPR program fees exceed profit margins. Members have also identified conflicting regulatory

requirements between Oregon's EPR program and forthcoming EPR programs in other states, which will exacerbate the difficulties members have already experienced in applying EPR to interstate supply networks. For example, NAW has learned that certain product packaging treated as curbside recyclable in Oregon is being classified by Oregon's PRO as hazardous waste and assessed high fees of $2.05 to $2.73 per pound. Program Plan at 199–203. By contrast, another proposed PRO program[7] would have assessed the same type of packaging at only $0.019 to $0.078 per pound. As another example, the U.S. Food and Drug Administration (FDA) recognizes Polystyrene as food-contact safe material[8], yet Oregon's EPR program classifies it as non-recyclable and subjects it to some of the highest fees in the schedule— ranging from $1.94 to $2.58 per pound, consistent with materials deemed toxic or hazardous. These program characteristics and others illustrate the program's excessive and discriminatory burden on certain producers and on interstate commerce.

67.    Oregon's approved program fee structure disincentivizes packaging materials that are encouraged or required under other federal or state programs, creating conflicting regulatory demands and placing NAW members at a competitive disadvantage. As a result, the Act imposes irreparable harm on NAW members, mandating compliance with a regulatory framework in which they face crushing burdens, exercise no consequential voice, and have no meaningful recourse.

## I.    FIRST CAUSE OF ACTION

## (VIOLATION OF DORMANT COMMERCE CLAUSE)

### (U.S. Const., art. I, § 8)

68.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 67.

69.    Article 1, Section 8, Clause 3 of the United States Constitution grants Congress the ability to regulate Commerce within the States. Even in cases where Congress has not spoken, courts may invalidate State actions that discriminate against interstate commerce or otherwise

---

[7] LPMA Fee Schedule (April 1, 2025), Interchange 360 (Apr. 2025), https://interchange360.com/wp-content/uploads/2025/04/LPMA-Fee-Schedule-April-2025.pdf. (The Lubricant Packaging Management Association is a non-profit EPR compliance agency). The provided fees per gallon have been converted to fees per pound.
[8] 21 C.F.R. § 177.1640.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

unduly burden interstate commerce. *See South Dakota v. Wayfair, Inc.*, 585 U.S. 162, 172–174 (2018); *see also Oregon Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S. 93, 100 (1994) (invalidating as discriminatory the imposition of higher fees on shippers of Oregon waste). Such "burdens on interstate commerce generally result from inconsistent regulation of activities that are inherently national or require a uniform system of regulation." *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012). Courts also invalidate state laws that, while facially neutral, impose burdens on interstate commerce that are clearly excessive in relation to the putative local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Courts may also invalidate regulations with "specific impermissible 'extraterritorial effect'" such as those that "deliberately 'prevent[ed out-of-state firms] from undertaking competitive pricing' or 'deprive[d] businesses and consumers in other States of 'whatever competitive advantages they may possess.'" *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 374 (2023) (citations omitted).

70.    The Act violates the Dormant Commerce Clause because it discriminates in favor of in-state producers while imposing disproportionate compliance costs on out-of-state businesses. For example, out-of-state businesses must disaggregate Oregon-bound products from shipments with other destinations to ensure traceability. This disaggregation imposes higher costs to adapt logistics and reporting systems that serve national and regional shipments, compared with in-state producers. It also unduly burdens interstate commerce by subjecting producers to complex, non-reviewable volume-based fees and reporting obligations determined by the state-specific PRO, unnecessarily creating inconsistent obligations that disrupt the uniformity of an inherently national market. Oregon's PRO structure fails to provide certainty around product end-markets, which disproportionately impacts national or regional supply chains that cannot always track distribution movement after products initially enter Oregon. Thus, out-of-state businesses are more likely to be double-charged or erroneously treated as the responsible producer. Finally, the law has an impermissible extraterritorial effect of compelling out-of-state distributors to alter packaging design and sourcing decisions made entirely outside of Oregon.

