Darin Sands, OSB No. 106624
dsands@bradleybernstein.com
BRADLEY BERNSTEIN SANDS LLP
1211 NW Glisan St., Ste 204
Portland, OR 97209
Telephone: +1 503-734-2480

David R. Carpenter*
drcarpenter@sidley.com
Caleb J. Bowers*
cbowers@sidley.com
Alexandra T. Mushka*
amushka@sidley.com
SIDLEY AUSTIN LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213-896-6000
Facsimile: +1 213-896-6600

[Additional counsel on following page]


Attorneys for Plaintiff
NATIONAL ASSOCIATION OF
WHOLESALER-DISTRIBUTORS

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS,<br><br>Plaintiff,<br><br>v.<br><br>LEAH FELDON, DIRECTOR, OREGON DEPARTMENT OF ENVIRONMENTAL QUALITY, in her official capacity; MATT DONEGAN, KAREN MOYNAHAN, MARK WEBB, AND SILVIA TANNER, in their official capacities as members of the Oregon Environmental Quality Commission,<br><br>Defendants. | Case No. 3:25-cv-01334-SB<br><br>**PLAINTIFF NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS' MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER**<br><br>**ORAL ARGUMENT REQUESTED FOR JANUARY 14, 2026** |


PAGE 1 -   MOTION FOR PRELIMINARY INJUNCTION

Additional counsel for Plaintiff
National Association of Wholesaler-Distributors

Gordon D. Todd*
gtodd@sidley.com
Richard W. Smith*
rwsmith@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202-736-8000
Facsimile: +1 202-736-8711

*Pro hac vice

## TABLE OF CONTENTS

L.R. 7-1(A) CERTIFICATION ............................................................................... 8

MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING
ORDER .................................................................................................................... 8

I.       INTRODUCTION ....................................................................................... 8

II.      BACKGROUND ....................................................................................... 11

         A.     Overview of Oregon's Plastic Pollution and Recycling Modernization Act .........11

         B.     As Implemented, a Single Private Organization Has Been Delegated Authority to
                Run the Program and to Set Exorbitant, Retrospective Fees Pursuant to a
                Confidential Methodology. ....................................................................................12

         C.     NAW's Members Face Irreparable Harm, Including from Unreasonable and
                Arbitrary Fees that Threaten the Viability of Interstate Supply Chains. ...............17

III.     ARGUMENT .............................................................................................. 22

         A.     NAW Is Likely to Succeed on the Merits. .............................................................22

                1.     The Act Violates the Dormant Commerce Clause. .......................................... 22

                2.     The Act Violates Due Process By Delegating Unprecedented Regulatory
                       Power to a Private Entity. ............................................................................... 27

                3.     The Act Violates the Unconstitutional Conditions Doctrine. ........................ 31

         B.     NAW's Members Will Be Irreparably Harmed Without a Preliminary Injunction.
                ...............................................................................................................................33

         C.     The Equities Favor NAW. .....................................................................................35

IV.      CONCLUSION .......................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariz. Dream Act Coal. v. Brewer*,
757 F.3d 1053 (9th Cir. 2014) ........................................................................33

*Ass'n to Pres. & Protect Loc. Livelihoods v. Sidman*,
147 F.4th 40 (1st Cir. 2025)............................................................................23

*Bibb v. Navajo Freight Lines*,
359 U.S. 520 (1959)..................................................................................23, 24

*Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*,
567 F.3d 79 (2d Cir. 2009)..............................................................................26

*C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*,
511 U.S. 383 (1994).........................................................................................27

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936)...........................................................................27, 28, 29

*Cheer Pack N. Am., LLC v. Valley Forge Ins. Co.*,
2017 WL 1552315 (D. Mass. Apr. 28, 2017) .................................................24

*Comptroller of Treasury of Md. v. Wynne*,
575 U.S. 542 (2015).........................................................................23, 25, 27

*K.W. ex rel. D.W. v. Armstrong*,
298 F.R.D. 479 (D. Idaho 2014), *aff'd* 789 F.3d 962 (9th Cir. 2015) ...................30

*Dolan v. City of Tigard*,
512 U.S. 374 (1994).....................................................................................32, 33

*E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ...........................................................................34

*Eubank v. City of Richmond*,
226 U.S. 137 (1912).........................................................................................28

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012).........................................................................................30

*Frost & Frost Trucking Co. v. Railroad Comm'n of Cal.*,
271 U.S. 583 (1926).....................................................................................31, 32

*Gen. Elec. Co. v. New York State Dep't of Lab.*,
  936 F.2d 1448 (2d Cir. 1991) ........................................................................28

*General Motors Corp. v. Tracy*,
  519 U.S. 278 (1997) ........................................................................................24

*Gordon v. Holder*,
  721 F.3d 638 (D.C. Cir. 2013) ......................................................................36

*Horne v. Dep't of Agric.*,
  576 U.S. 350 (2015) ........................................................................................32

*Japan Line, Ltd. v. County of Los Angeles*,
  441 U.S. 434 (1979) ........................................................................................24

*Johnson v. Michigan Milk Mktg. Bd.*,
  295 Mich. 644 (1940) .....................................................................................28

*Jones v. Flowers*,
  547 U.S. 220 (2006) ........................................................................................30

*Karem v. Trump*,
  960 F.3d 656 (D.C. Cir. 2020) ......................................................................34

*Koontz v. St. Johns River Water Mgmt. Dist.*,
  570 U.S. 595 (2013) ...........................................................................31, 32, 33

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ........................................................................................30

*McKesson v. Div. of Alcoholic Beverages & Tobacco*,
  495 U.S. 18 (1990) ..........................................................................................30

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) .....................................................................34, 36

*National Pork Producers Council v. Ross*,
  598 U.S. 356 (2023) ........................................................................................23

*Nollan v. California Coastal Commission*,
  483 U. S. 825 (1987) .......................................................................................32

*Nw. Airlines, Inc. v. Cnty. of Kent, Mich.*,
  510 U.S. 355 (1994) ...................................................................................23, 25

*Ohio Bell Telephone Co. v. Pub. Utils. Comm'n of Ohio*,
  301 U.S. 292 (1937) ........................................................................................30

*Philip Morris USA Inc. v. Scott*,
　　561 U.S. 1301 (2010) ..................................................................................34

*Pike v. Bruce Church, Inc.*,
　　397 U.S. 137 (1970) ........................................................................23, 24, 25

*S. Dakota v. Wayfair*,
　　585 U.S. 162 (2018) ....................................................................................23

*San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of Puerto Rico*,
　　967 F.2d 683 (1st Cir. 1992) (Breyer, J., op.) ............................................26

*Washington ex rel. Seattle Title Trust Co. v. Roberge*,
　　278 U.S. 116 (1928) ....................................................................................28

*Southern Pacific Co. v. Arizona*,
　　325 U.S. 761 (1945) ....................................................................................24

*Southern Pacific Co. v. Denton*,
　　146 U.S. 202 (1892) ...............................................................................31, 32

*Stanley v. Univ. S. Cal.*,
　　13 F.3d 1313 (9th Cir. 1994) ......................................................................34

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
　　240 F.3d 832 (9th Cir. 2001) ......................................................................34

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
　　588 U.S. 504 (2019) ....................................................................................22

*Valle del Sol Inc. v. Whiting*,
　　732 F.3d 1006 (9th Cir. 2013) ....................................................................35

*Will v. Mich. Dep't of State Pol.*,
　　491 U.S. 58 (1989) ......................................................................................34

*Winter v. NRDC*,
　　555 U.S. 7 (2008) ........................................................................................22

**Statutes**

Or. Rev. Stat. § 459A.860 ......................................................................35, 36

Or. Rev. Stat. § 459A.863 ................................................................11, 12, 20

Or. Rev. Stat. § 459A.866 ..............................................................................11

Or. Rev. Stat. § 459A.869 ................................................................................12

Or. Rev. Stat. § 459A.872 ................................................................................12

Or. Rev. Stat. § 459A.875 .............................................................................12, 13

Or. Rev. Stat. § 459A.884 .............................................................................12, 13

