Darin Sands, OSB No. 106624
dsands@bradleybernstein.com
BRADLEY BERNSTEIN SANDS LLP
1211 NW Glisan St., Ste 204
Portland, OR 97209
Telephone: +1 503-734-2480

David R. Carpenter*
drcarpenter@sidley.com
Caleb J. Bowers*
cbowers@sidley.com
Alexandra T. Mushka*
amushka@sidley.com
SIDLEY AUSTIN LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213-896-6000
Facsimile: +1 213-896-6600

[Additional counsel on following page]

Attorneys for Plaintiff
NATIONAL ASSOCIATION OF
WHOLESALER-DISTRIBUTORS

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>LEAH FELDON, DIRECTOR, OREGON DEPARTMENT OF ENVIRONMENTAL QUALITY, in her official capacity; MATT DONEGAN, KAREN MOYNAHAN, MARK WEBB, AND SILVIA TANNER, in their official capacities as members of the Oregon Environmental Quality Commission,<br><br>　　　　　Defendants. | Case No. 3:25-cv-01334-SB<br><br>**DECLARATION OF BRIAN WILD IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER** |

PAGE 1 -   DECLARATION OF BRIAN WILD IN SUPPORT OF PLAINTIFF'S MOTION
　　　　　FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING
　　　　　ORDER

Additional counsel for Plaintiff
National Association of Wholesaler-Distributors

Gordon D. Todd*
gtodd@sidley.com
Richard W. Smith*
rwsmith@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202-736-8000
Facsimile: +1 202-736-8711

*Pro hac vice

I, Brian Wild, declare as follows:

1.       I am the Chief Government Relations Officer of Plaintiff National Association of Wholesaler-Distributors ("Plaintiff" or "NAW"). I am over the age of eighteen and competent to testify in this matter. I make this declaration in support of Plaintiff National Association of Wholesaler-Distributors' Motion for Preliminary Injunction and/or Temporary Restraining Order.

2.       As Chief Government Relations Officer of NAW, I have reviewed NAW records and information reported to me by NAW personnel or NAW member companies in the regular course of NAW's activities, including for matters related to Oregon's Plastic Pollution and Recycling Modernization Act (the "Act") and the Extended Producer Responsibility ("EPR") requirements provided therein. I regularly speak with NAW members regarding EPR matters.

3.       NAW is a national trade association founded in 1946 that represents distributors and wholesalers across the United States. NAW's membership comprises direct member companies and a federation of national, regional, and state associations across 19 commodity lines of trade, which together include approximately 35,000 companies operating nearly 150,000 locations throughout the nation.

4.       Many NAW members are medium-sized businesses that operate distribution centers, manage inventory, and coordinate logistics across multiple states, including Oregon. Many NAW members are "producers" under the Act because they sell or distribute packaged goods in or into Oregon or import products later sold into Oregon, and these goods and/or the packaging in which they are contained are subject to the Act.

5.       NAW has members that distribute into Oregon from facilities both within and outside the state, and whose operations span multiple jurisdictions with differing, and at times conflicting, EPR regimes (including those in the process of being implemented by other states). These members operate distribution centers, manage inventory, and coordinate logistics across

state lines. Many of NAW's members are too big to qualify for the exemption offered to small businesses with less than $5 million in total revenues.

6. Attached as Exhibit A is a copy of the document titled, Oregon Program Plan (2025–2027) ("Program Plan"), which the Oregon Department of Environmental Quality ("DEQ") approved on February 21, 2025. I obtained a copy of this document from DEQ's public website, <https://www.oregon.gov/deq/recycling/pages/modernizing-oregons-recycling-system.aspx>, on or about November 19, 2025. I have reviewed the document in the course of performing my duties for NAW. Exhibit A is a true and correct copy of the document as it appeared on DEQ's website on that date. The document discusses the elements of Oregon's EPR program, and these elements, including the design, fee-setting, and implementation, directly affect NAW members' ability to plan, price, and execute their interstate distribution activities.[1]

7. The Program Plan contemplates, among other things, contracting with municipalities; creating a new network of collection sites and depot locations, service providers, and recycling centers; creating new tracking and accounting systems; and conducting public education and outreach campaigns.

