Darin Sands, OSB No. 106624
dsands@bradleybernstein.com
BRADLEY BERNSTEIN SANDS LLP
1211 NW Glisan St., Ste 204
Portland, OR 97209
Telephone: +1 503-734-2480

David R. Carpenter*
drcarpenter@sidley.com
Caleb J. Bowers*
cbowers@sidley.com
Alexandra T. Mushka*
amushka@sidley.com
SIDLEY AUSTIN LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213-896-6000
Facsimile: +1 213-896-6600

[Additional counsel on following page]

Attorneys for Plaintiff
NATIONAL ASSOCIATION OF
WHOLESALER-DISTRIBUTORS

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS,<br><br>Plaintiff,<br><br>v.<br><br>LEAH FELDON, DIRECTOR, OREGON DEPARTMENT OF ENVIRONMENTAL QUALITY, in her official capacity; MATT DONEGAN, KAREN MOYNAHAN, MARK WEBB, AND SILVIA TANNER, in their official capacities as members of the Oregon Environmental Quality Commission,<br><br>Defendants. | Case No. 3:25-cv-01334-SB<br><br>**DECLARATION OF JAMES E. WINKLE IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER** |

Additional counsel for Plaintiff
National Association of Wholesaler-Distributors

Gordon D. Todd*
gtodd@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202-736-8000
Facsimile: +1 202-736-8711

*Pro Hac vice

## DECLARATION OF JAMES E. WINKLE

I, James E. Winkle, declare the following:

1. I am Executive Vice President and Chief Financial Officer of Harbor Foods. I submit this declaration in support of the National Association of Wholesaler-Distributors' Motion for a Preliminary Injunction and/or Temporary Restraining Order. The following facts are within my own personal knowledge and, if called upon as a witness, I could and would competently testify thereto.

2. Harbor Foods is privately held, independent food distributor serving independent convenience stores, independent restaurants, quick service restaurants, and other retail establishments in Oregon, California, and Washington. Harbor Foods purchases food products from suppliers and sells them to customers such as restaurants and convenience stores.

3. Many products Harbor Foods distributes are packaged in plastic or other materials—such as wraps, pouches, cartons, containers, and similar materials—that are essential to food safety, sanitary handling, and transport. These materials prevent leakage, contamination, and spoilage that would otherwise render food products unsellable.

4. Harbor Foods does not manufacture, package, or repackage products, except for using small amounts of secondary/tertiary packaging for shipment. Primary packaging design and material choices are controlled by manufacturers and brand owners who sell to Harbor Foods. Harbor Foods has no input on decisions made by these suppliers regarding product type, materials, and weight. A small portion of our product portfolio is private label branded products, over which Harbor Foods has certain limited control of packaging decisions.

5. Oregon's Extended Producer Responsibility ("EPR") program, implemented through the state's approval of Circular Action Alliance ("CAA") as the sole producer responsibility organization ("PRO"), has proven impracticable for Harbor Foods. Although Harbor Foods lacks decision making control for the vast majority of the products in our portfolio, Harbor Foods is nonetheless treated as a "producer" for products we distribute into Oregon.

6. Harbor Foods was compelled to join CAA but was not permitted to negotiate the terms of our participation. It is not feasible for Harbor Foods to meet the producer requirements of the EPR statute without joining a PRO. Meeting the producer requirements is extremely costly and Harbor Foods could not reasonably pay those costs to create a standalone producer responsibility program.

7. Harbor Foods' analysis of Oregon's EPR requirements and related CAA invoices so far shows that the EPR fee assessed for the products we were able to categorize, based on the provided "definitions," negatively impacted our profit margins significantly. As is true for most wholesale distributors, our profit margins are often razor thin and given that distribution of packaged products is our business, there is no opportunity to absorb costs across other types of products or services. Harbor Foods also does not have the market leverage or pricing power to simply raise costs at the level necessary to account for EPR fees, nor does Harbor Foods have any recourse for cost increases charged by our suppliers due to EPR. Overall, the Oregon fees charged thus far demonstrate that most of Harbor Foods' Oregon sales of products that fall under this requirement would be at a loss due to EPR fees absent a price increase specifically to account for these charges.

