DAN RAYFIELD
Attorney General
SARA D. VAN LOH #044398
Senior Assistant Attorney General
ALEXANDER C. JONES #213898
Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Sara.VanLoh@doj.oregon.gov
          Alex.Jones@doj.oregon.gov

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS , <br><br> Plaintiff, <br><br> v. <br><br> LEAH FELDON, DIRECTOR, OREGON DEPARTMENT OF ENVIRONMENTAL QUALITY, in her official capacity; MATT DONEGAN, KAREN MOYNAHAN, MARK WEBB, AND SILVIA TANNER, in their official capacities, <br><br> Defendants. | Case No. 3:25-CV-01334-SI <br><br> DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INUNCTION <br><br><br> Hearing: February 6, 2026, at 9:00 a.m. |

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INUNCTION

SV1/jc4/1004815261

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES .......................................................................................iii

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................. 1

    A.    2018–2020: In the wake of a global waste trade crisis, the Oregon
          Recycling Steering Committee proposes requiring producers to share cost
          of recycling products................................................................................. 1

    B.    2021: Oregon Legislature enacts Plastic Pollution and Recycling
          Modernization Act. ................................................................................... 2

    C.    2022-2024: Rulemaking process to implement the RMA. ....................... 4

    D.    March 2024–February 2025: DEQ review and public comment on three
          successive drafts of CAA's program plan, with three successively more
          detailed fee schedules. ............................................................................. 6

    E.    February–June 2025: DEQ approves program plan, producers submit
          supply data, and CAA uses that data to calculate exact base fee rates. ......... 7

    F.    July 2025–Present: DEQ-approved program plan goes into effect, with
          millions of dollars committed to local governments and service providers. ........ 10

    G.    November 2025: Plaintiff seeks preliminary injunction barring all
          enforcement of the RMA and requiring DEQ to take action to exempt
          Plaintiff's members from fees.............................................................. 11

III.  LEGAL STANDARDS ...................................................................................... 12

    A.    Preliminary Injunction ........................................................................... 12

    B.    Facial Challenge..................................................................................... 12

IV.   ARGUMENT .................................................................................................... 12

    A.    Plaintiff is unlikely to succeed on the merits of its claims. .................... 13

        1.    Plaintiff is unlikely to succeed on the merits of its dormant
              Commerce Clause claim. ............................................................. 13

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

a.   Plaintiff fails to establish that the RMA is discriminatory on its face, in its purpose, or in its effect. .................................... 14

b.   Plaintiff's attempt to characterize the membership fees as discriminatory user fees or tariffs relies on inapposite case law. ............................................................................................... 18

c.   The *Pike* balancing test does not apply here. ............................... 19

2.   Plaintiff is unlikely to succeed on the merits of its due process claim. ....................................................................................................... 22

3.   Plaintiff is unlikely to succeed on the merits of its unconstitutional conditions claim. ................................................................................. 26

B.   Plaintiff has not shown that its members are likely to suffer irreparable harm in the absence of an injunction. ................................................................. 27

C.   The equities and public interest favor denial of Plaintiff's motion. ..................... 29

D.   Plaintiff's requested injunction goes beyond DEQ's enforcement authority. ........................................................................................................... 31

V.   CONCLUSION ............................................................................................................ 32

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Agendia, Inc. v. Becerra,*
    4 F.4th 896 (9th Cir. 2021) ........................................................................ 25

*Am. Apparel & Footwear Ass'n, Inc. v. Baden,*
    107 F.4th 934 (9th Cir. 2024) .................................................................... 12

*Apple, Inc. v. Samsung Elecs. Co.,*
    678 F.3d 1314 (Fed. Cir. 2012)................................................................... 27

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris,*
    729 F.3d 937 (9th Cir. 2013) ............................................................... 13, 16

*Ass'n to Preserve & Protect Local Livelihoods v. Sidman,*
    147 F.4th 40 (1st Cir. 2025)....................................................................... 20

*Baird v. Bonta,*
    81 F.4th 1036 (9th Cir. 2023) .................................................................... 13

*Benisek v. Lamone,*
    585 U.S. 155 (2018)................................................................................... 28

*Bibb v. Navajo Freight Lines, Inc.,*
    359 U.S. 520 (1959)................................................................................... 20

*Boardman v. Pac. Seafood Grp.,*
    822 F.3d 1011 (9th Cir. 2016) ................................................................... 27

*Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.,*
    567 F.3d 79 (2d Cir. 2009).......................................................................... 18

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.,*
    476 U.S. 573 (1986)................................................................................... 14

*Carter v. Carter Coal Co.,*
    298 U.S. 238 (1936)............................................................................. 22, 23

*Comptroller of Treasury v. Wynne,*
    575 U.S. 542 (2015)................................................................................... 19

*Daniels Sharpsmart, Inc. v. Smith,*
    889 F.3d 608 (9th Cir. 2018) ..................................................................... 17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*Dep't of Revenue of Ky. v. Davis*,
    553 U.S. 328 (2008) ........................................................................................... 13

*Env't Prot. Info. Ctr. v. Carlson*,
    968 F.3d 985 (9th Cir. 2020) ............................................................................ 13

*Eubank v. City of Richmond*,
    226 U.S. 127 (1912) ..................................................................................... 22, 23

*Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*,
    405 U.S. 707 (1972) ........................................................................................... 18

*Exxon Corp. v. Governor of Maryland*,
    437 U.S. 117 (1978) ..................................................................................... 16, 21

*FCC v. Consumers' Rsch.*,
    606 U.S. 656 (2025) ..................................................................................... 23, 24

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) ....................................................................... 29, 31

*Gen. Motors Corp. v. Tracy*,
    519 U.S. 278 (1997) ........................................................................................... 17

*Goldie's Bookstore, Inc. v. Super. Ct. of Cal.*,
    739 F.2d 466 (9th Cir. 1984) ............................................................................ 27

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014) ............................................................................ 29

*Lopez v. Brewer*,
    680 F.3d 1068 (9th Cir. 2012) .......................................................................... 12

*Los Angeles Mem. Coliseum Comm'n v. Nat'l Football League*,
    634 F.2d 1197 (9th Cir. 1980) .............................................................................

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
    571 F.3d 873 (9th Cir. 2009) ................................................................. 29, 30, 31

*Maryland v. King*,
    567 U.S. 1301 (2012) ........................................................................................ 29

*Minn. v. Clover Leaf Creamery Co.*,
    449 U.S. 456 (1981) ........................................................................................... 22

*Moody v. NetChoice*,
    603 U.S. 707 (2024) ........................................................................................... 12

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*Nat'l Ass'n of Optometrists & Opticians Lenscrafters, Inc. v. Brown*,
    567 F.3d 521 (9th Cir. 2009) ......................................................................... 17

*Nat'l Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998).......................................................................................... 12

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023)............................................................................ 14, 19, 20, 21

*Natural Res. Def. Council v. Winter*,
    508 F.3d 885 (9th Cir. 2007) ......................................................................... 31

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*,
    896 F.2d 1283 (11th Cir. 1990) ..................................................................... 28

*New Energy Co. of Ind. v. Limbach*,
    486 U.S. 269 (1988).......................................................................................... 13

*Nken v. Holder*,
    556 U.S. 418 (2009).......................................................................................... 12

*Nw. Airlines, Inc. v. Cnty. of Kent*,
    510 U.S. 355 (1994).......................................................................................... 18

*O'Shea v. Littleton*,
    414 U.S. 488 (1974).......................................................................................... 27

*Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*,
    511 U.S. 93 (1994)............................................................................... 13, 14, 17

*Park Vill. Apartment Tenants Ass'n. v. Mortimer Howard Tr.*,
    636 F.3d 1150 (9th Cir. 2011) ....................................................................... 27

*Pharm. Research & Mfrs. of America v. Cnty. of Alameda*,
    768 F.3d 1037 (9th Cir. 2014) ................................................................. 16, 17

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970).......................................................................................... 14

*Raymond Motor Transp. Inc. v. Rice*,
    434 U.S. 429 (1978).......................................................................................... 20

*Rocky Mountain Farmers Union v. Corey*,
    730 F.3d 1070 (9th Cir. 2013) ....................................................................... 13

*S.D. Myers, Inc. v. City & Cty. of San Francisco*,
    253 F.3d 461, 467 (9th Cir. 2001) ................................................................. 14

Page v -     DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
           INUNCTION

*Short v. Brown,*
  893 F.3d 671 (9th Cir. 2018) ........................................................................ 12

*Southern Pacific Co. v. Arizona ex rel. Sullivan,*
  325 U.S. 761 (1945) ...................................................................................... 20

*Sunshine Anthracite Coal Co. v. Adkins,*
  310 U.S. 381 (1940) ...................................................................................... 25

*United States v. Salerno,*
  481 U.S. 739 (1987) ................................................................................ 12, 32

*Vaqueria Tres Monjitas, Inc. v. Irizarry,*
  587 F.3d 464 (1st Cir. 2009) ........................................................................ 28

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
  455 U.S. 489 (1982) ...................................................................................... 28

