# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS, <br><br>                 Plaintiff, <br><br>     v. <br><br> LEAH FELDON, DIRECTOR, OREGON DEPARTMENT OF ENVIRONMENTAL QUALITY, in her official capacity; MATT DONEGAN, KAREN MOYNAHAN, MARK WEBB, AND SILVIA TANNER, in their official capacities as members of the Oregon Environmental Quality Commission, <br><br>                 Defendants. | Case No. 3:25-cv-01334-SB <br><br><br><br> **DECLARATION OF KIMBERLY A. HOLMES IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER** |

## DECLARATION OF KIMBERLY A. HOLMES

I, Kimberly A. Holmes, declare the following:

### Background and Qualifications

1.      I am the Oregon Executive Director for Circular Action Alliance ("CAA"). I am over the age of eighteen and competent to testify. I make this declaration in support of the Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction in this matter. Except where otherwise indicated, the facts described in this declaration are based on my personal

knowledge or on information I have obtained from CAA personnel and records in the course of performing my duties for CAA.

2.     In my role as CAA's Oregon Executive Director, I am responsible for overseeing CAA's work to develop and implement the extended producer responsibility ("EPR") program for packaging, printing and writing paper, and food serviceware under Oregon's Plastic Pollution and Recycling Modernization Act (the "Act"). My responsibilities include working closely with the Oregon Department of Environmental Quality ("DEQ"), the Oregon Recycling System Advisory Council, producers, local governments, recycling service providers, non-governmental organizations, and other interested parties. My responsibilities include overseeing CAA's Oregon producer responsibility organization ("PRO") and the development and implementation of the Oregon program plan.

3.     I have worked in the solid waste, recycling, and sustainable materials management field for more than twenty years. Before joining CAA as Oregon Executive Director, I was the owner and principal consultant of 4R Sustainability, a consulting firm focused on advancing recycling and sustainability goals in partnership with industry and other stakeholders. Earlier in my career, I led recycling and sustainability initiatives for the Plastics Industry Association as Vice President of Sustainability and held other roles in the recycling and materials management sector.

4.     In my role as CAA's Oregon Executive Director, I have become familiar with the Act, the rules DEQ has adopted to implement the Act, and the structure and day-to-day operation of CAA's Oregon program. I have reviewed the First Amended Complaint and the Motion for Preliminary Injunction filed by the National Association of Wholesaler-Distributors in this case and understand the main allegations they make about the Oregon program and CAA's role in it. In

this declaration, I describe how Oregon's EPR program operates from CAA's perspective, how CAA's Oregon program plan and fee structure were developed and approved, and how producers participate in and interact with the program.

**Overview of Oregon's Plastic Pollution and Recycling Modernization Act**

5.      EPR is a policy approach where producers, rather than local governments, bear a portion or all of the financial and operational responsibility for managing products at the end of their life. Since the 1990s, EPR principles have been incorporated into national and sub-national waste and recycling laws across Europe, Canada, and a growing number of U.S. states, particularly for packaging and paper products. In the United States, Oregon was an early adopter of EPR, enacting the Oregon E-Cycles electronics recycling program in 2007, which required manufacturers to finance and provide responsible end-of-life management for covered electronic devices. Since 2021, seven states—California, Colorado, Maine, Maryland, Minnesota, Oregon, and Washington—have enacted packaging EPR laws that follow the same basic model for shifting responsibility for the end-of-life management of covered packaging and paper from taxpayers and local governments to producers. During the past year, at least nine additional states, including Hawaii, Illinois, Massachusetts, New Jersey, New York, North Carolina, Rhode Island, Tennessee, and Wisconsin have introduced similar EPR packaging bills.

6.      In 2021, the Oregon legislature enacted Senate Bill 582, known as the Plastic Pollution and Recycling Modernization Act. The law took effect in January 2022, at which time DEQ began its formal rulemaking process, and implementation of the producer-funding programs started in July 2025. The Act establishes an EPR-based recycling system for packaging, printing and writing paper, and food serviceware sold in or into Oregon and requires producers of these

covered products to participate in a PRO approved by the Oregon DEQ. Oregon's EPR program for packaging does not exist in a vacuum. For years, the state has used producer-responsibility models, sometimes referred to as stewardship programs, for other products, including electronics, architectural paint, mattresses, and pharmaceuticals.

7.     I understand that the legislature enacted the Act against the backdrop of struggling international recycling markets causing rising recycling costs for local governments, steadily increasing contamination rates, and a desire to reduce the negative environmental and public health impacts caused by packaging waste through increased recycling. In doing so, it adopted the widely used EPR model to shift a portion of the financial and operational responsibility for covered packaging away from taxpayers and local governments and onto the producers whose products generate those materials. In the Act, Oregon adopted a producer responsibility model informed by the approaches used for decades in European and Canadian packaging EPR systems and by product stewardship programs in Oregon and other states. Under these models, governments set the legal obligations and performance goals, while one or more PROs, acting under regulatory oversight, provide the logistical and financial machinery that allows producers to comply.

