Darin Sands, OSB No. 106624
dsands@bradleybernstein.com
BRADLEY BERNSTEIN SANDS LLP
1211 NW Glisan St., Ste 204
Portland, OR 97209
Telephone: +1 503-734-2480

David R. Carpenter*
drcarpenter@sidley.com
Caleb J. Bowers*
cbowers@sidley.com
Alexandra T. Mushka*
amushka@sidley.com
SIDLEY AUSTIN LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213-896-6000
Facsimile: +1 213-896-6600

[Additional counsel on following page]


Attorneys for Plaintiff
NATIONAL ASSOCIATION OF
WHOLESALER-DISTRIBUTORS

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS, <br><br> Plaintiff, <br><br> v. <br><br> LEAH FELDON, DIRECTOR, OREGON DEPARTMENT OF ENVIRONMENTAL QUALITY, in her official capacity; MATT DONEGAN, KAREN MOYNAHAN, MARK WEBB, AND SILVIA TANNER, in their official capacities as members of the Oregon Environmental Quality Commission, <br><br> Defendants. | Case No. 3:25-cv-01334-SB <br><br> **PLAINTIFF NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** <br><br> **ORAL ARGUMENT SCHEDULED FOR FEBRUARY 6, 2026** |

PAGE 1 -  PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

Additional counsel for Plaintiff
National Association of Wholesaler-Distributors

Gordon D. Todd*
gtodd@sidley.com
Richard W. Smith*
rwsmith@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202-736-8000
Facsimile: +1 202-736-8711

*Pro hac vice

## <u>TABLE OF CONTENTS</u>

**Page No.**

I.    INTRODUCTION ................................................................................................. 1

II.    BACKGROUND ................................................................................................. 2

III.    RESPONSE TO THE RULE 12(b)(1) MOTION ............................................... 3

IV.    RESPONSE TO THE RULE 12(b)(6) MOTION ............................................... 6

    A.    The Complaint States a Dormant Commerce Clause Claim .................................. 6

    B.    The Complaint States an Unconstitutional Conditions Claim. ............................ 10

    C.    The Complaint States a Due Process Claim. ......................................... 12

    D.    The Complaint States an Equal Protection Claim ................................. 15

    E.    At Minimum, the Court Should Grant Leave to Amend. ..................... 17

V.    CONCLUSION .................................................................................................. 18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v Iqbal*,
    556 U.S. 662 (2009)................................................................................................6

*Barrett v. Belleque*,
    544 F.3d 1060 (9th Cir. 2008) ........................................................................6, 16

*Bibb v. Navajo Freight Lines*,
    359 U.S. 520 (1959)..........................................................................................6, 7

*Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*,
    567 F.3d 79 (2d Cir. 2009)..................................................................................10

*Carter v. Carter Coal Co.*,
    298 U.S. 238 (1936)............................................................................................12

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985)............................................................................................15

*Coal. to Def. Affirmative Action v. Brown*,
    674 F.3d 1128 (9th Cir. 2012) ..............................................................................3

*Colon Health Ctrs. of Am., LLC v. Hazel*,
    733 F.3d 535 (4th Cir. 2013) .............................................................................7, 9

*Comptroller of Treasury of Md. v. Wynne*,
    575 U.S. 542 (2015)........................................................................................7, 10

*DeSoto v. Yellow Freight Sys., Inc.*,
    957 F.2d 655 (9th Cir. 1992) ..............................................................................17

*Eminence Capital, LLC v. Aspeon*,
    316 F.3d 1048 (9th Cir. 2003) ............................................................................17

*Eubank v. City of Richmond*,
    226 U.S. 127 (1912)............................................................................................12

*Exxon v. Governor of Maryland*,
    437 U.S. 117 (1978)........................................................................................9, 10

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)............................................................................................14

*Hart v. Massanari*,
266 F.3d 1155 (9th Cir. 2001) ........................................................5

*Hoye v. City of Oakland*,
653 F.3d 835 (9th Cir. 2011) ........................................................6

*Japan Line, Ltd. v. County of Los Angeles*,
441 U.S. 434 (1979) ........................................................7

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ........................................................9

*Kotev v. First Colony Life Ins.*,
927 F. Supp. 1316 (C.D. Cal. 1996) ........................................................5, 7

*Leite v. Crane Co.*,
749 F.3d 1117 (9th Cir. 2014) ........................................................3

*Matsumoto v. Labrador*,
122 F.4th 787 (9th Cir. 2024) ........................................................4

*Mecinas v. Hobbs*,
30 F.4th 890 (9th Cir. 2022) ........................................................4, 5

*Merrifield v. Lockyer*,
547 F.3d 978 (9th Cir. 2008) ........................................................15

*Miles v. California*,
320 F.3d 986 (9th Cir. 2003) ........................................................3

*National Pork Producers Council v. Ross*,
598 U.S. 356 (2023) (Roberts, C.J., concurring in part) ........................................................7, 9, 10

*Nw. Airlines, Inc. v. County of Kent*,
510 U.S. 355 (1994) ........................................................7, 10

*Pennhurst State School & Hospital v. Halderman*,
465 U.S. 89 (1984) ........................................................3

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970) ........................................................7, 9, 10

