Darin Sands, OSB No. 106624
dsands@bradleybernstein.com
BRADLEY BERNSTEIN SANDS LLP
1211 NW Glisan St., Ste 204
Portland, OR 97209
Telephone: +1 503-734-2480

David R. Carpenter*
drcarpenter@sidley.com
Caleb J. Bowers*
cbowers@sidley.com
Alexandra T. Mushka*
amushka@sidley.com
SIDLEY AUSTIN LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213-896-6000
Facsimile: +1 213-896-6600

[Additional counsel on following page]


Attorneys for Plaintiff
NATIONAL ASSOCIATION OF
WHOLESALER-DISTRIBUTORS

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS,<br><br>             Plaintiff,<br><br>    v.<br><br>LEAH FELDON, DIRECTOR, OREGON DEPARTMENT OF ENVIRONMENTAL QUALITY, in her official capacity; MATT DONEGAN, KAREN MOYNAHAN, MARK WEBB, AND SILVIA TANNER, in their official capacities as members of the Oregon Environmental Quality Commission,<br><br>             Defendants. | Case No. 3:25-cv-01334-SB<br><br>**PLAINTIFF NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS' REPLY BRIEF IN FURTHER SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER**<br><br>**[REDACTED VERSION]**<br><br>**ORAL ARGUMENT SCHEDULED FOR FEBRUARY 6, 2026** |

Additional counsel for Plaintiff
National Association of Wholesaler-Distributors

Gordon D. Todd*
gtodd@sidley.com
Richard W. Smith*
rwsmith@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202-736-8000
Facsimile: +1 202-736-8711

*Pro hac vice

<u>**TABLE OF CONTENTS**</u>

**Page No.**

I.  INTRODUCTION ................................................................................................. 1

II.  RESPONSE TO FACTS ..................................................................................... 2

    A.  There Has Never Been an EPR Program Like This...................................3

    B.  DEQ's Alleged Oversight Does Not Cure the Problems. .........................4

    C.  Newly Available Documents Confirm the Constitutional Deficiencies. ................6

        1.  CAA's Recent Financial Report. ....................................................... 7

        2.  CAA's Fee-Setting Methodology (Appendix G). ............................ 8

III.  NAW IS LIKELY TO PREVAIL ON THE MERITS...................................... 10

    A.  The Act Violates Due Process Through an Unprecedented Delegation of Regulatory Authority to a Private Entity. .............................................10

    B.  The Act Violates the Dormant Commerce Clause.................................15

        1.  The Act Fails the *Pike* Balancing Test........................................... 15

        2.  The Oregon Act is an Invalid User Fee and State Tariff. ............... 21

    C.  The Act Violates the Unconstitutional Conditions Doctrine. ...............23

IV.  THE REMAINING FACTORS SUPPORT INJUNCTIVE RELIEF. ........... 26

    A.  NAW Has Made a Clear Showing of Irreparable Harm. ......................26

    B.  The Equities Favor NAW. ...................................................................29

    C.  The Court Has the Authority to Grant the Requested Relief. ...............31

V.  CONCLUSION.................................................................................................. 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arc of Cal. v. Douglas*,
757 F.3d 979 (9th Cir. 2014) ....................................................................28, 29

*Ariz. Dream Act Coal. v. Brewer*,
757 F.3d 1053 (9th Cir. 2014) ...........................................................................26

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
729 F.3d 937 (9th Cir. 2013) .............................................................................19

*Bibb v. Navajo Freight Lines*,
359 U.S. 520 (1959)............................................................................................16

*Bridgeport & Port Jefferson Steamboat v. Bridgeport Port Auth.*
567 F.3d 79 (2d Cir. 2009)..................................................................................22

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936)..........................................................................10, 11, 14

*Comptroller of Treasury v. Wynne*,
575 U.S. 542 (2015)......................................................................................16, 23

*Daileader v. Certain Underwriters at Lloyds Lond. Syndicate 1861*,
96 F.4th 351 (2d Cir. 2024) ...............................................................................30

*Doe v. Horne*,
115 F.4th 1083 (9th Cir. 2024) ..........................................................................29

*Dolan v. City of Tigard*,
512 U.S. 374 (1994)......................................................................................23, 25

*E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) .............................................................................29

*Eubank v. City of Richmond*,
226 U.S. 137 (1912)......................................................................................10, 11

*Exxon v. Governor of Maryland*,
437 U.S. 117 (1978)......................................................................................20, 21

*FCC v. Consumers' Research*,
606 U.S. 656 (2025)................................................................................ *passim*

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)...............................................................................14

*Gen. Motors Corp. v. Tracy*,
519 U.S. 278 (1997)...............................................................................16

*Gibson v. Berryhill*,
411 U.S. 564 (1973)...............................................................................11

*Hecox v. Little*,
104 F.4th 1061 (9th Cir. 2024) .............................................................28

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017) ...........................................................28, 32

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015)...............................................................................23

*Hoye v. City of Oakland*,
653 F.3d 835 (9th Cir. 2011) ................................................................10

*Hunt v. Washington Apple Advertising Commission*,
432 U.S. 333 (1977)...............................................................................21

*Koontz v. St. Johns River Water Mgmt. Dist.*,
570 U.S. 595 (2013)..........................................................................23, 25

*Maldonado v. Morales*,
556 F.3d 1037 (9th Cir. 2009) ..............................................................21

*McGautha v. California*,
402 U.S. 183 (1971) (Brennan, J., dissenting)......................................13

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ...........................................................29, 31

*MT & M Gaming, Inc. v. City of Portland*,
383 P.3d 800 (Or. 2016) .......................................................................31

*Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*,
567 F.3d 521 (9th Cir. 2009) ................................................................19

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023)................................................................16, 18, 19, 20

*Nollan v. California Coastal Comm'n,*
483 U.S. 825 (1987)..................................................................................23

*Parcel 49C Ltd. v. United States,*
31 F.3d 1147 (Fed. Cir. 1994).................................................................31

*Pharmaceutical Research & Manufacturers of America v. County of Alameda,*
768 F.3d 1037 (9th Cir. 2014) (*Alameda*).......................................18, 19

*Philip Morris USA, Inc. v. Scott,*
561 U.S. 1301 (2010) (Scalia, J., in chambers) .....................................29

*Pike v. Bruce Church, Inc.,*
397 U.S. 137 (1970)..................................................................15, 16, 18, 21

*Republic of Philippines v. Marcos,*
862 F.2d 1355 (9th Cir. 1988) .................................................................27

*Ross-Whitney Corp. v. Smith Kline & French Lab'ys,*
207 F.2d 190 (9th Cir. 1953) ...................................................................27

*Schafer v. Fraser,*
290 P.2d 190 (Or. 1955) ...........................................................................30

*Washington ex rel. Seattle Title Trust Co. v. Roberge,*
278 U.S. 116 (1928)..............................................................................10, 11

*Southern Pacific Co. v. Arizona,*
325 U.S. 761 (1945)...................................................................................16

*Southern Pacific Co. v. Denton,*
146 U.S. 202 (1892)...................................................................................25

*Steffel v. Thompson,*
415 U.S. 452 (1974)...................................................................................26

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*
240 F.3d 832 (9th Cir. 2001) ...................................................................29

*United States v. Sperry Corp.,*
493 U.S. 52 (1989).....................................................................................22

*Valencia Kolb Props. v. Pima County,*
No. 13-cv-1319, 2014 WL 12575855 (D. Ariz. Nov. 6, 2014) ..............31

*West Lynn Creamery v. Healy,*
512 U.S. (1994)..........................................................................................22

*Will v. Mich. Dep't of State Pol.*,
    491 U.S. 58 (1989) ........................................................................27

*Withrow v. Larkin*,
    421 U.S. 35 (1975) ........................................................................11

*Young v. U.S. ex rel. Vuitton et Fils S.A.*,
    481 U.S. 787 (1987) ......................................................................11

**Statutes**

Cal. Pub. Res. Code § 42989 ...............................................................4

Conn. Gen. Stat. §§ 22a-905a(h), (i) ....................................................4

Oregon EPR Law ................................................................................26

Oregon's Act ..................................................................................21, 22

ORS § 459A.156 ..................................................................................3

ORS § 459A.159 ..................................................................................3

ORS § 459A.203 ..................................................................................3

ORS § 459A.233 ..................................................................................3

ORS § 459A.827 ..................................................................................3

ORS § 459A.869 ............................................................................14, 24

ORS § 459A.875 ................................................................................11

ORS § 459A.884 ................................................................................11

ORS § 459A.890 ................................................................................22

Plastic Pollution and Recycling Modernization Act, Or. Laws ch. 459 (2021) ......................15, 23

