# EXHIBIT B

## TO DECLARATION OF CALEB J. BOWERS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER



Submitted electronically to: rethinkrecycling@deq.oregon.gov　　　　　　　　January 5, 2026

Ms. Leah Feldon
Director
Oregon Dept. of Environmental Quality
700 NE Multnomah Street
Portland, OR 97232

**Subject: Comments of National Association of Wholesaler-Distributors on the 2023-2024 Annual Financial Report of Circular Action Alliance**

Dear Ms. Feldon:

On behalf of the National Association of Wholesaler-Distributors ("NAW"), I write to comment on the unredacted 2023–2024 annual financial report of Circular Action Alliance ("CAA").[1]

**Executive Summary**

CAA reports more than $6.2 million in pre-program start-up costs for 2023 and 2024, which are supposedly in furtherance of Oregon's Plastic Pollution and Recycling Modernization Act (the "Act"). These costs include expenditures categorized broadly as consulting, technical services, administrative expenses and legal fees, among others. CAA's report references pre-program start-up expenditures, the development of national shared services, and the intent to improve accounting systems. It also references a cost allocation approach under which shared services are allocated to states based on estimated program size.

Even when viewed in a favorable light, the financial report is seriously deficient in the detail it supplies for producers, the public, and the Oregon Department of Environmental Quality ("DEQ"). The report makes it impossible to assess whether reported costs are reasonable, specific to Oregon, and appropriately allocated. More broadly, the report reflects that CAA is functioning, in effect, as a financially unstable start-up paying large sums of money to consultants. It further appears that CAA's financial health is conditioned on its appointment as a Producer Responsibility Organization ("PRO") in multiple states, calling into question whether DEQ has adequately supervised CAA and its expenditures.

Of course, CAA's expenditures directly result in charges to producers for products sold in Oregon, and producers subject to the EPR program have no choice but to register with CAA and

---

[1] Available at https://www.oregon.gov/deq/recycling/Documents/rmaCAAaFA2024.pdf.

**NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS**

1325 G Street N.W., Suite 1000, Washington, DC  20005 • 202-872-0885 • www.naw.org　　　　1

pay those fees. These producers, which include NAW members, should be able to ascertain with specificity what their program fees are paying for. To the extent those program fees are passed down to Oregon consumers in the form of higher program costs, the public is also entitled to understand how these *de facto* taxes are being spent. DEQ must exercise oversight of the expenditures, including by having CAA provide sufficient information. NAW respectfully requests that DEQ correct these deficiencies.[2]

**Background on NAW**

NAW is the "national voice of wholesale distribution," an association comprised of employers of all sizes and national, regional, state, and local line-of-trade associations spanning the $8 trillion wholesale distribution industry that employs over six million workers in the United States. Approximately 35,000 enterprises with almost 150,000 places of business in all 50 states and the District of Columbia are affiliated with NAW, including companies distributing in Oregon who are impacted by the Act.

Most wholesaler-distributors are small-to-mid-sized private companies with minimal in-house legal and compliance resources as compared to larger corporations. While only a few have recognized name brands (unlike the manufacturers and retailers which are their supply-chain partners), many do have name brands for the products they distribute.

Wholesale distribution's role in the economy is often underestimated, but the industry represents approximately one-third of U.S. gross domestic product and a key component of our economic supply chain. Wholesaler-distributors are recognized as essential critical infrastructure, as they provide manufacturers with the ability to grow and develop their business. Additionally, distributors simplify logistics and create efficiency for buyers by providing product expertise and services.

**Discussion of Comments**

NAW has identified the following key issues presented by CAA's report. NAW requests that DEQ promptly resolve these issues, which relate both to DEQ's implementation of the Act and oversight of CAA, and to CAA's performance as a PRO.

