DAN RAYFIELD
Attorney General
SARA D. VAN LOH #044398
Senior Assistant Attorney General
ALEXANDER C. JONES #213898
Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Sara.VanLoh@doj.oregon.gov
        Alex.Jones@doj.oregon.gov

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS , | Case No.  3:25-CV-01334-SI |
| Plaintiff, | DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS |
| v. | Hearing: February 6, 2026, at 9:00 a.m. |
| LEAH FELDON, DIRECTOR, OREGON DEPARTMENT OF ENVIRONMENTAL QUALITY, in her official capacity; MATT DONEGAN, KAREN MOYNAHAN, MARK WEBB, AND SILVIA TANNER, in their official capacities, | |
| Defendants. | |

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 5

II.    ARGUMENT ....................................................................................................... 5

   A.    The EQC Defendants are entitled to Eleventh Amendment immunity ............................. 5

   B.    Plaintiff's complaint fails to state a claim for relief. ....................................... 9

      1.    The dormant Commerce Clause claim fails. ............................................... 9

      2.    The unconstitutional conditions claim fails. ........................................... 16

      3.    The procedural due process claim fails. ................................................. 17

      4.    The equal protection claim fails. ......................................................... 21

III.    CONCLUSION .................................................................................................. 24

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A.J. Cal. Mini Bus, Inc. v. Airport Comm'n of the City & Cty. of S.F.*,
148 F. Supp. 3d 904 (N.D. Cal. 2015) ......................................................................21

*Assoc. des Eleveursde Canards et d'Oies du Quebec v. Harris*,
729 F.3d 937 (9th Cir. 2013) ...................................................................................11

*Bibb v. Navajo Freight Lines, Inc.*,
359 U.S. 520 (1959) ...........................................................................................13, 14

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................................11

*Ex parte Young*
209 U.S. 123 (1908) ...........................................................................................5, 6, 8

*Exxon Corp. v. Governor of Maryland*,
437 U.S. 117 (1978) ..............................................................................................9, 10

*Fayer v. Vaughn*,
649 F.3d 1061 (9th Cir. 2011) ...........................................................................17, 21

*Gen. Motors Corp. v. Tracy*,
519 U.S. 278 (1997) ..............................................................................................9, 10

*Heller v. Doe*,
509 U.S. 312 (1993) ..............................................................................................22, 23

*Japan Line, Ltd. v. County of Los Angeles*,
441 U.S. 434 (1979) .................................................................................................13

*Jones v. Allison*,
9 F.4th 1136 (9th Cir 2021) ......................................................................................8

*Kaahamanu v. County of Maui*,
315 F.3d 1215 (9th Cir. 2003) ...................................................................................8

*Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*,
440 U.S. 391 (1979) ...................................................................................................8

*Lazy Y Ranch Ltd. v. Behrens*,
546 F.3d 580 (9th Cir. 2008) ...................................................................................23

Page 2

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*Mackey v. Montrym,*
    443 U.S. 1 (1979) ................................................................................................20

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ......................................................................................19, 20

*Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown,*
    567 F.3d 521 (9th Cir. 2009) .............................................................................9

*Nat'l Pork Producers Council v. Ross,*
    598 U.S. 356 (2023) ......................................................................................10, 11

*NetChoice, LLC v. Bonta,*
    152 F.4th 1002 (9th Cir. 2025) .......................................................................16

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,*
    439 U.S. 96 (1978) ............................................................................................19

*Or. Waste Sys., Inc. v. Dep't of Envtl. Quality,*
    511 U.S. 93 (1994) ............................................................................................9

*Pennhurst State School & Hospital v. Halderman,*
    465 U.S. 89 (1984) ............................................................................................5

*Pharmaceutical Rsch. & Mfrs. of America v. Cnty. of Alameda,*
    768 F.3d 1037 (9th Cir. 2014) ....................................................................10, 15

*Seminole Tribe of Fla. v. Florida,*
    517 U.S. 44 (1996) ............................................................................................5

*Southern Pacific Co. v. Arizona,*
    325 U.S. 761 (1945) ......................................................................................14, 15

*Supreme Court of Virginia v. Consumers Union of U.S., Inc.,*
    446 U.S. 719 (1980) ..........................................................................................8

*Tenney v. Brandhove,*
    341 U.S. 367 (1951) ..........................................................................................8

*United States v. Salerno,*
    481 U.S. 739 (1987) ..........................................................................................16

*Ventura Mobilehome Cmtys. Owners Ass'n v. City of San Buenaventura,*
    371 F.3d 1046 (9th Cir. 2004) .........................................................................21

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*Yagman v. Garcetti,*
    852 F.3d 859 (9th Cir. 2017) .......................................................................................20, 21

## STATUTES, RULES, REGULATIONS

ORS ch. 183
    310 ..........................................................................................................................................7
    335 ........................................................................................................................................19
    484 ...................................................................................................................................19, 20
    490 ........................................................................................................................................20

ORS ch. 459A
    239 ..........................................................................................................................................7
    755 ..........................................................................................................................................7
    863 ........................................................................................................................................12
    869 ..........................................................................................................................................7
    875 ...........................................................................................................................17, 18, 20
    878 ....................................................................................................................................8, 19
    881 ...................................................................................................................................17, 18
    884 ........................................................................................................................................17
    887 ........................................................................................................................................18
    914 ..........................................................................................................................................6
    920 ..........................................................................................................................................6
    923 ..........................................................................................................................................6
    926 ..........................................................................................................................................6
    944 ....................................................................................................................................6, 22
    955 ..........................................................................................................................................6
    962 ....................................................................................................................................7, 8
    975 ..........................................................................................................................................6

ORS ch. 468
    100 ..........................................................................................................................................7
    130 ..........................................................................................................................................8

