Maureen S. Bayer, OSB No. 214905
  Direct:  503.802.2115
  Email:  maureen.bayer@tonkon.com
Tonkon Torp LLP
1300 SW Fifth Ave., Suite 2400
Portland, OR 97201
Facsimile:  503.274.8779
    *Attorney for Air-Conditioning, Heating, and
    Refrigeration Institute' American Lighting Association;
    and Association of Home Appliance Manufacturers*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

(PORTLAND DIVISION)

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS,<br><br>       Plaintiff,<br><br>   v.<br><br>LEAH FELDON, DIRECTOR, OREGON DEPARTMENT OF ENVIRONMENTAL QUALITY, in her official capacity; MATT DONEGAN, KAREN MOYNAHAN, MARK WEBB, AND SILVIA TANNER, In their official capacities as members of the Oregon Environmental Quality Commission,<br><br>      Defendants. | Civil No. 3:25-cv-01334-SB<br><br>**AMICI CURIAE BRIEF OF AIR-CONDITIONING, HEATING, AND REFRIGERATION INSTITUTE; AMERICAN LIGHTING ASSOCIATION; AND ASSOCIATION OF HOME APPLIANCE MANUFACTURERS** |

PAGE 1 –    AMICI CURIAE BRIEF OF AIR-CONDITIONING, HEATING, AND
            REFRIGERATION INSTITUTE, AMERICAN LIGHTING ASSOCIATION, AND
            ASSOCIATION OF HOME APPLIANCE MANUFACTURERS

## TABLE OF CONTENTS

**INTEREST OF AMICI CURIAE** .................................................................1

**INTRODUCTION AND SUMMARY OF THE ARGUMENT** ..............................3

**ARGUMENT** ..........................................................................................3

     **I.**     **MEMBERS OF AMICI TRADE ORGANIZATIONS SELLING PRODUCTS IN INTERSTATE COMMERCE ARE DISPROPORTIONATELY IMPACTED BY THE ACT** ................................3

          **A.**     **Members of Amici Trade Groups Selling Products in Interstate Commerce are Disproportionately Impacted by the Act Because Their Products Require Specialty Packaging** ..........................5

          **B.**     **Amici are Disproportionately Impacted by the Act Because it is Unreasonably Burdensome to Obtain and Report the Data the Act Requires** .................................................................8

     **II.**     **THE ACT DOES NOT RESULT IN THE SUSTAINABILITY IT PURPORTS TO PROMOTE AND THEREFORE FAILS THE *PIKE* TEST** ..............................................................................11

**CONCLUSION** .....................................................................................13

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970)................................................................................................12

*S. Dakota v. Wayfair*,
    585 U.S. 162, 173 (2018)...........................................................................................4

**Statutes**

Oregon's Plastic Pollution and Recycling Modernization Act ............................................. *passim*

**Other Authorities**

10 C.F.R. §430.32(s)(6) .......................................................................................................7

49 C.F.R. §173.1 et seq.........................................................................................................8

**INTEREST OF AMICI CURIAE**

The Air-Conditioning, Heating, and Refrigeration Institute ("AHRI" or the "Institute") is an industry trade organization representing more than 330 manufacturers of heating, ventilation, air conditioning, and commercial refrigeration ("HVACR") and water heating equipment worldwide. This equipment includes residential and commercial air conditioners, water heaters, heat pumps, furnaces, boilers, air handlers, and heat exchangers. AHRI represents companies dedicated to manufacturing and installing highly effective and efficient HVACR and water heating systems for the health, safety, comfort, and productivity of its customers.

AHRI is an internationally recognized advocate for the HVACR and water heating industry and certifies the performance of many products manufactured by its members. The Institute's comprehensive roster of equipment performance standards and guidelines are the basis for its certification program and are adopted or harmonized worldwide. Products bearing the AHRI Certified® mark are proven to perform accurately and consistently. International regulators and consumers rely heavily on AHRI's industry-leading certification program for the accurate and unbiased evaluation of equipment.

