AMY EDWARDS, OSB No. 012492
amy.edwards@stoel.com
RACHELLE D. COLLINS, OSB No. 214059
rachelle.collins@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  503.224.3380
Facsimile:  503.220.2480

*Attorneys for Intervenor American Forest & Paper
Association*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHOLESALE DISTRIBUTORS, | Case No.:  3:25-cv-01334-SI |
| Plaintiff, | **AMERICAN FOREST & PAPER ASSOCIATION'S MOTION FOR INTERVENTION** |
| v. | |
| LEAH FELDON, DIRECTOR, OREGON DEPARTMENT OF ENVIRONMENTAL QUALITY, IN HER OFFICIAL CAPACITY; MATT DONEGAN; KAREN MOYNAHAN, MARK WEBB, AND SILVIA TANNER, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE OREGON ENVIRONMENTAL QUALITY COMMISSION, | **EXPEDITED CONSIDERATION REQUESTED** |
| Defendants. | |

Page 1 –   AMERICAN FOREST & PAPER ASSOCIATION'S MOTION FOR
INTERVENTION

## I. L.R. 7.1(A) CERTIFICATION

American Forest & Paper Association ("AF&PA"), through its counsel, has conferred with counsel for Plaintiff National Association of Wholesale Distributors ("NAW") and Defendant Leah Feldon in the above-captioned matter, regarding this motion. NAW does not take a position on this motion. Defendant Leah Feldon opposes this motion, contending that the addition of new parties now would prejudice her ability to fully litigate and present her case on the current trial schedule.

## II. INTRODUCTION

AF&PA hereby moves to intervene in this case as a plaintiff pursuant to Federal Rule of Civil Procedure ("Rule") 24(a) or, in the alternative, Rule 24(b). Plaintiff NAW brought this suit against Defendant Leah Feldon ("Defendant") in her official capacity as the director of Oregon Department of Environmental Quality ("DEQ"), among others,[1] alleging that Oregon's Plastic Pollution and Recycling Modernization Act (the "Act") is unconstitutional. NAW alleges that the Act is unconstitutional under the Dormant Commerce Clause and the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution[2] and asks the Court to (1) declare that the Act is invalid and unenforceable; and (2) permanently enjoin Defendant from implementing or enforcing the Act and regulations against NAW and its members. On February 6, 2026, the Court granted NAW's motion for preliminary injunction enjoining Defendant from enforcing the Act against NAW and its members. [Dkt. 88.]

---

[1] NAW initially brought claims against additional individual defendants, but the Court dismissed without prejudice all claims against those additional individual defendants in its February 6, 2026, Order. [Dkt. 88.]

[2] NAW initially brought additional claims under the Federal and Oregon Constitutions, but the Courts dismissed without prejudice those claims in its February 6, 2026 Order. [Dkt. 88.]

Page 2 –     AMERICAN FOREST & PAPER ASSOCIATION'S MOTION FOR
                  INTERVENTION

As described below and in the accompanying Declaration of Mark Pitts ("Pitts Decl.") , AF&PA and its members are entitled to intervene as of right (1) to protect their right against the Act's discrimination against interstate commerce or otherwise unduly burdening interstate commerce; and (2) to protect their right to procedural due process with respect to the fees assessed by the "producer responsibility organization" (the "PRO") established by the Act.

Like Plaintiff NAW, AF&PA and its members are subject to the requirements of the Act, including fees assessed by the PRO. As such, disposition of this case in favor of Defendant would impair the rights of AF&PA and its members. However, NAW does not adequately represent AF&PA's interests. NAW brought this action on behalf of NAW's members and seeks a permanent injunction enjoining Defendant from implementing or enforcing the Act and regulations against NAW's members. While there may be some overlap between NAW's members and AF&PA's members, a permanent injunction applying only to NAW's members certainly would not protect all of AF&PA's members. Furthermore, NAW is a national trade association whose members constitute wholesalers and distributors across the United States, including members that conduct business in Oregon. NAW's membership does not encompass the breadth of forest product manufacturing companies that make up AF&PA's membership, nor does NAW's membership represent all of the potential impacts the Act has on AF&PA's members.

