Steven Wilker, OSB No. 911882
  Direct: 503.802.2040
  Email: steven.wilker@tonkon.com
Maureen S. Bayer, OSB No. 214905
  Direct:  503.802.2115
  Email:  maureen.bayer@tonkon.com
Tonkon Torp LLP
1300 SW Fifth Ave., Suite 2400
Portland, OR 97201
Facsimile:  503.274.8779
    *Attorneys for [Proposed] Intervenors Oregon Business and Industry
    Association, Northwest Grocery Association, and Food Northwest*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

(PORTLAND DIVISION)

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS, <br><br> Plaintiff, <br><br> v. <br><br> LEAH FELDON, DIRECTOR, OREGON DEPARTMENT OF ENVIRONMENTAL QUALITY, in her official capacity, <br><br> Defendants. | Civil No. 3:25-cv-01334-SI <br><br> **MOTION FOR PRELIMINARY INJUNCTION BY OREGON BUSINESS AND INDUSTRY ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD NORTHWEST** <br><br> ORAL ARGUMENT REQUESTED <br><br> EXPEDITED CONSIDERATION REQUESTED |

## TABLE OF CONTENTS

LR 7-1(A)  CERTIFICATION ...................................................................................................1

MOTION .................................................................................................................................1

MEMORANDUM ...................................................................................................................1

    I.       INTRODUCTION...................................................................................................1

    II.      STATEMENT OF FACTS.....................................................................................2

        A.       Background. .........................................................................................2

        B.       Potential Intervenors Face Impossible Tasks....................................2

    III.     LEGAL STANDARD ...........................................................................................11

    IV.    ARGUMENT........................................................................................................11

        A.       Proposed Intervenors are Likely to Succeed on the Merits or Present Serious Questions on the Merits. ...............................................11

            a)       The Dormant Commerce Clause........................................... 12

                (1)      The Act Unlawfully Discriminates Against Interstate Commerce ..........................................12

                (2)      The Act fails the *Pike* Balancing Test, and Therefore Imposes Excessive Burdens on Interstate Commerce ..........................................14

            b)       Due Process.......................................................................... 18

         B.       Irreparable Harm .................................................................................22

        C.       Balance of Equities and Public Interest Weighs in Favor of Granting the Preliminary Injunction.....................................................24

    V.      CONCLUSION ...................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ...................................................................................2, 11, 24

*Am. Trucking Ass'ns, Inc. v. Michigan Pub. Servs. Comm'n*,
545 U.S. 429 (2005)......................................................................................................12

*Amoco Production Co. v. Village of Gambell, AK*,
480 U.S. 531 (1987)......................................................................................................24

*Arizona Dream Act Coal v. Brewer*,
757 F.3d 1053 (9th Cir. 2014) .....................................................................................22

*Association to Preserve and Protect Local Livelihoods v. Sidman*,
147 F.4th 40 (1st Cir. 2025)..........................................................................................14

*Beacon Theaters, Inc. v. Westover*,
359 U.S. 500 (1959)......................................................................................................22

*Biard v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) ......................................................................................24

*Bibb v. Navajo Freight Lines, Inc.*,
359 U.S. 520 (1959)......................................................................................................17

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
520 U.S. 564 (1997)......................................................................................................13

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936)...............................................................................................18, 21

*Comptroller of Treasury of Md.v. Wynne*,
575 U.S. 542 (2015)......................................................................................................14

*K.W. ex rel. D.W. v. Armstrong*,
298 F.R.D. 479 (D. Idaho 2014), aff'd 789 F.3d 962 (9th Cir. 2015) ....................21

*Department of Revenue of Kentucky v. Davis*,
553 U.S. 328 (2008)......................................................................................................13

*East Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) .......................................................................................23

*Elrod v. Burns*,
   427 U.S. 347 (1976)............................................................................................................22

*Eubank v. City of Richmond*,
   226 U.S. 137 (1912)..................................................................................................19, 20, 21

*Exxon Corp. v. Governor of Maryland*,
   437 U.S. 117 (1978)............................................................................................................14

*F.C.C. v. Fox Television Stations*,
   567 U.S. 239 (2012)............................................................................................................20

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
   98 F.4th 1180 (9th Cir. 2024) .......................................................................................11, 24

*Flynt v. Bonta*,
   131 F.4th 918 (9th Cir. 2025) .............................................................................................13

*General Motors Corp. v. Tracy*,
   519 U.S. 278 (1997)............................................................................................................14

*Goldberg v. Kelly*,
   397 U.S. 254 (1970)............................................................................................................21

*Gordon v. Holder*,
   721 F.3d 638 .......................................................................................................................25

*J.L. v. Cissna*,
   341 F.Supp.3d 1048 (N.D. Cal. 2018) ...............................................................................25

*Japan Line Ltd. V. County of Los Angeles*,
   441 U.S. 434 (1979)............................................................................................................15

*Maine v. Taylor*,
   477 U.S. 131 (1986)............................................................................................................13

*Manrique v. Kolc*,
   65 F.4th 1037 (9th Cir. 2023) .............................................................................................11

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) .........................................................................................22, 25

*Mirabelli v. Bonta*,
   2026 U.S. 575049, 607 U.S. ---- (2026) ............................................................................22

*Nat'l Ass'n of Optometrists & Opticians v. Harris*,
   682 F.3d 1144 (9th Cir. 2012) ............................................................................................14

*Nat'l Pork Producers Counc. v. Ross*,
  598 U.S. 356 (2023)..................................................................................................12, 17

*National Federation of Independent Business v. Sebelius*,
  567 U.S. 519 (2012)...........................................................................................................25

*Philip Morris USA Inc. v. Scott*,
  561 U.S. 1301 (2010)..........................................................................................................23

*Pike v. Bruce Church, Inc.*,
  397 U.S. 137 (1970)......................................................................................................14, 15

*Rocky Mountain Farmers Union v. Corey*,
  730 F.3d 1070 (9th Cir. 2013) ...........................................................................................13

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020)..............................................................................................................22

*Roman v. Wolf*,
  977 F.3d 935 (9th Cir. 2020) .............................................................................................24

*State of Washington ex rel. Seattle Title Trust Co. v. Roberge*,
  278 U.S. 116 (1928)................................................................................................19, 20, 21

*Semmes Motors, Inc. v. Ford Motor Co.*,
  429 F.2d 1197 (2d Cir. 1970).............................................................................................23

*South Dakota v. Wayfair*,
  585 U.S. 162 (2018)......................................................................................................12, 13

*Southern Pacific Co. v. Arizona ex rel. Sullivan*,
  325 U.S. 761 (1945)............................................................................................................17

*Stanley v. University of Southern California*,
  13 F.3d 1313 (9th Cir. 1994) .............................................................................................23

*Steves and Sons, Inc. v. JELD-WEN, Inc.*,
  988 F.3d 690 (4th Cir. 2021) .............................................................................................22

*Stuhlbarg International Sales Co. v. John D. Brush & Co.*,
  240 F.3d 832 (9th Cir. 2001) .............................................................................................23

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas*,
  588 U.S. 504 (2019)......................................................................................................12, 13

