# EXHIBIT A

Darin Sands, OSB No. 106624
dsands@bradleybernstein.com
BRADLEY BERNSTEIN SANDS LLP
1211 NW Glisan St., Ste 204
Portland, OR 97209
Telephone: +1 503-734-2480

David R. Carpenter*
drcarpenter@sidley.com
Caleb J. Bowers*
cbowers@sidley.com
SIDLEY AUSTIN LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213 896 6000

Gordon D. Todd*
gtodd@sidley.com
Richard W. Smith*
rwsmith@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736 8000

* *Pro hac vice*

Attorneys for Plaintiff NATIONAL
ASSOCIATION OF WHOLESALER-
DISTRIBUTORS

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
### PORTLAND DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS, | Case No. 3:25-cv-01334-SI |
| Plaintiff, | **PLAINTIFF'S TRIAL WITNESS LIST** |
| v. | **Complaint Filed: July 30, 2025** |
| LEAH FELDON, DIRECTOR, OREGON DEPARTMENT OF ENVIRONMENTAL QUALITY, in her official capacity, | |
| Defendant. | |

1

Plaintiff National Association of Wholesaler-Distributors ("NAW") makes the following disclosure of its final trial witnesses pursuant to the Court's March 4, 2026 Trial Management Order (Dkt. 91) and May 28, 2026 Trial Management Order Addendum (Dkt. 138).

## I.    Lay Witnesses

The following individuals are possible fact witnesses who NAW may call at trial to support any claim or defense:

1)    **Brian Wild**, Chief Government Relations Officer of Plaintiff National Association of Wholesaler-Distributors ("NAW"). Address: c/o National Association of Wholesaler-Distributors, 1325 G St NW #1000, Washington, DC 20005. Counsel estimates that Mr. Wild's direct examination will last approximately 2–3 hours.

Mr. Wild may testify regarding Plaintiff NAW, including its mission, its members, and the wholesaler-distributor industry. Mr. Wild may further testify regarding NAW's interest in the subject matter of this lawsuit, including: the status of NAW members as Producers under the Plastic Pollution and Recycling Modernization Act ("the Act"), financial and operational burdens members have experienced in connection with the Act, and the basis of the foregoing burdens in the facial mechanics of the Act.

Mr. Wild may further testify regarding wholesaler-distributors' limited control over the specifications of covered products in their portfolio, including because of food-safety requirements, upstream supplier specifications, and wholesaler-distributors' particular role in supply chains.

Mr. Wild may further testify regarding a lack of compliance options under the Act, including: An inability to feasibly create a standalone producer responsibility program; the founding and leadership of the Circular Action Alliance and its Oregon Affiliate (collectively, "CAA"); the mandatory nature of CAA participation and assent to the Oregon Addendum to the participation agreement; and an absence of opportunity to negotiate the terms of participation in CAA.

PLAINTIFF'S TRIAL WITNESS LIST

Mr. Wild may further testify regarding the nature of wholesaler-distributors' business model, and the Act's impact on that business model, including: Thin profit margins as inherent to its distribution business; a resulting inability to absorb costs; a lack of pricing power to pass fees through to customers, and products that sell at a loss following the Act's imposition of fees.

Mr. Wild may further testify regarding the limitations of, and burdens experienced in connection with, product tracing, including the difficulty and expense of tracking product movement through different jurisdictions, and wholesaler-distributors' capacity to pay for such tracking.

Mr. Wild may further testify regarding the burdens wholesaler-distributors have experienced in connection with CAA's fees and manner of assessing fees, including: A lack of access to CAA's fee methodology and inputs to that methodology, and resulting inability to review invoices for accuracy or proportionality of costs; duplicative fees assessed both to wholesaler-distributors and upstream manufacturers; pricing and profitability concerns arising from the retrospective nature of fee assessments under the Act; the obstacles to challenging fee assessments; and an inability to avoid duplicative fees through the timely production of corrected data.

Mr. Wild may further testify regarding the necessity of, and burdens experienced in connection with, EPR fee passthrough, including: A loss in market competitiveness stemming from competing with small producers and obligated producers who nevertheless fail to report covered products; a loss of competitiveness in interstate markets to the extent upstream producers pass EPR-related costs through to Oregon distribution centers and thereby increase the cost of selling products outside of Oregon; rerouting shipments from and avoiding distribution into Oregon; inability to compete in Oregon due to EPR-related costs; and practical limits to price increases and wholesaler-distributors' resulting inability to restore already-thin profit margins.

