

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS,

     Plaintiff,

v.                 Case No. 3:25-cv-01334-SI

LEAH FELDON, DIRECTOR, OREGON DEPARTMENT OF

ENVIRONMENTAL QUALITY, in her official capacity,

     Defendant.

_____


REMOTE STREAMING 30(B)(6) DEPOSITION OF

ERIN SAYLOR


TAKEN ON

FRIDAY, JUNE 5, 2026

9:02 A.M.


1925 GLENMORRIE DRIVE

LAKE OSWEGO, OREGON  97034



**NAEGELI**
DEPOSITION & TRIAL

(800) 528 - 3335
NAEGELIUSA.COM



COURT REPORTING

LEGAL VIDEOGRAPHY

REMOTE DEPOSITIONS

TRIAL PRESENTATION

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS



**NAEGELI** | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

ERIN SAYLOR                   June 05, 2026                              2
98017                                                             30(b)(6)

REMOTE APPEARANCES


Appearing on behalf of the Plaintiff:

DARIN M. SANDS, ESQUIRE

Bradley Bernstein & Sands, LLP

1211 Northwest Glisan Street, Suite 204

Portland, Oregon  97209

(503) 734-2480

dsands@bradleybernstein.com


-AND-


CALEB J. BOWERS, ESQUIRE

Sidley Austin, LLP

350 South Grand Avenue

Los Angeles, California  90071

(213) 896-6000

cbowers@sidley.com

REMOTE APPEARANCES CONTINUED


Appearing on behalf of the Plaintiff:

GORDON D. TODD, ESQUIRE

Sidley Austin, LLP

150 K Street Northwest

Washington, District of Columbia 20005

(202) 736-8000

gtodd@sidley.com


Appearing on behalf of the Defendant:

SARA D. VAN LOH, ESQUIRE

Oregon Department of Justice

100 Southwest Market Street

Portland, Oregon  97201

(971) 673-1880

sara.vanloh@doj.oregon.gov

REMOTE APPEARANCES CONTINUED


Appearing on behalf of the Defendant:

YOUNGWOO JOH, ESQUIRE

ALEXANDER C. JONES, ESQUIRE

Oregon Department of Justice

100 SW Market Street

Portland, Oregon  97201

(971) 673-1880

youngwoo.joh@doj.oregon.gov

alex.jones@doj.oregon.gov


Also Present:

Nicole Portley, Program Plan Lead, Oregon DEQ

Jennifer Patton, Paralegal

Amarit Ubhi, Law Clerk

Timothy Garrett, Naegeli Technician

ERIN SAYLOR                    June 05, 2026                         5
98017                                                          30(b)(6)

EXAMINATION INDEX

PAGE

EXAMINATION BY MR. SANDS                          8

EXAMINATION BY MR. JOH                            81

ERIN SAYLOR                          June 05, 2026                                    6
98017                                                                          30(b)(6)

EXHIBIT INDEX

EXHIBIT                                                          PAGE

| 1 | Table 5A | 39 |
| 2 | RMA | 29 |

REMOTE STREAMING 30(B)(6) DEPOSITION OF

ERIN SAYLOR

TAKEN ON

FRIDAY, JUNE 5, 2026

9:02 A.M.

THE REPORTER:  We are on the record at 9:02 a.m.

Ms. Saylor, would you please raise your right hand?

Do you affirm under penalty of perjury that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE DEPONENT:  I do.

THE REPORTER:  Will each attorney please state their name and whom they represent?

MR. SANDS:  Darin Sands, Bradley Bernstein Sands, on behalf of Plaintiff.  Caleb, do you --

MR. BOWERS:  Sorry.  We were limiting to the other folks last time.

MR. SANDS:  Okay.  Okay, that's fine. Yeah, that's fine.

MR. BOWERS:  Yeah, let's just have Darin on the record for Plaintiff.

MR. JOH:  YoungWoo Joh, Oregon Department

of Justice for Defendant, Director Leah Feldon and Department of Environmental Quality.

MS. LOH: Sara Van Loh for the Oregon Department of Justice on behalf of Director Feldon.

MR. JONES: Alexander Jones from the Oregon Department of Justice on behalf of Defendant, Director Feldon.

THE REPORTER: Okay, thank you. You may proceed.

ERIN SAYLOR, having been first duly affirmed to tell the truth, was examined, and testified as follows:

EXAMINATION

BY MR. SANDS:

Q.   Good morning, Ms. Saylor.

A.   Good morning.

Q.   Can you -- can you just do a quick volume check?  I want to make sure I can hear you.

A.   Hi.  Can you hear me?

Q.   Okay, yeah, I can hear you.  Thank you.

My name is Darin Sands.  I'm an attorney, and I represent the Plaintiff, the National Association of Wholesaler-Distributors this morning.

Can you tell me what your full name is?

A.   It's Erin Saylor.

Q.   And where do you work?

A.    I work for the Department of Environmental Quality with the state of Oregon.

Q.    And how long have you worked -- for the purpose -- strike that.  For the purpose of this deposition, I'll refer to it as DEQ.  Is that okay with you?

A.    Yes, that's fine.

Q.    And how long have you worked at the DEQ?

A.    Since April of 2022.

Q.    And where did you work before that?

A.    Immediately prior I was with Columbia River Keeper.

Q.    Okay.  And what was your role there?

A.    I was a staff attorney.

Q.    And so you're an attorney, I take it?

A.    Correct.

Q.    Okay.  And before Columbia River Keeper, where did you work?

A.    Immediately, I was actually home with my family for a while.  I worked part-time for my in-laws.  But between 2008 and 2015, I worked for the U.S. Environmental Protection Agency in Washington, D.C.

Q.    And what was your role there?

A.    For the first two years between 2008 and

2010, I worked pursuant to a grant from the Oak Ridge Institute for Science and Education in the Office of Water, and then in 2010, I was hired permanently as a federal employee in the Office of Civil Enforcement as an attorney advisor.

Q.    Okay.  And in that role as an attorney advisor, what sort of enforcement actions were you responsible for?

A.    I was in the chemical risk and reporting enforcement branch working primarily on issues related to the Toxic Substances Control Act.

Q.    Okay.  Going back to your time at DEQ, when you started in April 2022, what was your position?

A.    I was an environmental law specialist in the Office of Civil -- the Office of Compliance and Enforcement.

Q.    Okay.  And what sort of enforcement compliance issues did you cover in that role?

A.    I worked exclusively on water quality issues.

Q.    Did you work on any recycling issues in that role?

A.    I did not.

Q.    And how long were you in that role?

A.    Between April 2022 and February 2025.

Q.    **And what role did you take on in February 2025?**

A.    In February 2025, I moved into the manager position in the Office of Compliance and Enforcement on a rotational temporary basis, and I was made permanent in February of 2026.

Q.    **Okay.  And what was your responsibility in that role?**

MR. JOH:  Objection.  Vague.

BY MR. SANDS:

Q.    **You can answer.**

A.    I manage the entire Office of Compliance and Enforcement.  So I manage the staff.  I review the cases that are issued.  I sign the cases that are issued, answer general questions related to enforcement that arise within the agency.

Q.    **And has that been your role to this day?**

A.    Correct.

Q.    Okay.  **And as part of that role, do you have responsibilities over enforcement related to the Recycling Modernization Act?**

A.    I will.  We have not yet had any formal enforcement related to that act.

Q.    **Okay.  Do you handle any pre-enforcement**

activity related to the Recycling Modernization Act at this time?

A.   As questions arise in the program I may be asked questions, but that's about the limited extent that I have.

Q.   Okay.  Are -- are there people who report to you who currently handle Recycling Modernization Act enforcement?

A.   Yes.

Q.   And who are they?

A.   Esther Westbrook and Sarah Wheeler.

Q.   And let's just start with Ms. Westbrook. What's her role?

A.   She's an environmental law specialist.

Q.   And how long has she been in that role?

A.   I do not know the exact date, off the top of my head.  I think it is in the realm of 17 years, I believe.

Q.   Okay.  And what is her current responsibility relating to enforcement related to the Recycling Modernization Act?

A.   She is one -- along with Sarah Wheeler, one of the lead environmental law specialists assigned to the program.  So both she and Sarah are direct resources for the program if they have

questions relating to that.

Q. Okay. And does Sarah Wheeler have the same role as Ms. Westbrook?

A. Correct.

Q. Okay. How long has Ms. Westbrook been handling matters related to the Recycling Modernization Act?

A. I'm not able to answer that.

Q. Okay. Can you approximate?

A. I would assume since the act first came into being.

Q. Okay. And how about Ms. Wheeler?

A. The same answer. I assume they have both been working on it since it was developed.

Q. Okay. And who do you report to?

A. I report to Shannon Davis.

Q. And what's Ms. Davis' role?

A. She's the deputy administrator of the Department of Environmental Quality.

Q. And have you been reporting to Ms. Davis since February 2025?

A. Correct.

Q. Okay. Have you been deposed before, Ms. Saylor?

A. I have not.

Q. Okay. Well, just a quick few instructions just to get them out of the way, although I know you're an attorney so you're probably familiar with some of them.

But just because we have a court reporter here, it's important that you give me an opportunity to finish my question before you answer and I will do my best to do the same, although sometimes we will speak over each other. But let's try and avoid that for the court reporter's sake.

Please make sure you provide audible answers, so no head nodding. Make sure we have written answers on the record.

If you need to take a break at any point, just let me know. I'm going to try and take short breaks intermittently probably every hour or so, but we're on a short deadline today so I'll probably try and keep those brief.

But if you need to go use the restroom or break for any other reason, just please let me know. I'll have you finish the question pending, but don't hesitate to ask that.

A. Okay.

Q. Okay. And, of course, you understand you're under oath today?

ERIN SAYLOR                         June 05, 2026                              15
98017                                                                    30(b)(6)

A.    Correct.  Yes.

Q.    And is it your understanding that you've been designated by the Department of Environmental Quality as a 30(b)(6) witness in this case -- in other words, a witness speaking on behalf of the DEQ?

A.    Yes.

Q.    And is it correct that the topic that you've been designated for is DEQ's role in enforcing producer requirements contained in Oregon statute 459(a).869?

A.    Correct.

Q.    Okay.  Have you been designated on any other topics?

A.    No.

Q.    What have you done to prepare for your testimony here today?

A.    I reviewed information on DEQ's website about the RMA.  I reviewed the statute.  I reviewed DEQ's Division 12 regulations and also our guidance table applicable to RMA violations, which is Table 5A.

Q.    And did you review any other documents?

A.    No.

Q.    Did you speak to anybody in preparation

for today's deposition?

A.   I spoke with DOJ counsel as well as Sarah Wheeler, Esther Westbrook, and Natalie (sic) Portley.

Q.   What is Ms. Portley's role?

A.   I do not know what her title is, but she works in the Materials Management Program.

Q.   Okay.  And when did you have those conversations with those three individuals?

A.   I believe it was yesterday.

Q.   And did you have that conversation with all three of them together or separately?

A.   Together.

Q.   And how long was that conversation?

A.   Approximately an hour.

Q.   Okay.  Did you give any --

MR. JOH:  Counsel?

MR. SANDS:  Oh, go ahead.

MR. JOH:  Sorry to interrupt here.  I just wanted to go back to the designation of the topic and to clarify --

MR. SANDS:  Yeah.

MR. JOH:  -- that Ms. Saylor's designation is limited to formal DEQ enforcement.

MR. SANDS:  Understood.  Thank you for the

clarification.

MR. JOH:  Mm-hmm.

MR. SANDS:  I noticed that after -- after I read it.

BY MR. SANDS:

Q.   Did you -- other than speaking with those three individuals and reviewing the documents you listed, did you do anything else to prepare for today's testimony?

A.   I did not.

Q.   Okay.  We touched on this briefly, but who within DEQ is responsible for Recycling Modernization Act enforcement against producers?

A.   That's a very broad question.  I'm not sure.  Can you -- can you be more specific?

Q.   Okay.  Yeah, sure.  Sure.

Is there -- is there an individual at DEQ who's in charge of supervising enforcement activity for the RMA against producers?

A.   No one specific individual that's designated.

Q.   Okay.  Who are the individuals that are responsible for that generally then?

A.   I would not be able to name names. Typically, someone in the Materials Management

Program would work to do the initial analysis on whether a violation has occurred, and at that point if there is a determination made that a violation has occurred, it would be referred to my office, the Office of Compliance and Enforcement.

Q.   Okay.  And I think you testified to this earlier.  You're in charge of that office?

A.   Correct.

Q.   Okay.  Is there any of your supervisors who are responsible for supervising your enforcement of the RMA?

A.   The leadership team within DEQ would have an opportunity to review cases that are issued, but they do not typically weigh in directly.

Q.   Okay.  Beyond your -- could -- strike that.

Could you restate the name of your department again?

A.   The Office of Compliance and Enforcement.

Q.   Beyond the Office of Compliance and Enforcement, are there other offices or units at DEQ that are responsible for RMA enforcement decisions?

A.   The Materials Management Program.

Q.   Okay.  And who does the Materials Management Program report to?

A.    Cheryl Grabham is the manager of the Materials Management Program and --

Q.    And what -- oh, sorry.  I cut you off.

A.    No, that's okay.  That's all in there.

Q.    And what office or unit is she in?

A.    She's in the Materials Management Program.

Q.    Okay.  Who has -- at DEQ who has -- who has authority to open an investigation into a violation of the RMA?

MR. JOH:  Objection.  Scope.

BY MR. SANDS:

Q.    You can answer.

A.    I suppose it would be jointly between the Materials Management Program and my office, the Office of Compliance and Enforcement.

Q.    Okay.  And who has authority to issue a warning or notice of violation of the RMA?

A.    Those are --

MR. JOH:  Same objection.  You can answer.

THE DEPONENT:  Those are issued from the Materials Management Program.

BY MR. SANDS:

Q.    And who is responsible at DEQ?  What department for referring a matter for civil penalties?

NAEGELI
DEPOSITION & TRIAL    (800) 528-3335
                      NAEGELIUSA.COM

A.    That would happen from the Materials Management Program.

Q.    Okay.  Within your Office of Compliance are there staff dedicated exclusively to RMA enforcement?

A.    Currently, Esther Westbrook and Sarah Wheeler are the two environmental law specialists that -- that work on materials management enforcement.

Q.    Okay.  Are they also in charge of oversight of producer responsibility organizations like the CAA?

A.    They are not responsible for oversight of those organizations.

Q.    Okay.  And do you know who is?

A.    That would be the Materials Management Program.

Q.    Okay.  What role, if any, does the Oregon Department of Justice play in the process before DEQ initiates an enforcement action under the RMA?

A.    We have contact counsel at DOJ that we coordinate with as questions arise.

Q.    Is that a dedicated individual?

A.    Yes.

Q.    And who is that?

A.    Gary Rubin.

Q.    And at what point do they get involved in the process?

A.    It depends on if there are questions that we have that we need their -- we need their advice on.

Q.    Okay.  Would they be consulted prior to an enforcement action being taken -- a formal enforcement action?

A.    Potentially.

Q.    In what situations would they not be consulted?

A.    We don't have an obligation to consult with them.  We only consult with them if we have a legal question that we would like their advice on.

