

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

NATIONAL ASSOCIATION OF

WHOLESALE-DISTRIBUTORS,

      Plaintiff,

v.                    CASE NO. 3:25-CV-01334-SI

LEAH FELDON, DIRECTOR, OREGON

DEPARTMENT OF ENVIRONMENTAL

QUALITY, in her official capacity,

      Defendant.

_____

REMOTE STREAMING DEPOSITION OF

ARIANNE SPERRY

TAKEN ON

WEDNESDAY, JUNE 10, 2026

9:04 A.M.

2944 NE 30TH AVENUE

PORTLAND, OREGON 97212





## NAEGELI
### DEPOSITION & TRIAL

**(800) 528 - 3335**

**NAEGELIUSA.COM**



*Nationwide*

**COURT REPORTING**

**LEGAL VIDEOGRAPHY**

**REMOTE DEPOSITIONS**

**TRIAL PRESENTATION**

**LEGAL TRANSCRIPTION**

**COPYING AND SCANNING**

**LANGUAGE INTERPRETERS**



*Powerful*
LITIGATION SUPPORT

**NAEGELI** | **(800) 528-3335**
DEPOSITION & TRIAL | NAEGELIUSA.COM

REMOTE APPEARANCES


Appearing on behalf of the Plaintiff:

CALEB J. BOWERS, ESQUIRE

Sidley Austin LLP

350 South Grand Avenue

Los Angeles, California 90071

(213) 896-6000

cbowers@sidley.com


DARIN SANDS, ESQUIRE

Bradley Bernstein and Sands LLP

1211 NW Glisan Street, Suite 204

Portland, Oregon 97209

(503) 734-2480

dsands@bradleybernstein.com

ARIANNE SPERRY                    June 10, 2026                        3
98024

REMOTE APPEARANCES (CONTINUED)


Appearing on behalf of the Defendant:

YOUNGWOO JOH, ESQUIRE

Oregon Department of Justice

100 SE Market Street

Portland, Oregon 97201

(971) 673-1880

Youngwoo.joh@doj.oregon.gov


Also Present:

Dan Horne, Paralegal, DOJ Oregon

Nicole Portley, Client Rep for Defendant

Jess Bryan, Naegeli Technician

ARIANNE SPERRY                        June 10, 2026                             4
98024

EXAMINATION INDEX

                                                                    PAGE


EXAMINATION BY MR. SANDS                               7

EXAMINATION BY MR. JOH                                 88

FURTHER EXAMINATION BY MR. SANDS                       93

NAEGELI  (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

ARIANNE SPERRY                June 10, 2026                              5
98024

EXHIBIT INDEX

EXHIBIT                                              PAGE


1    COMPENSATION TO LOCAL GOVERNMENTS        9

2    DIGITAL EXHIBIT PLACEHOLDER              17

3    OREGON PROGRAM PLAN                      19

4    QUALITY REPORT Q1                        27

5    CONSIDERATIONS FOR EXPANSION             35

6    COUNCIL MEMBERSHIP                       67

7    EMAIL FEB 9 2026                         82

ARIANNE SPERRY                    June 10, 2026                                  6
98024

REMOTE STREAMING DEPOSITION OF

ARIANNE SPERRY

TAKEN ON

WEDNESDAY, JUNE 10, 2026

9:04 A.M.


            THE REPORTER:  We are on the record at
9:04 a.m.

            Ms. Sperry, please raise your right hand.

            Do you affirm under penalty of perjury
that the testimony you are about to give will be the
truth, the whole truth, and nothing but the truth?

            THE DEPONENT:  I do.

            THE REPORTER:  Thank you.

            Will each attorney please state their name
and whom they represent?

            MR. SANDS:  Darin Sands, Bradley Bernstein
Sands on behalf of plaintiff National Association of
Wholesaler-Distributors.

            MR. BOWERS:  Caleb Bowers, Sidley Austin,
also on behalf of plaintiff.

            MR. JOH:  YoungWoo Joh for Oregon
Department of Justice representing defendant
Director Leah Feldon for Department of Environmental
Quality.

THE REPORTER:  Thank you, counsel.

You may proceed.

ARIANNE SPERRY, having been first duly affirmed to tell the truth, was examined and testified as follows:

EXAMINATION

BY MR. SANDS:

Q.    Good morning, Ms. Sperry.

A.    Good morning.

Q.    My name is Darin Sands.  I'm an attorney here in Portland, and I represent plaintiff.

Have you ever been deposed before?

A.    No.

Q.    Okay.  Well, I just want to start off with a few quick introductions and introductory instructions.  Namely, please try to wait until I'm done with a question before you answer it, and I will try to do the same.  We have a court reporter who is transcribing what we're writing down and so it gets very hard for her if we talk over each other.

Second is make sure you provide audible answers to my questions.  So yes, no, you know, not nodding head for the similar reason that it's transcribed.

And finally, if you need to take a break, please let me know.  I will try and take a break or two between now and noon.  But if you need a break for any reason, just let me know.  We'll have to finish the question but I'm happy to make sure you're comfortable during this process.

A.    Okay.

Q.    And finally, are you aware you are under oath in this deposition here today?

A.    Yes.

Q.    Okay.  And do you understand that you're testifying on behalf of the Department of Environmental Quality, not merely in your personal capacity?

A.    Yes.

Q.    And do you understand that you've been identified to testify on behalf of the DEQ on behalf of particular topics?

A.    Yes.

Q.    And one of those topics is designated as Topic 14, which is DEQ's understanding and assessment of payments by CAA to third parties under the Oregon Program Plan Allowable Costs and any DEQ process for determining proportionality and appropriateness relative to materials recycled with

respect to payments under ORS 459A.890.

Is that correct?

A.   Correct.

Q.   And the other topic you've been designated for is Topic 16, which is about ORSAC, including its membership and role in advising DEQ and PROs on implementation of the act.

Is that correct?

A.   Correct.

Q.   Okay.  And just for the record, what does ORSAC stand for?

A.   Oregon Recycling System Advisory Council.

Q.   Okay.  Just for the purpose of this record, when I refer to ORSAC we'll agree that we're referring to that entity?

A.   Yes.

Q.   And similarly, when I refer to DEQ, I'll be referring to Oregon DEQ.

A.   Okay.

Q.   I'm going to -- I'm going to start with Topic 14 today.  I'm putting in the chat a document that's been marked as Exhibit 1.

(WHEREUPON, Exhibit 1 was marked for identification.)

BY MR. SANDS:

Q.   When you have an opportunity, could you look at that?

A.   It's asking me to save it.  Is that what is --

Q.   Yeah.  It may ask you to save it or open it.  Either way is fine.

MR. JOH:  I think you can save it and then click on it to open it.

THE DEPONENT:  Okay.

BY MR. SANDS:

Q.   Are you able to open that document?

A.   Yeah.  I was just looking at it to make sure I understood what it was.  Yeah.

Q.   Great.  Let me know when you're done.

A.   I'm done.

Q.   Okay.  Do you recognize that document?

A.   Yes.

Q.   And what is it?

A.   It is a section of Oregon Revised Statute Chapter 459A.890, Compensation to Local Governments and Local Government Service Providers.

Q.   And what is your understanding of what that statute is?

A.   It -- I guess I would go to the statute itself.  The language in the statute itself.  It

says, "A producer responsibility organization shall, upon request, fund in advance or reimburse, as appropriate, the eligible expenses of a local government or the local government's service provider for eligible costs as provided in this section."

Q.   Okay.  And are there any -- are there any provisions in this statute related to funding by CAA third parties that you are not prepared to testify about today?

A.   Are there any parts of this statute that I'm not prepared to, is that what you're asking?

Q.   Correct.

A.   That I'm not prepared to testify today? No.

Q.   Okay.  And do I understand correctly that DQ is -- to the extent there are payments by CAA to third parties that are not included in this particular statute that those are covered by a different designee -- 30(b)(6) designee?

A.   Yes.

Q.   Okay.  What did you do to prepare for today's deposition?

A.   I spoke with colleagues on my team.

Q.   Okay.  Which colleagues?

ARIANNE SPERRY                    June 10, 2026                                12
98024

A.    Nicole Portley.

Q.    Anyone else?

A.    David Allaway, Justin Gast, Cheryl Grabham, Cathie Rhoades, and Rachel Vanwoert.

Q.    Vanwoert?

A.    Yeah.  I think it's V-A-N-W-O-E-R-T.

Q.    Anyone else beyond those six individuals?

A.    I don't think so.  No.

Q.    And when did you meet with them?  Did you meet with all of them at the same time or individually?

A.    I met with them individually.

Q.    Okay.  Can you -- well, let's just start with Nicole Portley.  When did you meet with her?

A.    Last week.  I think Thursday.

Q.    Okay.  And how long did you meet with her?

A.    Forty-five minutes.

Q.    Were there any other meetings with Nicole Portley to discuss your testimony here today?

A.    No.

Q.    How about David Allaway?  When did you meet with him?

A.    Monday morning.

Q.    For about how long?

A.    Half an hour.

ARIANNE SPERRY                    June 10, 2026                           13
98024

Q.   Did you have any other meetings with Mr. Allaway about your testimony here today?

A.   No.

Q.   And I believe you said Justin Gast.

Is that right?

A.   Yes.

Q.   And what's his --

A.   Um --

Q.   Oh, sorry.

A.   Sorry.

Q.   What is his title?

A.   I don't know.

Q.   Okay.  What is his general job responsibility?

A.   He works on the Recycling Modernization Act team.  And --

Q.   Is there something -- yeah, sorry.

A.   -- he -- his focus -- he works on a lot of different topics.  His focus can be facilities, recycling processing facilities, the recycling system.

Q.   Okay.  Do you know who he reports to?

A.   Cheryl Grabham.

Q.   And when did you meet with Mr. Gast?

A.   Yesterday.

ARIANNE SPERRY                       June 10, 2026                              14
98024

Q.    Okay.  And for how long?

A.    About 15 minutes.

Q.    Okay.  And Cheryl Grabham, what is her title?

A.    She's the product stewardship manager.

Q.    And what do you understand that job to entail?

A.    DEQ has several product stewardship programs including mattress product stewardship, drug takeback, electronics, paint.  And she manages -- including the Recycling Modernization Act.  And she manages all of those programs.

Q.    Okay.  And when did you meet with her?

A.    Monday.

Q.    For about how long?

A.    Half an hour.

Q.    Okay.  And Cathie Rhoades, what is her title?

A.    She is one of DEQ's regional specialists. DEQ has staff in each of the states' regions that help local governments comply with their opportunity to recycle requirements.  She is the lead worker for all of the regional specialists.

Q.    As part -- in part of her role does she handle or -- strike that.

ARIANNE SPERRY                    June 10, 2026                              15
98024

As part of her role, does she -- is she involved in the AAA's payment to local governments under the RMA?

A.    The regional specialists work directly with all of the regulated local governments.  And they have offered their assistance to local governments and designated service providers in some cases, but primarily local governments to provide information about -- information about local government obligations under the RMA, as well as the Opportunity to Recycle Act.

And also, clarifying for, you know, as the local governments are in the middle of contract negotiations or discussions with CAA, what are CAA's obligations to local governments and service providers?  So the regional specialists are sometimes engaged in those conversations.

Q.    Okay.  Rachel Vanwoert -- oh, sorry.  Strike that.

Ms. Rhoades.  When did you meet with her?

MR. JOH:  Objection.  Vague.

BY MR. SANDS:

Q.    In connection with preparing for this deposition?

A.    Yesterday.

NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

ARIANNE SPERRY                     June 10, 2026                          16
98024

Q.    For how long?

A.    Half an hour.

Q.    Okay.  And Ms. Vanwoert, Rachel Vanwoert.
What is her title or job duty at DEQ?

A.    She is a Recycling Modernization Act
technical assistant in Eastern Region.

Q.    Okay.  And what does she do in comparison
to what Ms. Rhoades duty is as a regional
specialist?

A.    You know, the regional specialists have
been operating to ensure compliance with the
Opportunity to Recycle Act for a long time.  And as
the Recycling Modernization Act began to be
implemented, they added new elements to their
workplans.  The Recycling Modernization Act
technical assistants were hired also to help
specifically related to implementation of the RMA.

However, I think the -- I don't know if I
could exactly delineate the job duties of a regional
specialist versus RMATA.

Q.    Okay.  Yeah, that's fine.

A.    It's kind of shifted over time.

Q.    Okay.  And when did you meet with Ms.
Vanwoert?

A.    Yesterday.

ARIANNE SPERRY                    June 10, 2026                              17
98024

Q.    Okay.  And for how long?

A.    Forty-five minutes.

Q.    Okay.  I've put into the chat a document that's been marked Bates 61026.  We'll mark that whole folder as Exhibit 2.

(WHEREUPON, Exhibit 2 was marked for identification.)

BY MR. SANDS:

Q.    Sorry.  I didn't label it as such.

I'll represent to you that this has been provided to us by your counsel as a collection of documents that you've used to prepare for this deposition.

Before we look at that document, did you look at documents to prepare for today's deposition?

A.    Yes.

Q.    And do you recall which documents they were or how many approximately?

A.    I looked at the seven documents that are in the binder.

Q.    Okay.  Yeah.

A.    That we shared.

Q.    Okay.  Just -- there are eight documents in the -- if you can open the zip file that I attached -- put into the chat as Exhibit 2.

I don't want to spend a ton of time on this but I believe if you could just skim through these documents to see if these are the documents you reviewed and there are eight in here.  So maybe there is one that you forgot about.

Oh, I see.  Okay.  Why don't we just -- we'll walk through each of these briefly rather than you looking at each of them.

A.    Okay.

MR. JOH:  So before --

MR. SANDS:  Yeah.

MR. JOH:  Before we move on, do you mind if I put into the record what --

MR. SANDS:  Sure.

MR. JOH:  -- the chat?

So the paralegal for Department of Justice just said that the eighth document that was referenced by counsel is an email that was not part of the binder but was related to this subject.  And so it was produced ahead of the deposition.

MR. SANDS:  Okay.  Great.

BY MR. SANDS:

Q.    Okay.  I'm putting in the chat what's been marked as Exhibit 3, which is Bates stamped NAWD_DEQ_356252.

ARIANNE SPERRY                    June 10, 2026                         19
98024

(WHEREUPON, Exhibit 3 was marked for identification.)

BY MR. SANDS:

Q.   We'll be talking about this document a little bit more later but for the purposes of this question, is this one of the documents you reviewed to prepare for today's deposition?

A.   Let me check.

Q.   Okay.

MR. JOH:  And counsel, this may be implicit, but is this taken from the binder that we sent?

MR. SANDS:  Correct.

MR. JOH:  Okay.

THE DEPONENT:  Okay.  So this document, Exhibit 3, what I read is Oregon Program Plan Amended Version, May 4, 2026.

BY MR. SANDS:

Q.   And what is that document?  How would you describe it?

A.    It's the most recently approved and amended plan that explains how CAA will meet its obligations under the RMA.

Q.   Okay.  And what were you -- how were you using this to prepare for today's deposition?

ARIANNE SPERRY                    June 10, 2026                         20
98024

What's the relevant information in this report relating to CAA's payment under ORS 459A.890?

A.   Yeah.  There are a few different areas that I was looking at on page 26 of the document.

Q.   Okay.

A.   It's not 26.  Okay.  Okay.  Yeah.  It is 26.  Yes.  I was looking at the funding request review criteria.

Q.   And what are those criteria?

A.   CAA developed these criteria to help them assess funding requests from local governments pursuant to ORS 459A.890(5).  We call it the system expansion funding.

Q.   Okay.

A.   There is --

Q.   Would -- oh, sorry.  I cut you off.  Go ahead.

A.   Well, there are still some words in the administrative rules that clarify that part of the statute that use terms like "as needed," and CAA applied these criteria to identify local government needs assessment requests that are high priority, eligible costs to be funded within the program plan period.

Q.   Okay.  And when you were discussing the

ARIANNE SPERRY                     June 10, 2026                          21
98024

OAR additional words, "as needed," how do you think those words modify CAA's obligations?

A.    I don't understand that question.  I'm sorry.

Q.    Yeah.  And it may be just be I misunderstood you.

I think you said that there are some -- there are some additional criteria in the OAR beyond these six factors to evaluate system expansion requests by local governments.

Is that right?

A.    No.

Q.    Okay.  What did you mean?  I'm sorry.

A.    The administrative rules, 340-090-800, they clarify the costs that are eligible for the PRO to pay related to system expansion.  There are still some words in those administrative rules that are vague.  Like "as needed."  Or "if necessary." Although, I don't -- if necessary is not actually in the rules but it's language along those lines.

Q.    Okay.  So how does -- my question is how would those words in the OAR 340-090-800 modify, if at all, the six factors that are identified to guide CAA in this document?

A.    It's my understanding that CAA developed

these six factors to assist them in evaluating requests that are not cut and dry because of the vagueness of some of the language in the rules.

Q.    I see.  Okay.

Did DEQ play any role in developing these six factors on page 26 of Exhibit 3?

A.    The program plan went through an extensive review process.  And that included Recycling Council review or SAC review, public comment period, and DEQ review.  And this is the approved -- these are the approved criteria in the plan.

Q.    Okay.  So DEQ approved these criteria as being consistent with Oregon state law and Oregon state regulations?

A.    Yeah.

Q.    Beyond looking at these six factors, were there anything else in this document you looked at to prepare for today's deposition?

A.    I looked at the dispute settlement process.

Q.    And what page is that on, do you know?

A.    It starts on page 46.

Q.    Okay.  And what -- how is that section relevant to your testimony here today?

A.    There was a question about process.  And

so there is in the approved program plan a dispute settlement process related to service expansion funding requests?

Q.    And what kind of disputes would fall into that section?

A.    My understanding is that if a local government or service provider was making a request for funding from CAA under 890(5) and if CAA did not agree that the funding was appropriate, it could go through -- that could elevate to a level of a dispute that could go through this process.

Q.    And that process culminates in binding arbitration between the CAA and the local government requesting funding?

A.    That is what is in the approved plan.

Q.    Is that your understanding of what happens?

A.    Yeah.

Q.    What role does DEQ play in that binding arbitration?  Is it a party?

A.    DEQ's role in the dispute resolution comes in step two of the dispute resolution approach which is on page 47 in the table.  Well, actually one and two.

So there's a working group review that

ARIANNE SPERRY                    June 10, 2026                         24
98024

includes CAA, local government, service providers, and DEQ. And this group could choose to offer an interpretation of the issue for the parties to consider.