71.    The Act also burdens interstate commerce because it functions as a state-specific regulatory regime that disrupts the uniformity of national packaging and distribution practices. Products passing through Oregon but destined elsewhere result in overcounting of covered products because upstream entities cannot track where customers send products. By requiring tailored compliance efforts for Oregon that do not apply elsewhere and attempting to shift the types of materials used in commerce, the law creates a patchwork of state-specific requirements. As described above, some distributors have declined to sell products into Oregon because the program fees exceed profit margins, effectively excluding them from the Oregon market. NAW members have expended excessive resources—in some cases, including hundreds of hours and dozens of staff members—on compliance to communicate and negotiate compliance obligations with other companies (i.e., due to uncertainties in Oregon's hierarchical program), trace products, and attempt to estimate and recoup costs paid for fees in the state, among other impacts. This regulatory framework imposes barriers to the free flow of packaged goods across state lines, unduly burdening the operation of a market that routinely crosses state lines and is characterized by national supply chains.

72.    As a result, interstate commerce is unduly burdened as distributors must alter distribution pathways or segregate inventory by destination state, increasing operational complexity. The burdens on distributors and other companies operating nationwide are excessive in relation to any putative local benefits, since the disruption to the market cannot be outweighed by speculative or marginal reductions to in-state waste.

73.    The Act also has impermissible extraterritorial effects in violation of the Dormant Commerce Clause because it forces out-of-state producers to make product and packaging design, sourcing, and distribution decisions in a manner consistent with the standards set by CAA. This remains the case even when products are bound for other states, given the realities of national markets and economies of scale. Oregon's program deprives firms of the ability to make competitive decisions, burdens market entry, and its attempt to make itself the national regulator

of product packing standards violates the extraterritoriality principle of the Dormant Commerce Clause.

## II.      SECOND CAUSE OF ACTION
## (UNCONSTITUTIONAL CONDITIONS)

74.      Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 73.

75.      The Act violates the federal doctrine of unconstitutional conditions as applied to producers' economic liberty and due process rights under the Fourteenth Amendment. The doctrine prohibits the government from coercing individuals into relinquishing constitutional rights in exchange for certain benefits. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) (collecting cases). Oregon's EPR program conditions access to state markets and receipt of fee-related incentives on a producer's agreement to contract with a single private organization, thereby compelling surrender of constitutional rights such as freedom of contract and due process protections. The CAA contract obligates producers to pay annual fees, calculated by CAA using its propriety and purportedly confidential methodology. The contract provides no meaningful opportunity for members to participate in CAA decision-making or challenge fee schedules. If producers fail to comply with CAA's determinations, they face liquidated damages, audit costs, and potential enforcement referral to DEQ. *See* Agreement Addendum §§ 4.2, 5.6.2, 6.2.8. The contract further binds producers to arbitration. *Id*. at § 8.

76.      The Act therefore impermissibly conditions access to the Oregon market and the receipt of eco-modulated incentives on producers relinquishing core constitutional rights under the Fourteenth Amendment.

77.      Freedom of contract is a recognized economic liberty interest under the federal Due Process Clause. *See Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 572 (1972). The Act, by creating a monopolistic structure wherein there is only one PRO operating in the state, unreasonably restricts producers' freedom of contract. In order to access the market or receive incentives, producers must contract with CAA. Failure to comply with the conditions imposed by CAA via contract may lead to penalties and state enforcement. Producers, and, in particular,

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

structurally disadvantaged mid-sized businesses, have no meaningful ability to negotiate contractual terms. This infringement upon freedom of contract is not rationally related to Oregon's interests in regulating packaging given that, among other things, the same interests could be effected by designing a regulatory scheme that does not effectively require all producers to sign a contract with a single private entity.

78.    The regulatory regime established under the EPR law also requires producers to waive their right to constitutionally adequate procedural protections. In *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Supreme Court established that the federal Due Process Clause affords individuals subject to deprivation of property by the state, the constitutional right to procedural safeguards. The degree of protection depends (1) on the private interest effected, (2) the risk of erroneous deprivation and the value of additional or substitute procedural safeguards, and (3) the state's interest. *Id.* at 335. The balancing test established by *Mathews* weighs against the adequacy of procedural protections afforded to producers here.

79.    The private interest in access to the Oregon market and freedom from costly fees on the part of producers is substantial. Under the CAA contract, however, producers are provided no meaningful opportunity to opine on or challenge CAA's fee assessments. CAA members are not guaranteed the opportunity to provide comment on the development of fee schedules, and CAA is under no obligation to disclose their fee calculations—indeed, CAA retains a confidential appendix describing its fee methodology. And members must waive any opportunity to litigate disputes in court. All of these factors contribute meaningfully to the outsized risk that CAA will erroneously subject its members to unreasonable or arbitrary fees. The introduction of additional safeguards, such as the right to comment on CAA's methodology or opportunity for judicial review, would provide immense value to producers. Oregon's interest in the efficient administration of the EPR program is not enough to justify ceding, effectively, complete control over the determination of fees to a single, self-interested private organization.