Plastic Pollution and Recycling Modernization Act, Or. Laws ch. 459 (2021).................... *passim*

**Other Authorities**

Circular Action Alliance, Oregon Staff and Leadership (last accessed Nov. 24,
   2025), https://circularactionalliance.org/oregon-leadership .....................................12

OAR §§ 340-090-0750 .....................................................................................15

OAR §§ 340-090-0900 to -0930 ........................................................................20

*Plastic Pollution and Recycling Modernization Act*, Oregon DEQ (last visited
   Nov. 20, 2025), https://www.oregon.gov/deq/recycling/pages/modernizing-
   oregons-recycling-system.aspx .......................................................................8

U.S. Const. amend. V .......................................................................................28

U.S. Const. amend. XIV ...................................................................................10

U.S. Const. art. I, § 8, cl. 3 ............................................................................. *passim*

## L.R. 7-1(A) CERTIFICATION

Counsel for Plaintiff National Association of Wholesaler-Distributors ("NAW") conferred with counsel for Defendants Leah Feldon, in her official capacity as Director of the Oregon Department of Environmental Quality ("DEQ"), and Matt Donegan, Karen Moynahan, Mark Webb, and Silvia Tanner, in their official capacities as members of the Oregon Environmental Quality Commission ("EQC") (collectively, "Defendants"), on November 12, 2025, regarding this motion. The parties were unable to resolve the issues.

## MOTION FOR PRELIMINARY INJUNCTION
## AND/OR TEMPORARY RESTRAINING ORDER

Plaintiff NAW respectfully moves the Court for a preliminary injunction barring Defendants from enforcing directly or indirectly Oregon's Plastic Pollution and Recycling Modernization Act (the "Act") and regulations promulgated thereunder and taking such actions as may be necessary to defer the obligations of NAW's members to pay fees under the Act, pending final adjudication of the merits of this action. Per discussions with the Clerk and Defendants' counsel, NAW requests that the motion be heard on January 14, 2026. If the Court is not prepared to enter a preliminary injunction by that date, Plaintiff requests that the Court enter a temporary restraining order pending its decision on injunctive relief.

## I.    INTRODUCTION

In 2021, Oregon set out to rewrite its state recycling program with the stated goals of promoting sustainability and improving waste management, including by putting the costs of life-cycle management onto producers and manufacturers.[1] As adopted, however, and particularly as implemented, the Act falls far short. Far from promoting sustainability and responsibility, the Act creates a labyrinthine scheme, shrouded in secrecy, that imposes costs disproportionately on distributors with little to no control over the manufacture, selection, or

---

[1] *See Plastic Pollution and Recycling Modernization Act*, Oregon DEQ (last visited Nov. 20, 2025), https://www.oregon.gov/deq/recycling/pages/modernizing-oregons-recycling-system.aspx.

disposition of most packaging. The scheme substantially burdens and discriminates against interstate commerce, denies covered businesses any meaningful process, and strips away important constitutional liberties. While NAW fully supports the goal of building a circular economy, any such program must be both sustainable *and* constitutional. As Oregon's program is neither, it must be enjoined.

The Act purports to establish an "extended producer responsibility" ("EPR") program. EPR programs are nothing new; historically, they have charged a fee to buyers or sellers of specific products: for example, a collection and disposal fee for mattress or carpet purchasers, or a recycling bottle "deposit" for glass and plastic bottles. Oregon's new EPR program, in contrast, has unprecedented breadth, scope, and complexity, and an utter lack of transparency. It covers essentially all products that use packaging in their sale or distribution—more or less all products sold in or into the State—and reaches entities across the interstate supply chain, regardless of whether they control or dispose of the packaging.

What is more, to administer Oregon's program, the State delegated unprecedented regulatory authority to a single private third-party organization founded and controlled by large companies that are themselves directly interested in the regulations and their enforcement. Covered entities are required to enter into a non-negotiable "contract" with this private organization, which then imposes retrospective fee assessments pursuant to a confidential methodology to fund yet-to-be-established recycling operations and a new statewide infrastructure of waste management. Parties like NAW's members are thus forced to pay fees that they cannot predict or plan for, while the non-negotiable contract strips them of any meaningful opportunity or judicial process to challenge their fee assessments.

NAW's members received their first invoices for EPR fees in July 2025. Particularly for small and medium-sized businesses, the fees were shockingly high and significantly higher than what had been projected previously based on information publicly submitted to the Oregon DEQ. Often, the fees *exceed* the profit margins associated with the products.

PAGE 9 -   MOTION FOR PRELIMINARY INJUNCTION

Moreover, given the complexity of the interstate supply chain, covered entities face frequent confusion and insurmountable hurdles in determining their obligations. Among other issues, that creates a significant risk of double-counting (effectively, double taxing) materials distributed in interstate commerce, and parties have no meaningful way to determine whether fees are being apportioned accurately and fairly. Yet a failure to report, underreporting, or other noncompliance can result in steep civil penalties of up to $25,000 per day.

NAW brought this suit because the program is unconstitutional in multiple ways. The Act's arbitrary burdens and fees threaten the viability of interstate supply chains and unreasonably interfere with interstate commerce, in violation of the Dormant Commerce Clause. The United States Supreme Court has also long held that delegations of sweeping regulatory authority to private entities are suspect under the Due Process Clause, and for that and other reasons, the Act also violates the Fourteenth Amendment rights of NAW's members.

Post-filing discussions have generated no voluntary relief, and the next round of invoices will hit in January 2026 based on a new rate schedule. DEQ was not required to approve the new fees, and NAW's members still have no access to the fee methodology, nor any choice about whether to continue their "contractual" relationship with the third-party organization. Nonetheless, NAW's members are bracing for another round of excessive and unsustainable fees, with significant rate hikes on many product categories.

NAW's members thus face imminent and irreparable harm warranting preliminary injunctive relief. For many, the Act will make it logistically and economically unsustainable to do business in Oregon. Those who continue to do business will be forced, at the risk of crushing daily civil penalties, to comply with and pay into an unconstitutional program and suffer ongoing competitive harm—all without any meaningful ability to recover their losses if (and when) the Act is declared unlawful. Accordingly, NAW requests that the Court grant the requested relief, preliminarily enjoining Defendants from enforcing any obligations under the Act and deferring the payment obligations of NAW's members pending final adjudication.

PAGE 10 - MOTION FOR PRELIMINARY INJUNCTION

## II.    BACKGROUND

### A.    Overview of Oregon's Plastic Pollution and Recycling Modernization Act

NAW's Amended Complaint describes in detail the statutory and regulatory scheme. Am. Compl. ¶¶ 1–7, 21–59. The following briefly summarizes key features and definitions.

"**Covered products**." The Act covers an exceptionally broad range of materials, defining "covered product" to include (with limited exceptions) essentially all forms of packaging, food serviceware, and printing and writing paper. OR. REV. STAT. ("ORS") §§ 459A.863(6)(a), (18)(a). Imagine purchasing aluminum foil from a retailer. The foil itself is food serviceware subject to a fee. Different fees would also apply to the foil's container (the "primary packaging"); the box and filler used to ship the items in bulk to the store ("secondary packaging"); and any other materials used to facilitate shipping to and from the distribution center, such as pallet wrap ("tertiary packaging"). And that fee structure applies to any product that is sold or shipped using packaging or a container, such as fresh produce, shelf-stable foods, toothpaste, wine, household goods, personal protective equipment, school supplies, cleaning fluids, and most anything else that comes in a paper, plastic, glass, ceramic, metal, or wood container—essentially everything.[2]

"**Producers.**" To impose responsibility over the covered products, the Act uses the term "producer," which is defined broadly. For packaged items, for example, "producers" include brand-owning manufacturers or licensees that sell packaged items in Oregon; wholesalers and distributors who sell packaged items into Oregon; or alternatively importers into the United States. ORS §§ 459A.863(22), 459A.866. The Act sets out alternative means for identifying the "producer" for remote sales and other situations. Ascertaining the "producer" for a given line of

---

[2] There are exemptions for certain categories of products, like pharmaceutical drugs. *See, e.g.,* ORS § 459A.863(6)(b). There are also *partial* exemptions for products subject to other recycling laws. For example, a wine bottle itself may be exempt if subject to a bottle-deposit rule, but the crate and filler used to ship the wine would not be exempt. Paint cans that have been *collected* pursuant to Oregon's paint stewardship program may be excluded, but paint cans otherwise are also a covered product.