8. Oregon approved the Circular Action Alliance ("CAA") as a Producer Responsibility Organization ("PRO") to administer the program. CAA is the only organization that has been approved for Oregon. Attached as Exhibit B is a true and correct copy of certain materials obtained from the Circular Action Alliance's website, located at <https://circularactionalliance.org/>, consisting of information on CAA's founders and leadership, as accessed by me on or about November 19, 2025. Exhibit B accurately reflects the information published on CAA's website on or about that date.

9. NAW has tracked CAA's implementation of the Oregon program and its impact on members. As a practical matter, producers subject to the Oregon law have no alternative to

---

[1] CAA amended the Program Plan on September 12, 2025, but the amendments do not appear material to the issues producers are experiencing.

PAGE 4 -   DECLARATION OF BRIAN WILD IN SUPPORT OF PLAINTIFF'S MOTION
            FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING
            ORDER

joining CAA. Complying with the requirements of the Act independently is extremely cost-prohibitive for NAW's members due to the high costs involved, such as performing studies and creating recycling infrastructure. Therefore, distributors have no real choice but to join the only PRO, which is CAA. NAW is aware that CAA requires covered entities to execute a non-negotiable participation agreement and Oregon-specific addendum as a condition of participation, which include provisions requiring binding, confidential arbitration for disputes relating to Oregon EPR obligations as well as terms, conditions, and fees imposed on producers. Based on my review of the Program Plan and discussions with NAW members, it contains the following problematic elements (among others) for distributors:

- CAA's methodology grants incentives and bonuses to those who conduct LCEs, of the type that would disproportionately flow to CAA's Founding Members who are large enough to conduct those analyses, meaning that NAW's members would effectively be subsidizing those payment reductions.

- CAA's Founding Members are the types of companies that are inherently better situated to absorb EPR fees or shift the fees onto others.

- There is an obvious conflict-of-interest to the extent disputes or issues may arise between CAA and a Founding Member or company represented on the Board (CAA's Board includes representatives of Founding Members). Where disputes arise between CAA and a Founding Member or company represented on the Board, NAW and its members generally would consider CAA's resolution of the dispute as involving a conflict of interest based on the absence of an impartial third party in the resolution.

- CAA has kept its detailed fee methodology confidential. To the extent CAA's Founding Members and/or Board (populated by representatives of those Founding Members) have access to or influence over that methodology, they would occupy a privileged position over other producers who lack such access.

PAGE 5 -   DECLARATION OF BRIAN WILD IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER

10. NAW members began receiving their first Oregon EPR invoices from CAA in or about July 2025, with subsequent invoices scheduled to issue again in or about January 2026 based on members' prior-year data. NAW has received multiple reports across its membership that these initial invoices were materially higher than expected based on CAA's earlier public-facing materials and proposed fee schedules. Members also report that invoicing was retrospective and not accompanied by sufficient detail to understand, validate, or self-audit the underlying calculations.

11. In monitoring implementation, NAW has sought information from DEQ, and understands members have sought information from DEQ and/or CAA, regarding the methodology used to set member fees, including the cost allocation model and the structure and magnitude of "ecomodulated" adjustments. NAW and multiple members have been unable to obtain the detailed methodology necessary to understand how material categories, systemwide cost allocations, and member-specific inputs produce the amounts invoiced to covered entities. In several instances, members who asked DEQ or CAA for the underlying methodology or data were not provided the requested information.

12. NAW understands from CAA's public materials that the program plan separates packaging and other covered materials into approximately 60 categories and includes a base fee schedule for those categories. Members, however, have reported that the fees ultimately invoiced do not consistently align with public schedules and that CAA retains discretion to revise fee levels, cost allocations, and adjustment criteria, compounding the difficulty of forecasting costs.

13. Attached as Exhibit C is a screen capture from the presentation titled, Circular Action Alliance, Budgeting for EPR Fees, Q1 2025. I obtained the screen capture from CAA's website at <https://circularactionalliance.org/webinar-archives/v/cf8n47jbms94ntfkzcsx24e7gdtybt> on or about November 19, 2025. Exhibit C is a true and correct copy of the applicable information published on CAA's website on that date. Exhibit C reflects CAA's general description of its fee methodology; on the other hand, CAA's

"Detailed Fee-Setting Methodology" is contained in an appendix to the Program Plan that has been marked confidential. *See* Ex. A., Appendices at 85. NAW members have requested access to CAA's methodology and have been denied by CAA and DEQ.