8. Harbor Foods has not had access to CAA's fee methodology and therefore has not been able to confirm whether CAA's invoice is accurate and what our fees are paying for. Furthermore, the fees we have been charged (over $500,000) were based on "estimates" for 2024 and were assessed in March 2025, giving our company no way or time to recoup any of these fees through price increases to our customers. Following our submittal of the required "estimated" fees for 2024, we discovered that roughly half of the amount that we provided to CAA included fees on products that had already been paid by the manufacturer, which further complicates this matter. Harbor reached out to CAA to inquire about resubmitting our "estimates" without the inclusion of those products already paid for by the manufacturer and were told we have to submit payment on our original numbers and CAA would determine if we would be eligible for a credit at some future point.

PAGE 4 - DECLARATION OF JAMES E. WINKLE IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER

9.  Price increases to our customers, regardless of the reason, vary and are market sensitive. Passing Oregon's EPR fees to our customers would be required in order for us to sustain our profitability, however, in many cases it would make us less competitive, especially against competitors in Oregon who may be exempt from the requirements (e.g., under the exemption for small producers) or others who have avoided reporting their products. It is simply not practicable to raise prices at the level needed to account for these EPR fees. Harbor Foods would also be at a competitive disadvantage on our interstate commerce transactions from our Roseburg, Oregon facility into Northern California based on the potential of a manufacturer passing their EPR fees to Harbor Foods—and we have to try and sell our products, at a higher price, than our competitors that are selling into California and are not subject to the Oregon EPR fees.

10. At the same time, Harbor Foods has faced supplier price increases of up to 80% on the products we purchase and distribute. For many products, the lack of transparency around EPR pricing makes it impossible to determine to what extent supplier increases are due to EPR—and, in turn, whether that means the subject products have already been reported for EPR purposes. For example, Harbor Foods has received such price increases without any itemization to attribute a portion of the increase to EPR costs compared with other costs (e.g., tariffs). Many suppliers also have not been forthcoming with information on their products, including which products (if any) they are reporting for EPR purposes. This means that Harbor Foods cannot determine whether a given product has already been reported to CAA and Oregon. Harbor Foods is therefore faced with the impossible decision of either reporting the product itself and potentially double-paying fees—when there has already been a huge impact on our profit margin due to supplier cost increases—or assuming that the product has already been reported and thereby risking noncompliance under Oregon's program.

11. The EPR program's framework and implementation create persistent uncertainty regarding the scope of Harbor Foods' legal obligations, as the statutory scheme places full responsibility on private entities within a supply chain to determine compliance and reporting among themselves. Harbor Foods has faced increased costs or responsibility for costs under this

scheme, which it would not otherwise have borne. For example, Harbor Foods faces increased costs when upstream manufacturers or brand owners decline to pay EPR fees for a particular product despite that they should be the first-obligated producer, leaving Harbor Foods to report or be subject to penalties. Harbor Foods has also "double" paid fees on products where it lacked information from suppliers or customers to determine whether fees were already paid, including as discussed above. There is no regulatory mechanism to confirm which upstream seller or manufacturer, if any, is taking responsibility for a given product, resulting in duplicative reporting and payments. Neither Oregon nor CAA provide information on products for which fees have been paid. Instead, producers are left guessing whether they have any obligation at all and if so, what that obligation is.

12. Upstream producers have not been forthcoming with information necessary to fulfill the EPR requirements. For example, because Harbor Food lacks control over packaging materials, we must obtain from our suppliers any information on packaging product types, weight, composition, etc. that is required for EPR reporting. Yet these suppliers have no legal obligation under Oregon's program to provide us with this information, nor do producers, for example, report the information into a centralized database. Without this information, it is utterly impracticable to determine Harbor Foods' own EPR obligations.