*Washington ex rel. Seattle Trust Co. v. Roberge,*
  278 U.S. 116 (1928) ...................................................................................... 23

*West Lynn Creamery, Inc. v. Healy,*
  512 U.S. 186 (1994) ...................................................................................... 19

*Winter v. Nat. Res. Def. Council,*
  555 U.S. 7 (2008) .............................................................................. 12, 27, 29

*Wreal, LLC v. Amazon.com, Inc.,*
  840 F.3d 1244 (11th Cir. 2016) ............................................................... 28, 29

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 8 ............................................................................................ 13

## STATUTES, RULES, REGULATIONS

Telecommunications Act of 1996, Pub L. No. 104-104, 110 Stat. 56 .................... 24

ORS 192.345(2) ..................................................................................................... 8

ORS 459A
  .150–.189 ...................................................................................................... 3
  .200–.266 ...................................................................................................... 3
  .305–.355 ...................................................................................................... 2
  .820–.855 ...................................................................................................... 2
  .860 .................................................................................................... 2, 15, 22
  .863 ................................................................................................... 3, 15

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

.866 ................................................................................................ 15
.869 ................................................................................................ 3, 31
.875 ................................................................................ 3, 4, 6, 10, 31
.878 ........................................................................................... 4, 6
.881 ................................................................................................... 4
.884 ........................................................................... 3, 5, 19, 31
.887 ................................................................................................... 3
.890 ................................................................................................... 3
.899 ................................................................................................... 4
.914 ................................................................................................... 4
.944 ................................................................................................... 5
.962 ................................................................................................. 10

OAR 340-090
    -0630 ........................................................................................... 4
    -0640 ........................................................................................... 5
    -0650 ........................................................................................... 5
    -0660 ........................................................................................... 5
    -0670 ........................................................................................... 5
    -0700 ........................................................................................ 5, 6
    -0720 ......................................................................................... 30
    -0840 ........................................................................................... 5
    -0860 ........................................................................................... 5
    -0870 ........................................................................................... 9
    -0910 ........................................................................................... 5

## OTHER AUTHORITIES

Alexander Volokh, *The Myth of the Federal Private Nondelegation Doctrine*,
    99 Notre Dame L. Rev. 203 (2023) ................................................... 23

Alexander Volokh, *The New Private-Regulation Skepticism: Due Process, Non-Delegation, and Antitrust Challenges*, 37 Harv. J. L. & Pub. Pol'y 931 (2014) ........................................ 23

Or. Dep't of Env't Quality, *Plastic Pollution and Recycling Modernization Act*, Oregon.gov:
    DEQ Recycling, https://www.oregon.gov/deq/recycling/pages/modernizing-oregons-recycling-system.aspx (last visited Dec. 21, 2025) ........................................... 7

Page vii -  DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
        INUNCTION
SV1/jc4/1004815261

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## I.   INTRODUCTION

Plaintiff seeks a preliminary injunction enjoining the Oregon Department of Environmental Quality's implementation and enforcement of Oregon's Plastic Pollution and Recycling Modernization Act (RMA). The RMA requires producers to share the burden of reducing the negative environmental and other consequences of packaging materials brought into and disposed of in Oregon. Plaintiff challenges the constitutionality of the RMA on several grounds. But Plaintiff's motion does not demonstrate any constitutional violation.  Instead, it shows that Plaintiff misunderstands what the law requires and how the program works. The reality is a far cry from the amorphous, impenetrable, coercive monster that Plaintiff describes. Instead, the RMA is a responsible reaction to a growing, global waste-disposal problem, and it requires producers of those materials to participate in the solution. In seeking the extraordinary remedy of a preliminary injunction, Plaintiff has not demonstrated any likelihood of success on the merits or met the other requirements for a preliminary injunction. The motion for preliminary injunction should be denied.

## II.   BACKGROUND

**A.     2018–2020: In the wake of a global waste trade crisis, the Oregon Recycling Steering Committee proposes requiring producers to share cost of recycling products.**

For years, Oregon and much of the world relied on China to take much of the recyclable paper and plastics generated by residents and businesses. (Portley Decl. ¶ 3, Ex. 2 at 3, 6.) In Oregon, the loss of local markets, the low cost of shipping materials to China, and China's acceptance of materials with relatively high levels of contamination led to a dependence on the Chinese market as an outlet for materials collected in Oregon. (*Id.*) In January 2018, the Chinese government banned the import of certain plastic and paper grades and set a tighter contamination standard for paper—effectively closing the market for Oregon's recyclable materials. (Portley Decl. ¶ 4, Ex. 2 at 3, 6.) The loss of China's markets disrupted recycling systems worldwide, and in Oregon, communities made changes to their recycling collection programs in response

Page 1 -    DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
                      INUNCTION
SV1/jc4/1004815261

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

including raising customer rates, suspending recycling, or removing items from programs. (*Id*.) In some cases, materials collected for recycling were disposed of. (*Id*.)

In May 2018, DEQ convened a Recycling Steering Committee to consider how to address the problems in Oregon's recycling system that the recent crisis had laid bare. (Portley Decl. ¶ 5, Ex. 2 at 3, 6.) The Committee's members included representatives of various stakeholders, including local governments, the recycling industry, and the paper and plastics industries. (Portley Decl. ¶ 5; Mitchell Decl. ¶ 6.) The Committee engaged in a two-year process involving research and analysis of alternative recycling infrastructure and frameworks, as well as public meetings, listening sessions, and surveys. (Portley Decl. ¶ 5, Ex. 2 at 7–12.) In September 2020, the Committee concluded that the only way to address Oregon's recycling problems was through comprehensive system reform, and that such reform must include cost-sharing by the producers of products themselves. (Portley Decl. ¶ 6, Ex. 1 at 2–3.) The Committee explained its conclusions in a "Recommended Concept for Modernizing Oregon's Recycling System." (Portley Decl. ¶ 6, Ex. 1.) The Committee explained that, while residents and businesses pay the cost of sorting recyclables, they have little influence on how that money could be used to invest in and modernize the system. (Portley Decl., Ex. 1 at 2.) In contrast, the Committee explained, "consumer brands, packaging producers and plastics manufacturers hold the most power to influence change." (*Id*.)

**B.      2021: Oregon Legislature enacts Plastic Pollution and Recycling Modernization Act.**

Building on the work of the Committee, in 2021, the legislature enacted the RMA. The RMA requires producers to share in the responsibility of reducing the negative environmental, social, economic, and health impacts of the products they sell in or into Oregon, and that are ultimately discarded in the state. ORS 459A.860. (Portley Decl. ¶ 11.) This principle is often referred to as extended producer responsibility, or "EPR." (*Id*.) DEQ administers multiple EPR programs, including the E-Cycles Program for electronics (*see* ORS 459A.305–459A.355), the PaintCare Program for architectural paints (*see* ORS 459A.820–459A.855), the Drug Take Back

Page 2 -    DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INUNCTION
           SV1/jc4/1004815261

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Program for pharmaceuticals (see ORS 459A.200–459A.266), and a Mattress Recycling Program (*see* ORS 459A.150–459A.189). (Portley Decl. ¶ 12.) Through these programs, producers help fund the diversion of product streams to recovery or to more environmentally responsible disposal. (*Id.*)

The RMA covers a broader range of products and producers than DEQ's other EPR programs. (*Id.* ¶ 14.) Covered products are packaging, printing and writing paper, and food serviceware. ORS 459A.863(6). The RMA also provides more detailed and prescriptive requirements than the laws governing DEQ's other EPR programs. (Portley Decl. ¶ 13.) While Oregon is the first state to have implemented an extensive EPR program for packaging, similar packaging EPR programs have existed in most Canadian provinces and throughout the European Union for decades. (*Id.*) Since 2021, six other states—California, Colorado, Maine, Maryland, Minnesota, and Washington—have also enacted packaging EPR laws on a similar model, and at least nine more states have introduced bills for similar laws. (Holmes Decl. ¶ 5.)

Under the RMA, producers of certain products sold in or into Oregon must form or join a producer responsibility organization (PRO): a nonprofit organization formed by producers that pools the resources of its members to implement certain obligations on their behalf. ORS 459A.869(1); ORS 459A.863(23). If a business is a producer of certain types of products, that producer must join a PRO, report how much of each type of product they have sold in or into Oregon, and pay PRO membership fees based on what they sell. ORS 459A.869(1)–(2); ORS 459A.887(2)(c); ORS 459A.884(1). The PRO then uses those funds to cover costs associated with the recycling of those products, including by paying for recycling services provided by local governments and service providers. ORS 459A.875(2)(a)(A)–(B), (3); ORS 459A.890.

Before it begins operating, a PRO must submit a producer responsibility program plan, in which it explains how it will "[e]stablish, calculate and charge membership fees" in accordance with statutory requirements, how it will use those fees to provide for and fund recycling services, and how it will otherwise meet the obligations imposed by the RMA. ORS 459A.875(1),

Page 3 -   DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INUNCTION
SV1/jc4/1004815261

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

(2)(a)(B), (2)(a)(E), (2)(o)–(p). DEQ reviews the PRO's program plan, solicits and responds to feedback from an Oregon Recycling System Advisory Council (whose members must include representatives of producers or producer trade associations or suppliers), and makes the program plan available for public comment, before finally accepting or rejecting the plan. ORS 459A.878(1)–(2); ORS 459A.899(2)(a)(E). The PRO must then implement the plan as approved by DEQ and must get DEQ approval before making changes to how it calculates membership fees or how it compensates local governments and service providers for recycling services. ORS 459A.875(3); ORS 459A.881(1)(b)–(c).