8.     The Act establishes an EPR program for certain packaging, printing and writing paper, and food serviceware supplied in or into Oregon. At a high level, the statute and implementing rules define which materials are "covered products" and which entities are treated as "producers" of those products for purposes of the program. *See* Or. Rev. Stat. §§ 459A.863, 459A.866. In general terms, covered products include many common forms of consumer packaging and paper products supplied in or into Oregon, and a "producer" is the entity that is

most responsible for placing those covered products on the Oregon market, rather than simply any business that handles the products in the supply chain.

9. Oregon law and DEQ rules establish a hierarchy for identifying the responsible producer when more than one business participates in supplying a covered product. Under that hierarchy, the primary responsible party is ordinarily the brand owner whose name appears on the product sold to consumers in Oregon, if that brand owner meets the statutory and regulatory criteria. If there is no qualifying brand owner or licensee with the required presence, responsibility can shift to other entities identified in the law, such as importers. Only if none of those producers are located within the United States does responsibility move further down the supply chain to a distributor that first places the product on the Oregon market. As a result, with the exception of service packaging at a physical retail location (*i.e.,* single use shopping bags, nursery trays, etc.) and food serviceware (*i.e.*, single use paper or plastic plates, cups, cutlery, etc.), wholesalers and distributors that simply move other companies' branded products through the supply chain are not ordinarily the "producer" for those products if a qualifying brand owner or importer exists.

10. Oregon law requires producers of covered products that supply in or into Oregon to participate in an approved producer responsibility program. One way for a producer to satisfy this requirement is to join a PRO whose program plan DEQ has reviewed and approved.

**CAA's Selection as Oregon's Producer Responsibility Organization**

11. Founded in 2022, Circular Action Alliance is a section 501(c)(3) public charity that serves as a PRO dedicated to implementing EPR laws for paper and packaging across the United States. CAA is a producer-founded and producer-led membership organization founded by companies from the food, beverage, consumer goods, restaurant, and retail industries. CAA's

mission is to help producers comply with EPR laws, deliver harmonized, best-in-class services and work with governments, businesses, and communities to reduce waste and recycle more. CAA's structure, governance, and membership are described in detail in the CAA Oregon Program Plan. Oregon Program Plan (2025-2027), Exhibit A, Declaration of Brian Wild, Doc. No. 34-1 (hereinafter "Oregon Program Plan"). CAA currently serves as the PRO designated to implement, or to support implementation of, state EPR programs for paper and packaging in California, Colorado, Maryland, Minnesota, and Oregon, spanning a wide variety of covered material types. CAA's registration data shows that more than 2,800 producers have joined CAA's Oregon program.

12.     In my role as Oregon Executive Director, I was responsible for coordinating CAA's work as a prospective PRO in Oregon, including preparing and submitting the materials DEQ required to evaluate CAA's qualifications. As part of that process, CAA submitted an Oregon Program Plan that described in detail how CAA would meet the statutory and regulatory requirements for a producer responsibility organization. The plan addressed CAA's governance and nonprofit status, its financial and technical capacity, and its approach to fulfilling Oregon's requirements for funding recycling services, supporting system improvements, providing education and outreach, and managing certain materials through a depot system. DEQ staff reviewed CAA's submission, requested additional information, and worked with us over a period of months to refine and clarify the plan.

13.     On February 21, 2025, after completing that review and a public comment process, DEQ approved CAA's Oregon Program Plan for the 2025–2027 period and designated CAA as the producer responsibility organization for Oregon's EPR program for packaging, printing and

writing paper, and food serviceware. As of the date of this declaration, CAA is the only PRO with an approved program plan in Oregon, and producers that join CAA's Oregon program and comply with its requirements are able to meet their obligation to participate in an approved producer responsibility program under Oregon law.

14. As a PRO, CAA provides compliance services that enable producers to meet their obligations under state EPR laws in a coordinated and efficient manner. In general, a PRO is responsible for developing a comprehensive program plan for managing covered products or covered materials, submitting that plan for review by any state-appointed advisory bodies, revising that plan based on regulator and public feedback, and securing formal approval from the state regulatory agency. The state approved plan governs program operations, including the collection and management of producer fees.

15. CAA has published a set of Strategic Operating Principles, which are available on CAA's About webpage, https://circularactionalliance.org/about. Consistent with its Strategic Operating Principles, CAA, in its role as an EPR compliance organization, seeks to: deliver cost-efficient EPR services by leveraging scale, harmonization of service delivery, and consistent program planning across states wherever possible; ensure strong producer governance and a level playing field for producers by working with regulators to increase producer participation and by providing clear, consistent reporting guidance so that each producer pays its fair share; develop program plans, policies, and plan amendments through robust data collection, evidence-based decision-making, and meaningful consultation with interested parties; and improve the public's recycling experience and environmental outcomes by expanding access to recycling services,

reducing contamination, supporting innovation in packaging design and end markets, and helping producers access high-quality recycled materials for use in new products and packaging.