*Rivera v. Anderson*,
No. 24-cv-677, 2025 WL 606212 (W.D. Wash. Feb. 25, 2025) ........................................................5

*S. Dakota v. Wayfair*,
585 U.S. 162 (2018) ........................................................6

PAGE 3 -   PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

*Sato v. Orange Cnty. Dep't of Educ.*,
　861 F.3d 923 (9th Cir. 2017) ................................................................3

*Washington ex rel. Seattle Trust Co. v. Roberge*,
　278 U.S. 116 (1928) ..............................................................................12

*Southern Pac. Co. v. Arizona*,
　325 U.S. 761 (1945) ................................................................................7

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
　588 U.S. 504 (2019) ................................................................................6

*Tritchler v. County of Lake*,
　358 F.3d 1150 (9th Cir. 2004) ..............................................................3

*United States v. Salerno*,
　481 U.S. 739 (1987) ..............................................................................11

*Weber v. Aetna Cas. & Sur. Co.*,
　406 U.S. 164 (1972) ..............................................................................16

*Ex parte Young*,
　209 U.S. 123 (1908) ........................................................................3, 4, 5

**Statutes**

Fed. R. Civ. P. 12 ..............................................................................1, 3, 6

Fed. R. Civ. P. 15 ....................................................................................17

Or. S.B. 582, 2021 Reg. Sess. .......................................................*passim*

ORS § 459.376 ...........................................................................................4

ORS § 459A.863 ......................................................................................16

ORS § 459A.872 ......................................................................................16

ORS § 459A.878 ......................................................................................15

ORS § 459A.884 ......................................................................................13

ORS §§ 459A.914–975 ..............................................................................4

ORS § 459A.962 ..................................................................................5, 15

ORS § 468.130 .....................................................................................5, 15

PAGE 4 -   PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

**Other Authorities**

*Enforce*, Black's Law Dictionary (12th ed. 2024)............................................................5

https://www.oregon.gov/deq/recycling/Documents/rmaCAAaFA2024.pdf .................................2

U.S. Const. art. I, § 8, cl. 3............................................................6

## RESPONSE IN OPPOSITION TO MOTION TO DISMISS

Plaintiff National Association of Wholesaler-Distributors ("NAW") respectfully submits this Response in Opposition to the Motion to Dismiss ("Motion" or "MTD") filed by Defendants Leah Feldon, in her official capacity as Director of the Oregon Department of Environmental Quality ("DEQ"), and Matt Donegan, Karen Moynahan, Mark Webb, and Silvia Tanner, in their official capacities as members of the Oregon Environmental Quality Commission ("EQC") (collectively, "Defendants").

## I.    INTRODUCTION

NAW's Motion for Preliminary Injunction ("PI Motion"), supporting declarations, and concurrently filed Reply provide, in great detail, the legal and evidentiary bases for NAW's claims in this action. Because the matter has been so extensively briefed in connection with the pending PI Motion, NAW will not repeat everything here and incorporates the facts and arguments by reference.

Suffice it to say, the PI Motion and accompanying material not only show that NAW's First Amended Complaint ("FAC") states legally cognizable claims; those materials establish a likelihood that NAW will prevail on the merits. At the very least, the FAC has pled sufficient allegations to state a claim and to defeat Defendants' Rule 12(b)(6) motion to dismiss.

Defendants also invoke the Eleventh Amendment and move to dismiss the state law claims and defendants who are members of EQC. To the extent the Eleventh Amendment requires dismissal of the state-law claims, NAW reserves the right to refile them in state court. The EQC Defendants, however, are properly parties to NAW's claims for injunctive and declaratory relief and need not be dismissed.

Finally, even if the Court were inclined to grant the Motion to Dismiss, it should do so without prejudice and with leave to amend. Since filing the FAC—and even since filing its PI Motion—NAW has continued to gather more information in support of its claims and the Act's unconstitutional impacts. Again, NAW believes that its showing for the PI Motion already

PAGE 1 -   PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

demonstrates a likelihood of success on the merits. But to the extent necessary, NAW requests leave to amend to give it the opportunity to further analyze recently produced information and to present additional facts in support of its action.

## II.     BACKGROUND

This action challenges Oregon's Plastic Pollution and Recycling Modernization Act (the "Act"), which creates a so-called "extended producer responsibility" ("EPR") program for product packaging, food serviceware, paper goods, and certain other items. FAC ¶¶ 1–3. The FAC describes in detail the Act and its regulations (*id.* ¶¶ 21–40), and the authority delegated to Circular Action Alliance ("CAA") as the sole "producer responsibility organization" ("PRO") approved to administer the program (*id.* ¶¶ 41–59). The FAC also pleads in detail the extraordinary and unsustainable impacts and harm on NAW's members. FAC ¶¶ 60–67.

The FAC seeks declaratory and injunctive relief and asserts causes of action for violations of (1) the Dormant Commerce Clause, (2) the unconstitutional conditions doctrine, (3) Due Process, (4) Equal Protection, and (5) the Oregon law Nondelegation Doctrine. The FAC raises these claims both as a facial challenge and as applied. FAC ¶ 9.