**Other Authorities**

https://www.oregon.gov/deq/mm/Documents/dtbFoundAR2425.pdf ............4

https://www.oregon.gov/deq/mm/Documents/dtbMPar2425.pdf ................3

https://www.oregon.gov/deq/mm/pages/drugtakeback.aspx; ........................3

OR. ADMIN. R. §§ 340-090-0750 .......................................................12

Report by the Comptroller and Auditor General (last accessed Jan. 9, 2026)
    https://committees.parliament.uk/work/2630/disposable-packaging-coffee-
    cups-and-plastic-bottles-inquiry/news/100389/ ........................................................................4

U.S. Const. art. I, § 8, cl. 3 ..............................................................................................15

<u>**REPLY BRIEF IN FURTHER SUPPORT OF PRELIMINARY INJUNCTION
AND/OR TEMPORARY RESTRAINING ORDER**</u>

**I.      INTRODUCTION[1]**

Defendants' opposition confirms the fundamental constitutional defects warranting

preliminary injunctive relief. The EPR law at issue is unprecedented in scope, affecting virtually

every product that is sold or distributed in commerce. Yet core regulatory functions—including

rate setting, fee assessments, and the determination of total system costs—have been delegated to

a single private entity that regulated parties have no choice but to join. That entity, CAA, is

controlled by a select group of large companies also subject to the Act, giving them the power to

regulate their own competitors and even refer them to DEQ for enforcement. The State does not

dispute that fees are imposed retrospectively and often exceed the margins associated with the

products. And neither the public nor CAA's own membership at large had any opportunity to

review or comment on CAA's "confidential" fee-setting methodology. The result is an

intentionally opaque scheme that violates Due Process and the Dormant Commerce Clause; and

that unconstitutionally conditions the ability to do business in Oregon on submitting to a non-

negotiable contract with an unaccountable start-up entity to which regulatory authority has been

unduly delegated.

The State (supported by its amicus curiae) contends there are many historical examples of

other EPR programs, but those traditionally relate to narrowly defined classes of products with a

far more transparent and constrained fee structure. In both scope and structure, this EPR program

is unprecedented, and its unique features are what give rise to constitutional violations.

The State's purported oversight fails to cure the problems, as the practical authority for

program implementation rests in the hands of the CAA. Among other things, CAA is free to

change the fees it charges without DEQ review or approval, and DEQ has never considered the

---

[1] Capitalized terms have the meaning provided in Plaintiff's Opening Memorandum unless
otherwise stated. NAW's Motion, ECF 33, is cited as "Mot." Plaintiff's Opposition, ECF 45, is
cited as "Opp."

impact of the fees on specific products, consumers, or businesses. Nor has there ever been any meaningful public opportunity to assess CAA's costs and cost assumptions.

The constitutional defects are confirmed by two documents that NAW obtained after filing its Motion: a CAA financial report, and the Fee-Setting Methodology recently submitted under seal. These documents reveal two troubling realities. First, CAA's solvency depends on its Founding Members and expansion into other states. Second, CAA is intentionally overcharging members in the current fee cycles in anticipation of future cost overruns, and to account for materials unrelated to producers' own waste. These documents also confirm there has not been a meaningful opportunity to test CAA's costs and assumptions.

At bottom, the State seeks to create an entirely new statewide recycling infrastructure by granting vast authority to a private entity to impose what amounts to stealth taxes on businesses and ultimately consumers. If Oregon wants to design a program to avoid accountability, this is it. If Oregon wants to help large, vertically integrated companies squeeze out small and mid-sized businesses, this is it. If Oregon wants to force consumers to pay more for every product they buy while hiding the reasons for costs going up, this is it.

NAW has established a likelihood of success on its claims, its members face irreparable harm, and the balance of equities favors relief. The Court should also reject Defendants' argument that the requested relief goes beyond DEQ's enforcement authority (an argument that, if anything, only highlights the private delegation problem). NAW respectfully requests that the Court grant the Motion.

## II.    RESPONSE TO FACTS

On the merits, the State argues the Act is consistent with past EPR programs and is adequately overseen by DEQ. Because those premises cut across multiple legal issues, NAW will address them up front.

**A.      There Has Never Been an EPR Program Like This.**

Defendants concede benignly that the Act here "covers a broader range of products and producers than DEQ's other EPR programs." Opp. 3. That is a gross understatement, and the comparison to other programs actually proves NAW's point. Historical EPR programs typically address a *discrete* product type with distinct needs, such as paint, mattresses, and pharmaceuticals. Opp. 2–3. And, they include far more transparent and predictable fee structures, often in the form of a point-of-sale fee or per-unit charge. The Act here, in contrast, impacts virtually all products that use packaging for their sale or distribution—virtually all goods sold or distributed in commerce, along with the secondary and tertiary packaging that accompanies them (e.g., shipping materials). That breadth, combined with a uniquely opaque fee structure, makes the EPR program here truly unprecedented.

The following briefly highlights examples of other historical EPR programs:

**Mattresses**. In contrast to the Act, Oregon's mattress stewardship statute uses a *flat fee* applied equally to each mattress sold to a consumer in the state, collected by retailers from consumers *at the point of sale* and itemized on the consumer's receipt. ORS §§ 459A.156(2)(b), 459A.159(1)(i).

**Paint**. Similarly, Oregon's paint stewardship statute requires a *uniform statewide assessment* for architectural paint, imposed on each container of paint sold in the state. Each retailer or distributor must add the assessment to the purchase price. ORS § 459A.827(4)(f).

**Pharmaceutical take-back program**. Drug manufacturers must participate in a drug take-back program and pay costs associated with each manufacturer's share of specified prescription and nonprescription drugs sold in the state. ORS §§ 459A.203(1), 459A.233. Although third-party plans administer the law, their combined annual expenditures are only ***$3 million*** per year.[2] In contrast, CAA's Plan assumes annual program costs of up to ***$289.5 million***

---

[2] *See* https://www.oregon.gov/deq/mm/pages/drugtakeback.aspx; Med-Project 2024-2025 Annual Report p. 167, https://www.oregon.gov/deq/mm/Documents/dtbMPar2425.pdf (noting

and total costs of *$731 million* through 2027, meaning far greater costs must be pushed onto small and mid-sized businesses. Wild Decl. Ex. A, at p. 50.

Other historical state EPR programs are similarly narrow. *See, e.g.*, Cal. Pub. Res. Code §§ 42989, 42989.1 (point-of-sale mattress fee that must be pre-approved by regulators and disclosed to customer on invoice and receipt); Conn. Gen. Stat. §§ 22a-905a(h), (i) (same); N.Y. Env. Cons. L. § 27-1913 ($2.50 waste management fee for tires, set by statute; paid at purchase).

In these examples, the discrete nature of the program, together with a fixed per-unit fee or small program scope, means that financial obligations are tied predictably to sales of individual product units. That helps ensure accountability and manageability. Here, rather than address discrete products with distinct needs, the EPR law impacts virtually all goods sold or distributed and is intended to create an entirely new statewide waste-management and recycling infrastructure. Rather than assess fees on a transparent per-product basis, the Act allows CAA to set and modify fees assigned to different categories of *materials*—all of which obscures the true impact of the fees on consumers and businesses for any given product.[3]

**B.    DEQ's Alleged Oversight Does Not Cure the Problems.**

The breadth, structure, and complexity of the program also demonstrate why DEQ's alleged oversight is insufficient. Defendants describe high-level statutory guidelines for the program and DEQ's review of different iterations of CAA's plan (Opp. 5–7), ultimately arguing that "DEQ has approved the fee-setting methodology in its entirety" (Opp. 26). But by counsel's own characterization at the Parties' December 2, 2025 conference with the Court, all of DEQ's

---

annual expenditure of $1,442,532,52); Drug Take Back Solutions Foundation, Oregon Drug Take-Back Program 2024/2025 Annual Report pp. 22–23, https://www.oregon.gov/deq/mm/Documents/dtbFoundAR2425.pdf ($1,664,839.31 in annual expenditures).

[3] Defendants also reference foreign packaging EPR programs, both those are known to impose high costs while adding little value. *See, e.g.*, The Packaging Recycling Obligations, Report by the Comptroller and Auditor General (last accessed Jan. 9, 2026) https://committees.parliament.uk/work/2630/disposable-packaging-coffee-cups-and-plastic-bottles-inquiry/news/100389/ (U.K. audit reflecting that it "does not know what value the scheme has added in its 20 years of operation").

oversight happens at a 30,000-foot level. None of that accounts for how the implementation actually works or the impact on businesses.

In particular, while DEQ may have approved a "Plan," it is undisputed that CAA is free to set and increase the particular rates *without* DEQ review and approval. Mot. 15. CAA, in fact, has set and modified fees that deviate materially from what DEQ reviewed and in a manner that businesses cannot reasonably predict or accrue for. Moreover, CAA has conceded that its fee projections have been based on "very imperfect data." Wild Decl. ¶ 25.