1. Lack of Oregon-Specific Cost Transparency

The revised financial report aggregates substantial expenditures and fails to provide supporting documentation demonstrating an Oregon nexus for those expenditures. This occurs throughout the report, but a prime example is the large consulting and technical services costs. CAA reports more than $3 million in "consulting" costs and more than $2 million in "technical and administrative services" as Oregon pre-program start-up expenditures for 2023 and 2024. Circular Action Alliance 2023–2024 Financial Report ("Financial Report") at 4. These costs are not accompanied by *any* explanation or documentation demonstrating who was paid, at what

---

[2] NAW's comments in this letter are provided in addition to the allegations in NAW's Amended Complaint filed in federal court in the District of Oregon, *Nat'l Ass'n of Wholesaler-Distributors v. Feldon, et al.*, Case No. 3:25-cv-01334-SB. Nothing in this letter should be construed as limiting or precluding NAW's claims in any manner whatsoever, and NAW retains the right to supplement or amend its claims as it deems appropriate.

**NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS**

1325 G Street N.W., Suite 1000, Washington, DC  20005 · 202-872-0885 · www.naw.org                    2

rates, and for what specific services. Without this information, producers and DEQ cannot evaluate whether such costs are allowable, reasonable, or properly attributable to activities in Oregon. These concerns are heightened because DEQ delegated authority to a single private entity to administer Oregon's EPR program. If this were a taxpayer-funded program in which the State hired a recycling-service provider, there would have been a competitive bidding process, and the State presumably would require detailed documentation of how taxpayer money was being spent. Instead, CAA has been granted wide authorization to spend what it wants and then pass those charges onto businesses that have no option but to pay whatever fees are demanded. CAA has no competition and thus no market pressure to constrain costs. As CAA explains in its own Financial Report, CAA's risks of insolvency are mitigated by it being "required to exist by state law" (Financial Report at 15)—not on CAA's ability to manage or control costs.

All of this is recipe for waste. Unlike historical EPR programs that involve transparent point-of-sale fees, CAA's fee-setting methodology has been deemed confidential and the EPR fees are structured in a way to hide the true costs of the program from Oregon consumers (even if consumers ultimately must bear a share of the costs through higher product prices). In effect, the EPR fees are a hidden, *de facto* tax on businesses and consumers, without any meaningful insight into how the tax is determined or how taxpayers' money is being spent.

Furthermore, the level of detail provided in the Financial Report is not sufficient for DEQ or producers to determine whether CAA is compliant with the budget that DEQ approved in CAA's Program Plan for 2025–2027, including CAA's budgeted pre-program startup costs and costs for the initial program period. *See, e.g.,* CAA Program Plan, Appendix E, Table iii. Also, the level of shared services (i.e., for CAA's national program) discussed in the Financial Report appears to exceed the level contemplated in the approved Program Plan, which makes a mere passing reference to "PRO Program and Administration" costs that reportedly include, among other items, "cost of shared services support allocated from National CAA." CAA Program Plan, Appendix E, p. 53. Again, the information provided in the Financial Report is not sufficient to assess CAA's compliance.

In addition, to the extent CAA submits this or similar information to comply with the financial disclosures required for its annual reports, the submittal is clearly deficient. DEQ's rules require the PRO to include in its 2025 annual report an addendum providing a "*complete* accounting of costs incurred in 2024" relating to certain program activities. OAR 340-090-0850 (emphasis added). This includes information on numerous types of expenses including "[a] summary of *all other payments* made to satisfy the producer responsibility organization's obligations under ORS 459A.860 (Legislative findings) to 459A.975 (Rules)…." O.R.S. 459A.887(2)(i) (emphasis added). Although the requirements allow for some amount of summarization, CAA's current submittal stretches this allowance beyond its reasonable interpretation because it is almost entirely devoid of any detail regarding the payments that CAA has made. This type of reporting cannot reasonably be said to contain a "complete" summary of "all" payments made.

2. Uncertain Allocations for Shared Services

The Financial Report raises another concern about whether Oregon is being fairly apportioned costs benefiting other States. The Financial Report reflects that CAA is building a centralized

national operating infrastructure to serve several state programs, with large categories of expenses being incurred at the national level and then passed onto the various states:

> Indirect costs include the costs managed at the national level – including Finance, HR, Procurement, IT, Legal, Producer Services and others. These costs support operations across all states and drive synergies to be managed at the national level. All indirect costs are charged at a set allocation factor to each state.