OAR ch. 340 div. 090
    0750 ................................................................................................................................17, 18
    0910 ................................................................................................................................22, 23

Interstate Commerce Act 54 Stat. 899 (1940) .......................................................................15

## OTHER AUTHORITIES

Seymour Simon, *The Law of Shipping Containers,*
    5 J. Mar. L. & Com. 507 (1974) ...........................................................................................13

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

# I.    INTRODUCTION

Plaintiff's opposition to Defendants' motion to dismiss fails to rehabilitate the defects in the First Amended Complaint ("Complaint"). Plaintiff pursues claims against the Environmental Quality Commission members ("EQC Defendants") who are entitled to Eleventh Amendment immunity. In challenging the law's constitutionality, Plaintiff's arguments repeatedly misconstrue or ignore the plain language of the statutes and applicable administrative rules. But the statutes and rules speak for themselves. In ruling on this motion to dismiss, the Court need not accept Plaintiff's interpretation of the law. The Complaint fails to state a claim upon which relief may be granted as to any claim and must be dismissed.

# II.    ARGUMENT

## A.    The EQC Defendants are entitled to Eleventh Amendment immunity.[1]

Plaintiff argues that Eleventh Amendment immunity does not shield the EQC Defendants from suit because their promulgation of administrative rules for DEQ to implement and enforce the Plastic Pollution and Recycling Modernization Act (the "RMA") is itself "enforcement." (Pl.'s Opp. Mot. Dismiss (Pl.'s Opp.) 5, ECF No. 68.) But neither the statutes nor the cases Plaintiff cites support their argument.

As discussed in Defendants' motion to dismiss, the *Ex parte Young* exception to Eleventh Amendment immunity is limited to suits seeking "prospective injunctive relief" against state officials "in order to end a **continuing federal law violation**." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 45, 73 (1996) (emphasis added). The Complaint alleges that EQC is "tasked under Oregon law with adopting rules and policies to govern and oversee DEQ's regulatory programs, including the EPR program." (First Am. Compl. (Compl.) ¶ 19, ECF No. 26.) The Complaint also alleges that the RMA is "administered by DEQ through regulations approved by EQC," and

---

[1] Plaintiff concedes that the state-law claims must be dismissed under *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984) (Pl's Opp. 3), so the arguments here will focus exclusively on the federal claims against the EQC Defendants.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

that these regulations "add little to the [RMA's] requirements as concerns producers." (Compl. ¶ 21.)

Plaintiff asserts that the EQC Defendants are properly before this Court because they are "officials **responsible for NAW's ongoing and impending** constitutional harms." (Pl.'s Opp. 5 (emphasis added).) But even assuming the challenged regulations were unconstitutional, promulgating the administrative rules challenged here does not itself create a continuing violation of federal law subject to this Court's jurisdiction. The EQC Defendants—who are individually named rather than the agency precisely because federal courts do not have general jurisdiction over states or their agencies—have no further involvement in "enforcing" the RMA; DEQ alone has that authority. Plaintiff identifies no ongoing, prospective action by the EQC Defendants for the Court to enjoin. Being "responsible for" previously promulgating administrative rules to which Plaintiff objects does not fall within the *Ex parte Young* exception.

As Plaintiff acknowledged in its opposition, the RMA itself sets forth the respective responsibilities of the EQC and of DEQ in implementing and enforcing the RMA's provisions, ORS 459A.863–975. (*See* Pl.'s Opp. 4.) For EQC, ORS 459A.975 authorizes EQC to "adopt rules as necessary to implement" the RMA. The statutes also instruct EQC to promulgate administrative rules for specific purposes, for example, to "identify materials that are suitable for recycling collection in this state and the methods for collection of those materials," ORS 459A.914(1), and that "adopt and periodically revise a contamination management fee to be paid by producer responsibility organizations to commingled recycling processing facilities to compensate the facilities for the costs of removing and disposing covered products that are contaminants," ORS 459A.920(1). *See also* ORS 459A.923 (setting processor commodity risk fee); ORS 459A.926 (setting recycling rate of plastic); ORS 459A.944 (describing requirements for life cycle evaluations); ORS 459A.955 (describing permit requirements for commingled recycling processing facilities). In each instance, the RMA provides explicit criteria for the EQC to consider and/or follow when promulgating particular rules.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

None of these statutes authorize EQC to "enforce" the RMA. Instead, ORS 459A.962 authorizes **DEQ**—not EQC—to investigate suspected violations of the RMA; to issue orders requiring compliance with the RMA; to impose civil penalties for RMA violations, and to pursue injunctive relief prohibiting the in-state sale of covered products in violation of ORS 459A.869 (detailing requirements for producers and producer responsibility organizations). For each enforcement mechanism, the RMA requires DEQ to comply with the Oregon Administrative Procedures Act's requirements for contested case proceedings, ORS 183.310(2)(a), which includes notice and an opportunity for hearing. ORS 459A.962. In sum, the RMA specifically instructs EQC to promulgate rules and DEQ to manage and enforce the program.

Unlike the RMA, other statutes give EQC specific enforcement authority or oversight in other contexts. *See* ORS 468.100 ("Whenever [EQC] has good cause to believe that any person is engaged or is about to engage in any acts or practices which constitute a violation of ORS 448.305, 454.010 to 454.040, 454.205 to 454.255, 454.505 to 454.535, 454.605 to 454.755 and ORS chapters 468, 468A and 468B, or any rule, standard or order adopted thereto… the commission may institute actions or proceedings for legal or equitable remedies to enforce compliance thereto or to restrain further violations."); ORS 459A.239 (assigning enforcement authority to EQC for a covered manufacturer's failure to participate in the drug take-back program, including by issuing notices of violation and civil penalties and by suspending program operations, if necessary); ORS 459.755 (allowing a permittee to appeal to the EQC if DEQ revokes a permit).