The American Lighting Association ("ALA") is a trade organization representing the decorative lighting, ceiling fan, and controls industries. ALA represents more than four-hundred companies in the residential and decorative lighting industry, including manufacturers, importers, retailers, and related professionals. The ALA serves as the collective voice of the lighting industry, actively advocating for policies that support its members and the broader lighting community. More than ninety percent of ALA member companies are closely held and family owned, which means they have limited capacity and resources to absorb complex regulatory obligations.

The Association of Home Appliance Manufacturers ("AHAM") is a trade association representing more than 160 member companies that manufacture 90 percent of the major, portable and floor care appliances shipped for sale in the United States. AHAM members

PAGE 1 –    AMICI CURIAE BRIEF OF AIR-CONDITIONING, HEATING, AND
            REFRIGERATION INSTITUTE; AMERICAN LIGHTING ASSOCIATION;
            AND ASSOCIATION OF HOME APPLIANCE MANUFACTURERS

provide safe, innovative, sustainable and efficient products that enhance consumers' lives. The home appliance industry is a significant segment of the economy, measured by the contributions of home appliance manufacturers, wholesalers, and retailers to the U.S. economy. In all, the industry drives nearly $200 billion in economic output throughout the United States and manufactures products with a factory shipment value of more than $50 billion. The home appliance industry, through its products and innovation, is essential to consumer lifestyle, health, safety and convenience. Home appliances are a success story in terms of energy efficiency and environmental protection. In Oregon, the home appliance industry is a significant and critical segment of the economy. The total economic impact of the home appliance industry to Oregon is $1.5 billion, nearly 10,000 direct and indirect jobs, $160.4 million in state tax revenue and more than $514.0 million in wages.

The AHRI, ALA, and AHAM (collectively, "Amici") have a strong interest in this case because, in each case, Amici's members are obligated Producers[1] under Oregon's Plastic Pollution and Recycling Modernization Act (the "Act"). As such, not only are they required to shoulder a significant financial burden that others in the supply chain avoid, but they are also forced to join a third-party Producer Responsibility Organization ("PRO") vested with broad and largely unchecked power to charge its members fees. As set forth in Plaintiff National Association of Wholesaler-Distributors ("NAW")'s Brief in Support of Motion for Preliminary Injunction and/or Temporary Restraining Order,

> The Act's arbitrary burdens and fees threaten the viability of interstate supply chains and unreasonably interfere with interstate commerce, in violation of the Dormant Commerce Clause. The United States Supreme Court has also long held that delegations of sweeping regulatory authority to private entities are suspect under the Due Process Clause.

---

[1] Defined terms have the same meaning as that in docket number ("Dkt.") 33 at 11-12.

PAGE 2 –    AMICI CURIAE BRIEF OF AIR-CONDITIONING, HEATING, AND REFRIGERATION INSTITUTE; AMERICAN LIGHTING ASSOCIATION; AND ASSOCIATION OF HOME APPLIANCE MANUFACTURERS

Dkt. 33 at 10. As with NAW's members, Amici's members face imminent and irreparable harm warranting preliminary injunctive relief. Because Amici represent interests beyond those of the parties to this litigation and can demonstrate to the Court specific unconstitutional impacts of the law on their respective industries, Amici believe that this brief will assist the Court in resolving the crucial legal issues this case presents.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The Act purports to improve Oregon's recycling system, promote sustainability, and reduce packaging, while shifting the financial burden to "Producers," which include members of Amici. But the Act, its implementing regulations, and the Oregon Department of Environmental Quality's ("DEQ") approved Producer Responsibility Plan were designed around fast-moving consumer-facing goods and food packaging rather than the bulky and/or durable products that members of Amici manufacture. Goods manufactured by Amici's members flow through multi-tier distribution networks, have long product lifecycles, and rely heavily on tertiary logistics and transport packaging that is fundamentally different from consumer packaging. In the industries represented by Amici, packaging is necessarily heavier, more voluminous, uses a multitude of materials, and importantly, is largely not consumer-facing. The Act fails to account for these crucial differences, resulting in requirements that are fundamentally incompatible with how Amici's goods are manufactured, transported, distributed, sold, and installed for the end-consumer. Ultimately, because of these shortcomings, the Act disproportionately impacts members of Amici operating in interstate commerce in a manner incompatible with the constitutional requirements of the commerce clause.