### III.  FACTUAL BACKGROUND

**A.      The Act's Statutory Framework and Oregon Regulations.**

The Act mandates that "producers" of product packaging, food serviceware, paper goods, and certain other items join a "producer responsibility organization" (PRO). The Act defines "producers" broadly. Or. Rev. Stat. §§ 459A.863(22), 459A.866. For example, packaged items

Page 3 –        AMERICAN FOREST & PAPER ASSOCIATION'S MOTION FOR
                INTERVENTION

producers include brand owners and manufacturers that sell packaged items in Oregon; wholesaler and distributors who sell packaged items into Oregon; or alternatively importers into the United States. The Act exempts only the smallest producers with less than $5,000,000 in gross revenue or less than one ton of covered materials per year. *See* Or. Rev. Stat. §§ 459A.863(32), 459A.872(1).

A PRO is granted wide authority to set "eco-modulated" fees associated with a vast range of materials sold or distributed into the state, otherwise referred to as an "extended responsibility program" ("EPR"). The PRO must use "objective and measurable criteria whenever possible" in setting requirements, Or. Rev. Stat. § 459A.875(2); however, the Act fails to specify what these criteria are. The Act further fails to prescribe a uniform methodology for fee calculations, leaving significant discretion to the PRO in setting and adjusting producer fees, subject only to broad statutory guidelines and limited regulatory oversight. Instead of telling producers what they must pay, the Act vests the PRO with the authority to establish and collect membership fees from participating producers. Or. Rev. Stat. § 459A.884(1).

As part of the Act, each "producer" must register with a PRO; enter into a non-negotiable contract with that PRO; and provide the PRO data about the materials and volumes in its operations, which the PRO uses to assess fees. Pitts Decl. ¶ 22. To date, Oregon has approved only a single PRO—the Circular Action Alliance ("CAA")—meaning that CAA's terms and conditions, fees, incentives, and penalties are all mandatory. *Id.*

A recurring aspect of the statutory requirements is that the PRO is the entity responsible to "ensure," "provide," and "describe" the numerous components of program implementation. *See* Or. Rev. Stat. § 459A.875. DEQ is the designated agency for administering the EPR program, with authority to approve or reject PRO program plans, enforce compliance, and

Page 4 – AMERICAN FOREST & PAPER ASSOCIATION'S MOTION FOR INTERVENTION

impose civil penalties of up to $25,000 per day for violations. Or. Rev. Stat. §§ 459A.878, 459A.962, 468.130. However, recourse for producers who disagree with the PRO is limited to binding arbitration with the PRO. Pitts Decl. ¶ 22

Oregon's regulations charge the PRO with setting producer membership fees based on the weight and type of covered products sold or distributed in Oregon, in short, based on "market share." Or. Admin. R. § 340-090-0700(1). The regulations further allow the PRO discretion to offer "other fee adjustments to its member producers." Or. Admin. R. § 340-090-0910(3)(c); *see also* Or. Rev. Stat. § 459A.884(4). Notably, while the regulations require PROs to implement eco-modulated or graduated fees that reflect environmental impact, they do not prescribe any specific methodology, thresholds, or performance standards for how such fees must be calculated or applied, providing minimal regulatory guardrails.

The Act, as well as DEQ and the Oregon Environmental Quality Commission's ("EQC") lack of specificity in defining program requirements, and lack of oversight related to the PRO's implementation and modification of fees charged to producers under the Act, establishes a fee structure that is both opaque and effectively insulated from regulatory scrutiny.

**B.     CAA Program Plan**

The Act charges CAA with responsibility for calculating and collecting producer fees. The details of this process are provided in CAA's Program Plan. *See* Declaration of Bran Wild in Support of Plaintiff's Motion for Preliminary Injunction and/or Temporary Restraining Order [Dkt. 34] ("Wild Decl."), Ex. A (the "Program Plan"). However, producers do not know the details because CAA has provided that its fee methodology is confidential for DEQ's eyes only. *See, e.g.,* Pitts Decl. ¶¶ 6, 19-20, 27. Producers have no recourse to challenge CAA's methodology. *Id.* ¶¶ 11, 20.