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
  550 U.S. 330 (2007)............................................................................................................12

*Valle Del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ..................................................................................25

*Washington v. Trump*,
    145 F.4th 1013 (2025) ...............................................................................................23

*Will v. Michigan Department of State*,
    491 U.S. 58 (1989) ...................................................................................................23

*Winter v. Natural Resources Def. Council, Inc.*,
    555 U.S. 7 (2008) ...............................................................................................11, 24

**Statutes**

Oregon's Plastic Pollution and Recycling Modernization Act .............................................. *passim*

ORS 459A.866(1)(a) ....................................................................................................13

**Other Authorities**

21 CFR Part 170 ...........................................................................................................6

Fifth Amendment ........................................................................................................18

LR 7-1(a) .......................................................................................................................1

LR 7-1(a)(1) ..................................................................................................................1

U.S. Const. art. I, § 8, cl. 3 ..........................................................................................12

**LR 7-1(a)  CERTIFICATION**

Pursuant to LR 7-1(a)(1), the undersigned counsel certifies that the parties conferred with counsel for Plaintiff and Defendant.  Plaintiff does not take a position on the Motion.  Defendant opposes the Motion.

**MOTION**

Proposed Intervenors Oregon Business and Industry Association ("OBI"), Northwest Grocery Association, dba Northwest Grocery Retail Association, ("NWGRA") and Food Northwest (collectively, "Proposed Intervenors") respectfully move the Court for a preliminary injunction barring Defendant from directly or indirectly enforcing Oregon's Plastic Pollution and Recycling Modernization Act ("the Act") and regulations promulgated thereunder against Proposed Intervenors or their members, and from taking such actions as may be necessary to defer the obligation of Proposed Intervenor's members to pay fees under the Act, pending final adjudication of the merits of this action.

**MEMORANDUM**

## I.    INTRODUCTION

The Act is an attempt by Oregon to revamp the state's recycling program and to shift the costs for recycling away from municipalities and on to businesses by way of an extended producer responsibility ("EPR") program for packaging.  While its intentions are admirable, the Act on its face and as implemented creates impermissible barriers to interstate commerce violating the dormant commerce clause.  The Act also violates due process by impermissibly delegating regulatory power to a private entity, and by stripping regulated entities of the right to be heard.  In its motion for preliminary injunction, Plaintiff set forth significant evidence of its likelihood to succeed on the merits and irreparable harm.  *See* Docket Number ("Dkt.") 33, *passim*.  In consideration of this evidence and following compelling testimony, this Court granted Plaintiff's Motion for Preliminary Injunction, finding that "[s]erious questions go to the merits of Plaintiff's claims, there is a likelihood of irreparable injury, and the balance of

PAGE 1 –   PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY
            ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
            NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

hardships tips sharply in favor of plaintiff."  Dkt. 88 at 2, citing *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011).  Proposed Intervenors are similarly situated to Plaintiff and come before the Court to ask that if their motion to intervene is granted, that the Court also extend the injunction granted in Dkt. 88 to them, on the grounds set forth herein.

## II.    STATEMENT OF FACTS

### A.    Background.

So as not to burden the Court with repetitive background information, movants hereby adopt and incorporate by reference sections A and B of Plaintiff's Motion for Preliminary Injunction, Dkt. 33 at 11–16.  Generally, Proposed Intervenors' arguments are the same as Plaintiffs, and on that basis the motion for preliminary injunction should be granted.

### B.    Potential Intervenors Face Impossible Tasks.

Proposed Intervenor OBI is a Salem-based business advocacy group founded in 2017 when Associated Oregon Industries and the Oregon Business association merged.  Declaration of Angela Wilhelms ("Wilhelms Decl.") ¶ 3.  OBI's mission is to strengthen Oregon's economy to achieve a healthy, prosperous, and competitive state for the benefit of present and future generations.  *Id*. at ¶ 4.  OBI has approximately 1,600 members across every region in Oregon.  *Id*. at ¶ 5.  Members are businesses of every size and represent virtually every industry and sector, employing more than 250,000 Oregonians.  *Id*.  OBI is the Oregon affiliate of the National Association of Manufacturers and the National Retail Federation.  *Id*.  OBI members Hood River Distillers (Declaration of Erica Mitchell ("Mitchell Decl.")); A to Z Wineworks LLC (Declaration of Amy Prosenjak ("Prosenjak Decl.")); and the Stoller Wine Group (Declaration of Gary Mortensen ("Mortensen Decl.")) have all provided declarations in support of this motion.

Proposed Intervenor NWGRA is a trade organization that advocates for grocery, retail and food suppliers in the Pacific Northwest, representing Washington, Oregon and Idaho.  Declaration of Amanda Dalton (Dalton Decl.) ¶ 3.  Collectively, NWGRA members employ more than 122,000 people at nearly 1,000 locations.  *Id*.  NWGRA uniquely represents a diverse

PAGE 2 –    PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY
ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

membership of chain and independent grocers, grocery vendors and suppliers, and delivery partners. *Id.* NWGRA's mission is to advocate in the state and local legislatures on issues that impact the grocery industry in the Pacific Northwest. *Id.* ¶ 4. NWGRA members have over 409 retail locations in Oregon employing over 44,100 people. *Id.* ¶ 5. NWGRA member California Strawberry Commission (Declaration of Rick Tomlinson ("Tomlinson Decl.")) provided a declaration in support of this motion.

Proposed intervenor Food Northwest is a 501(c)(6) nonprofit trade organization representing the interests of food manufactures and related companies in Oregon, Idaho and Washington. Declaration of Dave Dillon ("Dillon Decl.") ¶ 3. Food Northwest advocates for the Pacific Northwest food industry's ability to produce and deliver safe, wholesome food. *Id.* Its membership includes over 60 food manufacturing companies and subsidiaries and over 140 companies that supply products or services to food manufacturers. *Id.* Food Northwest member Pacific Coast Producers (Declaration of Matt Strong ("Strong Decl.") and Declaration of Beverly Pester Kennedy ("Kennedy Decl.")) provided declarations in support of this motion.

A significant number of Proposed Intervenors' members are obligated Producers under the Act. Wilhelms Decl. ¶ 5; Dalton Decl. ¶ 5; Dillon Decl. ¶ 4. In support of their missions and obligations to their members, all three organizations have advocated in the Oregon legislature for sensible amendments to the Act to lessen the extreme burdens on businesses operating in Oregon. Wilhelms Decl. ¶ 6; Dalton Decl. ¶ 6; Dillon Decl. ¶¶ 7–9. In addition, OBI and NWGRA have petitioned the Oregon Department of Environmental Quality ("DEQ") to delay enactment of the program in order to give its members additional time to gather the required data. Wilhelms Decl. ¶ 6; Dalton Decl. ¶ 7. In addition, OBI has participated as a member of a related Rulemaking Advisory Committee and submitted comments and feedback throughout rulemaking processes. Wilhelms Decl. ¶ 6.