Mr. Wild may further testify regarding coordination difficulties with upstream producers, including: Upstream producers' significant, non-itemized price increases; difficulty attributing the foregoing price increases to EPR reporting; upstream producers' unwillingness to disclose their reporting status; upstream producers' unwillingness to disclose the covered-product information

PLAINTIFF'S TRIAL WITNESS LIST

necessary for downstream wholesaler-distributors to discharge their obligations under the Act; wholesaler-distributors' inability to otherwise obtain covered-product information necessary to discharge their obligations under the Act; the absence of a centralized resource for determining upstream producers' reporting status or covered-product information; and the compounding of these difficulties by certain wholesaler-distributors' large and continually-changing product portfolio.

Mr. Wild may further testify regarding the burdens wholesaler-distributors have experienced as a result of uncertainty surrounding upstream producers' reporting status, including having either to pay duplicative fees where first-obligated producers refuse to pay EPR fees or disclose their reporting status, or to forgo such payment and subject themselves to enforcement risk.

Mr. Wild may further testify regarding the burdens associated with the manual determination of covered products' specifications for reporting purposes, including the labor and expense associated with product analysis, and the need for repeat-testing in light of a continually-changing product portfolio.

Mr. Wild may further testify regarding medium-sized wholesaler-distributors' competitive disadvantages relative to large producers, including: Medium-sized wholesaler-distributors' practical inability to conduct life cycle evaluations and avail themselves of incentives or bonuses under the Act; medium-sized wholesaler-distributors' practical inability to absorb or pass through EPR fees; and, to the extent large producers are represented on CAA's Board, large producers' inequitable level of access to and influence over program officials and regulatory materials.

Mr. Wild may further testify regarding the burdens of complying with other state EPR programs alongside the Oregon EPR Program, including the need for additional product testing, initial regulatory analysis and ongoing compliance tracking, and broader challenges associated with complying with unreconciled EPR regimes.

Mr. Wild may further testify regarding communication difficulties with CAA and DEQ, including: Unsuccessful attempts at avoiding overpayment of fees through the timely correction

PLAINTIFF'S TRIAL WITNESS LIST

of reporting data, receipt of generic answers to questions not fully responsive to the questions posed, the inability of producers to obtain guidance from CAA interpreting the RMA and its implementing regulations, and a history of failing to answer queries or otherwise return communications.

The foregoing may include testimony pursuant to Federal Rule of Civil Procedure 26(a)(2)(C), which will be based on Mr. Wild's education, training, and experience, the materials disclosed by NAW and NAW members in this proceeding, and the testimony offered by other witnesses in this matter.

**2)     Corey Rodriguez**, Vice President of Sales – West Region at RJ Schinner Co., Inc. ("RJ Schinner"). Address: c/o RJ Schinner Corporate, N89W14700 Patrita Drive, Menomonee Falls, WI 53051. Counsel estimates that Mr. Rodriguez's direct examination will last approximately 2–3 hours.

Mr. Rodriguez may testify regarding RJ Schinner's limited control over the specifications of covered products in its portfolio, including because of food-safety requirements, upstream supplier specifications, and re-distributors' particular role in supply chains.

Mr. Rodriguez may further testify regarding a lack of compliance options under the Act, including: An inability to feasibly create a standalone producer responsibility program; the mandatory nature of CAA participation and assent to the Oregon Addendum to the participation agreement; and an absence of opportunity to negotiate the terms of participation in CAA.

Mr. Rodriguez may further testify regarding the nature of RJ Schinner's business model, physical location(s) in Oregon, and the Act's impact on RJ Schinner's business model, including: Thin profit margins as inherent to its re-distribution business; a resulting inability to absorb costs; a lack of pricing power to pass fees through to customers; products that sell at a loss following the Act's imposition of fees.

Mr. Rodriguez may further testify regarding the limitations of, and burdens experienced in connection with, product tracing, including the difficulty and expense of tracking product movement through different jurisdictions, and RJ Schinner's capacity to pay for such tracking.