Q.    Okay.  So there are situations in which your office could initiate a formal enforcement action without consulting with the Oregon DOJ?

A.    Correct.

Q.    Okay.  Has DEQ adopted any written enforcement policies that are specific to the RMA?

A.    Yes.

Q.    And what are those?

A.    It's Table 5A to our enforcement guidance.

Q.    Are there any others?

A.   As far as I'm aware, that's the only one.

Q.   Okay.  And do you know when that was put into place?

A.   If I could -- I have it in front of me if it's okay if I look at it.  It's dated --

Q.   Sure.

A.   -- dated January 2025.

Q.   Has it been amended since January 2025?

A.   I have a recollection of it being slightly amended.  I do not recall the date.

Q.   Okay.  And was it just once you think it was amended?

A.   Yes.

Q.   And what does that table cover in terms of policies?

A.   It lists out what the expected enforcement response is for various violations that could occur under the Act.

Q.   So does it have specific policies related to what happens if a producer doesn't register?

A.   It does.

Q.   And not -- how about for not reporting data?

A.   I'll have to look to see if that is specifically listed.

Q.    Well, let's hold off on that.  If -- what role does DEQ's internal management directive play in enforcement decisions around the RMA?

A.    It should control enforcement decisions around the RMA.  If -- if we were to do something not in conformance with the RMA, we would have explicit reasons for that and it would be documented in the case record.

Q.    Okay.  I think you just said if you did something that didn't comply with the RMA.  Did you mean --

A.    Closely.

Q.    -- did not comply with the internal management directive?

A.    Correct, yes.

Q.    Okay.

A.    If we -- if we do something different from the internal management directive, we would document that -- the reasons for that in the case file.

Q.    Okay.  Are staff in either your office or the Materials Management Division trained on the RMA?

A.    Yes.

Q.    And what is the form of that training?

A.    Actually, I need to -- going back to the

earlier question, I'm not sure if they received formal training.

Q.   Okay.  Are -- do you -- are you recalling any sort of training, formal or otherwise?

A.   Not that I'm aware of.

Q.   Okay.  So you're not aware of enforcement staff being trained on producer hierarchy?

A.   No.

Q.   Are you aware of enforcement staff being trained on CAA's fee methodology?

A.   Not a formal training, no.

Q.   How about informal training?

A.   The little -- the folks that do the enforcement are often the same individuals that were responsible for writing the rules and involved in the development of the statute, so any training would come through their experience in developing the program.

Q.   Okay.  But they haven't received any independent training from DEQ as to how the department is interpreting either producer hierarchy or CAA's fee methodology.  Is that right?

A.   Not that I'm aware, but that would be a better question for Natalie Portley in the Materials Management Program.

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

Q.    Okay.  Aside from those two topics -- I -- I don't want to put words in your mouth, but has the enforcement team received any training from DEQ on exemptions, credits, or invoice disputes under the RMA?

A.    Not formal training that I'm aware of.

Q.    Okay.  Is the -- anybody on the enforcement team in your office or the Materials Management office provided information or training on CAA's fee methodology and the inputs used by CAA?

A.    I don't know the answer to that.

Q.    Are you aware of what CAA's fee methodology or the inputs they use are?

A.    I am not.

Q.    Are you aware of anybody on your staff who's aware of those things?

A.    I am not.

Q.    Is anybody at DEQ aware of those?

MR. JOH:  Objection.  Scope and foundation.

BY MR. SANDS:

Q.    Are you aware of anybody at DEQ being aware of CAA's fee methodology or the inputs used?

A.    I assume that there are folks in the Materials Management Program that would be able to

answer that.

Q.    Okay.    Are you aware of CAA participating in any training of staff in your office?

A.    I am not aware.

Q.    Are you aware of any policies related to the RMA -- related to RMA enforcement that are in -- currently in draft form?

A.    No.

Q.    Are you aware of any plans in your office for developing enforcement guidance in the future?

A.    No.

Q.    Okay.    I'm going to come back to that in a bit, but I wanted to move on to actual violations.

My understanding is that there are sort of two buckets of non-compliance under the RMA, but I want you to clarify if I have this wrong.

But the first would be companies that -- or producers that did not register with the CAA, and the second would be producers who registered with the CAA but have been alleged to have failed to comply with their obligations in connection with that registration.

Is that a fair characterization?

A.    I am not an expert on the RMA itself.    My understanding -- my personal understanding is that

ERIN SAYLOR                    June 05, 2026                    27
98017                                                    30(b)(6)

what you said is correct, but the Materials Management Program is in a better position to answer those specific questions.

Q. Okay. But in terms of formal DEQ enforcement of the RMA, you're the designated representative, correct?

A. Yes, I am the designated representative. How our process works is that the decision or the initial investigation and determination of a violation occurs in the program office, the Materials Management Program.

Q. Okay. But beyond that, you're not sure of how they handle that?

A. Correct.

Q. Well, in terms of formal DEQ enforcement, if a producer was -- failed to register with the CAA, would your office be responsible for enforcing that failure?

A. The initial response as laid out in Table 5A is they would receive a warning letter, and that is a letter that would be sent from the Materials Management Program.

Q. Okay. Are you aware of how the Materials Management division identifies producers who have failed to register with the CAA?

A.    Based on my conversation with Natalie Portley, my understanding is the CAA sends a list to DEQ, and DEQ does some additional analysis to confirm whether the producers on that list should be on that list.

Q.    Okay.  And -- and by that list, you're saying a list of producers who have failed to register with the CAA?

A.    Correct.

Q.    Okay.  Are you aware of how CAA develops that list?

A.    I do not have knowledge of that.

Q.    Does anybody -- in your knowledge, does anybody at DEQ work with CAA in developing that list?

A.    Natalie Portley would be able to answer that.

Q.    Okay.  Once the CAA provides you with a list of producers who have failed to register, I think you testified that DEQ does some additional work to confirm that list.  Is that correct?

A.    That's my understanding from speaking with Natalie.

Q.    Okay.  And do you know what that work is?

A.    I do not.  Natalie would be able to answer

that.

Q.   Okay.  I'm going to try and share a document in here.

MR. JOH:  Counsel -- and just to make this easy, I think by Natalie you mean Nicole?

THE DEPONENT:  Oh, apologies.  Yes, Nicole Portley.

MR. JOH:  Sorry to interrupt.  I thought it'd just be easier if I --

MR. SANDS:  Oh, yeah, that's fair.

MR. JOH:  -- clarified that here.

MR. SANDS:  Yes, thank you.

THE DEPONENT:  Thank you for correcting that, YoungWoo.  Yes, my understanding is that Nicole Portley will be also speaking with you.

BY MR. SANDS:

Q.   Okay.  Let's see if I can put a -- okay, I put a document in the chat.  Can you see that?

A.   Yes.

Q.   The document that I have put in the chat is Exhibit 2.

(WHEREUPON, Exhibit 2 was marked for identification.)

BY MR. SANDS:

Q.   I apologize for skipping Exhibit 1, but

for the record, it's a -- it's not Bates stamped, but it's an eight-page document that's entitled Recycling Modernization Act.

It appears to come from the State of Oregon Department of Environmental Quality and it has below it a producer status list, which has a list of producer names.  Do you see that document?

A.    I do.

Q.    Do you recognize that document?

A.    I have never seen this document before.

Q.    Have you seen any document that's similar that contains a list of producers who have been identified as failing to comply with the RMA?

A.    I have not.

Q.    In your role in charge of the Office of Compliance, have you ever seen any document that provides a list of producers who are alleged to be in violation of the RMA?

A.    I have not.

Q.    Okay.  And what -- just out of curiosity, why would -- it would seem that the person who's in charge of the Office of Compliance would be notified of producers who are alleged to not be in compliance with the RMA.  What is the reason for you not seeing lists like that?

A.    We have not yet received any referrals for formal enforcement from the Materials Management Program.  So the Materials Management Program will make the initial determination for whether violations have occurred, and at that point they send a warning letter.

If the warning letter is not -- it's a warning letter with an opportunity to correct.  If it's not corrected, at that point they will receive a pre-enforcement notice, and only after that pre-enforcement notice is issued is a case referred to the Office of Compliance and Enforcement.

Q.    Okay.  So until it reaches that point, your office is not aware of any producers that are alleged to be in violation of the RMA?

MR. JOH:  Objection.  Misstates testimony.

THE DEPONENT:  It would not have risen to my level.  It's possible that Esther Westbrook or Sarah Wheeler may have had some conversations with the Materials Management Program.  But at that point, it is not a formal enforcement matter.

MR. SANDS:  Okay.  And just maybe can we just go off the record for a sec?

MR. JOH:  Sure.

THE REPORTER:  Okay.  We are going off the

record at 9:33 a.m.

(WHEREUPON, a recess was taken.)

THE REPORTER:  We are back on record at 9:35 a.m.

BY MR. SANDS:

Q.  Ms. Saylor, I apologize, but can you just repeat for me the point at which your Office of Compliance becomes involved in potential violations of the RMA?

A.  Sure.  So going back, if a violation is first alleged, the proper response under our Table 5A enforcement guidance is they would receive a warning letter with an opportunity to correct and that would be issued by the Materials Management Program.

If it is not corrected -- if the violation is not corrected within the time set out in that warning letter, then the Materials Management Program will issue what's referred to as a pre-enforcement notice, or PEN.

At that point, if a PEN is sent the PEN will be referred to the Office of Compliance and Enforcement for a formal enforcement -- issuance of a formal enforcement.

Q.  Okay.  So your office becomes involved

when a PEN is issued?

A. Correct.

Q. Okay. Has a PEN been issued to date regarding the RMA?

A. No.

Q. Okay. And just to clarify with counsel, it's my understanding that to the extent any enforcement activity takes place prior to the issuance or -- prior to the issuance of the PEN or including the issuance of the PEN that those issues and topics will be covered by a different 30(b)(6) designee. Is that correct?

MR. JOH: That's correct, counsel.

MR. SANDS: Okay. Okay.

BY MR. SANDS:

Q. Just a quick separate question, to go back to your office. Would it be -- would the Office of Compliance be responsible for formal enforcement activities against CAA if it was to have violated this -- the RMA?

MR. JOH: Objection. Vague.

THE DEPONENT: I did not prepare for that specific question. I believe it's outside the scope of the specific statutory piece that was cited in the deposition notice. So I'm not able to answer

that question.

BY MR. SANDS:

Q.   Okay.  Well, you're just -- I mean, this -- I don't want to quibble over it, but you're in charge of the Office of Compliance.

In your personal knowledge, would your office be responsible for enforcement actions against the CAA if it was found to have violated the RMA, or would that be a different Office?

A.   It's my understanding that if there was formal enforcement and there is a mechanism for formal enforcement against the producer or the organization in the statute, then yes, that would be handled by the Office of Compliance and Enforcement.

Q.   Okay.  But in your capacity as manager in charge of the Office of Compliance, you're not aware of any formal enforcement mechanisms against the CAA if it were to violate the RMA?

MR. JOH:  Objection.  Scope.

THE DEPONENT:  I have -- sorry.  I have not reviewed that portion of the statute, so I just don't know what the enforcement mechanism is for the CAA.

BY MR. SANDS:

Q.   Okay.  I think you have -- strike that.

You testified that to date no PEN has been issued against a producer related to a violation of the RMA.  If -- I want to ask you a little bit about what would happen in your office or at DEQ if such a -- if such a notice was issued.

If a PEN was issued for a producer failing to register with the CAA, how would your office confirm whether that fact was true or not?

A.    When the matter is referred to the Office of Compliance and Enforcement, it would come with the full case package from the Materials Management Program, so there will be a case file with supporting documentation to support the alleged violation.

The environmental law specialist who is assigned to the case would review that material and have conversations with the contact in the Materials Management Program to confirm that we have sufficient evidence to move forward with issuing a notice of civil penalty for that violation.

Q.    Does the Office of Compliance have a policy or procedure for investigating alleged violations beyond information that CAA provides to it?

A.    I don't know that we have a specific

ERIN SAYLOR                    June 05, 2026                         36
98017                                                          30(b)(6)

policy for that.  It is just generally standard practice for us to ensure that we have the evidence to support the violations that we are alleging, and that evidence is typically included in the referral file that we receive from the Materials Management Program.

Q.    Okay.  And have you -- am I correct that you have not yet received a referral package in connection with the violation of the RMA?

A.    That's correct.

Q.    So you can't say what may or may not be in that based on any actual past experience.  Is that right?

A.    Correct.

Q.    Okay.  And -- but are you aware of any policy that would require your office to confirm materials that were provided to it by CAA connected to alleged violations?

A.    Not a policy that would require it, no.

Q.    Is there any practice or custom in your office that would lead you to believe that those -- that information would be investigated to confirm that it's true?

A.    It would depend on what was in the referral package that we received and the level of

certainty that the environmental law specialist had that we had the evidence necessary to support the violation.

Q.   Okay.  If a non-compliance package included only information provided by the CAA, would that be a sufficient basis to pursue a formal enforcement action?

MR. JOH:  Objection.  Vague.

THE DEPONENT:  I can't answer that.  It truly depends on what was in the referral package and the specific facts of the case.

BY MR. SANDS:

Q.   Okay.  But there's no formal DEQ procedure or policy for what would be included in an investigation file in connection with the violation of the RMA?

A.   No.

Q.   Is there any DEQ requirement that your office independently confirm details provided by the CAA?

A.   No.

Q.   Generally, what are the factors that your office uses to determine whether DEQ would pursue a formal enforcement action against a producer in connection with the violation of the RMA?

A.    Well, we would just review the referral file to see if -- you know, it depends on what the alleged violation is and whether we have the information necessary to support that alleged violation.

And, you know, there is an appeal right, so when an environmental law specialist is evaluating one of these referral files and drafting a case, we're ensuring that we have all the evidence that we need to defend that case before an administrative law judge if it should reach that point.

**Q.    Okay.  When you say it depends on the alleged violation, what do you mean by that?  Are there types of violations that would be treated differently?**

A.    No, but the evidence that you would need to support a different violation would be different depending on what the violation is.

**Q.    Okay.  But there's no general factors that you -- your office uses to determine that, whether to pursue a violation or not?  It's all just based on a case-by-case assessment -- subjective assessment?**

A.    Well, the Table 5A sets out what the

appropriate enforcement response is.  So if, you know, a violation has been alleged and they receive the warning letter and then they'll receive the PEN if they don't comply with the warning letter, then it will be referred to our office, and we will evaluate the evidence to see if the violation of the statute or the regulations has occurred.

Q.   Okay.  But there's no objective standard that you're working from to determine that?

A.   No.

Q.   Okay.  Let me just -- okay, I'm going to put another document in.

Okay.  I've added what has been marked Exhibit 1 into the chat.  Do you see that, Ms. Saylor?