And then for disputes that involve statutory or rule interpretation, DEQ may choose to conduct an independent review and issue an interpretation. So that is the second step in the process.

Q. Okay. If ultimately a local government contends that CAA did not comply with the six factors listed in this plan in evaluating its funding request and that dispute went to binding arbitration and the local government lost, what recourse would that local government have to seek review of that arbitration decision?

A. I don't know.

Q. Would CAA be obligated to adopt the statutory or rule interpretation offered by DEQ in step two?

A. Okay. And just were there any other parts of this document that you looked at in preparation for today's deposition?

A. I looked at the proposed methods for calculating transportation costs.

ARIANNE SPERRY                    June 10, 2026                         25
98024

Q.    What page is that on?

A.    Starting on page 50.

Q.    Okay.  And what -- how is that relevant to your testimony here today?

A.    Transportation cost reimbursement is one of the streams of funding covered by ORS 459A.890. That's (2).

Q.    And what does -- what is the method for calculation transportation costs on page 50?  What does that represent?

A.    The law requires -- let me see if I can go to 890.

Q.    So just for the record, you're looking at OAR 340-090-0800.  I'll actually mark that as an exhibit.  So I'll hold on one second so you can --

A.    No.  I'm looking at --

Q.    Oh.

A.    I'm looking at 459A.890 and I'm just going to --

Q.    Oh, okay.

A.    -- (2)(a).  "The costs of transporting covered products from a recycling depot or recycling reload facility to a comingled recycling processing facility or responsible end market, including the cost to receive, consolidate, load, and transport

ARIANNE SPERRY                    June 10, 2026                        26
98024

covered products, are eligible costs for funding or reimbursement by a PRO."

Q. So is page 50 -- the method on page 50 --

A. And then it ways -- yeah. And then it says, "The transport of covered products for less than 50 miles or for greater de minimis distance, as established by the EQC by rule."

So that's what it does not cover. So it has to be 50 miles or greater for them to cover the transportation costs. And in the program plan is where CAA lays out its methodology for calculating how it's going to calculate the transportation costs.

Q. Okay. And that methodology was approved by DEQ when it approved this plan?

A. Yeah.

Q. Okay. And were there any other parts of this document you looked at to prepare for today's deposition?

A. No.

Q. Okay. And just to talk briefly about this document, you -- I think you described it earlier but this is the amended version of the CAA Oregon Program Plan that was issued on May 4, 2026.

Is that correct?

A.    Correct.

Q.    Okay.  And this -- this is a complete copy of that document?

A.    Are you asking me about the one that's in my binder?

Q.    Yes.  Well, I'll represent to you that the one in your binder and the one I show you have been represented by your counsel to be the same one but --

A.    Okay.  Great.

Q.    So your answer is yes?

Can you give an audible answer?

A.    Yes.

Q.    Okay.  Thank you.

I'm going to put another document in the chat.

Oh, I'm sorry.  I'm going to rename that.  So let's ignore that one.

Okay.  Do you see the document that's been marked Exhibit 4?

(WHEREUPON, Exhibit 4 was marked for identification.)

THE DEPONENT:  Yes.  Let me download it.

BY MR. SANDS:

Q.    Okay.  While you're downloading, this is

also from the deposition notebook provided by your counsel. It is entitled Circular Action Alliance Oregon, Paper and Packaging ETR Quarterly Report. And it's Bates stamped NAWD_DEQ_356675.

Just let me know when you've had a chance to look at that document.

A. Okay.

Q. And what is this document? Do you recognize it?

A. Yes. It is the quarterly report for Quarter 1 2026 submitted by CAA to DEQ.

Q. Okay. And is this something that the CAA produces for DEQ as part of its obligations under the RMA?

A. Yes.

Q. And what -- what is this report meant to represent?

A. The quarterly report has multiple purposes. During the program plan review, the Recycling Council, the ORSAC requested updates from CAA on implementation of the system expansion investments made through 890(5).

So, and also, it is a place where CAA can provide updates on its compliance with meeting the convenience standard for the collection points of



PRO -- materials on the PRO acceptance list.  It is also a place where CAA can make requests for alternative compliance approaches to meeting convenience standard.

Q.    Are there other reports that CAA provides to DEQ separate from this that provide updates or data on its spending with local governments under ORS 459A.890?

A.    There is information about CAA's budget and finances in the annual report.

Q.    Aside from the annual report and this quarterly report, are there other ways in which CAA reports its spending to DEQ under ORS 459A.890?

A.    I am not aware of other places.

Q.    Okay.  And in preparing for today's deposition, what was it in this document that you were looking at?

A.    On page 5 of the document -- wait.  Sorry. Page 6 of the document.  I was looking at this paragraph, the second one from the bottom on page 6. It begins, "Communities that did not respond to the original ORSOP survey were provided an additional opportunity to participate by completing the ORSOP 2.0 survey."

Q.    Okay.

ARIANNE SPERRY                    June 10, 2026                              30
98024

A.   And it goes on from there.

Q.   And what is this process it's describing in terms of identifying priority communities?

A.   Well, can you -- can you be a little more specific about your question?

Q.   Sure.  Looking at this -- this page, the first paragraph talks about CAA ending into primary funding agreements with all 16 Priority A communities.  And I think if you look at the page prior, there's a list of communities that are listed Priority A through G.

A.   Yes.

Q.   Can you just describe the process that CAA is doing there in terms of identifying priority communities?  Why is it -- why is it doing that?

A.   Oh, yeah.  So that is part of the administrative rules.  So I can find that reference.

Q.   We don't need to look at the specific rule right now but you're saying that this process is them implementing portions of --

A.   Yes.

Q.   -- Oregon's Administrative Rules?  Okay.

A.   Yes.  Yeah.

Q.   Okay.

A.   So the priority levels for the different

communities are laid out in the administrative rules.  Priorities A through F --

Q.    Okay.

A.    -- are all identified in the administrative rules in terms of like how to prioritize who should get funding first.  So CAA started with the highest priority communities, those communities that needed funding from CAA in order to meet their Opportunity to Recycle obligations that without the funding from CAA they would be out of compliance.

Q.    Okay.  And do you happen to -- without going and finding it, do you happen to know what the OAR references for those regulations?

A.    Yeah.  That's what I was going to --

Q.    Okay.

A.    -- just make sure I was getting the right one for you guys.

So that is 340-090-0790, Expansion of Service.

Q.    Okay.  And just briefly, can you -- you've talked about the Opportunity to Recycle Act.

Can you just explain briefly your understanding of the relationship between that bill and the RMA?

MR. JOH:  Objection.  Scope.

MR. SANDS:  You can answer.

MR. JOH:  But go ahead.

THE DEPONENT:  Should I respond?

MR. SANDS:  Yes.

MR. JOH:  Yes.

THE DEPONENT:  Oh.  Okay.

So the Opportunity to Recycle Act is from 1983 and requires local governments that are more than 4,000 in population to provide recycling collection service.

And the Recycling Modernization Act made some changes to those requirements.  For example, it changed the materials that were required to be collected.

BY MR. SANDS:

Q.   Okay.  And was -- how does the Opportunity to Recycle obligations in the RMA tie into CAA's obligation to fund local government recycling efforts under the RMA?  In other words, is ORS 459A.890 intended to provide local government funding in order to meet their obligations under the Opportunity to Recycle Act?

MR. JOH:  Objection.  Foundation and scope.

You can answer.

THE DEPONENT:  Oh, okay.

Yes.  It is -- the funding in ORS 459A.890 has multiple purposes, one of which is to help communities meet their Opportunity to Recycle obligations.

BY MR. SANDS:

Q.    What are the other purposes?

A.    Well, let's go look at the statute itself.

Q.    Which -- which statute?

A.    459A.890.

Q.    Okay.  So that's Exhibit 1.  Correct? We'll look at the one I used as Exhibit 1 just so we have a clear record.

A.    Okay.  Great.  Okay.

So we already talked about (2), which is the, "Costs of transporting covered products from a recycling depot or recycling reload facility to a comingled recycling processing facility or responsible end market."

Q.    Mm-hmm.

A.    And (3) is, "The costs of periodically evaluating the quality and contamination of collected materials as required by ORS 459A.929, if the evaluation occurs at a location other than a

ARIANNE SPERRY                    June 10, 2026                        34
98024

comingled recycling processing facility."

(4) is, "The costs of contamination reduction programming for residential and commercial customers required by ORS 459A.929."

(5) is what we've been talking about a lot today which is associated -- "Costs associated with the expansion and provision of recycling collection services for covered products as provided in this subsection," which goes into the various eligible costs and that a local government needs to commit to expanding recycling opportunities through a needs assessment process.

Q.    Okay.

A.    And then (6) is the costs of complying with the requirement that containers be 10 percent post-consumer recycled content.

Q.    Okay.  Just going back to Exhibit 4, you -- you were describing how you were looking at that second to last paragraph on page 6.

Why were you looking at that section?

MR. JOH:  And counsel, do you mean the section titled System Expansion Funding Administrative Process?

MR. SANDS:  Yes.  My understanding is that Ms. Sperry said that she was specifically looking at

the second to last paragraph in that section on page 6.

MR. JOH:  Okay.  Thank you.

THE DEPONENT:  I guess I was refreshing my memory about the process that has been undergone by CAA to identify -- both identify and evaluate the needs that local governments have identified through the needs assessment process through this additional survey that CAA developed the ORSOP.  I'm trying to find the actual -- what does ORSOP stand for?  Oh, Oregon Recycling System Optimization Project.

BY MR. SANDS:

Q.  Okay.

A.  So that is a survey that CAA developed for communities that did fill out the original needs assessment that DEQ conducted in 2023 to provide more detail in order to develop the budget for the program plan.

Q.  Okay.  I put in the chat what's been marked as Exhibit 5.

(WHEREUPON, Exhibit 5 was marked for identification.)

BY MR. SANDS:

Q.  This is also I'll represent from the collection of documents your counsel says was in

ARIANNE SPERRY                  June 10, 2026                        36
98024

your deposition notebook.  It is entitled Considerations for evaluating system expansion funding requests during the first program period of the Recycling Modernization Act.  It's dated 6-2-2025.  And it has a Bates stamp NAWD_DEQ_356808.

Let me know when you've had a chance to review that document.

A.    Okay.

Q.    And what's that document?

A.    This is a document that I worked to develop in the spring of 2025 following the approval of the program plan in February of 2025 to help communicate to local governments how the approval for the program plan affected the way that the requests that they had made through the needs assessment would be evaluated or managed, I guess. Like what would happen to those requests?  What was the process that they would go through for being evaluated?  What types of criteria would be applied?

Q.    Okay.  And is this a document that DEQ sent to local governments?

A.    Yes.

Q.    Did you -- and I think you just said you were the primary author of this document.

Is that right?



ARIANNE SPERRY                  June 10, 2026                          37
98024

A.    Yes.

Q.    Did you work with CAA in developing this document?

A.    Yes.

Q.    Okay.  And who at CAA did you work with?

A.    Kim Holmes and Greg -- what is Greg's last name?

Q.    Greg at CAA?

A.    I don't know.

Q.    Okay.

A.    Greg.

Q.    And do you know what their titles or job duties were?

A.    Kim is the executive director of CAA Oregon.  I don't know if I can tell you what Greg's particular job title is.

Q.    Okay.  And what -- what was the nature of your discussions with CAA about this document?

A.    Does it accurately reflect the process and considerations that they will be taking into account when they evaluate requests from local governments?

Q.    And were there multiple drafts of this document or is this the only draft?

A.    There probably were multiple drafts I'm guessing.

ARIANNE SPERRY                    June 10, 2026                          38
98024

Q.    Okay.

A.    I did not go back and look through the files.

Q.    Did CAA make changes to your initial drafts?

A.    I do recall CAA having some comments on the draft.

Q.    And do you know what those comments were about?

A.    I would have to go back.  To be sure I'd have to go back and look at -- or if I have a previous version of this document I would say that -- or I believe I recall that on page 3 and page 4 under Expanded Reload Facility and Expanded Recycling Depot, in the second column there's reference to, "Requests are likely to be considered high-priority if they are needed to:  facilitate collection of the full USCL, Uniform Statewide Collection List, facilitate capacity for the anticipated increase in collected material, and facilitate optimal sorting of material at the CRPF." And I believe that some of that language was landed on through conversations with CAA.

Q.    Okay.  And would those discussions have been in writing or over the phone or in person?

ARIANNE SPERRY                June 10, 2026                          39
98024

A.    We did have a meeting to discuss the document.

Q.    Okay.  Just to switch gears a little bit. What's your current title at DEQ?

A.    Recycling program implementation lead.

Q.    Okay.  And so are you the implementation lead for the RMA for the DEQ?

A.    That is my title.

Q.    Is there anybody else who is in charge of implementation who you report to?

A.    I report to Cheryl Grabham, the manager of the product stewardship team.

Q.    Okay.

A.    And she has, as we said, multiple product stewardship programs.  RMA is a bigger program than most of the others.

Q.    Okay.  And what are your responsibilities relating to local governments and recycling system implementation?

A.    The regional specialists are the ones working directly with local governments to assure compliance with the Opportunity to Recycle Act.  The Recycling Modernization Act is changing some of those obligations.  And I work closely with the regional staff to coordinate and share information

about how those changes are being applied, being implemented.  We've gone through multiple rulemaking processes as part of RMA implementation.  We developed the recyclable -- the acceptance lists for local governments and the PRO.  So there's a lot of things that have evolved over the past few years in terms of how local governments work with this new program.

Q.    Okay.

A.    How they engage with it.

Q.    **And what are your responsibilities specifically related to compensation of local governments and service providers under ORS 459A.890?**

A.    Primarily there -- okay.  So there are a lot of people involved in -- there are hundreds of local governments that are eligible to receive funding from CAA.  And a lot of service providers that can be designated by their local government to receive funding directly from CAA.

And there's a lot of communication that needs to happen to make sure that everybody has this information they need.  And so helping develop the messaging to communities across Oregon.  Is it accurate?  And then when questions come up, helping

ARIANNE SPERRY                    June 10, 2026                          41
98024

to develop the response.  That's part of how I've engaged.  Those are --

Q.    Do you -- sorry, go ahead.

A.    There's a new obligation for local governments as part of the Recycling Modernization Act.  They have to conduct contamination reduction programming and DEQ has an obligation to develop a list of approved contamination reduction programming elements that local governments can choose from to develop their programs.  And so I led that effort to develop statewide contamination reduction goals and approved programming elements.

Q.    Okay.  Do you have any role in auditing or monitoring the accounting of CAA payments to local governments or service providers under ORS 459A.890?

A.    No.

Q.    Does anybody at DEQ have that responsibility?

A.    There's not a process in place for auditing or monitoring payments.

Q.    Okay.  My understanding is that when CAA funds a local government or approved service provider under ORS 459A.890 that they enter into a funding agreement with CAA.

Is that right?

NAEGELI
DEPOSITION & TRIAL    (800) 528-3335
NAEGELIUSA.COM

ARIANNE SPERRY                    June 10, 2026                    42
98024

A.    Every entity that is preparing to receive funding from CAA enters into a primary funding agreement.

**Q.    Do you play any role in reviewing those funding agreements?**

A.    The regional specialists are in a role of supporting local governments to make sure they have all the information they need and understand their obligations, as well as the obligations of CAA to them.

And sometimes they hear from a local government a concern that they have about the negotiation process with CAA.  And those concerns are shared sometimes, especially if a local government is very concerned, then those concerns are shared with me.  So I have heard about those concerns.

We work with the regional staff, the local government representatives, the service providers, and CAA.  If there's something that is a tricky issue, a unique circumstance, something that is coming up when statute and rules and what is the language in the program plan is applied on the ground in a particular community questions come up. And DEQ sees its role as helping to -- sometimes it

ARIANNE SPERRY                June 10, 2026                        43
98024

is misunderstanding or miscommunication in many cases that is solved by more conversation.  You know, more questions and considerations.

So I would say a lot of the work we're doing is dialogue and bringing people together.  And so -- so I guess I do hear -- I do hear about the negotiation process, the contracting process because of that.

Q.   Does -- is there any requirement that somebody at DEQ approve individual funding agreements before they're entered into between CAA and local governments or service providers?

A.   No.

Q.   Is there any requirement that DEQ approve payment requests made by local governments or service providers to CAA?

A.   Say that again.

Q.   If a local government to service provider makes a payment request or applies for funding from CAA, does the DEQ have to approve that request before it's issued?

A.   In most -- for most of the funding streams, no.  for the contamination reduction programing funding stream, yes.  Because that is a new obligation under the Opportunity to Recycle Act.

ARIANNE SPERRY                    June 10, 2026                          44
98024

It has kind of become part of the Opportunity to Recycle Act obligations of local governments.

Q.     Okay.

A.     The -- the regional specialists are just -- they're receiving the programs from local governments and just ensuring that they are choosing programs that are on the approved list that we established.  Or if they --

Q.     So --

A.     Okay.  Sorry.

Q.     **Sorry.  Go ahead.  I cut you off.  I'm sorry.**

A.     Or if they are requesting an alternative program element then the regional specialists are considering those and approving those.

And then once they have an approved program from DEQ, CAA is -- CAA is paying those invoices as long as they have all the accountability mechanisms in place -- receipts and I don't know all of the types of receipts that CAA is requesting. But CAA is not considering the appropriateness of the work.  Just making sure that the work is done as it was stated it would be done.

Q.     Okay.  Who is the --

MR. JOH:  Counsel, sorry to interrupt.

ARIANNE SPERRY                June 10, 2026                      45
98024

But I do want to check at this point whether Ms. Sperry would like a break.  And I guess if you're wrapping up this line of questioning we could take a break after that.

MR. SANDS:  Yeah.  Just a couple of more questions.  I was planning on it.

MR. JOH:  Okay.

BY MR. SANDS:

Q.    Okay.  So I think, Ms. Sperry, you just testified that CAA isn't responsible for ensuring the appropriateness of the project.  Just that they're spending the dollars as they said they would.

Did I -- am I representing that correctly or did I misunderstand you?

A.    For the Contamination Reduction Program, specifically.

Q.    Oh, okay.  Okay.

A.    DEQ is ensuring that local government contamination reduction programming is aligned with the established list of approved programming elements.

Q.    Okay.  I got it.

For noncontamination reduction spending, who is responsible for ensuring that that local

ARIANNE SPERRY                June 10, 2026                           46
98024

government and approved service provider spending is aligned with RMA requirements?

A.    The funding should be in alignment with the statute, the administrative rules, and the program plan.  The approved program plan.  And laid out in the contract that the primary funding agreement and the individual addenda for each funding stream.  And if a local government believes that there's a problem they can elevate and bring that concern to DEQ and we would look into that.