### III.    THIRD CAUSE OF ACTION

### (VIOLATION OF DUE PROCESS)

### (U.S. CONST. amend. XIV, OR. CONST. art. I, § 10)

80.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 79.

81.    The U.S. Constitution prohibits states from depriving persons of property without due process of law. U.S. Const. amend. XIV. The Oregon Constitution also guarantees "justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation." OR. CONST. art. I, § 10. The procedural due process protections afforded by the "due course of law" provision of the Oregon Constitution are "essentially the same as that of the Fourteenth Amendment." *Carr v. SAIF Corp.*, 65 Or. App. 110, 115, 670 P.2d 1037, 1040 (Or. Ct. App. 1983).

82.    As described above, the regulatory regime established by the EPR law fails to provide adequate procedural protections as required by the Fourteenth Amendment and, thus, as also required by Article I, Section 10 of the Oregon Constitution. The three-part test established by *Mathews* to assess procedural adequacy under the due process doctrine illustrates this failure.

83.    While the private interest in access to the Oregon market and freedom from costly fees on the part of producers is great, producers are afforded scant opportunity to be heard. CAA has refused to provide meaningful guidance in response to members' questions about their obligations and fees. For example, NAW members have attempted to dispute invoices—and even perform ministerial tasks like updating company recipients of notice—and have received either no meaningful response from CAA or are still waiting for responses (e.g., after weeks). Under the Program Plan, producers are provided no meaningful opportunity to opine on or challenge CAA's fee assessments. And members must submit to binding arbitration, removing any opportunity for judicial review. NAW members have also been informed that they must sign CAA's standard contract *as-is* to be eligible to report, with no negotiation permitted on key provisions such as auditing and back charging—provisions which would otherwise be negotiable in any commercial

context. To maintain market access, companies have no choice but to sign the CAA agreement and forgo meaningful recourse.

84.     The EPR program establishes an arbitrary and opaque fee-setting scheme, making it exceedingly difficult—if not impossible—for regulated entities to predict or verify the basis for their financial obligations. Fees are calculated using past sales data, while companies lack visibility into future sales, making it impossible to project economic impacts accurately. Regulated entities have not received detailed breakdowns of fee obligations and are unable to determine their obligations sufficiently to accrue funds and pay for those obligations in the ordinary course of business.

85.     All of these factors contribute to the outsized risk that CAA will erroneously subject its members to unreasonable or arbitrary fees. The introduction of additional safeguards, such as the opportunity for notice and comment participation or judicial review, would provide immense value to producers. Oregon's interest in the efficient administration of the EPR program, on the other hand, is not enough to justify ceding, effectively, complete control over the determination of fees to a single, self-interested, private organization.

### IV.    FOURTH CAUSE OF ACTION
### (VIOLATION OF EQUAL PROTECTION)
### (U.S. CONST. amend. XIV, OR. CONST. art. I, § 20)

86.     Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 85.

87.     The U.S. Constitution prohibits states from denying equal protection of the law. U.S. CONST. amend. XIV. The Oregon Constitution further guarantees that "[n]o law shall be passed *granting* to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens." OR. CONST. art. I, § 20 (emphasis added). The "provisions of the state Constitution are the antithesis of the fourteenth amendment in that they prevent the enlargement of the rights of some in discrimination against the rights of others, while the fourteenth amendment prevents the curtailment of rights." *City of Klamath Falls v. Winters*, 289 Or. 757, 774–775, 619 P.2d 217, 227 (1980) (internal quotation marks and citation omitted).

88.    The Act violates the Equal Protection Clause of the Fourteenth Amendment by imposing disproportionate regulatory burdens on mid-sized wholesalers and distributors because this class of producers fall above the statutory exemption thresholds but lack the market power and internal infrastructure of large producers. It further violates the Oregon Constitution by granting certain privileges exclusively to large producers.

89.    Small producers are explicitly exempt from the EPR program if they have less than $5,000,000 in gross revenue or supply under one ton of covered materials annually. OR. REV. STAT. §§ 459A.863(32), 459A.872(1).