PAGE 11 - MOTION FOR PRELIMINARY INJUNCTION

business is often difficult and requires closely scrutinizing multiple transactions. Declaration of Brian Wild ("Wild Decl.") ¶ 18. Generally, the "producer" is *not* the retailer.

**Obligation to join a Producer Responsibility Organization**: The State itself does not set the fees that producers must pay. Instead, the Act generally requires that "producers" join an approved "Producer Responsibility Organization" ("PRO"). ORS § 459A.869(1).[3]

Producers must report data to the PRO, including on the types and volumes of covered materials that were sold in or into Oregon the prior year. The PRO, in turn, must develop and administer a program plan for collecting and handling materials, and it sets the fees, incentives, and conditions for registered members to fund the program. *See* ORS §§ 459A.875, 459A.884.

**B.    As Implemented, a Single Private Organization Has Been Delegated Authority to Run the Program and to Set Exorbitant, Retrospective Fees Pursuant to a Confidential Methodology.**

The Act erects substantial financial and logistical barriers to forming a PRO, including requiring that any PRO represent "at least 10% of the total market share of covered products in Oregon." ORS § 459A.869(12); *see also* Wild Decl. ¶ 9 (describing barriers to entry). As a result, Oregon has approved only one PRO to implement the Act—an entity called the Circular Action Alliance ("CAA"). *See* Wild Decl. ¶ 8 & Ex. A (CAA Program Plan). According to its website, CAA is founded by some of the nation's largest companies, many of which also have representatives on its Board of Directors. *Id*. Ex. B.[4] Because CAA is the only approved PRO, its terms, conditions, and fees are all mandatory for any producer subject to the Act. *Id.* ¶ 9.

As approved by DEQ, CAA's 2025–2027 Program Plan is ambitious, to say the least. It seeks to *create*, in the first instance, a new statewide infrastructure for collecting, sorting, and recycling or disposing of all covered products, which the Program Plan separates into 60 different categories of covered materials. *Id*. Ex. A at pp. 194–195, 199–203. The Program Plan

---

[3] The Act exempts only the smallest producers with less than $5,000,000 in gross revenue or less than one ton of covered materials per year. *See* ORS §§ 459A.863(32), 459A.872(1).

[4] *See also* Circular Action Alliance, Oregon Staff and Leadership (last accessed Nov. 24, 2025), https://circularactionalliance.org/oregon-leadership.

contemplates, among other things, contracting with municipalities; creating a new network of collection sites and depot locations, service providers, and recycling centers; creating new tracking and accounting systems; and conducting public education and outreach campaigns. *Id.* at pp. 5–7, 20, 93–94, 116–119.

The Act provides some high-level criteria for the Program Plan but otherwise vests substantial discretion in the PRO (here, CAA) to determine both its costs and the fees it will charge. For example, the Act requires the PRO to use "objective and measurable criteria *whenever possible*," leaving ample room for subjective and non-measurable criteria. ORS § 459A.875(2)(a) (emphasis added).

With respect to fees specifically, CAA is required to establish a fee schedule sufficient to pay for the program, and generally is supposed to assess fees based on the material type and volume of covered products sold in or into Oregon. ORS § 459A.884(1). It must establish a "base fee schedule" applicable to different material types, as well as so-called "ecomodulated fees" intended to incentivize individual producers to make changes to the ways in which they produce, use, and market covered products. ORS §§ 459A.884 (2)–(4). Subject to only general criteria—e.g., recyclable material must have a lower base fee rate than non-recyclable material; products with a lower environmental impact should have lower ecomodulated fees than those with higher impacts—the PRO has vast discretion to define the categories, rates, and incentives/penalties in assessing fees.

Unsurprisingly, the assessment-setting mechanism implemented by CAA appears to bear little-to-no relationship to the actual cost of addressing packaging related to each covered entity. Rather, as CAA has described its methodology generally (i.e., not specific to Oregon), it starts by estimating the total system costs of its start-up project; then it allocates the projected future system costs to each of the dozens of different material types; from there, it allocates fees to members based on their reported materials and volumes from the prior year; and it applies on top

of all of that ecomodulation "bonuses" and "maluses"—as depicted on the following chart:



Wild Decl. ¶ 11 & Ex. C.

With regard to Oregon specifically, this is what CAA has disclosed publicly in its Program Plan about its fee-setting methodology:



Wild Decl. ¶ 11 & Ex. A, Appendix G, p. 85. In other words, CAA's methodology for imposing fees on companies selling goods in or into Oregon has never been publicly disclosed, vetted, or subject to notice and comment. Distributors who have requested access to the method have been denied by both CAA and DEQ. *Id.*

DEQ conceded during rulemaking that it was not in a position to determine the overall fiscal impacts of the EPR program, and it conducted no comprehensive economic impact

analysis beyond a limited review for small businesses. Wild Decl. ¶ 14 & Ex. D at pp. 15–16.

For example, there was never any assessment of:

- Whether the fees realistically could be absorbed by the different types of producers (i.e., not just large producers, but also mid-sized distributors like NAW's members);

- The feasibility of "producers" allocating costs to non-reporting parties that nonetheless should share the burdens (e.g., the ability to pass fees on to upstream suppliers who control the packaging or downstream to consumers responsible for the purchasing decisions);

- The impact on supply chains (e.g., whether the economic and logistical burdens would cause certain entities to pull out of Oregon); or

- The impact on product quality and consumers (e.g., whether it is feasible to change food packaging without compromising food safety or shelf-life, or conversely whether increasing the cost and accessibility of goods like fresh produce is beneficial to Oregon consumers).

*See* Wild Decl. ¶ 21.

CAA's Program Plan does provide a *draft* base-fee schedule identifying a base fee rate/volume for over sixty different categories of covered products. Wild Decl. Ex. A at pp. 199–203. But, as further explained below, that is not the "final" fee schedule that CAA used to generate the first round of invoices sent to producers in July 2025. *See infra* at pp. 17–18. Indeed, DEQ specifically grants CAA authority to revise the fee schedule, cost allocations, and ecomodulated adjustments granted to individual producers without requiring an amendment to the DEQ-approved Program Plan or other DEQ approval. OR. ADMIN. R. ("OAR") §§ 340-090-0750(1), (2).[5]

---

[5] DEQ approval of a Plan amendment is required only for "changes to the overall criteria for and magnitude of graduated fee adjustments" or other "alternate approaches to determining membership fees…." OR. ADMIN. R. §§ 340-090-0750(1), (2).

PAGE 15 - MOTION FOR PRELIMINARY INJUNCTION

The next round of invoices is scheduled to be issued in January 2026, and CAA only very recently provided producers with information on the fee schedule that it will use. Wild Decl. ¶ 24. Based on information provided by CAA, NAW understands that

- 27 product categories (nearly half) will see fee increases of 25% or more, with some rates increasing by 45% (while only 2 product categories would see significant fee decreases);

- CAA will continue to use producers' 2024 data to calculate 2026 fees (regardless of whether a producer has made changes to its materials, volumes, or sales); and

- CAA's Board (populated by representatives of the State's largest producers) reviewed the fee-setting methodology, even though CAA's "members-at-large" (*i.e.*, everyone else compelled by law to join) do not have access to it.

*Id.* As noted above, under the Act and its implementing regulations, DEQ is not required to approve the 2026 fee schedule, any of the fee increases, or the other changes or decisions driving the new rates.