14. Attached as Exhibit D is a copy of the document titled, Oregon Environmental Quality Commission Meeting, Rulemaking, Action Item G. The document bears the date, November 16-17, 2023. I obtained a copy of this document from DEQ's public website, <https://www.oregon.gov/deq/recycling/pages/modernizing-oregons-recycling-system.aspx>, on or about November 19, 2025. Exhibit D reflects a true and correct copy of document published on DEQ's website on that date. I reviewed the document as part of NAW's monitoring of the rulemaking process. In the rulemaking process, DEQ acknowledged that it was not in a position to determine the overall fiscal impacts of the EPR program, and DEQ did not require any economic impact analysis on businesses beyond a limited assessment for small businesses.

15. Across NAW's membership, members report that Oregon's EPR fees are being assessed on a retrospective basis using prior-year material types and volumes; that they do not know the applicable fee rates or adjustments at the time of sale; and that the program has provided no reliable, member-accessible mechanism to verify whether upstream or downstream parties have reported the same products, avoid duplicative payments, or reconcile overlapping reports. Members also report that CAA's invoices lack sufficient line-item detail for producers to determine whether the charges overlap with charges assessed to other obligated parties for the same products.

16. NAW has received numerous member reports that Oregon's EPR fees have exceeded margins for a substantial number of distributed products, and that suppliers have implemented significant price increases—often without itemizing EPR components—making it impossible to determine whether a given product has already been reported and paid for upstream. Although the data varies among distributors of different product lines, a significant number of companies report after-tax profit margins of less than 1%, with the average margin of

about 2%. Members further report that they frequently lack the practical ability to pass fees through to customers in the normal course of business due to retail pricing dynamics, competition from exempt or non-reporting entities, and the retrospective nature of the fee framework.

17.     The Oregon program's structure has also generated what members describe as a "free rider" and "asymmetry" problem. Reporting members pay into the system even where comparable non-reporting competitors sell similar goods into Oregon, and the structure provides no transparent, centralized method for confirming upstream or downstream reporting for a given stock keeping unit. Members have also reported that broader program incentives—such as fee modulation tied to life cycle evaluations—are economically out of reach for mid-sized distributors, who cannot feasibly undertake those studies.

18.     NAW has received reports of double counting and duplicative assessments arising from multi-state distribution flows, where products received at an Oregon hub later leave the state, or where Oregon-bound products originate outside of Oregon and pass through multiple facilities before reaching an Oregon destination. In practice, members describe that there is no workable, affordable, or standardized reconciliation mechanism provided by the program to track and net out multi-state movements at the level of specificity needed to avoid duplicative assessments, particularly where downstream transfers occur outside the distributor's control or visibility. More broadly, members have reported that ascertaining the "producer" for a given line of business often involves a difficult process and requires closely scrutinizing multiple transactions.

19.     Members have also reported that CAA's guidance on categorization and reporting has been inconsistent, generic, or not sufficiently responsive to specific, fact-intensive questions, and that where errors or overlapping reports were identified, CAA directed members to pay first and then seek undefined or delayed credits or refunds, with no clear process or timeframe for resolution.

20.     In connection with the Oregon EPR program, NAW has diverted organizational resources from its core mission to address member inquiries, analyze program documents, engage with DEQ (and CAA via its resources and materials) regarding program implementation, educate members, and collect and synthesize member experiences. NAW staff and counsel have expended significant time attempting to understand the program's evolving fee structures, to identify and convey common implementation problems, and to help members navigate the lack of transparent, centralized reporting confirmation mechanisms. These efforts have required substantial time and expense separate and apart from this litigation.

21.     Based on review of DEQ's publicly available rulemaking and related materials, and NAW's participation and monitoring during the rulemaking period, NAW is not aware of any comprehensive economic impact analysis by DEQ that evaluated the overall fiscal impacts of the Oregon EPR program on mid-sized distributors and wholesalers, the feasibility of passing costs through to upstream or downstream parties in interstate supply chains, the risk of supply chain disruptions and product withdrawals that members have reported, or the extent to which higher fees may be charged for more environmentally friendly materials due to charges based on overall weight. NAW has seen no program documentation that addresses how the program will avoid over-collection from reporting entities due to exemptions, non-reporting, or inaccurate market share projections.