13. Harbor Foods offers several thousand different stock keeping units ("SKU") across food, beverage, and related product categories. A large majority of these SKUs are sold to our customers in Oregon (as well as other states), and constitute a meaningful portion of Harbor Foods' regional distribution activities and require frequent deliveries throughout the state. It is not feasible or practicable for Harbor Foods to obtain full, detailed packaging specifications for all the SKUs being sold into Oregon and is further compounded by the changing nature of the subject products and materials, which Oregon's EPR program further dictates as materials are supposed to be shifting toward more recyclable content. In addition, many manufacturers consider their formulations and material compositions proprietary or otherwise have refused to share them—or simply not responded to Harbor Foods' requests for information.

PAGE 6 - DECLARATION OF JAMES E. WINKLE IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER

14. Many of Harbor Foods' suppliers have not been responsive to requests for product-related information for EPR reporting. Based on this lack of responsiveness, the only option for Harbor Foods to determine our EPR obligations is manual analysis. In addition, certain upstream entities are not the manufacturer of record and cannot provide manufacturer-level data.

15. Oregon's EPR program provides 60 different material categories that in many cases are not discernable from simply observing the packaging material. Therefore, in all but the most obvious cases, determining the appropriate material category requires laboratory testing. Given the large number of SKUs that Harbor carries and offers, determining the material category would demand hundreds of hours of staff time for each reporting cycle (i.e., annually) as well as testing costs that cannot reasonably be borne by Harbor Foods' business model particularly in conjunction with paying the program fees. Frequent product substitutions and ongoing packaging redesigns further undermine the reliability of any attempt to capture specifications retrospectively.

16. The uncertainties regarding Harbor Foods' EPR obligations are further compounded by the retrospective nature of Oregon's fee framework. Fees are charged at the end of a calendar year based on product data from that year. But Harbor Foods' sales are variable, and we cannot predict within a particular year which products or materials will be sold and in what quantities. This makes it impossible to charge and accrue amounts throughout the year to cover the EPR fees.

17. Even if Harbor Foods were able to obtain detailed packaging information on its numerous SKUs from suppliers, compliance would still not be feasible when accounting for differences in state requirements for packaging. For example, Harbor Foods would need to either disaggregate products sold into Oregon or somehow trace products to determine which are sent into Oregon and those that leave the state from our Oregon facility. Harbor Foods distributes products across multiple state lines through three primary regional facilities, creating additional complexity in tracing packaging and assigning EPR obligations. Approximately 18 percent of sales occurring from Harbor Foods' Roseburg, Oregon facility, 20 percent of sales occurring from our Lacey, Washington facility, and 9 percent of sales from our Modesto, California facility are made

PAGE 7 - DECLARATION OF JAMES E. WINKLE IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING
ORDER

to customers located out of state. Washington out-of-state sales are generally made to northern Oregon and Idaho, Oregon out-of-state sales are made to northern California, and California out-of-state sales are made to Nevada. These overlapping routes make it difficult to determine when a product sold from a facility in one state to another accrues Oregon EPR fees or when there instead should not be any fee because the product subsequently leaves Oregon. Without a clear mechanism for tracking and reconciling multi-state shipments, Harbor Foods faces significant risk of double counting or duplicative fee assessments when goods cross state lines. Developing such a system would be extremely burdensome.

18. Constructing a multi-jurisdictional data-tracking architecture that aligns with Oregon's program while also accommodating other states' EPR classifications is not practicable for a mid-sized business with small product margins that are already exceeded by EPR fees. The difficulty is compounded because Harbor Foods lacks many data inputs from suppliers and customers as discussed above. Oregon requires categorization across 60 packaging types; nearby states use even more granular classifications and have issued additional requirements different from Oregon's requirements, such as California, which has created upwards of 95 covered material categories.