The requirements of the RMA are explained in more detail in the Background section of Defendants' concurrently filed Motion to Dismiss; that explanation is incorporated herein by reference.

## C.     2022-2024: Rulemaking process to implement the RMA.

After the enactment of the RMA, DEQ and the Environmental Quality Commission (EQC) went through two rounds of rulemaking to adopt administrative rules clarifying and implementing the RMA. (Portley Decl. ¶ 14.) Each rulemaking included six to eight meetings of a Rulemaking Advisory Committee, multiple topic-specific consultations with the Oregon Recycling System Advisory Council, periods for public comment on the draft rules, and two public hearings. (*Id*. ¶ 15.) Each of those meetings included opportunity for written or verbal public input. During the rulemaking processes, DEQ received comments and feedback from various parties. (*Id*.) DEQ has posted the detailed rulemaking documentation on its website, including all the rule concept documents that went to the Rulemaking Advisory Committee, a plain language guide to the rules, and all public comments received on the rules. (*Id*. ¶ 16.)

The first rulemaking took place from 2022 to 2023, culminating in the adoption of administrative rules in November 2023. (*Id*. ¶ 14.) As directed by the RMA, one of these rules establishes a PRO Recycling Acceptance List: the list of materials for which a PRO must provide for the collection and responsible recycling. OAR 340-090-0630(3); *see* ORS 459A.914(1)(b).

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

The rules further address the obligations of a PRO, including ensuring that materials go to responsible end markets (OAR 340-090-00670), and the collection of materials in a manner that meets convenience standards (OAR 340-090-0640), performance standards (OAR 340-090-0650), and collection targets (OAR 340-090-0660).

The second rulemaking took place from 2023 to 2024, culminating in the adoption of further administrative rules in November 2024. (Portley Decl. ¶ 14.) These rules include clarifications of how to identify and classify covered products and exempt products (OAR 340-090-0840(1)–(3)), and how to determine the producers of specific types of products (OAR 340-090-0860).

The rules also provide specifics for how a producer can conduct a life cycle evaluation (LCE), which evaluates and discloses the environmental impacts of covered products through the life cycle of the products. OAR 340-090-0910(1); *see* ORS 459A.944 (life cycle evaluation). Large producers—the 25 largest producers based on market share—are statutorily required to perform an LCE once every two years, while other producers may do so voluntarily to obtain a reduction of PRO membership fees. ORS 459A.944(1)–(2); ORS 459A.884(4)(d). The rules specify that a large producer can get a fee reduction for its statutorily-required LCE only if it shows "proof of substantial impact reduction." OAR 340-090-0910(3)(b). Other producers can get a fee reduction for conducting a voluntary LCE, with or without proof of substantial impact reduction. OAR 340-090-0910(3)(a)–(b).

The rules also address how PROs must set producers' membership fees and what information to use in setting those fees. Each year, a producer submits market data for the previous year to its PRO, establishing the weight of covered products it sold or distributed in or into Oregon. OAR 340-090-0700(1)(d). The PRO then uses that data to compile supply information on the total amount of covered products sold or distributed by its members. OAR 340-090-0700(4)(a). The PRO must use that supply information to set fees for its members. OAR 340-090-0700(4)(b). Starting in 2026, a PRO must set producer fees using supply data from two

Page 5 -    DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
            INUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

years prior to that program year; for example, 2028 fees will be set on the basis of 2026 supply data. OAR 340-090-0700(4)(b). This two-year cadence gives producers time to finalize their reporting data and report it to the PRO, and then for the PRO to integrate that data into the fee-setting process, resulting in a finished fee schedule for the subsequent year. (Portley Decl. ¶ 17.) For the 2025 program year—the first year that a producer responsibility program has gone into effect—the PRO must use supply data based on covered products sold by its members in the prior year, rather than two years earlier. OAR 340-090-0700(3), (4)(c). This requirement for the first program year was informed by input that many producers did not have supply data gathering protocols in place for 2023. (Portley Decl. ¶ 17.)

**D.    March 2024–February 2025: DEQ review and public comment on three successive drafts of CAA's program plan, with three successively more detailed fee schedules.**

From 2022 to 2024, DEQ held extensive consultations with prospective PROs, of which there were initially four. (Portley Decl. ¶ 18.) One of those prospective PROs was Circular Action Alliance (CAA). (*Id.*) During that period, DEQ held weekly calls with CAA, in which DEQ conveyed extensive information about the requirements of the RMA. (*Id.*) Between March 2024 and February 2025, CAA submitted three draft program plans. (*Id.* ¶ 20.) Each of those draft plans was reviewed by DEQ and the Oregon Recycling System Advisory Council and was made available for public comment. (*Id.*) *See* ORS 459A.875; ORS 459A.878. DEQ rejected CAA's first and second draft program plans, while providing extensive recommendations for improving the plan to meet each statutory requirement each time. (*Id.* ¶¶ 21–22.) On February 21, 2025, DEQ approved CAA's third draft program plan, subject to certain final changes directed by DEQ. (*Id.* ¶ 23.)

Each draft of the program plan contained a successively more detailed projection of the 2025 fee schedule for producer base fees per material per pound. (*Id.* ¶ 28.) Before the program plan was approved, not all of the producers had submitted the supply data that CAA needed to calculate exact fee rates for each material. (*Id.* ¶ 28; Holmes Decl. ¶ 20.) Accordingly, the

Page 6 -    DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

projected fee schedule features price ranges for each material rather than exact figures. (Portley Decl. ¶ 28; Holmes Decl. ¶ 20.) In formulating those fee ranges, CAA relied on market data, modeling, and preliminary cost assumptions to forecast program costs and illustrate a range of potential fees for each covered material category. (Holmes Decl. ¶ 20.) The first draft program plan contained preliminary fee ranges for six broad material categories. (Portley Decl. ¶ 28.) The second draft contained a more detailed set of fee ranges for sixteen more specific material categories. (*Id.*) The third draft that DEQ ultimately approved contained fee ranges for a full set of 60 specific material categories. (*Id.*; Wild Decl., Ex. A at 200–04.)

On May 16, 2025, CAA submitted an amendment to the program plan. (Portley Decl. ¶ 25.) DEQ conducted a review of the plan amendment, informed by input received from the Advisory Council and by public comment. (*Id.*) DEQ approved the amendment on September 12, 2025, subject to directed changes to the amendment. (*Id.*)

DEQ has posted all four versions of the program plan—the two rejected drafts, the accepted third draft, and the amended plan—on its public website, along with the Advisory Council feedback and public comments on each draft. (*Id.* ¶ 30.) *See* Or. Dep't of Env't Quality, *Plastic Pollution and Recycling Modernization Act*, Oregon.gov: DEQ Recycling, https://www.oregon.gov/deq/recycling/pages/modernizing-oregons-recycling-system.aspx (last visited Dec. 21, 2025) (under heading "Archive of draft program plan documentation").

**E.     February–June 2025: DEQ approves program plan, producers submit supply data, and CAA uses that data to calculate exact base fee rates.**

CAA's approved program plan sets out how CAA must implement the producer responsibility program. *See* ORS 459A.875(2)–(3). (*See* Portley Decl. ¶ 25.) In short, it sets out how CAA must assess fees from its members and how it must use those fees to fund recycling services and otherwise implement RMA obligations on the producers' behalf. *See* ORS 459A.875(2)(a).

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

The plan provides over 40 pages of explanation of the membership fee structure, base fee rates, and fee reductions. (Portley Decl., Ex. 3 at 191–231.) The plan explains that, to determine the base fees, the fee-setting methodology differentiates between fees for different materials based on each material's share of supply tons, the estimated management costs of each material, and the commodity revenues generated by each material. (*Id.* at 196.) "Materials with the highest supply quantities and management costs pay the highest share of costs." (*Id.*) The plan itself contains projected ranges of fee rates for 60 different material categories. (*Id.* at 200–03.)

In addition, CAA submitted a more detailed explanation of the technical elements of its fee-setting methodology as Appendix G to the program plan.[1] (*Id.* at 198; Holmes Decl. ¶¶ 29–30.) CAA submitted Appendix G to DEQ as a confidential addendum to the program plan, asserting that it contained proprietary data and models that could be used by others to replicate or reverse-engineer CAA's approach.[2] (Portley Decl. ¶ 26; Holmes Decl. ¶ 30.) DEQ reviewed Appendix G, met with CAA to discuss the fee methodology, directed CAA to make changes, and ultimately approved the plan only after determining that Appendix G, along with the rest of the plan, satisfied the requirements of the RMA and its implementing rules. (Portley Decl. ¶ 26; Holmes Decl. ¶ 21.)