16.     In Oregon, CAA's role is to administer the DEQ-approved program plan for packaging, printing and writing paper, and food serviceware on behalf of participating producers. CAA's responsibilities include implementing the approved program plan, operating producer registration and reporting systems, calculating and invoicing producer fees in accordance with the approved fee methodology, and using those fees to carry out the program obligations described in the plan, subject to DEQ's oversight. CAA is not a government agency and does not create laws or issue regulations, enforce violations of laws or regulations, or collect any general tax revenues for the state. Those functions, including rulemaking and enforcement related to the program, are performed by DEQ and the Environmental Quality Commission, not CAA.

**Program Plan Process**

17.     In developing CAA's Oregon Program Plan, CAA was required to follow distinct statutory criteria set out in Oregon law, *see* Or. Rev. Stat. § 459A.875(2), as well as additional requirements from DEQ's implementing rules and Internal Management Directive. Among other things, the statute and rules specify the types of packaging, printing and writing paper, and food serviceware that are "covered products," identify which entities in a supply chain are treated as "producers" of those products, and require the plan to use objective and measurable criteria whenever possible. They also require the plan to address statewide service obligations, recyclability and environmental impacts, contamination reduction, and responsible end markets, and to ensure that average base fees for covered materials that are not accepted for recycling are higher than average base fees for covered materials that are accepted for recycling.

18. CAA developed a baseline assessment of the existing recycling system for the Oregon Program Plan using data from the Oregon Recycling System Optimization Project and DEQ's Needs Assessment. These studies, together with additional information from local government contracts, haulers, materials recovery facilities, and market data, provided estimates of current recycling system costs and performance. CAA staff and I then met with local governments, haulers, processors, producers, and other interested parties to understand how the system was operating on the ground, what improvements were needed to meet Oregon's statutory requirements, and what costs those improvements would entail.

19. Using this information, CAA and its technical advisors built an Oregon-specific activity-based costing model to estimate the costs of collecting, transporting, and processing different types of covered materials, as well as contamination management and other system functions. We used this model to identify the system improvements required under Oregon law, such as expanded access to collection services, investments in depots and processing infrastructure, and education and outreach, and to estimate the associated costs. As new data and input from interested parties became available, we refined our assumptions and updated the model so that the plan and its financing reflected the best information we had at the time.

20. In CAA's Oregon Program Plan, the material base fee levels were necessarily presented as estimates because CAA did not yet have producer-reported Oregon supply data under the new law. At the time the Program Plan was submitted, producers had not yet reported their Oregon-specific supply weight to CAA. As a result, CAA relied upon the best available information—market data, modeling, and preliminary cost assumptions—to forecast program costs and illustrate a range of potential fees by covered material category. The Program Plan made

clear that until producers reported their actual amount of supplied materials in the first quarter of 2025, only the fee-setting methodology and a range of fee estimates could be provided. Further, the Program Plan explained that the base fee schedule would be updated annually at a minimum, to reflect changes to actual producer supply data, system operations, and costs.

21.     CAA submitted its draft Oregon Program Plan, including a detailed description of the fee-setting methodology, to DEQ for review. DEQ made the plan available for public comment and received input including from local governments, service providers, producers, non-governmental organizations, and advisory bodies such as the Recycling System Advisory Council. DEQ staff reviewed the plan, asked follow-up questions, and provided comments and conditions on several aspects of the program. DEQ reviewed CAA's proprietary data and models that were provided to DEQ confidentially in Appendix G and met with CAA on the methodology before approving. DEQ also received a CAA presentation on the Cost-to-Manage model and how it is applied to set fees. CAA revised the plan twice in response to feedback and public comment, and resubmitted it for approval.

22.     DEQ approved CAA's Oregon Program Plan and will oversee CAA's implementation of the program. Under Oregon law and DEQ rules, CAA is required to implement the plan as approved, to report regularly on program performance and finances, and to work with DEQ on any material amendments or updates. DEQ retains authority to require modifications to the plan, to impose additional conditions, or to approve additional producer responsibility organizations. The development and implementation of CAA's Oregon plan have therefore occurred within the framework of Oregon's statutes and rules and under DEQ's continuing oversight.