NAW's PI Motion further supports and elaborates on those allegations through the Declarations of Brian Wild, Ed Allen, and James E. Winkle and the exhibits thereto. In addition, since the filing of the FAC, DEQ has made public CAA's 2025 Financial Report covering fiscal years 2023–2024 ("Financial Report").[1] And on or around January 8, 2026, Defendants filed under seal pursuant to a protective order "Appendix G" to CAA's Program Plan—CAA's "Detailed Base Fee-Setting Methodology." *See* ECF 62–65. As stated in the FAC, Appendix G, while now produced under seal, was declared confidential and withheld from the public and NAW members during the rulemaking process. FAC ¶¶ 6, 43–44.

---

[1] The Financial Report is now available at DEQ's website, https://www.oregon.gov/deq/recycling/Documents/rmaCAAaFA2024.pdf, and it is attached to the Declaration of Caleb Bowers that is being concurrently filed with the Reply in support of the PI Motion.

PAGE 2 -   PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

NAW incorporates by reference the relevant facts and allegations set forth in the FAC and materials submitted in connection with the PI Motion.

## III.    RESPONSE TO THE RULE 12(b)(1) MOTION

It is debated whether Eleventh Amendment immunity "implicate[s] a federal court's subject matter jurisdiction," *Tritchler v. County of Lake*, 358 F.3d 1150, 1154 (9th Cir. 2004), and thus whether it provides grounds for "dismissal for lack of subject matter jurisdiction" on a Rule 12(b)(1) motion, *Miles v. California*, 320 F.3d 986, 988–89 (9th Cir. 2003). *But see Sato v. Orange Cnty. Dep't of Educ.*, 861 F.3d 923, 927 n.2 (9th Cir. 2017). But the difference is immaterial. "The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

The State invokes Eleventh Amendment immunity to seek dismissal of (1) NAW's state-law claims and (2) all claims against the members of the Oregon Environmental Quality Commission (the EQC Defendants).  To the extent the state-law claims must be dismissed under *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984) (MTD 14–15), NAW reserves the right to bring them in state court. But the Rule 12(b)(1) motion should be denied as to the EQC Defendants.

Defendants concede that this Court has jurisdiction with respect to claims against Leah Feldon, in her official capacity as Director of DEQ. Nonetheless, they try to distinguish the EQC Defendants on the theory that EQC does not "enforce" the Act. That argument fails.

Under *Ex parte Young*, state officials sued in their official capacity who may otherwise be shielded by the Eleventh Amendment are nonetheless compelled to answer "actions for prospective or declaratory or injunctive relief … for their alleged violations of federal law" if the official has "some connection with the enforcement of the act" challenged. *Coal. to Def. Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)). This "'some connection' standard" is not demanding—it "requires

only that the official subject to suit has a 'relevant role that goes beyond a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision.'" *Matsumoto v. Labrador*, 122 F.4th 787, 802 (9th Cir. 2024) (quoting *Mecinas v. Hobbs*, 30 F.4th 890, 903–04 (9th Cir. 2022)).

To trigger *Ex parte Young*, an official's "connection" with the challenged act "does not need to be primary authority to enforce [it]," nor must the official even possess "the full power to redress a plaintiff's injury." *Matsumoto*, 122 F.4th at 803. Similarly, the fact that other officials *also* play a role in implementation "is of no moment" if the named official has "clear duties to oversee" the regulatory process, which may include "the promulgation of [rules and regulations] which [other] officials have no discretion to disregard." *Mecinas*, 30 F.4th at 900, 903. In the election context, for example, when a political action committee challenged an Arizona statute dictating the ordering of candidate names on ballots, the Ninth Circuit ruled that the Arizona Secretary of State need not be "the one who prints the ballots" to be subject to suit under *Ex parte Young*. *Id.* at 903. That the Secretary exercised statutory "authority to 'prescribe rules' for 'producing [and] distributing' ballots in accordance with the [challenged] statute" was more than sufficient. *Id.* at 900. The court thus made clear that when a state official is charged with promulgating binding rules and regulations to effectuate an unconstitutional statutory scheme, such an "official ha[s] a relevant role" sufficient to render them a "properly named … defendant under *Ex parte Young*." *Id.* at 903–04.

The allegations in the FAC and unambiguous provisions of the challenged regulatory scheme leave no doubt that the EQC Defendants possess the requisite "connection with the enforcement of the act" under *Ex parte Young*. Defendants criticize NAW for "lump[ing] the [EQC] and [DEQ] together as the agencies responsible for the implementation and enforcement of the RMA's provisions." MTD 20. But it is *Oregon's law*—not NAW—that is responsible for this legal reality that EQC now seeks to avoid. *See generally* ORS 459A.914–975 (defining the several, complementary implementation responsibilities of EQC and DEQ); *see also, e.g.*, ORS

§ 459.376 (authorizing EQC to "take whatever action is appropriate" for enforcement of its rules or orders, and to "institute proceedings to enforce compliance with or restrain violations of ORS chapters 459 and 459A"); ORS §§ 459.962, 468.130 (endowing EQC and DEQ with authority over civil penalties to effectuate the challenged regulatory regime); FAC ¶¶ 30–36 (detailing EQC's regulatory authority and impact).