For example, CAA's Plan (as reviewed by DEQ) provided only estimated ranges for fees, and even then, for its July 2025 invoices, CAA changed its fee amounts for ***46 out of 60*** categories. These changes resulted in materially different, and often far higher, fees than projected. Winkle Decl. ¶ 23; Allen Decl. ¶ 6. CAA's rates for 2026 present similar issues: nearly half of the categories will see fee increases of 25% or more, with some rates increasing by 45% (while only two product categories would see significant fee decreases). Mot. 16.

Defendants also do not dispute that, in many cases, the EPR fees exceed the margins associated with the ultimate product. Mot. 17. The declarations provide an example of one product, for instance, that is offered for sale at ***$63.96/case***, and the EPR fees amount to ***$25.20/case***. Allen Decl. ¶ 9 (first line item). No business can bear that cost, and no customer would be willing to accept that price increase. More generally, declarants explain that EPR fees have caused suppliers to raise product costs significantly (up to 50% or more). Allen Decl. ¶ 11; Winkle Decl. ¶ 10; Wild Decl. ¶ 16. Defendants do not cite any example of a historical EPR program with fees that are anywhere close to those amounts relative to the product price.

The retrospective nature of the fees compounds these problems. CAA sets and revises rates that it charges against *past* reported volumes, making it impossible to predict what the fees will be, to account for them in sales projections, and to charge prices sufficient to cover the fees. Mot. 18. Again, Defendants do not dispute this, shrugging off the "cadence" of the reporting and fee-setting as just how the program works. Opp. 6. While that "cadence" may suit CAA and be

tolerable for its Founding Members, it is not workable for small and mid-sized businesses that operate on razor-thin margins.

Defendants have no response to these issues because *they have never even attempted to analyze* the impact of the EPR fees on business or consumers, or whether the fees make sense in the context of particular products. *See* Wild Decl. Ex. B. at 10–12. That is the problem: this program is so unprecedented in scope, it is impossible to assess whether CAA's fees make sense in any given context. While Defendants contend they considered cost models for the recycling infrastructure, they cite no models—because there are none—analyzing, for example:

- The impact of CAA's fees on products that already use state-of-the-art packaging or in situations like food packaging, where certain materials *are required* for food safety and quality and to comply with U.S. Food and Drug Administration standards—yet are made uneconomical by CAA's rates;

- How the EPR fees are supposed to be absorbed or allocated across the supply chain, or their impact on distributors like NAW's members, who do not have any control over the packaging;

- What share of the EPR fees will ultimately fall on Oregon consumers in the form of higher prices, and whether consumers would be willing to pay those amounts if the increase were transparently disclosed to them.

These issues do not exist to the same degree in historical EPR programs because of the more targeted scope of the program and more transparent nature of the fees.

### C. Newly Available Documents Confirm the Constitutional Deficiencies.

The unprecedented nature of the fees goes part and parcel with the fact that the program here does not exist merely to "cover costs associated with the recycling of those products," as Defendants claim. Opp. 3. Rather, the program exists to build an entirely new recycling infrastructure for the State and fund a start-up company (CAA) to do so. CAA first decides on its

*total system costs* for this new infrastructure, and CAA then allocates those costs. Two recently available documents confirm the constitutional deficiencies.

### 1. CAA's Recent Financial Report.

Shortly after NAW filed its Motion, DEQ made publicly available CAA's unredacted financial report for its 2023-2024 start-up phase ("Financial Report"). Bowers Decl. Ex. A.[4]

At the outset, the Financial Report showcases a complete absence of detail on CAA's costs:

#### Oregon Pre-Program Start-up Costs

| | 12/31/2024 | 12/31/2023 |
|---|---|---|
| Direct [1] | $  150,000 | $  - |
| Salary and Wages [2] | 373,712 | - |
| Professional Fees | | |
| Consulting [3] | 2,649,425 | 671,814 |
| Legal Fees [4] | 234,492 | 25,049 |
| Technical and Administrative Services [5] | 1,954,733 | 102,508 |
| Total Professional Fees | 4,838,650 | 799,371 |
| General and Administrative Expenses [6] | 42,757 | - |
| Total Expenditures | $  5,405,119 | $  799,371 |

*Id.* at 4. For example, CAA's report (in the table above) identifies more than $3 million in "consulting" costs and more than $2 million in "technical and administrative services" for 2023 and 2024. *Id.* These costs are not accompanied by any explanation or documentation demonstrating who was paid, at what rates, and for what specific services.

Moreover, the included Financial Statements acknowledge "uncertainty about the Organization's ability to continue as a going concern," meaning, whether it will go bankrupt given that CAA is in "the start-up phase to build out the plans, systems, and organization to implement the EPR laws." *Id.* at 15. Factors that purportedly "alleviate this uncertainty" include,

---

[4] DEQ's website indicates that CAA submitted the Financial Report on November 15, 2025, but to NAW's knowledge, it was not posted online until sometime after the Motion was filed the following week. *See* Bowers Decl. ¶¶ 3–5. Plaintiff's complete comments to DEQ on the Financial Report are provided as Exhibit B to the Bowers Declaration.

among other things: (a) other states adopting similar EPR laws; (b) CAA being or becoming the PRO in these other states and purportedly being "required to exist by state law"; and, (c) CAA's Founding Members committing funds to support CAA's "start-up phase" and until CAA becomes sustainable. *Id.* at 15–16; *see also id.* at 22–23 (indicating that CAA incurs costs at a national level, which it will allocate to each state).

As further explained below, this Financial Report goes directly to the constitutional issues. Oregon has vested substantial program control and discretion in a third-party entity that is dependent on and controlled by the nation's largest companies. This is not merely an in-state program to cover defined costs associated with disposing of certain products in Oregon; it is a "start-up" to build new statewide infrastructure. And the scheme relies on a single entity (CAA) using admittedly imperfect data to make determinations about the packaging and fees for goods sold across multiple states.

2.       **CAA's Fee-Setting Methodology (Appendix G).**

In its Opposition brief, Defendants offered to provide NAW's counsel with "Appendix G" to the CAA Plan—the Fee-Setting Methodology that DEQ withheld from the public when approving the plan. The belated production of Appendix G (with an "Attorney's Eyes Only" designation) raises more questions than it answers.

█████████████████████████████

███████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████ Such entities are effectively being forced out of the Oregon market, as the alternative to outright market withdrawal is to raise costs in a manner that will place a heavy and, in all likelihood, intolerable burden on consumers.

Moreover, because Appendix G was never publicly released, there was never any ability for the public or CAA's members at large to validate, test, or comment on CAA's cost assumptions. Only CAA's Founding Members (as represented on its Board) have privileged access and input into the Fee-Setting Methodology. It would be one thing if Oregon's recycling infrastructure project were directly funded through taxpayer dollars or government recycling contracts awarded through competitive bidding. Those processes are hardly perfect and themselves are susceptible to fraud and abuse, but they at least promote some form of accountability and transparency to taxpayers. Because the fee structure here is designed to obscure the impact on consumers and products, and because DEQ has never even attempted to analyze the fiscal impact on businesses (or consumers), there is no meaningful cost-containment mechanism or oversight sufficient to protect those who must bear the fees.

III.    **NAW IS LIKELY TO PREVAIL ON THE MERITS**

The points above and presented in the Motion flow across NAW's constitutional claims and establish its strong likelihood of prevailing on the merits. Defendants frame much of their argument around the standards for a "facial" challenge and NAW's alleged burden to prove that there is "no set of circumstances" under which the Act would be valid. Opp. 12, 14, 32 (citing *United States v. Salerno*, 481 U.S. 739 (1987)). That ignores that NAW has also pled its claims as an as-applied challenge, FAC ¶ 9, and further that the specific posture for this Motion is NAW's request to enjoin enforcement of the Act as it is currently being implemented. *See Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011) ("A paradigmatic as-applied attack . . . challenges . . . a subset of the statute's applications, or the application of the statute to a specific factual circumstance."). Regardless of how the challenge is framed, NAW has shown a likelihood of prevailing. Because the Court indicated it is most interested in the Due Process/ Private Delegation claim, we will start there.

A.    **The Act Violates Due Process Through an Unprecedented Delegation of Regulatory Authority to a Private Entity.**

NAW's motion demonstrates why this scheme violates Due Process protections against private delegations. Defendants hand-wavingly dismiss this "little-known" doctrine. Yet Defendants acknowledge, as they must, the continuing validity of the Due Process Clause non-delegation cases on which NAW relies, including *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936), *Eubank v. City of Richmond*, 226 U.S. 137 (1912), and *Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116 (1928). Opp. 22–23. The rarity of decisions invalidating such schemes underscores the exceptional nature of the program here and how unconstitutional it is.