Financial Report at 22. CAA indicates that costs of shared services are allocated to state producer programs based on each state's estimated share of overall program size.

CAA states that it uses a cost allocation factor, but that factor is undisclosed. Whatever the specific factor is used, CAA's fees appear to be inflated to the extent it must recover costs of national infrastructure before Oregon sees benefits. These inflated fees cause real harm to small and mid-sized producers, who are compelled to fund a build-out of national shared-services and continued indirect costs of this shared system. A centralized approach also carries risk that charges will be over-allocated among programs (e.g., "double dipping").

Furthermore, shared costs are currently derived from 2027 projections. Financial Report at 22 (stating, "CAA is currently basing the overall percentage share based on 2027 program size estimates"). Such an allocation based on forward-looking estimates creates a meaningful opportunity that Oregon producers will be required to cross-subsidize other later-starting state programs, and that fees will thereby be over-collected from Oregon producers, with no recoupment mechanism. This is especially true without a robust reconciliation of estimates against actual costs and service usage. The failure to true-up estimates to actual costs disincentives cost discipline, and there appears to be no mechanism for holding CAA responsible for these estimates.

   3. Accounting Limitations

CAA acknowledges that "[p]rior to 2025, CAA operated with a limited financial system." Financial Report at 23. Apparently, cost allocations were made simply by using "reasonable" estimates—in CAA's own judgment. CAA states, "[e]very effort was made to split direct and indirect costs appropriately to ensure state-specific costs were being captured reasonably. *Id.* This quaint assurance is unhelpful to producers, including NAW members, who are being charged fees greater than their profits margins on products sold into Oregon. Moreover, the control of CAA by large producers, and lack of meaningful recourse provided to producers under the Act and CAA program framework, further calls into question CAA's unilateral judgment. The exercise of such judgment should be subject to scrutiny, and CAA's admission heightens the need for independent verification of state-attributed costs reported for 2023 and 2024.

CAA also discusses that it underwent independent audits for 2023 and 2024 and that auditors found "no deficiency" in the accounting system and/or policies. Financial Report at 23. This point of discussion is vague and fails to address the core issue of whether Oregon costs are properly allocated. The Financial Report further fails to provide transparent and verifiable information in support of its (or the auditors') conclusion. National-level audits are no substitute

for Oregon-specific financial review to address implementation of the Act and CAA's allocation methodology and controls.

4. Lack of Recourse to Challenge Expenditures

CAA's submission, in the first instance, of a redacted financial report underscores the lack of transparency provided to producers, the public, and DEQ. DEQ's decision to require that CAA make its *unredacted* report available is a step in the right direction, which should be continued. Yet, even if NAW and its members have an opportunity to comment on information that CAA chooses to provide, they are unable to obtain any meaningful recourse for aspects of the program that they disagree with—keeping in mind that producers are effectively bound to CAA's program as the sole PRO for Oregon. As DEQ is aware, CAA's program agreements require binding arbitration. *See, e.g.,* Oregon Addendum to the Participant Producer Agreement, § 8. This leaves NAW members bound by CAA's expenditure-related determinations for both acute and programmatic disagreements that members have with CAA's approach. Producers should have an opportunity to meaningfully challenge expenditures.

**Conclusion**

Oregon producers should be able to understand and verify costs they are required to finance. Financial transparency is central to the legitimacy of Oregon's EPR program and the ability of businesses to implement that program. DEQ should require public disclosure of CAA's allocation methodology, which should include allocation factors, underlying assumptions, and a mandatory true-up process to reconcile estimated allocations to actual costs incurred. Future financial reports should also include independent financial assurance focused on Oregon (i.e., in addition to nationwide financial assurance).

NAW respectfully requests that DEQ resolve the numerous deficiencies with financial transparency in its implementation of the Act and the information that CAA reports to DEQ and the public.
Sincerely,

Brian Wild
Chief Government Relations Officer
National Association of Wholesaler-Distributors