Plaintiff points to ORS 459.376 as authority for EQC to exercise enforcement authority over the RMA. (Pl.'s Opp. 5.) But that general statute, enacted decades before the RMA and providing EQC with authority to take "whatever action is appropriate" to enforce its rules or orders, does not supplant the specific enforcement procedures set forth in the RMA.

The RMA carefully delineates the distinct responsibilities of EQC and DEQ: EQC promulgates administrative rules and DEQ implements and enforces them. Indeed, the

Page 7 -    DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS
SV1/af2 /1011886406

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Complaint itself articulates this division of responsibilities. (Compl. ¶ 19 (noting EQC is "tasked under Oregon law with adopting rules and policies to govern and oversee DEQ's regulatory programs, including the EPR program" and "directly approved several of the contested regulations implementing" the RMA); Compl. ¶ 28 ("DEQ is the designated agency for administering the EPR program, with authority to approve or reject PRO program plans, enforce compliance, and impose civil penalties of up to $25,000 per day for violations") (citing ORS 459A.878, 459A.962, 468.130); Compl. ¶ 30 "EQC is the administrative body charged with approving regulations issued under the Act, while DEQ is the regulatory agency responsible for approving PRO plans").)

Having promulgated the regulations that DEQ is tasked with enforcing does not render the EQC Defendants ongoing participants in a continuing violation of federal law. The *Ex parte Young* exception does not apply here.

Additionally, to the extent that Plaintiff relies on the EQC Defendants' rulemaking process itself as the basis for naming them as defendants here, that effort similarly fails. State, local, and regional officials have common-law legislative immunity in federal court. *Tenney v. Brandhove*, 341 U.S. 367 (1951) (state officials); *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391 (1979) (local/regional officials). Those officials are "absolutely immune from liability under § 1983 for their legislative acts." *Kaahamanu v. County of Maui*, 315 F.3d 1215, 1219 (9th Cir. 2003). The immunity applies in suits for damages or injunctive relief. *Supreme Court of Virginia v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 732–33 (1980). The immunity applies to anyone who performs "legislative functions," even if they are formally "outside the legislative branch." *Jones v. Allison*, 9 F.4th 1136, 1140 (9th Cir 2021). EQC's adoption of administrative rules under the RMA would likely qualify as a legislative act for purposes of legislative immunity, since the rules (1) involve the formulation of policy, (2) apply to the public at large rather than just a few individuals, (3) are formally legislative in character, and (4) bear all the hallmarks of traditional legislation. *See Kaahumanu*, 315 F.3d at

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

1220.  The EQC Defendants cannot be held liable for adopting particular rules, and they cannot be enjoined from adopting or compelled to adopt particular rules. The EQC Defendants must be dismissed from this action with prejudice.

**B.    Plaintiff's complaint fails to state a claim for relief.**

    **1.    The dormant Commerce Clause claim fails.**

Plaintiff's allegations do not state a claim under the dormant Commerce Clause. The facts on which Plaintiff relies in the Complaint and its briefing do not show that the RMA discriminates against interstate commerce on its face, in its purpose, or in its effects. Nor do the alleged facts show that the RMA substantially burdens interstate commerce or improperly regulates instrumentalities of interstate commerce. Further, the RMA does not impose a use tax or tariff. Plaintiff's dormant Commerce Clause claim must be dismissed.

    **a.    Plaintiff does not allege facts showing unconstitutional discrimination against interstate commerce.**

Plaintiff does not suggest that the RMA facially discriminates against interstate commerce, focusing instead on the RMA's purportedly discriminatory effect on its members. But the Complaint does not allege—nor does Plaintiff's opposition brief identify—any facts that could be characterized as discrimination against interstate commerce, as defined by the Supreme Court. To wit, "'discrimination' means differential treatment of in-state and out-of-state economic interests that **benefits** the former and **burdens** the latter." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994) (emphasis added). The way to identify such differential treatment is to clearly identify the in-state interests that are purportedly favored over their similarly situated out-of-state competitors. *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997). A "threshold question [is] whether the companies are indeed similarly situated for constitutional purposes." *Id.* "This is so for the simple reason that the difference in products may mean that the different entities serve different markets, and would continue to do so even if the supposedly discriminatory burden were removed." *Id.*; *see also Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 125-26 (1978); *Nat'l Ass'n of Optometrists & Opticians LensCrafters,*

SV1/af2 /1011886406

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*Inc. v. Brown*, 567 F.3d 521, 527 (9th Cir. 2009). Companies are substantially similar when there is "actual or prospective competition between the supposedly favored and disfavored entities in a single market." *Gen. Motors*, 519 U.S. at 300.

The Complaint does not even attempt to identify any similarly situated in-state competitors who specifically benefit from the RMA at the expense of Plaintiff's out-of-state members. Instead, Plaintiff simply asserts that "similarly-situated local producers do not face the same supply chain issues and thus do not have the same burdens [as interstate producers]." (Pl.'s Opp. 8.) That is insufficient to show that the RMA discriminates against interstate commerce. Absent the identification of a specific in-state entity, neither Defendants nor the Court can evaluate whether the in-state and out-of-state entities are in fact competitors or whether one is favored over the other, as necessary to test the validity of Plaintiff's discrimination claim.