## ARGUMENT

I. **MEMBERS OF AMICI TRADE ORGANIZATIONS SELLING PRODUCTS IN INTERSTATE COMMERCE ARE DISPROPORTIONATELY IMPACTED BY THE ACT**

As set forth in Plaintiff's Motion for Preliminary Injunction, "the Dormant Commerce Clause doctrine [provides that] state regulations may not discriminate against interstate

PAGE 3 –    AMICI CURIAE BRIEF OF AIR-CONDITIONING, HEATING, AND REFRIGERATION INSTITUTE; AMERICAN LIGHTING ASSOCIATION; AND ASSOCIATION OF HOME APPLIANCE MANUFACTURERS

commerce; and . . . States may not impose undue burdens on interstate commerce. Dkt. 33 at p. 23, *quoting S. Dakota v. Wayfair*, 585 U.S. 162, 173 (2018). Over the past year, members of Amici have experienced both discrimination against interstate commerce and undue burdens on interstate commerce which demonstrate that the Act violates the Dormant Commerce Clause.

Members of Amici trade organizations can demonstrate that the Act unconstitutionally discriminates against interstate commerce by applying disproportionate and undue burdens on companies operating across state lines. First, the packaging required to safely and securely move, store, and transport the products manufactured by Amici's members is significant, specialized, and heavy. For example, packaging for a single heat pump can amount to sixty pounds of packaging. Damage and breakage due to improper or insufficient packaging and storage can lead to unnecessary additional waste and cost, and injury to employees. Because the Act charges Producers for packaging based on the weight of each separate material, this disproportionately impacts manufacturers of HVACR and water heating equipment, household appliances, and lighting.

By way of illustration, each member of AHAM faces an estimated average weighed annual cost of **$272,374** in fees charged by the PRO. Because this number relies heavily on the products shipped, the actual cost to each manufacturer varies and there are some manufacturers that are charged significantly higher fees. Importantly, this number does not include the internal and external costs related to collecting and reporting the data, or legal fees. Nationally, based on fees assessed in Oregon and extrapolating to other states with approved or expected programs, AHAM conservatively estimates that the fees charged under packaging EPR laws is approximately **$140,311,943** across the home appliance industry, annually.

Second, the Act holds these manufacturers as the entity financially responsible for fees for tertiary packaging that is handled and often removed and disposed of by distributors, warehousers, retailers, dealers, and/or installers throughout the equipment distribution chain, and not in the ordinary household or commercial setting. While there are numerous participants

PAGE 4 –    AMICI CURIAE BRIEF OF AIR-CONDITIONING, HEATING, AND REFRIGERATION INSTITUTE; AMERICAN LIGHTING ASSOCIATION; AND ASSOCIATION OF HOME APPLIANCE MANUFACTURERS

throughout the manufacturing and distribution supply chains, including packaging manufacturers, product distributors, dealers, importers, retailers, and installers, the manufacturer is often responsible for fees for the packaging required to protect its products, despite the fact that the packaging is not disposed of by the end user.

In addition, members of Amici have already experienced irreparable harm at the hands of the Act, in direct violation of the Dormant Commerce Clause. The fees they have been forced to shoulder appear to bear no relationship to the cost of recycling the materials or the sustainability of those materials, are impossible to predict, are based on a secret methodology (*see* Dkt. 69 at 16-17), and are not fairly apportioned because they shift costs away from in-state consumers and retailers.

### A.    Members of Amici Trade Groups Selling Products in Interstate Commerce are Disproportionately Impacted by the Act Because Their Products Require Specialty Packaging

While Amici represent manufacturers of different types of products, all three organizations represent members whose products necessarily require more protective packaging than most other types of goods due to their size, weight, fragility, and/or potential for damage during transport and storage. These packaging needs are driven by safety and quality requirements.

Because the Act charges Producers for packaging based on the weight of each separate material used, Producers of goods in these categories are significantly burdened with higher fees than other Producers because of the wide variety of materials required, and the weight of those materials. Oregon's approach does not account for industry-specific realities and instead creates uniform obligations that impose outsized costs on packaging-intensive industries.