Page 5 –     AMERICAN FOREST & PAPER ASSOCIATION'S MOTION FOR
                    INTERVENTION

In joining CAA, as producers are effectively required to do, producers are bound by the terms of the Program Plan and must agree to CAA's Participant Producer Agreement ("Producer Agreement") as well as the Oregon Addendum to the Participant Producer Agreement ("Agreement Addendum"), which govern CAA's administration of the Oregon EPR program.[3] Pitts Decl. ¶ 21. The Producer Agreement and Agreement Addendum bind producers while failing to provide any meaningful recourse to challenge CAA's rules, interpretations, or conclusions regarding program administration. *Id.* The Program Plan and Agreement Addendum fail to provide any formal process for producers to appeal or challenge fee assessments, adjustments, or categorization. *Id.* ¶ 11. Producers are obligated to comply or face liquidated damages, audit costs, and potential enforcement referrals to DEQ, which carry penalties up to $25,000 per day. *See* Agreement Addendum §§ 4.2, 5.6.2, 6.2.8; Or. Rev. Stat. § 459A.962(4), § 468.130. The Agreement Addendum further provides, "**Dispute Resolution.** If resolution cannot be reached by the parties through good faith efforts to resolve any dispute themselves or through non-binding mediation, any dispute, controversy, or claim arising out of or relating to this Oregon Addendum, including the interpretation, scope, or breach thereof or the extent of the Parties' obligations under the Oregon EPR Law, shall be resolved by binding arbitration." Agreement Addendum § 8.

Further, CAA's fee model is based on CAA determined costs for the overall program, which is then allocated to registered producers based on their purported respective market share. *See, e.g.,* Or. Rev. Stat. § 459A.884(1). If producers do not register with CAA or are otherwise

---

[3] The Producer Agreement and Agreement Addendum are attached to the Declaration of James E. Winkle in Support of Plaintiff's Motion for Preliminary Injunction and/or Temporary Restraining Order [Dkt. 36], Exs. A-B.

152074602.1 0084191-00005

not subject to the Act, the costs increase from registered producers regardless of the impact of their respective products in Oregon.  Pitts Decl. ¶ 19.  In other words, registered producers will bear the costs to address disposal of covered materials that entered Oregon through non-registered or otherwise exempt manufacturers.  *Id.* ¶¶ 19, 23.

The final approved CAA Program Plan leaves significant discretion to CAA in setting and adjusting fees, with limited DEQ oversight of annual fee updates.  Moreover, the dispute resolution and compliance processes provided are largely internal to the PRO structure, with binding arbitration the only recourse after CAA's internal remedies have been exhausted.  The plan lacks robust mechanisms for ongoing public input or agency review of changes to key program elements, such as the eco-modulation criteria or the addition of new covered materials.

The Oregon program's complexity, lack of transparency, and concentration of authority in a single PRO create a system in which mid-sized businesses are exposed to disproportionate financial and operational burdens.

**C.     Impact on AF&PA and Its Members.**

AF&PA is a national trade association whose members constitute manufacturers of essential forest products across the U.S., including members whose products may enter the Oregon market.  Pitts Decl. ¶ 3.  AF&PA members represent about 87% of U.S. pulp, paper, paper-based packaging and tissue production capacity in the U.S.  *Id.*  As part of their operations, many use or distribute paper, packaging materials, or products containing materials that fall within the scope of the Act.  *Id.* ¶ 4.

As producers, and like NAW's members, AF&PA's members are subject to the reporting, fee assessment, and packaging modification requirements imposed by Oregon's EPR program. *Id.* ¶¶ 4, 6.  This includes the obligation to register with CAA as the sole approved PRO,

Page 7 –      AMERICAN FOREST & PAPER ASSOCIATION'S MOTION FOR
                     INTERVENTION

calculate and report the weights of all packaging sold into Oregon, and pay fees based on material-specific rates and environmental impact modifiers—as well as comply with any of the calculations or requirements discussed in CAA's "confidential" fee appendix to the Program Plan. *Id.* ¶ 6. The lack of publicly available information and time for coordination among regulated parties before being charged fees means, among other things, that distributors and others in the supply chain have difficulty discerning the producer for a particular product. *Id.*

Oregon's program pushes responsibility for determining who should comply onto a hierarchy of "producer" companies for each product. Due to this structure and the lack of publicly available information from CAA, AF&PA members face significant challenges in coordinating with manufacturers, suppliers, customers, and other potential producers to determine products covered by Oregon's program and which entity should bear responsibility for reporting and fees. *Id.* That structure, along with CAA's failed implementation of the requirements, further means that companies who attempt to comply in good faith are punished when others in the supply chain shirk their obligations. This system, in turn, increases AF&PA members' potential liability and compliance obligations. *Id.* ¶¶ 6, 22.