Like Plaintiff's members, Proposed Intervenors' members play a critical role in the supply and movement of goods nationwide and in Oregon. Wilhelms Decl. ¶ 8; Dalton Decl. ¶

PAGE 3 –  PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY
ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

8; Dillon Decl. ¶ 7.  The Act subjects Proposed Intervenors' members to significant compliance obligations, even though they frequently have little or no control over the design or composition of the packaging they distribute.  *Id*.  As a result, they are required to assume financial and logistical responsibilities that do not correspond to their role in the product life cycle.  *Id*.  As "Producers," under the Act, Proposed Intervenors' members are subject to all of the same obligations and harm as Plaintiff's members.  Wilhelms Decl. ¶ 9; Dalton Decl. ¶ 5; Dillon Decl. ¶ 7.  The ongoing and irreparable harm faced by members of Proposed Intervenors is summarized below and in the declarations supporting this motion.

**Excessive and Unpredictable Fees.**  Members of the Proposed Intervenors report having received invoices from CAA for exorbitant fees that they have no way of budgeting for due to their retroactive nature.  The first collected fees for production and packaging were for the year prior to the effective date of the Act.  Dillon Decl. ¶ 5.  CAA did not publish, or have, a fee structure in place in time for Producers to change their packaging decisions and only assessed fees after the fact.  *Id*.  This saddled companies with an expense—and for some a large expense—that was not budgeted and was impossible to plan for.  *Id*.  This came at the same time as most companies were already under tremendous inflationary pressure in their materials and labor costs.  *Id*.  The retroactive effect of the Act further placed excessive hardship on regulated companies to navigate a new set of requirements and fees at the same time those requirements and fees were being finalized outside the normal process for public comment and without the transparency required of public entities.  *Id.* at ¶ 6.  The condensed ramp-up time was greatly compressed by CAA, which put more pressure on companies to attempt to operate in a system that was not fully designed.  *Id.*

In the case of Hood River Distillers ("HRD"), an Oregon-based manufacturer of distilled spirits, the total amount owed to CAA is equivalent to a substantial portion of the company's gross profit derived from Oregon.  Mitchell Decl. ¶ 12.  A member of NWGRA reported that EPR-related fees for one product were greater than twice the typical profit margin for that

PAGE 4 –    PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY
             ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
             NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

product. Dalton Decl. ¶ 9. Another member of NWGRA reported several dozen items where the EPR fee exceeded the profit margin at a customer level, and among those products, the EPR fee caused the profit margins to be negative. *Id.* As set forth in Plaintiff's Motion for Preliminary Injunction, "information provided by CAA regarding the 2026 rates indicates not only that those unreasonable fees will continue to apply in most cases, but nearly half of the categories will see *significant* increases of 25% [or] more," Dkt. 33 at 17 (emphasis in original), which impacts all producers. Moreover, DEQ appears not to care at all that the authority it has delegated to CAA may cause irreparable harm, stating in the hearing on Plaintiff's Motion for Preliminary Injunction, "[i]f the fees are more expensive than the profit margins, then that's just the reality of the situation." Bayer Decl. ¶ 3; Exhibit A at 45:5-9.

The California Strawberry Commission (the "Commission") is a member of NWGRA, and certain Commission members are obligated producers under the Act. Declaration of Rick Tomlinson ("Tomlinson Decl.") ¶¶ 6-7. Strawberries are packed into clamshells made of recycled plastic on the farm where they are grown, then transported to a "cooler" before being transported by truck all over the country within 48-hours. Tomlinson Decl. ¶ 9. The costs to package, cool, transport, market, and sell strawberries are deducted from what the farmers receive for the sale of the strawberries. *Id.* The fees under the Act are now also deducted from that amount, leaving farmers with virtually no return for the sale of the strawberries that they grow. *Id.*

Plaintiff also correctly identified that "[t]he retrospective and nontransparent nature of the fee structure also makes it impossible to predict what the fees will be or to account for them in sales." Dkt. 33 at 18. Fees charged by CAA under the Act for 2024 were not invoiced until July 2025, and CAA did not provide the 2025 fee schedule until June 2025. Dkt. 34 at ¶ 10, Ex. A p. 198. This retrospective approach makes it impossible for Producers to budget for fees charged under the Act. Commission members lack visibility into future sales, particularly due to the

PAGE 5 –    PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY
            ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
            NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

extreme volatility in the strawberry market which bears upon climate and weather factors. Tomlinson Decl. ¶ 8. This makes it impossible to project economic impacts accurately. *Id*.

**Limited Ability to Modify Packaging.** A common misconception underpinning the Act is that Producers have wide discretion to manage choices around packaging and therefore can control the fees by simply reducing packaging, or changing the type of packaging used. Strong Decl. ¶ 10. However, that is simply not the case. Factors that Proposed Intervenors report which prevent, preclude, or limit packaging from being modified include, without limitation:

- Existing contracts
- Retailer requirements and limitations
- Product size, shape, and fragility
- Transportation and logistical considerations
- Consumer and food safety
- Worker safety
- Competing packaging requirements, including those under federal law, such as those regulating food contact substances and food contact materials under 21 CFR Part 170.

Members of NWGRA have reported that packaging changes must be considered on a nationwide level, and do not have the ability to have different packaging for the same item across states. Dalton Decl. ¶ 10. As such, packaging changes for all states with packaging EPR programs, including Oregon, will impact all states. *Id*. Even attempting to use state specific packaging would drastically drive up the cost of goods. *Id*.

Strawberries have a short shelf life, bruise easily, and must be refrigerated. Tomlinson Decl. ¶¶ 8–9. The "clamshell" containers that strawberries are sold in have been a responsible end-market for PET beverage containers since 2000 and are 100% recycle-ready, as defined by the Association of Plastic Recyclers' guide. *Id*. at ¶ 12. A Life Cycle Analysis indicated that

PAGE 6 –   PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY
ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

PET berry clamshells have a lower environmental impact than fiber containers and switching from recycled plastic clamshells to paperboard would consume 1,000 acres of trees annually. *Id*. As such, packaging for strawberries has already been optimized, and there is no additional opportunity to revise packaging to reduce fees under the Act. *Id*.

For Pacific Coast Producers ("PCP"), packaging fruit into plastic bowls uses specialized packaging machinery that can only use certain types of materials and must also adhere to food safety standards. Strong Decl. ¶ 10. Any attempt to change this packaging is a multi-year effort involving international travel, production trial runs, tests to ensure products are shelf stable and can be loaded and remain intact through the entire chain of production, from manufacture to consumer. *Id*. Even when limited testing was conducted on using lighter weight plastic for fruit bowls, a heavier cardboard was required to ensure that the packaging stayed intact, making the overall packaging heavier, and environmental impacts greater. *Id*. at ¶ 11.

**Limited Ability to Pass On Fees.** Just like Plaintiff, members of Proposed Intervenors are limited with respect to passing on EPR fees because of pre-existing contracts, refusal by upstream suppliers to take on EPR liability, and competition considerations. There is also a very significant disproportionate impact between companies based on their size and position in the marketplace. For example, a large, national or multi-national Producer with strong bargaining power, integrated distribution, and vertical integration may have the ability to absorb EPR fees. However, smaller regional companies may have no choice but to raise the price of products, cut production, and limit services, all of which affects their ability to be competitive in the marketplace.