PLAINTIFF'S TRIAL WITNESS LIST

Mr. Rodriguez may further testify regarding the burdens it has experienced in connection with CAA's fees and manner of assessing fees, including: A lack of access to CAA's fee methodology and inputs to that methodology, and resulting inability to review invoices for accuracy or proportionality of costs; duplicative fees assessed both to RJ Schinner and upstream manufacturers; pricing and profitability concerns arising from the retrospective nature of fee assessments under the Act; the obstacles to challenging fee assessments; and an inability to avoid duplicative fees through the timely production of corrected data.

Mr. Rodriguez may further testify regarding the necessity of, and burdens experienced in connection with, EPR fee passthrough, including: A loss in market competitiveness stemming from competing with small producers and obligated producers who nevertheless fail to report covered products; disruptions to distribution in and through Oregon; and practical limits to price increases and RJ Schinner's resulting inability to restore already-thin profit margins.

Mr. Rodriguez may further testify regarding coordination difficulties with upstream producers, including: Upstream producers' significant, non-itemized price increases; difficulty attributing the foregoing price increases to EPR reporting; upstream producers' unwillingness to disclose their reporting status; upstream producers' unwillingness to disclose the covered-product information necessary for RJ Schinner to discharge its obligations under the Act; RJ Schinner's inability to otherwise obtain covered-product information necessary to discharge its obligations under the Act; the absence of a centralized resource for determining upstream producers' reporting status or covered-product information; and the compounding of these difficulties by RJ Schinner's large and continually-changing product portfolio.

Mr. Rodriguez may further testify regarding the burdens RJ Schinner has experienced as a result of uncertainty surrounding upstream producers' reporting status, including having either to pay duplicative fees where first-obligated producers refuse to pay EPR fees or disclose their reporting status, or to forgo such payment and subject itself to enforcement risk.

Mr. Rodriguez may further testify regarding the burdens associated with the manual determination of covered products' specifications for reporting purposes, including the labor and

PLAINTIFF'S TRIAL WITNESS LIST

expense associated with product analysis, and the need for repeat-testing in light of a continually-changing product portfolio.

Mr. Rodriguez may further testify regarding the burdens of complying with other state EPR programs alongside the Oregon EPR Program, including the need for additional product testing, initial regulatory analysis and ongoing compliance tracking, and broader challenges associated with complying with unreconciled EPR regimes.

Mr. Rodriguez may further testify regarding communication difficulties with CAA, including a history of failing to answer queries or otherwise return communications, and the inability of producers to obtain guidance from CAA interpreting the RMA and its implementing regulations.

**3)** **Ed Allen**, President of WCP Solutions ("WCP"). Address: c/o WCP Solutions, 23200 64th Avenue South, Kent, WA 98032. Counsel estimates that Mr. Allen's direct examination will last approximately 2–3 hours.

Mr. Allen may testify regarding WCP's limited control over the specifications of covered products in its portfolio, including because of food-safety requirements, upstream supplier specifications, and distributors' particular role in supply chains.

Mr. Allen may further testify regarding a lack of compliance options under the Act, including: An inability to feasibly create a standalone producer responsibility program; the mandatory nature of CAA participation and assent to the Oregon Addendum to the participation agreement; and an absence of opportunity to negotiate the terms of participation in CAA.

Mr. Allen may further testify regarding the nature of WCP's business model, and the Act's impact on that business model, including: Thin profit margins as inherent to its wholesale-distribution business; a resulting inability to absorb costs; a lack of pricing power to pass fees through to customers, and products that sell at a loss following the Act's imposition of fees.

Mr. Allen may further testify regarding the limitations of, and burdens experienced in connection with, product tracing, including the difficulty and expense of tracking product movement through different jurisdictions, and WCP's capacity to pay for such tracking.

PLAINTIFF'S TRIAL WITNESS LIST

Mr. Allen may further testify regarding the burdens it has experienced in connection with CAA's fees and manner of assessing fees, including: A lack of access to CAA's fee methodology and inputs to that methodology, and resulting inability to review invoices for accuracy or proportionality of costs; duplicative fees assessed both to WCP and upstream manufacturers; pricing and profitability concerns arising from the retrospective nature of fee assessments under the Act; the obstacles to challenging fee assessments; and an inability to avoid duplicative fees through the timely production of corrected data.

Mr. Allen may further testify regarding the necessity of, and burdens experienced in connection with, EPR fee passthrough, including: A loss in market competitiveness stemming from competing with small producers and obligated producers who nevertheless fail to report covered products; disruptions to distribution in and through Oregon; and practical limits to price increases and WCP's resulting inability to restore already-thin profit margins.