A.   I do.

THE REPORTER:  Exhibit 1 marked.

(WHEREUPON, Exhibit 1 was marked for identification.)

BY MR. SANDS:

Q.   Okay.  So I believe this is Table 5A, which you have previously testified to.  But if you could take a moment to review it to confirm that, that would be great.

A.   Yes, this does look like the Table 5A that

I was referring to.

Q.    Okay.  How is this table used by your office?

A.    It's used to determine what the appropriate enforcement response would be for each of the listed violations.

Q.    Okay.  So let's just start with the first Class 1 violation.  It says failing to register or become a member of a producer responsibility organization.  That's the violation language.

And then the guidance language is send WLOC a first violation.  If not corrected by deadline or for repeated violations within three years, send PEN and refer.  Do you see that?

A.    I do.

Q.    Is there any guidance in this document about how your office would determine whether an organization had failed to register or become a member of a producer responsibility organization?

A.    There is not.

Q.    Is there any guidance in this document about what evidence your office should be gathering to determine whether any of these violations have taken place?

A.    There is not.

Q.   And are there any other policies beyond this table that would provide guidance on that issue?

A.   Not that I'm aware of.

Q.   Okay.  It says Class 1 violations and Class 2 violations.  What are the differences between those two?

A.   Those are referring to what are listed in Division 12 regulations as specifically are Class 1 or Class 2.  So it just depends on the -- those decisions were made at the time the regulations were adopted.

Q.   Okay.  So they're just mirroring the statutory language?

A.   The regulatory language.

Q.   Okay.  Sorry.  Yes, thank you for correcting me.

Is there any guidance in this document relating to producer responsibility organization compliance with the RMA?

A.   I'm just looking through.  It looks like -- I mean, it looks like the second one listed here is directed towards producer responsibility organization requirements.

Yeah, it looks like there are violations

related to producer responsibility programs.

Q.    Okay.  Does that help clarify your answer earlier about whether or not your office would be responsible for taking enforcement action against PROs if they violated the RMA?

A.    Yes, so we would.

Q.    Okay.  And that would be guided by this document?

A.    Correct.

Q.    And there are no other documents that you're aware of that govern that?

A.    No.

MR. JOH:  Objection.  Scope.

BY MR. SANDS:

Q.    Does your office prioritize different types of violations of the RMA differently?

MR. JOH:  Objection.  Vague.

THE DEPONENT:  My office has not yet received any referrals for RMA violations.

BY MR. SANDS:

Q.    Okay.  But if you were -- let's say there was an alleged violation for non-registration with CAA.  One was a non-payment of amounts due and owing.  One would be inaccurate reporting.  One would be a failure to sign documents CAA requires.

Would -- is there -- would your office handle those in different ways or similar ways?

A.    They would be handled according to -- well, can you clarify what you mean by handled?

Q.    I guess prioritized differently.

A.    I'm not able to answer that.  It -- it depends on, you know, what our resources are at the time and, you know, the severity of potential environmental impact, those sorts of considerations.

Q.    Okay.

Well, that's helpful.  I mean, in terms of prioritizing violations of the RMA, what -- you mentioned potential environmental impact.  Is that a factor your office would look to in terms of determining which violations took precedent over others?

A.    When I say that, I say that in the context of how we prioritize which cases we turn to first --

Q.    Mm-hmm.

A.    -- because we do have some resource constraints and so we do often consider when the referral came in, what the severity is on, you know, potential environmental impact or potential programmatic impact.  Those are factors that we take into account when deciding the order of the cases

that we issue.

Q.    Okay.  So can you just list those -- those factors for me again?

A.    So, you know, there's many different factors.  This is not an inclusive list, but I would say environmental impact, programmatic impact, need, you know, for greater deterrent effect.

If it's an ongoing violation, we typically pursue those before ones that have been entirely corrected.

Q.    What -- what do you mean when you say programmatic impact?

A.    If it is a violation that is of particular importance to the program -- I'm having trouble coming up with an example but, you know, if -- if not pursuing enforcement would have a negative impact on the program overall, then that would be a reason for us to prioritize moving forward with that enforcement.

Q.    Okay.  Would the CAA have input or discussions with you with regard to what would be considered programmatic impact?

A.    I'm not able to answer that.

Q.    And why aren't you able to answer that?

A.    I think that that would probably be a

conversation that would happen between the Materials Management Program and CAA.

Q. Okay. Have you or anybody in your Office of Compliance had discussions with CAA about the RMA?

A. I have not, and to my knowledge, neither have Sarah or Esther.

Q. Have you had -- you or anybody in your office had discussions with the Materials Management division about CAA's concerns about programmatic impact?

A. Not to my knowledge.

Q. Has DEQ adopted any policies around a grace period related to enforcement?

A. My -- so my understanding is, and it's in Table 5A, there was a -- we adopted a technical assistance period specific to local governments. Beyond that, I have no knowledge of a grace period being adopted.

Q. Okay. How about safe harbors?

A. I am not aware of that.

Q. How about a compliance assistance policy?

A. I'm also not aware of that.

Q. Is there any policy related to enforcement discretion for your office?

ERIN SAYLOR                    June 05, 2026                    46
98017                                                     30(b)(6)

A.   Could you be more specific?

**Q.   Well, I guess, guiding the discretion your office has about whether and how to pursue violations by producers of the RMA.**

A.   Not specific to the RMA, no.

**Q.   Are there any mitigating factors that your office would consider in evaluating a violation of the RMA by a producer?**

A.   In what respect do you mean mitigating?

**Q.   Well, I mean, are you familiar with the concept of mitigating factors that would influence an enforcement decision generally?**

A.   We have mitigating factors that we take into account when we're assessing a civil penalty.

**Q.   Okay.   And what would those be?**

A.   They're set out in the Division 12 regulations.  Typically, when we are calculating a civil penalty there is a base penalty component and then there are a number of factors that we consider including the respondent's mental state and whether it has been corrected or not.

Those are typically the two pieces where we have the most discretion to, you know, either increase or decrease a penalty based on those factors.

Q.   But you're not aware of any -- any policy around mitigating factors related to a decision as to whether to enforce an RMA violation in the first place?

A.   Correct.

Q.   Would -- so would good-faith uncertainty over whether a producer was a producer under the RMA -- would that be a mitigating factor that your office would consider in determining whether to take a formal enforcement action?

A.   I don't have enough familiarity with the substance of the RMA to answer that.

Q.   Okay.  You're the manager in charge of the Office of Compliance?

A.   Right.

Q.   Okay.  Would that be your answer as well for whether DEQ considered invoice accuracy?  Sorry, strike that.

Would that be your answer as well with regard to whether DEQ would consider good-faith uncertainty about an invoice's accuracy in determining whether to take a formal enforcement action?

A.   I will say that any decision about whether to take a formal enforcement action would not be

solely in my office.  This would happen in consultation with the Materials Management Program.

So the Materials Management Program has the substantive knowledge to advise my office on the questions that you are asking.  So it would be a joint conversation that would occur.

Q.   Okay.  So if a producer was to come to DEQ after receiving an invoice from the CAA and they told DEQ, we aren't paying this invoice because we don't believe the amount invoiced is correct or we don't know if it's correct, how would that sort of information be handled by your office or your office in conjunction with the Materials Management Program?

A.   Someone in the --

MR. JOH:  Objection.  Vague, and incomplete hypothetical.

BY MR. SANDS:

Q.   You can answer.

A.   Someone in the Materials Management Program would investigate that and look into the accuracy of what was provided by CAA or assessed by CAA and the information that's being provided by the producer.

Q.   Okay.  So prior to an enforcement --

NAEGELI
DEPOSITION & TRIAL    (800) 528-3335   NAEGELIUSA.COM

formal enforcement action taking place, the Materials Management Program would conduct an investigation into the accuracy of the invoice amount.  Is that what your testimony is?

A.   Yes, and my understanding is that before a warning letter with opportunity to correct would be issued, there would be some sort of investigation into whether or not DEQ is -- struggling for the right word.  Whether or not DEQ, you know, also believes there to have been a violation.  So there will have been some independent analysis that was done.

Q.   Okay.  Well, let's just use the example of accuracy of a CAA invoice.  What sort of investigation would be done by DEQ to evaluate that accuracy?

MR. JOH:  Objection.  Scope.

BY MR. SANDS:

Q.   I'll clarify my question is in the context of your office's decision to pursue a formal enforcement action.

A.   So by the time a case is referred to us for formal enforcement that investigation will have occurred in the Materials Management Program.

So I cannot speak to what the Materials

ERIN SAYLOR                June 05, 2026                        50
98017                                                    30(b)(6)

Management Program specifically would do to investigate that.

What I can speak to is that OCE and the environmental law specialist that's ultimately assigned to the case will review that material to ensure independently that we believe we have the information necessary to support the violation.

Q.  Okay.  So how would your office independently investigate whether or not a CAA invoice was accurate if that was the basis for an alleged violation of the RMA?

A.  Well, when I say independently, I mean we will re-review the information that's in the file. So there will be a conversation with the Materials Management Program about what they did, about what information's in the file, making sure that we have the information that we need to support the violation.

And I just don't -- because we have not had an RMA referral yet, I can't speak to exactly what information that would be.

Q.  Would your office require that there be independent verification of the accuracy of an invoice beyond what CAA represents to you about the accuracy of an invoice?

A.    I can't answer that.  We have not had conversations with the Materials Management Program yet about that.

Q.    Okay.  But generally, you're responsible for formal enforcement actions under the RMA.  If you were presented with a request for formal enforcement action for failure to pay a CAA invoice, would your office require that some independent verification of the accuracy of the invoice be made aside from what CAA provided to you?

MR. JOH:  Objection.  Incomplete hypothetical.

THE DEPONENT:  Can I reset on what -- what do you mean by independent?

BY MR. SANDS:

Q.    So let's -- CAA issues an invoice to a producer and says that the producer owes $100,000.  The producer tells DEQ, we are not paying $100,000 because we do not believe that is an accurate assessment of the amount we should be owing under the RMA.

Your office is presented with that dispute.  What independent verification would your office make to determine whether or not the amount invoiced by CAA was an accurate assessment under the

terms of the RMA?

A.    So if a producer raised a dispute like that, it would be raised to the Materials Management Program and the Materials Management Program would need to -- they would be the first line trying to sort out that dispute.

I don't know what information they would look for to sort out that dispute.  There would have to be some sort of investigation into determining the accuracy of what the CAA invoiced them.

So for my office, if it does eventually get to my office as an enforcement referral, we would want to see what information did the Materials Management Program look at to confirm that the CAA invoice was correct.

Q.    Okay.  And what information would you want them to have looked at to confirm the accuracy of that -- that assessment?

A.    I can't speak to specifics because I just don't know enough about the specifics of the RMA to know what that information would be.

But my office would need assurances that we can prove by a preponderance of the evidence that the violation occurred.  I can't speak to what that specific evidence would be.

NAEGELI
DEPOSITION & TRIAL     (800) 528-3335
                       NAEGELIUSA.COM

ERIN SAYLOR                    June 05, 2026                          53
98017                                                          30(b)(6)

Q.    Can you say that it would require you to understand what CAA's rate-setting methodology is?

A.    I assume that that would be a necessary piece of the puzzle.

Q.    And that you would have to see what input CAA was using to determine a particular invoice for a particular producer?

A.    That sounds reasonable.

Q.    Okay.  And but it's your testimony here today that you don't know whether the Materials Management department actually looks at stuff like that in determining whether a violation has taken place?

A.    I do not know what they look at right now.

MR. SANDS:  Maybe it would be a good time to take a quick break.  You know, obviously, we're short on time, but I want Ms. Saylor to have a chance to take a breath and for our court reporter, too.

So can we maybe take a five-minute break or does that work?

MR. JOH:  Can we do 10 minutes?

MR. SANDS:  Sure, let's do 10.

MR. JOH:  Okay.

MR. SANDS:  So how about we come back

around 10:15?

MR. JOH:  Sounds good.

MR. SANDS:  Okay.

THE REPORTER:  Okay.  We are going off the record at 10:06 a.m.

(WHEREUPON, a recess was taken.)

THE REPORTER:  We are back on the record at 10:18 a.m.

BY MR. SANDS:

Q.    Ms. Saylor, we were speaking earlier about Nicole Portley.  Can you remind me what her role is at DEQ?

A.    She works in the Materials Management Program, and I do not recall what her actual title is.

Q.    Is -- do you know who is in charge of the Materials Management department?

A.    It's Cheryl Grabham.

Q.    Okay.  Has your Office -- Office of Compliance been involved in any enforcement activity against producers related to the RMA?

A.    Can you be more specific about what you mean by activity?

Q.    Well, I think earlier you described what you characterized, I believe, as pre-enforcement

actions such as warning letters.

A.    And -- and what was the question specifically?

Q.    Well, has your Office of Compliance been involved in any of those efforts?

A.    I believe that the Materials Management Program has consulted with Esther Westbrook and Sarah Wheeler on development of those letters.

Q.    Okay.  And in what role have they played?

A.    Just as a consulting role just to ensure that they're drafted in a way that, you know, accurately reflects what the violation would be.

Q.    Okay.  Has Ms. Westbrook or Ms. Wheeler as part of that process conducted any sort of independent investigation as to the merits of the claims?

A.    Not to my knowledge.  My understanding is they've just provided a review of those letters.

Q.    So in terms of issuing those letters, those letters would have come from whose office?

A.    The Materials Management Program.

Q.    Okay.  And does that -- would Ms. Portley be involved in that?

A.    My understanding is she was involved in the issuance of those letters.

Q.    Were you involved in any way in the issuance of those letters?

A.    I was not.

Q.    And can we quickly look -- it should still be in the chat -- Exhibit 2.

A.    Was that the producer status list?

Q.    Correct.

A.    Okay.

Q.    I know that you said that you had not seen this document before, but are you aware of whether this document would have been produced by the Materials Management group?

A.    What do you mean by produced?

Q.    Issued, created.

A.    Well, I see that it has DEQ's logo on the top, so that implies to me that this was developed or at least reviewed by DEQ.

Q.    Okay.  But who at DEQ?

A.    It would have been the Materials Management Program.

Q.    Okay.  And your office wasn't involved in that?

A.    No.

Q.    Are you familiar with the contents of the CAA provider agreement?

A.    I am not.

Q.    Have you ever reviewed that document?

A.    I have not.

Q.    Are you familiar with the Oregon addendum to the CAA provider agreement?

A.    I am not.

Q.    And you have not reviewed that either?

A.    No.

Q.    Has anybody in your Office of Compliance reviewed either of those documents?

A.    I don't know the answer to that.

Q.    But you're not aware of any other person in your division reviewing those documents?

A.    No.

Q.    Are you familiar with the dispute resolution provisions contained in those documents?

A.    I am not.

Q.    Okay.  Are you aware -- well, strike that.

Is a producer agreeing to the CAA provider agreement a requirement under the RMA?