Q.    Okay.  What would happen in a situation where a local government was requesting funding and it was approved by CAA but it wasn't in alignment with the statutory and planned guidance that you just referenced, who would be responsible for identifying that?

MR. JOH:  Objection.  Vague and incomplete hypothetical.

You can answer.

THE DEPONENT:  I'm not sure I -- I agree.  I'm having a hard time like imagining the type of situation you might be referring to.

BY MR. SANDS:

Q.    Well, let's say a local government requested funding for a project that, you know,

ARIANNE SPERRY                June 10, 2026                        47
98024

let's say they requested just $100,000,000 for a recycling depot that should cost $10,000,000.  Who would be responsible for ensuring that that wasn't approved and paid?

A.   I guess I still feel like I don't understand your question.  Because you're -- you're saying it should.  And I guess where does the "should" come in?

Q.   Well, who -- I guess that's a better question.  Who evaluates whether a funding request from a local government is justified or appropriate under the RMA?

A.   The -- I mean, I would go back to the program plan.  I mean, it has to be in alignment with the statute, the rules, and the approved program plan.  And the approved program plan has a number of criteria.

Q.   And is the -- is the CAA the entity that's responsible for ensuring that funded projects meet those requirements?

A.   Yeah.

Q.   Does the DEQ have any process for evaluating or ensuring that the CAA's determination on that front is correct?

A.   So you're asking if a community in Oregon

ARIANNE SPERRY                    June 10, 2026                        48
98024

was requesting a gold plated recycling facility, recycling depot and CAA said yep, sure, no problem, are there any checks on that?

Q.    Yes.

A.    That's your question?

Q.    Yes.

A.    That has not been my experience at all in the roll out of this program.  My experience has been that, you know, if there was a concern, there have been lots of conversations about kind of differentiating local government wants versus needs.

The statue and rules focus on eligible requests.  They say that local governments can request recycling depots and a PRO will pay for both the startup costs and the operating costs of recycling depots.  And there's what if a local government wants a recycling depot on every street corner?  What do we do?  How do we deal with that situation?

And that is not something that has come to pass.  Local governments do not want to manage more facilities.  They recognize that the goal of this program is to provide convenient access to recycling opportunities throughout the state.  Provide equity. And there's kind of a baseline level of convenient

ARIANNE SPERRY                June 10, 2026                        49
98024

recycling opportunities.

So I think what we are hearing from local governments is, for example, CAA is required to fund staffing at local government depots. Some local governments have reported through their conversations with CAA that CAA is asking a lot of questions about how would you use the staff? What are the staff needed for?

DEQ is monitoring that conversation pretty closely because the statute and administrative rules do say staffing at local government depots is an eligible cost for PRO funding. And CAA is asking really good questions. Like what -- how would the staff be used. Can you provide us with a list of tasks that the staff would be responsible for?

Some local governments are concerned about contamination at depots. Illegal dumping, contamination in recycling containers. That is -- can be covered by the contamination reduction programming funding, which is a separate funding stream. So CAA is really honing in on separating those two different funding streams.

Q.    Right.  No, I understand.

I guess my question was, what official DEQ policies or procedures are there to ensure that CAA

ARIANNE SPERRY                    June 10, 2026                              50
98024

is not funding projects in a wasteful or disproportionate or unnecessary way.  What are the policies and procedures at DEQ to audit or evaluate that?

A.    I think that relating to the way that CAA is budgeting and using its funding.  Nicole Portley would be a better person to ask those questions.

Q.    Okay.  Is there anybody at DEQ who is responsible for evaluating the appropriateness of individual funding requests by local governments at DEQ other than Ms. Portley?

A.    The appropriateness -- evaluating the appropriateness of payments to local governments?

Q.    Yes.

A.    I guess I would say that if a payment is in alignment with the statute and the administrative rules and the program plan and the Contamination Reduction Program -- approved programming elements and the, you know, then if they enter into a contract that is the process.

Q.    Okay.  But does anybody at DEQ -- is there anybody at DEQ who is responsible for ensuring that the funding request actually complies with all of those pieces of guidance that you just referenced?

A.    I guess I don't think so.

ARIANNE SPERRY                June 10, 2026                              51
98024

MR. SANDS:  Okay.  We can take a break now.  Sorry for making you wait until 10:30.

THE REPORTER:  That's okay.

MR. SANDS:  Shall we say 10 minutes?  We'll go off the record.

MR. JOH:  Sure.

THE REPORTER:  Perfect.  We are off the record at 10:29 a.m.

(WHEREUPON, a recess was taken.)

THE REPORTER:  The time is 10:45 a.m., and we are back on the record.

BY MR. SANDS:

Q.   Hello, Ms. Sperry.  Just following up on our earlier discussion.

If DEQ was to determine that a payment by CAA under ORS 459A.890 to a local government or service provider was not consistent with the factors listed in the approved CAA plan or Oregon statute or Oregon regulation, does it have the power to require a local government to return that funding?

A.   I'm not sure I know the answer to that question.

Q.   In your experience at DEQ, has DEQ ever sought to instruct a local government to return or reduce funds received by CAA for those reasons?

ARIANNE SPERRY                    June 10, 2026                        52
98024

A.    Has that ever happened?  Has DEQ identified a payment that was outside of -- that was not in alignment with the law, is that what you're saying?

Q.    Correct.  Correct.

A.    Not as far as I'm aware.

Q.    Okay.  And have you had any discussions with anyone at DEQ about the process for that if that was to happen?

A.    No.

Q.    Okay.  In terms of system expansion payments, are those payments based on an evaluation of the actual tons of material that will be recycled as a result of the expansion or are they based on other factors?

A.    The statute and the rules, you know, they are intended to say what costs are eligible for payment by the PRO.  And they are not based on the amount of material that would be collected.

Q.    Okay.  Do you have a general sense of what they are based on?

A.    I think I need a little bit more specificity with your question.  Are you asking me to lay out statutory intent?

Q.    No.  I was just -- you indicated that

ARIANNE SPERRY                    June 10, 2026                              53
98024

expansion payments aren't based on the actual amount

of recycled material that will occur after an

expansion occurs.  So I was just asking for your

understanding of the general factors that are used

in determining whether an expansion payment is

justified or not.

A.    The -- a local government has to make its

request through the needs assessment.  And the

eligible costs are identified in the administrative

rules.  So we could look through those

administrative rules at the list of eligible costs.

Q.    Okay.  That's okay.

Does the DEQ require a cost-benefit

analysis before a system expansion payment is

approved?

A.    No.

Q.    In other -- no?  Sorry.  What was your

answer?

A.    No.

Q.    Does DEQ require an analysis of whether an

expansion primarily benefits recycling products

supplied by assessed producers as opposed to exempt

or noncovered materials?

A.    Can you say that again?

Q.    Does the DEQ require an analysis of

ARIANNE SPERRY                June 10, 2026                54
98024

whether an expansion payment primarily benefits the recycling of assessed -- products supplied by assessed producers as opposed to exempt or noncovered materials?

A.    For expansion payments?

Q.    Mm-hmm.

A.    So I just want to clarify what the costs are for expansion in 340-090-800.

Q.    Mm-hmm.

A.    It's for startup costs for enroute programs, including trucks, collection containers, hiring and training staff, safety equipment, contamination monitoring equipment for onboard. Start up and operational costs for recycling depots. And there's also recycling reload facilities if no other facility is available or existing facilities are inadequate.

Q.    Okay.

A.    It does not -- there is no consideration for amount of material collected in the rules.

Now, if you go to the criteria, CAA has included in its program plan for consideration of requests from local governments, there is some consideration within those.

Q.    In which section?

ARIANNE SPERRY                    June 10, 2026                          55
98024

A.   So on page 26, the goal of number three, driving efficiency and effectiveness, it says, "Funding request should improve current system efficiency and support cost-effective diversion. Funding should be used both to improve the performance of existing recycling programs, increasing the recovery of materials that are currently recycled, and add new materials in a cost-effective manner."

Q.   Mm-hmm.

MR. JOH:  I'm sorry to interrupt here but I think that's page 27.

THE DEPONENT:  Oh, yeah.  You're right. Thank you.

BY MR. SANDS:

Q.   Do you know how CAA evaluates whether something is being done in a cost-effective manner?

A.   I do not.

Q.   Does DEQ conduct any independent assessment of whether something is under that -- that it is being done in a cost-effective manner?

A.   I think for individual payments, you know, there's other ways that DEQ is assessing the overall program on a program level.  Individual payments I don't -- there's not a process in place.

Q.    Okay.  Does DEQ track recycling outcomes for each expansion project in terms of, you know, how much additional recycled material is being processed per dollar or something like that?

A.    Does DEQ track per dollar spent how much more recycling --

Q.    Let me strike that question.  It was not clear.

If CAA funds an expansion project per a local government and that expansion project is built, does DEQ have any way of tracking how much additional recycling capacity has been added by that project?

A.    Recycling capacity on a -- on a community level is -- I don't -- I'm not aware of tracking specific to the RMA.

Q.    Okay.  Looking at Exhibit 4.

A.    Okay.  Exhibit 4.

Q.    On page 9.

A.    Yeah.

Q.    There's a section entitled Implementing Education and Outreach Initiatives.

Are you familiar with CAA's education and outreach initiatives for the RMA?

A.    Yes.

Q.    And are those -- are those efforts funded by the producer fees that are assessed under the RMA?

A.    Yes.

Q.    And what are -- at a very high level, what are those educational and outreach initiatives and what are they designed to achieve?

A.    CAA is required to develop educational resources about the Uniform Statewide Collection List and the proper importance of recycling and the proper preparation of materials for the Uniform Statewide Collection List, the materials that are not accepted on the Uniform Statewide Collection List, and make those available for free to local governments and their designated service providers to distribute to customers.

Q.    Okay.  And it looks like on page 9 it says that communities have downloaded 233 collateral items and ordered more than 46,000 pieces of educational materials during the quarter.

Do you see that?

A.    Yes.

Q.    Do you know how much the E&O initiatives have cost?

A.    I don't have that information at top of

ARIANNE SPERRY                    June 10, 2026                              58
98024

mind.

Q.    Okay.    Does DEQ measure the effectiveness or impact of the E&O initiatives in terms of increase in recycling activities?

A.    No.

Q.    What would be the check on ensuring that CAA is spending money on E&O initiatives that are effective versus not effective?

A.    I would look at CAA's program plan to see if one of the goals in the program plan relates to the education outreach materials.  And I also would look at the annual report, the review of the program budget.  The annual report is -- goes through a public comment period.  Is reviewed by the ORSAC and by DEQ.

Q.    Is there any one --

A.    So that would be the place where we would take a look at any expenditures that seemed out of line.

Q.    And what's the process at DEQ for evaluating payments that were out of line and correcting them?

A.    I -- we have not -- they have not submitted their annual report.  It's due January 30th.

ARIANNE SPERRY                    June 10, 2026                    59
98024

Q.   What will the process be?

MR. JOH:  Objection.  Scope.

THE DEPONENT:  I don't know.

BY MR. SANDS:

Q.   Did DEQ review in advance CAA's E&O initiative strategy to assure that it would be effective prior to the money being spent in Q1 2026?

MR. JOH:  Objection.  Vague.

THE DEPONENT:  We did.

Oh, sorry.  We did review their education outreach approach.

BY MR. SANDS:

Q.   Who did?

A.   I did.

Q.   And what was your process for evaluating that?

A.   The -- there's a requirement for CAA to engage local governments and service providers and the Recycling Council, as well as DEQ in development of their educational resources and campaigns.  There was an extensive process of review of the materials and their plans.

Q.   What metrics does DEQ use to determine whether the D&O -- E&O initiatives were successful or not?

ARIANNE SPERRY                    June 10, 2026                         60
98024

A.    I would have to go take a look at CAA's program plan where they have identified kind of their own metrics.

Q.    Does DEQ have its own metrics?

A.    No.

Q.    Okay.  What systems does DEQ use to review or track payments under 459A.890?

A.    You're asking if DEQ is tracking individual payments made under 890?

Q.    Yes.

A.    We are not.

Q.    Okay.  Do you have access to any of CAA's system that tracked those payments?

A.    No.

Q.    Does DEQ have access to payment request data submitted by local governments and services providers to CAA?

A.    No.

Q.    Does DEQ receive any payment receipts or other data related to how local governments or service providers are spending funds provided by CAA?

A.    Do we have access to receipts -- what did you say?

Q.    Yeah.  Just backup documentation to ensure

that the local governments or service providers are spending the funds provided in accordance with their legal obligations.

A.   That is CAA's job.

Q.   Okay.  And DEQ doesn't have any access to that backup material?

A.   No.

Q.   Has DEQ ever reviewed or audited the cost accounting and reimbursement records of CAA?

A.   I'm not entirely sure.  That is not something I'm prepared to speak on today.

Q.   Okay.  So just to look at Exhibit 3 again. I believe it's Exhibit 3.  I have too many tabs open.

A.   The program plan?

Q.   No, sorry.  I'm looking for the -- it's Exhibit 1.  Sorry.  It's ORS 459.

A.   Okay.

Q.   Section 11.  On page 3.

A.   Mm-hmm.

Q.   Are you familiar with that section?

MR. JOH:  Counsel, we're looking at Exhibit 3 and you said page 3?

MR. SANDS:  Exhibit 1.  Sorry.  Exhibit 1.

MR. JOH:  Okay.

THE DEPONENT:  Yes.

BY MR. SANDS:

Q.    Okay.  You're familiar with that.

Has DEQ -- are you aware of any situation in which DEQ has exercised its rights under Section 11 of 459A.890?

A.    No.  And it's very early in implementation.  CAA is -- we are not even a year in and CAA has -- is partway through the contracting process with communities across Oregon.  So I think this will play out as implementation continues.

Q.    Okay.  But today, through Q1 2026, just CAA has distributed -- sorry, that's an estimate.  Strike that.

Okay.  Well, shifting now to ORSAC.  What are your responsibilities relating to ORSAC?

A.    DEQ is responsible for staffing, supporting the Oregon Recycling System Advisory Council.

Q.    And how do you interact with that in your job duties?

A.    I provide the support to the council.  To the chair and vice chair.  And individual committees of the council.

Q.    Okay.  Are there other people at DEQ who

ARIANNE SPERRY                June 10, 2026                63
98024

also staff ORSAC?

A.    We've received assistance from Mia Wheitz with scheduling primarily.  And you know, meeting coordination.  Like setting up Zoom calls.

Q.    Mm-hmm.  Do you communicate with anyone at CAA about ORSAC matters?

A.    Yes.

Q.    And who do you communicate with at CAA about ORSAC matters?

A.    Primarily Kim Holmes.

Q.    Okay.  And what are the nature of your communications with her about ORSAC?

A.    Typically, at the Recycling Council meetings, DEQ and CAA both provide implementation updates.  So I coordinate with Kim on making sure that we have our presentations prepared.  We usually, you know, pull together all the presentations so that they all kind of run smoothly during the meeting.

Q.    Okay.  Do you collaborate with CAA about the substance of those updates, what they include or don't include?

A.    Occasionally, we'll give them feedback about kind of the level of detail that's appropriate for the Recycling Council.

ARIANNE SPERRY                    June 10, 2026                    64
98024

Q.    Okay.  What is your understanding of the statutory role that ORSAC serves as it relates to the RMA?

A.    The council provides guidance on review and guidance on implementation of the RMA both to DEQ and to CAA.  And I will say in many cases, CAA is presenting to the Recycling Council.  For example, its annual report is upcoming.  The program plan.  So whenever there's a presentation or a requirement that the Recycling Council review or consult on a topic that CAA is working on, then I would help coordinate with that.

Q.    Do they have to approve any CAA documents like annual reports or program plans?

A.    There is a long list in the statute ORS 459A.902 of the duties of the council.  And so there -- it does not -- it does not -- the word "approve" is not part of it.  It is -- they consult.  They review.  They provide guidance.  They make recommendations.  They make written recommendations.

Q.    Does CAA have any statutory or legal obligation to follow those recommendations?

A.    No.

Q.    Do they review CAA's fee methodology?

A.    I'm just double-checking in the statute.

ARIANNE SPERRY                    June 10, 2026                         65
98024

So it says that, "The council shall make written recommendations to the department and PROs on matters that the council determines are beneficial to the public interest, including producer membership fee structures described in ORS 459A.884."

Q.   And as the DEQ liaison with ORSAC, have you witnessed ORSAC discussing or reviewing producer membership fee structures?

A.   The Recycling Council reviewed the program plan in great detail.

Q.   Did they review the CAA's fee methodology, Appendix G to the program plan?

MR. JOH:  Objection.  Scope.

THE DEPONENT:  So this would be a good question for Nicole.

BY MR. SANDS:

Q.   Nicole Portley?

A.   Mm-hmm.

Q.   Okay.

THE REPORTER:  Can you verbalize that answer, please?

THE DEPONENT:  This would be a good question for Nicole.

THE REPORTER:  Yes.

ARIANNE SPERRY                    June 10, 2026                         66
98024

BY MR. SANDS:

Q.   Is ORSAC involved in situations in which producers have issues or questions with the fees that have been assessed against them?

A.   I guess I wouldn't -- I would say that they have not been involved with individual producers.  You know, specific producers that have concerns about fees.  Recently, the council has participated in conversations around the fees that the last producers are paying.

Q.   And how did that get escalated to ORSAC?

A.   It came to DEQ's attention as a potential rulemaking topic.

Q.   How so?

A.   The last producers and wine growers brought some concerns to DEQ and DEQ decided to consider whether there should be a rulemaking on the way that glass is managed in the program.  And because the set of topics under -- statutorily identified under duties of the council, it covers the materials that are on the Uniform Statewide Collection List, as well as recycling depot or mobile collection events for recyclable items, which relates to materials on the PRO collection list, which is glasses on the PRO collection list.

So it seemed like that topic was within the realm of the Recycling Council, how glass was managed, what's on the recycling acceptance list would be something the council should consider as well.

Q.    Just going back to some earlier topics we were talking about.  Does ORSAC have approval or veto power over anything that CAA or DEQ does with regard to the RMA?

A.    The council is advisory in nature.

Q.    Okay.  So it doesn't have any approval or veto power over anything relating to the RMA, only advisory power?

A.    Correct.  Only advisory.

Q.    I added something as Exhibit 6 to the chat.

(WHEREUPON, Exhibit 6 was marked for identification.)