90.    At the other end of the spectrum, large producers—i.e., those that are among the 25 largest producers based on market share, OR. REV. STAT. § 459A.863(8)—benefit not only from economies of scale but also from incentive structures embedded in the program. The Program Plan allows producers to receive fee reductions (or bonuses) for conducting LCEs and changing their product packaging. Only large producers are required to conduct these LCEs, which are expensive and therefore also preclude participation by smaller entities. Furthermore, the Program Plan requires all producers to contribute, in advance, a portion of fees that will be used to fund these fee reductions, meaning that mid-sized producers effectively must subsidize larger producers. Program Plan at 216–217. Therefore, the bonus system presents a structural skew in favor of large producers. This incentive structure operates as a regressive burden, disproportionately harming mid-sized entities.

91.    Mid-sized businesses are uniquely disadvantaged. They are too large to qualify for an exemption but too small to influence the CAA fee-setting process. These mid-sized entities are left to absorb complex and escalating costs without meaningful input, recourse, or cost-shifting ability. For example, mid-sized distributors do not control supplier or purchaser decisions regarding the types and materials of products manufactured, sold, and purchased in Oregon, but often have EPR fees shifted to them by upstream entities. In addition to contractual shifting of costs (e.g., due to a disparity in bargaining power), for example, a national manufacturer selling identical plastic containers and a regional distributor reselling those containers into Oregon may

both be classified as producers, yet only the distributor may be held accountable for fees because the upstream manufacturer is located out-of-state and unregistered with CAA.  Furthermore, in some cases, mid-sized distributors also manage large product catalogues, meaning they must expend excessive resources to assess compliance obligations and track product movement. Mid-sized companies often pay materially higher fees than large producers due to the fee-shifting permitted by Oregon's law and economies of scale in reporting, auditing, and life-cycle assessments. Similarly, large producers can absorb or pass through EPR costs, while mid-sized distributors cannot, resulting in customer flight or lost contracts and profits.

92.    The structure of Oregon's law results in similarly situated producers—those selling comparable products into Oregon—being treated differently based solely on scale, without a rational connection to the State's policy goals.

93.    The unequal treatment of mid-sized businesses under the Act serves no legitimate governmental interest. Oregon's goals of increasing recyclability and reducing packaging waste could be achieved through uniform, transparent, and proportionate compliance obligations. Instead, the law creates a system that incentivizes large-producer dominance and shields small producers entirely, leaving mid-sized companies to carry a disproportionate share of the compliance burden.

## V.    FIFTH CAUSE OF ACTION

## (VIOLATION OF NONDELEGATION DOCTRINE)

## (OR. CONST. art. 1, § XXI, art. III, § I, art. IV, § I)

94.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 93.

95.    This case presents an actual controversy between Plaintiff and Defendants EQC and DEQ concerning the constitutionality and legality of Oregon's EPR law. The Act affords the Producer Responsibility Organization—a private entity—broad authority to administer program requirements, including the authority to develop methodology for charging fees against all packaging sold or distributed in the state, award certain incentives, and levy penalties against producers.

96.     The nondelegation doctrine under the Oregon Constitution, derived from Article III, section 1; Article IV, section 1; and Article I, section 21, prohibits the state legislature from delegating its lawmaking function absent (1) clear legislative standards or policies guiding the exercise of delegated authority, and (2) adequate procedural safeguards to protect those subject to an agency's actions. *See City of Damascus v. Brown*, 266 Or. App. 416, 439–443, 337 P.3d 1019, 1031–1033 (Or. Ct. App. 2014) (summarizing Oregon nondelegation doctrine). A delegation to private individuals "further heightens the need for adequate safeguards to protect against arbitrary action." *Id*. at 450; *see also Corvallis Lodge No. 1411 Loyal Order of Moose v. Oregon Liquor Control Commission*, 67 Or. App. 15, 677 P.2d 76 (1984) (invaliding rule as an "improper delegation (or subdelegation) of governmental authority" to private actors).

97.     Here, the Act's delegation of legislative authority to a private, non-governmental entity is not constrained by clear standards or adequate safeguards, and is therefore unlawful. The Act fails to articulate sufficient standards to guide the PRO's extraction of fees from producers, allowing the PRO to adopt a fee methodology that leads to exorbitant, duplicative, and arbitrary fees.