On top of the uncertainty created by this opaque fee structure, "producers" are required to execute CAA's non-negotiable "Participant Producer Agreement" ("Producer Agreement") and the Oregon Addendum to the Participant Producer Agreement ("Agreement Addendum"). Winkle Decl. Exs. A & B. Producers are obligated to comply with the requirements set forth therein—including timely payment of invoices—or face liquidated damages, audit costs, and potential enforcement referrals to DEQ. *See id.*, Ex. B §§ 4.2, 5.6.2, 6.2.8. The Agreements further provide no meaningful judicial or administrative process to resolve disputes, *including disputes over the interpretation of the law itself*. Instead, participants are compelled to engage in binding and confidential arbitration, and to waive any right of appeal, in the event of "any dispute, controversy, or claim arising out of or relating to this Oregon Addendum, including the interpretation, scope, or breach thereof or the extent of the Parties' obligations under the Oregon EPR Law." *Id.*, Ex. B § 8.

PAGE 16 - MOTION FOR PRELIMINARY INJUNCTION

### C.     NAW's Members Face Irreparable Harm, Including from Unreasonable and Arbitrary Fees that Threaten the Viability of Interstate Supply Chains.

NAW is a national trade association whose members constitute wholesalers and distributors across the United States. Wild Decl. ¶ 3. NAW's members import, distribute, or supply packaged goods into Oregon and are subject to the requirements of the Act. *Id.* ¶ 4. Founded in 1946, NAW comprises direct member companies and national, regional, and state associations across 19 commodity lines of trade, which together include approximately 35,000 companies operating nearly 150,000 locations throughout the nation. *Id.* ¶ 3.

NAW's members include medium-sized businesses that are integral to regional and national supply chains. *Id.* ¶¶ 4–5. These companies typically operate distribution centers, manage inventory, and coordinate logistics across state lines. *Id.* As part of their operations, many use or distribute packaging materials, or products containing (or contained in) those materials, that fall within the scope of the Act. *Id.* ¶ 4. As a result, many of NAW's members are considered "producers" under the Act, and face ongoing and irreparable harm as summarized below and in the accompanying declarations. *Id.*

**Excessive and unpredictable fees**. Starting with the July 2025 invoices, NAW's members have been forced to bear exorbitant and unpredictable fees. Wild Decl. ¶¶ 10, 16; Declaration of Ed Allen ("Allen Decl.") ¶¶ 6, 18; Declaration of James E. Winkle ("Winkle Decl.") ¶¶ 7, 25–26. In many cases, the fees have significantly exceeded the draft rate schedule approved by CAA, and the unpredictability has deprived NAW's members of any meaningful ability to budget for them. Wild Decl. ¶ 10; Allen Decl. ¶ 6; Winkle Decl. ¶ 23. Particularly for distribution businesses operating on thin margins, the fees are not sustainable. Wild Decl. ¶ 16; Allen Decl. ¶¶ 12, 24; Winkle Decl. ¶ 7, 26. Indeed, in many cases, the fees *exceed* the profit margins associated with the products. Wild Decl. ¶ 16; Allen Decl. ¶¶ 9, 24. And the information provided by CAA regarding the 2026 rates indicates not only that those unreasonable fees will continue to apply in most cases, but nearly half of the categories will see significant *increases* of 25% of more. Wild Decl. ¶¶ 24–25.

PAGE 17 - MOTION FOR PRELIMINARY INJUNCTION

The retrospective and nontransparent nature of the fee structure also makes it impossible to predict what the fees will be or to account for them in sales. Wild Decl. ¶¶ 10–12, 15–16, 24; Winkle Decl. ¶¶ 8, 16, 25. Ordinarily, when faced with new costs, businesses will adjust their prices to accrue funds to cover the costs as goods are shipped and sales are made. But under Oregon's retrospective approach, NAW members are not told by CAA (and, by extension, the State) what the charge associated with a particular sale of goods will be until long after the sale has occurred. Wild Decl. ¶¶ 10, 24 (explaining that 2025 and 2026 invoices are based on 2024 data reported before rates were announced); Allen Decl. ¶ 6.

**Limited ability to modify packaging**. The fees imposed on NAW's members are especially unreasonable and arbitrary given that NAW's members often have no control over the packaging used for the products they distribute; those are determined by the supplier or dictated by the customer.[6] Allen Decl. ¶ 3; Winkle Decl. ¶ 4. To the extent fees are intended to incentivize changes in materials or volume, the fees applied to NAW's members utterly fail to satisfy that statutory purpose. Wild Decl. ¶¶ 13, 16–19 & Ex. C.

In yet other situations, NAW's members are already using state-of-the-art materials or their packaging is particularly suited for a beneficial purpose. For example, food packaging often uses multi-layer plastic films or coated paper; those materials are subject to particularly high EPR fees, but they are also necessary to ensure food safety, prevent leakage, and preserve shelf-life. Allen Decl. ¶ 20; Winkle Decl. ¶ 20. In those situations, there are no fully recyclable options available to satisfy FDA and state food-safety standards, and thus no way to reduce the exorbitant EPR fees without compromising safety and performance. *Id.*

And in other cases, the fees perversely *incentivize* plastic packaging because its fee formula (base rate per pound) results in lower fees based on weight. Thus, if the more sustainable packaging (e.g., recyclable glass) is significantly heavier than the non-recyclable plastic

---

[6] Indeed, in many cases, distributors do not even have information on packaging material type, and if the suppliers fail to provide the information, they are required to engage in burdensome and costly analyses to make that determination.

PAGE 18 - MOTION FOR PRELIMINARY INJUNCTION

alternative, the formula may penalize producers who switch to more sustainable packaging.[7] *See* Wild Decl. ¶¶ 6, 11, Ex. A at pp. 199-203, & Ex. C.

**Limited ability to pass on fees**. Moreover, NAW's members frequently have limited practical ability to allocate fees fairly. Wild Decl. ¶ 16; Allen Decl. ¶¶ 11–12, 17; Winkle Decl. ¶¶ 7, 9–10. In many cases, upstream suppliers (who have more control over the packaging) are refusing to accept responsibility and trying to send EPR fees downstream, even when the suppliers may be the first-obligated producer under the law. Allen Decl. ¶¶ 5, 21–23; Winkle Decl. ¶¶ 11–12. And many downstream sellers are likewise refusing to raise their prices on consumers since it could impact those sellers' own competitiveness and reputation. Allen Decl. ¶ 17; *see* Winkle Decl. ¶ 9.

Even if NAW's members could pass the fees on, the retrospective nature of the fee framework makes that particularly difficult as noted above: NAW's members don't know exactly what fees will be attributed to what product at the time of sale, and members with variable sales may not sell the same mix of products the following year. Wild Decl. ¶¶ 10, 15–16, 22, 24; Winkle Decl. ¶ 16. This makes it impossible to charge and accrue amounts throughout the year to cover the EPR fees, particularly as CAA has discretion to change its fees and does not disclose its methodology. Wild Decl. ¶¶ 9–10, 24–25; Winkle Decl. ¶¶ 16, 25; Allen Decl. ¶ 6.

If responsibility for collecting or paying the fee were clearly assigned, such as at the point of sale (similar to a bottle deposit), that would at least be transparent and allow sellers to plan for and allocate costs appropriately in their supply chains. Wild Decl. ¶ 26. Yet it is clear why Oregon chose not to go that route: consumers would revolt if they knew and had to bear the costs of this program. Instead, the State is shifting a disproportionate share of system costs to companies whose primary role is simply to distribute products in the interstate supply chain, and that have little-to-no control over decisions to design, reduce, reuse or recycle a product.

---

[7] For example, a glass bottle weighing about 0.88 pounds and charged at 11 cents per pound results in a higher total fee than a non-recyclable, multi-layer plastic pouch that holds similar volume but weighs only 0.044 pounds.

PAGE 19 - MOTION FOR PRELIMINARY INJUNCTION

**Too big for exemptions, too small for incentives**. NAW's members are uniquely disadvantaged in another way. Generally speaking, NAW's members are too big to qualify for the exemption offered to small businesses with less than $5 million in total revenues. Wild Decl. ¶ 5; Allen Decl. ¶ 16. At the same time, they are not big enough to qualify for the incentives available to large producers (many of which are CAA's founding members and have representatives on CAA's board). *Id.* In particular, the Act and CAA's Plan allow producers to conduct "life cycle evaluations" ("LCEs") as a means of earning incentive bonuses and fee adjustments. *See* ORS § 459A.863(8); OAR § 340-090-0900 to -0930. Yet because the costs of performing an LCE are prohibitively high, these bonus adjustments are scarcely accessible to NAW's members. Wild Decl. ¶ 17.