22.     Multiple NAW members have conveyed to NAW that the Oregon program's retrospective, opaque, and discretionary fee design makes it infeasible to price products accurately, budget prospectively, or avoid paying fees in excess of product-level margins. Members have also emphasized that fees and related supplier cost increases are already affecting competition in Oregon and in neighboring markets, especially where Oregon-assessed fees are carried with goods across state lines into jurisdictions without similar programs. NAW offers the declarations of Ed Allen (WCP Solutions) and James Winkle (Harbor Foods) as representative examples of the program's impacts; their experiences are consistent with the broader reports

NAW has received from other members doing business in or into Oregon. In particular, their experiences reflect widespread challenges with retrospective fee-setting, lack of access to methodology, invoice opacity, duplicative reporting risks, interstate tracking complexities, and the competitive disadvantages faced by reporting distributors relative to exempt or non-reporting entities. Certain NAW members are at imminent risk of being forced out of Oregon, or at least withdrawing products from the market because of these fees, which CAA continues to assess against producers in Oregon.

23. NAW understands that in addition to penalties charged by CAA such as late fees and interest, Oregon law authorizes civil penalties for noncompliance that can reach significant daily amounts, which further compels members to pay disputed or insufficiently explained invoices to avoid enforcement exposure. Members have expressed concern that, even if NAW prevails on its claims, amounts paid to CAA may not be recoverable through any ordinary process.

24. The next round of CAA invoices is expected in or about January 2026, which will still be based on 2024 data. CAA only recently provided information on the fee schedule to be used for these invoices; the timing of this schedule does not provide distributors with the necessary information to reasonably predict fee rates, adjustments, or methodology for those invoices, and they face the prospect of further retrospective and unpredictable assessments without a transparent mechanism to validate or challenge the charges in a timely and effective manner.

25. During one webinar attended by NAW related to CAA's California EPR program in mid-October 2025, a CAA representative stated its Oregon fee allocations were constructed based on "very imperfect data." In addition, on November 18, 2025, CAA hosted a webinar for members and provided some general updates. Among other things, CAA advised that:

- 27 product categories (nearly half) would see fee increases of 25% or more, with some rates increasing by 45% (while only 2 product categories would see significant fee decreases);

- CAA has represented it will continue to use producers' 2024 data to calculate 2026 fees (regardless of whether a producer has made changes to its materials, volumes, or sales); and

- CAA's Board (populated by representatives of the State's largest producers) seem to have access to review the fee-setting methodology, even though CAA's members at large do not have access to it.

26.  Other producer responsibility schemes provide much greater clarity to regulated parties. For example, many state and local jurisdictions have implemented taxes on plastic bags at the retail level. In the City of Chicago, for instance, the checkout bag tax provides that retailers must charge the consumer $.10 per bag purchased and pay $.09 per bag to the wholesaler which remits that amount to the city. Retailers there are best positioned to collect the tax and thereby change consumer behavior. As another example, a federal bill (the REDUCE Act, introduced H.R. 5389/S.2645) has been proposed, which would tax virgin plastic resins intended for single-use plastics. This bill would apply the tax at the beginning of the supply chain where the manufacturer is best positioned to comply.

27.  Attached as Exhibit E is a true and correct copy of the correspondence, subject: Request for Delay of Effective Date for the Plastic Pollution and Recycling Modernization Act, addressed from NAW (Brian Wild) to Ms. Leah Feldon, Director of DEQ, bearing the date June 4, 2025, and DEQ's response, subject: Request to delay implementation of the RMA, addressed from DEQ (Nicole Portley) to Brian Wild, bearing the date June 23, 2025. I obtained a copy of this correspondence from NAW's files, where the document is kept in the regular course of business.

I hereby declare under penalty of perjury of the laws of the United States that the foregoing statements are true and correct.

DATED:  November 24, 2025

                                                               */s/ Brian Wild*
                                                               Brian Wild