19. In addition, the complexity of rules and lack of harmonization across states make it impractical to maintain a consistent, accurate reporting system across jurisdictions. The statutory and program materials themselves are voluminous and highly technical, without any centralized regulatory apparatus (e.g., to connect product codes or industry-standard identifiers to the applicable fee categories).

20. Adjusting materials to satisfy recyclability criteria also conflicts with food safety and shelf-life requirements. Many food service items and packaged goods rely on multi-layer plastic films or laminated coatings to prevent grease seepage, moisture loss, and leakage during storage or transit. Replacing these materials with single-layer or paper-based alternatives often compromises product integrity, shortens shelf life, and increases the risk of contamination or spoilage. For temperature-sensitive or liquid products, fully recyclable packaging typically cannot

PAGE 8 - DECLARATION OF JAMES E. WINKLE IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER

maintain the same barrier performance needed to meet FDA and state food-safety standards, forcing Harbor Foods and its suppliers to choose between compliance with EPR requirements and ensuring consumer safety and marketability.

21. CAA's guidance to Harbor Foods has been inconsistent and nontransparent. Harbor Foods has sought clarification on basic questions such as the treatment of overlapping reports (e.g., "double" counting), but CAA has responded with generic email responses that do not resolve specific questions or even identify the CAA personnel responding in some cases. CAA representatives have provided conflicting information. CAA has also referred Harbor Foods to Oregon's Department of Environmental Quality in some cases, which has likewise provided limited or no substantive guidance on specific issues.

22. CAA's invoices lack detail sufficient to validate charges and provide no method to identify whether payments overlap with those of upstream parties. The refund process is unclear, and the handling of interest on overpayments is not transparent. As mentioned above, after Harbor Foods submitted its initial report to CAA, for certain products it came to Harbor Foods' attention that its suppliers or vendors had submitted overlapping reports on the same products. When Harbor Foods attempted to amend its own reporting to exclude those items, CAA instructed Harbor Foods to pay first and seek a potential refund later. Because of the binding and non-negotiable nature of CAA's program agreement, and the lack of recourse provided in that agreement, Harbor Foods has no effective recourse for challenging CAA.

23. CAA's invoice for EPR fees was materially higher than Harbor Foods' initial estimate based on the information CAA had provided.

24. Harbor Foods has devoted substantial staff time and resources to EPR compliance. To date, various Harbor Foods personnel have spent roughly the equivalent of two to three full-time workweeks gathering data, coordinating (or attempting to coordinate) with vendors and customers, and preparing reports. Harbor Foods retained consultants to map SKUs to Oregon's categories and fee rates and to attempt to align Oregon reporting with other states' EPR systems,

but material differences among state programs and Oregon's other program characteristics and uncertainties, limit the effectiveness of these efforts.

25. Oregon's EPR program fee structure undermines Harbor Foods' ability to serve Oregon customers. Fees are assessed without transparent, publicly vetted methodology, and the fee schedule and inputs can change without meaningful oversight or notice. The lack of clarity about which entity in the producer hierarchy is obligated for a given product creates a substantial risk that Harbor Foods will either pay fees that upstream manufacturers should bear or face enforcement risk if it refrains from reporting products for which Harbor Foods is not the primary obligated producer.

26. The combined effect of the EPR program characteristics is a significant burden on Harbor Foods' business, interstate supply network, and distribution planning.

27. Attached to this declaration as Exhibit A is the document titled, Circular Action Alliance, Participant Producer Agreement. Exhibit A is a true and correct copy of the document in the form provided by CAA. I obtained a copy of this document from Harbor Foods' files, where the document is kept in the regular course of business.

28. Attached to this declaration as Exhibit B is the document titled, Circular Action Alliance, Oregon Addendum to Participant Producer Agreement. Exhibit B is a true and correct copy of the document in the form provided by CAA. I obtained a copy of this document from Harbor Foods' files, where the document is kept in the regular course of business.

I hereby declare under penalty of perjury of the laws of the United States that the foregoing statements are true and correct.

Executed on this 20th day of November 2025, in Lacey, Washington.

*James E. Winkle*