The plan also sets out how CAA must use the membership fees to fund the program's implementation. The plan provides itemized budgets estimating program plan costs for each year. (Portley Decl., Ex. 3 at 308–13.) It provides estimates of how much will be invested in each county or municipality for each program year and specifies how much of each amount will be applied to which services. (*Id.* at 32–43.) The plan sets out an operations plan for the collection

---

[1] Defendants intend to separately seek leave to file Appendix G under seal and subject to a protective order, after meeting and conferring with Plaintiff.

[2] Neither Plaintiff nor any other member of the public has filed a public records request for Appendix G. (Portley Decl. ¶ 27.) If they were to do so, then DEQ would make a determination as to whether the information is a trade secret and whether the public interest requires disclosure, in accordance with Oregon's public records laws. (*Id.*) *See* ORS 192.345(2).

Page 8 -    DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
            INUNCTION
            SV1/jc4/1004815261

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

and recycling of covered materials, including how CAA will invest in system expansions and improvements for local governments and service providers. (*Id.* at 20–61.)

The plan allocates $81.5 million between 2025 and 2027 in reimbursements to local governments and their service providers to fund infrastructure service expansions from 2025 to 2027. (*Id.* at 42.) Those funds are intended to cover the costs of containers, trucks, depots, and reload facilities necessary to implement expanded recycling services under the RMA, as well as annual operating and education expenditures. (*Id.*; Mitchell Decl. ¶ 15.) The program plan also budgets $185.2 million between 2025 and 2027 for payments to commingled recycling processing facilities for receiving and sorting covered materials, disposing of contaminants and residue, managing material cost fluctuations, and implementing facility improvements required to meet RMA requirements. (Portley Decl., Ex. 3 at 309; Mitchell Decl. ¶ 15.)

After DEQ approved the program plan, producers had until March 31, 2025, to pre-register with the PRO and submit data on covered products they had sold in or into the state. (Portley Decl. ¶ 31.) *See* OAR 340-090-0870. The majority of obligated producers were the brand owners of the products. (Holmes Decl. ¶ 33.) CAA estimates that distributors of other brands' products accounted for less than 5% of the 2025 fees. (*Id.*) All producers joined CAA pursuant to a Participant Producer Agreement and an Oregon Addendum to that agreement. (*See* Winkle Decl., Exs. A & B.)[3] The agreement describes CAA's and the producers' responsibilities under the program plan, including paying fees that are calculated under the DEQ-approved fee methodology. (Winkle Decl., Exs. A & B; Holmes Decl. ¶ 43.)

---

[3] Plaintiff filed the Participant Producer Agreement and Oregon Addendum under seal out of concern that CAA might assert confidentiality over the documents. *See* Van Loh Decl., Ex. 1. But an exact copy of Exhibit A is available online, as is the template for the Oregon Addendum in Exhibit B. *See* https://static1.squarespace.com/static/64260ed078c36925b1cf3385/t/6737a811c89a3347467e0b5e/1731700753807/Participant+Producer+Agreement+-+Preview.pdf (last accessed Dec. 22, 2025). Accordingly, neither document should be sealed in this case.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Under those agreements, if contract-related disputes such as over how an invoice was calculated, for example, cannot be resolved through discussion between CAA and the producer, the agreement provides for arbitration between those parties. (Winkle Decl., Exs. A & B; Holmes Decl. ¶ 44.) CAA has explained that the arbitration provision is intended in part to reduce costs to the program, which is funded by the producers themselves, and also to provide for a more confidential setting, where producers can easily share commercially sensitive information that may be needed to resolve a dispute. (Holmes Decl. ¶ 44.) Those dispute resolution provisions do not address or limit a producer's ability to challenge the RMA or its implementing rules in court. (Winkle Decl., Exs. A & B; Holmes Decl. ¶ 44.) Nor do they address or limit DEQ's enforcement authority over both producers and CAA. *See* ORS 459A.962.

After producers joined the PRO and submitted their data on covered products sold, CAA used the data to calculate exact base fee rates for each material category. (Portley Decl. ¶¶ 31– 32.) In May 2025, CAA issued a finalized fee schedule containing those exact fee rates and began issuing invoices to producers in June 2025. (*Id.* ¶ 32.) To calculate fee rates for each program year, CAA relies in part on supply data provided by the producers and by applying the fee methodology set out in the program plan. ORS 459A.875(2)(a)(E), (3). (Holmes Decl. ¶ 20.) The base fee schedule will be updated at least annually to "reflect changes to producer supply tons, system operations and costs." (Portley Decl., Ex. 3 at 196.) The fee schedule for 2026 is publicly available on CAA's website. (Holmes Decl. ¶ 27, Ex. A.)

## F. July 2025–Present: DEQ-approved program plan goes into effect, with millions of dollars committed to local governments and service providers.

The producer responsibility program went into effect on July 1, 2025. (Portley Decl. ¶ 43.) Since then, program funds have been used to fund a variety of services, equipment, and upgrades across the state. Program funds were used to send over 200,000 pieces of education and outreach materials to help Oregonians recycle correctly. (Holmes Decl. ¶ 41.) Communities have received over $2.1 million for anti-contamination programs. (*Id.*) Recycling facilities have been

Page 10 -  DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
                INUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

supported with over $8 million to fund upgrades and stabilize market fluctuations that can raise costs. (*Id*.) More than 16,000 recycling carts have been ordered, and 20 RecycleOn Centers are now open. (*Id*.) Ten recycling trucks will be ordered and delivered in spring 2026 that currently lack access to recycling services. (*Id*.)

Soon after the program plan went into effect, local governments and their designated service providers began submitting invoices for RMA-authorized funding. (Mitchell Decl. ¶ 14) Commingled recycling processing facilities began contracting for construction, equipment, technology, and property acquisitions, based on funds allocated in the program plan. (*Id*. ¶ 16.) One company in Portland committed several million dollars toward infrastructure upgrades and technology improvements to its processing facility to begin complying with the RMA's 2028 benchmarks. (Jenkins Decl. ¶ 4.)

Local governments and their service providers began ordering trucks and other needed equipment to prepare for offering new recycling services in their communities, investments that would not have been made without the assurance of receiving reimbursement from CAA. (Mitchell Decl. ¶ 14; John Decl. ¶ 6 (Roseburg); Thompson Decl. ¶ 6 (Newport); Miller Decl. ¶ 6 (Eugene); Henry Decl. ¶ 10 (Baker City); Eben Decl. ¶ 12 (Portland).)

**G.    November 2025: Plaintiff seeks preliminary injunction barring all enforcement of the RMA and requiring DEQ to take action to exempt Plaintiff's members from fees.**

Plaintiff filed its original complaint on July 30, 2025 (ECF No. 1), and a first amended complaint on October 27, 2025 (ECF No. 26). On November 24, 2025, Plaintiff filed its Motion for Preliminary Injunction and/or Temporary Restraining Order. (Mot., ECF No. 33.) The motion argues that Plaintiff is likely to succeed on the merits of three federal constitutional claims: that the RMA violates (1) the Dormant Commerce Clause (Mot. 22–27), (2) the Due Process Clause of the Fourteenth Amendment (*id*. at 27–31), and (3) the unconstitutional conditions doctrine (*id*. at 31–33). The motion does not address Plaintiff's equal protection claim or any claims based on the Oregon Constitution.

Page 11 -  DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
                 INUNCTION

# III. LEGAL STANDARDS

## A.    Preliminary Injunction

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (citation omitted). To obtain a preliminary injunction, a plaintiff must establish that "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest." *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). When the government is a party, courts consider the last two factors together, because the defendant's equities merge with the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

## B.    Facial Challenge

Facial invalidation of legislation "is, manifestly, strong medicine" that "has been employed by the Court sparingly and only as a last resort." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (citation modified). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987) (cited by *Am. Apparel & Footwear Ass'n, Inc. v. Baden*, 107 F.4th 934, 938 (9th Cir. 2024)). In evaluating disfavored facial challenges, courts must consider "how a law works in all of its applications." *Moody v. NetChoice*, 603 U.S. 707, 744 (2024). Further, courts should "construe [the challenged law] narrowly and resolve any ambiguities in favor of the interpretation that most clearly supports constitutionality." *Salerno*, 481 U.S. at 468.

# IV. ARGUMENT

The Court must deny Plaintiff's motion for preliminary injunction because (1) Plaintiff is unlikely to succeed on the merits of its claims; (2) Plaintiff has not identified or adequately

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

supported irreparable harm; (3) the balance of the equities favor denial of Plaintiff's motion; and

(4) the scope of Plaintiff's requested injunction goes beyond DEQ's enforcement authority.

**A.     Plaintiff is unlikely to succeed on the merits of its claims.**

To obtain preliminary injunctive relief under *Winter*, Plaintiff must first establish that it is

likely to succeed on the merits of its claim. *See Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir.

2023). A plaintiff's ability to show a likelihood of success on the merits "is a threshold inquiry"

and "the most important" factor. *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir.

2020). Where a plaintiff fails to establish a likelihood of success, the court need not consider the

remaining *Winter* factors. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729

F.3d 937, 944 (9th Cir. 2013).