**Producer Fees and Use of Funds**

23.     In the fall of 2023, CAA began developing a national fee-setting methodology intended to be used in every EPR state where CAA serves as the PRO and is responsible for setting producer fees. As that work continued through 2024, CAA also established a set of guiding principles to inform the development of fair and equitable fees. Those seven principles are described at page 194 of the Oregon Program Plan. Three are especially relevant here:

1)  **Harmonization.** CAA uses a consistent national fee-setting methodology across states, while recognizing that the resulting fee rates will vary by state to reflect different statutory requirements and program costs.

2)  **Fairness.** Producers that supply covered materials to consumers are expected to contribute to the costs of the recycling system, including producers that rely on materials that are currently difficult or uneconomic to recycle.

3)  **Clarity.** CAA commits to preparing fee-setting materials and producer consultations in a way that clearly communicates the principles, methodologies, and approach CAA uses to determine fee rates.

24.     Consistent with these principles, CAA's Oregon Program Plan includes an extensive, roughly 30-page chapter explaining its fee-setting process in detail. The Program Plan also includes a complete fee schedule estimating the low and high end of the fees for each of the 60 material categories. Producers and the public had an opportunity, before DEQ acted, to see both this proposed methodology and the projected fees for each category.

25.     The fee-setting methodology itself is designed to implement the Act's mandate that PRO membership fees generate sufficient revenue to fund all costs associated with the producer responsibility program. In broad terms, three core data components drive the fee calculation:

1)  **Total Program Costs.** Each year, CAA determines the costs required to implement the Oregon program in compliance with the Act and DEQ rules.

2)  **Relative Material Costs.** Because some materials cost more per ton to manage than others, CAA developed indices to represent the relative cost of collecting, sorting, processing, and marketing each material type in Oregon's system.

3)  **Producer-Reported Supply.** Each year, producers report the amount of covered material they supply into Oregon, broken down by covered material category.

CAA has provided on its public website a document entitled Understanding EPR Fee-Setting, https://static1.squarespace.com/static/64260ed078c36925b1cf3385/t/69173a8f1fa9ee46abcc44fe/1763129999473/CAA+Understanding+EPR+Fees+%28Infographic%29+-+Digital+-+11-2025.pdf. The following is an excerpt from that document, which shows that CAA's fee-setting process follows a clear, stepwise approach:



26.     In practical terms, this means that a producer can understand its Oregon EPR fees in a straightforward way. First, CAA publishes the covered material categories and per-pound rates using the methodology described in the Program Plan. Second, the producer determines how many pounds of each category it supplied into Oregon in the prior year, using CAA's reporting tools. Third, CAA multiplies those reported pounds by the public per-pound rates. The resulting invoice is therefore a direct, mechanical application of published rates to producer-reported data.

27.     For financing and reporting purposes, Oregon's program divides covered materials into distinct categories that reflect meaningful differences in recyclability, sortability, contamination, and system costs. These categories are grouped into three broad groups: materials accepted for recycling on the Uniform Statewide Collection List, materials accepted for recycling on the PRO Recycling Acceptance List, and covered materials that are not accepted for recycling. For each category, CAA sets a base fee rate that is informed by the Oregon cost model, including material-specific cost indices and material-specific commodity revenues, so that materials that are

more costly to manage tend to have higher base fees than materials that are easier and less expensive to collect and process. For example, polystyrene foamed containers, which are difficult to collect and recycle, have one of the highest base rates at $1.38 per pound. General use paper, on the other hand, is easily recyclable and therefore has one of the lowest base rates at $0.05 per pound. This example can be found in the document attached as Exhibit A, which is a true and correct copy of a document titled "2026 Oregon Producer Fee Schedule (Public Version)" that CAA has made publicly available on its website, https://static1.squarespace.com/static/64260ed078c36925b1cf3385/t/693b2c9103be112d168e1b1 9/1765485713621/OR+2026+Fee+Schedule+Public.pdf.

28. In designing the methodology, CAA staff aimed to generate revenue that reasonably matches projected program costs, not to create surplus funds, consistent with Oregon's statutory requirements. If revenues in a given period exceed or fall short of actual costs, those differences are accounted for in future fee setting, and all funds remain restricted to program purposes. CAA does not have authority to divert fee revenues to unrelated uses or to the State's general fund.

29. Throughout its review of the Program Plan, DEQ had full visibility into CAA's proposed fee methodology. Certain technical elements of the algorithm, data, and modeling process were provided in Appendix G to the Program Plan, which CAA submitted to DEQ on a confidential basis consistent with DEQ's processes for handling sensitive business information. Much of the high-level structure of that methodology has since been described publicly in CAA's guidance materials and presentations.