Defendants try to wave off the myriad implementation powers and obligations of the EQC, which include "[p]romulgating the administrative rules that now guide … administration and enforcement of the RMA." MTD 21. In doing so, they ignore that the EQC's "adoption of the administrative rules implementing the RMA," *id.*, is literally a means of "giv[ing] force or effect to" and thus related to *enforcing* Oregon's unconstitutional EPR scheme, *see Enforce*, Black's Law Dictionary (12th ed. 2024). Defendants' invocation of a single decision from a different district court is not to the contrary. *See* MTD 21 (citing *Rivera v. Anderson*, No. 24-cv-677, 2025 WL 606212, at *2–4 (W.D. Wash. Feb. 25, 2025)).[2] Here, as in *Mecinas*, "given the [EQC]'s role in promulgating" binding regulations that effectuate the unconstitutional law from which NAW seeks relief, *Ex parte Young*'s "modest requirement is far exceeded." 30 F.4th at 904.

All Defendants named in this action are therefore properly identified as officials responsible for NAW's ongoing and impending constitutional harms. None may claim immunity from suit under the Eleventh Amendment. The Motion to Dismiss as to the EQC Defendants should be denied.

---

[2] "A district court bound by circuit authority … has no choice but to follow it," but "[n]o trial court decision[]" qualifies as "binding precedent." *Hart v. Massanari*, 266 F.3d 1155, 1163 (9th Cir. 2001); *see Kotev v. First Colony Life Ins.*, 927 F. Supp. 1316, 1321 (C.D. Cal. 1996) (a district court "is not bound by the decision of another district court"). Moreover, *Rivera* does not support the Defendants' motion in the first place. *See Rivera*, 2025 WL 606212, at *3 (acknowledging that, under *Mecinas*, a lawsuit "against the person bound to enforce what the legislature had promulgated" is not barred by the Eleventh Amendment).

PAGE 5 -   PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

## IV.    RESPONSE TO THE RULE 12(b)(6) MOTION

A motion to dismiss under Rule 12(b)(6) must be denied if the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard is not a "probability requirement," and is satisfied so long as the complaint's well-pled facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Upon such a motion, all "[f]actual allegations in the complaint are taken as true and all reasonable inferences are drawn in the plaintiff's favor." *Barrett v. Belleque*, 544 F.3d 1060, 1061 (9th Cir. 2008).

Defendants reference the standards for a facial constitutional claim (MTD 17 n.2), but they ignore that NAW expressly pleads constitutional violations both facially and as applied. FAC ¶ 9; *see Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011) ("A paradigmatic as-applied attack, [in] contrast [to a facial challenge], challenges . . . a subset of the statute's applications, or the application of the statute to a specific factual circumstance."). However framed, NAW has sufficiently stated a claim as to each cause of action.

### A.    The Complaint States a Dormant Commerce Clause Claim.

NAW has extensively briefed the grounds for its claim under the Dormant Commerce Clause in its PI Motion and Reply, and NAW fully incorporates those arguments here. Particularly under Rule 12(b)(6) standards, NAW has more than adequately stated a claim.

The Commerce Clause "prohibits state laws that unduly restrict interstate commerce." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019) (cleaned up). U.S. Const. art. I, § 8, cl. 3. This Dormant Commerce Clause doctrine enshrines two primary principles: "First, state regulations may not discriminate against interstate commerce; and second, States may not impose undue burdens on interstate commerce." *S. Dakota v. Wayfair*, 585 U.S. 162, 173 (2018). State laws may also be invalid on their face where they directly regulate the instrumentalities of interstate commerce, *see, e.g.*, *Bibb v. Navajo Freight Lines*, 359

U.S. 520 (1959), or where they amount to an excessive "user fee," *Nw. Airlines, Inc. v. County of Kent*, 510 U.S. 355, 369 (1994), or state tariff, *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542 (2015).

Starting with the *Pike* test, state regulation will be invalid where the "burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *see also National Pork Producers Council v. Ross*, 598 U.S. 356, 396 (2023) (Roberts, C.J., concurring in part) ("As a majority of the Court agrees, *Pike* extends beyond laws either concerning discrimination or governing interstate transportation."). The *Pike* balancing test is inherently "fact-bound." *Colon Health Ctrs. of Am., LLC v. Hazel*, 733 F.3d 535, 546 (4th Cir. 2013). As such, on a motion to dismiss, where the plaintiff need only plead "enough to raise a right to relief above the speculative level," courts should "not attempt to forecast what further investigation may demonstrate." *Id*. (quotation omitted). Defendants argue that Plaintiff's "allegations do not establish a substantial or excessive burden on interstate commerce, regardless of whether it is compared to the putative local interest." MTD 18. That argument fails based on the allegations and the law, particularly for purposes of the pleadings stage.

*First*, NAW has clearly alleged that the EPR program imposes unreasonable and excessive fees on products that are distributed in interstate commerce, including distributors whose very role in the supply chain is to transport goods in interstate commerce. *E.g.*, FAC ¶¶ 5, 65–66, 70. And the fees specifically target packaging (including secondary packaging and tertiary packaging like pallet wrap), the purpose of which is to transport goods in interstate commerce. That makes this case akin to those involving the "instrumentalities" of interstate commerce. *See Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 453 (1979) (shipping containers); *Bibb*, 359 U.S. at 520 (trucks); *Southern Pac. Co. v. Arizona*, 325 U.S. 761 (1945) (trains).