Together, these cases prohibit the delegation of regulatory authority to self-interested market participants without meaningful governmental control or procedural safeguards. Mot. 27–31. Such delegations are the "most obnoxious form," as regulatory authority is vested in "private persons whose interests may be and often are adverse to the interests of others in the same

business." *Carter*, 298 U.S. at 311. In other contexts as well, the Supreme Court has long recognized that due process forbids the exercise of power by decisionmakers who possess a pecuniary interest in the outcome of a regulatory or adjudicatory action. *See, e.g.*, *Withrow v. Larkin*, 421 U.S. 35, 47 & n.14 (1975) (identifying "pecuniary interest" cases as one type where "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable"); *Gibson v. Berryhill,* 411 U.S. 564, 579 (1973) (finding due process violation where industry participant members of a state licensing board had "substantial pecuniary interest" in outcome given the Board's actions would eliminate competitors).

As NAW's Motion explains, that is what has occurred here. Mot. 28–29. The Act vests sweeping authority in the private PRO to set the fees, incentives, and conditions for registered members to fund the EPR program. ORS §§ 459A.875, 459A.884. CAA—the only PRO approved in Oregon—was founded and is governed by some of the nation's largest companies. Wild Decl. Ex. B. Not surprisingly, small- and mid-sized businesses, including wholesaler-distributors, are not represented. CAA's Financial Report confirms that CAA is dependent on these Founding Members for its solvency. Bowers Decl. Ex. A. This places the delegation to CAA squarely within the concerns raised by *Carter*, *Eubank*, and *Roberge*. The Act vests coercive regulatory authority in self-interested market participants—including retailers, NAW's competitors, and others in the supply chain—who possess both the incentive and the ability to structure binding fees and conditions in ways that advantage themselves and disadvantage an unwilling minority.

Contrary to Defendants' suggestion (Opp. 25), the doctrine does not require showing actual bias. Rather, "our system of law has always endeavored to prevent even the *probability* of unfairness." *Withrow*, 421 U.S. at 47 (emphasis added); *see also Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 805 (1987) (warning of mere "*potential* for private interest to influence the discharge of public duty"). In fact, the conflicts of interest here are real. CAA's materials show █████████████████████████████████████████████████

███████ something that may be palatable for the largest companies operating in the State, such as CAA's Founding Members, but has the potential to be ruthlessly punishing to small and mid-sized businesses. Likewise, CAA's Founding Members are in a far better position than small and mid-sized business to absorb or pass through the EPR fees (including forcing NAW's members to bear them), making them more likely to approve program scope and fee decisions that disproportionately impact others.

Defendants attempt to paper over the due process concerns by asserting that the Act and its implementing rules "provide detailed requirements for PROs and producers to comply with the law," and involve "DEQ's careful and ongoing oversight." Opp. 25. As discussed above and in the Motion, those alleged safeguards do not address the fundamental problems. For example:

- DEQ specifically grants CAA authority to revise the fee schedule, cost allocations, and fee adjustments granted to individual producers without requiring DEQ approval. OR. ADMIN. R. ("OAR") §§ 340-090-0750(1), (2).
- CAA's Fee-Setting Methodology, although available to Founding Members, remains confidential to the public and producers at large, and there is no meaningful mechanism to ensure the reasonableness of CAA's costs and expenditures. Wild Decl. ¶ 11 & Ex. A, Appendix G, p. 85.
- The incredible scope and structure of the program itself—applicable to virtually every product in commerce, but where fees are not apportioned on a per-product basis—makes it impossible for DEQ to provide meaningful oversight into how the fees are impacting particular products, businesses, or consumers. And DEQ has never even attempted to perform that analysis.

*See* Mot. 11–22; *supra* at 2–9.

Defendants cite *FCC v. Consumers' Research*, 606 U.S. 656 (2025), as denying a claim alleging an unconstitutional delegation to a private administrator. *Consumers' Research*, however, was not a Due Process Clause case. While the non-delegation doctrine has "roots both

in . . . separation of powers . . . and in the Due Process Clause," *McGautha v. California*, 402 U.S. 183, 272 n.21 (1971) (Brennan, J., dissenting), *Consumers' Research* was a separation of powers case. The question of whether the delegation to private persons with a "financial stake . . . offend[s] the Fifth Amendment's Due Process Clause" was not raised and therefore was not addressed by the Supreme Court. 606 U.S. at 720 n.6 (Gorsuch, J., dissenting).

Nevertheless, the Court's analysis in *Consumers' Research* reinforces the constitutional deficiencies here. *Consumers' Research* upheld a scheme in which telecommunications providers contribute to a "Universal Service Fund" administered by a non-profit association (the "Administrator"), to provide reliable communications services across the United States. *Consumers' Research*, 606 U.S. at 666. The key features of the Universal Service Fund scheme, compared to Oregon's EPR scheme, are as follows:

**The fee-setting process**. In *Consumer's Research*, it was the Federal Communications Commission ("FCC") that "devised a formula" to calculate how much carriers must contribute to the Fund based on a "contribution factor" determined quarterly by the Commission. 606 U.S. at 668–69. While the Administrator "produces the initial projections" that "feed into the contribution factor," *id*. at 660, the FCC itself must on a quarterly basis approve and publish the factor that determines the individual contributions, *id*. at 693–94. "Not the Administrator, but the Commission endorses *final* projections, converts them into a contribution factor, and *formally promulgates* them." *Id.* at 695 (emphasis added). Here, it is the opposite. DEQ merely approved a CAA "Plan" with *draft* fee ranges based on a "methodology" that CAA created. CAA is the one that set the final fee schedule for the July 2025 invoices (in a manner that varied materially from the draft DEQ reviewed), and CAA retains discretion to change the fee schedule, other variables, and individual producer fee assessments—*without* DEQ review or approval. CAA is not merely playing an "advisory role" to an agency that "alone has decision-making authority." *Consumers' Research*, 606 U.S. at 693.

**How the administrator is governed**. In *Consumers' Research*, the Administrator's Board of Directors is appointed by the FCC itself, as the Supreme Court noted. 606 U.S. at 692–93. There is no such DEQ supervision over CAA, which is funded and controlled by large companies who have a distinct self-interest in how the Act is implemented and in shifting costs to others. Indeed, the Act requires that a PRO, to be formed, represent a certain percentage of the "total combined market share" of covered products in Oregon, ORS § 459A.869, meaning that producers with the largest market share can come together to form and influence the PRO, while small and mid-sized business cannot. *See Carter*, 298 U.S. at 310–11. Rather than ensuring fairness, the Act incentivizes PRO capture by large companies not subject to the agency's supervisory appointment authority.

**Transparency and cost control**. By statute, the Administrator in *Consumers' Research* "publicly reports [its cost] projections, along with supporting documents, to the Commission," while the FCC's rules further "dictate the programs' scope," including by imposing certain funding caps. 606 U.S. at 693–94 (citing 47 CFR § 54.709(a)(3)). Here, the Act imposes far fewer guardrails on CAA's ability to determine its own scope and costs. Further, CAA is allowed to treat its Fee-Setting Methodology as confidential and proprietary—which both (a) impairs public scrutiny and (b) confirms that CAA is acting as a private entity in its own self-interest.

**Cadence and nature of the fee assessment.** In *Consumers' Research*, contributions were determined on a quarterly basis, as a function of the carriers' projected revenues and the Fund's projected expenses. 606 U.S. at 693. Here, in contrast, fees are not set and revised by quarterly projections of revenue versus costs. The Act's "cadence" (Opp. 6) is to use a producer's *past material volumes* as the basis for imposing fees according to rates that are not disclosed until up to two years later. That retrospective fee setting itself runs contrary to the fundamental tenet of due process that "regulated parties should know what is required of them so they may act accordingly." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

Moreover, because EPR fees are not set relative to a producer's *revenue*, that heightens the likelihood that producers will be subject to exorbitant fees they cannot bear.

**Procedural protections**. Finally, in *Consumers' Research*, by statute, "anyone aggrieved by an action of the Administrator may seek *de novo* review by the Commission." 606 U.S. at 693 (citing 47 CFR §§ 54.719–54.725). Here, there is no such right. CAA's members are forced to proceed through confidential and binding arbitration. Winkle Decl. Ex. B § 8. Defendants' argument that CAA can obtain judicial review of *a DEQ enforcement order* is not responsive (Opp. 26–27), since the relevant deprivation of property rights occurs when producers are compelled to pay the fees. Both the Act on its face and as implemented by CAA provide no meaningful pre-deprivation process. Mot. 30–31.