But even if Plaintiff did identify a similarly situated in-state competitor, Plaintiff would still fail to establish unconstitutional discrimination. Plaintiff focuses on the RMA's purported disproportionate impact on "interstate businesses." (Pl.'s Opp. 8 (emphasis in original).) That RMA compliance may be more burdensome on businesses that operate in interstate commerce is not discrimination. *See Exxon*, 437 U.S. at 126. "[T]here is nothing unusual or unconstitutional per se about a state or county regulating the in-state conduct of an out-of-state entity when the out-of-state entity chooses to engage the state or county through interstate commerce." *Pharmaceutical Rsch. & Mfrs. of America v. Cnty. of Alameda*, 768 F.3d 1037 (9th Cir. 2014). "Companies that choose to sell products in various States must normally comply with the laws of those various States." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023). The point of the discrimination analysis is to uncover protectionist intent, where a state attempts to favor its local businesses at outsiders' expense. Plaintiff does not dispute that the RMA is a waste-management regulatory scheme that—on its face—applies equally to all producers regardless of where they are located. That compliance costs vary by producer is to be expected. It does not show discrimination against interstate commerce.

Page 10 -  DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

For the same reason, the dormant Commerce Clause bars discrimination against *out-of-state businesses*, not businesses that simply *operate* in interstate commerce. To the extent that Plaintiff's claim relies on increased compliance costs on businesses that operate in interstate commerce, which could include in-state and out-of-state businesses, the claim fails.

> **b.     Plaintiff does not allege facts showing a substantial burden on interstate commerce.**

To survive a motion to dismiss a dormant Commerce Clause claim, a plaintiff "must plead facts 'plausibly' suggesting a substantial harm to interstate commerce; facts that render that outcome a 'speculative' possibility are not enough." *Pork Producers*, 598 U.S. at 385 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The plaintiff "must first show that the statute imposes a substantial burden before the court will determine whether the benefits of the challenged law are illusory." *Assoc. des Eleveursde Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 951-52 (9th Cir. 2013).

In *Pork Producers*, a plurality of the Court rejected the plaintiffs' allegations that certain out-of-state entities would have difficulty complying with the challenged law and "may choose not to do so" as establishing a substantial burden on interstate commerce. 598 U.S. at 385. The Court explained that "*other* out-of-state competitors seeking to enhance their own profits may choose to modify their existing operations or create new ones to fill the void." *Id.* (emphasis in original). The Court concluded that "the facts pleaded in this complaint merely allege harm to some producers' favored 'methods of operation,'" with substantial harm to interstate commerce "remain[ing] nothing more than a speculative possibility." *Id.* at 386-87.

Here, too. Plaintiff contends that the RMA imposes a substantial burden on the flow of interstate commerce because complying with the law may require distributors to rework their interstate supply chains; pay fees on "*all* products that at any point may touch Oregon, even if those products are only passing through or out of the State"; or raise prices on "*all* products that *may* end up in Oregon, whether or not they do, to account for the possibility that EPR fees may be assessed against them." (Pl.'s Opp. 8.) First of all, nothing in the RMA suggests that it applies

Page 11 -  DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

to products passing through the state. Second, these purported impacts are purely speculative. And most importantly, these allegations do not articulate a substantial burden on the flow of interstate commerce. Reworking an interstate supply chain reflects the abandonment of a preferred but unprotected method of operation. Paying fees (that that the law does not require), raising prices to cover costs, or deciding to withdraw from the market when other companies would likely fill the void are not impediments to the flow of interstate commerce, let alone a substantial burden. Plaintiff's allegations do not show that the RMA imposes a substantial burden on interstate commerce.

Plaintiff also contends that the RMA imposes a burden by regulating the "instrumentalities" of interstate commerce, likening packaging to shipping containers, trucks, and trains. (Pl.'s Opp. 7.) In arguing that packaging should be considered an "instrumentality" of interstate commerce, Plaintiff misinterprets the scope of the RMA's application to transport packaging and relies on inapposite caselaw.

Plaintiff argues that packaging should be treated as an instrumentality of interstate commerce because (1) the RMA's fees apply to products that are distributed in interstate commerce; and (2) the RMA "specifically target[s] packaging (including secondary packaging and tertiary packaging like pallet wrap), the purpose of which is to transport goods in interstate commerce." (Pl.'s Opp. 7.) Setting aside the fact that an instrumentality of interstate commerce is the *means* by which goods are transported, not the goods themselves, Plaintiff's argument misconstrues the RMA's application. The RMA generally does not apply to pallet wrap applied by distributors, nor does it apply to the pallets themselves. ORS 459A.863(6)(b)(D), (H) ("'Covered product' does not include … [r]igid pallets used as the structural foundation for transporting goods … [or p]allet wrap or similar packaging used to secure a palletized load if added by a person that is not the producer of the palletized covered products."). So a non-manufacturer distributor, who breaks incoming pallets and re-forms from them a pallet for outbound transit to Oregon, adding only pallet wrap for the shipment into Oregon, would have

no covered products to report and no fees to be paid. Although the RMA clearly applies to packaging of goods that move through interstate commerce, Plaintiff's suggestion that the RMA specifically or singularly targets such packaging is incorrect.

And the three cases Plaintiff cites do not support its arguments that packaging is an "instrumentality" of interstate commerce or that the RMA violates the dormant Commerce Clause. In *Japan Line, Ltd. v. County of Los Angeles*, the Supreme Court invalidated a California tax levied on foreign-owned shipping containers specifically because the tax involved foreign— not interstate—commerce. 441 U.S. 434, 446 (1979) (requiring "a more extensive constitutional inquiry" in matters involving "Commerce with foreign Nations" because "[f]oreign commerce is pre-eminently a matter of national concern."). The Court did not address state regulation of interstate commerce at all.