The packaging used in these industries is intended to protect product, factory, and transportation personnel during storage, transport and delivery. The safest and most effective materials can withstand multiple impacts and maintain integrity in a variety of conditions. Unlike smaller, fast-moving consumer goods, packaging for heavy, durable, or fragile goods

PAGE 5 –    AMICI CURIAE BRIEF OF AIR-CONDITIONING, HEATING, AND
REFRIGERATION INSTITUTE; AMERICAN LIGHTING ASSOCIATION;
AND ASSOCIATION OF HOME APPLIANCE MANUFACTURERS

have different requirements and must be able to ensure the protection of workers during transportation and at distribution centers.

For example, large appliances such as refrigerators, freezers, dishwashers, cooking ranges, washers and dryers are stacked in warehouses as high as 30 feet and packaging cannot fail while products are warehoused, regardless of environmental or climate conditions. Once assembled, HVACR equipment, water heating equipment, and major appliances are often packaged, stored and moved in very large warehouses or distribution centers. These facilities often have limited climate control, and the contents can be exposed to extreme temperature and humidity changes. Low temperatures can cause packaging materials to become brittle, while humidity and heat can affect the packaging's structural integrity and limit the effectiveness of adhesives or the strength of packaging products made from fiber. For safety purposes, it is vital to maintain the structural strength of packaging materials, particularly with respect to major appliances that are regularly stacked vertically with multiple units above ground. Furthermore, these appliances are often moved around by clamp truck and the packaging must withstand the force of the clamps to be moved efficiently.

While the Act purports to incentivize Producers to modify the types and volume of packaging used to reduce fees, for members of Amici this is not a viable option. Manufacturers are not free to reduce or modify packaging in its sole discretion because packaging requirements are dictated by logistical, transportation, storage, and even legal considerations. While paper packaging alternatives such as light paperboard or cardboard, molded pulp, or honeycomb would have a lower fee under the Act, these materials can only absorb a limited number of impacts and are more apt to lose structural integrity in hot and humid environments. Such modifications to packaging would result in product loss and employee injury. It is a risk that these industries simply cannot take.

The inability to easily modify packaging can be illustrated by the experience of a member of AHRI that manufactures commercial refrigeration equipment and systems. These include

PAGE 6 –   AMICI CURIAE BRIEF OF AIR-CONDITIONING, HEATING, AND
            REFRIGERATION INSTITUTE; AMERICAN LIGHTING ASSOCIATION;
            AND ASSOCIATION OF HOME APPLIANCE MANUFACTURERS

refrigerator and freezer cases in grocery, drug, and discount stores for products like dairy, meat, beverages, and frozen goods.  The member manufactures this equipment in factories around the world, with locations in the United States, but none in Oregon.  As such, its products are necessarily shipped in interstate commerce.  Its products are extremely large systems and include cases, glass doors, lighting, mechanical and electrical equipment, as well as being pre-filled with regulated chemical refrigerants.  Part of the engineering of the system is how it is safely shipped to the consumer so that it arrives in good working order.  These systems are moved by forklift and then transported on 53-foot-long flatbed trucks.  As such, they require packaging such as bubble wrap, foam, plastic film, wood, and cardboard to protect the system components while being moved by forklifts, being transported on the open road, and stored prior to installation.  If packaging is reduced or modified, then the risk of damage upon arrival significantly increases.  These refrigerated case components cannot simply be exchanged locally if damaged in shipping – a flatbed truck would have to travel back to the factory with the damaged equipment, where it would be repaired, packaged again, and then trucked back to its destination. In such a scenario, there is zero environmental benefit to reducing packaging and significant environmental detriment in the described inefficient return (for example, through increased use of fossil fuels and having to repackage the damaged item).  Manufacturers in the position of this member are therefore disproportionately impacted by the Act.