The realities of modern interstate commerce further complicate the determination of producer responsibilities. In many cases, it is unclear whether products that arrive in Oregon remain there. *Id.* ¶ 18. Members are forced to trace (or attempt to trace) products through supply chains on an individual product, supplier, and customer basis, and to negotiate compliance with upstream and downstream entities. *Id.* If others in the supply chain refuse to comply or insist on shifting their burden as producers to members as contracting parties, then members are left with the impossible choice of either (a) reporting products for which they are not the primary producer in the Oregon, with the resulting fee obligation; (b) declining to report

Page 8 –     AMERICAN FOREST & PAPER ASSOCIATION'S MOTION FOR
INTERVENTION

those products and thereby increasing the risk that DEQ or CAA will pursue enforcement against the AF&PA member; or (3) bearing increased costs in their contracts with customers, which are not limited to products sold only in Oregon. AF&PA members affected by the Act may also be inappropriately charged fees or charged fees for products subsequently moved out of state by a downstream entity (*i.e.,* unbeknownst to the producer). *Id.* ¶ 18. Members lack recourse under Oregon's rules and have no meaningful opportunity to provide input or challenge the fee methodology, program incentives, or fee calculations to which they are subject. *Id.* ¶¶ 6, 19-20.

Producers registered with the PRO, including AF&PA members, started getting their first "invoices" for fees in July 2025. *Id.* ¶ 19. For many, the fees were significantly higher than expected. *Id.* For example, while there is general recognition that products made from paper are more recyclable than plastics, the fees imposed by CAA result in higher costs for producers of paper products than plastic products because paper weighs more. *Id.* ¶ 8.

Since then, CAA has not provided meaningful guidance in response to members' questions about their obligations and fees. *Id.* ¶ 26. In several instances, members who asked DEQ and/orca for the underlying methodology or data were not provided the requested information. *Id.* Again, under the Program Plan, producers, including AF&PA members, are provided no meaningful opportunity to opine on or challenge CAA's fee assessment. *Id.* ¶¶ 6, 11. Instead, members must submit to binding arbitration, removing any opportunity for judicial review. *Id.* ¶ 21. Further, DEQ and CAA have not provided sufficient guidance of information to respond to members' inquiries. *Id.* ¶¶ 20, 26.

Producers, including AF&PA members, received invoices for 2026 PRO fees in January 2026, which were due on March 6, 2026. On February 6, 2026, the Court granted NAW's motion for preliminary injunction blocking DEQ's enforcement of the Act against NAW

members until the Court rules on the merits of the case. [Dkt. 88] Since then, despite requests, DEQ has refused to cease enforcement of the Act to any producers other than NAW members even though other producers facing the same imminent and irreparable harm as NAW members recognized by the Court—*e.g.,* unrecoverable compliance costs, competitive distortions, and risk of steep civil penalties. Pitts Decl. ¶¶ 29-30, Exs. 1-2. Producers that fail to pay their January 2026 invoices by March 6 could face civil penalties of up to $25,000 per day. Or. Rev. Stat. § 459A.962(4), § 468.130. Even more concerning, DEQ has advised that it will not be issuing any refunds in the future for fees paid under the program, noting that "[l]ocal governments and facilities that sort recycling are depending on – and already using – fees to expand system capabilities across the state." Pitts Decl., Ex. 2. In other words, if an AF&PA member were to pay its January 2026 invoice now, DEQ will refuse to refund that money even if the Court rules that the Act is unconstitutional.