In the context of distilled spirits, Oregon is a control state with a price floor, meaning spirits are sold to the State through the Oregon Liquor and Cannabis Commission ("OLCC") and then sold to consumers through OLCC-operated stores. Mitchell Decl. ¶ 14. The State has established a minimum price floor for products, and a significant portion of HRD's sales in

PAGE 7 –    PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY
            ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
            NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

Oregon occur at this floor price.  *Id.*  HRD's competition at the price floor is mostly multinational conglomerates that can absorb a substantial overhead increase.  *Id.*[1]

**Disproportionate Allocations and Free Rider Problem.**  As pointed out by Plaintiff, the Act requires the Producer Responsibility Organization ("PRO") to first estimate the total system costs and then allocate those costs in various ways to be covered by producers.  Dkt. 33 at 20; Declaration of Brian Wild ("Wild Decl."), Dkt. 34 ¶¶ 11-13.  This sets up a system whereby the more participants in the program, the less each individual has to pay.  But this also allows for fee-paying members to cover the costs for those who are exempt or those who are recalcitrant. The "free rider" problem identified by Plaintiff also impacts Potential Intervenors' members: the "covered products" of those who choose not to participate adds to the total amount of materials that must be managed by the State's recycling system.  Therefore, those in compliance necessarily pay for their competitors who are "free riders," which increases their prices and costs of doing business putting those in compliance with the Act at a competitive disadvantage. Mitchell Decl. ¶ 15.

**Logistical Burdens, Significant Likelihood of Double-Counting.**  Calculating and reporting the weights of all packaging sold into Oregon, and paying fees based on material-specific rates has resulted in extreme hardships to Proposed Intervenors' members.  Wilhelms Decl. ¶ 9; Dalton Decl.  ¶ 9.  HRD has hundreds of packaging types, and it took the company two months to gather the necessary data, including weighing each type of packaging.  Mitchell Decl. ¶ 12.  In order to meet its data-gathering and reporting obligations under the Act, PCP's Director of Regulatory Affairs estimates that she spent 30 percent of her time in 2025 ensuring that reporting obligations under the Act were met.  Kennedy Decl. ¶ 9.  In addition, PCP had to dedicate one financial analyst to create a reporting system to extract data from other systems and

---

[1] *See* Mitchell Declaration ¶¶ 14-15 filed under seal, for additional details as to specific harm.

PAGE 8 –    PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY
                    ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
                    NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

compile data provided by other functions within PCP. *Id.* at ¶ 10. Data collection efforts included compilation of packaging materials and configurations for each product, compilation of the weight of each packaging component in each product, and creation of the ability to aggregate this data. *Id.* The packaging material types also needed to be mapped to the material classifications published by DEQ under the Act. *Id.* This information must be maintained and updated on an on-going basis due to packaging changes and product additions. *Id.*

The Act also requires Proposed Intervenors' members to report packaging for products that move through Oregon but that may not be used in Oregon due to lack of transparency in the stream of commerce. For example, one of OBI's members is a frozen food manufacturer. Wilhelms Decl. ¶ 11. They sell to a customer who has no distribution centers in Oregon, and yet they are aware that their products end up being sold in Oregon. *Id.* Similarly, a member of NWGRA reported that many of its products are manufactured outside of Oregon at one of its many facilities in other states. Dalton Decl. ¶ 11. They also sell to distributors and private label customers at a distribution center level who may bring the product into Oregon. *Id.* This member has had disputes arise with distributors and private label customers as to who is the designated "Producer," and the member company does not have visibility to these sales. *Id.* Additionally, though this member has provided packaging information to its private label customers, they have no visibility as to whether their customers have properly reported. *Id.*

Likewise, when strawberries are shipped from California to a distribution center in a state that borders Oregon, there is no way for the strawberry brand owner (the "Producer" under the Act) to know whether those strawberries are sold into Oregon or another state. Tomlinson Decl. ¶ 10. Likewise, even when strawberries are shipped to a distribution center in Oregon, there is no way for the strawberry brand owner to know if the strawberries are sold in Oregon or in another bordering state. *Id.*

PCP produces fruit and tomatoes in cans and other packaging that are grown in Central and Northern California. Kennedy Decl. ¶ 3, 5. PCP's customers include over 45,000 retail

PAGE 9 –    PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY
ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

grocery stores and over 1.5 million foodservice outlets such as hotels, schools, restaurants, prisons and hospitals nationwide. *Id*. ¶ 7. Information about the ultimate destination of products is not customarily shared by PCP's customers, nor is it customary for manufacturers to seek this information from their customers, because it is proprietary, competitive information. *Id*. ¶ 11. If granular distribution information were required to underpin public reports, then other distributors and manufacturers could determine market share of products, which is information that could be used for anticompetitive purposes. *Id*.

Since PCP cannot obtain state-specific sales data, it is forced to use a population-based formula to generate an estimate of its sales in any given state. *Id*. at ¶¶ 12-13. PCP knows that this method generates an inaccurate estimate, because population of a particular state has little to do with its sales. *Id*. at ¶ 13. PCP has no way to know the exact quantity of its products sold in Oregon because it may ship to a distributor in Oregon that then transports the product for sale into a neighboring state. *Id*. Since PCP's products are shelf-stable, products shipped in one calendar year may be sold in a later year. *Id*. As such, there is a very significant risk of under- or over-reporting. *Id*.

**Obligated Producers are Forced to Enter Into Agreements with the Sole Producer Responsibility Organization.** As with Plaintiff, Potential Intervenor's members must register with Circular Action Alliance ("CAA") as the sole approved PRO. Under the Act, obligated companies are forced to enter into a non-negotiable participation agreement with CAA, as well as a non-negotiable Oregon Addendum to the participation agreement which contains a clause requiring binding confidential arbitration for resolution of disputes. Tomlinson Decl. ¶ 11; Mitchell Decl. ¶ 6; Kennedy Decl. ¶ 8; Declaration of Amy Prosenjak in support of Proposed Intervenor's Motion to Intervene  ("Prosenjak Decl.") ¶ 6; Declaration of Gary Mortensen in support of Proposed Intervenor's Motion to Intervene ("Mortensen Decl.") ¶ 9; Wilhelms Decl. ¶ 10.

PAGE 10 –   PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY
            ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
            NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

## III.    LEGAL STANDARD

A court should grant a preliminary injunction where a plaintiff establishes that: (1) it will likely succeed on the merits; (2) it will likely suffer irreparable harm absent preliminary relief; (3) the balance of equities is in its favor; and (4) an injunction is in the public interest. *Winter v. Natural Resources Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  In assessing these factors, the Ninth Circuit uses the "sliding scale" approach, wherein "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

## IV.    ARGUMENT

### A.    Proposed Intervenors are Likely to Succeed on the Merits or Present Serious Questions on the Merits.

Within the sliding scale framework, this Court applied the "serious questions" test to the merits factor in granting injunctive relief to Plaintiff, finding that "[s]erious questions go to the merits of Plaintiff's claims, there is a likelihood of irreparable injury, and the balance of hardships tips sharply in favor of Plaintiff."  Dkt. 88 at 2 citing *Cottrell*, 632 F.3d at 1131–32. The Court should likewise apply the factors to Proposed Intervenors and rule that the merits factor is met.