Mr. Allen may further testify regarding coordination difficulties with upstream producers, including: Upstream producers' significant, non-itemized price increases; difficulty attributing the foregoing price increases to EPR reporting; upstream producers' unwillingness to disclose their reporting status; upstream producers' unwillingness to disclose the covered-product information necessary for WCP to discharge its obligations under the Act; WCP's inability to otherwise obtain covered-product information necessary to discharge its obligations under the Act; the absence of a centralized resource for determining upstream producers' reporting status or covered-product information; and the compounding of these difficulties by WCP's large and continually-changing product portfolio.

Mr. Allen may further testify regarding the burdens WCP has experienced as a result of uncertainty surrounding upstream producers' reporting status, including having either to pay duplicative fees where first-obligated producers refuse to pay EPR fees or disclose their reporting status, or to forgo such payment and subject itself to enforcement risk.

Mr. Allen may further testify regarding the burdens associated with the manual determination of covered products' specifications for reporting purposes, including the labor and

PLAINTIFF'S TRIAL WITNESS LIST

expense associated with product analysis, and the need for repeat-testing in light of a continually-changing product portfolio.

Mr. Allen may further testify regarding the burdens of complying with other state EPR programs alongside the Oregon EPR Program, including the need for additional product testing, initial regulatory analysis and ongoing compliance tracking, and broader challenges associated with complying with unreconciled EPR regimes.

Mr. Allen may further testify regarding communication difficulties with CAA and DEQ, including: Unsuccessful attempts at avoiding overpayment of fees through the timely correction of reporting data, receipt of generic answers to questions not fully responsive to the questions posed, the inability of producers to obtain guidance from CAA interpreting the RMA and its implementing regulations, and patterns of inconsistent communication.

**4)**     **James E. Winkle**, Executive Vice President and Chief Financial Officer of Harbor Foods. Address: c/o Harbor Foods, 3901 Hogum Bay Rd. NE, Lacey, WA 98516. Counsel estimates that Mr. Winkle's direct examination will last approximately 2–3 hours.

Mr. Winkle may testify regarding Harbor Foods' limited control over the specifications of covered products in its portfolio, including because of food-safety requirements and product quality control, upstream supplier specifications, and distributors' particular role in supply chains.

Mr. Winkle may further testify regarding a lack of compliance options under the Act, including: An inability to feasibly create a standalone producer responsibility program; the mandatory nature of CAA participation and assent to the Oregon Addendum to the participation agreement; and an absence of opportunity to negotiate the terms of participation in CAA.

Mr. Winkle may further testify regarding the nature of Harbor Foods' business model, and the Act's impact on that business model, including: Thin profit margins as inherent to its distribution business; a resulting inability to absorb costs; a lack of pricing power to pass fees through to customers, and products that sell at a loss following the Act's imposition of fees.

PLAINTIFF'S TRIAL WITNESS LIST

Mr. Winkle may further testify regarding the limitations of, and burdens experienced in connection with, product tracing, including the difficulty and expense of tracking product movement through different jurisdictions, and Harbor Foods' capacity to pay for such tracking.

Mr. Winkle may further testify regarding the burdens it has experienced in connection with CAA's fees and manner of assessing fees, including: A lack of access to CAA's fee methodology and inputs to that methodology, and resulting inability to review invoices for accuracy or proportionality of costs; duplicative fees assessed both to Harbor Foods and upstream manufacturers accounting for approximately half of owed fees; pricing and profitability concerns arising from the retrospective nature of fee assessments under the Act; the obstacles to challenging fee assessments; and an inability to avoid duplicative fees through the timely production of corrected data.

Mr. Winkle may further testify regarding the necessity of, and burdens experienced in connection with, EPR fee passthrough, including: A loss in market competitiveness stemming from competing with small producers and obligated producers who nevertheless fail to report covered products; a loss of competitiveness in interstate markets affecting Harbor Foods' Oregon distribution centers, to the extent upstream producers pass EPR-related costs through to those distribution centers, and thereby increase the cost of selling products outside of Oregon; disruptions to distribution in and through Oregon; and practical limits to price increases and Harbor Foods' resulting inability to restore already-thin profit margins.