A.    I don't know the answer to that.

Q.    Is a -- is a provider agreeing to sign the Oregon addendum to the CAA provider agreement required by the RMA?

A.    I don't know the answer to that.

Q.    In evaluating whether or not to take a formal enforcement action against a producer, does DEQ treat large producers, small producers, importers, distributors differently for enforcement purposes?

MR. JOH:  Objection.  Vague, and scope.

THE DEPONENT:  We have not yet received any referrals for formal enforcement pursuant to the RMA, so we have not made any decisions.

BY MR. SANDS:

Q.    Okay.  But if referrals were made, do you have any policies, procedures within your office that would lead to large producers and small producers being treated differently?

A.    We don't have any policies.  I assume that we would treat all referrals the same, which is to evaluate whether we have the evidence to support a violation.

Q.    Okay.  Are you aware of the types of matters that CAA can refer to DEQ for formal enforcement action?

MR. JOH:  Objection.  Vague.

MR. SANDS:  Strike that.

BY MR. SANDS:

Q.    Are you aware of what types of violations

of the RMA the CAA may refer to DEQ for formal enforcement action?

A.   My knowledge is fairly limited to this status list that you have included here as Exhibit 2.  I understand that the CAA produces a list of folks who have not registered or have not paid fees to DEQ.  That's the extent of my knowledge.

Q.   Okay.  And are you aware of what supporting documents the CAA provides other than that list when it's referring potential violations to the DEQ for formal enforcement?

A.   I do not know what documents they provide.

Q.   Are you aware of DEQ ever rejecting a CAA referral?

A.   Not to my knowledge.

Q.   Are you aware of DEQ ever asking CAA to correct an invoice or a data error before DEQ would consider enforcement action?

A.   That would have happened from the Materials Management Program, so I do not have direct knowledge of them.

Q.   Okay.  And you aren't aware either directly or indirectly of any such instance?

A.   I personally am not aware, no.

Q.   Does DEQ review individual CAA invoices

before they are issued?

A.    The Materials Management --

MR. JOH:  Objection.  Foundation.  And scope, sorry.  Go ahead.

THE DEPONENT:  The Materials Management Program would have to answer that.

BY MR. SANDS:

Q.    And would your answer be the same with regard to whether DEQ approves individual producer fee assessments issued by CAA?

MR. JOH:  Same objections.

THE DEPONENT:  That is Materials Management Program's function.

BY MR. SANDS:

Q.    If your office was evaluating whether or not to take a formal enforcement action against a producer, would you have the power to order CAA to revise an invoice if you determined that it was inaccurate?

A.    I don't know the answer to that.

Q.    Do you know if your office -- strike that. If your office was considering a formal enforcement action against a producer and in the course of your investigation you determined that an invoice is incorrect, would DEQ have the power to order CAA to

issue a refund or a credit?

MR. JOH:  Objection.  Scope.

THE DEPONENT:  I don't know the answer to that.  The Materials Management Program would know the specific requirements in the rule and statute better than I do.

BY MR. SANDS:

Q.  Okay.  So if your -- if your office was evaluating whether to pursue a formal enforcement action and, in the course of your investigation, you determined that an invoice was inaccurate, what steps would your office take?

A.  My office would not be involved in that. The Materials Management Program would be responsible for working with the CAA to fix that.

Q.  Okay.  But if your office discovered that, in the course of its independent investigation, would you notify the Materials Management division?

A.  Yes.

Q.  Are you ever -- are you aware of any instance in which DEQ has asked the CAA to revise an invoice or issue a refund?

A.  I am not.

Q.  If -- if you -- if you or your office was given a file to pursue formal enforcement actions

against a producer and that producer disputed the accuracy of an invoice issued by CAA, would your office defer enforcement until that dispute was resolved?

A.   Before issuing a case we would want to make certain that we had the evidence necessary to support the violation, so we would not move forward with the case until we had the evidence to support the violation.

Q.   What would happen if your office was referred a case for a producer refusing to sign the CAA producer agreement or Oregon addendum?  What would happen in that situation if that was the basis of a violation?

A.   I'm not familiar enough with the statute or the rules to know how that would be handled in an enforcement action.

Q.   Are you aware of the DEQ conducting any audits of producer reports generated by CAA?

A.   I don't --

MR. JOH:  Objection.  Scope, and foundation.

THE REPORTER:  What was the answer?

THE DEPONENT:  I don't have personal knowledge.

BY MR. SANDS:

Q.    And you don't have any knowledge that was gained as a result of your discussions connected to your preparation for this deposition today?

A.    Not related to that, no.

Q.    I think that you testified earlier that your office would become involved once a PEN notice was issued.  Is that right?

A.    That is correct.

Q.    And would it be your office that issued that PEN notice?

A.    No, the pre-enforcement notices are issued by the Materials Management Program.

Q.    Okay.  And once the PEN notice is issued, what -- what then does your office start to do in regard to a potential violation of the RMA?

A.    Once the PEN is issued the program then sends us a referral package with all of the supporting documentation to support the alleged violation.

It will be assigned to an environmental law specialist who will review the information, determine whether we have sufficient evidence to support the alleged violations, and then draft the notice of civil penalty enforcement and order.

Q.    Okay.  And when is that -- sorry, can you repeat what that notice is that you just mentioned?

A.    It's called a notice of civil penalty assessment and order.

Q.    Okay.  And what information is contained in that notice?

A.    Typically, there is a referral form which just summarizes the information that's -- what the alleged violation was, what the basis for -- you know, what evidence supports that alleged violation, and then all the documentation necessary to support the alleged violation that the program has compiled.

Q.    Is there any evidence that DEQ compiled that would not be provided to a producer in that notice?

MR. JOH:  Objection.  Vague.

BY MR. SANDS:

Q.    In other words, is there any evidence that DEQ would withhold?

A.    Everything that's sent to or -- or handled by DEQ is a public record.  So when a pre-enforcement notice is sent to a respondent, they typically don't receive the entire case file, but they are free to submit a public records request and receive it.

Q.   Okay.  Would that include evidence related to CAA fee-setting methodology?

A.   I have no reason to believe that that information is not a public record and would not be releasable if we receive a public records request about it.

Q.   Would DEQ object to the release of that methodology under the PRA?

MR. JOH:  Objection.  Foundation.

THE DEPONENT:  The Materials Management Program would be in a better position to answer that question.

BY MR. SANDS:

Q.   Okay.  So this is -- now we're talking about a situation in which a producer has been issued a notice of civil penalty.  That would be issued by your office, correct?

A.   Correct.

Q.   And your office would be in charge of pursuing those claims against a producer?

A.   Correct.

Q.   And so if in the course of that action a target producer made a PRA request relating to evidence underlying that notice, why wouldn't your office be in charge of determining whether or not

DEQ would object to the release of that information or not?

A. Well, if it's --

MR. JOH: Counselor, you said PRA. Are you talking about the Public Records Act?

MR. SANDS: Correct.

MR. JOH: Okay. And objection as to scope and foundation. Sorry, scope, rather. Go ahead.

THE DEPONENT: So can you repeat the question? Sorry.

BY MR. SANDS:

Q. Yes. I guess in your role as manager of the Office of Compliance, have you ever had a situation in which a target of a notice letter sought evidence under the Public Records Act?

A. Yes.

Q. Okay. Have -- in your experience in that role, has DEQ ever objected to the release of evidence sought under a Public Records Act request in that context?

MR. JOH: Objection. Scope and foundation.

THE DEPONENT: It depends on -- you know, there are exemptions to the public records request including whether there is privileged information in

there, you know, consultation with DOJ attorneys.

Sometimes we receive complaints from outside parties who request to remain anonymous. Sometimes there's, you know, personally identifiable information that we need to exempt.

So your question is fairly broad. That is information that we would potentially not release. But generally, as long as there are no applicable exemptions, we would release the entire enforcement file to them.

BY MR. SANDS:

Q.    **In determining whether to assert an exemption under the Public Records Act request, would that be something that you as the manager of the Office of Enforcement would be involved in?**

A.    I could be involved in it but I would not be the only decision maker. If it's a program document, the Materials Management Program would weigh in as well.

Q.    **Who would the ultimate decision rest with?**

MR. JOH:  Objection.  Scope, and foundation.

THE DEPONENT:  I think it would be jointly made.

BY MR. SANDS:

Q.   Okay.  Have you had any discussions with the Materials Management department about whether or not a Public Records Act exemption would apply to CAA rate-setting materials or formulas?

A.   I have not.

MR. JOH:  Objection.  Scope.

BY MR. SANDS:

Q.   Sorry, can you answer that?

A.   I have not, and I don't have any reason to believe.  But I also don't -- can't say definitively if it wouldn't be released.

Q.   Okay.  Would a producer be able to have a pre-enforcement meeting with the DEQ prior --

MR. JOH:  Objection.  Scope and -- sorry, go ahead.

BY MR. SANDS:

Q.   -- prior to a notice of civil penalty being entered?

MR. JOH:  Objection.  Scope, and foundation.

MR. SANDS:  Well, just on that, I mean, scope -- the scope, the topic is DEQ's role in enforcing producer requirements and contained -- and specifically with respect to formal DEQ enforcement.

So what I'm asking about here is what her

role is, her office's role is in that process of formal DEQ enforcement.  She's the head of -- the manager of the civil -- of the enforcement department.  So I'm not sure what scope or -- or foundation issues exist.  But --

MR. JOH:  It's specific to the question about pre-enforcement, but we don't have to back and forth on this.

MR. SANDS:  Okay.  Yeah, sure.  Okay.

BY MR. SANDS:

**Q.  Well, so after your -- prior to your office issuing a notice of civil penalty, do you provide -- does your office provide a producer with an opportunity to have a pre-enforcement meeting?**

A.  Typically, what happens after a pre-enforcement notice is issued sometimes respondents do reach out and want to meet or want to provide additional information.

We do accept additional information that they submit that might be relevant to our determination of whether a violation has occurred. We don't typically meet with them prior to issuance of a notice of civil penalty assessment and order, but there isn't a firm rule against that.

So usually what happens is after we issue

a notice of civil penalty assessment and order, at that point we issue an informal meeting and give them the opportunity to come in and discuss with us concerns that they have related to that order.

Q.   Okay.   I know that your office has not yet had a enforcement action against a producer under the RMA, but if you were to issue a notice of civil penalty related to a producer failing to pay a CAA invoice would there be a written process for them to object to the accuracy of that invoice after a -- a notice of civil penalty has been issued?

A.   Yes.   So after a notice of civil penalty assessment and order is issued, there's a 20-day period in which a respondent can request a contested case hearing.

Typically, when we get those requests for a contested case hearing our first -- our first like response is to reach out and ask if they would be interested in having an informal meeting.

And so typically after the notice of civil penalty is issued, we'll have an informal meeting where the respondent will have an opportunity to present additional information, any concerns that they have, whatever defenses they have, and we will consider those in the context of settlement.

So usually there's a pretty long, depending on the complexity of the case, back and forth discussion in the interest of reaching settlement.

Q.    Okay.  So in the context of the RMA, if a producer was disputing whether or not it was a producer at all, would that be something that would handle -- be handled in this informal meeting process?

A.    Yes.

Q.    Okay.  And would DEQ issue a written conclusion as to whether that claim was valid after that meeting?

If a producer presented evidence that it shouldn't be treated as a producer under the RMA and you guys agreed with it or disagreed with it, would you issue any sort of written response to that?

A.    Not typically.  We don't have a formal process.  So sometimes the environmental law specialist will write back and explain either why or why not we are moving forward with settlement or, you know, whatever response would be to the arguments raised.

But we don't have a formal process for providing a written document like that.

Q.   Okay.  Is there any DEQ procedure that you're aware of that would stay CAA's collection efforts while you were having discussions with a producer related to a dispute?

MR. JOH:  Objection.  Scope, and foundation.

THE DEPONENT:  I'm not aware of a specific process but I think in the consideration of -- you know, the enforcement ultimately falls to DEQ.

So I'm not -- I just haven't had enough discussions with the Materials Management Program to know how we would handle that situation.

BY MR. SANDS:

Q.   Okay.  If a producer was challenging the accuracy of a CAA invoice and your office was pursuing a notice of civil penalty and a hearing on that issue, is a producer permitted to withhold payment pending resolution of that hearing?

A.   I would want to consult with the Materials Management Program before giving an answer to that.

Our -- it's a little bit different from our normal -- in the normal scope of an enforcement if an enforcement order includes a requirement for them to comply in some way or the civil penalty associated with that violation, the deadlines for

that are stayed during the appeals process.  I don't know how we would handle where it's something that is due to an outside party.

Q.    Okay.  In your role of head in the Office of Compliance what role would CAA play in your enforcement activity after a notice of civil penalty was issued?

A.    It would depend on the circumstances of the case.  I think there is the potential that they could be called as a witness or if it's we're purely going based on documentation that was provided to the Materials Management Program, we may be able to just rely on the Materials Management Program person.  So I think there is the potential that they could be a witness.

Q.    If you were referred a formal -- like I guess if you were referred a file from the office of Materials Management for formal enforcement and you determined -- your office determined that enforcement wasn't appropriate, would your office notify CAA of that determination?

A.    It's more likely that we would have a conversation with the Materials Management Program who would have that conversation with CAA.

It is possible we might have a joint

discussion where we're all together, but it's not something that OCE would be having directly with CAA without the Materials Management Program's involvement.

Q.   Has your office, either in conjunction with the Materials Management department or without had any discussions with CAA about enforcement of the RMA?

A.   I have not personally had any conversations with CAA about enforcement of the RMA. I do not know if Sarah or Esther have been involved in conversations with them.

Q.   Was that something that you asked them in your discussion with them yesterday in preparation for this deposition?

A.   I did not ask them about that specifically.

Q.   And you have -- outside of that preparation meeting you don't recall any conversations with Ms. Westbrook or Ms. Wheeler about any discussions they had with CAA?

A.   I have not.  No, I have no recollection of discussing that with them.

Q.   Have you had any discussions with anybody in the office of Materials Management about their

discussions with the CAA?

A.    Not about their discussions with CAA specifically, no.

Q.    What about the CAA generally?

A.    My discussions with Ms. Portley in preparation for this were just generally about, you know, what is the CAA -- basically the producer status list, just understanding that they provide the list to DEQ.

DEQ reviews it.  That's the extent of the conversation I've had with the Materials Management Program about CAA's involvement.

Q.    Okay.  Because I think when I originally showed you Exhibit 2 you said you'd never seen it before.  Did you not look at that document when you were having a conversation with Ms. Portley?

A.    No, I did not.

Q.    Okay.

A.    We spoke generally about what the requirement is for CAA.

Q.    Okay.  And what did Ms. Portley tell you about how that document was produced or how it was used by DEQ?

A.    She just told me that they haven't -- we were talking specifically about obligations under

the statute, and so the statute requires CAA to produce this list to DEQ and that DEQ reviews it, and it is the DEQ-reviewed version of this list that gets posted to CAA's website.