BY MR. SANDS:

Q.    When you get a chance could you look at that?

As you're looking at it, it's entitled Oregon Recycling System Advisory Council Membership Bates stamped -- Bates stamped NAWD_DEQ_356926.  And I'll represent this was a document that was produced

ARIANNE SPERRY                    June 10, 2026                    68
98024

by your counsel with the representation that this was in your deposition preparation notebook.

A.    Okay.

Q.    Let me know when you have a chance --

A.    Yeah.

Q.    Okay.  Do you recognize this document?

A.    Yes.

Q.    And what is this document?

A.    It is a list of the Recycling Council membership.

Q.    Okay.  And who produced this list?

A.    I did.

Q.    Okay.  And is this accurate as of today?

A.    Well, the membership is.  I am not 100 percent certain about the term dates.  There's been some confusion around those.

Q.    Are there any CAA members on the Oregon Recycling System Advisory Council?

A.    Are there any -- pardon?  Say that again.

Q.    CAA board members?

A.    Oh.  I would have to double-check.  I don't know for certain.

Q.    Are you aware of anybody who is on the ORSAC who is affiliated with CAA?

A.    Well --

MR. JOH:  Object to vague.

THE DEPONENT:  Yeah.  As I said, I need to check and see.  I know that we have had -- in the past we've had members of the Recycling Council that are on CAA's board.  I'm not 100 percent sure who is on CAA's board right now.  I know that Dylan de Thomas is representative for the Recycling Partnership that is -- that has a contract with CAA. So I know that a number of members of the Recycling Council have interactions with CAA.

BY MR. SANDS:

Q.  Are there other ORSAC members, haulers, producers -- or sorry, haulers, processors, or service providers who receive CAA payments under ORS 459A.890?

A.  Yes.

Q.  And what conflict of interest rules apply to them in the context of their votes on ORSAC?

MR. JOH:  Objection.  Foundation and scope.

BY MR. SANDS:

Q.  You can answer.

A.  Yeah.  So the Recycling Council members are asked to provide information about conflicts of interest.  And that is -- that is the main conflict

ARIANNE SPERRY                    June 10, 2026                        70
98024

of interest kind of approach that the Recycling

Council takes for conflicts of interest.

Q.   Are you aware of any situation in which a

member of ORSAC has abstained or recused from

participation in a discussion or vote based on a

conflict of interest?

MR. JOH:  Objection.  Scope.

THE DEPONENT:  It is possible that that

has occurred.  I do not recall.

BY MR. SANDS:

Q.   Where would we find out information about

whether that's occurred and any disclosures about

conflicts of interest?

A.   To the extent that meetings are recorded

then the statements may have been made in the

meetings.

Q.   I think you mentioned earlier that there

were disclosures by ORSAC members about potential

conflicts of interest.  Are those --

A.   Those happen verbally in the meetings.

Q.   Okay.  Are you -- do you recall just

sitting here today as the liaison of DEQ of any

situations where that occurred?

A.   Yes.  In many meetings, Recycling Council

members have disclosed their -- any financial

relationship they might have with CAA.

Q.   Do you recall any situation where a member has abstained from participating in a discussion or recused from a vote due to those conflicts?

MR. JOH:  Objection.  Misstates testimony.

THE DEPONENT:  I guess I -- what did you -- I said I didn't recall any situation where -- I know that Recycling Council members have abstained from votes.  Typically, that happens when they missed the discussion and don't feel prepared to vote.

BY MR. SANDS:

Q.   Okay.  So you cannot recall sitting here today any situation in which an ORSAC member has recused from a vote or abstained from a discussion based on a conflict of interest?

MR. JOH:  Objection to scope.

THE DEPONENT:  Yeah.  I can't recall a specific instance.  It's possible that it happened but I don't know.

BY MR. SANDS:

Q.   Do -- are ORSAC meetings subject to public meeting requirements under Oregon law?

A.   Yes.

Q.   And are all the materials, minutes, and

recordings of those meetings publicly available?

A.    If there were a request for meeting materials that are not posted on our website we could make those available.

Q.    **What materials are put on the website as a matter of just normal course versus the ones that are not?**

MR. JOH:  Objection.  Scope.

THE DEPONENT:  We -- we have -- we have put the -- we upload the agenda and background documents to the website.

BY MR. SANDS:

Q.    **Are the videos of the hearings posted on the website?**

A.    The recordings of the meetings are typically made available in terms of convenience copies for members to review or if they miss a meeting they can request the recording.

Q.    **Can the public request videos of the meetings from DEQ or does it have to go through a PRA request?**

A.    It would -- I believe we would ask them to go through a public records request because the videos -- the recordings require some preparation to make them ready to share.  The --

Q.   Does ORSAC -- oh, sorry.

A.   Yeah.  It's just like there's a little bit of process there.

Q.   Does ORSAC ever receive confidential materials?

MR. JOH:  Objection.  Vague.

THE DEPONENT:  Yeah.  I guess I would ask you to get a little bit more specific there.

BY MR. SANDS:

Q.   Well, I guess ORSAC is given materials to review as part of its process.  Can you recall any situation in which it received material labeled confidential or otherwise under the understanding that it should not be publicly disclosed?

A.   I am not -- I'm not sure.  During the review of the program plan, I'm not sure if there were any components of that that would fall into that category.  That would be a good question for Nicole.

Q.   Okay.  Does ORSAC have any responsibility for payments made to local governments or authorized service providers under ORS 459A.890?

MR. JOH:  Objection.  Vague.

THE DEPONENT:  Specific payments?  You're asking whether the Recycling Council would review

specific payments?

BY MR. SANDS:

Q.   Well, just tell me what review responsibilities they have with regard to those payments overall.  If they're broad, narrow, that's fine.  I just -- I don't know.

A.   So the -- in general, the Recycling Council has broad review.  They can review pretty much anything related to the RMA.

So it does say that they shall make written recommendation on matters that the council determines are beneficial to the public interest, including the manner in which PRO fees will be distributed to local governments or local government service providers under ORS 459A.890, including review of statewide transportation reload, reimbursement, and other formulated elements and priorities for system funding where discretion is provided in statute or in rules adopted by the EQC. So --

Q.   Okay.  And is -- oh, go ahead.  Sorry.

A.   I think that's related to what you're asking about.

Q.   Okay.  Yeah, I guess I'm asking, are you aware of any situations where those payments have

ARIANNE SPERRY                June 10, 2026                              75
98024

actually been discussed or considered by ORSAC?

A.    The way that the Recycling Council has engaged on the topic of system expansion funding is through, you know, the program plan review and the budget that was laid out.

The identification of -- in the program plan there's a table of communities and the type of requests that are being funded or CAA plans to fund. And it breaks down by priority level and timing. And the Recycling Council has requested quarterly updates on how that process is moving forward.

Q.    If you could just quickly look at Exhibit 4.

A.    Okay.

Q.    Is that an example of that?  Is this a report that was requested by ORSAC?

A.    Well, yes.  Yes.  It's part of -- that is part of the job of the quarterly reports.  Yes.

Q.    Okay.  And how -- how does ORSAC consider this quarterly report?  In other words, is there a meeting that this report or a report like it would be on the agenda?

A.    The quarterly reports are posted to the website.  And it's my understanding that there's review by individual Recycling Council members.  It

ARIANNE SPERRY                June 10, 2026                        76
98024

has not been a topic specifically discussed at a
Recycling Council meeting.

Q.    Is there -- who sets the agenda for those
meetings?

A.    The Recycling Council chair and vice chair
work with DEQ to develop the agenda.

Q.    Is there any plans to have ORSAC discuss
or review funding under ORS 459A.890 to date?  Is
there any plans for that in the future?

A.    Can you -- can you say that again?

Q.    I think what you testified to earlier is
that members of ORSAC have received quarterly
reports such as Exhibit 4 related to spending on
local governments and authorized service providers.

Is that right?

A.    They -- the quarterly reports are posted
to our website and are available to the Recycling
Council members.

Q.    Okay.  And it was your -- it was your
testimony that you don't recall the specific topic
of local government spending being discussed at an
ORSAC meeting to date.

Is that right?

A.    I don't think I said that.

Q.    Okay.  Do you recall a situation in which

ORSAC reviewed or discussed spending by CAA pursuant to ORS 459A.890?

A.    This topic is raised at every Recycling Council meeting.  DEQ and CAA provide updates on implementation at the beginning of or during the Recycling Council meetings.  CAA is regularly saying we've worked with this many communities.  They're signing contracts.  This is what's happening on the ground in communities across Oregon.  And similarly, DEQ is sharing progress along these lines as well.

Q.    Okay.  And I apologize if I've already asked this.  But beyond the quarterly reports and the annual plan and the annual report, are there any materials related to CAA spending that ORSAC receives?

A.    Beyond the quarterly reports, the annual reports, presentations at the Recycling Council meetings?

Q.    No.  Sorry.  What I'm trying to get at is what is the material that they have access to that details CAA spending on local governments pursuant to ORS 459A.890?

And my understanding is that you testified that they get quarterly reports.  They get the annual plan.  And they get an annual report from

ARIANNE SPERRY                June 10, 2026                                78
98024

CAA.   Are there any other materials that the ORSAC receives that detail or discuss CAA spending pursuant to ORS 459A.890?

A.    Yeah.   So it would be, you know, the budget and the program plan, the annual report, the quarterly reports, and then the updates at the -- at the meetings.

Q.    Okay.   And the updates at the meeting would come in the form of PowerPoint presentations?

A.    Yes.

Q.    Okay.   Do they receive any data with regard to the amount of individual contracts with local governments and authorized service providers?

A.    That information is shared in the PowerPoint.

Q.    Okay.   Has ORSAC ever recommended that CAA not fund or stop funding a local government or service provider under ORS 459A.890?

MR. JOH:  Objection.  Scope.

THE DEPONENT:  No.

BY MR. SANDS:

Q.    Is there any procedure by which a producer could come before the ORSAC with a concern about, for instance, the fee methodology used?

MR. JOH:  Objection.  Scope.

NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

THE DEPONENT:  Yes.  There is a public input period at every Recycling Council meeting.

BY MR. SANDS:

Q.    Okay.  And who -- what is the process for getting access to that?  Does somebody just sign up for it?

A.    The public input period is scheduled into the agenda that is posted to the website ahead of every meeting.  We run through the agenda at the beginning of every meeting.  And anyone who is participating in a call can at the time of that agenda item raise their hand or note in the chat that they would like to speak to the council.

Q.    And do they have the right to ask questions or is it just a comment period?

A.    It is just an opportunity for public input.

Q.    Okay.  So if an ORSAC -- if a producer in Oregon had a specific issue with regard to the amount that they had been charged under the RMA, would they be able to present that specific dispute to ORSAC?

A.    Yeah.  They have a limited amount of time for their public input in the meeting.  But they would present their concerns and while the approach

that DEQ and the Recycling Council take is not to respond to public input during the meeting.  We typically follow up if there's a concern that has been raised.

Q.    Okay.  I guess my question was a little bit different.  You're talking about everybody in the public has a right to participate in a public comment period in the meetings.

But I guess what I'm asking for is about, and more specifically, is that if there was a specific dispute between a producer and the CAA regarding a particular invoice, is there any mechanism by which ORSAC has to consider that dispute or otherwise be a venue for that dispute other than the public comment period?

A.    So you're asking about the process that a producer would -- what -- what venues they have available to them to raise concerns about the fees being charged?

Q.    Mm-hmm.

A.    Yeah.  I am not prepared to speak on that.

Q.    But you're not aware of any process by which ORSAC considers specific objections to the implementation of the RMA aside from the public comment period?

ARIANNE SPERRY                    June 10, 2026                          81
98024

A.    So you're saying like how -- is there another way that a producer could -- could engage with the Recycling Council on its fees other than the public input opportunity?

Q.    Well, let me put it this -- let me put it this way.  If -- if producers wanted to get on the agenda for an ORSAC meeting, would they be able to request that through DEQ, having the issue of producer fee methodology discussed?

A.    There have been a number of situations where industry groups have reached out to discuss their unique situation.  The RMA in some cases, you know, maybe through a rulemaking process, those have ended up being discussed at the Recycling Council.  Like if it becomes a topic that is being considered through a rulemaking process, those topics often overlap with the Recycling Council review topics.

Q.    Has producer -- has producer fee methodology ever been the subject of a ORSAC meeting in your experience as the DEA liaison?

A.    I think -- fee methodology for a particular producer, that's your question?

Q.    No.  Just producers overall.  We could start there.

A.    The way that the Recycling Council has

ARIANNE SPERRY                    June 10, 2026                              82
98024

engaged on producer fees is through program plan review and review of program plan amendments.

Q. Okay. But no other specific discussion that you can recall?

A. Sometimes, you know, the way that a particular material is managed has an effect on the fees. For example, the glass producers. There's been discussion relating to how to manage glass in Oregon's recycling system. And that could have an effect, ultimately, on the fees that glass producers pay.

Q. Okay. But -- okay.

We're almost done with my stuff. Let me just --

Okay. I'm putting what has been marked Exhibit 7 in the chat.

(WHEREUPON, Exhibit 7 was marked for identification.)

BY MR. SANDS:

Q. Again, this is a document that was identified by your counsel, something you'd reviewed in preparation, I believe. I don't want to misrepresent it but it's Bates stamped NAWD_DEQ_356812.

A. Is this the email?

Q.   Yeah.

A.   Okay.  This was not part of my --

Q.   Okay.

A.   -- binder of material.

Q.   Okay.  Well, do you -- do you see?  Have you been able to open it?  It's Exhibit 7.

A.   Yes.

Q.   Okay.

A.   I see it.

Q.   And do you recognize this document?

A.   I mean, it says that I'm on here as a -- I'm copied on this.

Q.   Uh-huh.

A.   I don't specifically recall this email.

Q.   Okay.  It looks like this email was sent by Erin Klinebriel Stein.  Erin Stein, I guess, at Washington County.

Do you know who Erin is?

A.   Yes.

Q.   And who is she?

A.   She was -- well, it says in her email that she's the operations supervisor at Washington County for their waste collection program.  And maybe more.  I don't know.

Q.   Is this the sort of inquiry you would get

ARIANNE SPERRY                          June 10, 2026                          84
98024

from local governments about things like CAA contracts?

MR. JOH: Objection. Scope.

THE DEPONENT: Yeah. So this is not a typical email that we would get. It is very detailed.

I don't understand --

MR. JOH: Counsel, sorry to interrupt this question. Sorry. Well, I'll let her finish the question but it sounds like she doesn't recall this document. We're pretty close to --

MR. SANDS: Yeah. Don't worry. I'm not going to -- I just want to let her answer the question.

THE DEPONENT: So I don't know how this was responded to by DEQ staff. I didn't respond to it.

BY MR. SANDS:

Q. Okay.

A. I wouldn't have.

My -- I could make a supposition of how it was responded to, which is that this is a matter for CAA. How the -- how CAA wants the level of information and the type of information that CAA wants in terms of accountability and mechanism for

ARIANNE SPERRY                    June 10, 2026                              85
98024

the costs that have been incurred for contamination reduction programming is a matter for CAA to respond to.

Q. Okay. That's not something DEQ would involve itself with?

A. Correct.

MR. JOH: Objection. Scope.

BY MR. SANDS:

Q. Okay. Okay.

Just give me one second. I don't think I have any other questions but --

THE REPORTER: Do you mind if we actually go off the record --

MR. SANDS: Sure.

THE REPORTER: -- for approximately three to five minutes while you look that over?

MR. SANDS: Yep. Yeah. That's great.

THE REPORTER: Okay. We are off the record at 11:54 a.m.

(WHEREUPON, a recess was taken.)

THE REPORTER: The time is 12:07 p.m., and we are back on the record.

BY MR. SANDS:

Q. Ms. Sperry, just a few more questions.

Aside from the money that CAA is

ARIANNE SPERRY                    June 10, 2026                          86
98024

distributing to local governments and approved service providers, does DEA also fund local governments and approve service providers on programs similar to or related to programs funded under ORS 459A.890?

MR. JOH:  Objection.  Scope.

THE DEPONENT:  Does DEQ provide funding to local governments and service providers related to ORS 459A.890?

Q.    Yeah.

A.    Is that your question?

Q.    Yes.

A.    No.

Q.    As part of funding distributed under ORS 459A.890, does DEQ do any review to determine whether those payments duplicate local rates, rate payer charges, franchise fees, or other public funding of similar projects?

MR. JOH:  Objection.  Scope.

THE DEPONENT:  The funding provided by the PRO in 890 is part of the cost of providing recycling collection services to customers throughout the state.  So the transportation cost reimbursement and that, you know, the cost of transporting recycles to processing facility or

responsible end market is part of the cost that rate payers pay.  It's part of their bill that they get.

So when the PRO is paying for it, that should show up as an offset in the rates.  So it should, you know, be -- it should result in downward pressure on the rates all other things being equal.

BY MR. SANDS:

Q.    And are you aware of situations in which that has occurred?

A.    There are hundreds of local governments throughout the state.  We are not even one year into the implementation of this program.  So I think it's -- this is a topic that we are keeping our eyes on as implementation continues.

Q.    As of right now is there any requirement that a local government credit end customers or refund end customers to the extent that they are reimbursed for expenses such as the ones you described?

A.    They're -- local governments are the ones that set their rates.  And DEQ is not involved in rate setting at the local level.

Q.    Okay.  So if a local government was charging customers for things such as transportation costs and those transportation costs were ultimately

reimbursed by CAA, there's no mechanism by which DEQ can require the local government to refund that to customers?

A.    No.

MR. SANDS:  Okay.  I think that's all. Thank you, Ms. Sperry.

I think your counsel has a few questions.

MR. JOH:  Thank you, counsel.

EXAMINATION

BY MR. JOH:

Q.    Ms. Sperry, my name is YoungWoo Joh.  I am an attorney for the defendant Director Leah Feldon. I'm going to ask you a few questions.

And the first thing I want to start out with is do you recall your testimony earlier this morning referring to some words, some terms in the OARs as being vague?

A.    Yes.

Q.    And Ms. Sperry, are you an attorney?

A.    No.

Q.    And do you have an understanding of the term what "vague" means in the constitutional law sense?

A.    No.

Q.    So when you said -- when you used the word

"vague," did you mean it in that particular way?

A.    No.

Q.    So tell me what you meant by vague when referring to terms in the OARs.

A.    Terms like "if necessary," "as needed," those put some constraints on the costs.  The eligible costs that are set out in the administrative rules.

Q.    And but when you said that those terms were vague, what did you mean by that?

A.    That -- that there could be -- there needed to be additional information considered.

Q.    Okay.  So I'll turn to the next thing.

And do you recall your testimony -- and I think it'll be helpful if I pull up the exhibit.