98.     Under the Oregon Constitution, a law must contain "objective legislative standards or a fully expressed legislative policy that guides the exercise of the delegated authority." *Id*. at 441. The Act is devoid of objective standards, and cannot be said to contain a legislative policy that is fully expressed. For example, the Act prescribes no methodology for the calculation of membership fees, requiring only that fees be "sufficient to meet the financial obligations of the organization." OR. REV. STAT. § 459A.884(1).

99.     There are myriad ways under the statute by which the PRO could justify its fees, no matter how exorbitant, discriminatory, or arbitrary. Though the regulations promulgated by EQC discussed above provide certain additional fee guidelines,[9] such regulations do not cure the

---

[9] The regulations specify recyclable materials eligible for a reduced fee, OR. ADMIN. R § 340-090-0760, set the base fee and waste fees that a PRO must pay to Oregon, OR. ADMIN. R §§ 340-090-0690(2), (3), provide a calculation of "market share" based on item weight and type, OR. ADMIN. R § 340-090-0700(1), identify certain changes to PRO fee structures that require plan

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

issues inherent in the underlying legislation nor are they specific enough to adequately constrain CAA. The Oregon legislature, by failing to define key concepts, limits, or priorities for the PRO's exercise of power under these federal programs, has therefore impermissibly ceded fundamental policymaking authority to a private entity, in violation of the Oregon Constitution's nondelegation doctrine.

100.    The Act also fails to provide sufficient procedural safeguards for producers against PRO decision-making. Among other things, the fee methodology is not publicly disclosed and thus could not be subject to public scrutiny or comment. And the legislature did not provide for judicial review of PRO fee assessments. In fact, neither the Act, subsequent regulations, nor the Program Plan provide any procedure for participating in the determination of or challenging such assessments. Producers seeking to do business in Oregon have no choice but to submit to CAA's directed method of dispute resolution—binding arbitration. *See* Agreement Addendum § 8. Fee assessments are therefore effectively insulated from judicial review, removing a significant check on the power of PROs to arbitrarily or unreasonably assess fees.

## PRAYER FOR RELIEF

101.    WHEREFORE, Plaintiff respectfully requests that the Court:

A.    Declare the Act and regulations promulgated thereunder to be invalid and unenforceable pursuant to 28 U.S.C. § 2201;

B.    Issue a permanent injunction enjoining Defendants from implementing or enforcing the Act and regulations promulgated thereunder;

C.    Award Plaintiff such costs of suit and attorney's fees to which Plaintiff may be entitled to by law, including, without limitation, 42 U.S.C. § 1988; and

D.    Award such other relief as the Court deems just and proper.

---

amendments, OR. ADMIN. R § 340-090-0750, and require PROs to consider equity and cost burden in setting fees, OR. ADMIN. R § 340-090-0830.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Date:  October 27, 2025

SIDLEY AUSTIN LLP

By: */s/ David R. Carpenter*

David R. Carpenter*
drcarpenter@sidley.com

Caleb J. Bowers*
cbowers@sidley.com
Alexandra T. Mushka*
amushka@sidley.com
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213 896 6000
Facsimile: +1 213 896 6600

Gordon D. Todd*
gtodd@sidley.com
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736 8000
Facsimile: +1 202 736 8711
*Pro hac vice*

BRADLEY BERNSTEIN SANDS LLP
Darin Sands, OSB No. 106624
1211 NW Glisan St., Ste 204
Portland, OR 97209
Telephone: +1 503-734-2480

Attorneys for Plaintiff
NATIONAL ASSOCIATION OF
WHOLESALER-DISTRIBUTORS

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## CERTIFICATE OF SERVICE

I hereby certify on October 27, 2025, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system which sent notification of such filing to the following:

| | |
|---|---|
| Dan Rayfield, Attorney General<br>Sara Van Loh, Sr. Assistant Attorney General<br>Alex Jones, Assistant Attorney General<br>Department of Justice<br>100 SW Market Street<br>Portland, OR 97201 | *Attorneys for Defendants* |
| Darin Sands<br>Bradley Bernstein Sands LLP<br>1211 NW Glisan Street, Ste 204<br>Portland, OR 97209 | *Attorneys for Plaintiff* |

*/s/ David R. Carpenter*
David R. Carpenter