**Disproportionate allocations and the free rider problem**. The top-down nature of the fee methodology exacerbates the unreasonable burdens on NAW's members. That is, the methodology *starts with the estimated total system costs*, which are then allocated in various ways to different reporting producers. Wild Decl. ¶¶ 11–13. This means that reporting members are paying for materials generated by small businesses who are exempt. *Id.* ¶¶ 16–17. Reporting members are also subsidizing the bonuses given to the largest producers who perform LCEs (even though those LCEs do not themselves reduce program costs). *Id.* ¶ 17. The scheme also suffers from a serious "free rider" problem: if a competitor does not report or underreports, then NAW's reporting members are paying for them too and may also find themselves at a competitive disadvantage to the extent they (but not their competitors) must raise prices to account for EPR fees. *Id.*

Indeed, CAA has openly admitted in webinars that its Oregon fee allocations are based on "very imperfect data" (Wild Decl. ¶ 25), and its Program Plan likewise acknowledges that there is a "high degree of uncertainty in the market share projections" used to generate the fee schedules. Wild Decl. Ex. A, at 41. All of this confirms that NAW's members are not merely paying the reasonable costs for recycling or disposing of *their own* products, or proportionate

enrollment in a PRO program; instead, they are being forced to bear a disproportionate share of the costs to create an entirely new, statewide recycling infrastructure.

**A logistical nightmare for businesses operating in interstate commerce, and a significant likelihood of double-counting.** The complexity of interstate supply chains creates particular burdens for NAW's members. Take, for example, one NAW member that distributes thousands of SKUs using different regional distribution centers, including ones in Washington and Oregon. Winkle Decl. ¶¶ 13, 17. The Washington distribution center includes sales to Oregon, while the Oregon distribution center also makes sales in California. *Id.* ¶ 17. On top of that, NAW's members may sell to downstream vendors who—without the members' knowledge—then transport the product out of state. *Id.* ¶ 17; Allen Decl. ¶¶ 6–7, 20. These overlapping routes and uncertainty over downstream sales make it difficult to determine whether products should accrue Oregon EPR fees and/or whether they may be subject to conflicting requirements in another state. Winkle Decl. ¶¶ 17–19; Allen Decl. ¶¶ 7–8, 20–21. Without a clear mechanism for tracking and reconciling multi-state shipments—which is impractical to create—there is a significant risk of double counting or duplicative fee assessments when goods cross state lines. Winkle Decl. ¶¶ 11, 17; Wild Decl. ¶ 18; Allen Decl. ¶¶ 8, 10, 20–21.

This risk of double-counting also arises from confusion over who in the supply chain may be responsible for the materials. When NAW's members reported their 2024 data to CAA, they did so often without knowing whether another party in the supply chain was reporting those same products or materials; and CAA's processes provide no method to identify whether payments overlap with those made by other parties. Wild Decl. ¶¶ 15, 19; Winkle Decl. ¶¶ 21–22; Allen Decl. ¶ 19. In certain circumstances, NAW's members have identified situations of likely "double counting" or overcharges, but with no clear mechanism for how to obtain a refund. Wild Decl. ¶ 18–19; Winkle Decl. ¶ 22.

**No choice, no accountability.** The foregoing problems are all compounded by the fact that there is only one PRO, meaning that CAA's terms and fees are not just take-it-or-leave-it;

PAGE 21 - MOTION FOR PRELIMINARY INJUNCTION

they are take-it-or-leave-the *State.* Wild Decl. ¶ 8. When NAW's members have gone to CAA with questions or issues (including overcharges), the responses have been inconsistent, unhelpful, and nontransparent. *See* Wild Decl. ¶ 15; Winkle Decl. ¶¶ 21–22; Allen Decl. ¶ 19, And because of the arbitration provision noted above, NAW members have no meaningful appeal rights or any right to challenge their fee assessments in court. Wild Decl. ¶ 9.

**NAW now seeks relief to avoid ongoing irreparable harm**. The logistical and economic burdens imposed by the Act and the PRO are not sustainable. NAW's members will either be forced out of the Oregon market, or they may stay but be forced to absorb unreasonable and excessive fees and face competitive harm as compared to those who qualify for exemptions, have lower fees due to incentives, or fail to report. Wild Decl. ¶¶ 16–17, 22; *see* Winkle Decl. ¶¶ 23–26; Allen Decl. ¶¶ 22–24. NAW initially filed this suit in July 2025, in response to the first round of invoices. While NAW hoped that the suit might trigger a voluntary deferral of the program by the State, it did not. With the next round of invoices scheduled for January 2026, NAW has no choice at this juncture but to seek injunctive relief against the program's enforcement, pending final adjudication of NAW's claims.

## III.    ARGUMENT

A plaintiff is entitled to a preliminary injunction if it establishes that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). The factors are met here.

### A.    NAW Is Likely to Succeed on the Merits.

NAW's operative complaint asserts several claims under the U.S. Constitution, each of which is independently sufficient to establish a likelihood of success on the merits.

#### 1.    The Act Violates the Dormant Commerce Clause.

The Constitution's Commerce Clause, U.S. Const. art. I, § 8, cl. 3, "prohibits state laws that unduly restrict interstate commerce." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588

PAGE 22 - MOTION FOR PRELIMINARY INJUNCTION

U.S. 504, 514 (2019) (cleaned up). This Dormant Commerce Clause doctrine enshrines two primary principles: "First, state regulations may not discriminate against interstate commerce; and second, States may not impose undue burdens on interstate commerce." *S. Dakota v. Wayfair*, 585 U.S. 162, 173 (2018). State laws may also be invalid on their face where they directly regulate the instrumentalities of interstate commerce, *see, e.g.*, *Bibb v. Navajo Freight Lines*, 359 U.S. 520 (1959), or where they amount to an excessive "user fee," *Nw. Airlines, Inc. v. Cnty. of Kent, Mich.*, 510 U.S. 355, 369 (1994), or state tariff, *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542 (2015). Oregon's Act violates each of these prohibitions.

### a. The Act Fails to Satisfy the *Pike* Balancing Test, Which Applies with Particular Force Because Packaging is Integral to Interstate Commerce.

State regulation will be invalid where the "burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).[8] Under *Pike*, state laws may be found invalid even where they appear nondiscriminatory or even if they do not specifically regulate the instrumentalities of interstate commerce (such as trains, trucks, or planes), if they "prevent the continuous flow of interstate commerce *through* the regulating jurisdiction." *Ass'n to Pres. & Protect Loc. Livelihoods v. Sidman*, 147 F.4th 40, 57 (1st Cir. 2025); *see also National Pork*, 598 U.S. at 396 (Roberts, C.J., concurring in part) ("As a majority of the Court agrees, *Pike* extends beyond laws either

---

[8] In *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023), the Supreme Court rejected the argument that state laws with extraterritorial effects are *per se* unconstitutional, and a majority of Justices further rejected a *Pike*-based claim on the facts there. The Court did not, however, discard the *Pike* balancing test; instead, it "left the 'courtroom door open' to challenges premised on even nondiscriminatory burdens," and it recognized that some cases "have invalidated state laws ... that appear to have been genuinely nondiscriminatory." *Nat'l Pork*, 598 U.S. at 379 & n.2 (quoting *General Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997) (collecting cases)); *see also, e.g.*, *id.* at 396 (Roberts, J. concurring in part and dissenting; joined by Alito, Kavanaugh, and Jackson, JJ.) (agreeing with plurality's rejection of extraterritoriality argument, but expressing view that case should be remanded for further proceeding on *Pike*); *id.* at p. 403 (Kavanaugh, J., concurring in part and dissenting in part) ("Six Justices of this Court affirmatively retain the longstanding Pike balancing test for analyzing dormant Commerce Clause challenges to state economic regulations."); *id.* at 391 (Sotomayor, J., concurring in part, joined by Kagan, J.) (concluding that *Pike* balancing test applies even to nondiscriminatory state laws, but joining in view that claim there failed on the facts).