### 1.     Plaintiff is unlikely to succeed on the merits of its dormant Commerce Clause claim.

The Commerce Clause provides that "Congress shall have Power … [t]o regulate

Commerce … among the several States." U.S. Const. art. I, § 8. This grant of power to Congress

"has long been understood to have a 'negative' aspect that denies the States the power

unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Or.*

*Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 98 (1994). "The modern law of what has

come to be called the dormant Commerce Clause is driven by concern about 'economic

protectionism—that is, regulatory measures designed to benefit in-state economic interests by

burdening out-of-state competitors.'" *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38

(2008) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273–74 (1988)).

Courts analyze whether laws are protectionist by examining the law on its face, in its

purpose, and in its effects. *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th

Cir. 2013). This includes determining whether the law directly regulates or discriminates against

interstate commerce or otherwise favors in-state economic interests in effect. *Ass'n des Eleveurs*,

729 F.3d at 948. A law that directly regulates or discriminates against interstate commerce is

Page 13 -   DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
                  INUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

subject to the "strictest scrutiny." *Or. Waste Sys.*, 511 U.S. at 101. Nondiscriminatory laws are

constitutional except in a narrow subset of cases where "the burden imposed on interstate

commerce is clearly excessive in relation to the putative local benefits." *Nat'l Pork Producers*

*Council v. Ross*, 598 U.S. 356, 377–80 & n.2 (2023) (quoting *Pike v. Bruce Church, Inc.*, 397

U.S. 137, 142 (1970)).

Plaintiff contends that the RMA violates the dormant Commerce Clause by imposing a

burden on interstate commerce that is "clearly excessive in relation to the putative local benefits"

under *Pike* and by purportedly imposing an unfairly apportioned user tax operating as an

unlawful state tariff.[4] (Mot. 23–27.) To prevail on this facial challenge to the RMA, Plaintiff

must meet the high burden of proving that there is no set of circumstances under which the RMA

would be valid. *See S.D. Myers, Inc. v. City & Cnty. of San Francisco*, 253 F.3d 461, 467 (9th

Cir. 2001) (applying *Salerno* standard to dormant Commerce Clause claim). Because Plaintiff

fails to establish any Commerce Clause violation, let alone establish that the RMA is invalid in

its entirety, Plaintiff is unlikely to succeed on the merits of this claim.

### a. Plaintiff fails to establish that the RMA is discriminatory on its face, in its purpose, or in its effect.

A per se dormant Commerce Clause violation occurs when a statute "directly regulates or

discriminates against interstate commerce, or when its effect is to favor in-state economic

interests over out-of-state interests." *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 614 (9th

Cir. 2018) (quoting *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573,

579 (1986)). Here, Plaintiff argues not that the RMA directly regulates out-of-state transactions,

but that the RMA discriminates against interstate commerce and favors in-state economic

---

[4] Plaintiff presents its dormant Commerce Clause arguments in reverse. Ordinarily, a court first determines whether the challenged law discriminates against interstate commerce, directly or in effect, and then turns to the *Pike* test to evaluate whether the burden on interstate commerce is clearly excessive. *See Or. Waste Sys.*, 511 U.S. at 99. Here, Plaintiff first raises the *Pike* test and then argues that the Act discriminates against interstate commerce in effect. Because application of the *Pike* test still requires the Court to consider whether the challenged law has a discriminatory purpose, DEQ will address the arguments in the usual order.

Page 14 -   DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
          INUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

interests "in effect." (Mot. 27.) Specifically, Plaintiff asserts that the RMA "is designed to shift costs *away* from in-state consumers and in-state retailers, while imposing disproportionate logistical and economic burdens on those who operate in interstate supply chains"; and creates "significant risks" of double-counting materials or assessing fees on materials that leave the state, resulting in duplicative and conflicting fee payments for producers operating in multiple states. (*Id.*) Plaintiff then posits that "businesses that operate exclusively in-state do not face that risk and experience significantly lower compliance burdens in tracing their products." (*Id.*)

These arguments do not establish that the RMA is discriminatory because: (1) Plaintiff fails to show that the RMA is designed to shift costs out of state, (2) the RMA applies equally to businesses that operate in-state and out-of-state; and (3) Plaintiff fails to compare similarly situated in-state and out-of-state entities as necessary to show discriminatory effect.

First, Plaintiff provides no evidence whatsoever showing either that the RMA is designed to or does in fact shift costs out of state. As discussed in the Background section above, the RMA is designed to assign responsibility to the producers of the products themselves. *See* ORS 459A.860. Accordingly, the RMA generally assigns producer responsibility to the entity that actually manufactures or packages an item. *See* ORS 459A.866. (*See also* Holmes Decl. ¶ 33 (majority of obligated producers are the brand owners of the products, while distributors of other brands' products accounted for less than 5% of producer fees).) The logic behind that has nothing to do with whether the producers are in-state or out-of-state. Rather, it is that the producers—the businesses that actually make and package the products being sold and ultimately discarded in Oregon—"hold the most power to influence change." (Portley Decl., Ex. 1 at 2.) Moreover, products that are not ultimately discarded in Oregon are not covered products under the RMA, so fees are not assessed for such products. ORS 459A.863(6)(b)(J) (excluding as a "covered product" "[a]ny item that is not ultimately discarded inside this state, whether for purposes of recovery or disposal").

Page 15 -  DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
           INUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Plaintiff relies on the Allen Declaration, paragraphs 7–8, 12–13, 16, 20 (ECF No. 35), and the Winkle Declaration, paragraphs 17–29 (ECF No. 36) to support its argument that the RMA shifts costs out-of-state. (Mot. 27.) None of the cited paragraphs establish either that the RMA shifts costs away from in-state consumers and retailers or that the RMA imposes "disproportionate" burdens on interstate commerce. That two of Plaintiff's members have experienced logistical and economic burdens when attempting to comply with the RMA does not support the conclusion that such burdens are "disproportionate" or burden interstate commerce. *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 126 (1978) ("The fact that the burden of a state regulation falls on *some* interstate companies does not, by itself, establish a claim of discrimination against interstate commerce.") (emphasis added).

Second, the RMA regulates even-handedly, applying equally to business entities that fall within its definition of a producer, whether located in-state or out-of-state. In a case involving a similar regulatory regime to the one here, the Ninth Circuit rejected a dormant Commerce Clause claim challenging a county ordinance for discriminatory effect on the ground that the ordinance applied evenly to in-state and out-of-state entities. *Pharm. Rsch. & Mfrs. of Am. v. Cnty. of Alameda*, 768 F.3d 1037, 1040 (9th Cir. 2014). There, the challenged ordinance required prescription drug manufacturers to collect, transport, and dispose of unwanted medication in Alameda County. *Id.* Manufacturers who sold, offered for sale, or distributed covered drugs were required to operate and finance a program that would effectuate manufacturer compliance with the ordinance's collection and disposal requirements. *Id.* The ordinance also required the manufacturers to "promote the stewardship program to the public via 'educational and outreach materials,'" and it allowed manufacturers to jointly operate a program or pay a third party to operate the program on their behalf. *Id.* The Ninth Circuit concluded that the ordinance was not discriminatory, explaining that "a statute that treats all private companies exactly the same does not discriminate against interstate commerce." *Id.* at 1041–42 (citing *Ass'n des Eleveurs*, 729 F.3d at 948).

Page 16 -  DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
            INUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Here, as in *Pharmaceutical Research*, the RMA requires producers of covered packaging materials to join a producer responsibility organization and pay fees to ensure the proper collection and disposal of covered materials in this state. As in *Pharmaceutical Research*, the RMA makes no distinction between in-state and out-of-state producers and thus is not discriminatory on its face. As the Ninth Circuit noted, "[T]here is nothing unusual or unconstitutional per se about a state or county regulating the in-state conduct of an out-of-state entity when the out-of-state entity chooses to engage the state or county through interstate commerce." *Pharm. Rsch.*, 768 F.3d at 1043–44.

Third, Plaintiff does not compare substantially similar in-state and out-of-state entities as necessary to determine whether the RMA discriminates against interstate commerce. *Or. Waste Sys., Inc.*, 511 U.S. at 99 ("'[D]iscrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."); *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298–99 (1997) ("Conceptually, of course, any notion of discrimination assumes comparison of substantially similar entities.").

In an apparent effort to draw a comparison, Plaintiff points to "in-state consumers and in-state retailers," but those categories are both too broad and not similarly situated to Plaintiff's members. An in-state entity that offers different products or competes in different markets is not similarly situated to an out-of-state entity for this analysis; even competing in the same market is not sufficient to conclude that certain entities are similarly situated. *Nat'l Ass'n of Optometrists & Opticians Lenscrafters, Inc. v. Brown*, 567 F.3d 521, 527 (9th Cir. 2009). But Plaintiff does not even attempt to identify a similarly situated in-state entity, much less provide the necessary comparative analysis. Plaintiff's members are wholesaler-distributors. (Mot. 17.) Consumers and retailers are not similarly situated competitors.