30.     Appendix G contains a narrow set of additional implementation details about CAA's fee-setting methodology. The core elements of that methodology—including the fee-setting principles, data inputs, and overall approach—are already described in CAA's public materials and in the Oregon Program Plan. Appendix G simply provides a step-by-step description of the fee-setting calculation, the initial material-specific cost-to-manage values used to develop the 2025 draft fees, the way commodity revenues and indirect costs are allocated to covered materials, certain aggregation and rounding conventions, and the resulting 2025 fee schedule showing the base, system-improvement, and disposal portions of each fee. This limited additional detail is confidential and commercially sensitive because it reflects CAA's proprietary modeling choices and non-public inputs and assumptions and could be used by others to replicate or reverse-engineer CAA's approach or gain insights into producers' costs and program economics that are not otherwise available.

31.     Notwithstanding this limited confidentiality, producers had ample notice and opportunity to comment. Producers and other interested parties reviewed the 30-page description of the fee-setting approach in the Program Plan, as well as the detailed material categories and estimated fee ranges. DEQ had full access to Appendix G in evaluating and ultimately approving CAA's methodology.

32.     CAA applies published, material-specific fee rates to the weights that producers report to calculate their invoices. For each covered material category, CAA publishes the per-pound base fee and any applicable additional amounts, and producers can use these published rates together with their own reported supply weight to understand and forecast their fees. CAA then issues invoices based on the producer's reported Oregon-destined supply weight and the applicable

published rates. Invoices specify the period covered and the due date for payment, and producers are expected to pay those invoices within the time frames described in CAA's program documents and agreements. Exhibit A lists the material-specific per-pound and flat-fee rates that CAA applies to producer-reported weights to calculate invoices.

33.     According to an internal analysis of CAA's data, the majority of obligated producers are the brand owners of the products. Companies that would be categorized as distributors of another brand's products appear to comprise only a small percentage of the overall EPR program. CAA estimates that these distributors accounted for less than 5% of 2025 program fees in Oregon.

**Fairness in Setting Fees and Responding to Producer Questions**

34.     Part of CAA's mission is to help producers understand, comply with, and plan for their obligations in states that have enacted EPR laws for paper and packaging. On its website, CAA maintains a Producer Resource Center, https://circularactionalliance.org/producer-resource-center, as well as pages with information and resources specific to each state program, including Oregon, https://circularactionalliance.org/oregon. CAA also employs dedicated Producer Services teams to answer producer questions.

35.     To help producers better understand the Oregon program, the fees, and how to budget, CAA held multiple webinars. A full list of all of the webinars CAA has offered is available at https://circularactionalliance.org/events-calendar. In the leadup to the first invoices being issued, between January 2025 to July 2025, CAA offered several recurring webinars for the public on "Budgeting for EPR Fees" and for registered producers on "Oregon Fee Setting Explained."

36.     CAA employs a risk-based Producer Report Validation process to ensure the accuracy and fairness of producer-reported supply data. In 2025, all submitted reports were analyzed by CAA's Data & Analytics team to identify the highest-risk variances. This analysis compared reported weights to expected values (based on historical data, sector benchmarks, and predictive models) and identified some instances for further review. Analytical tools will be further enhanced and automated in 2026 and future years to support an increased number of producer reports expected in that timeframe.

37.     Desktop reviews were also extensively conducted to validate the producer supply reports. Desktop reviews are conducted for reports meeting specific risk criteria, including the largest reports comprising highest amounts of total reported supply weight for a given period, reports with data errors, and reports missing or null values in key categories. Where discrepancies or risks are identified, the Producer Services team follows up with producers for clarification or substantiation.

38.     As described above, CAA works extensively on the front end to reduce potential reporting issues, and CAA also works directly with brand owners, manufacturers, distributors, and wholesalers that have concerns about double reporting and encourages any entity in the supply chain with concerns about potential double reporting to raise them through CAA's Producer Report Adjustments process.

39.     CAA has handled more than 200 reporting adjustment requests in Oregon through CAA's Producer Report Adjustments process, approving the vast majority of them. The most common reasons for reporting adjustments include data-entry errors and unit-of-measure conversion errors.

**Public Interest**

40. Fees collected from producers through CAA's Oregon program are used to fund the costs of implementing the approved program plan in Oregon. These costs include, among other things, payments and reimbursements to local governments, haulers, and materials recovery facilities (MRFs) for collection and processing services; investments in depots and other collection infrastructure; education and outreach activities to improve recycling participation and reduce contamination; information technology systems needed to operate the program; and auditing and assurance activities. Producer fees collected for the Oregon program are dedicated to these program purposes and are not remitted to the State's general fund or used for activities unrelated to implementing the Oregon program plan.

41. In 2025, program funds were used to send over 200,000 pieces of education and outreach materials to help Oregonians recycle correctly. Communities received just over $2.1 million for anti-contamination programs designed to prevent contamination before it starts. Recycling facilities have made significant investments and upgrade commitments in anticipation of receiving supporting funding through the 2027 program plan period and have already been supported with over $8 million to fund upgrades and stabilize market fluctuations that can raise costs. More than 16,000 recycling carts were ordered, and as of the end of 2025, 20 RecycleOn Centers are now open. In addition, ten recycling trucks will be ordered and delivered in Spring 2026 to communities that currently lack access to recycling services.