PAGE 7 -   PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

*Second*, the Act not only impacts products going *to* Oregon, but also products moving *through* and *outside of* Oregon as well—i.e., it impacts the market and distribution network as a whole. While Defendants argue that fees nominally only apply to materials disposed of in the State (MTD 3, 18), that ignores the complexity of interstate supply chains. Mid-stream entities, such as distributors, do not know where (much less how) the packaging for products they sell is disposed of. Thus, as a practical matter, the Act imposes on them the burden of (a) entirely reworking interstate supply chains to disaggregate and/or trace products; (b) paying EPR fees on *all* products that at any point may touch Oregon, even if those products are only passing through or out of the State; and/or (c) raising prices (or bearing price increases imposed by suppliers) on *all* products that *may* end up in Oregon, whether or not they do, to account for the possibility that EPR fees may be assessed against them. *See* FAC ¶¶ 62–64, 70–72. Under any of the above scenarios, there is a direct and substantial burden on the flow of commerce, with consequential impacts rippling through the interstate supply chain.

*Third*, there is also a *discriminatory* and *disproportionate* impact on interstate businesses. That is because otherwise similarly-situated local producers do not face the same supply chain issues and thus do not have the same burdens. Moreover, Oregon could have funded waste-collection efforts through fee applied at the local point-of-sale or collected by retailers (like traditional, product-focused EPR programs), but instead it *chose* a scheme that disproportionately targets the companies operating in interstate commerce. FAC ¶¶ 3, 66

*Fourth*, there is heightened risk of conflicting obligations from a patchwork of different state regulations, particularly given that other states (such as California and Colorado) are in the process of setting up their own EPR programs. This creates risks of double counting and conflicting regulatory demands. FAC ¶¶ 66–67; *see also, e.g., id.* ¶ 66 (observing that Oregon's EPR fees penalize use of food packaging material that is necessary to meet FDA safety standards). It also has the effect of compelling out-of-state distributors to make design and source decisions based on Oregon EPR fees even for products sold out of state. *Id.* ¶¶ 70, 73.

PAGE 8 -   PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

Defendants implausibly argue that the Act "does not force" producers to engage in any product or packaging re-design, MTD 19, yet the Act explicitly requires using "eco-modulated" fees specifically for the purpose of penalizing certain materials and practices while incentivizing changes in packaging design and sourcing. *See* FAC ¶¶ 32, 52; *see also* Wild Decl. Ex. A (CAA Approved Plan) at 12 (identifying key goal of program as "incentivize producers to improve environmental outcomes").

Given that packaging is essential for the movement of goods in interstate commerce, NAW has sufficiently pled a strong interest in "national uniformity" and "trade in the national marketplace," making *Pike*'s balancing test particularly appropriate. *Nat'l Pork*, 598 U.S. at 395, 399 (Roberts, C.J. concurring in part). Indeed, CAA's recent Financial Report reflects that CAA's solvency and operations presume that it will act as the PRO across multiple states (Bowers Decl. Ex. A at 15), effectively positioning itself as an interstate regulator.

These allegations sufficiently plead an undue burden on interstate commerce, especially at the pleadings stage. NAW's "fact-intensive" *Pike* claim "cannot be properly resolved on a motion to dismiss." *Colon Health Ctrs.*, 733 F.3d at 546. The issues raised by NAW's claim and Defendants' Motion—such as how product distribution chains work; the direct and consequential impacts of fees on the interstate market and interstate actors; and the risks of double-counting or assessments on products outside of Oregon—are complex and "can only be uncovered via fact-finding." *Id.* at 547. That strongly "counsels against a premature dismissal." *Id.* at 546; *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018) (discussing the general "prohibition against resolving factual disputes at the pleading stage").

The cases on which Defendants rely do not compel dismissal on these facts. In *Exxon v. Governor of Maryland*, the law at issue did not inhibit "the flow of interstate goods" or "place added costs upon them," 437 U.S. 117, 126 (1978), which is precisely what NAW pleads here. Likewise, the plurality in *National Pork* focused on a "commensurability" issue (the problem of weighing California's moral interests in animal welfare), *see* 598 U.S. at 382 (Gorsuch, J.), *id.* at

394 (Barrett, J., concurring), whereas Defendants do not even attempt to argue a similar commensurability issue here.[3]

As also explained in NAW's PI Motion, separate from a *Pike* analysis, the Act imposes what is effectively an unfair user fee or unfairly apportioned tax. *See Nw. Airlines,* 510 U.S. at 369 (stating test for excessive "user fees"); *Wynne*, 575 U.S. at 549 (calling state tariffs "one of the chief evils" that Constitution was intended to address and invalidating state tax that, in effect, discriminated against interstate commerce). The Act is not designed merely to assess the actual costs of disposing of producers' own waste; rather, it is designed to stand-up an entirely new state waste-management and recycling infrastructure, with the total system costs then charged to reporting producers. Rather than fund this public infrastructure through tax dollars or point-of-sale fees collected at the retail level, Oregon is pushing those costs disproportionately onto those operating in the interstate supply chain. *See* PI Mot. 25–27; see *Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 567 F.3d 79, 86–88 (2d Cir. 2009) (invalidating ferry passenger fee as unfair and excessive where it was being used to fund all Port District operations, including expenditures apart from ferry service itself).