In *Consumers' Research*, the Supreme Court upheld the scheme because "[i]n every way that matters to the constitutional inquiry, the Commission, not the Administrator, is in control." 606 U.S. at 695. This case is the inverse. In every way that matters, CAA is in control, and the Act provides CAA with vast discretion to implement the Act in an arbitrary and oppressive way, without meaningful agency oversight or administrative or judicial recourse. NAW has demonstrated a strong likelihood of success on its due process claim.

**B.      The Act Violates the Dormant Commerce Clause.**

NAW has shown that the Act violates the Dormant Commerce Clause because (1) under *Pike*, it imposes substantial burdens on interstate commerce that are clearly excessive in relation to any putative local benefits, and (2) it operates in effect as an unfairly apportioned user fee or tax on interstate supply chains. Defendants fail to undermine this showing.

**1.      The Act Fails the *Pike* Balancing Test.**

**a. The Act unduly burdens interstate commerce**. Defendants advance an unduly narrow conception of the *Pike* test: they would restrict the substantial-burden inquiry only to regulations that "*actually prevent* interstate commerce from moving through the state." Opp. 21 (emphasis added). That is contrary to Supreme Court precedent. Neither the mud-flap

requirements invalidated in *Bibb*, for example, nor the train-length requirements in *Southern Pacific* "actually prevent[ed]" interstate commerce. *See Bibb v. Navajo Freight Lines*, 359 U.S. 520 (1959); *Southern Pacific Co. v. Arizona*, 325 U.S. 761 (1945). Both laws were held unconstitutional because they imposed *undue burdens* on interstate commerce that forced companies to restructure their nationwide operations to accommodate the States' idiosyncratic rule. The proper inquiry—as both *National Pork* and *Pike* itself recognize—is not whether commerce has been prevented entirely, but whether lack of national uniformity would meaningfully "*impede* the flow of interstate goods," that is, whether the regulation imposes a substantial burden on interstate commerce clearly excessive in relation to the putative local benefits. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 377–80 & n.2 (2023); *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *see also Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 n.12 (1997) (*Pike* scrutiny is appropriate where state regulation undermines national uniformity).

Here, Plaintiff has demonstrated that the Act presents precisely the kind of state-specific compliance burdens that these cases condemn. Because NAW's members frequently distribute identical products through multi-state supply chains—often from shared distribution centers within Oregon that serve both Oregon and neighboring states—they cannot feasibly segregate packaging, reporting, or cost allocation solely for Oregon without restructuring those interstate systems more broadly. *See* Allen Decl. ¶¶ 8, 10; Winkle Decl. ¶¶ 17–29. NAW's members also face a substantial and unavoidable risk of double counting and duplicative fee assessments where the same packaging is reported—or deemed reportable—under multiple states' laws, particularly where downstream purchasers transport goods across state lines after sale. *Cf. Comptroller of Treasury v. Wynne*, 575 U.S. 542, 562 (2015) (noting Commerce Clause concern regarding duplicative fee assessments). These burdens are not merely substantial; they fall disproportionately on interstate actors compared to producers that operate exclusively intrastate

and do not have the same supply complex chains. Indeed, the EPR fees target, in significant part, the secondary and tertiary packaging *used to distribute goods in interstate commerce*.

Take, for example, the substantial complexities posed for distributors who move product units through Oregon. Although units are exempt from EPR requirements if they are not subsequently discarded in Oregon, mid-stream entities, such as distributors, do not know where, much less how, the packaging for products they sell is disposed of. Yet the Act puts the onus on mid-stream distributors to follow each and every product to its ultimate point of sale. To comply with the Act, these distributors must rework entire supply chains in an attempt to distinguish between products that a producer believes *may* be sold and ultimately discarded in Oregon versus those that may not. This is a guessing game.

Moreover, the Act intentionally targets interstate commerce. Contrary to historical EPR programs, the Act does not use transparent point-of-sale charge assessed on in-state consumers, and it is specifically designed to exclude retailers—i.e., the in-state entities—from being "producers" in most cases. Instead, the Act pushes fees disproportionately onto those operating in interstate commerce, including distributors. The reworking of supply chains is not some ancillary "effect" of the regulation or compliance burden, as Defendants contend. Opp. 16, 20. Rather, it is an unduly burdensome consequence of the statutory regime itself, which forces interstate businesses to redesign their multi-state operations to accommodate Oregon.[5]

Indeed, CAA's Financial Report confirms the inherently interstate nature of this program. The Financial Report not only presumes that CAA will administer EPR programs in other states; CAA's solvency and operational planning *depends* on it. ECF 38, Ex. A, at 15, 22–23. Thus, CAA—as the PRO on behalf of Oregon, California, Colorado, and others—will be setting fees

---

[5] Defendants assert that, based on CAA's review of data, distributors accounted for less that 5% of the 2025 fees. (Opp. 9, 15.) It is not clear how that number was determined, but it is also immaterial. Even when brand owners/manufacturers pay the fees, they can use their market power push the fees down to distributors. Moreover, the impacts described above are not solely limited to distributors: they also affect a wide range of brand owners that would face similar problems with the excessiveness and unpredictability of fees, as well as with monitoring and tracing distribution across multiple states.

on virtually all products sold to over 56 million people. That is unquestionably regulating interstate commerce.

The foregoing readily distinguishes this case from *National Pork*. For the plurality who rejected the *Pike* claim in *National Pork*, the key issue was that the benefits and burdens were "incommensurable": it was impossible to compare production costs to California's asserted moral interests in animal welfare. *See*, *e.g.*, 598 U.S. at 382 (Gorsuch, J.) (explaining that balancing economic and moral interests at issue was "a task no court is equipped to undertake" as the "competing goods are incommensurable"); *id.* at 394 (Barrett, J., concurring) (agreeing with Justice Gorsuch's rationale about the "incommensurable" comparison). At the same time, the Chief Justice's concurrence explains that *Pike* "has not been so narrowly typecast" to only cases involving discrimination or instrumentalities of interstate commerce. *Id.* at 395.

This case does not present any such "commensurability" issue. Oregon's law operates not by imposing moral standards on what can be sold in the state; rather, it imposes a direct economic fee on products and in particular packaging that is used to distribute goods in interstate commerce. Those fees and related reporting requirements directly and necessarily burden the flow of interstate commerce—in fact, they are part of CAA's larger project for a multi-state scheme. While Oregon may have an interest in promoting recycling, the EPR fees' burden is clearly excessive (a) in relation to the products being sold, and (b) because the fees are not being used to cover the *actual* costs of recycling the materials but as a front-loaded financing mechanism to build an entirely new state recycling infrastructure.

**b. *County of Alameda* confirms the unprecedented nature of this program.**

Defendants cite *Pharmaceutical Research & Manufacturers of America v. County of Alameda*, 768 F.3d 1037 (9th Cir. 2014) (*Alameda*), as a case finding that an EPR program did not violate the Commerce Clause. Just as *Consumers' Research* actually reveals the unprecedented nature of Oregon's law, so does *Alameda*.

*Alameda* involved a stewardship program for the collection and disposal of unwanted pharmaceuticals. The County estimated the annual cost to each drug manufacturer at just $5,300 to $12,000 (based on $530,000–$1,200,000 per year in total program costs), whereas pharmaceutical companies' annual "revenue-stream in Alameda" was estimated at $950 million. *Alameda*, 768 F.3d at 104, 1045. Moreover, the court treated these compliance costs as effectively fixed—annual costs per drug manufacturer did not depend on the amount of drugs sold in the county. *Id.* Under those facts, the Court unsurprisingly found "no evidence that the Ordinance will interrupt, or even decrease, the 'flow of goods' into or out of Alameda." *Id.* at 1045.

The contrast to the facts here could not be more stark. Harbor Food's first invoice, for example, was over $500,000 for the first six-month period of the EPR program (Winkle Decl. ¶ 8), and Harbor Foods is *not* a major pharmaceutical company, but an independent food distribution company. Another declaration, discussed above, provides examples of EPR fees that are ***40%*** of product revenue—grossly exceeding the mere .1% of the revenue stream in *Alameda*. NAW has shown that the EPR fees will interrupt and decrease the flows of goods, including because the fees in many cases exceed the profit margins associated with distributing the products and because of the formidable logistical obstacles imposed by the program. The EPR fees in fact have resulted in dramatic price increases that cannot be absorbed or effectively allocated across the interstate supply-chain. Further, Defendants in this case (unlike in *Alameda*) have not even attempted to present evidence on the economic viability of fees as a share of product revenue because they have never even bothered to do a fiscal impact analysis.