Nor does *Japan Line* suggest that packaging would qualify as an instrumentality of interstate commerce. A shipping container "is a permanent reusable article of transport equipment . . . durably made of metal, and equipped with doors for easy access to the goods and for repeated use. It is designed to facilitate the handling, loading, stowage aboard ship, carriage, discharge from ship, movement, and transfer of large numbers of packages simultaneously by mechanical means to minimize the cost and risks of manually processing each package." *Id.* at 436 n.1 (quoting Simon, *The Law of Shipping Containers*, 5 J. Mar. L. & Com. 507, 513 (1974)). Importantly, shipping containers are "functionally a part of the ship." *Id.* at 443 (quotation marks and citation omitted). And in addition to shipping containers, the Court also characterized as instrumentalities of commerce "various forms of transportation equipment" such as railroad rolling stock, barges on inland waterways, domestic aircraft, and motor vehicles. *Id.* at 444. The Court did not address packaging. This case does not support the notion that packaging should be considered an instrumentality of interstate commerce.

Plaintiff's reliance on *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520 (1959), is similarly unavailing. There, an Illinois statute required all trucks and trailers using the state's

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

highways to be equipped only with a certain type of rear fender mudguard. *Id.* at 521-22. The Supreme Court framed the question as being "whether one State could prescribe standards for interstate carriers that would conflict with the standards of another State, making it necessary, say, for an interstate carrier to shift its cargo to differently designed vehicles once another state line was reached." Noting the "rather massive showing of burden on interstate commerce," the Court concluded, "This is one of those cases—few in number—where local safety measures that are nondiscriminatory place an unconstitutional burden on interstate commerce." *Id.* at 529. Even so, the Court emphasized that states generally may generally impose safety measures that "may sometimes place a great burden of delay and inconvenience on those interstate motor carriers entering or crossing its territory." *Id.* at 529-30. The mudflaps, however, were a bridge too far.

Like *Japan Line*, *Bibb* says nothing about packaging. And the Supreme Court did not invalidate the Illinois statute because the companies were operating in interstate commerce, "whose very role in the supply chain" was "to transport goods in interstate Commerce." (*See* Pl.'s Opp. 7.) The Court invalidated the statute because the trucks themselves moved goods through the country, and the statute made it impossible for the trucks to do so without employing onerous physical modifications that were only required by a single state. The RMA—which requires packaging producers to join a PRO and pay their fair share of waste disposal fees—is not even remotely analogous to the Illinois statute.

Finally, the Supreme Court in *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 771 (1945), concluded that Arizona could not independently regulate the number of train cars because "if the length of trains is to be regulated at all, national uniformity in the regulation adopted, such as only Congress can prescribe, is practically indispensable to the operation of an efficient and economical national railway system." Approximately 93% of Arizona freight traffic and 95% of passenger traffic was interstate, and complying with Arizona's Train Limit Law required a burdensome physical reduction in the number of train cars, causing significant delay "upon entering or leaving the state in order to comply with the law." *Id.* at 772-73. The Court found that

Page 14 -  DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

the law "impose[d] a serious burden" on interstate commerce because it "materially impedes the movement of … interstate trains through that state" while obstructing the national policy Congress enshrined in statute to promote the "adequate, economical and efficient railway transportation service." *Id.* at 773 (citing the Interstate Commerce Act, 54 Stat. 899).

The case did not involve packaging and is of no help to Plaintiff on that point. But Plaintiff also contends that the RMA impacts products moving through and outside of Oregon, to the extent that it might require distributors to "entirely rework[] interstate supply chains to disaggregate and/or trace products," (Pl.'s Opp. 8), so perhaps a comparison with the Arizona law could be made there. The difference, though, is that under the Arizona law, freight and passenger trains passing through the state would still have to engage in the physically demanding and time-consuming process of decoupling train cars, every time, while packaging for goods passing through Oregon is not subject to the RMA at all.

Packaging is not itself an instrumentality of interstate commerce. That the RMA applies to packaging of goods moving through interstate commerce does not transform such packaging into an instrumentality of interstate commerce.

         **c.**    **The RMA does not impose a user fee, a tax, or a tariff.**

Plaintiff's argument that the RMA imposes user fee, tax, or state tariff is without merit. (*See* Pl.'s Opp. 10.)  In *Pharmaceutical Research & Manufacturers of America v. County of Alameda*, the Ninth Circuit rejected plaintiffs' invitation to apply the "nexus" and "fairly apportioned" requirements of dormant Commerce Clause tax cases to a county's drug-disposal program that bears a striking resemblance to the RMA. 768 F.3d at 1044. This Court should do the same.

In sum, Plaintiff fails to state a dormant Commerce Clause claim. As in *Pork Producers*, that claim should be dismissed with prejudice.

SV1/af2 /1011886406

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

2.      **The unconstitutional conditions claim fails.**

Defendants moved to dismiss Plaintiff's unconstitutional conditions claim on the ground

that, rather than forcing producers to give up their constitutional rights to access the Oregon

market, the RMA allows other producers, including Plaintiff's members, to form their own PRO

if they are dissatisfied with CAA. (Defs. Mot. Dismiss (Mot.) 19, ECF No. 56.) In its opposition,

Plaintiff concedes the point. (*See* Pl.'s Opp. 10-11.) Plaintiff then argues that its members cannot

possibly form their own PRO because it is prohibitively expensive and infeasible, an assertion

that Plaintiff contends is sufficient to save Plaintiff's facial claim and its claim as applied to its

members. (*Id.* at 11.) It is not.

As to the facial claim, Plaintiff must establish that "no set of circumstances exists under

which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Because

there is no dispute that the RMA provides an avenue for producers to form a separate PRO and

Plaintiff does not and cannot allege that no producers could ever form a separate PRO under any

circumstances, Plaintiff's facial claim fails.