Oregon's EPR law assumes manufacturers can modify packaging to lessen environmental impact, reduce weight, or shift materials.  But in the case of federally mandated requirements, manufacturers cannot change or downsize this packaging, making it impossible to qualify for packaging reduction incentives or avoid higher EPR fees.  This conflict results in increased costs, administrative burdens, and unnecessary waste.  For example, Department of Energy energy conservation standards for ceiling fan light kits require that residential ceiling fan manufacturers include compact fluorescent light bulbs in every boxed ceiling fan, even though virtually all bulbs already meet efficiency requirements.  10 C.F.R. § 430.32(s)(6) ("Ceiling fan light kits

PAGE 7 –    AMICI CURIAE BRIEF OF AIR-CONDITIONING, HEATING, AND
REFRIGERATION INSTITUTE; AMERICAN LIGHTING ASSOCIATION;
AND ASSOCIATION OF HOME APPLIANCE MANUFACTURERS

manufactured on or after January 21, 2020 must be packaged with lamps to fill all sockets," with minimum specified required efficacy.)  This mandate forces manufacturer members of ALA to use specific, unavoidable packaging to protect and ship the federally required bulbs, leaving no ability to reduce, redesign, or eliminate these packaging components.

Members of both AHRI and AHAM manufacture products containing various mildly flammable refrigerants, which are hazardous materials and therefore may be subject to federal hazardous material transportation regulations and restrictions requiring special permits.  *See*, e.g. 49 C.F.R. § 173.1 et seq.  As holders of these special permits, freight companies often dictate to manufactures the material and method of packaging that will ensure compliance with the permitting, again taking the packaging considerations and decision-making out of the hands of the manufacturer. In circumstances where the packaging is dictated by federal statute, not manufacturer discretion, the Act imposes undue burdens on interstate commerce and penalizes manufacturers for packaging elements they are legally required to include and cannot modify.

Even if packaging could be modified, such modification would come at an extremely significant cost and burden.  Several members of ALA report that Oregon's fee structure has forced them to consider redesigning packaging solely to reduce fee exposure.  These redesigns are expensive and do not scale across states, which creates inefficiencies and financial strain. For example, Matthews Fan Company was faced with spending $20,000 dollars in costs to retool packaging just to reduce its fee exposure in Oregon.  Other states with similar laws have different requirements, and members simply cannot afford to change their packaging on a state-by-state basis.

### B.  Amici are Disproportionately Impacted by the Act Because it is Unreasonably Burdensome to Obtain and Report the Data the Act Requires

Members of Amici describe the Act's reporting requirements as substantial, disruptive, and in some cases, impossible to comply with.  At a minimum, compliance requires internal and external cross-functional coordination across packaging engineering, supply chain, information

technology, sustainability, legal, and finance.  Companies must gather extensive shipment data, estimate packaging weight, and classify materials, all while segregating those products being sold only in Oregon.  ALA member Matthews Fan Company reports spending a significant number of hours analyzing sales reports and estimating the tonnage of shipments.  Those hours come at a cost to the consumer, as this time could have been spent making products or improving processes.  These labor demands fall hardest on small companies without compliance departments.  Staff must be diverted from sales, logistics, product development, and customer support to meet Oregon's reporting mandate.  As a result, companies must incur costs to hire and train new personnel or substantially increase staff time for data collection, validation, and reporting.  The costs of annual compliance with the Act far exceed just those direct fees paid to the PRO because companies must build new datasets, develop estimates, or engage third-party software providers and consultants.  Participation in PROs, external EPR reporting services, and legal guidance and review adds recurring administrative expenses.  One AHRI member shared that administrative fees for reporting the data were well over ten times the fee charged.

Because manufacturers like Amici's members lack visibility into the destination of their products, reporting data to the PRO is costly and burdensome.  This is because unlike in-state producers of the type of packaged consumer goods contemplated by the Act, appliance manufacturers do not sell directly to consumers and do not sell "by state."  As with the Plaintiff's members, manufacturers also "cannot feasibly segregate packaging, reporting or cost allocation solely for Oregon without restricting those interstate systems more broadly." Dkt. 69 at 24. Products often move from the manufacturer through several layers of importers, distributors, dealers, retailers, and installers before finally reaching their ultimate destination at the end-user. In short, it has never been the business or interest of appliance manufacturers to have knowledge about the location of the end-consumer.  Logistics packaging also varies dynamically by shipment type and is not tied to fixed bills of materials.  As such, manufacturers, like Plaintiff's members, lack reliable visibility into where products are ultimately sold and lack control over