## IV. ARGUMENT

### A.      AF&PA Is Entitled to Intervene as of Right.

"An applicant seeking to intervene as of right under Rule 24 must demonstrate that four requirements are met: (1) the intervention application is timely; (2) the application has a significant protectable interest relating to the property or transaction that is the subject of the action; (3) the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) the existing parties may not adequately represent the applicant's interest." *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011). AF&PA meets each of these requirements.

Page 10 –      AMERICAN FOREST & PAPER ASSOCIATION'S MOTION FOR INTERVENTION

**1.     AF&PA's Motion Is Timely.**

The Ninth Circuit considers "three criteria in determining whether a motion to intervene is timely: (1) the stage of the proceedings; (2) whether the parties would be prejudiced; and (3) the reason for any delay in moving to intervene." *Nw. Forest Res. Council v. Glickman*, 82 F.3d  825, 836 (9th Cir. 1996).  A motion is timely if "made at an early stage of proceedings, [so that] the parties would not have suffered prejudice from the grant of intervention at that early stage, and intervention would not cause disruption or delay in the proceedings." *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011).

AF&PA's motion is timely.  While the Court has set an expedited trial date of July 2026, the existing parties have engaged in only limited discovery to date.  Further, AF&PA intends to abide by the expedited trial date and has no intention of seeking a continuation or otherwise delaying the set trial date.  AF&PA will also agree to any proposed schedule for briefing that the existing parties agree upon.  For those reasons, no prejudice, delay, or inefficiency will result from AF&PA's intervention.

Finally, AF&PA decision to seek intervention now is in direct response to DEQ's refusal to stay enforcement of the Act against non-NAW member producers despite the Court's entry of a preliminary injunction.  While AF&PA members are subject to the same catch-22 as NAW members—risk of enforcement and steep penalties if they decline to pay the 2026 PRO fees and the Act is held constitutional or the inability to recover 2026 PRO fees if paid and the Act is held unconstitutional—AF&PA members may also be subject to additional fees if NAW members are not subject to the costs of CAA's program.

Page 11 –     AMERICAN FOREST & PAPER ASSOCIATION'S MOTION FOR
                     INTERVENTION

**2. AF&PA Has a Significantly Protectable Interest Against Violations of the Dormant Commerce Clause and the Due Process Clause.**

Whether an applicant for intervention demonstrates sufficient interest in an action is a "practical, threshold inquiry" used to "dispos[e] of lawsuits by involving as many apparently concerns persons as is compatible with efficiency and due process." *United States v. City of Los Angeles, Calif.*, 288 F.3d 391, 398 (9th Cir. 2002). There is no "clear-cut [test] or bright-line rule" for determining whether an applicant has such an interest. *Id*. However, courts consistently recognize that an applicant has a significantly protectable interest in an action if it "asserts an interest that is protected under some law" and "there is a relationship between its legally protected interest and the plaintiff's claims." *Id*.

Here, AF&PA and its members have a significantly protectable interest under the Dormant Commerce Clause, which prohibits the Act from discriminating against interstate commerce or otherwise unduly burdening interstate commerce. As discussed above, the Act violates the Dormant Commerce Clause because it discriminates in favor of in-state producers while imposing disproportionate compliance costs on out-of-state businesses, including AF&PA's members, as well as out-of-state consumers. AF&PA and its members also have a significantly protectable interest under the Due Process Clause of the Fourteenth Amendment, which prohibits states from depriving persons of property without due process of law. As discussed above, under the Program Plan, producers are provided no meaningful opportunity to opine on or challenge the CAA's fee assessments, which are based on an arbitrary and opaque fee-setting scheme, making it exceedingly difficult—if not impossible—for regulated entities to predict or verify the basis for their financial obligations. And members must submit to binding arbitration, removing any opportunity for judicial review. These interests are directly related both legally and factually to the claims brought by NAW against Defendant.

Page 12 –     AMERICAN FOREST & PAPER ASSOCIATION'S MOTION FOR INTERVENTION

**3. Disposition of this Case in Defendant's Favor Would Harm AF&PA's Interests.**

Where the moving party "'would be substantially affected in a practical sense by the determination made in an action, [the party] should, as a general rule, be entitled to intervene.'" *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 822 (9th Cir. 2001) (quoting Fed. R. Civ. P. 24 advisory committee's notes).