Under the "serious questions" test, even if a plaintiff does not establish likelihood of success on the merits, establishment of (1) "serious questions going to the merits" and (2) "a hardship balance that tips sharply toward the plaintiff" will support an injunction—so long as the irreparable harm and public interest factors are also satisfied. *Cottrell*, 632 F.3d at 1131–32; *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024). "Serious question[s]" are questions that "cannot be resolved one way or the other at the hearing on the injunction because they require more deliberative investigation." *Manrique v. Kolc*, 65 F.4th 1037, 1041 (9th Cir. 2023) (internal quotations omitted).  As such, the "serious questions" factor is "a lesser showing than likelihood of success on the merits." *Flathead-Lolo-Bitterroot*

PAGE 11 –   PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

*Citizen Task Force*, 98 F.4th at 1190 (internal quotations omitted).  As set forth below, Proposed Intervenors can demonstrate serious questions going to the merits and a hardship balance that tips sharply toward in their favor with respect to each claim that remains in this matter.

**a)      The Dormant Commerce Clause**

As Plaintiff showed, and as Proposed Intervenors now also show, the Act violates the dormant commerce clause both by discriminating against interstate commerce and imposing burdens on interstate commerce.

The Constitution's Commerce Clause, U.S. Const. art. I, § 8, cl. 3, grants Congress the power to regulate commerce among the states.  *Am. Trucking Ass'ns, Inc. v. Michigan Pub. Servs. Comm'n*, 545 U.S. 429, 433 (2005).  Alongside this grant of authority, the Commerce Clause contains "a further, negative command, known as the dormant Commerce Clause", *Id.*, which "prohibits state laws that unduly restrict interstate commerce[,]" *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019).  Notably, it "[i]s an implicit restraint on state authority, even in the absence of a conflicting federal statute."  *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007).  The dormant Commerce Clause operates within two primary prongs: "First, state regulations may not discriminate against interstate commerce; and second, States may not impose undue burdens on interstate commerce." *South Dakota v. Wayfair*, 585 U.S. 162, 173 (2018).  The Act does both, and as such violates the dormant Commerce Clause.

**(1)      The Act Unlawfully Discriminates Against Interstate Commerce**

The Act's broad application to virtually all types of products, all types of packaging, and imposing obligations upon a wide range of participants in the chain of commerce results in a scheme which unlawfully discriminates against interstate commerce.

The "antidiscrimination principle lies at the 'very core' of [the] dormant Commerce Clause jurisprudence." *Nat'l Pork Producers Counc. v. Ross*, 598 U.S. 356, 369 (2023) (quoting

PAGE 12 –   PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY
                ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
                NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 581 (1997)).  Primarily, the dormant Commerce Clause "prohibits the enforcement of state laws driven by . . . economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."  *Flynt v. Bonta*, 131 F.4th 918, 923 (9th Cir. 2025) (internal quotation omitted).  State laws that so discriminate "face 'a virtually *per se* rule of invalidity.'"  *Id.* (quoting *South Dakota*, 585 U.S. at 173).  "[I]f a state law discriminates against out-of-state goods or nonresident economic actors, the law can be sustained only on a showing that it is narrowly tailored to 'advance a legitimate local purpose.'"  *Tennessee Wine*, 588 U.S. at 518 (quoting *Department of Revenue of Kentucky v. Davis*, 553 U.S. 328, 388 (2008)); *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013) ("If a statute discriminates against out-of-state entities on its face, in its purpose, or in its practical effect, it is unconstitutional unless it 'serves a legitimate local purpose, and this purpose could not be served as well by available nondiscriminatory means.'" (quoting *Maine v. Taylor*, 477 U.S. 131, 138 (1986)).

It is without question that the Act is only designed to benefit the State of Oregon, because it creates a new statewide recycling infrastructure, and provides no benefits to those outside of Oregon.  Nonetheless, the Act is designed to make those in the chain of commerce *furthest* from the point of sale in Oregon pay for this new recycling infrastructure.  Under the tiered definition of Producer, ORS 459A.866(1)(a) provides that for items sold in packaging under the manufacturer's own brand at a physical retail location in Oregon, the "producer" of the packaging obligated to report the weight of packaging and pay fees under the Act "is the person that manufactures the packaged item."  Other obligated producers include distributors, importers, and the first to sell certain products into the State.  *Id*.  As such, "the scheme is designed to shift costs away from instate consumers and in-state retailers while imposing disproportionate logistical and economic burdens on those who operate in interstate supply chains."  Dkt. 33 at 27, citing Allen Decl. ¶¶ 7–8, 12–13, 16, 20; Winkle Decl. ¶¶ 17–19.

PAGE 13 –  PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY
            ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
            NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

Under the Act, nearly all interstate commerce involving packaged goods is subject to fees that are akin to a tax or tariff imposed upon those selling goods into Oregon.  State laws have been invalidated where they amount to a state tariff, *Comptroller of Treasury of Md.v. Wynne*, 575 U.S. 542, 545 (2015).  The Act does not call the fees that producers are required to pay a "tax," but rather "membership fees," which are paid to a private third party (CAA) to pay "for the recycling and processes of those materials, including by funding and reimbursing services provided by local governments."  Dkt. 33 at 25.  For the reasons explained in Plaintiff's Motion for Preliminary Injunction, the fees under the Act are invalid because they are not a fair approximation of the costs reasonably attributable to members of Proposed Intervenors, and they are clearly excessive in relation to the benefits conferred.  Dkt. 33 at 26-27.

**(2)     The Act fails the *Pike* Balancing Test, and Therefore Imposes Excessive Burdens on Interstate Commerce**

Undue burdens on interstate commerce are analyzed under the *Pike* balancing test. Generally, the threshold inquiry to *Pike* balancing is whether a challenged law imposes a "substantial" or "significant" burden on interstate commerce."  *See Id.* at 24.  If a plaintiff can show that burden, "the court proceeds to determine whether that burden is 'clearly excessive in relation to the putative local benefits.'"  *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).  Such burdens may be direct or indirect.  *Pike*, 397 U.S. at 142.

Among such clearly excessive burdens is state regulation in fields where "a lack of national uniformity would impede the flow of interstate goods[.]"  *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012) (quoting *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 128 (1978)).  *See also General Motors Corp. v. Tracy*, 519 U.S. 278, 298 n. 12 (1997) (laws may fail the *Pike* balancing test where they "undermine[] a compelling need for national uniformity in regulation").  Similarly, state laws may be invalidated under *Pike* where they "prevent[] the continuous flow of commerce *through* the regulating jurisdiction." *Association to Preserve and Protect Local Livelihoods v. Sidman*, 147 F.4th 40, 57 (1st Cir.

PAGE 14 –   PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

2025) (emphasis original).  Among laws that failed under *Pike* are an Arizona law regulating cantaloupe packaging, *Pike*, 397 U.S. at 140, and a California property tax on shipping containers as "instruments of international traffic[,]" *Japan Line Ltd. V. County of Los Angeles*, 441 U.S. 434, 453 (1979).