Mr. Winkle may further testify regarding coordination difficulties with upstream producers, including: Upstream producers' significant, non-itemized price increases; difficulty attributing the foregoing price increases to EPR reporting; upstream producers' unwillingness to disclose their reporting status; upstream producers' unwillingness to disclose the covered-product information necessary for Harbor Foods to discharge its obligations under the Act; Harbor Foods' inability to otherwise obtain covered-product information necessary to discharge its obligations under the Act; the absence of a centralized resource for determining upstream producers' reporting

PLAINTIFF'S TRIAL WITNESS LIST

status or covered-product information; and the compounding of these difficulties by Harbor Foods' large and continually-changing product portfolio.

Mr. Winkle may further testify regarding the burdens Harbor Foods has experienced as a result of uncertainty surrounding upstream producers' reporting status, including having either to pay duplicative fees where first-obligated producers refuse to pay EPR fees or disclose their reporting status, or to forgo such payment and subject itself to enforcement risk.

Mr. Winkle may further testify regarding the burdens associated with the manual determination of covered products' specifications for reporting purposes, including the labor and expense associated with product analysis, and the need for repeat-testing in light of a continually-changing product portfolio.

Mr. Winkle may further testify regarding the burdens of complying with other state EPR programs alongside the Oregon EPR Program, including the need for additional product testing, initial regulatory analysis and ongoing compliance tracking, and broader challenges associated with complying with unreconciled EPR regimes.

Mr. Winkle may further testify regarding communication difficulties with CAA and DEQ, including: Unsuccessful attempts at avoiding overpayment of fees through the timely correction of reporting data, receipt of generic answers to questions not fully responsive to the questions posed, the inability of producers to obtain guidance from CAA interpreting the RMA and its implementing regulations, and patterns of inconsistent communication.

**5)** **Kim Holmes**, Executive Director, Circular Action Alliance Oregon. Address: c/o Circular Action Alliance, 20 F St NW, Floor 7, Washington, DC 20001. Counsel estimates that Ms. Holmes's direct examination will last approximately 2–3 hours.

Ms. Holmes may testify regarding CAA's founding, leadership, structure and organization, finances, administration, operations, and budget as they relate to administration of the Oregon program.

Ms. Holmes may further testify regarding CAA's establishment and implementation of its Oregon program under the Plastic Pollution and Recycling Modernization Act, including

development and implementation of the Oregon Program Plan, PRO registration and membership, the Producer Participation Agreement, and Oregon Addendum; Members' duties, rights, and responsibilities, the identification and handling of Covered Materials and non-Covered Materials, reporting, and coordination with DEQ in connection with administration of the Oregon program.

Ms. Holmes may further testify on the fee-setting and reporting processes under the Oregon Program Plan, including the development and implementation of producer fee schedules; program requirements affecting obligated producers; available incentives, exemptions, and eco-modulation features; and CAA's procedures for handling disputes arising in connection with the Oregon program.

Ms. Holmes may further testify regarding CAA's response to the burdens identified by producers in connection with Oregon program implementation, including issues relating to reporting, fee assessment, transparency, compliance, and multi-state operations.

**6)** **Rick Tomlinson**, President of the California Strawberry Commission. Address: c/o California Strawberry Commission, 180 Westridge Drive, Suite 269, Watsonville, California 95077-0269. Counsel estimates that Mr. Tomlinson's direct examination will last approximately 2–3 hours.

Mr. Tomlinson may testify regarding the strawberry industry's recycled content packaging and limited ability to improve or otherwise modify the specifications of its covered packaging, including because of food-safety requirements, perishability concerns, and the packaging's status as already maximally-optimized for recyclability.

Mr. Tomlinson may further testify regarding a lack of compliance options under the Act, including: An inability to feasibly create a standalone producer responsibility program; the mandatory nature of CAA participation and assent to the Oregon Addendum to the participation agreement; and an absence of opportunity to otherwise negotiate the terms of participation in CAA.

Mr. Tomlinson may further testify regarding the nature of the strawberry industry's business model, and the Act's impact on that business model, including thin profit margins as inherent to the strawberry industry and a resulting inability to absorb costs.

Mr. Tomlinson may further testify regarding the burdens the strawberry industry has experienced in connection with CAA's fees and manner of assessing fees, including: A lack of access to CAA's fee methodology and inputs to that methodology, and resulting inability to review invoices for accuracy or proportionality of costs; pricing and profitability concerns arising from the retrospective nature of fee assessments under the Act; and an inability to avoid duplicative fees through the timely production of corrected data.