Q.   And in that, did you have discussions with Ms. Portley about what -- what DEQ does as part of its review of that list before approving it?

A.   I did not ask for that, no.

Q.   And did she say anything about that process?

A.   Not that I recall.

Q.   Are you aware of any -- well, strike that.

If in the course of a formal enforcement investigation you determined that enforcement action wasn't justified against a producer and DEQ reached out to CAA about that, is there any formal timeline or process for CAA to respond to something like that?

A.   I don't have knowledge of that.

Q.   One of the potential bases for a formal enforcement action against a producer is whether a producer is producing a covered product under the RMA.

Is that correct?

A.   That is my understanding.

Q.   If a formal enforcement action was taken against a producer for not paying an invoice or registering with the CAA and the producer's defense was that it was not a covered product, who would be responsible for determining whether that producer made a covered product?  Would that be DEQ or CAA?

A.   For DEQ to move forward with an enforcement action DEQ would be able -- need to prove that it was a covered product.

Q.   Mm-hmm.  But as I understand your testimony today, and you can correct me if I'm wrong, it's that you can't say what your office would look at beyond what CAA provides in evaluating whether an enforcement action was justified or not?

A.   We have an obligation before we issue a case or when we issue a case.  It's DEQ's obligation.  It's my office's obligation.

We have to meet our burden of proof.  So we will look at whatever information we need to look at to prove whether something was a covered product, for example.

Q.   Okay.  Can you tell me what documents or evidence that DEQ would look to -- to determine whether or not a producer was a producer of a covered product under the RMA?

MR. JOH: Objection. Scope, and incomplete hypothetical.

THE DEPONENT: I don't have enough familiarity with the RMA to say specifically what documents would be available that we would be looking for to be included in that referral file. That would be a conversation between the environmental law specialist and the Materials Management Program.

BY MR. SANDS:

Q. Okay. Are you familiar with what a producer of record Is under the RMA?

A. I am not.

Q. Okay. Are you familiar with what -- how the RMA treats material categories --

A. I am not.

Q. -- as it applies to a product? Sorry.

A. Sorry, I didn't mean to cut you off.

Q. Yeah, that's okay.

Are you aware if DEQ has a written procedure for determining what material category applies to a particular product?

MR. JOH: Objection. Scope, and foundation.

THE DEPONENT: I am not. That would be a

ERIN SAYLOR                    June 05, 2026                          79
98017                                                         30(b)(6)

Materials Management Program function.

BY MR. SANDS:

Q.    I think that you testified earlier that the Materials Management department was initially responsible for determining whether a violation of the RMA has been made.  Is that correct?

A.    That is correct.

Q.    But your office would do an independent investigation of the file produced by the Materials Management department to determine whether formal enforcement action was appropriate?

A.    I think if I said independent investigation that might be overstating things.  We do a review of the referral file and ensure that we have the evidence that is necessary to support the violations.

Q.    Okay.  I think you have testified in multiple situations that you aren't familiar enough with the RMA to testify as to how to determine whether individual types of violations occurred or have not occurred.

Is that right?

A.    That's correct.

Q.    Is there somebody in your Office of Enforcement who has that specific knowledge?

A.   I think Nicole Portley from the Materials Management Program is probably the best person to answer questions to that.  Otherwise, either Ms. Westbrook or Ms. Wheeler might be able to testify based on their interactions with the Materials Management Program.

**Q.   Okay.  Are you aware of any specific knowledge that Ms. Westbrook or Ms. Wheeler have about the requirements of the RMA?**

A.   I am not aware of their specific knowledge, no.

**Q.   Have they received any training in the requirements of the RMA?**

A.   I'm not aware of them receiving training. However, I believe that they were consulted and involved in the development of the rules and the enforcement guidance documents.

MR. JOH:  Counsel, can we take a 10-minute break here, and basically consider that our at the hour break?

MR. SANDS:  Sure.

MR. JOH:  Okay.  Thank you.

THE REPORTER:  Okay.  We are going off the record at 10:56 a.m.

(WHEREUPON, a recess was taken.)

THE REPORTER:  We are back on the record at 11:11 a.m.

MR. SANDS:  Ms. Saylor, thank you for your time today.  I don't have any further questions at this time.

MR. JOH:  And I guess we can get into the follow-up here.  Are you all right with that, counsel?

MR. SANDS:  Yeah.  Mm-hmm.

EXAMINATION

BY MR. JOH:

Q.   All right.

Ms. Saylor, my name is YoungWoo Joh.  I'm an attorney for the Oregon Department of Justice. We've met before, and I am representing the Defendant, Director Feldon, in this matter along with my co-counsels.

I'm going to ask you a few follow-up questions.  The first one is do you recall your testimony today regarding specifics of the Recycling Modernization Act?

And I'll start with that question.

A.   Do I recall that?  Yes.

Q.   Yes.  And do you recall testifying that there were specific aspects of it that you were not

familiar with for your testimony today?

A.   I do recall that.

Q.   Are those aspects that your office, whether it's you or an environmental law specialist, would become familiar with when a matter is referred to your office for formal enforcement?

A.   Yes, that is correct.  So after we have referred -- we have received a referral, at that point we would dive into the referral package, really make sure that we fully understand the statute and the rules and the facts in developing that case.

Q.   And do you also remember a question from counsel Sands regarding the -- what would happen with a CAA fee payment during formal enforcement?

A.   I do recall that question.

Q.   And with respect to the answer to that question, would that require you to review the applicable statutes and rules when that case comes before your office?

A.   It would.  We would have to review those and likely consult with the Department of Justice as well.

Q.   And if there was a discretionary aspect to that, would that require working with the Materials

Management Program to determine the appropriate action or the appropriate call?

    A.   Yes, that's correct.  We would work with them to make the decision about what the appropriate, corrective action would be in the case.

        MR. JOH:  There's no further questions from me.  Sounds like Mr. Sands is saying that he is also -- okay.

        MR. SANDS:  Sorry, I'm still learning how to use the mute button.  No -- no further questions from me.

        THE REPORTER:  Okay.  So prior to going off the record, Attorney Sands, will you be ordering the original transcript?

        MR. SANDS:  Yeah.  I will defer to Mr. Bowers on timing for that.

        THE REPORTER:  Okay.  Mr. Bowers?

        MR. BOWERS:  Yeah, we had been doing two business days, if that's okay.

        THE REPORTER:  Okay.  Yes, sir.  And this is -- and this invoice is being sent to you, correct, for the transcript?

        MR. BOWERS:  Yes, that's correct.

        THE REPORTER:  All right, yes, sir. Attorney Joh, will you be ordering a copy?

NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

ERIN SAYLOR                          June 05, 2026                          84
98017                                                                    30(b)(6)

MR. JOH:  We will be ordering a copy with the same turnaround.

THE REPORTER:  Okay.  Yes, sir.

MR. JOH:  And can we also do a read and sign?  And for Darin and Caleb, I think our -- we proposed to do that within 14 days.
Is that all right?

MR. BOWERS:  I think so, yeah.  That -- that seems fine, yeah, given -- given the timing here, yeah.

MR. JOH:  Okay, thank you.

THE REPORTER:  Okay.  With that being said, we are going off the record at 11:14 a.m.

(WHEREUPON, the deposition of ERIN SAYLOR was concluded at 11:14 a.m.)

CERTIFICATE

I, Sheila Hidalgo, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.

I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand this 9th day of June, 2026.

Sheila Hidalgo

NAEGELI
DEPOSITION & TRIAL | (800) 528-3335
NAEGELIUSA.COM

Date:        06/05/2026        Assignment #: 98017

Deponent:  Erin Saylor

Case:      NAW vs. Feldon

DEPONENT:

It has been requested that your read and sign your transcript. This is to be read only by you.  Please make any corrections necessary on the Correction Sheet ONLY.  You are to sign the Correction Sheet ONLY, and ONLY where indicated. After signing the Correction Sheet, do the following:

1. The ORIGINAL executed Correction Sheet needs to be returned to our corporation.

2. Forward a COPY of the executed Correction Sheet directly to the attorney(s) listed below. (The address(es) can be found on the Appearance Page of your deposition.)

3. Retain a copy for your records.

CC:  Naegeli Deposition and Trial
     YoungWoo Joh, Esquire
     Sara Van Loh, Esquire
     Caleb J. Bowers, Esquire

ERIN SAYLOR                     June 05, 2026                          87
98017                                                             30(b)(6)

CORRECTION SHEET

Deposition of: Erin Saylor         Date: 06/05/2026

Regarding: NAW vs. Feldon

Reporter: Hidalgo/Barrett

_____

Please make all corrections, changes or

clarifications to your testimony on this sheet,

showing page and line number.  If there are no

changes, write "none" across the page.  Sign this

sheet on the line provided.

Page   Line   Reason for Change

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

            Signature: _____

                     Erin Saylor

Email to: Production@NaegeliUSA.com

DECLARATION

Deposition of: Erin Saylor    Date: 06/05/2026

Regarding: NAW vs LEAH FELDON

Reporter:  Sheila Hidalgo

_____


I declare under penalty of perjury the following to be true:


I have read my deposition and the same is true and accurate save and except for any corrections as made by me on the Correction Sheet herein.


Signed at _____, _____

on the _____ day of _____, 20____.







                    Signature: _____

                              Erin Saylor

Email to: Production@NaegeliUSA.com

NAEGELI
DEPOSITION & TRIAL | (800) 528-3335
NAEGELIUSA.COM

### Exhibits

**EX001 Table 5A** 29:25 39:14,17, 18

**EX002 RMA** 29:21,22 56:5 59:4,5 75:14

### $

**$100,000** 51:17, 18

### 1

**1** 29:25 39:14,17, 18 40:8 41:5,9

**10** 53:22,23

**10-minute** 80:18

**10:06** 54:5

**10:15** 54:1

**10:18** 54:8

**10:56** 80:24

**11:11** 81:2

**11:14** 84:13

**12** 15:20 41:9 46:16

**14** 84:6

**17** 12:17

### 2

**2** 29:21,22 41:6, 10 56:5 59:5 75:14

**20-day** 70:13

**2008** 9:21,25

**2010** 10:1,3

**2015** 9:21

**2022** 9:9 10:13 11:1

**2025** 11:1,3,4 13:21 22:7,8

**2026** 11:7

### 3

**30(b)(6)** 15:4 33:11

### 4

**459(a).869** 15:11

### 5

**5A** 15:22 21:24 27:20 32:12 38:25 39:21,25 45:16

### 9

**9:02** 7:8

**9:33** 32:1

**9:35** 32:4

### A

**a.m.** 7:8 32:1,4 54:5,8 80:24 81:2 84:13

**accept** 69:19

**account** 43:25 46:14

**accuracy** 47:17, 21 48:22 49:3,14, 16 50:23,25 51:9 52:10,17 62:2 70:10 72:15

**accurate** 50:10 51:19,25

**accurately** 55:12

**act** 10:11 11:22, 24 12:1,8,21 13:7,10 17:13 22:18 30:3 66:5, 15,19 67:13 68:3 81:21

**action** 20:20 21:8, 9,18 37:7,24 42:4 47:10,23,25 49:1, 21 51:7 58:2,21 59:2,18 60:16,23 61:10 62:17 65:22 70:6 76:14, 21 77:1,8,14 79:11 83:2,5

**actions** 10:7 34:7 51:5 55:1 61:25

**activities** 33:19

**activity** 12:1 17:18 33:8 54:20, 23 73:6

**actual** 26:13 36:12 54:14

**added** 39:13

**addendum** 57:4, 23 62:12

**additional** 28:3, 20 69:18,19 70:23

**administrative** 38:11

**administrator** 13:18

**adopted** 21:20 41:12 45:13,16, 19

**advice** 21:5,15

**advise** 48:4

**advisor** 10:5,7

**affirm** 7:11

**affirmed** 8:10

**agency** 9:22 11:17

**agreed** 71:16

**agreeing** 57:19, 22

**agreement** 56:25 57:5,20,23 62:12

**ahead** 16:18 60:4 66:8 68:15

**Alexander** 8:5

**alleged** 26:20 30:17,23 31:15 32:11 35:13,22 36:18 38:3,4,14 39:2 42:22 50:11 63:19,24 64:9,10, 12

**alleging** 36:3

**amended** 22:8, 10,12

**amount** 48:10 49:4 51:20,24

**amounts** 42:23

**analysis** 18:1

28:3 49:11

**anonymous** 67:3

**answers** 14:12,13

**apologies** 29:6

**apologize** 29:25 32:6

**appeal** 38:6

**appeals** 73:1

**appears** 30:4

**applicable** 15:21 67:8 82:19

**applies** 78:17,22

**apply** 68:3

**approves** 60:9

**approving** 76:7

**approximate** 13:9

**Approximately** 16:15

**April** 9:9 10:13 11:1

**arguments** 71:23

**arise** 11:17 12:3 20:22

**aspect** 82:24

**aspects** 81:25 82:3

**assert** 67:12

**assessed** 48:22

**assessing** 46:14

**assessment** 38:23,24 51:20, 25 52:18 64:4 69:23 70:1,13

**assessments**

60:10

**assigned** 12:24 35:16 50:5 63:21

**assistance** 45:17, 22

**Association** 8:22

**assume** 13:10,13 25:24 53:3 58:15

**assurances** 52:22

**attorney** 7:15 8:20 9:14,15 10:5,6 14:3 81:14 83:13,25

**attorneys** 67:1

**audible** 14:11

**audits** 62:19

**authority** 19:8,16

**avoid** 14:9

**aware** 22:1 24:5, 6,9,23 25:6,12, 15,16,18,22,23 26:2,4,5,9 27:23 28:10 31:14 34:16 36:15 41:4 42:11 45:21,23 47:1 56:10 57:12, 18 58:19,25 59:8, 13,16,22,24 61:20 62:18 72:2, 7 76:12 78:20 80:7,10,14

---

**B**

**back** 10:12 16:20 23:25 26:12 32:3, 10 33:16 53:25 54:7 69:7 71:2,20

81:1

**base** 46:18

**based** 28:1 36:12 38:22 46:24 73:11 80:5

**bases** 76:20

**basically** 75:7 80:19

**basis** 11:6 37:6 50:10 62:13 64:9

**Bates** 30:1

**behalf** 7:18 8:4,6 15:5

**believes** 49:10

**Bernstein** 7:17

**bit** 26:13 35:3 72:21

**Bowers** 7:19,23 83:16,17,18,23 84:8

**Bradley** 7:17

**branch** 10:10

**break** 14:14,20 53:16,20 80:19, 20

**breaks** 14:16

**breath** 53:18

**briefly** 17:11

**broad** 17:14 67:6

**buckets** 26:15

**burden** 77:18

**business** 83:19

**button** 83:10

---

**C**

**CAA** 20:12 25:10 26:2,18,20 27:17, 25 28:2,8,10,14, 18 33:19 34:8,17, 23 35:7,23 36:17 37:5,20 42:23,25 44:20 45:2,4 48:8,22,23 49:14 50:9,24 51:7,10, 16,25 52:10,14 53:6 56:25 57:5, 19,23 58:20 59:1, 5,9,13,16,25 60:10,17,25 61:15,21 62:2,12, 19 65:2 68:4 70:8 72:15 73:5,21,24 74:2,7,10,21 75:1,2,4,7,20 76:1,16,17 77:3, 6,13 82:15