So I'm sharing Exhibit 3 presented by the other side.

Do you recognize this document?

A.    Yeah.

Q.    And do you recall testifying about this document?

A.    Yes.

Q.    And do you recall testifying about specifically the section starting on page 46 with respect to dispute settlement process relating to

service expansion funding requests?

A.    Yes.

Q.    Do you recall your testimony regarding the binding arbitration piece when counsel asked you whether a local government would have a remedy after binding arbitration if CAA did not follow DEQ's interpretation of the RMA?

A.    Yes.

Q.    And do you recall that your answer was that you don't know?

A.    Yes.

Q.    Do you have -- is your recollection -- or is DEQ's understanding -- or I guess would you like to revisit that answer?

A.    It's DEQ's understanding that if CAA is not abiding by statute or law or administrative rule or its approved program plan that DEQ can enforce against that.

Q.    And did you -- is that -- is that revisiting based off of a conversation you had during a break?

A.    I spoke with Nicole Portley about this.

Q.    Okay.  And would Nicole Portley be able to speak in more detail during her deposition?

A.    Yes.

ARIANNE SPERRY                    June 10, 2026                          91
98024

Q.    Okay.    The last piece that I want to address is do you remember your testimony regarding counsel's questions regarding whether DEQ independently audits CAA?

A.    Yes.

Q.    And do you remember your testimony that DEQ does -- has not conducted independent audits?

A.    Yes.

Q.    Does the quarterly and annual reporting that CAA provides have some role in DEQ's ability to audit even if it doesn't independently conduct an audit?

A.    Yes.

Q.    And how so?

A.    How do the quarterly and annual reports allow DEQ to conduct an audit?

Q.    Correct.    Or something along those lines.

A.    They allow us to --

Q.    And maybe -- go ahead.

A.    They allow us to review the proposed amounts of spending in different categories.    Is that appropriate?    Does it set CAA up for success in terms of meeting its obligations under the law?    And then how is CAA moving forward in terms of implementing the program plan as they -- as

approved.

Q.    And do the annual reports contain the specific payments?

A.    To -- to local governments and service providers?  Those are in the annual report.

Q.    Is that something that you understand Nicole Portley will be able to speak more to during her deposition?

A.    Yes.

Q.    Are the reports published?

A.    The quarterly reports and the annual reports are published and go through a public comment.  Well, the annual report goes through a public comment.

Q.    And is there anything else as part of the requirements of the annual report that aid in DEQ's -- sorry -- ability to review expenditures?

A.    Is there anything in the annual report that aids in DEQ's ability to review their expenditures?

Q.    Rather, is there anything that CAA is required to do as part of the annual report that allows DEQ to review --

A.    Oh, like they do an independent audit.

Q.    Okay.

ARIANNE SPERRY                June 10, 2026                           93
98024

A.    Yeah.

Q.    **Yes.**

MR. JOH:  That's all my questions.

THE DEPONENT:  I actually have one other thing that I wanted to return to.  It was one of the last questions.

MR. JOH:  Can we -- so let's go on a break if we're going to do that.

THE DEPONENT:  Okay.

MR. JOH:  But Mr. Sands, if you wanted to ask follow-up questions --

MR. SANDS:  Yeah.  I just have -- yeah, I just have a couple of questions.

FURTHER EXAMINATION

BY MR. SANDS:

Q.    **Ms. Sperry, can you look again at Exhibit 1?**

A.    Is that the statute?

Q.    **Correct.**

A.    Okay.

Q.    **And can you look at section 11 that we discussed earlier?  That's on page 3.**

A.    Mm-hmm.

Q.    **It says, "The department may review or audit the cost accounting and reimbursement request**

records of a producer responsibility organization, a local government, or the local government's service provider that receives payment under this section."

Did I read that correctly?

A.    Yeah.

Q.    I think you testified earlier that you're not aware of any situation in which DEQ has exercised its power under this section.

Has your testimony changed in that regard?

A.    No.

Q.    Do CAA annual or quarterly reports contain cost accounting records?

MR. JOH:  Objection.  Vague.

THE DEPONENT:  Okay.  So your question is about the annual report and DEQ's ability to review the payments made to local governments that are in there.  And my statement that -- that we haven't done that yet?

Is that your question?

BY MR. SANDS:

Q.    Yeah.  I guess my question is pretty simple.  I think you just testified that DEQ has never exercised its power under section 11 here of Exhibit 1 to review or audit the cost accounting or reimbursement request records of a producer

ARIANNE SPERRY                    June 10, 2026                          95
98024

responsibility organization, a local government, or the local government service provider that receives payment under this section.

Is that correct?

A.   Well, it's possible that I -- that my understanding of cost accounting and reimbursement request records is not what -- the same as what you're referring to.  So because we're still in the process of getting through the first year of implementation and we haven't had a full annual report submitted yet, I think we haven't -- at least I haven't been a part of conversations where we've dug into some of these terms.

Q.   Is there an understanding of these terms that would change your answer with regard to whether DEQ has thought to use its power under section 11?

MR. JOH:  Objection.  Vague in scope.

THE DEPONENT:  So when I read the term "reimbursement request records," to me that is the accountability methods CAA has put in place to ensure that the funding that they are providing to communities across Oregon is used the way that it was intended.  And we can request that.  We have the power to do so.  We have no reason at this time to believe that any funding has been used

inappropriately and that -- so we have not requested that.

BY MR. SANDS:

Q.    Okay.  And approximately -- I know that you can't give me a specific number -- but approximately how much money to date has CAA distributed pursuant to ORS 459A.890?

A.    How much money has been spent?

Q.    Yes.

A.    So we could look at the quarterly report --

Q.    Okay.

A.    -- that CAA submitted.

Q.    I think that's Exhibit 4.

A.    So the quarterly report says how much funding has been kind of signed into contract at this time but not how much has actually been spent.

Q.    Okay.  So I'm just looking at page -- the bottom of page 8 and it says totals through Q1 2026. And this is for specifically just expansion funding. And it looks like the total is $81,525,503.

Is that right?

A.    Well, that is for the initial estimate in the program plan for the whole program plan.

Q.    Okay.  Where do you see how much has been

signed into contract to date?

A.    The total funding estimate signed addendums through Q1 2026.

Q.    Okay.  And where is that?

A.    Well, on the bottom of page 8.  It's the one, two, three, four -- fifth column from the left.

Q.    Okay.

A.    And it totals $13,000,000.

Q.    Okay.  Okay.

A.    But that doesn't mean all of it has been spent.  It just means that they've actually entered into funding agreements for payments that could ultimately total that amount.

MR. SANDS:  Okay.  No further questions.

MR. JOH:  Let me take maybe two, three minutes.

MR. SANDS:  Okay.

MR. JOH:  And then we'll let you know if we need to follow up on anything.

MR. SANDS:  Okay.

THE REPORTER:  Okay.  We are off the record at 12:27 p.m.

(WHEREUPON, a recess was taken.)

THE REPORTER:  The time is 12:32 p.m. and we are back on the record.

MR. JOH:  And there is nothing further from the State on this.

MR. SANDS:  Nor from plaintiff.

THE REPORTER:  Okay.  Attorney Sands, would you like to order the original transcript for today's deposition?

MR. SANDS:  Yeah.  I think there's a sort of standing two-day order from our side.

THE REPORTER:  Correct.  Perfect.  I have that noted.

And Attorney Joh, would you like to order a copy for yourself today?

MR. JOH:  Yes, please.  And same two-day request.

THE REPORTER:  Okay.

MR. JOH:  And we also request a read and sign.

THE REPORTER:  Read and sign.  I've got it.

Wonderful.  If that is everything, that concludes this deposition.

We are off the record at 12:33 p.m.

(WHEREUPON, the deposition of ARIANNE SPERRY concluded at 12:33 p.m.)

CERTIFICATE


I, Kylie Mifflin, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.


I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.


IN WITNESS HEREOF, I have hereunto set my hand this 12th day of June, 2026.


Kylie Mifflin CER No. 5316

Date: 6/10/26                    Assignment #: 98024

Deponent: Arianne Sperry

Case: National Assoc. of Wholesaler vs Feldon


DEPONENT:

It has been requested that your read and sign your transcript. This is to be read only by you.  Please make any corrections necessary on the Correction Sheet ONLY.  You are to sign the Correction Sheet ONLY, and ONLY where indicated. After signing the Correction Sheet, do the following:

1. The ORIGINAL executed Correction Sheet needs to be returned to our corporation.

2. Forward a COPY of the executed Correction Sheet directly to the attorney's listed below. The addresses can be found on the Appearance Page of your deposition.

3. Retain a copy for your records.


CC:  Naegeli Deposition and Trial

Darin Sands, Esquire

YoungWoo Joh, Esquire

CORRECTION SHEET

Deposition of: Arianne Sperry        Date: 6/10/26

Regarding: National Assoc. of Wholesaler vs Feldon

Reporter: Mifflin/Morrison

_____

Please make all corrections, changes or

clarifications to your testimony on this sheet,

showing page and line number.  If there are no

changes, write "none" across the page.  Sign this

sheet on the line provided.

Page   Line   Reason for Change

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

        Signature:  _____

                    Arianne Sperry

Email to: Production@NaegeliUSA.com

ARIANNE SPERRY                June 10, 2026                        102
98024

DECLARATION

Deposition of: Arianne Sperry    Date: 06/10/2026

Regarding: NATIONAL ASSOCIATION OF WHOLESALE-DISTRIBUTORS vs LEAH FELDON

Reporter:  Kylie Mifflin

_____

I declare under penalty of perjury the following to be true:

I have read my deposition and the same is true and accurate save and except for any corrections as made by me on the Correction Sheet herein.

Signed at _____, _____

on the _____ day of _____, 20____.

                Signature: _____

                        Arianne Sperry

Email to: Production@NaegeliUSA.com

NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

## Exhibits

**EX001 COMPENSATION TO LOCAL GOVERNMENTS** 9:22,23 33:12,13 61:17,24 93:16, 17 94:24

**EX002 DIGITAL EXHIBIT PLACEHOLDER** 17:5,6,25

**EX003 OREGON PROGRAM PLAN** 18:24 19:1,16 22:6 61:12,13,23 89:16

**EX004 QUALITY REPORT Q1** 27:20,21 34:17 56:17,18 75:12, 13 76:13 96:14

**EX005 CONSIDERATIONS FOR EXPANSION** 35:20, 21

**EX006 COUNCIL MEMBERSHIP** 67:15,17

**EX007 EMAIL FEB 9 2026** 82:16,17 83:6

## $

**$10,000,000** 47:2

**$100,000,000** 47:1

**$13,000,000** 97:8

**$81,525,503** 96:21

## (

**(2)** 25:7 33:16

**(2)(a)** 25:21

**(3)** 33:22

**(4)** 34:2

**(5)** 34:5

**(6)** 34:14

## 1

**1** 9:22,23 28:11 33:12,13 61:17, 24 93:17 94:24

**10** 34:15 51:4

**100** 68:14 69:5

**10:29** 51:8

**10:30** 51:2

**10:45** 51:10

**11** 61:19 62:6 93:21 94:23 95:16

**11:54** 85:19

**12:07** 85:21

**12:27** 97:22

**12:32** 97:24

**12:33** 98:22

**14** 8:21 9:21

**15** 14:2

**16** 9:5 30:8

**1983** 32:9

## 2

**2** 17:5,6,25

**2.0** 29:24

**2023** 35:16

**2025** 36:5,11,12

**2026** 19:17 26:24 28:11 59:7 62:12 96:19 97:3

**233** 57:18

**26** 20:4,6,7 22:6 55:1

**27** 55:12

## 3

**3** 18:24 19:1,16 22:6 38:13 61:12, 13,19,23 89:16 93:22

**30(b)(6)** 11:20

**30th** 58:25

**340-090-0790** 31:19

**340-090-0800** 25:14

**340-090-800** 21:14,22 54:8

## 4

**4** 19:17 26:24 27:20,21 34:17 38:13 56:17,18 75:13 76:13 96:14

**4,000** 32:10

## 459

**459** 61:17

**459A.884** 65:6

**459A.890** 9:1 10:20 20:2 25:6, 18 29:8,13 32:21 33:3,11 40:14 41:15,23 51:16 60:7 62:6 69:15 73:22 74:15 76:8 77:2,22 78:3,18 86:5,9,15 96:7

**459A.890(5)** 20:12

**459A.902** 64:16

**459A.929** 33:24 34:4

**46** 22:22 89:24

**46,000** 57:19

**47** 23:23

## 5

**5** 29:18 35:20,21

**50** 25:2,9 26:3,6,9

## 6

**6** 29:19,20 34:19 35:2 67:15,17

**6-2-** 36:4

**61026** 17:4

## 7

**7** 82:16,17 83:6

**8**

**8** 96:19 97:5

**890** 25:12 60:9 86:21

**890(5)** 23:8 28:22

**9**

**9** 56:19 57:17

**9:04** 6:8

**A**

**a.m.** 6:8 51:8,10 85:19

**AAA's** 15:2

**abiding** 90:16

**ability** 91:10 92:17,19 94:15

**abstained** 70:4 71:3,8,15

**acceptance** 29:1 40:4 67:3

**accepted** 57:13

**access** 48:23 60:12,15,23 61:5 77:20 79:5

**accordance** 61:2

**account** 37:20

**accountability** 44:18 84:25 95:20

**accounting** 41:14 61:9 93:25 94:12, 24 95:6

**accurate** 40:25 68:13

**accurately** 37:19

**achieve** 57:7

**act** 9:7 13:16 14:11 15:11 16:5, 12,13,15 31:22 32:8,12,23 36:4 39:22,23 41:6 43:25 44:2

**Action** 28:2

**activities** 58:4

**actual** 35:10 52:13 53:1

**add** 55:8

**added** 16:14 56:12 67:15

**addenda** 46:7

**addendums** 97:3

**additional** 21:1,8 29:22 35:8 56:3, 12 89:12

**address** 91:2

**administrative** 20:19 21:14,17 30:17,22 31:1,5 34:23 46:4 49:10 50:16 53:9,11 89:8 90:16

**adopt** 24:18

**adopted** 74:19

**advance** 11:2 59:5

**advising** 9:6

**advisory** 9:12 62:18 67:10,13,

14,23 68:18

**affected** 36:14

**affiliated** 68:24

**affirm** 6:10

**affirmed** 7:3

**agenda** 72:10 75:22 76:3,6 79:8,9,12 81:7

**agree** 9:14 23:9 46:20

**agreement** 41:24 42:3 46:7

**agreements** 30:8 42:5 43:11 97:12

**ahead** 18:20 20:17 32:3 41:3 44:11 74:21 79:8 91:19

**aid** 92:16

**aids** 92:19

**aligned** 45:20 46:2

**alignment** 46:3, 13 47:14 50:16 52:3

**Allaway** 12:3,21 13:2

**Alliance** 28:2

**Allowable** 8:23

**alternative** 29:3 44:13

**amended** 19:17, 22 26:23

**amendments** 82:2

**amount** 52:19 53:1 54:20 78:12 79:20,23 97:13

**amounts** 91:21

**analysis** 53:14, 20,25

**annual** 29:10,11 58:12,13,24 64:8, 14 77:13,16,25 78:5 91:9,15 92:2,5,11,13,16, 18,22 94:11,15 95:10

**answers** 7:23

**anticipated** 38:20

**apologize** 77:11

**Appendix** 65:13

**applied** 20:21 36:19 40:1 42:23

**applies** 43:19

**apply** 69:17

**approach** 23:22 59:11 70:1 79:25

**approaches** 29:3

**appropriateness** 8:25 44:21 45:11 50:9,12,13

**approval** 36:11, 13 67:7,11

**approve** 43:10, 14,20 64:13,17 86:3

**approved** 19:21 22:10,11,12 23:1, 15 26:14,15 41:8, 12,22 44:7,16 45:21 46:1,5,13

NAEGELI
DEPOSITION & TRIAL
(800) 528-3335
NAEGELIUSA.COM

47:4,15,16 50:18 51:18 53:15 86:1 90:17 92:1

**approving** 44:15

**approximately** 17:18 85:15 96:4, 6

**arbitration** 23:13, 20 24:14,16 90:4, 6

**areas** 20:3

**ARIANNE** 7:3

**assess** 20:11

**assessed** 53:22 54:2,3 57:2 66:4

**assessing** 55:23

**assessment** 8:22 20:22 34:12 35:8, 16 36:16 53:8 55:20

**assist** 22:1

**assistance** 15:6 63:2

**assistant** 16:6

**assistants** 16:16

**Association** 6:18

**assure** 39:21 59:6

**attached** 17:25

**attention** 66:12

**attorney** 6:15 7:10 88:12,19 98:4,11

**audible** 7:22 27:12

**audit** 50:3 91:11, 12,16 92:24

93:25 94:24

**audited** 61:8

**auditing** 41:13,20

**audits** 91:4,7

**Austin** 6:20

**author** 36:24

**authorized** 73:21 76:14 78:13

**aware** 8:8 29:14 52:6 56:15 62:4 68:23 70:3 74:25 80:22 87:8 94:7

**B**

**back** 34:17 38:2, 10,11 47:13 51:11 67:6 85:22 97:25

**background** 72:10

**backup** 60:25 61:6

**based** 52:12,14, 18,21 53:1 70:5 71:16 90:20

**baseline** 48:25

**Bates** 17:4 18:24 28:4 36:5 67:24 82:23

**began** 16:13

**beginning** 77:5 79:10

**begins** 29:21

**behalf** 6:18,21 8:12,17

**believes** 46:8

**beneficial** 65:4 74:12

**benefits** 53:21 54:1

**Bernstein** 6:17

**bigger** 39:15

**bill** 31:24 87:2

**binder** 17:20 18:19 19:11 27:5, 7 83:4

**binding** 23:12,19 24:13 90:4,6

**bit** 19:5 39:3 52:22 73:2,8 80:6

**board** 68:20 69:5, 6

**bottom** 29:20 96:19 97:5

**Bowers** 6:20

**Bradley** 6:17

**break** 8:1,2,3 45:2,4 51:1 90:21 93:7

**breaks** 75:9

**briefly** 18:7 26:21 31:21,23

**bring** 46:9

**bringing** 43:5

**broad** 74:5,8

**brought** 66:16

**budget** 29:9 35:17 58:13 75:5 78:5

**budgeting** 50:6

**built** 56:11

**C**

**CAA** 8:22 11:8,17 15:14 19:22 20:10,20 21:24, 25 23:8,13 24:1, 11,18 26:11,23 28:11,12,21,23 29:2,5,12 30:7,13 31:6,8,10 35:6,9, 14 37:2,5,8,14,18 38:4,6,23 40:18, 20 41:14,21,24 42:2,9,13,20 43:11,16,20 44:17,20,21 45:10 46:13 47:18 48:2 49:3, 6,12,21,25 50:5 51:16,18,25 54:21 55:16 56:9 57:8 58:7 59:17 60:17,22 61:9 62:8,9,13 63:6,8, 14,20 64:6,11,13, 21 67:8 68:17,20, 24 69:8,10,14 71:1 75:8 77:1,4, 6,14,21 78:1,2,16 80:11 84:1,23,24 85:2,25 88:1 90:6,15 91:4,10, 22,24 92:21 94:11 95:20 96:6, 13