PAGE 23 - MOTION FOR PRELIMINARY INJUNCTION

concerning discrimination or governing interstate transportation."); *Tracy*, 519 U.S. at 298 n.12 (laws may fail under *Pike* where they "undermine[] a compelling need for national uniformity in regulation").

Indeed, *Pike* itself invalidated an Arizona law regulating packaging (specifically, of cantaloupes). *Pike*, 397 U.S. at 140. So, too, did the Supreme Court invalidate a state property tax on shipping containers, which are "instruments of international traffic." *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 453 (1979).

Here, the *Pike* test applies with particular force, as the Act covers virtually all forms of packaging—not only the primary packaging for the product itself, but also the secondary and tertiary packaging specifically used for transport and distribution—which is integral to the smooth and uniform flow of interstate commerce. Like regulations on shipping containers, *id.*, trucks, *Bibb*, 359 U.S. at 520, or trains, *Southern Pacific Co. v. Arizona*, 325 U.S. 761 (1945), a regulation that places significant burdens on packaging and distributors operating interstate supply chains affects virtually every product traded across state lines. *Cheer Pack N. Am., LLC v. Valley Forge Ins. Co.*, 2017 WL 1552315, at *7 (D. Mass. Apr. 28, 2017) ("packaging itself can be essential to the process by which [goods are] made marketable.").

The *Pike* test is thus entirely appropriate here, and the Act fails it by imposing substantial burdens on the nationwide packaging and distribution system that are "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. In many cases, for example, the EPR fees exceed the profit margins associated with the products being distributed, effectively shutting distributors out of the State. In other cases (such as with food packaging), the EPR fee structure effectively punishes distributors for using packaging that complies with federal safety standards. More generally, the complexity of interstate supply chains creates a situation where (a) Oregon's law effectively will regulate not only products *entering* the State but also products *leaving* or *merely passing through* the State; (b) it is infeasible to make logistical and operational changes specific to Oregon without uprooting interstate supply chains more broadly; (c) there is

PAGE 24 - MOTION FOR PRELIMINARY INJUNCTION

an acute risk of distributors being subject to competing standards and double-counting across the different states.

Nor are these burdens offset by commensurate local benefits, which are speculative at best. DEQ conceded during rulemaking that it "was not in a position to determine the overall fiscal impacts of the EPR program" and conducted no comprehensive economic impact analysis beyond a limited review for small businesses. While Oregon has an interest in recycling and managing products discarded in the state, it has chosen not to apply the traditional local means for addressing such concerns (such as general taxation or assessing point-of-sale fees). Instead, it has adopted a scheme that specifically and disproportionately targets interstate supply chains and distributors—including those who have little-to-no control over the packaging or ability to modify it. For all of these reasons, under *Pike*, those disproportionate burdens are "clearly excessive in relation to the putative local benefits." 397 U.S. at 142.

### b.  The Act Imposes an Excessive User Fee or an Unfairly Apportioned Tax, and Discriminates Against Interstate Commerce.

Separate and apart from *Pike*, the Act violates the Dormant Commerce Clause by saddling interstate commerce with unreasonable fees that, in effect, discriminate against interstate commerce and operate as an unlawful state tariff. *See Nw. Airlines,* 510 U.S. at 369 (stating test for excessive "user fees"); *see also Wynne*, 575 U.S. at 549 (calling state tariffs "one of the chief evils" that Constitution was intended to address and invalidating state tax that, in effect, discriminated against interstate commerce).

The Act purports to impose benign "user fees": a "producer" must pay "membership" fees to the PRO, which uses the fees for the recycling and processes of those materials, including by funding and reimbursing services provided by local governments. Such a fee will only be valid if it "(1) is based on some fair approximation of the facilities' use, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce." *Nw. Airlines*, 510 U.S. at 369.

For many of the reasons discussed above, the EPR fees are not, in fact, a fair approximation of the costs reasonably attributable to NAW's members, and they are clearly excessive in relation to the benefits conferred. By CAA's own admission, it is currently working with "very imperfect data" and a "high degree of uncertainty" in its cost allocations. *See supra* at p. 20. NAW's members are being forced to bear unreasonable and excessive fees on packaging that they do not control and/or cannot modify; and are being forced to subsidize the costs associated with small exempt producers, large producers who receive bonus adjustments, and competitors who do not report. Moreover, unlike a typical "user fee"—which one would normally expect to know and pay as you go—the fees here are entirely retrospective and cannot be predicted.

Rather than fairly approximate the reasonable costs of handling a given producer's waste during the year, the EPR charges function more like a *tax* that is intended to fund a general state infrastructure project—for the benefit of the State's general public—but yet is disproportionately allocated to entities operating in interstate commerce. *See Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 567 F.3d 79, 86–88 (2d Cir. 2009) (invalidating ferry passenger fee as unfair and excessive where it was being used to fund all Port District operations, including expenditures apart from ferry service itself).[9] In practice, the EPR fees have the effect of an unlawful state tariff by imposing unsustainable logistical and economic burdens on distributors bringing products into the state. And the EPR fees are not fairly apportioned to NAW's members, who generally do not choose what packaging to use (like upstream suppliers), do not directly sell the products themselves (like in-state retailers), and do not choose what products to buy (like in-state consumers).

---

[9] *See also San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of Puerto Rico*, 967 F.2d 683, 685 (1st Cir. 1992) (Breyer, J., op.) (describing the difference between "regulatory fees"—which are charged for narrow benefit of regulated entities or to defray regulation-related expenses—and taxes, which are used for general public expenditures, such as paying for highway construction).

However they are characterized, the EPR program discriminates against interstate commerce. *See Wynne*, 575 U.S. at 566–67 (explaining that facially nondiscriminatory law may still violate Commerce Clause if it discriminates against interstate commerce "in effect")); *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 390 (1994) (explaining core purpose of Dormant Commerce Clause as "to prohibit state or municipal laws whose object is local economic protectionism" and invalidating law that purported to apply equally to in-state and out-of-state waste disposal). As reflected above, the scheme is designed to shift costs *away* from in-state consumers and in-state retailers while imposing disproportionate logistical and economic burdens on those who operate in interstate supply chains. *See* Allen Decl. ¶¶ 7–8, 12–13, 16, 20; Winkle Decl. ¶¶ 17–19. Moreover, due to the complexity of interstate supply chains, the Act creates significant risks of fees being assessed on materials even when they leave the state, or double-counting (double-taxing) materials that pass through more complex interstate supply chains. That poses a risk of duplicative and conflicting fee payments, particularly as additional states adopt similar EPR laws. In contrast, businesses that operate exclusively in-state do not face that risk and experience significantly lower compliance burdens in tracing their products.

For each of the foregoing reasons, NAW is likely to prevail on its claim that the EPR program violates the Dormant Commerce Clause.

### 2. The Act Violates Due Process By Delegating Unprecedented Regulatory Power to a Private Entity.

Delegations of regulatory authority to private entities trigger scrutiny under the Due Process Clause, particularly where the private entity is controlled by self-interested members of the very industry that is being regulated. This principle squarely applies here and is compounded by other aspects of the regulatory scheme that allow the private entity to charge *retrospective fees* without adequate notice, and without any meaningful process to challenge fee assessments.