In sum, Plaintiff's argument rests on the conclusory, unsupported assertion that "businesses that operate exclusively in-state do not face [the same] risk and experience significantly lower compliance burdens in tracing their products." (*Id.* at 27.) With no supporting

Page 17 - DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

evidence or further analysis, Plaintiff fails to make a clear showing that the RMA is

discriminatory in effect. And, far from showing that the RMA discriminates against interstate

commerce in every circumstance, Plaintiff fails to establish that the RMA discriminates against

interstate commerce at all.

> **b.    Plaintiff's attempt to characterize the membership fees as discriminatory user fees or tariffs relies on inapposite case law.**

Plaintiff's attempt to reclassify the membership fees as discriminatory user fees or tariffs

similarly fails. Plaintiff argues that the RMA is discriminatory by imposing a "user fee" that

"operate[s] as an unlawful state tariff." (Mot. 25.) For that argument, Plaintiff relies on two lines

of cases, neither of which applies to the program created by the RMA.

First, Plaintiff cites cases involving "user fees" imposed by state entities for the use of

state-owned transportation facilities. (*Id.*) But those cases are specific to facilities-based fees. For

example, in *Northwest Airlines, Inc. v. County of Kent*, 510 U.S. 355 (1994), out-of-state airlines

challenged fees charged by an airport for the airlines' use of airfields and terminal space. *Id.* at

359; (*see* Mot. 25.) In analyzing the constitutionality of those fees, the Court specifically applied

its prior holdings, which provide that when "a state at its own expense furnishes special facilities

for the use of those engaged in commerce, interstate as well as domestic, it may exact

compensation therefor." *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405

U.S. 707, 712–13 (1972); *see Nw. Airlines*, 510 U.S. at 369. Likewise, in *Bridgeport and Port

Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 567 F.3d 79 (2d Cir. 2009), the Second Circuit

applied the *Northwest Airlines* analysis to a fee charged to passengers of a ferry service for the

use of a state-owned dock. *Id.* at 81–83.

The analysis applied in those cases does not apply here. The RMA does not involve

"special facilities" for modes of transportation. And unlike the *Northwest Airlines* line of cases,

the RMA bears only an attenuated relationship to interstate commerce. That is, those cases

involved fees charged for out-of-state airlines' use of state-owned transportation facilities. In

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

stark contrast, the RMA here focuses on the responsible recovery and disposal of packaging in-state, long after the packaged product has been transported for commerce. Plaintiff fails to cite any case extending the *Northwest Airlines* analysis to regulations that bear only an attenuated relationship to interstate commerce. Plaintiff's attempt to apply that analysis here accordingly fails.

Second, Plaintiff's characterization of the RMA as creating a "state tariff" also lacks merit. (Mot. 25, 27.) A state tariff is a tax on "goods imported from other States," that does not apply "to similar products produced in State." *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193 (1994); *see Comptroller of Treasury v. Wynne*, 575 U.S. 542, 565 (2015) (citing *West Lynn* for its tariffs discussion). As to this case, even if the membership fee charged by a producer responsibility organization could constitute a "tax," nothing in the RMA authorizes the fee to be calculated based on the origin of a product or its packaging. *See, e.g.*, ORS 459A.884 (imposing standards for membership fees). Nor does Plaintiff allege that any producer responsibility organization has attempted to impose an origin-specific membership fee. Because the membership fees authorized by the RMA are agnostic of point-of-origin, they are not "state tariffs."

The Court should disregard Plaintiff's attempt to interject these inapplicable cases to the analysis here. Plaintiff has not met its burden to show that the facts and the law clearly support its position. The RMA is not discriminatory on its face, in its purpose, or in its effect.

### c.    The *Pike* balancing test does not apply here.

Explaining that nondiscriminatory state laws may still violate the dormant Commerce Clause under the balancing test set forth in *Pike*, Plaintiff asks the Court to find that the RMA "impos[es] substantial burdens on the nationwide packaging and distribution system that are 'clearly excessive in relation to the putative local benefits.'" (Mot. 24.) But as the Supreme Court recently emphasized, courts applying the *Pike* balancing test generally do not find state laws invalid absent some evidence of discriminatory purpose, except in a narrow set of cases where a

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

"lack of national uniformity would impede *the flow* of interstate goods." *Pork Producers*, 598

U.S. at 377–80 & n.2 (citation omitted).

Without directly acknowledging *Pork Producers*' conclusion that the *Pike* balancing test

applies only in an exceedingly narrow category of cases, Plaintiff argues that the RMA falls

within that category because it "covers virtually all forms of packaging," including packaging

used for transport and distribution. Plaintiff asserts that such packaging is "integral to the smooth

and uniform flow of interstate commerce" and, as a result, the *Pike* balancing test should apply.

(Mot. 24.)

But the cases Plaintiff cites do not support the argument that the RMA falls into the

narrow category described in *Pork Producers*. Plaintiff first quotes *Association to Preserve and

Protect Local Livelihoods v. Sidman*, 147 F.4th 40, 57 (1st Cir. 2025), for the general proposition

that a nondiscriminatory regulation may be invalid if it "prevent[s] the continuous flow of

interstate commerce *through* the regulating jurisdiction." (Mot. 23.) But Plaintiff omits the

context of that quote, where the First Circuit noted, "In each of those three cases, the challenged

regulation required an instrumentality of interstate commerce—whether a train in *Bibb* [*v.

Navajo Freight Lines, Inc.*, 359 U.S. 520 (1959)] and *Southern Pacific* [*Co. v. Arizona ex rel.

Sullivan*, 325 U.S. 761 (1945)], or a truck in *Raymond* [*Motor Transp. Inc. v. Rice*, 434 U.S. 429

(1978)]—to either comply with that regulation or not pass through the regulating jurisdiction at

all." The court went on: "Each regulation thus prevented the continuous flow of interstate

commerce *through* the regulating jurisdiction and not merely *to* it." *Sidman*, 147 F.4th at 57. The

court also distinguished other "continuous flow of commerce" cases because they "rest on the

same concern with the ability of instrumentalities of interstate commerce to continuously use an

artery of interstate commerce to move through the regulating jurisdiction." *Id.*

In its argument, Plaintiff likens the RMA's regulation of in-state disposal of packaging

materials to invalidated regulations on shipping containers, trucks, and trains, because "a

regulation that places significant burdens on packaging and distributors operating interstate

Page 20 -  DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
                 INUNCTION
         SV1/jc4/1004815261

                          Department of Justice
                          100 SW Market Street
                          Portland, OR 97201
                      (971) 673-1880 / Fax: (971) 673-5000

supply chains affects virtually every product traded across state lines." (Mot. 24.) Plaintiff does not argue that the RMA actually prevents interstate commerce from moving through the state. Having an effect on products traded across state lines is not the same thing as preventing the flow of interstate commerce through the state. Accordingly, Plaintiff's argument that the RMA falls within the narrow category of cases involving nondiscriminatory-yet-still-impermissible regulation fails. Because the RMA is nondiscriminatory and does not fall within the narrow exception the Supreme Court acknowledged in *Pork Producers*, the Court need not even apply the *Pike* test here.

But even if the Court applied the *Pike* test, Plaintiff's claim would fail. Plaintiff asserts that the RMA places a substantial burden on interstate commerce because (1) "fees exceed the profit margins associated with the products being distributed, effectively shutting distributors out of the State"; (2) the fee structure "punishes distributors for using packaging that complies with federal safety standards"; (3) the RMA "effectively will regulate not only products *entering* the State but also products *leaving or merely passing through* the State; (4) making logistical and operational changes specific to Oregon is infeasible because it would uproot the interstate supply chain more broadly; (5) distributors face an "acute risk" of "being subject to competing standards and double-counting across the different states." (Mot. 24–25.) But a plurality of the Supreme Court in *Pork Producers* declined to find that such issues imposed a substantial burden on interstate commerce. 598 U.S. at 383–86 (rejecting as a substantial burden that regulations fell solely on interstate companies, forcing some to withdraw from the market or incur new costs to serve that market; that the law might shift market share from one set of out-of-state firms to another; or that the law threatened to disrupt existing industry practice); *see also Exxon*, 437 U.S. at 127 (noting that the dormant Commerce Clause does not protect a particular structure or method of operation). Even limiting the inquiry to distributors (rather than the entirety of obligated producers, as required for a facial challenge), Plaintiff has not shown a substantial burden on interstate commerce.

Page 21 -  DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
          INUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

On the other hand, Oregon has a legitimate interest in protecting the environment, including "easing solid waste disposal problems." *See Minn. v. Clover Leaf Creamery Co.*, 449 U.S. 456, 462 (1981). The RMA's purpose is to "prioritize practices that prevent and reduce the negative environmental, social, economic and health impacts of production, consumption and end-of-use management of products and packaging across their life cycle." ORS 459A.860(4). The RMA dramatically improves recycling access statewide, and it requires "producers to share in the responsibility to reduce those [negative] impacts." *Id.* Compliance costs or market changes do not outweigh the significant local interests effectuated by the RMA.

Plaintiff failed to show that the RMA discriminates against or imposes a substantial burden on interstate commerce. For these reasons, Plaintiff is unlikely to prevail on the merits of its dormant Commerce Clause claim.