**Producer Participation Agreement and Dispute Resolution**

42. To participate in CAA's Oregon program, an obligated producer must register with CAA, execute CAA's Participant Producer Agreement and the Oregon Addendum (together, the

"Producer Agreement"), and provide information about the types and quantities of covered materials it supplies into Oregon. Once registered, producers are required to submit annual reports of the weights of covered materials that they supplied into Oregon during the designated reporting periods, broken down by covered material category as defined for the program.

43.     Producers of covered materials that choose to meet their Oregon obligations through CAA do so by signing CAA's Producer Agreement. It describes what CAA is responsible for under the Oregon program plan and what Participant Producers are responsible for, including registration, reporting, paying fees that are calculated under the approved fee methodology, and cooperating with audits and other program activities.

44.     The Producer Agreement, including the Oregon Addendum, includes dispute-resolution provisions that apply to disagreements between CAA and a producer about that contractual relationship. In practice, the kinds of issues that are expected to arise are questions about how an invoice was calculated, whether certain products have been categorized correctly, whether data were reported accurately, or how particular provisions of the agreement apply to a producer. Our expectation is that producers will raise those questions with us so CAA staff and I can try to resolve them, including by reviewing data, adjusting reports, and recalculating invoices where appropriate. If a dispute cannot be resolved that way, the agreement allows remaining contract-related disputes to be resolved through binding arbitration between CAA and the producer. These provisions are aimed at resolving disputes about the contract and the operation of the CAA program. They do not address, and are not intended to limit, a producer's ability to challenge Oregon's law or DEQ's rules in court. To my knowledge, no arbitrations have proceeded and, in fact, no one has requested arbitration.

45.     CAA uses arbitration for unresolved contract disputes for several reasons. First, arbitration is generally designed to be faster and less costly than full court litigation, which is important for a program that is funded by producer fees. Second, many of the disputes we would expect to see involve detailed, commercially sensitive producer information, such as packaging specifications, sales volumes, and supply-chain arrangements. Arbitration provides a way to address those questions in a more confidential setting than a public court filing, which helps protect producers' competitive information and makes it easier for them to share the level of detail we often need to resolve a dispute.

46.     From my experience working directly with producers, I know that producers that join CAA's Oregon program retain several important protections. They can and do ask questions about their invoices and reporting, and we have processes for adjusting reported supply data and invoices when errors are identified. If a producer believes that CAA is not following Oregon's law or DEQ's rules, they can raise those concerns directly with DEQ, which regulates the program and has authority over CAA's performance.

I declare under penalty of perjury of the laws of the United States that the foregoing statements are true and correct.

Executed on December 19, 2025

*s/ Kimberly A. Holmes*
Kimberly A. Holmes

# EXHIBIT A

# TO DECLARATION

# OF KIMBERLY A. HOLMES



# 2026 Oregon Producer Fee Schedule
## Fees for Program Year 2026

For any questions, please submit a portal case via the Help & Support tab in the Producer Portal, or reach out via email at producer.support@circularaction.org.

*Materials labeled N/A in the following table are not accepted on either the USCL or PRO Recycling Acceptance List.*