For any and each of the reasons above and in the PI Motion briefing, the Court should deny the motion to dismiss NAW's Commerce Clause claim.[4]

### B. The Complaint States an Unconstitutional Conditions Claim.

Defendants argue that NAW fails to plead an unconstitutional conditions claim for the sole reason that "the [Act] itself does not require producers to specifically join CAA," and producers retain the choice of "creat[ing] their own PRO." MTD 18–19. In doing so, Defendants effectively concede that CAA's contractual terms and conditions *do* in fact impose

---

[3] NAW's Reply in support the PI Motion further addresses *Exxon* and *National Pork.*
[4] Defendants' Motion argues only whether NAW has adequately pled a substantial burden on interstate commerce. MTD 18. It does not attempt to argue the balancing test aspect of *Pike*, nor would that fact-intensive analysis be appropriate at the pleading standard. In any event, NAW also adequately pleads that Defendants made no attempt to assess the impact on business and that the burdens are clearly excessive in relation to the asserted benefits, *e.g.*, FAC ¶¶ 5–7, 27, 38, 66, 71–72, as also further explained in the briefing on the PI Motion.

unconstitutional conditions on producers. Defendants do not dispute that producers are required to enter into a mandatory, non-negotiable contract with CAA as a condition of membership; that CAA's fee-setting methodology is confidential and insulated from public scrutiny; that CAA members are denied any meaningful opportunity to challenge fee assessments or classifications; or that producers must submit to binding arbitration and waive access to judicial review in order to comply with CAA's program; nor that these facts give rise to a cognizable legal claim under the unconstitutional conditions doctrine. FAC ¶¶ 6–7, 42–45, 56–58, 75–79. Instead, Defendants rely on the hypothetical existence of a competing PRO whose membership does not require producers to relinquish constitutional rights as a condition for entry into the Oregon market. This argument is based on a misunderstanding of both NAW's burden at the pleading stage and the unconstitutional conditions doctrine itself.

NAW plausibly alleges that Plaintiffs cannot form their own PRO because of the barriers created by the Act itself. FAC ¶ 48. By statute, the Act mandates that PROs represent at least 10% of the total market share of covered products in Oregon to be eligible for approval, making it infeasible for all but the largest producers to form a PRO. *Id*. (citing ORS § 459A.869(12)). Forming a PRO is also prohibitively expensive for small- and mid-sized businesses given financing obligations required by the Act and its implementing regulations. *Id.* (citing ORS § 459A.890–896; OR. ADMIN. R. § 340-090-0690). Drawing all reasonable inferences in NAW's favor, NAW's members forming their own PRO is not a viable alternative, and the existence of a hypothetical, alternative PRO is not a reasonable "set of circumstances" under which the constitutionality of the Act can be evaluated at the pleading stage. *United States v. Salerno*, 481 U.S. 739, 745 (1987). Again, and at most, Defendants raise factual questions about the feasibility of forming a PRO that cannot be resolved absent further fact development.

Defendants also fail to address that NAW brings not only a facial challenge but an as-applied challenge to the Act as implemented. The FAC alleges that, in operation, Oregon has approved only a single PRO—CAA—and producers seeking to do business in Oregon must join

PAGE 11 - PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

CAA and submit to its mandatory, non-negotiable contractual terms as a condition of market access. *See, e.g.*, FAC ¶¶ 4, 22, 41, 46, 57. These allegations describe the concrete manner in which the Act is currently enforced against NAW's members. NAW need not address a hypothetical about whether the Act would be constitutional if there were multiple PROs that competed against each other to drive down EPR fees and better serve their members. That hypothetical is not the reality of this program. NAW has alleged facts sufficient to establish that CAA's membership imposes unconstitutional conditions on access to the Oregon market. Nothing more is required for NAW to state a claim at this stage.

**C.      The Complaint States a Due Process Claim.**

As also explained in NAW's PI Motion, the Due Process Clause prohibits delegations of regulatory authority to private market participants without meaningful governmental control or procedural safeguards. *See Carter v. Carter Coal Co*., 298 U.S. 238, 311 (1936) (assessing a private delegation and finding that "one person may not be entrusted with the power to regulate the business of another, and especially of a competitor"); *Eubank v. City of Richmond*, 226 U.S. 127, 143 (1912) (invalidating delegation of authority to self-interested property holders where the statute and ordinance "creates no standard by which the power thus given is to be exercised"); *Washington ex rel. Seattle Trust Co. v. Roberge*, 278 U.S. 116, 122 (1928) (finding it violated due process to give coercive power to a minority private group "uncontrolled by any standard or rule prescribed by legislative action" and without any "provision for review"). Defendants contend that NAW's due process claim should be dismissed because the Act and implementing rules "contain[] detailed requirements for PROs before, during, and after their submission and approval of a program plan, including fee setting." MTD 20. NAW, however, alleges myriad instances where the Act and implementing regulations fail to provide adequate governing standards, *see, e.g.*, FAC ¶¶ 25–27, 36–40, 51–54, as outlined further below.