Other Ninth Circuit cases cited by Defendants likewise involved state laws that were more limited in scope and did not impose any substantial or disproportionate burden on interstate commerce. *See Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 950 (9th Cir. 2013) (similar to *Pork Producers*; affirming law prohibiting sales of foie gras that was the result of force-feeding birds); *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v.*

*Brown*, 567 F.3d 521, 522 (9th Cir. 2009) (law prohibiting certain legal relationships between optometrists and opticians).

**c. Defendants' other arguments do not support a contrary result.** Defendants seek to draw a distinction between regulations that affect commerce "*to*" a jurisdiction and those that regulate commerce "*through*" it, citing *Association to Preserve and Protect Local Livelihoods v. Sidman*, 147 F.4th 40, 57 (1st Cir. 2025). Defendants argue that because the Oregon Act formally excludes items "not ultimately discarded inside" Oregon, it regulates only commerce to the State. Opp. 15 (quoting ORS § 459A.863(6)(b)(J)).

That ignores how the Act and interstate commerce actually operate. Producers who operate in interstate distribution systems—including distribution centers that ship goods *out* of and *through* Oregon, or in neighboring states—often cannot know in advance or control where the products are "ultimately discarded." Allen Decl. ¶ 18 (explaining there is no feasible way to "reconcile cross-border movements" or "viably segregate product[s] at scale by destination state"). As the declarations further explain, for producers operating in interstate commerce, the EPR scheme creates a substantial risk of double-counting. *Id.* ¶ 10. The prospect of multiple EPR laws being set up in different states heightens the concerns: if the laws are inconsistent, then interstate distributors will face conflicting obligations for materials necessary to transport goods in commerce. And if CAA becomes the sole approved PRO across states—and it already has, in some states—then that presents its own problem of having a private entity effectively in charge of interstate commerce. Given that packaging is essential for the movement of goods in interstate commerce, this is a case involving a strong interest in "national uniformity" and "trade in the national marketplace," making *Pike*'s balancing test particularly appropriate. *See Pork Producers*, 598 U.S. at 395, 399 (Roberts, C.J. concurring in part).

For similar reasons, this case is also unlike *Exxon v. Governor of Maryland*, 437 U.S. 117 (1978), which stands for the unremarkable proposition that state laws are not unconstitutional where they "create no barriers whatsoever against interstate independent dealers" and do not

"place any added costs on them." *Id.* at 126. There, a group of out-of-state petroleum producers and refiners challenged a Maryland statute that forced them to divest from retail gas stations in the state. *See id.* at 123. Because the entire dispute hinged indisputably on gasoline sold *in Maryland*, the Court rejected the challenge. *Id.* at 126. Unlike *Exxon*, where the statute regulated only local retail structure without altering interstate distribution practices, Oregon's Act forces upstream changes to interstate logistics and pricing for out-of-state companies and makes it functionally impossible to meaningfully disaggregate covered products from those sold in other states. *See* Allen Decl. ¶¶ 7–8, 12, 13, 16, 20; Winkle Decl. ¶¶ 17–29.

This case is more akin to *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 338 (1977)—which *Exxon* distinguished—that invalidated a North Carolina statute because it forced Washington apple producers to "change[] their marketing practices to accommodate the needs of the North Carolina market." *Id.* at 338. The challenged statute in that case—like the Oregon Act here—was *facially* non-discriminatory in the sense that it required all packaged apples sold in North Carolina, regardless of provenance, to bear only the USDA apple grade rather than any particular state's own grade. *Id.* But the Court struck down the statute because it had discriminatory and unduly burdensome effects on interstate commerce, forcing out-of-state producers to "alter their long-established procedures, at substantial cost, or abandon the North Carolina market" entirely. *Id.* at 340. The same is true here.[6]

### 2.     The Oregon Act is an Invalid User Fee and State Tariff.

*Pike* aside, the EPR fees must be seen for what they are and what they are not. They are not formulated to cover the actual costs of recycling a given material. Instead, they aim to

---

[6] The North Carolina act's focus on packaging—the "very means by which apples are transported in commerce"—further supported that the act was invalid. *Id.* at 853. Indeed, as Plaintiff has shown, Mot. 24, packaging is a paradigmatic area where state-specific regulation undermines the national uniformity on which interstate commerce depends, because packaging decisions are necessarily made upstream of sales, and applied across multistate distribution networks. Defendants have not even attempted to argue that packaging is not a crucial instrumentality of interstate commerce, so any argument to that effect is now waived. *Maldonado v. Morales*, 556 F.3d 1037, 1048 n.4 (9th Cir. 2009) (arguments not made in response are conceded).

finance new public infrastructure by disproportionately charging businesses engaged in interstate commerce rather than more transparently raising taxes or fees from Oregon consumers and retailers. In this respect, the EPR fees operate as an invalid user fee or state tariff. Mot. 25–27. Defendants summarily dismiss this argument, *see* Opp. 18–19, but the distinctions they draw collapse under minimal scrutiny.

Defendants assert the EPR fees are not being used to fund "'special facilities' for modes of transportation." Opp. 18. That limitation finds no support in the law: courts have treated charges far removed from transportation—such as fees imposed on arbitration awards to fund the Iran-U.S. Claims Tribunal, for example—as user fees subject to Commerce Clause scrutiny. *See United States v. Sperry Corp.*, 493 U.S. 52, 62–63 (1989) (upholding such a charge as a "fair approximation" of the cost of government services). Oregon's Act is plainly a user fee, because it imposes per-unit fees on producers to fund state recycling facilities and reimburses local governments for municipal services. *See* ORS § 459A.890(1).

The constitutional defect here is not the type of facility funded, but whether the fee bears a sufficient functional relationship to the services for which it is imposed. *See* Mot. 26. Indeed, the ferry passenger fees in *Bridgeport* were held impermissible precisely *because* they lacked a "functional relationship" to the services funded. *See Bridgeport & Port Jefferson Steamboat v. Bridgeport Port Auth.* 567 F.3d 79, 87 (2d Cir. 2009) (holding ferry passenger fees unconstitutional where revenues were used for general port authority purposes unrelated to the ferry services).

Defendants likewise wave off Plaintiff's state tariff argument, suggesting that the Act's fees cannot constitute such a tax because they are not "calculated based on the origin of a product or its packaging." That contention is foreclosed by the very case on which they rely, *West Lynn Creamery v. Healy*, which invalidated a state fee that applied to *all* milk "dealers" in Massachusetts—whether based within Massachusetts or outside it—just like the Oregon statute applies to *all* "producers" here. 512 U.S. at 190 n.4 (1994) (noting that "dealer" was defined

broadly to include "any person" engaged in the Massachusetts milk business). What mattered was not the origin of the product, but the discriminatory effects of the act—specifically that the challenged act "allows Massachusetts dairy farmers who produce at higher cost to sell at or below the price charged by lower cost out-of-state producers." *Id.* at 195. The Act here similarly places out-of-state producers at a competitive disadvantage. Mot. 27.

Furthermore, the Act fails *Wynne*'s "internal consistency" test: if every state adopted Oregon's approach, interstate distributors could face multiple, duplicative fee obligations on the same packaging, while purely intrastate commerce would not. *See Wynne*, 575 U.S. at 562. This is more than just a hypothetical outcome. California and Colorado are implementing packaging EPR requirements, and four other states have passed packaging EPR laws—all modeled on the same framework but with their own variations.

At bottom, the fact remains that Oregon has imposed a state-specific, retrospective, opaque fee regime on packaging—the very means by which goods move in interstate commerce—that forces nationwide operational changes and exposes interstate firms to duplicative liability. That is exactly the kind of burden the Dormant Commerce Clause forbids.

### C.  The Act Violates the Unconstitutional Conditions Doctrine.

Defendants do not meaningfully engage with NAW's unconstitutional conditions argument: while the State may regulate economic activity, it may not condition participation in the market on the surrender of constitutional rights. Mot. 31–33. The Supreme Court has reaffirmed that participation in interstate commerce is not a discretionary benefit that the government may "hold hostage" to extract constitutional waivers. *Horne v. Dep't of Agric.*, 576 U.S. 350, 366 (2015). These principles apply equally to monetary exactions, holding that the government may not condition access to a lawful activity on demands for money that lack an "essential nexus and rough proportionality" to the regulated party's own impacts. *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604–07 (2013) (relying on *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1994)).

That is precisely what has occurred here. The Act conditions participation in the Oregon market on membership in a single private organization—CAA—the only approved producer responsibility organization in the State. Mot. 12–13. CAA requires producers to execute a non-negotiable Participant Producer Agreement and Oregon Addendum, which impose binding contractual terms related to fees and compel producers to waive access to a judicial forum. Mot. 16. CAA extracts payment of retrospective and nontransparent fees from its members calculated pursuant to a confidential methodology. Mot. 12–16. And CAA has conceded that the fees charged are not even roughly proportional to the actual costs of recycling a given producer's own materials: the fees are being assessed to fund "start-up" projects for an entirely new statewide infrastructure, to create reserves for potential future cost overruns, and to pay for products that the Legislature chose to exclude from the Act. *Supra* at pp. 4–9.