As to the as-applied claim, Plaintiff focuses on the fact that, for now, only CAA is an

approved PRO, so the "concrete manner in which the Act is currently enforced" represents

unconstitutional coercion. Although CAA was the only PRO that completed the process and

received approval of its program plan, neither DEQ nor the RMA forced producers to join CAA

and only CAA. The choice to form a different PRO, or not, is with the producers. The RMA does

not become unconstitutionally coercive because producers themselves do not avail themselves of

an available alternative. And conclusory allegations that Plaintiff's members, alone, cannot form

a PRO for whatever individual reasons likewise does not render the RMA unconstitutional. The

alternative exists. That is sufficient here.[2]

_____

[2] Plaintiff may also lack standing to raise a fact-intensive as-applied challenge on behalf of its
members. *See NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1013 (9th Cir. 2025) (rejecting
associational standing on behalf of the association's membership where the merits of the claim
asserted required the participation of individual members).

SV1/af2 /1011886406

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Plaintiff fails to state an unconstitutional conditions claim.[3] The claim must be dismissed.

### 3.    The procedural due process claim fails.[4]

In arguing that the RMA fails to provide constitutionally adequate governing standards and ongoing oversight, Plaintiff characterizes Defendants' detailed description of how the statutes and rules do exactly that as "a disagreement with NAW's factual allegations" that "cannot justify dismissal at this stage." (Pl.'s Opp. 13.) Plaintiff is mistaken. On a motion to dismiss, the Court is required to accept as true only allegations of *fact*, not conclusions of *law*. *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011). The Court may freely reject Plaintiff's interpretation of the RMA and the applicable administrative rules and resolve disputed questions of law.

Plaintiff's characterizations of the RMA and the implementing rules are generally incorrect. For example, Plaintiff asserts that the determination of material-specific base fee rates is delegated entirely to the PRO. (Pl.'s Opp. 13.) It is not. DEQ must review and approve all methods for calculating base fee rates, as well as fee adjustments, as part of the approval of a program plan. ORS 459A.875(2)(a)(E). Any change in how fees are calculated must be approved by DEQ as part of a plan amendment. ORS 459A.881(1)(a)(A), (b); OAR 340-090-0750(2).

Since base fee rates must be proportional to the costs to the PRO for each covered material, and calculating those costs depends on supply information from producers, the base fee rates can be updated annually to align with the latest reported information. OAR 340-090-0750(2); ORS 459A.884(1). Similarly, while "the fee adjustments granted to individual producers" might change, any "[a]lternate approaches to determining membership fees, including changes to the overall criteria for and magnitude of graduated fee adjustments, require a program

---

[3] Plaintiff also contends that Defendants "do not dispute" Plaintiff's characterization of the RMA's provisions in seeking dismissal of the unconstitutional conditions claim. (Pl.'s Opp. 11.) Defendants' motion to dismiss contained a lengthy, detailed discussion of the RMA. Where Plaintiff's arguments are inconsistent with those statutes and rules, both as written and in practice, Defendants dispute them.

[4] Defendants incorporate by reference their response to Plaintiff's non-delegation argument in their opposition to Plaintiff's motion for preliminary injunction. (ECF No. 45.)

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

plan amendment." OAR 340-090-0750(2). Accordingly, specific fee rates and fee adjustments will not always be the same, as each will necessarily change to reflect real-world information. But the PRO cannot change its methodology—the basic equations that generate those calculations—or otherwise change "how the [PRO] will . . . [e]stablish, calculate and charge membership fees, including incentives," without DEQ approval. ORS 459A.875(2)(a)(E); ORS 459A.881(1)(a)(A), (b). When it comes to how fee rates and adjustments must be set, DEQ makes the final decisions.

Plaintiff asserts that Defendants "fail to address NAW's allegation that DEQ is not required to and, in fact, has not approved CAA's final fee schedule." (Pl.'s Opp. 13; Compl. ¶ 45 ("To Plaintiff's knowledge, a 'final' fee schedule has never been publicly disclosed or subject to public notice and comment and approval by DEQ.").) CAA's final 2026 fee schedule has been publicly available since October 29, 2025.[5] The RMA requires DEQ approval of the PRO's fee schedules, first as part of its review of the PRO's program plan and then in its review of the PRO's annual report. *See* ORS 459A.875(2)(h) (program plan must "[d]escribe the membership fee structure of the producer responsibility organization, including a schedule of the membership fees actually charged to members"); ORS 459A.887(2)(k)(A), (C) (PRO annual report must include "[t]he membership fee schedule described in ORS 459A.884" and "[a] description of how the current membership fee schedule meets the requirements of ORS 459A.884"); ORS 459A.887(4) (annual reports subject to DEQ review and approval). To the extent that Plaintiff alleges that DEQ is not fulfilling that requirement, that would be a claim regarding the agency's compliance with the RMA, not a challenge to the validity of the RMA itself.

While Plaintiff asserts that producers lack an opportunity for a pre-deprivation hearing to challenge fee assessments, they cannot show that such hearings are required here. (*See* Pl.'s Opp. 14.) Whether a pre-deprivation hearing is required depends on (1) the private interest affected,

---

[5] Circular Action Alliance, 2026 Oregon Producer Fee Schedule, https://static1.squarespace.com/static/64260ed078c36925b1cf3385/t/693b2c9103be112d168e1b19/1765485713621/OR+2026+Fee+Schedule+Public.pdf (last accessed 1/29/26).

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

(2) the risk of erroneous deprivation through the procedures used, and the value of additional procedural safeguards, and (3) the government's interest, including the burdens of additional procedural safeguards. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Assuming that the assessment of PRO membership fees implicates the type of protected interest that implicates the *Mathews* factors, those factors do not require the state to provide for a hearing before every collection of those fees.