PAGE 9 –     AMICI CURIAE BRIEF OF AIR-CONDITIONING, HEATING, AND
            REFRIGERATION INSTITUTE; AMERICAN LIGHTING ASSOCIATION;
            AND ASSOCIATION OF HOME APPLIANCE MANUFACTURERS

that ultimate destination.  Downstream recipients of appliances are generally unable or unwilling to share downstream sales data.  Nonetheless, DEQ has treated this exceptional hurdle as easily surmountable, presuming that there is just one distributor in the supply chain from whom the manufacturer can easily obtain information: "Regarding the lack of visibility of the obligated producer with respect to how much product went to Oregon, the obligated producer will need to work with *the distributor* to obtain the data, or use a best-practice methodology to estimate it."[2] Product Stewardship Institute, Circular Action Alliance and DEQ Webinar Series: Preparing Producers for Oregon Packaging EPR: Consumer Goods and B2B Packaging, August 6, 2024 (emphasis added).  Far from simple, compelling such data would require restructuring national contracts to comply with a small number of state programs, which represents a significant burden and significant potential for loss of business.

Again, an example from an AHRI member may be instructive.  Consider the case of a 100-year old manufacturer of HVAR equipment with manufacturing facilities in the United States and Mexico.  Its customers are distributors, brokers, and dealers – but <u>not</u> the ultimate consumer.  It does not sell its products "by state."  Essentially, its customers are intermediaries that fulfill orders for the ultimate consumer.  This manufacturer's customers are distributors and have no incentive to provide information about its customers because it is worried the manufacturer would simply cut out the distributor and sell directly to the consumers, putting the distributor out of business.

In addition, this member's customers have warehouses and distribution centers divided by regions.  Customers may order a large quantity of air conditioners and heat pumps to fulfill future orders that are shipped to a warehouse in Oregon simply for reasons of convenience or capacity.  But ultimately those air conditioners and heat pumps may be shipped for installation in

---

[2] Available at: https://productstewardship.us/wp-content/uploads/2024/12/OR-DEQ-Webinar-3_QA.pdf

PAGE 10 –  AMICI CURIAE BRIEF OF AIR-CONDITIONING, HEATING, AND
    REFRIGERATION INSTITUTE; AMERICAN LIGHTING ASSOCIATION;
    AND ASSOCIATION OF HOME APPLIANCE MANUFACTURERS

Washington, Idaho, Nevada, or California.  If they go unsold for too long, they could be sold at discount to an out-of-state liquidator.  The manufacturer has no practical or actual visibility into the ultimate destination of its products.  Nevertheless, it must report to the PRO all of the packaging shipped to Oregon and pay for that packaging – <u>even if the packaging is never disposed of in the State</u>.  Like the Plaintiff's members, Amici's members "also face a substantial and unavoidable risk of double counting and duplicative fee assessments where  the same packaging is reported—or deemed reportable—under multiple states' laws, particularly where downstream purchasers transport goods across state lines after sale." Dkt. 69 at 24.

Another member of AHRI that manufactures commercial refrigeration systems sells its products to large chain retailers who often buy equipment in bulk without a destination in mind, instead storing the products until they are needed to upgrade or replace equipment.  If its customer orders the equipment for shipment into an Oregon warehouse, with the intent of storing it there before shipping it for later installation at a store in another state, the manufacturer will have unnecessarily paid the fee for that packaging that will never end up disposed of in Oregon.  As above, this manufacturer has no way of knowing where the packaging it applies will be discarded, burdening its operations in interstate commerce.

There are significant barriers to putting systems in place to determine where packaging is ultimately discarded.  Developing accurate state-level placement reporting would require renegotiating distributor contracts to mandate downstream sales and ship-to data.  Any expectation of disposal verification would necessitate new contractual or procedural arrangements with installers.  These changes would affect national distribution and service models, not just compliance in a single state.

## II.    THE ACT DOES NOT RESULT IN THE SUSTAINABILITY IT PURPORTS TO PROMOTE AND THEREFORE FAILS THE *PIKE* TEST

Under *Pike,* State regulations are invalid under the commerce clause if the "burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits."