Here, if the Court rules in favor of Defendant at trial—*i.e.,* determining that the Act is constitutional and denying a permanent injunction enjoining the enforcement of the Act against producers—AF&PA's interests as would certainly be harmed. Such a disposition would impose the exorbitant PRO costs and potentially civil penalties for unpaid fees in addition to future costs in order to continue conducting business in Oregon, all without any meaningful opportunity to challenge the fee assessments.

**4. AF&PA's Interests Are Not Adequately Represented by NAW.**

"[An] applicant-intervenor's burden in showing inadequate representation is minimal: it is sufficient to show that representation *may* be inadequate." *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1489 (9th Cir. 1995). As such, AF&PA need only show that its interests are sufficiently different from the existing parties such that the existing parties' representation "may be" inadequate.

To determine whether an existing party adequately represents an applicant's interest, the Ninth Circuit considers:

> "(1) whether the interest of a present party is such that it will undoubtedly make all the intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether the would-be intervenor would offer any necessary elements to the proceedings that other parties would neglect."

*United States v. City of L.A., Cal.*, 288 F.3d 391, 399 (9th Cir. 2002).

Page 13 –  AMERICAN FOREST & PAPER ASSOCIATION'S MOTION FOR INTERVENTION

NAW does not adequately represent AF&PA's interests.  NAW brought this action on behalf of NAW's members and seeks a permanent injunction enjoining Defendant from implementing or enforcing the Act and regulations against NAW's members only.  While there is some overlap between NAW's members and AF&PA's members, a permanent injunction applying only to NAW's members certainly would not protect all of AF&PA's members.  Furthermore, although some AF&PA members may also members of NAW representation of wholesalers and distributers does not extend to the breadth of industries represented by AF&PA and some of the impacts on AF&PA members differ from NAW members.

**B.      AF&PA Is Also Entitled to Permissive Intervention.**

As with intervention as of right, motions for permissive intervention are construed liberally in favor of the moving party.  *See Arakaki v. Cayetano*, 324 F.3d 1078, 1083 (9th Cir. 2003) ("Rule 24 traditionally receives liberal construction in favor of applicants for intervention.").  The Ninth Circuit usually requires an applicant who seeks permissive intervention under Rule 24(b) to "prove that it meets three threshold requirements: (1) it shares a common question of law or fact with the main action; (2) its motion is timely; and (3) the court has an independent basis for jurisdiction over the applicant's claims." *Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir. 1998).  However, the third requirement—an independent basis for jurisdiction—"does not apply to proposed intervenors in federal-question cases when the proposed intervenor is not raising new claims." *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011).

AF&PA easily meets the test for permissive intervention.  Under the first requirement, and as explained above, AF&PA shares the same issues of law and fact as those brought in

Page 14 –      AMERICAN FOREST & PAPER ASSOCIATION'S MOTION FOR INTERVENTION

NAW's complaint: whether the Act violates AF&PA's members rights under the Dormant Commerce Clause and the Due Process Clause.

Under the second requirement and as explained above, AF&PA's motion for intervention is timely because the existing parties have not even begun conducting discovery and AF&PA intends to abide by the expedited trial date and otherwise avoid any delays in the proceedings.

Finally, the third requirement is inapplicable here. NAW's claims raise federal questions, and AF&PA does not seek to raise new claims. Thus, AF&PA need not show a basis for jurisdiction separate from the federal questions raised by NAW's complaint.

Therefore, AF&PA satisfies the threshold requirements applicable to permissive intervention under Rule 24(b) and request the Court to grant such intervention on with respect to NAW's Due Process and Dormant Commerce Clause claims.

## V. CONCLUSION

For the reasons articulated above, AF&PA request that the Court expeditiously grant its motion to intervene as of right pursuant to Rule 24(a), or alternatively, permissive intervention pursuant to Rule 24(b).

DATED: March 16, 2026        STOEL RIVES LLP

*/s/ Amy Edwards*
AMY EDWARDS, Bar No. 012492
amy.edwards@stoel.com
RACHELLE D. COLLINS, Bar No. 214059
rachelle.collins@stoel.com
Telephone: 503.224.3380

*Attorneys for Intervenor American Forest & Paper Association*

152074602.1 0084191-00005