The Act fails the *Pike* test because of the substantial burdens it imposes on interstate commerce, that are "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142.  These substantial burdens are detailed at length above, and the local benefits are difficult to identify, let alone measure against the excessive burdens.  This is particularly true where the fee structure has the deleterious effect of incentivizing packaging that is more difficult to recycle, such as lightweight plastics and Styrofoam, because the fee formula is based on weight.  "Thus, if the more sustainable packaging (e.g., recyclable glass) is significantly heavier than the non-recyclable plastic alternative, the formula may penalize producers who switch to more sustainable packaging."  Dkt. 33 at 18–19, footnote and citation omitted.  This is exemplified by the excessive fees charged to OBI member HRD, who points out that by charging $0.11 per pound for easily recycled glass bottles and $0.12 per pound for rigid plastic, it is incentivized to switch to plastic bottles because plastic is much lighter than glass, and the company's fees would likewise be significantly less.  Mitchell Decl. ¶ 11.  The same goes for any lightweight, environmentally detrimental forms of packaging such as foams and plastics, over heavier packaging materials like glass and cardboard.  Pacific Coast Producers investigated making plastic bowls to hold fruit out of lighter weight plastic.  Strong Decl. ¶ 11.  As a result, the paperboard sleeves around the bowls needed to be heavier in order to adequately protect the integrity of the packaging ultimately making the product heavier, increasing shipping costs, and likely increasing greenhouse gas emissions during transport.  *Id*.  In addition, the CAA Program Plan sets forth a budget that includes $24.6 million (13%) the first year (2025) for PRO management and administration and start-up costs.  Wild Decl. Dkt. 34 ¶ 6; Dkt. 34-1 at 300.  Therefore, the local benefits under the Act are largely illusory, and we begin to see that the

PAGE 15 –   PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

scheme is more about collecting money—particularly on the front end—than it is about diverting waste in Oregon.

One of the most significant burdens that the Act imposes on interstate commerce is the requirement that producers follow the packaging to its ultimate destination to determine whether it must be reported. Failure to do so can result in double-counting. In a state like Oregon which is bordered by three other states, two of which have larger economies than Oregon (California and Washington)[2] products necessarily move through the State in a manner that is difficult for producers to track, particularly since producers are those furthest from the retail point of sale in the chain of commerce. There is further pressure on companies without visibility into the final point of sale for their products, leading to an opportunity to overpay. Dillon Decl. ¶ 12. Products often leave a food manufacturer and are then moved through an independent distributor or a major retailer's distribution network. *Id.* The point of final sale is proprietary to the distributor and/or retailer and therefore is often not shared with the manufacturer who then has no way to know what products end up sold in Oregon. *Id.*

Plaintiff provided copious evidence of the issue of product-tracking, which is particularly burdensome on those in the middle of the chain of commerce. But it is likewise burdensome for other types of Producers. PCP is an agricultural cooperative manufacturing fruit and tomatoes in cans and other packaging. Kennedy Decl. ¶ 11. A member of Food Northwest, PCP is the responsible Producer under the Act for all of the products it manufactures under its own brands, the significant majority of which are sold to national or regional distributors, not directly to retailers. *Id.* As such, PCP has no control over where its products are sold, and no reasonable way to find out. *Id.*

---

[2] Bureau of Economic Analysis, U.S. Department of Commerce. State annual gross domestic product ("GDP") summary, available at https://shorturl.at/7zoxy, showing 2024 GDP for California at more than $4 trillion; for Washington at more than $856 billion, and for Oregon at just more than $330 billion.

PAGE 16 –   PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY
            ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
            NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

Burdens further include pressure on employees to identify their company's compliance and fee obligations under the program at the same time neither DEQ nor CAA would or could answer questions about business to business exemptions, material classifications, the possibility of double counting materials, and other programmatic details.  Dillon Decl. at ¶ 10. Interpretations of category types in the program make a material difference in the fees owed.  *Id.* These distinctions can mean a difference of hundreds of thousands of dollars per year.  *Id.*  The fee assessment was not disclosed early enough to allow companies to estimate or budget for the fees putting cost pressure on companies mid-budget cycle.  *Id.* at ¶ 11.  CAA did not provide adequate mechanisms for late-registering companies to get into the program and "make good" on their fees and therefore left the full costs of the program on the shoulders of those companies that did register and pay timely.  *Id.*

Related pre-*Pike* cases additionally invalidated state laws that directly "regulat[ed] the instrumentalities of interstate transportation," such as trucks and trains.  *Natn'l Pork Producers Couns.*, 598 U.S. at 380; *Id.* at n. 2 (citing *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 523–30 (1959) (regulating mud flaps for trucks and trailers); *Southern Pacific Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 763–82 (1945) (regulating train length)).  Packaging, like trucks and trains, is an instrumentality of interstate commerce because products and goods cannot move in interstate commerce without the packaging that the Act requires.  For example, 1.2% of all strawberries grown in California are shipped for sale to Oregon.  Tomlinson Decl. ¶ 3. Strawberries only have a 15-day shelf life and must be packed and transported carefully to address quality and food safety concerns.  *Id*. at ¶ 8.  The clamshell packaging used for strawberries is made of recycled plastic and was carefully designed to promote food safety, prevent damage, and reduce food waste by preventing spoliation in transit.  *Id*. at ¶ 12.  The Act regulates this packaging and requires California strawberry farms to pay a weight-based fee for all clamshells sold in Oregon, despite the fact that without this packaging the product could not move at all in interstate commerce.  Likewise, PCP manufactures shelf-stable fruit and tomato

PAGE 17 –   PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY
ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

products which are packaged in cans, glass and plastic jars, plastic bowls, and pouches which move in interstate commerce to grocery stores, hotels, schools, restaurants and institutions nationwide. Strong Decl. ¶ 6-7. PCP's products must remain intact from the manufacturer to a truck, in transit to at least one warehouse, in transit again from a warehouse to a retailer, where it is loaded, stored, and loaded again onto a shelf for the customer, and then transported by the customer. *Id*. at ¶ 10. If the weight or strength of the packaging is reduced, then there is a greater risk of exposing the public to foodborne illness or of having to dispose of spoiled product when the packaging fails during transportation. *Id*. at ¶ 12. As such, packaging is an instrumentality of interstate commerce upon which the Act's requirements impose significant burdens in violation of the dormant commerce clause.

### b)      Due Process

When government delegates regulatory authority to private entities, significant constitutional due process issues arise. The Supreme Court has long established that such delegations are only permissible when they include strong constitutional safeguards.

Of particular concern is delegation of regulatory authority to private entities in the same industry—and thus, in competition—with those they are regulating. As the Supreme Court squarely explained, "one person may not be [e]ntrusted with the power to regulate the business of another, and especially of a competitor. And a statute which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal liberty and private property." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (holding that statutory scheme granting regulatory authority to a body of coal producers and laborers over wage and hour standards in the coal industry was unconstitutional as a violation of the due process clause of the Fifth Amendment). In such delegatory situations, due process may be violated in myriad ways.