Mr. Tomlinson may further testify regarding the necessity of, and burdens experienced in connection with, EPR fee passthrough, including a loss in market competitiveness stemming from competing with small producers and obligated producers who nevertheless fail to report covered products.

Mr. Tomlinson may further testify regarding communication difficulties with CAA and DEQ, and the inability of producers to obtain guidance from CAA interpreting the RMA and its implementing regulations

## II.    Expert Witnesses

The following individuals are expert witnesses who NAW may call at trial:

**7)    Calvin Lakhan, Ph.D**. NAW hereby incorporates by reference, as if fully set forth herein, the Expert Report of Calvin Lakhan, Ph.D., on Behalf of National Association of Wholesaler-Distributors, dated May 15, 2026; and the Rebuttal Expert Report of Calvin Lakhan, Ph.D., on Behalf of National Association of Wholesaler-Distributors, dated June 17, 2026. Dr. Lakhan's opinions are set forth in the expert report and rebuttal report he has served in this matter.

**8)    Douglas J. Thomas, Ph.D.** NAW hereby incorporates by reference, as if fully set forth herein, the Expert Report of Douglas J. Thomas, Ph.D., on Behalf of National Association of Wholesaler-Distributors, dated May 15, 2026, and Supplemental Expert Report of Douglas J. Thomas, Ph.D., on Behalf of National Association of Wholesaler-Distributors, dated June 12, 2026. Dr. Thomas's opinions are set forth in the expert report and supplemental expert report he has served in this matter.

PLAINTIFF'S TRIAL WITNESS LIST

### III.    Specific Reservation of Rights

1.    NAW reserves the right to call any witnesses necessary to provide a foundation for exhibits that other parties will not stipulate to authenticity or admissibility.

2.    NAW reserves the right to call rebuttal or impeachment witnesses, whether or not previously disclosed.

3.    NAW reserves the right to supplement or amend this witness list for good cause, by agreement of the parties, or as permitted by the Court.

DATED this 20th day of June, 2026.                SIDLEY AUSTIN LLP

By: */s/ Caleb J. Bowers*
Caleb J. Bowers*
cbowers@sidley.com

David R. Carpenter*
drcarpenter@sidley.com
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213 896 6000
Facsimile: +1 213 896 6600

Gordon D. Todd*
gtodd@sidley.com
Richard W. Smith*
rwsmith@sidley.com
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736 8000
Facsimile: +1 202 736 8711
*Pro hac vice

BRADLEY BERNSTEIN SANDS LLP
Darin Sands, OSB No. 106624
1211 NW Glisan St., Ste 204
Portland, OR 97209
Telephone: +1 503-734-2480

Attorneys for Plaintiff
NATIONAL ASSOCIATION OF
WHOLESALER-DISTRIBUTORS

**PROOF OF SERVICE**

STATE OF CALIFORNIA                )
                                   )
                                   )   SS
COUNTY OF LOS ANGELES              )
                                   )

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and not a party to the within action.  My business address is 350 South Grand Avenue, Los Angeles, California 90071.

On June 20, 2026, I served the foregoing document(s) described as

**PLAINTIFF'S TRIAL WITNESS LIST** on all interested parties in this action as follows:

Sara D. Van Loh                                    *Attorneys for Defendants*
Senior Assistant Attorney General
Email: sara.vanloh@doj.oregon.gov
Alexander Charles Jones
Assistant Attorney General
Email: alex.jones@doj.oregon.gov
Ann Fleckner
Email: ann.fleckner@doj.oregon.gov
YoungWoo Joh
Email: youngwoo.joh@doj.oregon.gov
Jane Kim
Email: jane.kim@doj.oregon.gov
Jennifer Patton
Email: jennifer.patton@doj.oregon.gov
Dan Horne
Email: dan.horne@doj.oregon.gov
Kris Tsuchiyama
Email: Kris.Tsuchiyama@doj.oregon.gov
Department of Justice
100 SW Market Street
Portland, OR 97201
Tel. (971) 673-1880

☒      (VIA E-MAIL OR ELECTRONIC TRANSMISSION)  Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent to the person(s) at the e-mail address(es) listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

PROOF OF SERVICE

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on June 20, 2026, at Los Angeles, California.

_____
Caleb J. Bowers