**CAA's** 24:10,22 25:10,12,23 45:10 53:2 72:2 75:12 76:4

**calculating** 46:17

**Caleb** 7:18 84:5

**call** 83:2

**called** 64:3 73:10

**capacity** 34:15

**case** 15:4 23:8,19 31:11 35:11,12, 16 37:11 38:9,10 49:22 50:5 62:5, 8,11 64:23 70:15, 17 71:2 73:9 77:16 82:12,19 83:5

**case-by-case** 38:23

**cases** 11:15 18:13 43:18,25

**categories** 78:15

**category** 78:21

**certainty** 37:1

**challenging** 72:14

**chance** 53:18

**characterization** 26:23

**characterized** 54:25

**charge** 17:18 18:7 20:10 30:15, 22 34:5,16 47:13 54:16 65:19,25

**chat** 29:18,20 39:14 56:5

**check** 8:17

**chemical** 10:9

**Cheryl** 19:1 54:18

**circumstances** 73:8

**cited** 33:24

**civil** 10:5,16 19:24 35:20 46:14,18 63:25 64:3 65:16 68:17 69:3,12,23 70:1, 7,11,12,20 72:16, 24 73:6

**claim** 71:12

**claims** 55:16 65:20

**clarification** 17:1

**clarified** 29:11

**clarify** 16:21 26:16 33:6 42:2 43:4 49:19

**Class** 40:8 41:5,6, 9,10

**Closely** 23:12

**co-counsels** 81:17

**collection** 72:2

**Columbia** 9:11,17

**companies** 26:17

**compiled** 64:12, 13

**complaints** 67:2

**complexity** 71:2

**compliance** 10:16,19 11:5,13 18:5,19,20 19:15 20:3 30:16,22,23 31:12 32:8,22 33:18 34:5,14,16 35:10,21 41:20 45:4,22 47:14 54:20 55:4 57:9 66:13 73:5

**comply** 23:10,13 26:21 30:13 39:4 72:24

**component** 46:18

**concept** 46:11

**concerns** 45:10 70:4,23

**conclusion** 71:12

**conduct** 49:2

**conducted** 55:14

**conducting** 62:18

**confirm** 28:4,21 35:8,18 36:16,22 37:19 39:23 52:14,17

**conformance** 23:6

**conjunction** 48:13 74:5

**connected** 36:17 63:3

**connection** 26:21 36:9 37:15,25

**consideration** 72:8

**considerations** 43:9

**considered** 44:22 47:17

**constraints** 43:21

**consult** 21:13,14 72:19 82:22

**consultation** 48:2 67:1

**consulted** 21:7, 12 55:7 80:15

**consulting** 21:18 55:10

**contact** 20:21 35:17

**contained** 15:10 57:16 64:5 68:23

**contents** 56:24

**contested** 70:14, 17

**context** 43:17 49:19 66:20 70:25 71:5

**control** 10:11 23:4

**conversation** 16:11,14 28:1 45:1 48:6 50:14 73:23,24 75:11, 16 78:7

**conversations** 16:9 31:19 35:17 51:2 74:10,12,20

**coordinate** 20:22

**copy** 83:25 84:1

**correct** 9:16 11:19 13:4,22 15:1,8,12 18:8 21:19 23:15 27:1, 6,14 28:9,21 31:8 32:13 33:2,12,13 36:7,10,14 42:9 47:5 48:10,11 49:6 52:15 56:7 59:17 63:9 65:17, 18,21 66:6 76:24 77:11 79:6,7,23 82:7 83:3,22,23

**corrected** 31:9 32:16,17 40:12 44:10 46:21

**correcting** 29:13 41:17

**corrective** 83:5

**counsel** 16:2,17 20:21 29:4 33:6, 13 80:18 81:8 82:14

**Counselor** 66:4

NAEGELI
DEPOSITION & TRIAL
(800) 528-3335
NAEGELIUSA.COM

**court** 14:5,10 53:18

**cover** 10:19 22:14

**covered** 33:11 76:22 77:4,6,9, 20,25

**created** 56:14

**credit** 61:1

**credits** 25:4

**curiosity** 30:20

**current** 12:19

**custom** 36:20

**cut** 19:3 78:18

**D**

**D.C.** 9:23

**Darin** 7:17,23 8:20 84:5

**data** 22:23 59:17

**date** 12:16 22:10 33:3 35:1

**dated** 22:5,7

**Davis** 13:16,20

**Davis'** 13:17

**day** 11:18

**days** 83:19 84:6

**deadline** 14:17 40:13

**deadlines** 72:25

**deciding** 43:25

**decision** 27:8 46:12 47:2,24 49:20 67:17,20 83:4

**decisions** 18:22 23:3,4 41:11 58:9

**decrease** 46:24

**dedicated** 20:4, 23

**defend** 38:10

**Defendant** 8:1,6 81:16

**defense** 77:3

**defenses** 70:24

**defer** 62:3 83:15

**definitively** 68:10

**department** 7:25 8:2,4,6 9:1 13:19 15:3 18:18 19:24 20:19 24:21 30:5 53:11 54:17 68:2 69:4 74:6 79:4,10 81:14 82:22

**depend** 36:24 73:8

**depending** 38:19 71:2

**depends** 21:4 37:10 38:2,13 41:10 43:7 66:23

**DEPONENT** 7:14 19:20 29:6,13 31:17 33:22 34:20 37:9 42:18 51:13 58:7 60:5, 12 61:3 62:24 65:10 66:9,23 67:23 72:7 78:3, 25

**deposed** 13:23

**deposition** 9:5 16:1 33:25 63:4

74:15

**deputy** 13:18

**DEQ** 9:5,8 10:12 15:6 16:24 17:12, 17 18:12,21 19:7, 23 20:19 21:20 24:20 25:3,18,22 27:4,15 28:3,14, 20 35:4 37:13,18, 23 45:13 47:17, 20 48:7,9 49:8,9, 15 51:18 54:12 56:17,18 58:3,20 59:1,7,11,13,16, 17,25 60:9,25 61:21 62:18 64:13,19,21 65:7 66:1,18 68:13,24 69:2 71:11 72:1,9 75:9,10,23 76:2, 6,15 77:6,7,8,23 78:20

**DEQ's** 15:9,18,20 23:2 56:15 68:22 77:16

**DEQ-REVIEWED** 76:3

**designated** 15:3, 9,13 17:21 27:5,7

**designation** 16:20,23

**designee** 33:12

**details** 37:19

**determination** 18:3 27:9 31:4 69:21 73:21

**determine** 37:23 38:21 39:9 40:4, 17,23 51:24 53:6 63:23 77:23

79:10,19 83:1

**determined** 60:18,24 61:11 73:19 76:14

**determining** 43:15 47:9,22 52:9 53:12 65:25 67:12 77:5 78:21 79:5

**deterrent** 44:7

**developed** 13:14 56:16

**developing** 24:17 26:10 28:14 82:11

**development** 24:16 55:8 80:16

**develops** 28:10

**differences** 41:6

**differently** 38:16 42:16 43:5 58:4, 14

**direct** 12:25 59:21

**directed** 41:23

**directive** 23:2,14, 18

**directly** 18:14 59:23 74:2

**Director** 8:1,4,7 81:16

**disagreed** 71:16

**discovered** 61:16

**discretion** 45:25 46:2,23

**discretionary**

82:24

**discuss** 70:3

**discussing** 74:23

**discussion** 71:3
74:1,14

**discussions**
44:21 45:4,9 63:3
68:1 72:3,11
74:7,21,24 75:1,
2,5 76:5

**dispute** 51:23
52:2,6,8 57:15
62:3 72:4

**disputed** 62:1

**disputes** 25:4

**disputing** 71:6

**distributors** 58:4

**dive** 82:9

**division** 15:20
23:21 27:24 41:9
45:10 46:16
57:13 61:18

**document** 23:18
29:3,18,20 30:2,
7,9,10,11,16
39:12 40:16,21
41:18 42:8 56:10,
11 57:2 67:18
71:25 75:15,22

**documentation**
35:13 63:19
64:11 73:11

**documented** 23:7

**documents** 15:23
17:7 42:10,25
57:10,13,16 59:9,
12 77:22 78:5
80:17

**DOJ** 16:2 20:21
21:18 67:1

**draft** 26:7 63:24

**drafted** 55:11

**drafting** 38:8

**due** 42:23 73:3

**duly** 8:10

---

**E**

**earlier** 18:7 24:1
42:3 54:10,24
63:6 79:3

**easier** 29:9

**easy** 29:5

**Education** 10:2

**effect** 44:7

**efforts** 55:5 72:3

**eight-page** 30:2

**employee** 10:4

**enforce** 47:3

**enforcement**
10:5,7,10,17,18
11:5,14,17,21,24
12:8,20 16:24
17:13,18 18:5,10,
19,21,22 19:15
20:5,9,20 21:8,9,
17,21,24 22:16
23:3,4 24:6,9,14
25:3,8 26:6,10
27:5,15 31:2,11,
12,21 32:12,20,
23,24 33:8,18
34:7,11,12,14,17,
22 35:10 37:7,24
39:1 40:5 42:4
44:16,19 45:14,

24 46:12 47:10,
22,25 48:25 49:1,
21,23 51:5,7
52:12 54:20 58:2,
4,8,21 59:2,11,18
60:16,22 61:9,25
62:3,17 63:25
64:22 67:9,15
68:24 69:2,3,16
70:6 72:9,22,23
73:6,18,20 74:7,
10 76:13,14,21
77:1,8,14 79:11,
25 80:17 82:6,15

**enforcing** 15:10
27:17 68:23

**ensure** 36:2 50:6
55:10 79:14

**ensuring** 38:9

**entered** 68:18

**entire** 11:13
64:23 67:9

**entitled** 30:2

**environmental**
8:2 9:1,22 10:15
12:14,23 13:19
15:3 20:7 30:5
35:15 37:1 38:7
43:9,13,23 44:6
50:4 63:21 71:19
78:8 82:4

**Erin** 8:10,24

**error** 59:17

**Esther** 12:11 16:3
20:6 31:18 45:7
55:7 74:11

**evaluate** 39:6
49:15 58:17

**evaluating** 38:8
46:7 58:1 60:15
61:9 77:13

**eventually** 52:11

**evidence** 35:19
36:2,4 37:2 38:9,
17 39:6 40:22
52:23,25 58:17
62:6,8 63:23
64:10,13,18 65:1,
24 66:15,19
71:14 77:23
79:15

**exact** 12:16

**EXAMINATION**
8:12 81:10

**examined** 8:11

**exclusively** 10:20
20:4

**exempt** 67:5

**exemption** 67:13
68:3

**exemptions** 25:4
66:24 67:9

**Exhibit** 29:21,22,
25 39:14,17,18
56:5 59:4 75:14

**exist** 69:5

**expected** 22:16

**experience** 24:17
36:12 66:17

**expert** 26:24

**explain** 71:20

**explicit** 23:7

**extent** 12:4 33:7
59:7 75:10

## F

**fact** 35:8

**factor** 43:14 47:8

**factors** 37:22 38:20 43:24 44:3, 5 46:6,11,13,19, 25 47:2

**facts** 37:11 82:11

**failed** 26:20 27:16,25 28:7,19 40:18

**failing** 30:13 35:6 40:8 70:8

**failure** 27:18 42:25 51:7

**fair** 26:23 29:10

**fairly** 59:3 67:6

**falls** 72:9

**familiar** 14:3 46:10 56:24 57:4, 15 62:15 78:11, 14 79:18 82:1,5

**familiarity** 47:11 78:4

**family** 9:20

**February** 11:1,2, 4,7 13:21

**federal** 10:4

**fee** 24:10,22 25:10,12,23 60:10 82:15

**fee-setting** 65:2

**fees** 59:6

**Feldon** 8:1,4,7 81:16

**file** 23:19 35:12 36:5 37:15 38:2 50:13,16 61:25 64:23 67:10 73:17 78:6 79:9, 14

**files** 38:8

**fine** 7:21,22 9:7 84:9

**finish** 14:7,21

**firm** 69:24

**five-minute** 53:20

**fix** 61:15

**folks** 7:20 24:13 25:24 59:6

**follow-up** 81:7,18

**form** 23:24 26:7 64:7

**formal** 11:23 16:24 21:8,17 24:2,4,11 25:6 27:4,15 31:2,21 32:23,24 33:18 34:11,12,17 37:6, 13,24 47:10,22, 25 49:1,20,23 51:5,6 58:2,8,20 59:1,11 60:16,22 61:9,25 68:24 69:2 71:18,24 73:16,18 76:13, 16,20 77:1 79:10 82:6,15

**formulas** 68:4

**forward** 35:19 44:18 62:7 71:21 77:7

**found** 34:8

**foundation** 25:20 60:3 62:22 65:9 66:8,22 67:22 68:20 69:5 72:6 78:24

**free** 64:24

**front** 22:4

**full** 8:23 35:11

**fully** 82:10

**function** 60:13 79:1

**future** 26:10

## G

**gained** 63:3

**Gary** 21:1

**gathering** 40:22

**general** 11:16 38:20

**generally** 17:23 36:1 37:22 46:12 51:4 67:8 75:4,6, 19

**generated** 62:19

**give** 7:12 14:6 16:16 70:2

**giving** 72:20

**good** 8:14,15 53:15 54:2

**good-faith** 47:6, 20

**govern** 42:11

**governments** 45:17

**Grabham** 19:1

54:18

**grace** 45:14,18

**grant** 10:1

**great** 39:24

**greater** 44:7

**group** 56:12

**guess** 43:5 46:2 66:12 73:17 81:6

**guidance** 15:20 21:24 26:10 32:12 40:11,16, 21 41:2,18 80:17

**guided** 42:7

**guiding** 46:2

**guys** 71:16

## H

**hand** 7:10

**handle** 11:25 12:7 27:13 43:2 71:8 72:12 73:2

**handled** 34:14 43:3,4 48:12 62:16 64:20 71:8

**handling** 13:6

**happen** 20:1 35:4 45:1 48:1 62:10, 13 82:14

**happened** 59:19

**harbors** 45:20

**head** 12:17 14:12 69:2 73:4

**hear** 8:17,18,19

**hearing** 70:15,17 72:16,18

**helpful** 43:11

**hesitate** 14:22

**hierarchy** 24:7,21

**hired** 10:3

**hold** 23:1

**home** 9:19

**hour** 14:16 16:15 80:20

**hypothetical** 48:17 51:12 78:2

**I**

**identifiable** 67:4

**identification** 29:23 39:19

**identified** 30:13

**identifies** 27:24

**Immediately** 9:11,19

**impact** 43:9,13, 23,24 44:6,12,17, 22 45:11

**implies** 56:16

**importance** 44:14

**important** 14:6

**importers** 58:4

**in-** 9:20

**inaccurate** 42:24 60:19 61:11

**include** 65:1

**included** 36:4 37:5,14 59:4 78:6

**includes** 72:23

**including** 33:10 46:20 66:25

**inclusive** 44:5

**incomplete** 48:17 51:11 78:2

**incorrect** 60:25

**increase** 46:24

**independent** 24:20 49:11 50:23 51:8,14,23 55:15 61:17 79:8, 12

**independently** 37:19 50:6,9,12

**indirectly** 59:23

**individual** 17:17, 20 20:23 59:25 60:9 79:20

**individuals** 16:9 17:7,22 24:14

**influence** 46:11

**informal** 24:12 70:2,19,21 71:8

**information** 15:18 25:9 35:23 36:22 37:5 38:4 48:12,23 50:7,13, 17,21 52:7,13,16, 21 63:22 64:5,8 65:4 66:1,25 67:5,7 69:18,19 70:23 77:19