**CAA's** 15:14 20:2 21:2 29:9 32:18 47:23 56:23 58:9 59:5 60:1,12 61:4 64:24 65:12 69:5, 6

calculate 26:12

calculating 24:25 26:11

calculation 25:9

Caleb 6:20

call 20:12 79:11

calls 63:4

campaigns 59:20

capacity 8:14 38:19 56:12,14

cases 15:8 43:2 64:6 81:12

categories 91:21

category 73:18

Cathie 12:4 14:17

chair 62:23 76:5

chance 28:5 36:6 67:20 68:4

change 95:15

changed 32:14 94:9

changing 39:23

Chapter 10:20

charge 39:9

charged 79:20 80:19

charges 86:17

charging 87:24

chat 9:21 17:3,25 18:15,23 27:16 35:19 67:16 79:12 82:16

check 19:8 45:1 58:6 69:3

checks 48:3

Cheryl 12:3 13:23 14:3 39:11

choose 24:2,6 41:9

choosing 44:6

Circular 28:2

circumstance 42:21

clarify 20:19 21:15 54:7

clarifying 15:12

clear 33:14 56:8

click 10:8

close 84:11

closely 39:24 49:10

collaborate 63:20

collateral 57:18

colleagues 11:24, 25

collected 32:15 33:24 38:20 52:19 54:20

collection 17:11 28:25 32:11 34:7 35:25 38:18,19 54:11 57:9,12,13 66:22,23,24,25 83:23 86:22

column 38:15 97:6

comfortable 8:6

comingled 25:23 33:19 34:1

comment 22:9 58:14 79:15 80:8, 15,25 92:13,14

comments 38:6,8

commercial 34:3

commit 34:10

committees 62:23

communicate 36:13 63:5,8

communication 40:21

communications 63:12

communities 29:21 30:3,9,10, 15 31:1,7,8 33:5 35:15 40:24 57:18 62:10 75:7 77:7,9 95:22

community 42:24 47:25 56:14

comparison 16:7

compensation 10:20 40:12

complete 27:2

completing 29:23

compliance 16:11 28:24 29:3 31:11 39:22

complies 50:23

comply 14:21 24:11

complying 34:14

components 73:17

concern 42:12 46:10 48:9 78:23 80:3

concerned 42:15 49:16

concerns 42:13, 15,17 66:8,16 79:25 80:18

concludes 98:21

conduct 24:7 41:6 55:19 91:11, 16

conducted 35:16 91:7

confidential 73:4, 13

conflict 69:17,25 70:6 71:16

conflicts 69:24 70:2,13,19 71:4

confusion 68:16

connection 15:23

consideration 54:19,22,24

considerations 36:2 37:20 43:3

considered 38:16 75:1 81:15 89:12

considers 80:23

consistent 22:13 51:17

consolidate 25:25

constitutional 88:22

constraints 89:6

**consult** 64:11,18

**containers** 34:15 49:18 54:11

**contamination** 33:23 34:2 41:6, 8,11 43:23 45:16, 20 49:17,18,19 50:17 54:13 85:1

**contends** 24:11

**content** 34:16

**context** 69:18

**continues** 62:11 87:14

**contract** 15:13 46:6 50:20 69:8 96:16 97:1

**contracting** 43:7 62:9

**contracts** 77:8 78:12 84:2

**convenience** 28:25 29:4 72:16

**convenient** 48:23,25

**conversation** 43:2 49:9 90:20

**conversations** 15:17 38:23 48:10 49:6 66:9 95:12

**coordinate** 39:25 63:15 64:12

**coordination** 63:4

**copied** 83:12

**copies** 72:17

**copy** 27:2 98:12

**corner** 48:18

**correct** 9:2,3,8,9 11:13 19:13 26:25 27:1 33:12 47:24 52:5 67:14 85:6 91:17 93:19 95:4 98:9

**correcting** 58:22

**correctly** 11:16 45:14 94:4

**cost** 25:5,25 47:2 49:12 57:24 61:8 86:21,23,24 87:1 93:25 94:12,24 95:6

**cost-** 55:8

**cost-benefit** 53:13

**cost-effective** 55:4,17,21

**costs** 8:23 11:5 20:23 21:15 24:25 25:9,21 26:1,10,13 33:17, 22 34:2,6,10,14 48:15 52:17 53:9, 11 54:7,10,14 85:1 87:25 89:6,7

**council** 9:12 22:8 28:20 59:19 62:19,22,24 63:13,25 64:4,7, 10,16 65:1,3,10 66:8,20 67:2,4, 10,23 68:9,18 69:4,10,23 70:2, 24 71:8 73:25 74:8,11 75:2,10, 25 76:2,5,18

77:4,6,17 79:2,13 80:1 81:3,14,17, 25

**counsel** 7:1 17:11 18:18 19:10 27:8 28:2 34:21 35:25 44:25 61:22 68:1 82:21 84:8 88:7,8 90:4

**counsel's** 91:3

**County** 83:17,22

**couple** 45:5 93:13

**court** 7:18

**cover** 26:8,9

**covered** 11:19 25:6,22 26:1,5 33:17 34:8 49:19

**covers** 66:20

**credit** 87:16

**criteria** 20:8,9,10, 21 21:8 22:11,12 36:19 47:17 54:21

**CRPF** 38:21

**culminates** 23:12

**current** 39:4 55:3

**customers** 34:4 57:16 86:22 87:16,17,24 88:3

**cut** 20:16 22:2 44:11

---

**D**

---

**D&o** 59:24

**Darin** 6:17 7:10

**data** 29:7 60:16, 20 78:11

**date** 76:8,22 96:6 97:1

**dated** 36:4

**dates** 68:15

**David** 12:3,21

**de** 26:6 69:6

**DEA** 81:20 86:2

**deal** 48:18

**decided** 66:16

**decision** 24:16

**defendant** 6:23 88:12

**delineate** 16:19

**department** 6:23, 24 8:12 18:16 65:2 93:24

**DEPONENT** 6:13 10:9 19:15 27:23 32:4,7 33:2 35:4 46:20 55:13 59:3, 9 62:1 65:15,23 69:2 70:8 71:6,18 72:9 73:7,24 78:20 79:1 84:4, 15 86:7,20 93:4,9 94:14 95:18

**deposed** 7:12

**deposition** 8:9 11:23 15:24 17:13,15 18:20 19:7,25 22:18 24:23 26:19 28:1 29:16 36:1 68:2 90:24 92:8 98:6, 21

**depot** 25:22 33:18 38:15 47:2 48:2,17 66:22

**depots** 48:14,16 49:4,11,17 54:14

**DEQ** 8:17,23 9:6, 17,18 14:8,20 16:4 22:5,9,12 23:19 24:2,6,19 26:15 28:11,13 29:6,13 35:16 36:20 39:4,7 41:7,17 42:25 43:10,14,20 44:17 45:19 46:10 47:22 49:9, 24 50:3,8,11,21, 22 51:15,23 52:1, 8 53:13,20,25 55:19,23 56:1,5, 11 58:2,15,20 59:5,19,23 60:4, 6,8,15,19 61:5,8 62:4,5,17,25 63:14 64:6 65:7 66:16 67:8 70:22 72:20 76:6 77:4, 10 80:1 81:8 84:16 85:4 86:7, 15 87:21 88:1 90:17 91:3,7,16 92:23 94:7,22 95:16

**DEQ's** 8:21 14:19 23:21 66:12 90:6, 13,15 91:10 92:16,19 94:15

**describe** 19:20 30:13

**describing** 30:2 34:18

**designated** 8:20 9:4 15:7 40:19 57:15

**designed** 57:7

**designee** 11:20

**detail** 35:17 63:24 65:11 78:2 90:24

**detailed** 84:6

**details** 77:21

**determination** 47:23

**determine** 51:15 59:23 86:15

**determines** 65:3 74:12

**determining** 8:24 53:5

**develop** 35:17 36:11 40:23 41:1, 7,10,11 57:8 76:6

**developed** 20:10 21:25 35:9,14 40:4

**developing** 22:5 37:2

**development** 59:19

**dialogue** 43:5

**differentiating** 48:11

**directly** 15:4 39:21 40:20

**director** 6:24 37:14 88:12

**disclosed** 70:25 73:14

**disclosures** 70:12,18

**discretion** 74:18

**discuss** 12:19 39:1 76:7 78:2 81:11

**discussed** 75:1 76:1,21 77:1 81:9,14 93:22

**discussing** 20:25 65:8

**discussion** 51:14 70:5 71:3,10,15 82:3,8

**discussions** 15:14 37:18 38:24 52:7

**disproportionate** 50:2

**dispute** 22:19 23:1,11,21,22 24:13 79:21 80:11,14 89:25

**disputes** 23:4 24:5

**distance** 26:6

**distribute** 57:16

**distributed** 62:13 74:14 86:14 96:7

**distributing** 86:1

**diversion** 55:4

**document** 9:21 10:11,16 17:3,14 18:17 19:4,15,19 20:4 21:24 22:17 24:22 26:18,22 27:3,15,19 28:6,8 29:16,18,19 36:7,

9,10,20,24 37:3, 18,23 38:12 39:2 67:25 68:6,8 82:20 83:10 84:11 89:18,21

**documentation** 60:25

**documents** 17:12,15,17,19, 23 18:3 19:6 35:25 64:13 72:11

**dollar** 56:4,5

**dollars** 45:12

**double-check** 68:21

**double-checking** 64:25

**download** 27:23

**downloaded** 57:18

**downloading** 27:25

**downward** 87:5

**DQ** 11:17

**draft** 37:23 38:7

**drafts** 37:22,24 38:5

**driving** 55:2

**drug** 14:10

**dry** 22:2

**due** 58:24 71:4

**dug** 95:13

**duly** 7:3

**dumping** 49:17

**duplicate** 86:16

**duties** 16:19 37:13 62:21 64:16 66:20

**duty** 16:4,8

**Dylan** 69:6

## E

**E&o** 57:23 58:3,7 59:5,24

**earlier** 26:22 51:14 67:6 70:17 76:11 88:15 93:22 94:6

**early** 62:7

**Eastern** 16:6

**education** 56:22, 23 58:11 59:10

**educational** 57:6, 8,20 59:20

**effect** 82:6,10

**effective** 55:9 58:8 59:7

**effectiveness** 55:2 58:2

**efficiency** 55:2,4

**effort** 41:10

**efforts** 32:20 57:1

**eighth** 18:17

**electronics** 14:10

**element** 44:14

**elements** 16:14 41:9,12 45:22 50:18 74:17

**elevate** 23:10 46:9

**eligible** 11:3,5 20:23 21:15 26:1 34:9 40:17 48:12 49:12 52:17 53:9, 11 89:7

**email** 18:18 82:25 83:14,15,21 84:5

**end** 25:24 33:20 87:1,16,17

**ended** 81:14

**ending** 30:7

**enforce** 90:17

**engage** 40:10 59:18 81:2

**engaged** 15:17 41:2 75:3 82:1

**enroute** 54:10

**ensure** 16:11 49:25 60:25 95:21

**ensuring** 44:6 45:10,19,25 47:3, 19,23 50:22 58:6

**entail** 14:7

**enter** 41:23 50:19

**entered** 43:11 97:11

**enters** 42:2

**entitled** 28:2 36:1 56:21 67:22

**entity** 9:15 42:1 47:18

**Environmental** 6:24 8:13

**EQC** 26:7 74:19

**equal** 87:6

**equipment** 54:12, 13

**equity** 48:24

**Erin** 83:16,18

**escalated** 66:11

**established** 26:7 44:8 45:21

**estimate** 62:13 96:23 97:2

**ETR** 28:3

**evaluate** 21:9 35:6 37:21 50:3

**evaluated** 36:16, 19

**evaluates** 47:10 55:16

**evaluating** 22:1 24:12 33:23 36:2 47:23 50:9,12 58:21 59:15

**evaluation** 33:25 52:12

**events** 66:23

**evolved** 40:6

**EXAMINATION** 7:6 88:9 93:14

**examined** 7:4

**executive** 37:14

**exempt** 53:22 54:3

**exercised** 62:5 94:8,23

**exhibit** 9:22,23

17:5,6,25 18:24 19:1,16 22:6 25:15 27:20,21 33:12,13 34:17 35:20,21 56:17, 18 61:12,13,17, 23,24 67:15,17 75:12 76:13 82:16,17 83:6 89:15,16 93:16 94:24 96:14

**existing** 54:16 55:6

**Expanded** 38:14

**expanding** 34:11

**expansion** 20:13 21:9,16 23:2 28:21 31:19 34:7, 22 36:2 52:11,14 53:1,3,5,14,21 54:1,5,8 56:2,9, 10 75:3 90:1 96:20

**expenditures** 58:18 92:17,20

**expenses** 11:3 87:18

**experience** 48:7, 8 51:23 81:20

**explain** 31:23

**explains** 19:22

**extensive** 22:7 59:21

**extent** 11:17 70:14 87:17

**eyes** 87:13

## F

**facilitate** 38:17, 19,21

**facilities** 13:19,20 48:22 54:15,16

**facility** 25:23,24 33:18,19 34:1 38:14 48:1 54:16 86:25

**factors** 21:9,23 22:1,6,16 24:12 51:17 52:15 53:4

**fall** 23:4 73:17

**familiar** 56:23 61:21 62:3

**February** 36:12

**fee** 64:24 65:5,9, 12 78:24 81:9,18, 21

**feedback** 63:23

**feel** 47:5 71:10

**fees** 57:2 66:3,8,9 74:13 80:18 81:3 82:1,7,10 86:17

**Feldon** 6:24 88:12

**file** 17:24

**files** 38:3

**fill** 35:15

**finally** 8:1,8

**finances** 29:10

**financial** 70:25

**find** 30:17 35:10 70:11

**finding** 31:13

**fine** 10:6 16:21 74:6

**finish** 8:5 84:9

**focus** 13:18,19 48:12

**folder** 17:5

**follow** 64:22 80:3 90:6 97:19

**follow-up** 93:11

**forgot** 18:5

**form** 78:9

**formulated** 74:17

**Forty-five** 12:17 17:2

**forward** 75:11 91:24

**Foundation** 32:24 69:19

**franchise** 86:17

**free** 57:14

**front** 47:24

**full** 38:18 95:10

**fund** 11:2 32:19 49:3 75:8 78:17 86:2

**funded** 20:23 47:19 57:1 75:8 86:4

**funding** 11:8 20:7,11,13 23:3, 8,9,14 24:13 25:6 26:1 30:8 31:6,8, 10 32:22 33:3 34:22 36:3 40:18, 20 41:24 42:2,5

43:10,19,22,24 46:3,6,8,12,25 47:10 49:12,20, 22 50:1,6,10,23 51:20 55:3,5 74:18 75:3 76:8 78:17 86:7,14,18, 20 90:1 95:21,25 96:16,20 97:2,12

**funds** 41:22 51:25 56:9 60:21 61:2

**future** 76:9

## G

**Gast** 12:3 13:4,24

**gears** 39:3

**general** 13:13 52:20 53:4 74:7

**give** 6:11 27:12 63:23 85:10 96:5

**glass** 66:18 67:2 82:7,8,10

**glasses** 66:25

**goal** 48:22 55:1

**goals** 41:11 58:10

**gold** 48:1

**good** 7:8,9 49:13 65:15,23 73:18

**government** 10:21 11:4 15:10 20:21 23:7,13 24:1,10,14,15 32:19,21 34:10 40:19 41:22 42:12,15,19 43:18 45:19 46:1, 8,12,24 47:11

48:11,17 49:4,11 51:16,20,24 53:7 56:10 74:14 76:21 78:17 87:16,23 88:2 90:5 94:2 95:1,2

**government's** 11:4 94:2

**governments** 10:20 14:21 15:2, 5,7,8,13,15 20:11 21:10 29:7 32:9 35:7 36:13,21 37:21 39:18,21 40:5,7,13,17 41:5,9,15 42:7 43:12,15 44:2,6 48:13,21 49:3,5, 16 50:10,13 54:23 57:15 59:18 60:16,20 61:1 73:21 74:14 76:14 77:21 78:13 84:1 86:1, 3,8 87:10,20 92:4 94:16