In *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936), the Court struck down a statutory scheme that granted regulatory authority to a group of coal producers and laborers—companies

that produced two-thirds of the total national production, plus one half of miners—to set maximum hours and minimum wages for the industry. *Id.* at 310–11. As the Court explained, "one person may not be entrusted with the power to regulate the business of another, and especially of a competitor," and "a statute which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal liberty and private property." *Id.* at 311. This delegation of power to private parties "clearly [denied] rights safeguarded by the due process clause of the Fifth Amendment." *Id.*

Nor is *Carter* alone. In *Eubank v. City of Richmond*, 226 U.S. 137, 143–44 (1912), the Court struck down on due process grounds a city ordinance giving private property owners sweeping authority to establish building lines for future construction. And in *Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 122 (1928), the Court similarly held that it violated due process to delegate to private owners coercive power over land use decisions for a neighboring property. Since *Carter*, courts have continued to recognize that delegations of regulatory authority to private parties trigger scrutiny under the Due Process Clause. *See, e.g.*, *Gen. Elec. Co. v. New York State Dep't of Lab.*, 936 F.2d 1448, 1455 (2d Cir. 1991) (reversing denial of summary judgment on a due process delegation claim involving private delegation of price fixing authority to labor groups); *Johnson v. Michigan Milk Mktg. Bd.*, 295 Mich. 644, 660 (1940) (finding due process violation where state impermissibly conferred legislative and adjudicative authority over price fixing to a Milk Marketing Board, whose members were composed of industry participants);

These problems apply squarely here. The Act delegates unprecedented regulatory authority to CAA—the only approved PRO—to set the terms, conditions, and fees for all "producers" in the state, affecting virtually all products sold or distributed in or into the State. Yet CAA touts, as its "founding members," some of the nation's largest companies that are themselves large producers under the Act. Wild Decl. Ex. B. Many of those Founding Members also have representatives who sit on CAA's Board of Directors. In certain areas, those large

companies may be competitors with NAW's members; in others, CAA's Founding Members and Board representatives may be retailers or suppliers who have a distinct self-interest in making sure that companies like NAW's members (distributors) bear a larger share of the costs.

This creates a system rife with the kinds of conflict of interests that the Due Process clause forbids, particularly in light of CAA's secret methodology for establishing fees. For example:

- CAA's methodology grants incentives and bonuses to those who conduct life-cycle evaluations (LCEs), and those benefits disproportionately flow to CAA's Founding Members (who are large enough to conduct those analyses), whereas NAW's members must subsidize the payment reductions offered to others;

- CAA's Founding Members are in a better position to absorb EPR fees—or shift the fees onto others—and thus may be more willing to impose and/or accept program features that have an outsized and unduly burdensome effect on others (such as higher total costs for a bigger program, or relatively higher fees on some product types versus others);

- There is an obvious conflict of interest to the extent disputes or issues may arise between CAA and a Founding Member or company represented on the Board. Where such disputes are resolving in the Founding Members' favor, that leaves others to bear a relatively greater share of the system costs;

- CAA has kept its detailed fee methodology confidential. To the extent CAA's Founding Members and/or Board (populated by representatives of those Founding Members) have access to or influence over that methodology, they occupy a privileged position over other producers who lack such access.

Wild Decl. ¶ 9. Thus, as in *Carter*, a block of controlling, self-interested producers are wielding inordinate power and influence to regulate the terms of conducting business for an unwilling minority. And there is good reason to be wary that such companies might use CAA as a means of defraying their own EPR compliance costs.

Nor do Defendants' agencies provide any meaningful protection against these excesses. As discussed, the Act provides only the most high-level guidance cabining CAA's broad discretion in formulating its plan—with respect to both setting total system costs and allocating them to different material types. DEQ did not engage in any economic impact analysis to test the

PAGE 29 - MOTION FOR PRELIMINARY INJUNCTION

impact of CAA's plan on different types of producers and products, and DEQ does not require approval for fee schedule changes or individual fee adjustments. Moreover, any disputes arising between CAA and NAW's members—including disputes over the interpretation of the Act itself—must be resolved through confidential arbitration; there is no administrative appeal process or even a traditional right to judicial review.

Indeed, the fee structure here is especially egregious because it operates on *a retrospective basis*, and through a nontransparent, confidential fee-setting methodology. It is a fundamental tenet of due process that "regulated parties should know what is required of them so they may act accordingly." *FCC v. Fox Television Stations, Inc*., 567 U.S. 239, 253 (2012). As explained above, CAA assesses fees on *prior years'* volumes based on rates that are determined only after the fact, making it impossible for businesses to accurately predict what their fees will be or to conform their operations accordingly.

The Due Process violation is further compounded by the lack of adequate notice and opportunity to contest fees during the CAA invoicing process. Procedurally, due process requires that an affected party receives "sufficient detail" about an administrative action taken so they "can prepare a responsive defense" prior to being deprived of their property. *K.W. ex rel. D.W. v. Armstrong*, 298 F.R.D. 479, 490 (D. Idaho 2014) (granting preliminary injunction as to agency procedure that "gives participants nothing more than the general explanation that several factors may have affected their individual budgets . . . and does not explain which combination of factors actually affected each participant's budget on an individualized level"), *aff'd* 789 F.3d 962, 968 (9th Cir. 2015).[10] As explained above, CAA is demanding payment from so-called

_____

[10] *See also, e.g., Jones v. Flowers, 547 U.S. 220*, 226 (2006) (absent special circumstances, individuals must be afforded pre-deprivation opportunity to present objections); *McKesson v. Div. of Alcoholic Beverages & Tobacco*, 495 U.S. 18, 37 (1990) (describing adequate notice and a meaningful opportunity to be heard as "root requirement[s] of the Due Process Clause"); *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (providing test for procedural due process to protect against risk of erroneous deprivation of property); *Ohio Bell Telephone Co. v. Pub. Utils. Comm'n of Ohio*, 301 U.S. 292, 300 (1937) (prohibiting state utilities commission from relying on "the strength of . . . unknown documents" to calculate the appropriate rate for telecommunications services and then demand refunds for prior years of alleged overcharging)

PAGE 30 - MOTION FOR PRELIMINARY INJUNCTION

"producers" based on invoices that provide scant information and where members have no meaningful way to verify the accuracy of the calculations or determine whether they are being double-charged or overcharged. Even when NAW's members have raised legitimate concerns, CAA has demanded immediate payment and refused to adjust invoices; NAW members are compelled to comply by the threat of punitive late fees and interest. Wild Decl. ¶ 23; Winkle Decl. ¶ 22. To the extent CAA is effectively operating as a state actor for the imposition and collection of regulatory fees, the lack of adequate notice and opportunity to be heard flagrantly violates procedural due process. Oregon should not be allowed to evade fundamental due process rights by delegating regulatory authority to a private entity, with which regulated parties are now forced to contract.

Thus, in these multiple ways, Oregon's EPR scheme violates Due Process.

### 3. The Act Violates the Unconstitutional Conditions Doctrine.

The unconstitutional conditions doctrine prohibits government from coercing people into giving up constitutional rights as a condition for accessing some privilege or benefit. *See, e.g.*, *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) (explaining that doctrine vindicates constitutional rights "by preventing the government from coercing people into giving them up"). As the Supreme Court explained in *Frost & Frost Trucking Co. v. Railroad Comm'n of Cal.*, while a state may in many cases condition the granting of a privilege, "the power of the state in that respect is not unlimited" and "may not impose conditions which require the relinquishment of constitutional rights." 271 U.S. 583, 593–594 (1926). *Frost*, for example, invalidated a state law that conditioned private carriers' right to operate on highways on their submission to public-carrier regulations for the quasi-public benefit. *Id.* at 591–94; *see also Southern Pacific Co. v. Denton*, 146 U.S. 202, 207 (1892) (invalidating statute that required companies to submit to the exclusive jurisdiction of state court, and waive the right to remove cases to federal court, as a condition to doing business in Texas).

These principles apply squarely here. As a condition of selling or distributing essentially any product into the State, businesses must agree to join a single private organization; agree to that organization's non-negotiable contract terms; and then pay supracompetitive and nontransparent retrospective fees to fund public-use infrastructure improvements across the state. *See supra* at pp. 12–16. That is not a "voluntary exchange." *Horne v. Dep't of Agric.*, 576 U.S. 350, 366 (2015) (explaining that selling products "in interstate commerce, although certainly subject to reasonable government regulation," is not something "that the Government may hold hostage, to be ransomed by the waiver of constitutional protection"); *see also Frost*, 271 U.S. at 592–594 (state could not compel private carriers to submit to common carrier regulations as a condition for operating on public highways). Further, because CAA's non-negotiable contract includes an arbitration clause, businesses are compelled—again, as a condition for doing business in the State—to waive their right to a judicial forum to challenge their fee assessments and CAA's interpretation of law. *See Denton*, 146 U.S. at 207 (Texas could not compel businesses to waive right to a federal judicial forum as condition for doing business in the state).