### 2.     Plaintiff is unlikely to succeed on the merits of its due process claim.

Although the First Amended Complaint alleges a straightforward procedural due process claim, in its moving papers Plaintiff relies on an entirely different argument: that the RMA violates the little-known non-delegation doctrine[5] under the Fourteenth Amendment. Specifically, Plaintiff asserts that the RMA violates the Due Process Clause because it purportedly delegates "unprecedented" regulatory authority and discretion to a private company—CAA—comprised of producer companies that may compete with Plaintiff's members, with little State oversight, improper retrospective fees, and no notice or opportunity to challenge the fees. (Mot. 29–31.) In making this argument, Plaintiff fundamentally mischaracterizes the RMA's text, history, and implementation.

Plaintiff's non-delegation/due process claim relies on a trio of cases, *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936); *Eubank v. City of Richmond*, 226 U.S. 127, 143–44 (1912);

---

[5] The First Amended Complaint includes a non-delegation claim under the Oregon Constitution, but Plaintiff does not assert that claim here. The State has asserted its Eleventh Amendment immunity to the claim. (*See, e.g.,* Defs.' Mot. to Dismiss.)

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*Washington ex rel. Seattle Trust Co. v. Roberge*, 278 U.S. 116, 122 (1928). Each case applied an analysis that courts have since called the private non-delegation doctrine. *FCC v. Consumers' Rsch.*, 606 U.S. 656 (2025). The Supreme Court in each of the three cases struck down regulatory schemes that gave private parties unrestrained coercive power over other individuals' protected property or liberty interests. Critical to the outcome in each case was not that the private parties had authority over others; it was that the private parties with their own selfish interests had *unrestrained* authority over others. *See* Alexander Volokh, *The New Private-Regulation Skepticism: Due Process, Non-Delegation, and Antitrust Challenges*, 37 Harv. J. L. & Pub. Pol'y 931, 941–43 (2014).

In *Carter Coal*, the Supreme Court invalidated legislation that delegated to a two-thirds majority of coal producers negotiating with unions representing a majority of miners the power to fix hours and wages for all miners in a given district. 298 U.S. at 283–84. The Court was particularly concerned that "[t]he power conferred upon the majority is, in effect, the power to regulate the affairs of an unwilling minority," *id*. at 311, where "the majority of coal producers could impose whatever conditions they wanted" on that minority. Alexander Volokh*, The Myth of the Federal Private Nondelegation Doctrine*, 99 Notre Dame L. Rev. 203, 235 (2023). In *Eubank*, the Court found a city ordinance that "conferr[ed] the power on some property holders to virtually control and dispose of the property rights of others," violated due process because it "create[d] no standard by which the power thus given was to be exercised." 226 U.S. at 143–44. *Roberge* concerned a zoning ordinance that required the written consent of two-thirds of owners of property within 400 feet of a proposed "philanthropic home for children or for old people." 278 U.S. at 118. The Supreme Court invalidated the ordinance because the neighboring owners had authority "uncontrolled by any standard or rule prescribed by legislative action," with "no provision for review" in that the owners' "failure to give consent is final," and they were "free to withhold consent for selfish reasons or arbitrarily" and subject to "their will or caprice." *Id.* at 122.

Page 23 - DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

In *FCC v. Consumers' Research*, 606 U.S. 656 (2025), a recent case involving certain striking parallels to the present case, the U.S. Supreme Court revisited the so-called private non-delegation doctrine. That case addressed a challenge to the FCC's implementation of the congressional mandate for "universal service," intended to "mak[e] communication services available, at affordable prices, to all Americans." *Id.* at 663. The Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, provided "detailed instructions" to the FCC about how to achieve that goal. 606 U.S. at 663. In response, the FCC created the Universal Service Fund to receive and disburse payments from telecommunications companies to subsidize basic communications services for consumers in certain underserved communities. *Id.* The FCC appointed a private, nonprofit corporation owned by an association of carriers to serve as the permanent Administrator of the Universal Service Fund. *Id.* at 669. The Administrator manages day-to-day operations of the Fund, including billing and collecting contributions from carriers, distributing those funds to program beneficiaries, and producing the financial projections that are used to determine how much the carriers pay into the fund. *Id.* at 669.

A non-profit group challenged the fee-setting process, arguing that by appointing a private corporation to the position of Administrator and giving them "*carte blanche*" to set the fee, the FCC had violated "what is commonly called the private nondelegation doctrine." *Id.* at 692. The Supreme Court rejected the claim because "the Administrator is broadly subordinate to the [FCC]," and because "[t]he FCC's rules implementing the Act dictate the programs scope …, they set eligibility criteria for beneficiaries, provide formulas for calculating subsidies, and impose some funding caps." *Id.* at 692–93.

Here, Plaintiff asserts that the RMA violates due process by delegating to CAA the "unprecedented regulatory authority … to set the terms, conditions, and fees" for all producers. (Mot. 28.) Without referencing any portion of the RMA itself, Plaintiff argues that it "provides only the most high-level guidance cabining CAA's broad discretion in formulating its plan— with respect to both setting total system costs and allocating them to different material types."

Page 24 -  DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
           INUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

(*Id.* at 29.) Even a cursory review of the comprehensive statutory requirements, as laid out in the Background section above and in the concurrently filed motion to dismiss, belies Plaintiff's characterization of the RMA.

As in *Consumers' Research*, the RMA and implementing rules provide detailed requirements for PROs and producers to comply with the law. CAA's lengthy program plan—which DEQ carefully reviewed and approved only after rejecting CAA's first two plan submissions—explains how CAA will ensure compliance with the law. CAA cannot materially deviate from the approved plan. Similarly, producers' obligations under the RMA are set forth in the Participant Producer Agreement and Oregon Addendum. And DEQ retains continuing oversight to ensure that CAA and producers are complying with the RMA, with enforcement authority against both CAA and its member producers should either become noncompliant.

In addition to being unsupported by any evidence, Plaintiff's speculation about theoretical conflicts of interest between CAA's board members fails to acknowledge the stringent and comprehensive statutory and regulatory framework under which CAA operates, with DEQ's careful and ongoing oversight for the program. Further, although Plaintiff decries a purported lack of input, Plaintiff and its members had more than four years to participate in the program's development, including two rounds of rulemaking and three rounds of public review of CAA's draft program plan, include fee-setting methodology.

The Supreme Court in *Consumers Research* concluded, "In every way that matters to the constitutional inquiry, the Commission, not the Administrator, is in control." *Id.* at 695. So, too, here. *See also Agendia, Inc. v. Becerra*, 4 F.4th 896, 902 (9th Cir. 2021) ("The statutory and regulatory scheme is constitutional because the contractors 'function subordinately' to the Secretary.") (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940)). For these reasons, Plaintiff is unlikely to succeed on the merits of its due process claim.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

3.      **Plaintiff is unlikely to succeed on the merits of its unconstitutional conditions claim.**

Plaintiff contends that the RMA, Oregon's comprehensive regulatory scheme designed to address packaging recycling and waste management throughout the state, improperly coerces Plaintiff's members into giving up their constitutional rights as a condition of entering the market. Without citing to or analyzing the law itself, Plaintiff argues that the RMA requires businesses to "join a single private organization; agree to that organization's non-negotiable contract terms; and then pay supracompetitive and nontransparent retrospective fees to fund public-use infrastructure improvements across the state." (Mot. 32.) Plaintiff also argues that businesses are required "to waive their right to a judicial forum to challenge their fee assessments and CAA's interpretation of the law." (*Id.*) Once again, Plaintiff mischaracterizes the law.

As discussed above, the RMA requires producers of covered products to create or join a producer responsibility organization, which effectuates the member producers' compliance with the RMA's substantive requirements for packaging materials recycling and disposal. Plaintiff's members could have come together to create their own producer responsibility organization— and still can—but they did not do so. The substantive terms in the Oregon Addendum of CAA's contract reflect the requirements of the RMA itself. The fee-setting process is also governed by the RMA and its implementing rules, and except for one small portion of confidential trade materials, is set forth in detail in the relevant statutes and public outreach materials. DEQ has approved the fee-setting methodology in its entirety. The collected fees are used to improve the state's recycling capabilities, including in rural areas that would otherwise have limited access to recycling facilities, in response to a global recycling crisis. Producers have opportunities to contest their fees directly with CAA, through informal discussions, mediation, or arbitration, if necessary. If a fee dispute continues and CAA notifies DEQ that a particular producer is noncompliant with the RMA's requirements, then DEQ may issue an enforcement order to the noncompliant producer. The producer can then challenge the order in state court under Oregon's

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Administrative Procedures Act, which may include substantive legal arguments such as federal constitutional claims.

In sum, the RMA does not coerce producers to give up any constitutional rights. Plaintiff is unlikely to succeed on the merits of this claim.

**B.    Plaintiff has not shown that its members are likely to suffer irreparable harm in the absence of an injunction.**

A party seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Park Vill. Apartment Tenants Ass'n. v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011). This requires "a clear showing," *Winter*, 555 U.S. at 22, of "a likelihood of substantial and immediate irreparable injury." *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)); *accord Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (holding the threatened harm must be "immediate" in character). Alleged harms must not be speculative in nature. *Goldie's Bookstore, Inc. v. Super. Ct. of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984).