| Material Category | Covered Material | Type | Base Fee Rate | SIM Portion | Final Fee Rate |
|---|---|---|---|---|---|
| **Printing and Writing Paper** | Newspapers | USCL | 5.0 ¢/lb | 0.0 ¢/lb | 5.0 ¢/lb |
| | Newsprint (inserts and circulars) | USCL | 5.0 ¢/lb | 0.0 ¢/lb | 5.0 ¢/lb |
| | Magazines, Catalogs and Directories | USCL | 5.0 ¢/lb | 0.0 ¢/lb | 5.0 ¢/lb |
| | Paper for General Use | USCL | 5.0 ¢/lb | 0.0 ¢/lb | 5.0 ¢/lb |
| | Other Printed Materials | USCL | 5.0 ¢/lb | 0.0 ¢/lb | 5.0 ¢/lb |
| **Glass and Ceramics** | Glass Bottles and Jars & Other Containers | PRO | 10.0 ¢/lb | 0.0 ¢/lb | 10.0 ¢/lb |
| | Ceramic – All Forms | N/A | 111.0 ¢/lb | 0.0 ¢/lb | 111.0 ¢/lb |
| **Metal** | Aluminum Containers | USCL | 6.0 ¢/lb | 0.0 ¢/lb | 6.0 ¢/lb |
| | Aluminum Foil and Molded Containers | PRO | 24.0 ¢/lb | 0.0 ¢/lb | 24.0 ¢/lb |
| | Aluminum Aerosol Containers | N/A | 64.0 ¢/lb | 0.0 ¢/lb | 64.0 ¢/lb |
| | Aluminum – Other Forms | N/A | 78.0 ¢/lb | 0.0 ¢/lb | 78.0 ¢/lb |
| | Steel Containers | USCL | 10.0 ¢/lb | 0.0 ¢/lb | 10.0 ¢/lb |
| | Steel Aerosol Containers | N/A | 64.0 ¢/lb | 0.0 ¢/lb | 64.0 ¢/lb |
| | Steel – Other Forms | N/A | 68.0 ¢/lb | 0.0 ¢/lb | 68.0 ¢/lb |
| | Metal – Small Format | PRO | 26.0 ¢/lb | 0.0 ¢/lb | 26.0 ¢/lb |
| | Pressurized cylinders | N/A | 62.0 ¢/lb | 0.0 ¢/lb | 62.0 ¢/lb |
| **Paper/Fiber** | Aseptic and Gable-top Cartons | USCL | 17.0 ¢/lb | 0.0 ¢/lb | 17.0 ¢/lb |
| | Kraft Paper | USCL | 8.0 ¢/lb | 0.0 ¢/lb | 8.0 ¢/lb |
| | Corrugated Cardboard | USCL | 8.0 ¢/lb | 0.0 ¢/lb | 8.0 ¢/lb |
| | Corrugated Cardboard (Tertiary/transport) non-consumer | USCL | 0.0 ¢/lb | 0.0 ¢/lb | 0.0 ¢/lb |
| | Paperboard | USCL | 8.0 ¢/lb | 0.0 ¢/lb | 8.0 ¢/lb |
| | Polycoated Paperboard | N/A | 48.0 ¢/lb | 0.0 ¢/lb | 48.0 ¢/lb |
| | Other Paper Laminates | N/A | 51.0 ¢/lb | 0.0 ¢/lb | 51.0 ¢/lb |
| | Other Paper Packaging | USCL | 8.0 ¢/lb | 0.0 ¢/lb | 8.0 ¢/lb |
| | Paper – Small Format | USCL | 44.0 ¢/lb | 0.0 ¢/lb | 44.0 ¢/lb |
| **Plastic – Rigid** | PET (#1) – Bottles, Jugs, and Jars (Clear/Natural) | USCL | 25.0 ¢/lb | 0.0 ¢/lb | 25.0 ¢/lb |
| | PET (#1) – Bottles, Jugs, and Jars (Pigmented/Color) | N/A | 67.0 ¢/lb | 0.0 ¢/lb | 67.0 ¢/lb |
| | PET (#1) – Thermoformed Containers, Cups, Plates, Trays | N/A | 57.0 ¢/lb | 0.0 ¢/lb | 57.0 ¢/lb |
| | PET (#1) – Tubs | USCL | 50.0 ¢/lb | 0.0 ¢/lb | 50.0 ¢/lb |
| | PET (#1) – Other Rigid Items | N/A | 70.0 ¢/lb | 0.0 ¢/lb | 70.0 ¢/lb |
| | PET (#1) – Lids | N/A | 60.0 ¢/lb | 0.0 ¢/lb | 60.0 ¢/lb |
| | HDPE (#2) – Bottles, Jugs and Jars (Clear/Natural) | USCL | 9.0 ¢/lb | 0.0 ¢/lb | 9.0 ¢/lb |
| | HDPE (#2) – Bottles, Jugs and Jars (Pigmented/Color) | USCL | 32.0 ¢/lb | 0.0 ¢/lb | 32.0 ¢/lb |
| | HDPE (#2) – Pails & Buckets | PRO | 18.0 ¢/lb | 0.0 ¢/lb | 18.0 ¢/lb |
| | HDPE (#2) – Tubs, Nursery (plant) pots & trays | USCL | 35.0 ¢/lb | 0.0 ¢/lb | 35.0 ¢/lb |

© 2025 Circular Action Alliance. All rights reserved. Originally published Oct. 29, 2025.



# 2026 Oregon Producer Fee Schedule
### Fees for Program Year 2026

For any questions, please submit a portal case via the Help & Support tab in the Producer Portal, or reach out via email at producer.support@circularaction.org.