PAGE 12 - PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

Defendants' assertion that the statutory scheme is sufficiently constraining merely reflects a disagreement with NAW's factual allegations and cannot justify dismissal at this stage.[5]

Defendants broadly claim that NAW's due process concerns are defeated by the Act given "[a] PRO cannot operate in [Oregon] without a[] [DEQ-]approved program plan." MTD 20–21 (citing ORS 459A.878(1)(a)). But Defendants fail to address NAW's allegation that DEQ is not required to and, in fact, has not approved CAA's final fee schedule. *See* FAC ¶ 45. Defendants also fail to address that DEQ's implementing regulations allow PROs to "revise fees, revise material cost allocations, and change any fee adjustments granted to individual producers, without proposing a program plan amendment for DEQ's approval" at all. FAC ¶ 34 (citing OR. ADMIN. R. §§ 340-090-0750(1), (2)). Taken together, these allegations plausibly establish that DEQ's fig leaf "approval" of program plans does not meaningfully constrain the specific financial obligations imposed on producers.

NAW has also plausibly alleged that the Act does not, contrary to Defendants' suggestion, adequately "provide[] requirements for how [membership] fees must be set." MTD 21; *see* FAC ¶¶ 25–28. Notably, the Act delegates entirely the determination of a critical input— the "material-specific base fee rate"—to the private PRO. ORS § 459A.884(2). The base fee rate is guided only by the general prescription that the base fee structure must charge lower fees for recyclable covered products and higher fees for nonrecyclables, with the base fee rate "approximately proportional to the covered products' relative contribution to the financial obligations of the producer responsibility organization." FAC ¶ 26 (citing ORS § 459A.884(3)(b)). Within this complex and indeterminate framework, PROs enjoy wide discretion to define material categories, make cost assumptions, allocate program-wide expenses, and set binding rates using proprietary methodologies that are neither disclosed to producers nor

---

[5] Tellingly, Defendants do not cite any case law in the section of their brief addressing the Due Process claim. To the extent they do so in reply, that would be improper. NAW's Reply in support of its PI Motion addresses the cases raised in Defendants' Opposition brief. Defendants should not be permitted to use their reply in support of this motion to dismiss as a stealth sur-reply for the PI Motion.

subject to meaningful review. *Id*. ¶¶ 25–27, 50–54. Correspondingly, CAA's 2026–2027 Program Plan is based on a purported proprietary and confidential base fee algorithm applied across more than 60 material categories, but that methodology was deemed confidential and thus was never subject to public scrutiny. *Id*. ¶¶ 4, 6, 42–43, 50, 61. Further, the implementing regulations afford the PRO discretion to offer "fee adjustments to its member producers," *id*. ¶ 32 (citing OR. ADMIN. R. § 340-090-0910(3)(c); ORS § 459A.884(4)), but do not prescribe any specific methodology, thresholds, or performance standards for how such adjustments must be calculated or applied, *id*. Finally, while the Act dictates a PRO must use "objective and measurable criteria whenever possible" in setting program plan requirements, it fails to specify what these criteria are, and "leaves room for using something *other than* objective and reasonable criteria" to guide fee determinations. *Id*. ¶ 25 (citing ORS § 459A.875(2)(a)).

These allegations plausibly show that the Act leaves core fee-setting decisions to a private PRO's discretion. Compounding the problem, the fees that operate on a *retrospective* basis: 2025 and 2026 fees are charged against 2024 sales, based on rates that CAA sets long after those sales are completed; current sales will be the basis for 2027 rates, but producers do not know what those 2027 rates will look like. That violates a fundamental tenet of due process that "regulated parties should know what is required of them so they may act accordingly." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

With respect to access to judicial review, Defendants do not deny that the Act itself fails to provide for review of a PRO's actions, and that, as implemented, there is no judicial review of CAA's fees assessments and no meaningful pre-deprivation process to challenge CAA's fee assessments. *See* PI Mot. 30–31 & n.10 (collecting cases on due process requirement to provide sufficient information and opportunity to be heard prior to deprivation of property); FAC ¶ 57 (citing arbitration provision in Agreement Addendum § 8, requiring binding and confidential arbitration for "any dispute, controversy, or claim" between CAA and producers, including relating to "the interpretation" of obligations "under the Oregon EPR Law"); FAC ¶ 83 (pleading

PAGE 14 - PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

that CAA has refused to answer questions or provide meaningful opportunity to challenge fee assessments).

Defendants try to dodge these problems by arguing that there would be judicial review of a *DEQ enforcement action* after a producer refuses to comply. MTD 22. But that is no remedy at all. Under the Act, noncompliance can result in steep civil penalties of up to $25,000 per day. FAC ¶ 28 (citing ORS §§ 459A.878, 459A.962, 468.130). It would be economically irrational for producers to refuse compliance in order to manufacture a path towards a judicial forum. The due process injury is therefore not cured by the theoretical possibility of later judicial review following DEQ enforcement.

To the extent CAA is effectively operating as a state actor for the imposition and collection of regulatory fees, the lack of adequate notice and opportunity to be heard flagrantly violates procedural due process. Oregon should not be allowed to evade fundamental due process rights by delegating regulatory authority to a private entity, with which regulated parties are now forced to contract. At the motion to dismiss stage, NAW need only plausibly allege that the Act, either on its face or as applied, lacks the meaningful governmental control and procedural protections due process requires. Because the Amended Complaint does exactly that, Defendants' request to dismiss NAW's due process claim should be denied.