Defendants' arguments for why the EPR scheme does not unconstitutionally condition constitutional rights are unpersuasive.

*First*, Defendants argue the regulatory scheme is not coercive because "Plaintiff's members could have come together to create their own producer responsibility organization—and still can." Opp. 26. That ignores reality. The Act requires a PRO to have "at least 10 percent of the total combined *market share* of all producers of covered products" (ORS § 459A.869(12) (emphasis added))—a threshold that effectively precludes small and mid-sized producers from forming a viable alternative and structurally entrenches control in the hands of the largest market participants. In fact, CAA is the only approved PRO, and there is no feasible alternative. As NAW's declarations explain, "[a]s a practical matter, producers subject to the Oregon law have no alternative to joining CAA." Wild Decl. ¶ 9; *see also, e.g.*, Winkle Decl. ¶ 6.

*Second*, Defendants suggest that extracting non-competitive and nontransparent retrospective fees does not pose any constitutional problem given the "fee-setting process is . . . governed by the [Act] and its implementing rules" and "DEQ has approved the fee-setting methodology in its entirety." Opp. 26. Defendants' alleged oversight is not sufficient to cure the

fee-setting problems for the reasons above, including the unpredictability of the retrospective fees that CAA can change without DEQ approval, and the unreasonableness of the fees relative to the product margins (a fiscal impact that Defendants have never considered). DEQ's purported input does not cure the problem: as a condition for entering the Oregon market, producers must enter into a commercial contract on non-negotiable terms with a private entity who can, of its own accord, revise and adjust regulatory fees.

*Third*, Defendants have no response to the fact that, as in *Koontz*, producers are being forced to fund statewide improvements that are not even roughly proportional to any given distributor's individual impacts. *Koontz* held that a wetlands management district could not condition a development permit on a property owner's willingness to fund mitigation projects *elsewhere* in the district, unrelated to his property. *Koontz*, 570 U.S. at 606. Here, Defendants assert that, as a whole, the "collected fees are used to improve the state's recycling capabilities, including in rural areas that would otherwise have limited access to recycling facilities, in response to a global recycling crisis." Opp. 26. But if a producer is selling products in Portland, charging fees to create new facilities "in rural areas" is precisely the problem presented in *Koontz*. ███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████ And the State's asserted desire to address a "global recycling crisis" is no different from the goal of wetland preservation in *Koontz*. "A strong public desire to improve the public condition will not warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Dolan*, 512 U.S. at 396.

*Fourth*, comes producers' right to a judicial forum. Defendants tacitly concede that a state may not compel a business to waive its right to a judicial forum as a condition for doing business. *Southern Pacific Co. v. Denton*, 146 U.S. 202, 207 (1892). Here, as a condition of participating in the Oregon market, producers *must* execute non-negotiable agreements with CAA, compelling members to submit to binding and confidential arbitration for any dispute,

controversy, or claim, including relating to the "interpretation" or "scope" of "the Parties' obligations under the Oregon EPR Law." Winkle Decl. Ex. B § 8. Defendants argue that CAA members do have rights to a judicial forum for *DEQ enforcement* actions, Opp. 26, but that is insufficient. Under the Act, noncompliance can result in steep civil penalties of up to $25,000 per day. Simply as a matter of economics, it would be irrational for producers to refuse compliance in order to manufacture a path towards judicial review. And as a matter of law, NAW members should not be forced to "first expose [themselves] to actual … prosecution" to obtain judicial review of an unconstitutional deprivation. *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). The constitutional injury is not cured by the theoretical possibility of later judicial review following DEQ enforcement. Put differently, if the State were responsible for administering the EPR fees directly, the process by which fees are invoiced and collected, and disputes are resolved, would manifestly violate due process. *See* Mot. 30–31. Yet here, the State denies producers those protections by forcing them into a non-negotiable private contract.

While the State may pursue legitimate environmental goals, it must do so through constitutionally permissible means, not by leveraging market access to extract unconstitutional conditions on private parties to subsidize broad public initiatives untethered to their own impacts.

## IV. THE REMAINING FACTORS SUPPORT INJUNCTIVE RELIEF.

### A. NAW Has Made a Clear Showing of Irreparable Harm.

NAW has demonstrated it faces an impending injury "for which there is no adequate legal remedy." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Oregon's EPR program compels producers "to self-identify" across 60 packaging material categories, Portley Decl. ¶ 39, which may or may not have already been reported by another producer in the supply chain, yet affords them *zero* data, tracking tools, or centralized assistance to fulfill that obligation. Winkle Decl. ¶ 18. In the absence of any "mechanism under Oregon's EPR program" to this end, Allen Decl. ¶ 8, NAW members must immediately develop a logistical infrastructure capable of tracking "multi-state movements" of products, "downstream transfers occur[ring]

outside the distributor's control," and all of the "multiple transactions" that occur up and down the supply chain just to determine *whether* to report a particular product, Wild Decl. ¶ 18. There is "no practicable way" for mid-sized distributors to do this. Allen Decl. ¶ 14.

Defendants hardly contest the severity of NAW's injuries. They do not meaningfully challenge the magnitude of CAA's unpredictable and margin-obliterating fees, the irrecoverable nature of NAW members' accrued and impending financial losses, the inability of distributors to build the logistical infrastructure necessary to comply with the law, or the damage to distributors' reputation, competitiveness, and goodwill that will result regardless of their attempts at compliance. Although Defendants gesture at the "rules of evidence," Opp. 27–28, "a preliminary injunction may be granted upon affidavits" and even inadmissible evidence, *Ross-Whitney Corp. v. Smith Kline & French Lab'ys*, 207 F.2d 190, 198 (9th Cir. 1953); *see also Republic of Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (accepting "hearsay for purposes of deciding whether to issue a preliminary injunction"). And while Defendants label NAW's impending harm as "speculative," Opp. 28, none of their submissions actually "*counter[]* the inference" of injury established through NAW members' affidavits, *Marcos*, 862 F.2d at 1363 (emphasis added).

To the contrary, as to NAW's financial losses in particular, Defendants' own declarations support a finding that distributors' impending losses could not be recouped. Affidavits from various waste management entities reveal that CAA has promised these industry players millions of dollars in reimbursements to be paid out from the very fees that CAA will unlawfully extract from NAW members. *E.g.*, Henry Decl. ¶¶ 5–10; John Decl. ¶¶ 5–7. Taken together with Defendants' sovereign immunity to damages, *see Will v. Mich. Dep't of State Pol.*, 491 U.S. 58, 70–71 (1989), the prospect of NAW members recovering their lost funds vanishes.

Defendants question whether a government-sanctioned deprivation in violation of due process implicates a sufficiently "fundamental right[]" to "constitute[] irreparable injury." *Id.* Whatever the answer to that question is "generally," Opp. 28, the answer in this Circuit and this

case is "yes," *see Hernandez v. Sessions*, 872 F.3d 976, 994–95, 1000 (9th Cir. 2017) (deprivation in violation of due process constitutes "irreparable injury"); *see also Hecox v. Little*, 104 F.4th 1061, 1088 (9th Cir. 2024) (holding that "it follows inexorably" from violation of Equal Protection Clause "that [the movant] ha[s] carried her burden as to irreparable harm").

Defendants also suggest NAW failed to "show reasonable diligence" because it "delayed filing its motion for preliminary injunction for … months." Opp. 28. That misrepresents the facts and the law.

First, the facts. NAW promptly filed this action after the first round of exorbitant EPR invoices, and then promptly filed this Motion after exhausting meet and confer efforts with Defense counsel. Even CAA could not predict its first round of fees. Holmes Decl. ¶¶ 19–20. Insofar as those fees proved "materially higher than … initial estimate[s]," Winkle Decl. ¶ 23; *accord* Wild Decl. ¶ 10, it is easy to see why NAW "filed its original complaint after the first invoices went out," Opp. 28. NAW then reasonably filed its request for preliminary relief in anticipation of the next round of invoicing. Further, the gap in time between the Complaint and NAW's Motion was substantially due to Defendants' own foot-dragging. NAW's counsel sought for months to meet and confer in good faith with Defendants' counsel about both the merits of the case and alternative options for expeditious resolution. Defendants' counsel repeatedly asked for additional time, including due to pressing other matters and based on a need to confer with their clients, but ultimately refused NAW's proposals. Bowers Decl. ¶¶ 8–15. NAW brought its Motion promptly after it became clear that those discussions had reached their end. *Id.* ¶ 17.

Second, the law. "[T]ardiness is not particularly probative in the context of ongoing, worsening injuries," which includes iterative economic exactions that threaten "the continued economic viability of [plaintiffs]" over time. *Arc of Cal. v. Douglas*, 757 F.3d 979, 990–91 (9th Cir. 2014) (addressing alleged two-year delay). Here, the "the actual" or "cumulative impact" of the EPR program has only become clear through the first round of July invoices; CAA's unhelpful "pay first, ask questions later" responses to distributor concerns and attempts to correct

errors; and CAA's further announcement that fees were increasing yet again for 2026. In this context, waiting to assess "the magnitude of the potential harm" before seeking preliminary relief was "prudent rather than dilatory." *Id.* Whatever time had passed "was not a long delay in this context, and even if it were, 'delay is but a single factor to consider in evaluating irreparable injury,' and 'courts are loath to withhold relief solely on that ground.'" *Doe v. Horne*, 115 F.4th 1083, 1111 (9th Cir. 2024) (quoting *Arc of Cal.*, 757 F.3d at 990).

Oregon's EPR program forces an unjust choice: (a) accept the impossible logistical obligations of compliance and try to absorb and/or pass down costs in an attempt to survive, or (b) abandon the Oregon market altogether. That bind damages NAW members' competitiveness, strips them of valuable clients, and harms their reputation. Allen Decl. ¶ 17 ("WCP has likely lost business" due EPR program); Wild Decl. ¶ 22 (discussing "competitive disadvantages faced by reporting distributors"); Winkle Decl. ¶ 9 (similar). Absent relief, NAW members face financial losses that "cannot be recouped," *Philip Morris USA, Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (Scalia, J., in chambers), a "significant change in their [operations]," *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021), the "threatened loss of prospective customers or goodwill," *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001), and a "deprivation of constitutional rights," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). Any of these injuries constitutes irreparable harm, and *all* of them are established by NAW's allegations and evidence.

### B. The Equities Favor NAW.

Trying to minimize these harms, Defendants quibble over the meaning of "status quo" and cite purported injuries of dissimilar third parties, asserting a tenuous right to unconstitutionally extracted funds to pay off debts that may never be incurred. That attempt fails.

Defendants concede the "requested relief . . . would require DEQ *not* to do something" yet still assert that a preliminary injunction "does not preserve the status quo." Opp. 30. This is inherently contradictory and wrong. The relevant "status quo" is "the last actual, peaceable[,]

uncontested status which preceded the pending controversy." *Daileader v. Certain Underwriters at Lloyds Lond. Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024). While "the RMA ha[s] already gone into effect," Opp. 30, its implementation—from the start—has been anything but peaceable or uncontested: NAW members challenged the assessments they received, Wild Decl. ¶¶ 18–19, took issue with CAA's instructions "to pay first and seek a potential refund later," Winkle Decl. ¶ 22, and literally "submit[ed] payment[s] *under protest*," Allen Decl. ¶ 19 (emphasis added). CAA has not collected on its second round of invoices, so NAW has not yet been subject to this additional flurry of coercive and crushing deprivations. In short, "the 'actual' status quo *ante* between the parties to this lawsuit [i]s one of non-payment." *Daileader*, 96 F.4th at 357. Preliminary relief preserves that status quo given payment is tantamount to an irretrievable loss.

Speculative concerns of dissimilar third parties who hope to benefit from an unconstitutional reallocation of resources from NAW members to the waste-management industry do not tip the scales in Defendants' favor. If DEQ truly "regulates the program and has authority over CAA's performance," Holmes Decl. ¶ 46, it is unclear how these third parties have any vested contractual right based on financial promises that DEQ did not make to reimburse expenditures that DEQ did not approve. These third parties stop short of squarely asserting that their financial harm is certain, likely, or even beyond their control, instead offering vague references to money "committed" or "budgeted" that obscure what they truly *must* pay. *E.g.*, John Decl. ¶ 6; Jenkins Decl. ¶ 4; Polk Decl. ¶ 13.[7] Whatever their financial obligations, these third parties have not expended substantial funds (if any) or demonstrated that they would be forced to do so if the EPR program is temporarily paused. And, unlike NAW members, if they *do* suffer harm, there is no evidence that they are subject to coercive arbitration agreements preventing them from seeking meaningful judicial redress from losses suffered in reliance on CAA's promises. *See generally Schafer v. Fraser*, 290 P.2d 190 (Or. 1955) (discussing "the

---

[7] Only one declarant both clearly differentiates between money "spent" and money "committed," and specifies whether funds relate to "orders [that] cannot be canceled." Henry Decl. ¶¶ 5–6.

doctrine of promissory estoppel"); *Valencia Kolb Props. v. Pima County*, No. 13-cv-1319, 2014 WL 12575855 (D. Ariz. Nov. 6, 2014) (applying doctrine to claim of loss in reliance on county public works project).

If funded via traditional point-of-sale taxes, general taxes, or procurement processes, Oregon's recycling modernization efforts would be subject to consumer, taxpayer, or market pressures to ensure fairness and efficiency. None of that is present here. The State has taken an otherwise rational program and stripped it of political accountability, transparency, and cost containment mechanisms. As evidenced by Defendants' declarations in opposition, the State has persuaded various interested third parties that they are entitled to government benefits derived from a plainly illegal scheme. That would be false under any ordinary procurement process. *See, e.g.*, *MT & M Gaming, Inc. v. City of Portland*, 383 P.3d 800, 811 (Or. 2016) (collecting cases establishing the public's interest in avoiding the "unlawful expenditure of public funds" via illegal procurement processes); *cf. Parcel 49C Ltd. v. United States*, 31 F.3d 1147, 1152 (Fed. Cir. 1994) ("[A] contractor has 'no right' to receive a contract award in the event of illegal Government bid processes."). It is equally false here.

Oregon understandably seeks to modernize its recycling infrastructure. However, the Constitution does not allow the State to fulfill those goals by extorting NAW members through an unaccountable and uncontained program run by a monopolistic start-up, and "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002. Equity favors NAW's request for preliminary relief.

### C. The Court Has the Authority to Grant the Requested Relief.

Based on the above, NAW requests that the Court grant relief enjoining DEQ's enforcement of the statute, and its Motion further requests that to take such steps as may be necessary to defer the EPR payment obligations of Plaintiff's members. Mot. 36. As to the latter part of the request, Defendants assert that because CAA is responsible for collecting and issuing invoices, the Court cannot issue an injunction requiring DEQ to pause those collections. Opp. 31.

The argument is wrong and, if anything, only confirms the problems with the Act's private delegation of authority to CAA.

At the outset, while Defendants' characterize NAW's request as a "mandatory injunction," nothing prohibits such relief. While Ninth Circuit precedent articulates a different standard for "mandatory" versus "prohibitory" injunctions, the Court has also recognized the distinction is a "somewhat artificial legal construct," and the rules governing preliminary relief "are not hard and fast rules, to be rigidly applied to every case regardless of its peculiar facts." *See Hernandez v. Sessions*, 872 F.3d 976, 998–99 (9th Cir. 2017).

Here, the constitutional violations arise from the Act's improper delegation of regulatory authority to a private entity; the fact that CAA has been allowed to set unreasonable and excessive fees, increasing them without needing DEQ approval and without DEQ ever analyzing the fiscal impacts on business and consumers; and the Act unconstitutionally forcing producers into a non-negotiable private contract that leaves producers without adequate recourse. For Defendants now to throw up their hands and say there is nothing they can do proves the point. Compelling the State to stop enforcing a statute is a classic form of prohibitory relief, and that in substance is what NAW seeks and would be occurring now.

In all events, "[m]andatory injunctions are most likely to be appropriate when the status quo is exactly what will inflict the irreparable injury upon complainant." *Hernandez*, 872 F.3d at 999 (cleaned up). That is the case here.

## V. CONCLUSION

Defendants request that the Court grant the Motion.

Date: January 16, 2026
                                   SIDLEY AUSTIN LLP

                                   By: */s/ David R. Carpenter*
                                       David R. Carpenter*
                                       drcarpenter@sidley.com

Caleb J. Bowers*
cbowers@sidley.com
Alexandra T. Mushka*
amushka@sidley.com
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213 896 6000
Facsimile: +1 213 896 6600

Gordon D. Todd*
gtodd@sidley.com
Richard W. Smith*
rwsmith@sidley.com
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736 8000
Facsimile: +1 202 736 8711
*Pro hac vice

BRADLEY BERNSTEIN SANDS LLP
Darin Sands, OSB No. 106624
1211 NW Glisan St., Ste 204
Portland, OR 97209
Telephone: +1 503-734-2480

Attorneys for Plaintiff
NATIONAL ASSOCIATION OF
WHOLESALER-DISTRIBUTORS