Regarding the first factor, the nature of the private interest must be viewed in context. The RMA does not impose an absolute duty to pay fees—rather, it requires fees to be paid as a condition of the producer selling covered products in or into the state. Even if a producer's right to sell those products is a protected property interest, the right to conduct a particular business activity may be conditioned upon "reasonable restrictions upon the exercise of the right." *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 439 U.S. 96, 106–07 (1978). State legislatures "have broad scope to experiment with economic problems," and "the right to conduct a business, or to pursue a calling, may be conditioned . . . ." *Id.* (internal quotation marks omitted).

Regarding the second *Mathews* factor, the risk of erroneous deprivation is lowered by the requirement of extensive DEQ review and approval of the PRO's program plan, and ongoing PRO reporting and DEQ oversight, as discussed above. The risk is further lowered by the various opportunities that producers have for input, review, and challenge to DEQ's review and approval throughout the process of developing a program plan and setting fee schedules.

Indeed, Plaintiff's arguments about notice and opportunity to be heard ignore that producers *do* have various opportunities to be heard in the processes leading up and including the setting of fee rates. (*See* Pl.'s Opp. 15.) All rules adopted by EQC implementing the RMA are subject to notice and public comment under Oregon's Administrative Procedures Act (APA). ORS 183.335. As for DEQ review and approval of a PRO's program plan, the RMA itself mandates a public comment period. ORS 459A.878(2). Moreover, DEQ's approval of a program

plan or plan amendment is itself subject to judicial review under the APA. *See* ORS 183.484 (providing for judicial review of orders in other than contested cases).

Thus, if a producer objects to a PRO's fee rates or methodologies, or any other components of a program plan, the producer has opportunities to be heard before DEQ approves the plan and can seek judicial review of that approval. For example, if a program plan does not adequately describe "how the [PRO] will . . . establish, calculate and charge membership fees," or "includ[e] a schedule of the membership fees actually charged to members," as required by the RMA, the producer can raise those issues in an APA challenge. *See* ORS 459A.875(2)(a)(E), (2)(h); ORS 183.484(5)(b)(C) (court shall remand agency order if it is "in violation of a . . . statutory provision"). Likewise, if a producer has a constitutional objection to how fees are set, to the confidentiality of certain components of a program plan, or other aspects of a program plan, the producer can also challenge DEQ's approval of the plan on those grounds. *See* ORS 183.484(5)(b)(C) (court shall remand agency order if it is "in violation of a constitutional . . . provision"). And even if DEQ has taken *no* action, but rather has "unlawfully refused to act or make a decision" as required by the RMA or other law, a producer can petition a court to "compel [DEQ] to act." *See* ORS 183.490.

Given those opportunities for notice, comment, and challenge in the development of program plans and fee schedules, a producer cannot claim to be blindsided when fees are finally assessed, or to have been denied all meaningful process. While "the Due Process Clause does not require 'that all governmental decisionmaking comply with standards that assure perfect, error-free determinations,'" the RMA provides significant protections. *See Yagman v. Garcetti*, 852 F.3d 859, 866 (9th Cir. 2017) (quoting *Mackey v. Montrym*, 443 U.S. 1, 13 (1979)).

Finally, the third *Mathews* factor is the government's interest, including the burdens of additional procedural requirements. *Mathews*, 424 U.S. at 335. Here, the state has substantial interests in requiring prompt payments of PRO membership fees. Requiring DEQ, the PRO, or a court to hold hearings before the PRO can collect fees would hamper the operations of the PRO,

Page 20 -  DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS
SV1/af2 /1011886406

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

as well as facilities and local governments that rely on PRO funding. It would also incentivize producers to request hearings simply to delay the payment of fees. Further, delaying the PRO's collection of fees, or requiring the PRO to hold hearings itself, could increase the operating costs of the PRO program, requiring the PRO to increase the fees that the producers themselves would have to pay. The state has an interest in avoiding such outcomes. *Cf. Yagman*, 852 F.3d at 866 (city had "substantial interests in discouraging dilatory challenges [to parking penalties], promptly collecting penalties, and conserving scarce resources").

### 4. The equal protection claim fails.

Plaintiff claims that the RMA violates the Equal Protection Clause by treating mid-sized producers differently from small and large producers, "based solely on scale." (Compl. ¶ 92.) Plaintiff concedes that any such disparate treatment would be subject to rational basis review. (Pl.'s Opp. 15).

Plaintiff insists that its assertions about unequal treatment under the RMA cannot be questioned at the motion-to-dismiss stage. (Pl.'s Opp. 16.) Not so. The Court is not bound to accept Plaintiff's characterization of the law or conclusory assertions of disparate treatment, even if they are "cast in the form of factual allegations." *See Fayer*, 649 F.3d at 1064; *Ventura Mobilehome Cmtys. Owners Ass'n v. City of San Buenaventura*, 371 F.3d 1046, 1054–55 (9th Cir. 2004) ("conclusory allegations" that plaintiff's members had been "singled out" to bear the expense of preserving affordable housing did "not state a colorable equal protection claim"). And even where there is disparate treatment, courts can and do "dismiss complaints on rational-basis review when there are apparent legitimate government purposes and the plaintiffs do not allege sufficient facts to overcome the presumption of rationality." *See A.J. Cal. Mini Bus, Inc. v. Airport Comm'n of the City & Cty. of S.F.*, 148 F. Supp. 3d 904, 918–20 (N.D. Cal. 2015) (collecting cases).

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

The only disparate treatment that Plaintiff identifies is the RMA's exemption for small producers. (*See* Pl.'s Opp. 16; ORS 459A.872.) That exemption has a rational basis, because it is "reasonably conceivable" that smaller producers might bear less responsibility for the impacts of products and packaging and might be less well equipped to bear the costs of dealing with those impacts. *See Heller v. Doe*, 509 U.S. 312, 320 (1993). Plaintiff does not and cannot "negat[e] every conceivable basis which might support" exempting small producers. *See id.* Instead, Plaintiff challenges the fairness of the exemption, contending that an EPR program without that exemption would allow for fees that are more truly proportional to each producer's output. (Pl.'s Opp. 16–17.) Even if that were so, "[a] classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality." *Heller*, 509 U.S. at 321 (internal quotation marks omitted). Rational basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* at 319. Nor is the basis for the small-producers exemption "subject to courtroom factfinding." *Id.* at 320. The question is not whether particular producers are *in fact* "better equipped" than others to bear the costs of an EPR program. (*See* Pl.'s Opp. 17.) Rather, the question is whether there is any "*conceivable* basis which *might* support" exempting the smallest producers. *See Heller*, 509 U.S. at 320 (emphasis added). There is. (*See* Mot. 31.) Rational basis review is satisfied.

Regarding large producers, Plaintiff does not identify any disparate treatment at all. Plaintiff asserts that large producers are privileged because they are better positioned to absorb PRO membership fees and avail themselves of mechanisms to lower their fees. (Pl.'s Opp. 16.) But both large and mid-sized producers must pay fees, and fee reductions are available to both. Indeed, if anything, the law provides for fee reductions on a *more* favorable basis for mid-sized producers than large ones. (*See* Mot. 17.) Large producers must perform life cycle evaluations (LCEs) on 1% of their products once every two years, and they can get a fee reduction for an LCE only if it shows "proof of substantial impact reduction." ORS 459A.944(1)–(2); OAR 340-090-0910(3)(b). Other producers (i.e., mid-sized producers) can choose whether or not to

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

perform an LCE, and if they do, they get a fee reduction—even without proof of substantial impact reduction. OAR 340-090-0910(3)(a)–(b). Even if larger businesses are still better able to absorb costs associated with the RMA, that is a function of those businesses' greater resources, not of any special privileges or exemptions conferred by the law.

Plaintiff also presents a new argument: that its members are denied access and input into CAA's fee-setting methodology while only CAA's founding members have access. (Pl.'s Opp. 16.) This theory is not pleaded in the Complaint. Plaintiff's equal protection claim asserts that producers are "being treated differently based solely on scale." (Compl. ¶ 92.) The Complaint does not allege anything about a distinction between founding PRO members and other producers, and Plaintiff does not point to anything in the law creating such a distinction. In any event, even if the RMA were to create such a distinction, and even if that could be characterized as disparate treatment, it would be supported by a rational basis. It is "reasonably conceivable" that, to allow for competition among multiple potential PROs, a group of producers that founds a PRO should be allowed to share some details about its methods with DEQ while not sharing those details with other producers who might use that information to create their own PROs. *See Heller*, 509 U.S. at 320. Regardless of whether that rationale was "the actual purpose" motivating the legislature or DEQ, it is a "'reasonably conceivable state of facts that *could* provide a rational basis'" for the purported distinction. *See Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 589 (9th Cir. 2008) (quoting *Heller*, 509 U.S. at 320) (emphasis added). Thus, even if Plaintiff's new theory were pleaded in the Complaint, it would fail to state a claim.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

### III.    CONCLUSION

For the reasons discussed above, the complaint should be dismissed in its entirety.


DATED January  30 , 2026.

        Respectfully submitted,

        DAN RAYFIELD
        Attorney General


        */s Sara D. Van Loh*
        SARA D. VAN LOH #044398
        Senior Assistant Attorney General
        ALEXANDER C. JONES #213898
        Assistant Attorney General
        Trial Attorneys
        Tel (971) 673-1880
        Fax (971) 673-5000
        Sara.VanLoh@doj.oregon.gov
        Alex.Jones@doj.oregon.gov
        Of Attorneys for Defendants

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## CERTIFICATE OF SERVICE

I certify that on January  30th, 2026, I served the foregoing **DEFENDANTS' REPLY IN**

**SUPPORT OF MOTION TO DISMISS** upon the parties hereto by the method indicated

below, and addressed to the following:

Darin Sands                                    ___ HAND DELIVERY
Bradley Bernstein Sands LLP                     ___ MAIL DELIVERY
1211 NW Glisan Street, Ste 204                  ___ OVERNIGHT MAIL
Portland, OR 97209                              ___ TELECOPY (FAX)
   *Of Attorneys for Plaintiff*                ___ E-MAIL
                                                 x  E-SERVE


David R. Carpenter                             ___ HAND DELIVERY
Caleb J. Bowers                                 ___ MAIL DELIVERY
Alexandra T. Mushka                             ___ OVERNIGHT MAIL
Sidley Austin LLP                               ___ TELECOPY (FAX)
350 South Grand Avenue                          ___ E-MAIL
Los Angeles, CA 90071                           _x_ E-SERVE
   *Of Attorneys for Plaintiff*


Gordon D. Todd                                 ___ HAND DELIVERY
Richard W. Smith                                ___ MAIL DELIVERY
Sidley Austin LLP                               ___ OVERNIGHT MAIL
1501 K Street, N.W.                             ___ TELECOPY (FAX)
Washington, DC 20005                            ___ E-MAIL
   *Of Attorneys for Plaintiff*              _x_ E-SERVE


                            *s/ Sara D. Van Loh*
                            SARA VAN LOH #044398
                            Senior Assistant Attorney General
                            ALEXANDER C. JONES #213898
                            Assistant Attorney General
                            Trial Attorneys
                            Tel (971) 673-1880
                            Fax (971) 673-5000
                            Sara.VanLoh@doj.oregon.gov
                            alex.jones@doj.oregon.gov
                            Of Attorneys for Defendants

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000