PAGE 11 –  AMICI CURIAE BRIEF OF AIR-CONDITIONING, HEATING, AND
           REFRIGERATION INSTITUTE; AMERICAN LIGHTING ASSOCIATION;
           AND ASSOCIATION OF HOME APPLIANCE MANUFACTURERS

*Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  While the Act purports to promote recycling and reduce environmental impact in Oregon, there is no apparent correlation between the recyclability of the materials or actual environmental impact and the fees charged.  The Act prescribes that recyclable material must have a lower base fee rate than non-recyclable material. But since the fees are based on the weight of each material used, lightweight materials that are nonetheless difficult or impossible to recycle such as Styrofoam presumably have a much higher environmental impact than heavier, easier to recycle materials such as cardboard.  As set forth above, in package-intensive industries there are higher reported packaging weights and fees, even where packaging is optimized for recycling, and is recycled at high rates.  The resulting burden on those operating in interstate commerce is disproportionate and unrelated to actual environmental impact that the Act purports to protect.  As set forth above, disposal of packaging occurs outside of manufacturer control, and packaging may never enter municipal waste streams in the manner assumed by the program.  Fees are therefore assessed based on speculative assumptions, including in cases where packaging is already being responsibly managed.

    For example, several members of ALA have deep and long-standing sustainability commitments. One leading example is Hubbardton Forge, a fifty-year-old Vermont-based lighting manufacturer known and celebrated for environmentally conscious production. Environmental impact is considered in every action taken by Hubberdton Forge to preserve and protect the natural world.  When possible, it uses recycled and biodegradable material to package and ship fixtures and glass elements.  All of Hubberdton Forge's wooden pallets, scrap copper, aluminum, and steel are recycled or repurposed by local companies.  The raw steel used to create lighting is produced from up to 100% recycled materials.  Even the excess heat from the ovens is captured and used to supplement the heating of the plant itself.   "At Hubbardton Forge, sustainability and eco-consciousness are the organization's comprehensive approach," according to the Director of Manufacturing.  "We take the entire production process and logistics into consideration to embrace sustainability and green principles whenever possible."  Hubbardton

Forge has been awarded the Vermont Governor's Award for Environmental Excellence in Pollution Prevention six times, as well as the Pinnacle Green Leaf Award (twice) and ARTS Green Manufacturer Award (twice).

Despite this commitment and record, the company faces significant burdens under Oregon's program.  As CEO, Maria Mullen explains, "[t]he costs associated with compliance with Oregon's requirement, both soft and hard, ultimately lead to two options: increased costs for consumers or disinvestment from those sustainability efforts that we care deeply about."  The detrimental effect this law has on even the most environmentally conscious manufacturers demonstrates that the intent of the Act is not fulfilled.

For these reasons, the Act's burdens are excessive in relation to the putative local benefits and is therefore in violation of the Commerce Clause.

## CONCLUSION

For the reasons set forth herein, Amici urge the Court to grant NAW's Motion for Preliminary Injunction.

DATED:  February 3, 2026.

TONKON TORP LLP


By:    s/ Maureen S. Bayer
　　　Maureen S. Bayer, OSB No. 214905
　　　　Direct:  503.802.2115
　　　　Email:  maureen.bayer@tonkon.com
　　　*Attorney for Air-Conditioning, Heating, and Refrigeration Institute; American Lighting Association; and Association of Home Appliance Manufacturers*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing **AMICI CURIAE BRIEF OF AIR-CONDITIONING, HEATING, AND REFRIGERATION INSTITUTE; AMERICAN LIGHTING ASSOCIATION; AND ASSOCIATION OF HOME APPLIANCE MANUFACTURERS** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the counsel of record for each party in this case.

DATED:  February 3, 2026.

TONKON TORP LLP

By:    *s/ Maureen S. Bayer*
     Maureen S. Bayer, OSB No. 214905
      Direct:  503.802.2115
      Email:  maureen.bayer@tonkon.com
     *Attorney for Attorney for Air-Conditioning, Heating, and Refrigeration Institute; American Lighting Association; and Association of Home Appliance Manufacturers*

097204\97204\19225745v5