As Plaintiff explains, CAA's "founding members" are among some of the nation's largest companies that are themselves large producers under the Act, and who have representatives on CAA's Board of Directors. Dkt. 33 at 28; Wild Decl. Dkt. 34 ¶ 8; Dkt. 34-2 at 2-3. As with

PAGE 18 –   PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, CAA's founding members "may be competitors with [Proposed Intervenors']
members," or "may be retailers or suppliers who have a distinct self-interest in making sure that
companies like [Proposed Intervenors] bear a larger share of the costs." *Id.* at 28–29. The litany
of conflicts of interest that the Due Process Clause forbids set forth in Plaintiff's Motion for
Preliminary Injunction (Dkt. 33 at 29; Wild Decl. Dkt. 34 ¶ 9.) is adopted and incorporated by
reference.

Delegation of regulatory power to private entities violates due process where the
delegating authority does not retain meaningful discretion over the delegee's decisions. *Eubank
v. City of Richmond*, 226 U.S. 137, 143–44 (1912) (striking down ordinance allowing two-thirds
of property owners to establish building lines for neighboring properties as violation of due
process because the delegating municipality failed to retain meaningful oversight and was
instead simply implementing private decisions); *State of Washington ex rel. Seattle Title Trust
Co. v. Roberge*, 278 U.S. 116, 122–23 (1928) (holding that delegation of governmental authority
to private landowners over zoning determinations violated due process because the ordinance did
not provide any mechanism for governmental review of landowners' decisions).

One of the most significant and troubling delegations of power to CAA is CAA's ability
to freely change fee schedules without DEQ approval, and adjust the fees imposed on individuals
without adequate notice and opportunity to be heard. As demonstrated by HRD's experience,
when CAA was approached with questions about the accuracy of its invoices, CAA responded
that HRD would have to verify that the invoice was correct itself, and if errors were found HRD
could *request* an adjustment. Mitchell Decl. ¶ 10, Ex. 2 at 1. The request for adjustment is
approved or denied in CAA's sole discretion. Mitchell Decl. Ex. 2 at 1. Even if CAA approves
a fee adjustment, it "will result in either an additional invoice or a future credit." *Id.* In addition,
CAA has proclaimed that "producers are only allowed one adjustment request for a submitted
report." *Id.* DEQ is not involved in this process, and there is no opportunity for appeal because
under the agreement (which Producers are forced to enter into with CAA), any and all disputes

PAGE 19 –   PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY
            ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
            NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

must be resolved through confidential arbitration. This broad and unchecked delegation of authority to an organization made up of the competitors of those being regulated is a clear violation of due process.

Due process additionally requires the delegating authority to establish clear standards to govern private decision-making. *Eubank*, 226 U.S. at 143–44 ("the statute and ordinance, while conferring the power on some property holders to virtually control and dispose of the property rights of others, creates no standard by which the power thus given is to be exercised"); *Roberge*, 278 U.S. at 122 ("The[ landowners] are not bound by any official duty, but are free to withhold consent for selfish reasons or arbitrarily and may subject the [regulated parties] to their will or caprice."). CAA's lack of such standards fails to uphold constitutional due process protections.

Indeed, due process necessitates both that "regulated parties [] know what is required of them so they may act accordingly" and that regulating parties have "precision and guidance" so that they "do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox Television Stations*, 567 U.S. 239, 253 (2012). No such safeguards are provided here, as CAA has exercised its broad and unchecked power to develop policies under which it administers the Act without rulemaking authority and without rulemaking process and procedure. As set forth on CAA's website:

> [CAA] is responsible for establishing and maintaining policies that define producer obligations under [EPR] laws and participation in the [PRO]. These policies set forth the specific requirements producers must meet—covering registration, reporting, and fee payment—in order to remain in good standing and fully compliant with both state EPR programs and CAA's participation agreements. CAA retains sole authority to develop, interpret, and amend these policies as needed to uphold regulatory compliance, ensure equitable treatment across producers, and support the effective administration of EPR responsibilities.[3]

---

[3] Circular Action Alliance website, Producer Policies, available at https://circularactionalliance.org/producer-policies (last accessed on March 12, 2026).

PAGE 20 –  PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

This unchecked delegation of authority without required government agency oversight defies principles of due process and should not be permitted to stand. While DEQ argued that it didn't "think an argument can reasonably be made under the circumstances that DEQ is not very closely involved in overseeing this program," Bayer Decl. ¶ 3; Exhibit A at 63:20-24, DEQ then admitted that it only approves the program plan and "doesn't need to be involved" in interactions with individuals. *Id*. at 64:4–11. This is precisely the lack of oversight that courts have found to be unconstitutional on due process grounds. *Carter,* 298 U.S. at 311; *Eubank*, 226 U.S. at 143, and *Roberge*, 278 U.S. at 122.

CAA and DEQ's collective refusal to make available the details behind its fee-setting methodology also violates due process because of lack of specificity. As discussed during the hearing in this matter, DEQ considers CAA's fee-setting methodology to be confidential so that CAA is protected from competition from other potential PROs, which the Court identified as "private-sector oriented and for the benefit of the Board of Directors of CAA." Declaration of Maureen Bayer ("Bayer Decl."), ¶ 3; Exhibit A at 36:22 – 38:22; 40:1-20. The Court had never seen a law approved constitutionality "where, No. 1, the methodology of how they determine the fees is kept confidential; [and] No. 2 there isn't any way to even appeal individual fee determinations back up to the State." *Id*. at 41:14-21. Due process requires that regulated parties be given "more than the general explanation that several factors may have affected their individual [determinations]." *K.W. ex rel. D.W. v. Armstrong*, 298 F.R.D. 479, 490 (D. Idaho 2014), aff'd 789 F.3d 962, 968 (9th Cir. 2015). Such lack of specificity "does not explain which combination of factors affect[s] each [regulated party's determination] on an individualized level[,]" *Id*., and without it parties are denied "an effective opportunity to defend" against those decisions, *Goldberg v. Kelly*, 397 U.S. 254, 267-68 (1970). Such a denial is "fatal to the constitutional adequacy of the procedures." *Id*. at 268.

Proposed Intervenors have demonstrated, at the very least, that serious questions go to the merits of their claims. As described below, Proposed Intervenors can also show a likelihood of

PAGE 21 – PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

irreparable injury, and that the balance of hardships tips sharply in their favor, such that this motion should be granted.

### B.    Irreparable Harm

Injunctive relief should be awarded where the movant is subject to "irreparable harm[,]" meaning that legal remedies are "insufficient." *Beacon Theaters, Inc. v. Westover*, 359 U.S. 500, 507–08 (1959); *Arizona Dream Act Coal v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (Irreparable harm is harm "for which there is no adequate legal remedy").  This Court found that there is a substantial likelihood of irreparable harm to Plaintiff "in part because of the very expensive penalty fees that are possible."  Bayer Decl. ¶ 3; Exhibit A at 97:23-25.  This irreparable harm identified by the Court is equally applicable to Proposed Intervenors as to Plaintiff' because their members are also obligated as Producers under the Act.

In addition, "it is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury[]'" in the analysis for preliminary injunction. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  When an alleged deprivation of a constitutional right is at issue, most courts have held that a further showing of irreparable injury is unnecessary.  Indeed, the Supreme Court has reemphasized this principle time and time again, most recently in *Mirabelli v. Bonta*, 2026 U.S. 575049 at *3, 607 U.S. ---- (2026) where, in no more than a single sentence assessment on the irreparable harm prong for injunctive relief, the Court concluded that, "[t]he denial of plaintiffs' constitutional rights . . . constitutes irreparable harm." *See also Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020).  Here too, Proposed Intervenors have sufficiently demonstrated serious due process concerns such that irreparable injury should be inferred.

However, even where a party's harm is an economic loss, and therefor potentially calculable as damages, "when the loss is so great as to threaten the existence of the moving party's business, then a preliminary injunction may be granted, even though the amount of direct financial harm is readily ascertainable." Fed. Prac. and Proc. § 2948.1.  *See, e.g., Steves and*

PAGE 22 –    PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY
              ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
              NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

*Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 719 (4th Cir. 2021) (holding that the closing of the movant's business due to imposed economic hardship constitutes irreparable harm); *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) ("[T]he right to continue a business . . . is not measurable entirely in monetary terms, the [movants] want to [continue their business], not to live on the income from a damages award."). Further, harm of an economic nature may be irreparable where movants experience (or will experience) loss of customers, goodwill, revenue, or business opportunity. *See Stuhlbarg International Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001); *Stanley v. University of Southern California*, 13 F.3d 1313, 1324 (9th Cir. 1994).

As demonstrated in the facts above, the unreasonable burden that the Act places upon Proposed Intervenors' members includes significant economic damage in the form of excessive and non-transparent fees translating to loss of revenue; conditions of unfair competition with respect to competitors who fail to comply with the Act; and for those not large enough to "absorb" the excessive fees under the Act, they will be forced to raise prices resulting in loss of customers, goodwill, revenue and business opportunity. *See* Dillon Decl. ¶ 13.

Lastly, economic harm may be irreparable even if the loss can be quantified due to the inability to recover damages. *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) ("[W]here parties cannot typically recover monetary damages flowing from their injury . . . economic harm can be considered irreparable."); *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) ("If expenditures cannot be recouped, the resulting loss may be irreparable."). Sovereign immunity of governmental officials and entities, for example, is a significant barrier to monetary recovery which supports a finding of irreparable harm. *See Washington v. Trump*, 145 F.4th 1013, 1036 (2025); *Will v. Michigan Department of State*, 491 U.S. 58, 70–71 (1989).

PAGE 23 –   PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY
            ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
            NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

As Plaintiff previously identified, if Proposed Intervenors continue to pay fees under the Act to CAA, it is very unlikely that such payments can be recovered because CAA is not a party to this action.

### C.     Balance of Equities and Public Interest Weighs in Favor of Granting the Preliminary Injunction.

A movant must show that the balance of equities is in its favor[4] and that a preliminary injunction is in the public interest.  As this Court found with Plaintiff, the balance of harms and public interest tips sharply in favor of Proposed Intervenors such that an injunction should be granted.  Courts "must balance the competing claims of injury and must consider the effect on each party the granting or withholding of the requested relief" to assess the balance of equities. *Winter*, 555 U.S. at 24 (quoting *Amoco Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 542 (1987)).  In weighing the public interest, courts consider how the injunction would affect not only the immediate litigants, but also the broader public served by government operations.  *See, e.g.*, *Winter*, 555 U.S. at 24–25 (considering how restrictions on Navy sonar training could affect national security and fleet preparedness beyond the immediate parties to the litigation).  Though usually two separate prongs, "[w]here the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020); *see also Biard v. Bonta*, 81 F.4th 1036, 1039–40 (9th Cir. 2023).  This merger reflects that government entities ostensibly act in the public interest, so their institutional interests align with broader public concerns.

Despite this assumed alignment, "it is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when

---

[4] Establishment of "a hardship balance that tips sharply toward the plaintiff" will support a preliminary injunction alongside "serious questions going to the merits" without the need to show a likelihood of success on those merits. *All. for the Wild Rockies*, 632 F.3d. at 1131–32; *Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1190.

PAGE 24 –   PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY
ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

there are no adequate remedies available." *Valle Del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (internal quotation omitted); *J.L. v. Cissna*, 341 F.Supp.3d 1048, 1070 (N.D. Cal. 2018) ("The[ balance of hardships and public interest factors] weigh in favor of a preliminary injunction when plaintiffs have also established that the government's policy violates federal law.") Indeed, "it is *always* in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (emphasis added); *Gordon v. Holder*, 721 F.3d 638, 653 ("enforcement of an unconstitutional law is always contrary to the public interest."). As the Supreme Court maintains,

> [o]ur deference in matters of policy cannot, however, become abdication in matters of law. . . . Our respect for [government's] policy judgments thus can never extend so far as to disavow restraints on [governmental] power that the Constitution carefully constructed. The peculiar circumstances of the moment may render a measure more or less wise, but cannot render it more or less constitutional.

*National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 538 (2012) (internal quotation omitted); *see also Gordon*, 721 F.3d at 653 (the law "does not permit [government] to prioritize any policy goal over the [Due Process Clause]").

As set forth herein and in the attached declarations of Proposed Intervenors and their members, the burdens the Act imposes are significant, immediate, and irreparable. They also far outweigh the benefit that may someday be conferred on the local public interest in recycling, particularly where the scheme in question incentivizes those regulated to use environmentally detrimental materials over materials that are easily recyclable because they weigh less. Granting the requested injunction will avoid imposition of irreparable harm on Proposed Intervenors, including financial harm and significant burdens to these businesses operating in interstate commerce.

/ / /

/ / /

/ / /

PAGE 25 –  PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION

## V.    CONCLUSION

In accordance with the above-stated reasons, and in alignment with the Court's prior grant of Plaintiff's Motion for Preliminary Injunction, Proposed Intervenors respectfully request that the Court issue a preliminary injunction barring Defendant from directly or indirectly enforcing the Act and regulations promulgated thereunder against Proposed Intervenors or their members, and from taking such actions as may be necessary to defer the obligation of Proposed Intervenor's members to pay fees under the Act, pending final adjudication of the merits of this action.

DATED:  March 16, 2026.

TONKON TORP LLP


By:    *s/ Maureen S. Bayer*
Steven Wilker, OSB No. 911882
 Direct: 503.802.2040
 Email: steven.wilker@tonkon.com
Maureen S. Bayer, OSB No. 214905
 Direct:  503.802.2115
 Email:  maureen.bayer@tonkon.com
*Attorneys for [Proposed] Intervenors Oregon*
*Business and Industry Association, Northwest*
*Grocery Association, and Food Northwest*

039545\00002\19290517v10

PAGE 26 –   PROPOSED INTERVENORS OREGON BUSINESS AND INDUSTRY
            ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
            NORTHWEST'S MOTION FOR PRELIMINARY INJUNCTION