**information's** 50:16

**initial** 18:1 27:9, 19 31:4

**initially** 79:4

**initiate** 21:17

**initiates** 20:20

**input** 44:20 53:5

**inputs** 25:10,13, 23

**instance** 59:23 61:21

**Institute** 10:2

**instructions** 14:1

**interactions** 80:5

**interest** 71:3

**interested** 70:19

**intermittently** 14:16

**internal** 23:2,13, 18

**interpreting** 24:21

**interrupt** 16:19 29:8

**investigate** 48:21 50:2,9

**investigated** 36:22

**investigating** 35:22

**investigation** 19:8 27:9 37:15 49:3,7,15,23 52:9 55:15 60:24 61:10,17 76:14 79:9,13

**invoice** 25:4 47:17 48:8,9 49:3,14 50:10,24, 25 51:7,9,16

52:15 53:6 59:17 60:18,24 61:11, 22 62:2 70:9,10 72:15 77:2 83:21

**invoice's** 47:21

**invoiced** 48:10 51:25 52:10

**invoices** 59:25

**involved** 21:2 24:15 32:8,25 54:20 55:5,23,24 56:1,21 61:13 63:7 67:15,16 74:11 80:16

**involvement** 74:4 75:12

**issuance** 32:23 33:9,10 55:25 56:2 69:22

**issue** 19:16 32:19 41:3 44:1 61:1,22 69:25 70:2,7 71:11,17 72:17 77:15,16

**issued** 11:15,16 18:13 19:20 31:11 32:14 33:1, 3 35:2,5,6 49:7 56:14 60:1,10 62:2 63:8,10,12, 14,17 65:16,17 69:16 70:11,13, 21 73:7

**issues** 10:10,19, 21,22 33:10 51:16 69:5

**issuing** 35:19 55:19 62:5 69:12

**J**

**January** 22:7,8

**Joh** 7:25 11:10 16:17,19,23 17:2 19:10,19 25:19 29:4,8,11 31:16, 24 33:13,21 34:19 37:8 42:13, 17 48:16 49:17 51:11 53:22,24 54:2 58:6,22 60:3,11 61:2 62:21 64:16 65:9 66:4,7,21 67:21 68:6,14,19 69:6 72:5 78:1,23 80:18,22 81:6,11, 13 83:6,25 84:1, 4,11

**joint** 48:6 73:25

**jointly** 19:13 67:23

**Jones** 8:5

**judge** 38:11

**Justice** 8:1,4,6 20:19 81:14 82:22

**justified** 76:15 77:14

**K**

**Keeper** 9:12,17

**knowledge** 28:12, 13 34:6 45:6,12, 18 48:4 55:17 59:3,7,15,21 62:25 63:2 76:19

79:25 80:8,11

**L**

**laid** 27:19

**language** 40:10, 11 41:14,15

**large** 58:3,13

**law** 10:15 12:14, 23 20:7 35:15 37:1 38:7,11 50:4 63:22 71:19 78:8 82:4

**laws** 9:21

**lead** 12:23 36:21 58:13

**leadership** 18:12

**Leah** 8:1

**learning** 83:9

**legal** 21:15

**letter** 27:20,21 31:6,7,8 32:13,18 39:3,4 49:6 66:14

**letters** 55:1,8,18, 19,20,25 56:2

**level** 31:18 36:25

**limited** 12:4 16:24 59:3

**limiting** 7:19

**list** 28:2,4,5,6,7, 11,15,19,21 30:6, 7,12,17 44:2,5 56:6 59:4,5,10 75:8,9 76:2,3,7

**listed** 17:8 22:25 40:6 41:8,22

**lists** 22:16 30:25

**local** 45:17

**logo** 56:15

**Loh** 8:3

**long** 9:3,8 10:25 12:15 13:5 16:14 67:8 71:1

**looked** 52:17

**M**

**made** 11:6 18:3 41:11 51:9 58:9, 11 65:23 67:24 77:6 79:6

**make** 8:17 14:11, 12 29:4 31:4 51:24 62:6 82:10 83:4

**maker** 67:17

**making** 50:16

**manage** 11:13,14

**management** 16:7 17:25 18:23, 25 19:2,6,14,21 20:2,8,16 23:2, 14,18,21 24:25 25:9,25 27:2,11, 22,24 31:2,3,20 32:14,18 35:11, 18 36:5 45:2,9 48:2,3,13,20 49:2,24 50:1,15 51:2 52:3,4,14 53:11 54:13,17 55:6,21 56:12,20 59:20 60:2,5,13 61:4,14,18 63:13 65:10 67:18 68:2

72:11,20 73:12, 13,18,23 74:3,6, 25 75:11 78:9 79:1,4,10 80:2,6 83:1

**manager** 11:4 19:1 34:15 47:13 66:12 67:14 69:3

**marked** 29:22 39:13,17,18

**material** 35:16 50:5 78:15,21

**materials** 16:7 17:25 18:23,24 19:2,6,14,21 20:1,8,16 23:21 24:24 25:8,25 27:1,11,21,23 31:2,3,20 32:14, 18 35:11,17 36:5, 17 45:1,9 48:2,3, 13,20 49:2,24,25 50:14 51:2 52:3, 4,13 53:10 54:13, 17 55:6,21 56:12, 19 59:20 60:2,5, 12 61:4,14,18 63:13 65:10 67:18 68:2,4 72:11,19 73:12, 13,18,23 74:3,6, 25 75:11 78:8 79:1,4,9 80:1,5 82:25

**matter** 19:24 31:21 35:9 81:16 82:5

**matters** 13:6 58:20

**mechanism** 34:11,22

**mechanisms** 34:17

**meet** 69:17,22 77:18

**meeting** 68:13 69:14 70:2,19,21 71:8,13 74:19

**member** 40:9,19

**mental** 46:20

**mentioned** 43:13 64:2

**merits** 55:15

**met** 81:15

**methodology** 24:10,22 25:10, 13,23 53:2 65:2,8

**minutes** 53:22

**mirroring** 41:13

**Misstates** 31:16

**mitigating** 46:6,9, 11,13 47:2,8

**Mm-hmm** 17:2 43:19 77:10 81:9

**Modernization** 11:22 12:1,7,21 13:7 17:13 30:3 81:21

**moment** 39:23

**morning** 8:14,15, 22

**mouth** 25:2

**move** 26:13 35:19 62:7 77:7

**moved** 11:4

**moving** 44:18 71:21

**multiple** 79:18

**mute** 83:10

---

**N**

**names** 17:24 30:7

**Natalie** 16:3 24:24 28:1,16,23, 25 29:5

**National** 8:21

**negative** 44:16

**Nicole** 29:5,6,15 54:11 80:1

**nodding** 14:12

**non-compliance** 26:15 37:4

**non-payment** 42:23

**non-registration** 42:22

**normal** 72:22

**notice** 19:17 31:10,11 32:20 33:25 35:5,20 63:7,11,14,25 64:2,3,6,15,22 65:16,24 66:14 68:17 69:12,16, 23 70:1,7,11,12, 20 72:16 73:6

**noticed** 17:3

**notices** 63:12

**notified** 30:22

**notify** 61:18 73:21

**number** 46:19

---

**O**

**Oak** 10:1

**oath** 14:25

**object** 65:7 66:1 70:10

**objected** 66:18

**objection** 11:10 19:10,19 25:19 31:16 33:21 34:19 37:8 42:13, 17 48:16 49:17 51:11 58:6,22 60:3 61:2 62:21 64:16 65:9 66:7, 21 67:21 68:6,14, 19 72:5 78:1,23

**objections** 60:11

**objective** 39:8

**obligation** 21:13 77:15,17

**obligations** 26:21 75:25

**occur** 22:17 48:6

**occurred** 18:2,4 31:5 39:7 49:24 52:24 69:21 79:20,21

**occurs** 27:10

**OCE** 50:3 74:2

**office** 10:3,4,16 11:5,13 18:4,5,7, 19,20 19:5,14,15 20:3 21:17 23:20 25:8,9 26:3,9 27:10,17 30:15, 22 31:12,14 32:7, 22,25 33:17 34:5,

7,9,14,16 35:4,7, 9,21 36:16,21 37:19,23 38:21 39:5 40:3,17,22 42:3,15,18 43:1, 14 45:3,9,25 46:3,7 47:9,14 48:1,4,12 50:8,22 51:8,22,24 52:11, 12,22 54:19 55:4, 20 56:21 57:9 58:12 60:15,21, 22 61:8,12,13,16, 24 62:3,10 63:7, 10,15 65:17,19, 25 66:13 67:15 69:12,13 70:5 72:15 73:4,17,19, 20 74:5,25 77:12 79:8,24 82:3,6,20

**office's** 49:20 69:1 77:17

**offices** 18:21

**ongoing** 44:8

**open** 19:8

**opportunity** 14:6 18:13 31:8 32:13 49:6 69:14 70:3, 22

**order** 43:25 60:17,25 63:25 64:4 69:23 70:1, 4,13 72:23

**ordering** 83:13,25 84:1

**Oregon** 7:25 8:3, 6 9:2 15:10 20:18 21:18 30:5 57:4, 23 62:12 81:14

**organization**

34:13 40:10,18, 19 41:19,24

**organizations** 20:11,14

**original** 83:14

**originally** 75:13

**oversight** 20:11, 13

**overstating** 79:13

**owes** 51:17

**owing** 42:24 51:20

**P**

**package** 35:11 36:8,25 37:4,10 63:18 82:9

**paid** 59:6

**part** 11:20 55:14 76:6

**part-time** 9:20

**participating** 26:2

**parties** 67:3

**party** 73:3

**past** 36:12

**pay** 51:7 70:8

**paying** 48:9 51:18 77:2

**payment** 72:18 82:15

**PEN** 32:20,21 33:1,3,9,10 35:1, 6 39:3 40:14 63:7,11,14,17

**penalties** 19:25

**penalty** 7:11 35:20 46:14,18, 24 63:25 64:3 65:16 68:17 69:12,23 70:1,8, 11,12,21 72:16, 24 73:6

**pending** 14:21 72:18

**people** 12:6

**period** 45:14,17, 18 70:14

**perjury** 7:11

**permanent** 11:7

**permanently** 10:4

**permitted** 72:17

**person** 30:21 57:12 73:14 80:2

**personal** 26:25 34:6 62:24

**personally** 59:24 67:4 74:9

**piece** 33:24 53:4

**pieces** 46:22

**place** 22:3 33:8 40:24 47:4 49:1 53:13

**Plaintiff** 7:18,24 8:21

**plans** 26:9

**play** 20:19 23:2 73:5

**played** 55:9

**point** 14:14 18:2 21:2 31:5,9,13,21

32:7,21 38:12 70:2 82:9

**policies** 21:21 22:15,19 26:5 41:1 45:13 58:12, 15

**policy** 35:22 36:1, 16,19 37:14 45:22,24 47:1

**portion** 34:21

**Portley** 16:4 24:24 28:2,16 29:7,15 54:11 55:22 75:5,16,21 76:6 80:1

**Portley's** 16:5

**position** 10:14 11:5 27:2 65:11

**posted** 76:4

**potential** 32:8 43:8,13,23 59:10 63:16 73:9,14 76:20

**potentially** 21:10 67:7

**power** 60:17,25

**PRA** 65:8,23 66:4

**practice** 36:2,20

**pre-** 31:10 32:19 64:21 69:15

**pre-enforcement** 11:25 31:10 54:25 63:12 68:13 69:7,14

**precedent** 43:15

**preparation** 15:25 63:4 74:14,

19 75:6

**prepare** 15:16 17:8 33:22

**preponderance** 52:23

**present** 70:23

**presented** 51:6, 22 71:14

**pretty** 71:1

**previously** 39:22

**primarily** 10:10

**prior** 9:11 21:7 33:8,9 48:25 68:13,17 69:11, 22 83:12

**prioritize** 42:15 43:18 44:18

**prioritized** 43:5

**prioritizing** 43:12

**privileged** 66:25

**procedure** 35:22 37:13 72:1 78:21

**procedures** 58:12

**proceed** 8:9

**process** 20:19 21:3 27:8 55:14 69:1 70:9 71:9, 19,24 72:8 73:1 76:10,17

**produce** 76:2

**produced** 56:11, 13 75:22 79:9

**producer** 15:10 20:11 22:20 24:7, 21 27:16 30:6,7 34:12 35:2,6

37:24 40:9,19 41:19,23 42:1 46:8 47:7 48:7,24 51:17,18 52:2 53:7 56:6 57:19 58:2 60:9,17,23 62:1,11,12,19 64:14 65:15,20, 23 68:12,23 69:13 70:6,8 71:6,7,14,15 72:4,14,17 75:7 76:15,21,22 77:2, 5,24 78:12

**producer's** 77:3

**producers** 17:13, 19 26:18,19 27:24 28:4,7,19 30:12,17,23 31:14 46:4 54:21 58:3,13,14

**produces** 59:5

**producing** 76:22

**product** 76:22 77:4,6,9,20,25 78:17,22

**program** 12:3,24, 25 16:7 18:1,23, 25 19:2,6,14,21 20:2,17 24:18,25 25:25 27:2,10,11, 22 31:3,20 32:15, 19 35:12,18 36:6 44:14,17 45:2 48:2,3,14,21 49:2,24 50:1,15 51:2 52:4,14 54:14 55:7,21 56:20 59:20 60:6 61:4,14 63:13,17 64:12 65:11

67:17,18 72:11, 20 73:12,13,23 75:12 78:9 79:1 80:2,6 83:1

**Program's** 60:13 74:3

**programmatic** 43:24 44:6,12,22 45:10

**programs** 42:1

**proof** 77:18

**proper** 32:11

**proposed** 84:6

**PROS** 42:5

**Protection** 9:22

**prove** 52:23 77:9, 20

**provide** 14:11 41:2 59:12 69:13, 17 75:8

**provided** 25:9 36:17 37:5,19 48:22,23 51:10 55:18 64:14 73:11

**provider** 56:25 57:5,19,22,23

**providing** 71:25

**provisions** 57:16

**public** 64:21,24 65:4,5 66:5,15, 19,24 67:13 68:3

**purely** 73:10

**purpose** 9:4

**purposes** 58:5

**pursuant** 10:1

58:8

**pursue** 37:6,23 38:22 44:9 46:3 49:20 61:9,25

**pursuing** 44:16 65:20 72:16

**put** 22:2 25:2 29:17,18,20 39:12

**puzzle** 53:4

---

### Q

**quality** 8:2 9:2 10:20 13:19 15:4 30:5

**question** 14:7,21 17:14 21:15 24:1, 24 33:16,23 34:1 49:19 55:2 65:12 66:10 67:6 69:6 81:22 82:13,16, 18

**questions** 11:16 12:3,4 13:1 20:22 21:4 27:3 48:5 80:3 81:4,19 83:6,10

**quibble** 34:4

**quick** 8:16 14:1 33:16 53:16

**quickly** 56:4

---

### R

**raise** 7:9

**raised** 52:2,3 71:23

**rate-setting** 53:2 68:4

**re-review** 50:13

**reach** 38:11 69:17 70:18

**reached** 76:15

**reaches** 31:13

**reaching** 71:3

**read** 17:4 84:4

**realm** 12:17

**reason** 14:20 30:24 44:18 65:3 68:9

**reasonable** 53:8

**reasons** 23:7,19

**recall** 22:10 54:14 74:19 76:11 81:19,23,24 82:2, 16

**recalling** 24:3

**receive** 27:20 31:9 32:12 36:5 39:2,3 64:23,25 65:5 67:2

**received** 24:1,19 25:3 31:1 36:8,25 42:19 58:7 80:12 82:8

**receiving** 48:8 80:14

**recess** 32:2 54:6 80:25

**recognize** 30:9

**recollection** 22:9 74:22

**record** 7:7,24

NAEGELI
DEPOSITION & TRIAL | (800) 528-3335
NAEGELIUSA.COM

14:13 23:8 30:1 31:23 32:1,3 54:5,7 64:21 65:4 78:12 80:24 81:1 83:13 84:13

**records** 64:24 65:5 66:5,15,19, 24 67:13 68:3

**recycling** 10:22 11:22 12:1,7,21 13:6 17:12 30:3 81:20

**refer** 9:5 40:14 58:20 59:1

**referral** 36:4,8,25 37:10 38:1,8 43:22 50:20 52:12 59:14 63:18 64:7 78:6 79:14 82:8,9

**referrals** 31:1 42:19 58:8,11,16

**referred** 18:4 31:11 32:19,22 35:9 39:5 49:22 62:11 73:16,17 82:5,8

**referring** 19:24 40:1 41:8 59:10

**reflects** 55:12

**refund** 61:1,22

**refusing** 62:11

**regard** 44:21 47:20 60:9 63:16

**register** 22:20 26:18 27:16,25 28:8,19 35:7 40:8,18

**registered** 26:19 59:6

**registering** 77:3

**registration** 26:22

**regulations** 15:20 39:7 41:9,11 46:17

**regulatory** 41:15

**rejecting** 59:13

**related** 10:11 11:16,21,24 12:1, 20 13:6 22:19 26:5,6 35:2 42:1 45:14,24 47:2 54:21 63:5 65:1 70:4,8 72:4

**relating** 12:20 13:1 41:19 65:23

**releasable** 65:5

**release** 65:7 66:1, 18 67:7,9

**released** 68:11

**relevant** 69:20

**rely** 73:13

**remain** 67:3

**remember** 82:13

**remind** 54:11

**repeat** 32:7 64:2 66:9

**repeated** 40:13

**report** 12:6 13:15, 16 18:25

**reporter** 7:7,15 8:8 14:5 31:25 32:3 39:17 53:18

54:4,7 62:23 80:23 81:1 83:12, 17,20,24 84:3,12

**reporter's** 14:10

**reporting** 10:9 13:20 22:22 42:24

**reports** 62:19

**represent** 7:16 8:21

**representative** 27:6,7

**representing** 81:15

**represents** 50:24

**request** 51:6 64:24 65:5,23 66:19,24 67:3,13 70:14

**requests** 70:16

**require** 36:16,19 50:22 51:8 53:1 82:18,25

**required** 57:24

**requirement** 37:18 57:20 72:23 75:20

**requirements** 15:10 41:24 61:5 68:23 80:9,13

**requires** 42:25 76:1

**reset** 51:13

**resolution** 57:16 72:18

**resolved** 62:4

**resource** 43:20

**resources** 12:25 43:7

**respect** 46:9 68:24 82:17

**respond** 76:17

**respondent** 64:22 70:14,22

**respondent's** 46:20

**respondents** 69:16

**response** 22:17 27:19 32:11 39:1 40:5 70:18 71:17, 22

**responsibilities** 11:21

**responsibility** 11:8 12:20 20:11 40:9,19 41:19,23 42:1

**responsible** 10:8 17:12,23 18:10, 22 19:23 20:13 24:15 27:17 33:18 34:7 42:4 51:4 61:15 77:5 79:5

**rest** 67:20

**restate** 18:17

**restroom** 14:19

**result** 63:3

**review** 11:14 15:23 18:13 35:16 38:1 39:23 50:5 55:18 59:25 63:22 76:7 79:14

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

82:18,21

**reviewed** 15:18, 19 34:21 56:17 57:2,7,10

**reviewing** 17:7 57:13

**reviews** 75:10 76:2

**revise** 60:18 61:21

**Ridge** 10:2

**risen** 31:17

**risk** 10:9

**River** 9:12,17

**RMA** 15:19,21 17:19 18:11,22 19:9,17 20:4,20 21:21 23:3,5,6, 10,22 25:5 26:6, 15,24 27:5 30:13, 18,24 31:15 32:9 33:4,20 34:9,18 35:3 36:9 37:16, 25 41:20 42:5,16, 19 43:12 45:5 46:4,5,8 47:3,7, 12 50:11,20 51:5, 21 52:1,20 54:21 57:20,24 58:9 59:1 63:16 70:7 71:5,15 74:8,10 76:23 77:25 78:4, 12,15 79:6,19 80:9,13

**role** 9:13,24 10:6, 19,23,25 11:2,9, 18,20 12:13,15 13:3,17 15:9 16:5 20:18 23:2 30:15 54:11 55:9,10

66:12,18 68:22 69:1 73:4,5

**rotational** 11:6

**Rubin** 21:1

**rule** 61:5 69:24

**rules** 24:15 62:16 80:16 82:11,19

---

**S**

**safe** 45:20

**sake** 14:10

**Sands** 7:17,18,21 8:13,20 11:11 16:18,22,25 17:3, 5 19:11,22 25:21 29:10,12,16,24 31:22 32:5 33:14, 15 34:2,24 37:12 39:20 42:14,20 48:18 49:18 51:15 53:15,23, 25 54:3,9 58:10, 23,24 60:7,14 61:7 63:1 64:17 65:13 66:6,11 67:11,25 68:7,16, 21 69:9,10 72:13 78:10 79:2 80:21 81:3,9 82:14 83:7,9,13,15

**Sara** 8:3

**Sarah** 12:11,22, 24 13:2 16:2 20:6 31:19 45:7 55:8 74:11

**Saylor** 7:9 8:10, 14,24 13:24 32:6 39:15 53:17 54:10 81:3,13

**Saylor's** 16:23

**Science** 10:2

**scope** 19:10 25:19 33:23 34:19 42:13 49:17 58:6 60:4 61:2 62:21 66:7, 8,21 67:21 68:6, 14,19,22 69:4 72:5,22 78:1,23

**sec** 31:23

**send** 31:6 40:11, 14

**sends** 28:2 63:18

**separate** 33:16

**separately** 16:12

**set** 32:17 46:16

**sets** 38:25

**settlement** 70:25 71:4,21

**severity** 43:8,22

**Shannon** 13:16

**share** 29:2

**short** 14:15,17 53:17

**showed** 75:14

**sic** 16:3

**sign** 11:15 42:25 57:22 62:11 84:5

**similar** 30:11 43:2

**sir** 83:20,24 84:3

**situation** 62:13 65:15 66:14 72:12

**situations** 21:11,

16 79:18

**skipping** 29:25

**slightly** 22:9

**small** 58:3,13

**solely** 48:1

**sort** 10:7,18 24:4 26:14 48:11 49:7, 14 52:6,8,9 55:14 71:17

**sorts** 43:9

**sought** 66:15,19

**sounds** 53:8 54:2 83:7

**speak** 14:9 15:25 49:25 50:3,20 52:19,24

**speaking** 15:5 17:6 28:22 29:15 54:10

**specialist** 10:15 12:14 35:15 37:1 38:7 50:4 63:22 71:20 78:8 82:4

**specialists** 12:23 20:7

**specific** 17:15,20 21:21 22:19 27:3 33:23,24 35:25 37:11 45:17 46:1, 5 52:25 54:22 61:5 69:6 72:7 79:25 80:7,10 81:25

**specifically** 22:25 41:9 50:1 55:3 68:24 74:17 75:3, 25 78:4

NAEGELI
DEPOSITION & TRIAL    (800) 528-3335
                       NAEGELIUSA.COM

**specifics** 52:19, 20 81:20

**spoke** 16:2 75:19

**staff** 9:14 11:14 20:4 23:20 24:7,9 25:15 26:3

**stamped** 30:1

**standard** 36:1 39:8

**start** 12:12 40:7 63:15 81:22

**started** 10:13

**state** 7:16 9:2 30:4 46:20

**status** 30:6 56:6 59:4 75:8

**statute** 15:11,19 24:16 34:13,21 39:7 61:5 62:15 76:1 82:11

**statutes** 82:19

**statutory** 33:24 41:14

**stay** 72:2

**stayed** 73:1

**steps** 61:12

**strike** 9:4 18:15 34:25 47:18 57:18 58:23 60:21 76:12

**struggling** 49:8

**stuff** 53:11

**subjective** 38:23

**submit** 64:24 69:20

**substance** 47:12

**Substances** 10:11

**substantive** 48:4

**sufficient** 35:19 37:6 63:23

**summarizes** 64:8

**supervising** 17:18 18:10

**supervisors** 18:9

**support** 35:13 36:3 37:2 38:4,18 50:7,17 58:17 62:7,8 63:19,24 64:11 79:15

**supporting** 35:13 59:9 63:19

**supports** 64:10

**suppose** 19:13

---

**T**

**table** 15:21 21:24 22:14 27:19 32:11 38:25 39:21,25 40:2 41:2 45:16

**takes** 33:8

**taking** 42:4 49:1

**talking** 65:14 66:5 75:25

**target** 65:23 66:14

**team** 18:12 25:3,8

**technical** 45:16

**tells** 51:18

**temporary** 11:6

**terms** 22:14 27:4, 15 43:11,14 52:1 55:19

**testified** 8:11 18:6 28:20 35:1 39:22 63:6 79:3, 17

**testify** 79:19 80:4

**testifying** 81:24

**testimony** 7:12 15:17 17:9 31:16 49:4 53:9 77:11 81:20 82:1

**things** 25:16 79:13

**thought** 29:8

**time** 7:20 10:12 12:2 32:17 41:11 43:8 49:22 53:15, 17 81:4,5

**timeline** 76:16

**timing** 83:16 84:9

**title** 16:6 54:14

**today** 14:17,25 15:17 53:10 63:4 77:11 81:4,20 82:1

**today's** 16:1 17:9

**told** 48:9 75:24

**top** 12:16 56:16

**topic** 15:8 16:20 68:22

**topics** 15:14 25:1 33:11

**touched** 17:11

**Toxic** 10:11

**trained** 23:21 24:7,10

**training** 23:24 24:2,4,11,12,16, 20 25:3,6,9 26:3 80:12,14

**transcript** 83:14, 22

**treat** 58:3,16

**treated** 38:15 58:14 71:15

**treats** 78:15

**trouble** 44:14

**true** 35:8 36:23

**truth** 7:13 8:11

**turn** 43:18

**turnaround** 84:2

**types** 38:15 42:16 58:19,25 79:20

**typically** 17:25 18:14 36:4 44:8 46:17,22 64:7,23 69:15,22 70:16, 20 71:18

---

**U**

**U.S.** 9:22

**ultimate** 67:20

**ultimately** 50:4 72:9

**uncertainty** 47:6, 21

**underlying** 65:24

**understand** 14:24

53:2 59:5 77:10
82:10

**understanding**
15:2 26:14,25
28:2,22 29:14
33:7 34:10 45:15
49:5 55:17,24
75:8 76:25

**Understood**
16:25

**unit** 19:5

**units** 18:21

---

### V

**Vague** 11:10
33:21 37:8 42:17
48:16 58:6,22
64:16

**valid** 71:12

**Van** 8:3

**verification** 50:23
51:9,23

**version** 76:3

**violate** 34:18

**violated** 33:19
34:8 42:5

**violation** 18:2,3
19:9,17 27:10
30:18 31:15
32:10,16 35:2,14,
20 36:9 37:3,15,
25 38:3,5,14,18,
19,22 39:2,6
40:8,10,12 42:22
44:8,13 46:7 47:3
49:10 50:7,11,18
52:24 53:12
55:12 58:18 62:7,

9,14 63:16,20
64:9,10,12 69:21
72:25 79:5

**violations** 15:21
22:17 26:13 31:5
32:8 35:23 36:3,
18 38:15 40:6,13,
23 41:5,6,25
42:16,19 43:12,
15 46:4 58:25
59:10 63:24
79:16,20

**volume** 8:16

---

### W

**wanted** 16:20
26:13

**warning** 19:17
27:20 31:6,7,8
32:13,18 39:3,4
49:6 55:1

**Washington** 9:22

**water** 10:3,20

**ways** 43:2

**website** 15:18
76:4

**weigh** 18:14
67:19

**Westbrook** 12:11,
12 13:3,5 16:3
20:6 31:18 55:7,
13 74:20 80:4,8

**Wheeler** 12:11,22
13:2,12 16:3 20:7
31:19 55:8,13
74:20 80:4,8

**Wholesaler-
distributors** 8:22

**withhold** 64:19
72:17

**WLOC** 40:12

**word** 49:9

**words** 15:5 25:2
64:18

**work** 8:25 9:1,10,
18 10:22 18:1
20:8 28:14,21,24
53:21 83:3

**worked** 9:3,8,20,
21 10:1,20

**working** 10:10
13:14 39:9 61:15
82:25

**works** 16:7 27:8
54:13

**write** 71:20

**writing** 24:15

**written** 14:13
21:20 70:9 71:11,
17,25 78:20

**wrong** 26:16
77:12

---

### Y

**years** 9:25 12:17
40:14

**yesterday** 16:10
74:14

**Youngwoo** 7:25
29:14 81:13