**Grabham** 12:4 13:23 14:3 39:11

**great** 10:14 18:21 27:10 33:15 65:11 85:17

**greater** 26:6,9

**Greg** 37:6,8,11

**Greg's** 37:6,15

**ground** 42:24 77:9

**group** 23:25 24:2

**groups** 81:11

**growers** 66:15

**guess** 10:24 35:4 36:16 43:6 45:2 47:5,7,9 49:24 50:15,25 66:5 71:6 73:7,10 74:24 80:5,9 83:16 90:13 94:21

**guessing** 37:25

**guidance** 46:14 50:24 64:4,5,19

**guide** 21:23

**guys** 31:18

## H

**Half** 12:25 14:16 16:2

**hand** 6:9 79:12

**handle** 14:25

**happen** 31:12,13 36:17 40:22 46:11 52:9 70:20

**happened** 52:1 71:19

**happening** 77:8

**happy** 8:5

**hard** 7:20 46:21

**haulers** 69:12,13

**head** 7:24

**hear** 42:11 43:6

**heard** 42:16

**hearing** 49:2

**hearings** 72:13

**helpful** 89:15

**helping** 40:23,25 42:25

**high** 20:22 57:5

**high-priority** 38:17

**highest** 31:7

**hired** 16:16

**hiring** 54:12

**hold** 25:15

**Holmes** 37:6 63:10

**honing** 49:21

**hour** 12:25 14:16 16:2

**hundreds** 40:16 87:10

**hypothetical** 46:18

## I

**identification** 9:24 17:7 19:2 27:22 35:22 67:18 75:6 82:18

**identified** 8:17 21:23 31:4 35:7 52:2 53:9 60:2 66:20 82:21

**identify** 20:21 35:6

**identifying** 30:3, 14 46:16

**ignore** 27:18

**Illegal** 49:17

**imagining** 46:21

**impact** 58:3

**implementation** 9:7 16:17 28:21 39:5,6,10,19 40:3 62:8,11 63:14 64:5 77:5 80:24 87:12,14 95:10

**implemented** 16:14 40:2

**implementing** 30:20 56:21 91:25

**implicit** 19:11

**importance** 57:10

**improve** 55:3,5

**inadequate** 54:17

**inappropriately** 96:1

**include** 63:21,22

**included** 11:18 22:8 54:22

**includes** 24:1

**including** 9:5 14:9,11 25:24 54:11 65:4 74:13, 15

**incomplete** 46:17

**increase** 38:20 58:4

**increasing** 55:7

**incurred** 85:1

**independent** 24:7 55:19 91:7 92:24

**independently** 91:4,11

**individual** 43:10

46:7 50:10 55:22, 24 60:9 62:23 66:6 75:25 78:12

**individually** 12:11,12

**individuals** 12:7

**industry** 81:11

**information** 15:9 20:1 29:9 39:25 40:23 42:8 57:25 69:24 70:11 78:14 84:24 89:12

**initial** 38:4 96:23

**initiative** 59:6

**initiatives** 56:22, 24 57:6,23 58:3,7 59:24

**input** 79:2,7,17, 24 80:2 81:4

**inquiry** 83:25

**instance** 71:19 78:24

**instruct** 51:24

**instructions** 7:16

**intended** 32:21 52:17 95:23

**intent** 52:24

**interact** 62:20

**interactions** 69:10

**interest** 65:4 69:17,25 70:1,2, 6,13,19 71:16 74:12

**interpretation**

24:3,6,8,19 90:7

**interrupt** 44:25 55:11 84:8

**introductions** 7:15

**introductory** 7:15

**investments** 28:22

**invoice** 80:12

**invoices** 44:18

**involve** 24:5 85:5

**involved** 15:2 40:16 66:2,6 87:21

**issue** 24:3,7 42:21 79:19 81:8

**issued** 26:24 43:21

**issues** 66:3

**item** 79:12

**items** 57:19 66:23

**J**

**January** 58:24

**job** 13:13 14:6 16:4,19 37:12,16 61:4 62:21 75:18

**Joh** 6:22 10:7 15:21 18:10,12, 15 19:10,14 32:1, 3,6,24 34:21 35:3 44:25 45:7 46:17 51:6 55:11 59:2,8 61:22,25 65:14 69:1,19 70:7 71:5,17 72:8

73:6,23 78:19,25 84:3,8 85:7 86:6, 19 88:8,10,11 93:3,7,10 94:13 95:17 97:15,18 98:1,11,13,16

**Justice** 6:23 18:16

**justified** 47:11 53:6

**Justin** 12:3 13:4

**K**

**keeping** 87:13

**Kim** 37:6,14 63:10,15

**kind** 16:22 23:4 44:1 48:10,25 60:2 63:18,24 70:1 96:16

**Klinebriel** 83:16

**L**

**label** 17:9

**labeled** 73:12

**laid** 31:1 46:5 75:5

**landed** 38:22

**language** 10:25 21:20 22:3 38:22 42:23

**law** 22:13 25:11 52:3 71:23 88:22 90:16 91:23

**lay** 52:24

**lays** 26:11

**lead** 14:22 39:5,7

**Leah** 6:24 88:12

**led** 41:10

**left** 97:6

**legal** 61:3 64:21

**level** 23:10 48:25 55:24 56:15 57:5 63:24 75:9 84:23 87:22

**levels** 30:25

**liaison** 65:7 70:22 81:20

**limited** 79:23

**lines** 21:20 77:10 91:17

**list** 29:1 30:10 38:19 41:8 44:7 45:21 49:14 53:11 57:10,12, 14 64:15 66:22, 24,25 67:3 68:9, 11

**listed** 24:12 30:10 51:18

**lists** 40:4

**load** 25:25

**local** 10:20,21 11:3,4 14:21 15:2,5,6,8,9,13, 15 20:11,21 21:10 23:6,13 24:1,10,14,15 29:7 32:9,19,21 34:10 35:7 36:13, 21 37:21 39:18, 21 40:5,7,12,17, 19 41:4,9,14,22

42:7,11,14,18 43:12,15,18 44:2, 5 45:19,25 46:8, 12,24 47:11 48:11,13,16,21 49:2,4,11,16 50:10,13 51:16, 20,24 53:7 54:23 56:10 57:14 59:18 60:16,20 61:1 73:21 74:14 76:14,21 77:21 78:13,17 84:1 86:1,2,8,16 87:10,16,20,22, 23 88:2 90:5 92:4 94:2,16 95:1,2

**location** 33:25

**long** 12:16,24 14:1,15 16:1,12 17:1 44:18 64:15

**looked** 17:19 22:17,19 24:22, 24 26:18

**lost** 24:14

**lot** 13:18 34:5 40:5,16,18,21 43:4 49:6

**lots** 48:10

**M**

**made** 28:22 32:12 36:15 43:15 60:9 70:15 72:16 73:21 94:16

**main** 69:25

**make** 7:22 8:5 10:12 29:2 31:17 38:4 40:22 42:7

**NAEGELI**
DEPOSITION & TRIAL
(800) 528-3335
NAEGELIUSA.COM

53:7 57:14 64:19,
20 65:1 72:4,25
74:10 84:21

**makes** 43:19

**making** 23:7
44:22 51:2 63:15

**manage** 48:21
82:8

**managed** 36:16
66:18 67:3 82:6

**manager** 14:5
39:11

**manages** 14:10,
12

**manner** 55:9,17,
21 74:13

**mark** 17:4 25:14

**marked** 9:22,23
17:4,6 18:24 19:1
27:20,21 35:20,
21 67:17 82:15,
17

**market** 25:24
33:20 87:1

**material** 38:20,21
52:13,19 53:2
54:20 56:3 61:6
73:12 77:20 82:6
83:4

**materials** 8:25
29:1 32:14 33:24
53:23 54:4 55:7,8
57:11,12,20
58:11 59:21
66:21,24 71:25
72:3,5 73:5,10
77:14 78:1

**matter** 72:6 84:22

85:2

**matters** 63:6,9
65:3 74:11

**mattress** 14:9

**means** 88:22
97:11

**meant** 28:16 89:3

**measure** 58:2

**mechanism**
80:13 84:25 88:1

**mechanisms**
44:19

**meet** 12:9,10,14,
16,22 13:24
14:13 15:20
16:23 19:22 31:9
32:22 33:5 47:19

**meeting** 28:24
29:3 39:1 63:3,19
71:23 72:2,18
75:21 76:2,22
77:4 78:8 79:2,9,
10,24 80:2 81:7,
19 91:23

**meetings** 12:18
13:1 63:14 70:14,
16,20,24 71:22
72:1,15,20 76:4
77:6,18 78:7 80:8

**member** 70:4
71:2,14

**members** 68:17,
20 69:4,9,12,23
70:18,25 71:8
72:17 75:25
76:12,18

**membership** 9:6
65:5,9 67:23

68:10,14

**memory** 35:5

**mentioned** 70:17

**messaging** 40:24

**met** 12:12

**method** 25:8 26:3

**methodology**
26:11,14 64:24
65:12 78:24 81:9,
19,21

**methods** 24:24
95:20

**metrics** 59:23
60:3,4

**Mia** 63:2

**middle** 15:13

**miles** 26:6,9

**mind** 18:12 58:1
85:12

**minimis** 26:6

**minutes** 12:17
14:2 17:2 51:4
71:25 85:16
97:16

**miscommunicatio
n** 43:1

**misrepresent**
82:23

**missed** 71:10

**Misstates** 71:5

**misunderstand**
45:15

**misunderstandin
g** 43:1

**misunderstood**

21:6

**Mm-hmm** 33:21
54:6,9 55:10
61:20 63:5 65:19
80:20 93:23

**mobile** 66:23

**Modernization**
13:15 14:11 16:5,
13,15 32:12 36:4
39:23 41:5

**modify** 21:2,22

**Monday** 12:23
14:14

**money** 58:7 59:7
85:25 96:6,8

**monitoring**
41:14,20 49:9
54:13

**morning** 7:8,9
12:23 88:16

**move** 18:12

**moving** 75:11
91:24

**multiple** 28:18
33:4 37:22,24
39:14 40:2

---

**N**

---

**narrow** 74:5

**National** 6:18

**nature** 37:17
63:11 67:10

**NAWD_DEQ_
356252** 18:25

**NAWD_DEQ_
356675** 28:4

**NAWD_DEQ_ 356808** 36:5

**NAWD_DEQ_ 356812** 82:24

**NAWD_DEQ_ 356926** 67:24

**needed** 20:20 21:1,18 31:8 38:17 49:8 89:5, 12

**negotiation** 42:13 43:7

**negotiations** 15:14

**Nicole** 12:1,14,18 50:6 65:16,18,24 73:19 90:22,23 92:7

**nodding** 7:24

**noncontaminatio n** 45:24

**noncovered** 53:23 54:4

**noon** 8:3

**normal** 72:6

**note** 79:12

**notebook** 28:1 36:1 68:2

**noted** 98:10

**number** 47:17 55:1 69:9 81:10 96:5

**O**

**OAR** 21:1,8,22 25:14 31:14

**OARS** 88:17 89:4

**oath** 8:9

**Object** 69:1

**Objection** 15:21 32:1,24 46:17 59:2,8 65:14 69:19 70:7 71:5, 17 72:8 73:6,23 78:19,25 84:3 85:7 86:6,19 94:13 95:17

**objections** 80:23

**obligated** 24:18

**obligation** 32:19 41:4,7 43:25 64:22

**obligations** 15:10,15 19:23 21:2 28:13 31:9 32:18,22 33:6 39:24 42:9 44:2 61:3 91:23

**Occasionally** 63:23

**occur** 53:2

**occurred** 70:9,12, 23 87:9

**occurs** 33:25 53:3

**offer** 24:2

**offered** 15:6 24:19

**official** 49:24

**offset** 87:4

**onboard** 54:13

**open** 10:5,8,11 17:24 61:14 83:6

**operating** 16:11 48:15

**operational** 54:14

**operations** 83:22

**opportunities** 34:11 48:24 49:1

**opportunity** 10:1 14:21 15:11 16:12 29:23 31:9, 22 32:8,17,23 33:5 39:22 43:25 44:1 79:16 81:4

**opposed** 53:22 54:3

**optimal** 38:21

**Optimization** 35:11

**order** 31:8 32:22 35:17 98:5,8,11

**ordered** 57:19

**Oregon** 6:22 8:23 9:12,18 10:19 19:16 22:13 26:23 28:3 35:11 37:15 40:24 47:25 51:18,19 62:10,18 67:23 68:17 71:23 77:9 79:19 95:22

**Oregon's** 30:22 82:9

**organization** 11:1 94:1 95:1

**original** 29:22 35:15 98:5

**ORS** 9:1 20:2,12 25:6 29:8,13 32:20 33:3,24

34:4 40:13 41:15, 23 51:16 61:17 64:15 65:5 69:14 73:22 74:15 76:8 77:2,22 78:3,18 86:5,9,14 96:7

**ORSAC** 9:5,11,14 28:20 58:14 62:15,16 63:1,6, 9,12 64:2 65:7,8 66:2,11 67:7 68:24 69:12,18 70:4,18 71:14,22 73:1,4,10,20 75:1,16,19 76:7, 12,22 77:1,14 78:1,16,23 79:18, 22 80:13,23 81:7, 19

**ORSOP** 29:22,23 35:9,10

**outcomes** 56:1

**outreach** 56:22, 24 57:6 58:11 59:11

**overlap** 81:17

**P**

**p.m.** 85:21 97:22, 24 98:22

**Packaging** 28:3

**paid** 47:4

**paint** 14:10

**Paper** 28:3

**paragraph** 29:20 30:7 34:19 35:1

**paralegal** 18:16

pardon 68:19

part 14:24 15:1 18:18 20:19 28:13 30:16 40:3 41:1,5 44:1 64:18 73:11 75:17,18 83:2 86:14,21 87:1,2 92:15,22 95:12

participate 29:23 80:7

participated 66:9

participating 71:3 79:11

participation 70:5

parties 8:22 11:9, 18 24:3

Partnership 69:8

parts 11:11 24:21 26:17

partway 62:9

party 23:20

pass 48:21

past 40:6 69:4

pay 21:16 48:14 82:11 87:2

payer 86:17

payers 87:2

paying 44:17 66:10 87:3

payment 15:2 20:2 43:15,19 50:15 51:15 52:2, 18 53:5,14 54:1 60:15,19 94:3 95:3

payments 8:22 9:1 11:17 41:14, 20 50:13 52:12 53:1 54:5 55:22, 24 58:21 60:7,9, 13 69:14 73:21, 24 74:1,5,25 86:16 92:3 94:16 97:12

penalty 6:10

people 40:16 43:5 62:25

percent 34:15 68:15 69:5

Perfect 51:7 98:9

performance 55:6

period 20:24 22:9 36:3 58:14 79:2, 7,15 80:8,15,25

periodically 33:22

perjury 6:10

person 38:25 50:7

personal 8:13

phone 38:25

piece 90:4 91:1

pieces 50:24 57:19

place 28:23 29:2 41:19 44:19 55:25 58:17 95:20

places 29:14

plaintiff 6:18,21 7:11 98:3

plan 8:23 19:16, 22 20:23 22:7,11 23:1,15 24:12 26:10,15,24 28:19 35:18 36:12,14 42:23 46:5 47:14,16 50:17 51:18 54:22 58:9,10 60:2 61:15 64:9 65:11,13 73:16 75:4,7 77:13,25 78:5 82:1,2 90:17 91:25 96:24

planned 46:14

planning 45:6

plans 59:22 64:14 75:8 76:7,9

plated 48:1

play 22:5 23:19 42:4 62:11

point 45:1

points 28:25

policies 49:25 50:3

population 32:10

portions 30:20

Portland 7:11

Portley 12:1,14, 19 50:6,11 65:18 90:22,23 92:7

post-consumer 34:16

posted 72:3,13 75:23 76:16 79:8

potential 66:12 70:18

power 51:19 67:8, 12,13 94:8,23 95:16,24

Powerpoint 78:9, 15

PRA 72:21

preparation 24:22 57:11 68:2 72:24 82:22

prepare 11:22 17:12,15 19:7,25 22:18 26:18

prepared 11:9,12, 14 61:11 63:16 71:10 80:21

preparing 15:23 29:15 42:1

present 79:21,25

presentation 64:9

presentations 63:16,18 77:17 78:9

presented 89:16

presenting 64:7

pressure 87:6

pretty 49:9 74:8 84:11 94:21

previous 38:12

primarily 15:8 40:15 53:21 54:1 63:3,10

primary 30:7 36:24 42:2 46:6

prior 30:10 59:7

priorities 31:2 74:18

NAEGELI
DEPOSITION & TRIAL    (800) 528-3335
NAEGELIUSA.COM

**prioritize** 31:6

**priority** 20:22 30:3,8,11,14,25 31:7 75:9

**PRO** 21:15 26:2 29:1 40:5 48:14 49:12 52:18 66:24,25 74:13 86:21 87:3

**problem** 46:9 48:2

**procedure** 78:22

**procedures** 49:25 50:3

**proceed** 7:2

**process** 8:6,24 22:8,20,25 23:2, 11,12 24:9 30:2, 13,19 34:12,23 35:5,8 36:18 37:19 41:19 42:13 43:7 47:22 50:20 52:8 55:25 58:20 59:1,15,21 62:10 73:3,11 75:11 79:4 80:16, 22 81:13,16 89:25 95:9

**processed** 56:4

**processes** 40:3

**processing** 13:20 25:23 33:19 34:1 86:25

**processors** 69:13

**produced** 18:20 67:25 68:11

**producer** 11:1 57:2 65:5,8 78:22

79:18 80:11,17 81:2,9,18,22 82:1 94:1,25

**producers** 53:22 54:3 66:3,7,10,15 69:13 81:6,23 82:7,10

**produces** 28:13

**product** 14:5,8,9 39:12,14

**products** 25:22 26:1,5 33:17 34:8 53:21 54:2

**program** 8:23 19:16 20:23 22:7 23:1 26:10,24 28:19 35:18 36:3, 12,14 39:5,15 40:8 42:23 44:14, 17 45:16 46:5 47:14,16 48:8,23 50:17,18 54:22 55:24 58:9,10,12 60:2 61:15 64:8, 14 65:10,13 66:18 73:16 75:4, 6 78:5 82:1,2 83:23 87:12 90:17 91:25 96:24

**programing** 43:24

**programming** 34:3 41:7,8,12 45:20,21 49:20 50:18 85:2

**programs** 14:9,12 39:15 41:10 44:5, 7 54:11 55:6 86:4

**progress** 77:10

**project** 35:11 45:11 46:25 56:2, 9,10,13

**projects** 47:19 50:1 86:18

**proper** 57:10,11

**proportionality** 8:24

**proposed** 24:24 91:20

**PROS** 9:6 65:2

**provide** 7:22 15:8 28:24 29:6 32:10, 21 35:16 48:23, 24 49:14 62:22 63:14 64:19 69:24 77:4 86:7

**provided** 11:5 17:11 28:1 29:22 34:8 60:21 61:2 74:19 86:20

**provider** 11:5 23:7 41:23 43:18 46:1 51:17 78:18 94:3 95:2

**providers** 10:21 15:7,16 24:1 40:13,18 41:15 42:19 43:12,16 57:15 59:18 60:17,21 61:1 69:14 73:22 74:15 76:14 78:13 86:2,3,8 92:5

**providing** 86:21 95:21

**provision** 34:7

**provisions** 11:8

**public** 22:9 58:14 65:4 71:22 72:19, 23 74:12 79:1,7, 16,24 80:2,7,15, 24 81:4 86:17 92:12,14

**publicly** 72:1 73:14

**published** 92:10, 12

**pull** 63:17 89:15

**purpose** 9:13

**purposes** 19:5 28:19 33:4,8

**pursuant** 20:12 77:1,21 78:3 96:7

**put** 17:3,25 18:13 27:15 35:19 72:5, 10 81:5 89:6 95:20

**putting** 9:21 18:23 82:15

---

**Q**

**Q1** 59:7 62:12 96:19 97:3

**quality** 6:25 8:13 33:23

**quarter** 28:11 57:20

**quarterly** 28:3,10, 18 29:12 75:10, 18,20,23 76:12, 16 77:12,16,24 78:6 91:9,15 92:11 94:11 96:10,15

NAEGELI
DEPOSITION & TRIAL    (800) 528-3335
                      NAEGELIUSA.COM

**question** 7:17 8:5 19:6 21:3,21 22:25 30:5 47:6, 10 48:5 49:24 51:22 52:23 56:7 65:16,24 73:18 80:5 81:22 84:9, 10,14 86:11 94:14,19,21

**questioning** 45:3

**questions** 7:23 40:25 42:24 43:3 45:6 49:7,13 50:7 66:3 79:15 85:11, 24 88:7,13 91:3 93:3,6,11,13 97:14

**quick** 7:15

**quickly** 75:12

**R**

**Rachel** 12:4 15:18 16:3

**raise** 6:9 79:12 80:18

**raised** 77:3 80:4

**rate** 86:16 87:1,22

**rates** 86:16 87:4, 6,21

**reached** 81:11

**read** 19:16 94:4 95:18 98:16,18

**ready** 72:25

**realm** 67:2

**reason** 7:24 8:4 95:24

**reasons** 51:25

**recall** 17:17 38:6, 13 70:9,21 71:2, 7,13,18 73:11 76:20,25 82:4 83:14 84:10 88:15 89:14,20, 23 90:3,9

**receipts** 44:19,20 60:19,23

**receive** 25:25 40:17,20 42:1 60:19 69:14 73:4 78:11

**received** 51:25 63:2 73:12 76:12

**receives** 77:15 78:2 94:3 95:2

**receiving** 44:5

**recently** 19:21 66:8

**recess** 51:9 85:20 97:23

**recognize** 10:16 28:9 48:22 68:6 83:10 89:18

**recollection** 90:12

**recommendation** 74:11

**recommendation s** 64:20,22 65:2

**recommended** 78:16

**record** 6:7 9:10, 14 18:13 25:13 33:14 51:5,8,11 85:13,19,22

97:22,25 98:22

**recorded** 70:14

**recording** 72:18

**recordings** 72:1, 15,24

**records** 61:9 72:23 94:1,12,25 95:7,19

**recourse** 24:15

**recovery** 55:7

**recused** 70:4 71:4,15

**recyclable** 40:4 66:23

**recycle** 14:22 15:11 16:12 31:9, 22 32:8,18,23 33:5 39:22 43:25 44:2

**recycled** 8:25 34:16 52:13 53:2 55:8 56:3

**recycles** 86:25

**recycling** 9:12 13:15,20 14:11 16:5,13,15 22:8 25:22,23 28:20 32:10,12,19 33:18,19 34:1,7, 11 35:11 36:4 38:15 39:5,18,23 41:5 47:2 48:1,2, 14,16,17,23 49:1, 18 53:21 54:2,14, 15 55:6 56:1,6, 12,14 57:10 58:4 59:19 62:18 63:13,25 64:7,10 65:10 66:22 67:2,

3,23 68:9,18 69:4,7,9,23 70:1, 24 71:8 73:25 74:7 75:2,10,25 76:2,5,17 77:3,6, 17 79:2 80:1 81:3,14,17,25 82:9 86:22

**reduce** 51:25

**reduction** 34:3 41:6,8,11 43:23 45:16,20,24 49:19 50:18 85:2

**refer** 9:14,17

**reference** 30:17 38:16

**referenced** 18:18 46:15 50:24

**references** 31:14

**referring** 9:15,18 46:22 88:16 89:4 95:8

**reflect** 37:19

**refreshing** 35:4

**refund** 87:17 88:2

**regard** 67:9 74:4 78:12 79:19 94:9 95:15

**Region** 16:6

**regional** 14:19,23 15:4,16 16:8,10, 19 39:20,25 42:6, 18 44:4,14

**regions** 14:20

**regularly** 77:6

**regulated** 15:5

**regulation** 51:19

**regulations** 22:14 31:14

**reimburse** 11:2

**reimbursed** 87:18 88:1

**reimbursement** 25:5 26:2 61:9 74:17 86:24 93:25 94:25 95:6, 19

**related** 11:8 16:17 18:19 21:16 23:2 40:12 60:20 74:9,22 76:13 77:14 86:4, 8

**relates** 58:10 64:2 66:24

**relating** 20:2 39:18 50:5 62:16 67:12 82:8 89:25

**relationship** 31:24 71:1

**relative** 8:25

**relevant** 20:1 22:24 25:3

**reload** 25:23 33:18 38:14 54:15 74:16

**remedy** 90:5

**remember** 91:2,6

**rename** 27:17

**report** 20:1 28:3, 10,16,18 29:10, 11,12 39:10,11 58:12,13,24 64:8 75:16,20,21

77:13,25 78:5 92:5,13,16,18,22 94:15 95:11 96:10,15

**reported** 49:5

**reporter** 6:7,14 7:1,18 51:3,7,10 65:21,25 85:12, 15,18,21 97:21, 24 98:4,9,15,18

**reporting** 91:9

**reports** 13:22 29:5,13 64:14 75:18,23 76:13, 16 77:12,16,17, 24 78:6 91:15 92:2,10,11,12 94:11

**represent** 6:16 7:11 17:10 25:10 27:6 28:17 35:24 67:25

**representation** 68:1

**representative** 69:7

**representatives** 42:19

**represented** 27:8

**representing** 6:23 45:14

**request** 11:2 20:7 23:7 24:13 43:19, 20 47:10 48:14 50:23 53:8 55:3 60:15 72:2,18,19, 21,23 81:8 93:25 94:25 95:7,19,23 98:14,16

**requested** 28:20 46:25 47:1 75:10, 16 96:1

**requesting** 23:14 44:13,20 46:12 48:1

**requests** 20:11, 22 21:10 22:2 23:3 29:2 36:3, 15,17 37:21 38:16 43:15 48:13 50:10 54:23 75:8 90:1

**require** 51:19 53:13,20,25 72:24 88:2

**required** 32:14 33:24 34:4 49:3 57:8 92:22

**requirement** 34:15 43:9,14 59:17 64:10 87:15

**requirements** 14:22 32:13 46:2 47:20 71:23 92:16

**requires** 25:11 32:9

**residential** 34:3

**resolution** 23:21, 22

**resources** 57:9 59:20

**respect** 9:1 89:25

**respond** 29:21 32:4 80:2 84:16 85:2

**responded** 84:16, 22

**response** 41:1

**responsibilities** 39:17 40:11 62:16 74:4

**responsibility** 11:1 13:14 41:18 73:20 94:1 95:1

**responsible** 25:24 33:20 45:10,25 46:15 47:3,19 49:15 50:9,22 62:17 87:1

**result** 52:14 87:5

**return** 51:20,24 93:5

**review** 20:8 22:8, 9,10 23:25 24:7, 16 28:19 36:7 58:12 59:5,10,21 60:6 64:4,10,19, 24 65:12 72:17 73:11,16,25 74:3, 8,16 75:4,25 76:8 81:17 82:2 86:15 91:20 92:17,19, 23 93:24 94:15, 24

**reviewed** 18:4 19:6 58:14 61:8 65:10 77:1 82:21

**reviewing** 42:4 65:8

**Revised** 10:19

**revisit** 90:14

**revisiting** 90:20

**Rhoades** 12:4 14:17 15:20 16:8

**rights** 62:5

**RMA** 15:3,10 16:17 19:23 28:14 31:25 32:18,20 39:7,15 40:3 46:2 47:12 56:16,24 57:3 64:3,5 67:9,12 74:9 79:20 80:24 81:12 90:7

**RMATA** 16:20

**role** 9:6 14:24 15:1 22:5 23:19, 21 41:13 42:4,6, 25 64:2 91:10

**roll** 48:8

**rule** 24:6,19 26:7 30:18 90:16

**rulemaking** 40:2 66:13,17 81:13, 16

**rules** 20:19 21:14, 17,20 22:3 30:17, 22 31:2,5 42:22 46:4 47:15 48:12 49:10 50:17 52:16 53:10,11 54:20 69:17 74:19 89:8

**run** 63:18 79:9

**S**

**SAC** 22:9

**safety** 54:12

**Sands** 6:17,18 7:7,10 9:25 10:10

15:22 17:8 18:11, 14,21,22 19:3,13, 18 27:24 32:2,5, 16 33:7 34:24 35:12,23 45:5,8 46:23 51:1,4,12 55:15 59:4,12 61:24 62:2 65:17 66:1 67:19 69:11, 21 70:10 71:12, 21 72:12 73:9 74:2 78:21 79:3 82:19 84:12,18 85:8,14,17,23 87:7 88:5 93:10, 12,15 94:20 96:3 97:14,17,20 98:3, 4,7

**save** 10:3,5,7

**scheduled** 79:7

**scheduling** 63:3

**scope** 32:1,25 59:2 65:14 69:20 70:7 71:17 72:8 78:19,25 84:3 85:7 86:6,19 95:17

**section** 10:19 11:6 22:23 23:5 34:20,22 35:1 54:25 56:21 61:19,21 62:5 89:24 93:21 94:3, 8,23 95:3,16

**seek** 24:15

**sees** 42:25

**sense** 52:20 88:23

**separate** 29:6 49:20

**separating** 49:21

**serves** 64:2

**service** 10:21 11:4 15:7,15 23:2,7 24:1 31:20 32:11 40:13,18 41:15,22 42:19 43:12,16,18 46:1 51:17 57:15 59:18 60:21 61:1 69:14 73:22 74:15 76:14 78:13,18 86:2,3,8 90:1 92:4 94:2 95:2

**services** 34:8 60:16 86:22

**set** 66:19 87:21 89:7 91:22

**sets** 76:3

**setting** 63:4 87:22

**settlement** 22:19 23:2 89:25

**share** 39:25 72:25

**shared** 17:22 42:14,16 78:14

**sharing** 77:10 89:16

**shifted** 16:22

**shifting** 62:15

**show** 27:7 87:4

**side** 89:17 98:8

**Sidley** 6:20

**sign** 79:5 98:17, 18

**signed** 96:16 97:1,2

**signing** 77:8

**similar** 7:24 86:4, 18

**similarly** 9:17 77:9

**simple** 94:22

**sitting** 70:22 71:13

**situation** 46:11, 22 48:19 62:4 70:3 71:2,7,14 73:12 76:25 81:12 94:7

**situations** 66:2 70:23 74:25 81:10 87:8

**skim** 18:2

**smoothly** 63:18

**solved** 43:2

**sort** 83:25 98:7

**sorting** 38:21

**sought** 51:24

**sounds** 84:10

**speak** 61:11 79:13 80:21 90:24 92:7

**specialist** 16:9,20

**specialists** 14:19, 23 15:4,16 16:10 39:20 42:6 44:4, 14

**specific** 30:5,18 56:16 66:7 71:19 73:8,24 74:1

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

76:20 79:19,21 80:11,23 82:3 92:3 96:5

**specifically** 16:17 34:25 40:12 45:17 76:1 80:10 83:14 89:24 96:20

**specificity** 52:23

**spend** 18:1

**spending** 29:7,13 45:12,24 46:1 58:7 60:21 61:2 76:13,21 77:1,14, 21 78:2 91:21

**spent** 56:5 59:7 96:8,17 97:11

**Sperry** 6:9 7:3,8 34:25 45:2,9 51:13 85:24 88:6, 11,19 93:16

**spoke** 11:24 90:22

**spring** 36:11

**staff** 14:20 39:25 42:18 49:7,8,14, 15 54:12 63:1 84:16

**staffing** 49:4,11 62:17

**stamp** 36:5

**stamped** 18:24 28:4 67:24 82:23

**stand** 9:11 35:10

**standard** 28:25 29:4

**standing** 98:8

**start** 7:14 9:20 12:13 54:14 81:24 88:14

**started** 31:7

**starting** 25:2 89:24

**starts** 22:22

**startup** 48:15 54:10

**state** 6:15 22:13, 14 48:24 86:23 87:11 98:2

**stated** 44:23

**statement** 94:17

**statements** 70:15

**states'** 14:20

**statewide** 38:18 41:11 57:9,12,13 66:21 74:16

**statue** 48:12

**statute** 10:19,23, 24,25 11:8,11,19 20:20 33:9,10 42:22 46:4 47:15 49:10 50:16 51:18 52:16 64:15,25 74:19 90:16 93:18

**statutorily** 66:19

**statutory** 24:6,19 46:14 52:24 64:2, 21

**Stein** 83:16

**step** 23:22 24:8, 20

**stewardship** 14:5,8,9 39:12,15

**stop** 78:17

**strategy** 59:6

**stream** 43:24 46:8 49:21

**streams** 25:6 43:23 49:22

**street** 48:17

**strike** 14:25 15:19 56:7 62:14

**structures** 65:5,9

**stuff** 82:13

**subject** 18:19 71:22 81:19

**submitted** 28:11 58:24 60:16 95:11 96:13

**subsection** 34:9

**substance** 63:21

**success** 91:22

**successful** 59:24

**supervisor** 83:22

**supplied** 53:22 54:2

**support** 55:4 62:22

**supporting** 42:7 62:18

**supposition** 84:21

**survey** 29:22,24 35:9,14

**switch** 39:3

**system** 9:12 13:21 20:12 21:9, 16 28:21 34:22

35:11 36:2 39:18 52:11 53:14 55:3 60:13 62:18 67:23 68:18 74:18 75:3 82:9

**systems** 60:6

---

**T**

**table** 23:23 75:7

**tabs** 61:13

**takeback** 14:10

**takes** 70:2

**taking** 37:20

**talk** 7:20 26:21

**talked** 31:22 33:16

**talking** 19:4 34:5 67:7 80:6

**talks** 30:7

**tasks** 49:15

**team** 11:24 13:16 39:12

**technical** 16:6,16

**term** 68:15 88:22 95:18

**terms** 20:20 30:3, 14 31:5 40:7 52:11 56:2 58:3 72:16 84:25 88:16 89:4,5,9 91:23,24 95:13, 14

**testified** 7:4 45:10 76:11 77:23 94:6,22

NAEGELI
DEPOSITION & TRIAL    (800) 528-3335
NAEGELIUSA.COM

**testify** 8:17 11:9, 14

**testifying** 8:12 89:20,23

**testimony** 6:11 12:19 13:2 22:24 25:4 71:5 76:20 88:15 89:14 90:3 91:2,6 94:9

**thing** 88:14 89:13 93:5

**things** 40:6 84:1 87:6,24

**Thomas** 69:7

**thought** 95:16

**Thursday** 12:15

**tie** 32:18

**time** 12:10 16:12, 22 18:1 46:21 51:10 79:11,23 85:21 95:24 96:17 97:24

**timing** 75:9

**title** 13:11 14:4,18 16:4 37:16 39:4,8

**titled** 34:22

**titles** 37:12

**today** 8:9 9:21 11:10,14 12:19 13:2 22:24 25:4 34:6 61:11 62:12 68:13 70:22 71:14 98:12

**today's** 11:23 17:15 19:7,25 22:18 24:23 26:18 29:15 98:6

**ton** 18:1

**tons** 52:13

**top** 57:25

**topic** 8:21 9:4,5, 21 64:11 66:13 67:1 75:3 76:1,20 77:3 81:15 87:13

**topics** 8:18,20 13:19 66:19 67:6 81:16,17

**total** 96:21 97:2, 13

**totals** 96:19 97:8

**track** 56:1,5 60:7

**tracked** 60:13

**tracking** 56:11,15 60:8

**training** 54:12

**transcribed** 7:25

**transcribing** 7:19

**transcript** 98:5

**transport** 25:25 26:5

**transportation** 24:25 25:5,9 26:10,12 74:16 86:23 87:24,25

**transporting** 25:21 33:17 86:25

**tricky** 42:20

**trucks** 54:11

**truth** 6:12 7:4

**turn** 89:13

**two-day** 98:8,13

**type** 46:21 75:7 84:24

**types** 36:19 44:20

**typical** 84:5

**typically** 63:13 71:9 72:16 80:3

**U**

**Uh-huh** 83:13

**ultimately** 24:10 82:10 87:25 97:13

**undergone** 35:5

**understand** 8:11, 16 11:16 14:6 21:3 42:8 47:6 49:23 84:7 92:6

**understanding** 8:21 10:22 21:25 23:6,16 31:24 34:24 41:21 53:4 64:1 73:13 75:24 77:23 88:21 90:13,15 95:6,14

**understood** 10:13

**Uniform** 38:18 57:9,11,13 66:21

**unique** 42:21 81:12

**unnecessary** 50:2

**upcoming** 64:8

**updates** 28:20,24 29:6 63:15,21 75:11 77:4 78:6,8

**upload** 72:10

**USCL** 38:18

**V**

**V-A-N-W-O-E-R-T** 12:6

**vague** 15:21 21:18 46:17 59:8 69:1 73:6,23 88:17,22 89:1,3, 10 94:13 95:17

**vagueness** 22:3

**Vanwoert** 12:4,5 15:18 16:3,24

**venue** 80:14

**venues** 80:17

**verbalize** 65:21

**verbally** 70:20

**version** 19:17 26:23 38:12

**versus** 16:20 48:11 58:8 72:6

**veto** 67:8,12

**vice** 62:23 76:5

**videos** 72:13,19, 24

**vote** 70:5 71:4,11, 15

**votes** 69:18 71:9

**W**

**wait** 7:16 29:18 51:2

**walk** 18:7

**wanted** 81:6 93:5, 10

**Washington** 83:17,22

**waste** 83:23

**wasteful** 50:1

**ways** 26:4 29:12 55:23

**website** 72:3,5, 11,14 75:24 76:17 79:8

**week** 12:15

**Wheitz** 63:2

**Wholesaler-distributors** 6:19

**wine** 66:15

**witnessed** 65:8

**Wonderful** 98:20

**word** 64:17 88:25

**words** 20:18 21:1, 2,17,22 32:20 75:20 88:16

**work** 15:4 37:2,5 39:24 40:7 42:18 43:4 44:22 76:6

**worked** 36:10 77:7

**worker** 14:22

**working** 23:25 39:21 64:11

**workplans** 16:15

**works** 13:15,18

**worry** 84:12

**wrapping** 45:3

**writing** 7:19 38:25

**written** 64:20 65:2 74:11

---

**Y**

---

**year** 62:8 87:11 95:9

**years** 40:6

**Yesterday** 13:25 15:25 16:25

**Youngwoo** 6:22 88:11

---

**Z**

---

**zip** 17:24

**Zoom** 63:4