*Koontz* is also instructive. There, the Court limited a state's ability to require that a landowner, as a condition for building on his wetlands property, hire contractors to make "off-site" improvements to District-owned wetlands miles away. *Koontz*, 570 U.S. at 604–607 (holding that principles established in *Nollan v. California Coastal Commission*, 483 U. S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1994), also apply to demands for money, not just use of property owner's land). Similarly here, imagine a food-serviceware distributor who wants to sell to grocery stores and restaurants in Portland. That distributor's EPR fees are not merely to cover the reasonable costs of managing *its* products in Portland. Instead, the distributor—under CAA's plan—is paying to help create new recycling depots in Baker City and Astoria, and is paying to fund a public education and outreach campaign, none of which bears any relation to the distributor's own footprint. This fails even "rough proportionality" and is really no different from requiring Mr. Koontz to fund mitigation efforts unrelated to his property

elsewhere in the ecosystem. *See Koontz*, 570 U.S. at 606 (government "may not leverage its legitimate interest in mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts").

As the Supreme Court has explained, "[a] strong public desire to improve the public condition will not warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Dolan*, 512 U.S. at 396. NAW supports efforts to achieve a circular economy. But conditioning its members' ability to do business on their total submission to the PRO is neither sustainable nor constitutional.

### B.  NAW's Members Will Be Irreparably Harmed Without a Preliminary Injunction.

Irreparable injury is that "for which there is no adequate legal remedy." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Absent a preliminary injunction deferring enforcement of the EPR program (including any imposition or collection of EPR fees), NAW's members will suffer multiple forms of irreparable injuries—tangible and intangible—any one of which suffices to show irreparable harm.

Absent relief, NAW's members will be forced to pay the excessive invoices—in which fees often exceed the profit margins on the invoices—with the next ones coming out in or around January. Certain NAW members are at imminent risk of being forced out of Oregon, or at least withdrawing products from the market because of these fees and the specter of ongoing, crushing EPR burdens. Wild Decl. ¶ 22. Other NAW members are attempting to raise prices where they can—including passing them onto suppliers and consumers—but that itself harms their ability to compete (especially against exempt business or non-reporting competitors) and reduces sales. Allen Decl. ¶¶ 8, 10–12, 17 (member reporting that it already has "likely lost business" due to "asymmetry in reporting and cost allocation"); Winkle Dec. ¶ 9. Yet other NAW members are at imminent risk of withdrawing from Oregon or at least withdrawing certain products from Oregon. In each of those situations, NAW's members will experience irreparable harm in the

form of unrecoverable lost sales and harm to their goodwill, reputation, and business relationships in the market. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (loss of "customers and accompanying goodwill and revenue" from unlawful government action supports a finding of "irreparable harm"); *Stanley v. Univ. S. Cal.*, 13 F.3d 1313, 1324 (9th Cir. 1994) (prospective and existing "loss[es] of business opportunity" constitute irreparable harm).

Moreover, the coerced choice—being forced to contract with CAA, submit to its requirements, agree to binding arbitration, and pay its fees; or otherwise abandon doing business in Oregon—itself deprives NAW's members of basic constitutional rights. "It is well established that" a deprivation of constitutional rights alone "unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) ("[A] prospective violation of a constitutional right constitutes irreparable injury for . . . purposes of seeking equitable relief." (cleaned up)).

Finally and independently, forcing NAW's members to continue to pay CAA's invoices creates a risk of irreparable harm because it is unlikely that such payments can be recovered, even if NAW ultimately prevails in this suit. Based on sovereign immunity, NAW and its members cannot recover damages from Defendants or the State. *See Will v. Mich. Dep't of State Pol.*, 491 U.S. 58, 70–71 (1989). And if, for example, CAA spends the collected fees during the pendency of the lawsuit, NAW's members may not be able to recoup them from CAA either. This constitutes irreparable harm. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 678 (9th Cir. 2021) ("[W]here parties cannot typically recover monetary damages flowing from their injury . . . economic harm can be considered irreparable."); *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) ("If expenditures cannot be recouped, the resulting loss may be irreparable.").

PAGE 34 - MOTION FOR PRELIMINARY INJUNCTION

To avoid this irreparable injury, NAW requests, on behalf of its members, an injunction to preliminarily enjoin DEQ from enforcing the Act (including any nonpayment of fees), or to require such acts as may be necessary to direct the PRO likewise to defer the collection of additional fees pending adjudication on the merits.

### C.     The Equities Favor NAW.

The balance of harms and public interest also favors NAW.

*First*, the burdens imposed on NAW's members are both severe and immediate, far outweighing the minimal harm the State may suffer from a temporary pause on its novel EPR system. If Oregon's EPR program is further enforced, NAW members will face severe and irrecoverable compliance costs, fees, and operational disruption. Producers will be subjected to retroactively-assessed fees that often exceed product margins. Winkle Decl. ¶¶ 7, 16, 26; Allen Decl. ¶¶ 6, 9, 12, 23–24. Distributors who have been subjected to double counting and overpayments will likely continue to bleed money arbitrarily and unjustly, given CAA's failure to offer any guidance or recourse for these errors. Winkle Decl. ¶¶ 11–12, 14–18; Allen Decl. ¶ 24. Mid-sized producers will continue to lose both money (from the diversion of resources for purposes of compliance) and market share (to exempt small producers). Allen Decl. ¶ 10–12. As explained, none of these losses are recoverable.

Enjoining enforcement of the EPR program during litigation preserves the status quo—nothing more. Oregon waited until 2022, "35 years since [its] first recycling program[]," to establish this one. ORS 459A.860(3). NAW is committed to litigating this matter to final judgment expeditiously, and thus if Defendants prevail, they can simply resume enforcement and their plans to build out the state infrastructure at that time.

*Second*, the "public interest" further supports a preliminary injunction here. "[I]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013). In fact "it is *always* in the public

interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (emphasis added). Oregon's EPR program offends several constitutional principles and lacks meaningful procedural safeguards. *See supra* § III.A.2–3. It might be reasonable, even commendable, for Oregon to strive to curb the "negative environmental, social, economic and health impacts" of certain practices. ORS § 459A.860. But the law "does not permit [Oregon] to prioritize any policy goal over the Due Process Clause," *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013), or any other limit imposed by the U.S. Constitution.

## IV.    CONCLUSION

NAW respectfully requests that the Court issue a preliminary injunction barring Defendants from enforcing the Act and regulations promulgated thereunder, and to take such steps as may be necessary to defer the EPR payment obligations of NAW's members. To the extent the Court is not prepared to enter a preliminary injunction at the upcoming hearing, NAW respectfully requests that the Court enter a temporary restraining order pending a final decision on the motion.

Date:  November 24, 2025                    SIDLEY AUSTIN LLP

By: */s/ David R. Carpenter*
        David R. Carpenter*
        drcarpenter@sidley.com

        Caleb J. Bowers*
        cbowers@sidley.com
        Alexandra T. Mushka*
        amushka@sidley.com
        350 South Grand Avenue
        Los Angeles, CA 90071
        Telephone: +1 213 896 6000
        Facsimile: +1 213 896 6600

        Gordon D. Todd*
        gtodd@sidley.com
        Richard W. Smith*
        rwsmith@sidley.com

PAGE 36 - MOTION FOR PRELIMINARY INJUNCTION

1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736 8000
Facsimile: +1 202 736 8711
*Pro hac vice*

BRADLEY BERNSTEIN SANDS LLP
Darin Sands, OSB No. 106624
1211 NW Glisan St., Ste 204
Portland, OR 97209
Telephone: +1 503-734-2480

Attorneys for Plaintiff
NATIONAL ASSOCIATION OF
WHOLESALER-DISTRIBUTORS