Plaintiff asserts that its members will suffer the following irreparable harm: (1) they will be forced to pay "excessive invoices … in which fees often exceed the profit margins"; (2) certain members "are at imminent risk of being forced out of Oregon, or at least withdrawing products from the market"; (3) other Plaintiff members are attempting to raise prices where they can—but that itself harms their ability to compete … and reduces sales"; (4) members will experience harm to their goodwill, reputation, and business relationships. (Mot. 33–34.)

There are several fundamental problems with these assertions. First, the Declaration of Brian Wild, ECF No. 34, largely describes in broad generalities what Plaintiff's members purportedly "report" to it, for example: "Members further report that they frequently lack the practical ability to pass fees through to customers in the normal course of business…." (*Id.* ¶ 16.) The rules of evidence may be relaxed in this context, but a laundry list of purportedly aggregated hearsay member complaints is not probative evidence of an imminent irreparable injury. Second,

Page 27 -  DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INUNCTION

that fees may exceed profit margins in some circumstances does not, in and of itself, demonstrate irreparable harm. *See Los Angeles Mem. Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197 (9th Cir. 1980). Third, the generic assertion that raising prices harms a company's ability to compete and reduces sales may or may not be factually accurate, but such speculation is not evidence of irreparable harm warranting injunctive relief. Finally, the assertion that members' goodwill, reputation, and business relationships will be harmed by the RMA is speculative, unsupported, and should be disregarded.

Plaintiff also argues that a deprivation of constitutional rights alone is an irreparable injury. (Mot. 34.) But courts generally find that a constitutional violation inherently constitutes irreparable injury only when fundamental rights such as free speech, association, or privacy are at issue. *See Ne. Fla. Ch. of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285–86 (11th Cir. 1990); *see also Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 484–85 (1st Cir. 2009). Because economic regulation does not implicate a fundamental right, the constitutional nature of Plaintiff's claims does not warrant a finding of irreparable harm. *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982) (noting in the context of a vagueness challenge that the Constitution demands more of laws inhibiting the exercise of fundamental constitutionally protected rights such as freedom of speech or association).

Finally, Plaintiff argues that its members may not be able to recover their fees if Plaintiff ultimately prevails in its lawsuit. Setting aside the fact that this argument consists of nothing more than rank speculation, if that were such a significant concern for Plaintiff's members, one would expect that Plaintiff would have either filed the lawsuit and request for preliminary injunction before the law went into effect. But it did not. Instead, Plaintiff filed its original complaint after the first invoices went out and then delayed filing its motion for preliminary injunction for nearly four more months. "[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018). "A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—

Page 28 -  DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
          INUNCTION
SV1/jc4/1004815261

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016); *see also Garcia v. Google*, 786 F.3d 733, 746 (9th Cir. 2015) (concluding that district court did not abuse its discretion in finding that a months-long delay in seeking injunctive relief undercut plaintiff's claim of irreparable harm).

Because Plaintiff fails to make a clear showing of imminent and substantial harm in the absence of an injunction, combined with Plaintiff's delay in seeking injunctive relief, this factor weighs against granting Plaintiff's motion.

## C.    The equities and public interest favor denial of Plaintiff's motion.

Courts presented with a motion for preliminary injunction "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 7, 24 (citation omitted). As part of weighing these considerations, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction," including the impacts on non-parties. *Id.*; *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (citation omitted).

In its motion, Plaintiff asserts that an injunction would "preserve[] the status quo— nothing more." (Mot. 35.) Plaintiff blithely dismisses the possibility that an injunction here would cause harm, characterizing the requested injunction as "a temporary pause on its novel EPR system" causing "minimal harm." (*Id.*) Plaintiff is incorrect on both counts.

There are two types of preliminary injunctions: (1) a prohibitory injunction that preserves the status quo by freezing the parties' positions pending a decision on the merits; or (2) a mandatory injunction that orders a responsible party to take an action. *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–79 (9th Cir. 2009) (citations omitted). Plaintiff asks the Court to issue an order "preliminarily enjoining Defendants from enforcing any

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

obligations under the Act and deferring payment obligations of Plaintiff's members pending final adjudication." (Mot. 10.) This request seeks two different types of relief: an order preventing DEQ from enforcing the RMA, and an order requiring DEQ to take unidentified affirmative steps to defer members' payment obligations. DEQ will focus on the request for an order preventing DEQ form enforcing the RMA.

Although the requested relief appears to be prohibitory, in that it would require DEQ *not* to do something, critically, the requested relief does not preserve the status quo. The "status quo" for purposes of a preliminary injunction means "the last, uncontested status which preceded the pending controversy." *Marlyn Nutraceuticals*, 571 F.3d at 878-79 (citation modified). Here, the RMA went into effect on July 1, 2025. (Portley Decl. ¶ 34; OAR 340-090-0720(1).) Plaintiff filed this action on July 30, 2025. (Compl., ECF No. 1.) Thus, the last, uncontested status which preceded the present controversy was that the RMA had already gone into effect.

Further, Plaintiff did not include a request for preliminary injunction in the original or amended complaint. (Compl. 22, Prayer for Relief ("Plaintiff respectfully requests that this Court … [i]ssue a permanent injunction enjoining Defendants from implementing or enforcing the Act and regulations promulgated thereunder"; First Am. Compl. 28, ECF No. 26 (same).) Plaintiff waited until November 24, 2025, nearly four months after filing this action, to seek a preliminary injunction. By that time, the program was well under way. An injunction now would not preserve the status quo; it would be incredibly disruptive and harmful to non-parties who have invested in infrastructure and improvements in reliance on the program continuing to exist. (*See generally*, John Decl.; Mitchell Decl.; Thompson Decl.; Miller Decl.; Jenkins Decl.; Henry Decl.; Eben Decl.) If the program were halted, and funding for local governments and their service providers were cut off, then service providers in communities like Newport and Baker City would have to scramble to find other ways to pay for their significant financial investments under the RMA. (*See* Thompson Decl. ¶ 7; Henry Decl. ¶ 10.)

Page 30 -  DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
          INUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

The RMA was literally years in the making. Plaintiff had ample opportunity to file a complaint and seek injunctive relief well before the law went into effect but chose to wait. Plaintiff's voluntary delay should not accrue to the detriment of innocent non-parties who had no way of knowing that their investments might be at risk. The equities and public interest clearly weigh against injunctive relief here.

**D.      Plaintiff's requested injunction goes beyond DEQ's enforcement authority.**

"Injunctive relief must be tailored to remedy the specific harm alleged, and an overbroad preliminary injunction is an abuse of discretion." *Nat. Res. Def. Council v. Winter*, 508 F.3d 885, 886 (9th Cir. 2007) (citation omitted). Plaintiff asks the Court to issue a preliminary injunction ordering DEQ "to take such steps as may be necessary to defer the EPR payment obligations of Plaintiff's members." (Mot. 36.) Although DEQ has thoroughly vetted and approved the fee methodology underpinning individual fees invoices, along with CAA's program plan, DEQ does not itself issue the invoices to producers. Nor does DEQ take steps to collect membership fees from producers, whether for producers in good standing or those in arrears. Instead, CAA, who is not a party to this lawsuit, bears that responsibility as set forth in the RMA. ORS 459A.875(2)(a)(E); ORS 459A.869(2); ORS 459A.884(1). The Court has jurisdiction to enjoin DEQ from enforcing the RMA. The Court cannot issue an injunction requiring DEQ to take indeterminate actions beyond its enforcement authority.

Mandatory injunctions are "particularly disfavored" and should not be granted absent an "extreme or very serious" injury that is not "capable of compensation in damages." *Marlyn Nutraceuticals*, 571 F.3d at 879 (citation modified). The burden on a plaintiff seeking a mandatory injunction is "doubly demanding," requiring a showing that "the law and facts *clearly favor* [plaintiff's] position, not simply that [plaintiff] is likely to succeed." *Garcia*, 786 F.3d at 740. Plaintiff has not met that burden here.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## V.  CONCLUSION

Plaintiff has failed to meet its burden to clearly establish any of the four *Winters* factors, let alone all of them. Without even attempting to demonstrate that there is no set of circumstances in which the RMA would be valid, as required for a facial challenge, *Salerno*, 481 U.S. at 745, Plaintiff asks this Court to enjoin DEQ's administration and enforcement of the RMA in its entirety. Plaintiff is not entitled to this extraordinary relief. Plaintiff's motion for preliminary injunction should be denied.

DATED December 22nd, 2025.

Respectfully submitted,

DAN RAYFIELD
Attorney General


*s/ Sara D. Van Loh*
SARA D. VAN LOH #044398
Senior Assistant Attorney General
ALEXANDER C. JONES #213898
Assistant Attorney General
Trial Attorneys
Tel (971) 673-1880
Fax (971) 673-5000
Sara.VanLoh@doj.oregon.gov
Alex.Jones@doj.oregon.gov
Of Attorneys for Defendants

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000