*Materials labeled N/A in the following table are not accepted on either the USCL or PRO Recycling Acceptance List.*

| Material Category | Covered Material | Type | Base Fee Rate | SIM Portion | Final Fee Rate |
|---|---|---|---|---|---|
| **Plastic – Rigid (cont.)** | HDPE (#2) – Package Handles, Lids | PRO | 29.0 ¢/lb | 0.0 ¢/lb | 29.0 ¢/lb |
| | HDPE (#2) – Other Rigid Items | N/A | 66.0 ¢/lb | 0.0 ¢/lb | 66.0 ¢/lb |
| | PVC (#3) – Rigid Items | N/A | 97.0 ¢/lb | 0.0 ¢/lb | 97.0 ¢/lb |
| | LDPE (#4) – Bottles, Jugs and Jars | N/A | 66.0 ¢/lb | 0.0 ¢/lb | 66.0 ¢/lb |
| | LDPE (#4) – Lids | PRO | 29.0 ¢/lb | 0.0 ¢/lb | 29.0 ¢/lb |
| | LDPE (#4) – Other Rigid Items | N/A | 66.0 ¢/lb | 0.0 ¢/lb | 66.0 ¢/lb |
| | PP (#5) – Bottles, Jugs and Jars | USCL | 38.0 ¢/lb | 0.0 ¢/lb | 38.0 ¢/lb |
| | PP (#5) – Other Rigid Containers, Cups, Plates, Trays (non-nursery (plant)) | N/A | 62.0 ¢/lb | 0.0 ¢/lb | 62.0 ¢/lb |
| | PP (#5) – Lids | PRO | 29.0 ¢/lb | 0.0 ¢/lb | 29.0 ¢/lb |
| | PP (#5) – Tubs, Pails and Buckets, Nursery (plant) pots & trays | PRO | 19.0 ¢/lb | 0.0 ¢/lb | 19.0 ¢/lb |
| | PP (#5) – Other Rigid Items | N/A | 66.0 ¢/lb | 0.0 ¢/lb | 66.0 ¢/lb |
| | PS (#6) Expanded/Foamed Hinged Containers, Plates, Cups, Tubs, Trays, and Other Foamed Containers | N/A | 138.0 ¢/lb | 0.0 ¢/lb | 138.0 ¢/lb |
| | PS (#6) White Expanded/Foamed Cushioning | PRO | 72.0 ¢/lb | 0.0 ¢/lb | 72.0 ¢/lb |
| | PS (#6) Colored Expanded/Foamed Cushioning | N/A | 138.0 ¢/lb | 0.0 ¢/lb | 138.0 ¢/lb |
| | PS (#6) Rigid Non-Expanded | N/A | 97.0 ¢/lb | 0.0 ¢/lb | 97.0 ¢/lb |
| | PLA, PHA, PHB – Rigid Items | N/A | 97.0 ¢/lb | 0.0 ¢/lb | 97.0 ¢/lb |
| | Other/Mixed Rigid Plastic | N/A | 97.0 ¢/lb | 0.0 ¢/lb | 97.0 ¢/lb |
| **Plastic – Flexible** | HDPE (#2)/LDPE (#4) Flexible and Film Items | PRO | 43.0 ¢/lb | 0.0 ¢/lb | 43.0 ¢/lb |
| | HDPE (#2)/LDPE (#4) (Pallet Wrap) non-consumer | PRO | 34.0 ¢/lb | 0.0 ¢/lb | 34.0 ¢/lb |
| | PP (#5) Flexible and Film Items | N/A | 102.0 ¢/lb | 0.0 ¢/lb | 102.0 ¢/lb |
| | PLA, PHA, PHB – Flexible and Film Items | N/A | 102.0 ¢/lb | 0.0 ¢/lb | 102.0 ¢/lb |
| | Plastic Laminates and Other Flexible Plastic Packaging | N/A | 102.0 ¢/lb | 0.0 ¢/lb | 102.0 ¢/lb |
| **Plastic – Other** | Plastic – Small Format | PRO | 28.0 ¢/lb | 0.0 ¢/lb | 28.0 ¢/lb |
| | Plastic containers for motor oil, antifreeze, or other auto-motive fluids, pesticides or herbicides, or other hazardous materials (flammable, corrosive, reactive, toxic) | N/A | 63.0 ¢/lb | 0.0 ¢/lb | 63.0 ¢/lb |
| **Wood and Other Organic Materials** | Wood and Other Organic Materials | N/A | 105.0 ¢/lb | 0.0 ¢/lb | 105.0 ¢/lb |

© 2025 Circular Action Alliance. All rights reserved. Originally published Oct. 29, 2025.



For any questions, please submit a portal case via the Help & Support tab in the Producer Portal, or reach out via email at producer.support@circularaction.org.

## Tiered Flat Fee Structure

In accordance with ORS 459A.884(6), Producers with gross revenues of less than $10 million but supplying covered materials sold for use in Oregon greater than five metric tons, or vice-versa, may also choose to pay a flat fee according to the following schedule:

| Weight Unit | Lower Bound | Upper Bound | Fee Value |
|---|---|---|---|
| Metric Ton | 1 | 2.5* | $1,200 |
| | 2.5 | 5* | $2,500 |
| | 5 | 7.5 | $4,100 |
| | 7.5 | 10 | $5,800 |

*These flat fee tiers are also available to producers with over $10 million in gross revenues.*

© 2025 Circular Action Alliance. All rights reserved. Originally published Oct. 29, 2025.