### D.     The Complaint States an Equal Protection Claim.

Oregon's EPR program, both on its face and as alleged in the Amended Complaint, violates the Constitution's straightforward mandate under the Equal Protection Clause "that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). In this case, rational basis review applies, but that will not save a law where there is "no rational or logical reason" for the "singling out of a particular economic group." *Merrifield v. Lockyer*, 547 F.3d 978, 989, 991–992 (9th Cir. 2008). Several aspects of the EPR scheme demonstrate how the Act, as implemented, operates irrationally and unequally against NAW's members. In particular:

PAGE 15 - PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

- NAW's members are subjected to extraordinary fees, often in excess of their profit margins, even though they do not control supplier or purchaser decisions regarding the types and materials of products manufactured, sold, and purchased in Oregon. FAC ¶¶ 5, 91.

- NAW's members are uniquely disadvantaged as between the smallest producers (who are exempt) and large producers (who can absorb the fees and avail themselves of mechanisms to lower their fees), and yet are forced to subsidize program costs for others. *Id.* ¶¶ 90-91; *see* ORS §§ 459A.863(32), 459A.872(1).

- NAW's members are denied access and input into the CAA fee-setting methodology (*see id.* ¶¶ 4, 6, 42–43), even though that access is granted to others (CAA's Founding Members).

Defendants hardly bother to contest the details of this discriminatory scheme. For example, they do not (and at this stage cannot) dispute the express exemption of small producers prescribed by law nor the *de facto* reverse-Robin Hood system privileging large producers. *Cf. Barrett*, 544 F.3d at 1061 ("Factual allegations in the complaint are taken as true and all reasonable inferences are drawn in the plaintiff's favor."). As such, above and beyond being merely "underinclusive," MTD at 25, the State's EPR program—viewed as a whole—irrationally burdens mid-size producers and distributors like NAW's members. *See Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175 (1972) (emphasizing "the basic concept of our legal system that legal burdens should bear some relationship to individual responsibility or wrongdoing").

Defendants' argument about the small-business exemption gives away the game. Defendants argue it is "reasonably conceivable that a producer with higher gross revenues will be better equipped to bear the costs and responsibilities of reducing environmental impacts than producers with lower revenues." MTD 24. But an EPR fee properly calibrated to fairly approximate the cost of recycling and managing covered materials should be payable by small and large businesses alike; the size of the assessment simply would scale with the size of the

PAGE 16 - PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

business. As relevant to NAW's other claims as well, Defendants' argument effectively concedes that the EPR fees and associated compliance burdens are not proportional to the actual costs of handling any given producer's materials.

In any event, distributors who do not control supplier or purchaser packaging decisions are not "better equipped" to bear the responsibilities of achieving the asserted environmental benefits. FAC ¶¶ 5, 91. And there is no rational basis for creating a scheme in which large producers get privileged access to information and statutory benefits compared to those like NAW's members. Accordingly, the Motion to Dismiss should be denied as to the Equal Protection Claim as well.

### E.    At Minimum, the Court Should Grant Leave to Amend.

"If a complaint is dismissed for failure to state a claim, leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)). Under the Federal Rules of Civil Procedure, "[t]he court should freely give leave [to amend]." Fed. R. Civ. P. 15(a)(2). Under Ninth Circuit precedent, that "policy is 'to be applied with extreme liberality.'" *Eminence Capital, LLC v. Aspeon*, 316 F.3d 1048, 1051 (9th Cir. 2003) (quoting *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001)).

For the reasons above and in the PI Motion, the Court should find that NAW has pled valid claims (and indeed, is likely to prevail on the merits). At the very minimum, the Court should grant leave to amend. Defendants themselves do not ask for dismissal with prejudice in their Motion, presumably recognizing that NAW would be entitled to marshal additional facts and allegations in support of its claims. As a further example, Defendants have only recently produced (under seal) CAA's "Confidential" Fee-Setting Methodology, and NAW should be given an opportunity to review and analyze that in further support of its claims.

PAGE 17 - PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

## V.    CONCLUSION

Accordingly, NAW respectfully requests that the Court deny the Motion to Dismiss in its entirety.

Date: January 16, 2026                    SIDLEY AUSTIN LLP

                                          By: */s/ David R. Carpenter*
                                              David R. Carpenter*
                                              drcarpenter@sidley.com

                                              Caleb J. Bowers*
                                              cbowers@sidley.com
                                              Alexandra T. Mushka*
                                              amushka@sidley.com
                                              350 South Grand Avenue
                                              Los Angeles, CA 90071
                                              Telephone: +1 213 896 6000
                                              Facsimile: +1 213 896 6600

                                              Gordon D. Todd*
                                              gtodd@sidley.com
                                              Richard W. Smith*
                                              rwsmith@sidley.com
                                              1501 K Street, N.W.
                                              Washington, D.C. 20005
                                              Telephone: +1 202 736 8000
                                              Facsimile: +1 202 736 8711
                                              *Pro hac vice*

                                              BRADLEY BERNSTEIN SANDS LLP
                                              Darin Sands, OSB No. 106624
                                              1211 NW Glisan St., Ste 204
                                              Portland, OR 97209
                                              Telephone: +1 503-734-2480

                                              Attorneys for Plaintiff
                                              NATIONAL ASSOCIATION OF
                                              WHOLESALER-DISTRIBUTORS

PAGE 18 - PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS