Victor Y. Xu, Oregon State Bar No. 223323
vxu@martenlaw.com
Marten Law LLP
1050 SW 6th Ave, Suite 2150
Portland, OR 97204-1158
Phone: 503.241.2641

James B. Pollack (*pro hac vice*)
jpollack@martenlaw.com
Marten Law LLP
920 5th Ave, Suite 2700
Seattle, WA 98104-1189
Phone: 206.292.2600

Attorneys for *Amicus Curiae*
The Recycling Partnership, Inc.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS, | Case No.: 3:25-cv-01334-SI |
| Plaintiff, | AMICUS BRIEF OF THE RECYCLING PARTNERSHIP, INC. |
| v. | |
| LEAH FELDON, DIRECTOR, OREGON DEPARTMENT OF ENVIRONMENTAL QUALITY, in her official capacity, | |
| Defendant. | |

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC.

**Table of Contents**

I. INTRODUCTION ............................................................................................................ 1

II. SUMMARY ................................................................................................................ 2

III. OREGON WASTE PREVENTION LAWS – HISTORY AND BACKGROUND ................ 3

IV. LEGAL FRAMEWORK ................................................................................................ 7

V. DISCUSSION ............................................................................................................ 11

    A.    Because the Act lacks a discriminatory purpose and does not regulate instrumentalities of interstate commerce, NAW's dormant Commerce Clause challenge under *Pike* is likely foreclosed as a matter of law. ........................................................................................ 12

    B.    The Act provides significant local benefits cognizable under *Pike*. ................................ 17

        1.    The Act increases recycling rates while reducing waste disposal and reliance on landfills, resulting in a range of environmental and economic benefits. ............................. 19

            a.    The Act's fee structure incentivizes packaging changes that improve recyclability and reduce costs to the recycling system. ........................................................................ 19

            b.    The Act funds education demonstrated to decrease contamination of recycled material. ................................................................................................................ 21

            c.    The Act reduces waste disposal and reliance on landfills.......................................... 23

        2.    The Act generates revenue for investment in Oregon recycling infrastructure. ........... 24

        3.    The Act stabilizes and decreases recycling costs for Oregon ratepayers....................... 26

        4.    The Act produces other environmental and public health benefits............................... 28

VI. CONCLUSION............................................................................................................ 29

## Table of Authorities

**Cases**

*Am. Fuel & Petrochemical Mfrs. v. O'Keeffe,*
   903 F.3d 903 (9th Cir. 2018) ........................................................................................ 15, 18

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris,*
   729 F.3d 937 (9th Cir. 2013) ................................................................................................. 7

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.,*
   476 U.S. 573 (1986).............................................................................................................. 12

*Conway v. Taylor's Executor,*
   66 U.S. 603 (1862)................................................................................................................... 8

*CTS Corp. v. Dynamics Corp. of Am.,*
   481 U.S. 69 (1987)............................................................................................................ 9, 17

*Edgar v. MITE Corp.,*
   457 U.S. 624 (1982)......................................................................................................... 15, 16

*Exxon Corp. v. Governor of Md.,*
   437 U.S. 117 (1978)....................................................................................................... passim

*Flynt v. Bonta,*
   131 F.4th 918 (9th Cir. 2025) ......................................................................................... passim

*General Motors Corp. v. Tracy,*
   519 U.S. 278 (1997)..................................................................................................... 9, 12, 13

*Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.,*
   742 F.3d 414 (9th Cir. 2014) ............................................................................................... 12

*Minnesota v. Clover Leaf Creamery Co.,*
   449 U.S. 456 (1981)............................................................................................ 9, 10, 11, 18

*Nat'l Ass'n of Optometrists & Opticians v. Harris,*
   682 F.3d 1144 (9th Cir. 2012) ..................................................................................... 9, 10, 17

*Nat'l Pork Producers Council v. Ross (Pork Producers I),*
   6 F.4th 1021 (9th Cir. 2021) ................................................................................................. 14

*Nat'l Pork Producers Council v. Ross (Pork Producers II),*
   598 U.S. 356 (2023)....................................................................................................... passim

*Pac. Nw. Venison Producers v. Smith*,
20 F.3d 1008 (9th Cir. 1994) ................................................................... 11, 15

*Pac. States Box & Basket Co. v. White*,
296 U.S. 176 (1935)..................................................................................... 11

*Pharm. Rsch. & Mfrs. of Am. v. County of Alameda*,
768 F.3d 1037 (9th Cir. 2014) ................................................... 8, 9, 12, 17

*Pike v. Bruce Church*,
397 U.S. 137 (1970)............................................................................... passim

*South Dakota v. Wayfair*,
585 U.S. 162 (2018)......................................................................................... 9

*Triumph Foods, LLC v. Campbell*,
156 F.4th 29 (1st Cir. 2025)........................................................................ 15

*United Haulers Ass'n. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
550 U.S. 330 (2007)............................................................... 7, 8, 17, 18

**Statutes**

ORS § 459.005(30) ............................................................................................ 4

ORS § 459A.007................................................................................................ 4

ORS § 459A.657................................................................................................ 7

ORS § 459A.860(1) .................................................................................... 19, 28

ORS § 459A.860(2) ........................................................................................ 28

ORS § 459A.860(3) .......................................................................................... 6

ORS § 459A.863(29) ...................................................................................... 29

ORS § 459A.866................................................................................................ 6

ORS § 459A.866(1)(a)(A) .............................................................................. 13

ORS § 459A.866(1)(b)(A) .............................................................................. 13

ORS § 459A.869(2) .................................................................................... 6, 25

ORS § 459A.875................................................................................................ 7

ORS § 459A.884(3) ....................................................................................................... 20

ORS § 459A.884(4) ....................................................................................................... 20

ORS § 459A.884(4)(a) ................................................................................................... 27

ORS § 459A.890 ........................................................................................................ 7, 26

ORS § 459A.890(1) ....................................................................................................... 25

ORS § 459A.890(4)(b) ................................................................................................... 22

ORS § 459A.893 ............................................................................................................ 22

ORS § 459A.896 .............................................................................................................. 7

ORS § 459A.896(1) ....................................................................................................... 25

ORS § 459A.920 ............................................................................................................ 27

ORS § 459A.923 ............................................................................................................ 27

ORS § 459A.923(2) ....................................................................................................... 26

ORS § 459A.926 .............................................................................................................. 7

## I. INTRODUCTION

The Recycling Partnership, Inc. is a 501(c)(3) non-profit dedicated to building a robust and accessible recycling system. The Recycling Partnership firmly believes that if you want to recycle, you should be able to recycle. A better recycling system will deliver the true economic and environmental benefits that citizens, communities, and the entire recycling industry deserve. The Recycling Partnership proactively advocates for the entire recycling industry through its work with communities, companies, and policymakers. The recycling industry includes a broad range of stakeholders, including brands, packaging manufacturers, consumers, collectors, haulers, and material recovery facilities (MRFs).

A robust recycling system has the power to deliver a host of economic, environmental, and waste management benefits. Unfortunately, U.S. recycling is not performing at the scope and scale needed to achieve these benefits. Nearly 80% of recyclables that enter residential recycling systems nationwide is not recovered.[1] Unrecovered waste may be landfilled, combusted, or simply end up as litter. Too many communities lack the tools, funding, and policies needed to divert these recyclables away from landfills and other nonuse pathways. The Recycling Partnership is dedicated to bridging this gap through a combination of research, grants, and policy advocacy.

The Recycling Partnership has been actively engaged in the design, passage, and implementation of Oregon's packaging extended producer responsibility law, known as the Plastic Pollution and Recycling Modernization Act (the Act). The Act reflects The Recycling Partnership's data-driven framework of five "Functional Requirements" that demonstrably

---

[1] THE RECYCLING P'SHIP, STATE OF RECYCLING: THE PRESENT AND FUTURE OF RESIDENTIAL RECYCLING IN THE U.S. 5 (2024), https://perma.cc/CJ8F-XZWQ.

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 1

support an effective and functional recycling system: (1) packaging must be recyclable; (2) households need access to recycling from their home; (3) residents need to fully engage in recycling; (4) recycling facilities need to effectively process material; and, (5) recycling facilities need sufficient end markets for recycled materials.[2] Interventions into the recycling system that promote these Functional Requirements unlock the benefits of the recycling system. The Act implements these proven interventions to improve recycling rates, divert waste from landfills, generate revenue, invest in current and future Oregon recycling infrastructure, reduce costs for Oregon ratepayers, and generate additional local environmental and public health benefits.

This brief first provides background on Oregon's waste prevention legislative efforts, up to and including the Act. Next, it summarizes the relevant legal framework that governs a court's analysis of a dormant Commerce Clause claim. The brief then explains why, under that framework, the National Association of Wholesale-Distributors' (NAW's) claim fails.

## II. SUMMARY

"Companies that choose to sell products in various States must normally comply with the laws of those various States." *Nat'l Pork Producers Council v. Ross* (*Pork Producers II*), 598 U.S. 356, 364 (2023). So too here. This amicus brief focuses on NAW's dormant Commerce Clause claim, which faces a series of legal and factual hurdles that NAW cannot overcome.

The U.S. Supreme Court has established a heavy presumption against courts deploying their implied authority under the dormant Commerce Clause to prevent state officials from enforcing a democratically adopted state law. This heavy presumption must be given even greater weight when a litigant seeks to invalidate a law governing waste disposal, which is typically and traditionally a local government function.

---

[2] *See id.* at 7-8.

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 2

Especially in light of this presumption, NAW cannot prevail under any of the three available theories of dormant Commerce Clause violations: direct (facial) discrimination, direct regulation, and "undue burden" under the *Pike* balancing test. The Act does not facially discriminate against out-of-state entities or directly regulate out-of-state entities. Nor, as required under *Pike*, can NAW show that the Act's burdens on the interstate *flow of goods* are both "significant," and "clearly excessive" in relation to the law's benefits. *See Pike v. Bruce Church*, 397 U.S. 137, 142, 145 (1970). And even if NAW can establish that the Act significantly burdens the interstate flow of goods, any such burdens are firmly outweighed by the Act's demonstrated and anticipated local benefits. These benefits include, among others, waste reduction, revenue generation, investment in local recycling infrastructure, stabilization of costs for ratepayers, and reduced environmental and human health impacts.

The Supreme Court has strongly cautioned courts to refrain from using the dormant Commerce Clause to second-guess the judgments of democratically elected lawmakers regarding the utility of legislation. Given the nature of the Act and its demonstrated local benefits, the Court should decline NAW's invitation to do so here.

### III. OREGON WASTE PREVENTION LAWS – HISTORY AND BACKGROUND

Oregon has been a leader in waste prevention, reuse, and recycling legislation for more than half a century. In 1971, the state adopted the first-in-the-nation bottle deposit law to "reduce Oregon's growing litter problem and to conserve resources."[3] Driven by a perceived shortage of landfill space, the state began to enact and implement a series of recycling programs in 1983, beginning with the Opportunity to Recycle Act that year.[4] That law sought to harness the

---

[3] *See* Or. Sec'y of State, *Oregon Bottle Bill Records*, https://perma.cc/DT5D-Z453.

[4] SANDY THIELE-CIRKA, OR. STATE LEGIS. COMM. SERVS., BACKGROUND BRIEF ON RECYCLING 1 (Nov. 2006), https://perma.cc/CA2W-8SYD.

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 3

"environmental benefits of waste prevention, reuse, and recycling" as well as "conserve energy and natural resources."[5] The Opportunity to Recycle Act required cities with more than 4,000 residents to provide residential curbside recycling and required wastesheds[6] throughout the state to provide depots for collecting recyclable materials. Or. Rev. Stat. (ORS) § 459A.007. In 1991, Oregon adopted the Recycling Act (SB 66), which (among other requirements) set a statewide recyclable material recovery goal of 50% by 2000.[7] While Oregon did not achieve the recovery goal by 2000, it did reach the goal in 2010.[8] In 2015, the Oregon Legislature raised the statewide recovery targets, set plastic-specific recovery targets, amended education programming requirements for cities, and expanded the Opportunity to Recycle Act to cover multi-family units.[9] These amendments were intended to divert greater quantities of waste away from landfills and incineration, but continued challenges to the recycling system over the following years spurred further legislative intervention. Some background on Oregon's recycling system may provide helpful context for understanding these challenges.

In Oregon, curbside materials are collected through legal agreements between local governments and hauling companies. After materials are collected, haulers transport commingled recyclables to one of the ten Commingled Recycling Processing Facilities (CRPFs), also known as MRFs. Eight CRPFs are located in Oregon, and two are located out of state. Oregon's CRPFs

[5] *Id.*

[6] A wasteshed is an area of the state that shares a common solid waste disposal system, or an appropriate area in which to develop a common recycling system. *See* ORS § 459.005(30).

[7] Or. Dep't of Env't Quality, *Oregon's Recycling Laws: Evolution of Oregon's Recycling Laws*, https://perma.cc/7KC8-4HLH.

[8] OR. LEG. COMM. SERVS., BACKGROUND BRIEF ON RECYCLING AND WASTE PREVENTION 1, 3 (Sep. 2012), https://perma.cc/ZU4B-J8RZ.

[9] Or. Dep't of Env't Quality, *Oregon's Recycling Laws: Evolution of Oregon's Recycling Laws*, https://perma.cc/7KC8-4HLH.

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 4

take loads of commingled recyclables and sort the loads into commodity-specific bales. Some of the bales are then sold locally for processing in-state, while others are sold and shipped out of state for processing. The recipients of these materials, known as end markets, turn recycled materials back into raw feedstock for the production of new products. For metals, processing is typically a smelter; for glass, a beneficiation plant; for paper and cardboard, a paper mill; and for plastics, a reclaimer where the plastic is washed, shredded, melted, and re-extruded. The commodity bale sales offset the cost of sorting, which in turn decreases recycling costs for Oregon ratepayers.

Historically, a significant share of Oregon's paper, cardboard, and plastic collected for recycling was sold to foreign processors—many of them located in China.[10] In January 2018, China adopted the so-called National Sword policy, which banned the import of any bales of material with contamination rates above certain thresholds. That policy effectively prohibited the export of Oregon's materials to China, cutting off access to established markets and to a critical source of revenue for Oregon's CRPFs. Oregon was not alone. The Solid Waste Association of North America found that on average, National Sword cut recycled commodity revenue for recyclers and local governments by 50%.[11] Nationally, some communities responded by simply canceling their recycling programs.

This disruption posed unique challenges for Oregon. As described above, the Opportunity to Recycle Act mandates the implementation of recycling programs in most communities. So, instead of shutting down, CRPFs in Oregon responded by increasing processing costs for

---

[10] OR. CONSENSUS & NAT'L POL'Y CONSENSUS CTR., OREGON RECYCLING STEERING COMMITTEE – PROCESS REPORT 4 (Sep. 2020), https://perma.cc/2WZS-ZAV8.

[11] SOLID WASTE ASS'N OF N. AM. & APPLIED RSCH. FOUND., RESETTING CURBSIDE RECYCLING PROGRAMS IN THE WAKE OF CHINA – EXECUTIVE SUMMARY (2019), https://perma.cc/29BE-PMGY.

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 5

haulers, who passed those costs along to municipalities, who were forced to raise rates for residents, suspend recycling, and remove materials from their recycling programs.[12] Oregon residents felt the impact of the end-market disruption because they pay directly for waste collection and recycling—much like a utility rate for electricity or water. When commodity market shocks increase processing costs, those costs are passed directly through the recycling supply chain into the monthly recycling and disposal rates paid by households (ratepayers) in Oregon. Along with these rate shocks, Oregon experienced a decrease in overall recycling rates that threatened the state's ability to meet its waste diversion goals.[13]

In this context, Oregon policymakers developed and adopted the Act to address a compounding set of challenges. The Act was designed to increase recycling rates, divert waste from landfills, generate revenue, invest in Oregon recycling infrastructure, stabilize and lower costs for Oregon ratepayers, and promote environmental benefits. *See* discussion *infra* Part V.B.

The Act achieves these goals through the implementation of a packaging stewardship program that makes "producers" of packaging bear some of the costs of the collection and recycling of packaging, and for recycling system expansion and enhancement. ORS § 459A.860(3). The producers (generally, brand holders of the underlying product) report the quantity of packaging they put into the Oregon market, and pay fees based on the weight of that packaging. ORS §§ 459A.866, 459A.869(2). This producer reporting and fee requirement is paired with a regulatory backdrop of stringent statewide collection and recycling targets for plastic, and strict requirements for the environmental and labor standards that end markets must

---

[12] OR. CONSENSUS & NAT'L POL'Y CONSENSUS CTR., OREGON RECYCLING STEERING COMMITTEE – PROCESS REPORT 4 (Sep. 2020), https://perma.cc/2WZS-ZAV8.

[13] *See* OR. DEP'T OF ENV'T QUALITY, 2022 OREGON MATERIAL RECOVERY AND WASTE GENERATION RATES REPORT 22 (2022), https://perma.cc/3VQJ-F97Q.

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 6

meet (including those within the state) to accept materials from Oregon. ORS §§ 459A.657, 459A.926, 459A.875. Producer funding is then used to invest in recycling infrastructure, including technology upgrades at CRPFs; transportation costs for materials; and new collection infrastructure for local governments. ORS §§ 459A.890, 459A.896. Much of this reporting infrastructure setup, fee calculation, fee collection, and funding distribution is undertaken by a third-party entity known as a producer responsibility organization (PRO). In Oregon, there can be multiple PROs, and they can compete for producer members. To reduce the administrative burden on the state, the PROs are created and funded by producers. In Oregon, the only currently approved PRO is the Circular Action Alliance (CAA).

This type of stewardship program, known as extended producer responsibility (EPR), has been adopted across multiple jurisdictions in the United States and abroad. EPR programs are not uniform; producers' involvement in the operation of waste collection infrastructure may vary. Those variations complicate direct comparison of programs in different jurisdictions, including comparisons between EPR programs abroad and Oregon's program. Nonetheless, EPR programs for many products including paper and packaging in other jurisdictions have proven, well-documented success in generating revenue, spurring investment in waste diversion infrastructure, catalyzing packaging design innovation, and driving waste collection.

## IV. LEGAL FRAMEWORK

The U.S. Supreme Court has "expressly cautioned against judges using the dormant Commerce Clause as 'a roving license for federal courts to decide what activities are appropriate for state and local governments to undertake.'" *Pork Producers II*, 598 U.S. at 380 (quoting *United Haulers Ass'n. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 343 (2007)); *accord Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 953 (9th Cir. 2013) ("[T]he Supreme Court has frequently admonished that courts should not 'second-

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 7

guess the empirical judgments of lawmakers concerning the utility of legislation.'" (cleaned up)). As the Supreme Court has warned, "[p]reventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of 'extreme delicacy,' something courts should do only 'where the infraction is clear.'" *Pork Producers II*, 598 U.S. at 390 (quoting *Conway v. Taylor's Executor*, 66 U.S. 603, 634 (1862)). And courts adjudicating claims under the dormant Commerce Clause must be "particularly hesitant" to interfere with state laws governing waste disposal, which is "both typically and traditionally a local government function." *United Haulers*, 550 U.S. at 344 (quotation marks omitted).

Subject to these limitations, the Ninth Circuit has identified three "strands" of dormant Commerce Clause jurisprudence: (1) cases that involve direct discrimination against interstate commerce; (2) cases that involve direct regulation of out-of-state entities (i.e., "state laws that operate extraterritorially beyond the state's borders"); and (3) cases that address, "under what has been termed '*Pike* balancing,' state laws that regulate even-handedly to effectuate a legitimate local public interest." *Flynt v. Bonta*, 131 F.4th 918, 923-25 (9th Cir. 2025) (citing *Pike*). This final category involves claims that laws have indirect (or "incidental") effects on interstate commerce. *See Pharm. Rsch. & Mfrs. of Am. v. County of Alameda*, 768 F.3d 1037,1040, 1044 (9th Cir. 2014).[14]

---

[14] In *Pharmaceutical Research*, the Ninth Circuit identified a "two-tiered approach" to analyzing state regulation under the dormant Commerce Clause. The first tier involves determining whether a law (a) directly discriminates against interstate commerce because it treats out-of-state and in-state companies differently; or (b) directly regulates interstate commerce. *Pharm. Rsch*, 768 F.3d at 1039-40, 1041-43. At the second tier, a court applies the *Pike* balancing test to laws that "regulate evenhandedly," and have "only indirect effects on interstate commerce." *See id.* at 1040, 1044 (quotation marks omitted). These three categories (two in the first tier and one in the second) comprise the three "strands" of dormant Commerce Clause jurisprudence later identified in *Flynt*. 131 F.4th at 923-25.

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 8

Parties alleging dormant Commerce Clause violations under *Pike* face a high bar. Under the *Pike* balancing test, a plaintiff must first show that the challenged law imposes a "substantial burden" on interstate commerce. *Flynt*, 131 F.4th at 931. "[O]nly in rare cases" has the Ninth Circuit found that a statute imposes a "significant burden." *Id.* at 932. Even if a plaintiff clears that initial hurdle, they must then demonstrate that the burdens are " 'clearly excessive' in relation to the law's putative benefits." *Id.* at 931 (quoting *South Dakota v. Wayfair*, 585 U.S. 162, 173 (2018)).[15] At this stage, *Pike* again favors the state, which receives a strong presumption: "[U]nless the benefits of the state's law are 'illusory,' courts typically accept the state's articulation of the law's claimed benefits." *Id.* at 925 (quoting *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1156 (9th Cir. 2012)). In addition, "if the state produces *some* evidence showing the purported benefits exist, [the benefits of a] challenged statute will not be considered illusory even if there is strong countervailing evidence." *Optometrists*, 682 F.3d at 1156 n.17 (emphasis added) (citing *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 92 (1987)).

Importantly, the analysis under *Pike* "turns on the interstate *flow of goods*," *Pharm. Rsch.*, 768 F.3d at 1044-45 (brackets omitted) (emphasis in original)—not on the burdens a law

---

[15] In *Pike*, the Supreme Court assessed whether the burdens of the challenged law were "clearly excessive" in relation to the law's benefits, in part by considering whether the local interests promoted by the law could be served by an alternative approach "with a lesser impact on interstate activities." 397 U.S. at 142; *see also Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 473 (1981 (undertaking analysis of "alternative statutory schemes"). The Ninth Circuit, however, has since clarified that this analysis applies only where a law is, in fact, discriminatory—i.e., favors in-state entities over directly competing out-of-state entities. *See Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1157 (9th Cir. 2012); *see also General Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997) ("any notion of discrimination assumes a comparison of substantially similar entities"). In any event, NAW has not explained how the alternative approaches it has suggested—namely, point-of-sale fees and general taxation—might be as effective as the Act in reaching the same goals (e.g., incentivizing producers to make packaging that is more recyclable).

places on particular interstate businesses, *see Flynt*, 131 F.4th at 932. *See also Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127-28 (1978) (noting that the dormant Commerce Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations"). Under *Pike*, neither discrimination nor injury to the interstate flow of goods can be established by a mere showing of lost profits by out-of-state firms, or of transfer of revenue or market share from out-of-state firms to in-state firms. *See, e.g.*, *Optometrists*, 682 F.3d 1144 at n.14 (so holding); *see also Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 474 (1981) ("A nondiscriminatory regulation serving substantial state purposes is not invalid simply because it causes some business to shift from a predominantly out-of-state industry to a predominantly in-state industry.").

Given the hefty burden on a party seeking to invalidate a law under *Pike*, it is unsurprising that the Supreme Court has not invalidated a law under *Pike* in 38 years. *See Flynt*, 131 F.4th at 931 (noting Sixth Circuit's 2018 assessment that the Supreme Court "ha[d] not invalidated a law under *Pike* in three decades"). Nor is amicus aware of a single case in which the Ninth Circuit has—at any point—invalidated a law under *Pike*.

Under the *Pike* framework, state laws regulating economic activity may impose substantial costs on individual firms or industries. They may raise costs for consumers. They may significantly devalue sizable business investments. They may even impose prohibitions and burdensome regulations that indisputably interfere with the natural function of an interstate market. Absent a "clearly excessive" burden on the interstate *flow of goods*, however, none of these effects are grounds for a finding of unconstitutionality under *Pike*.[16] Laws imposing strict

---

[16] *See Flynt*, 131 F.4th at 932 (noting that the law that withstood a Pike challenge in *Pork Producers* was projected to cost American farmers and pork producers "hundreds of millions (if not billions) of dollars" (quotation marks omitted)); *Exxon*, 437 U.S at 128 (that "the consuming

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 10

regulations on packaging—even those that ban forms of packaging widely used in commerce—are no exception. *See Clover Leaf*, 449 U.S. at 470-74 (rejecting *Pike* challenge to law banning retail sale of milk in nonreturnable, nonrefillable plastic containers); *Pac. States Box & Basket Co. v. White*, 296 U.S. 176 (1935) (rejecting dormant Commerce Clause challenge to Oregon law prescribing strict standard for packaging of produce and banning packaging manufactured by law's challenger), *cited with approval in Pike*, 397 U.S. at 143.

## V. DISCUSSION

Although the Supreme Court has left the door open for *Pike* claims against laws that, like the Act, do not have an express or furtive discriminatory purpose, the category of such laws that might fall under *Pike* is exceedingly narrow. The Act itself likely doesn't qualify for consideration under *Pike* at all. And even if this Court finds that *Pike* applies, NAW's challenge still fails. Even if NAW can establish that the Act significantly burdens the flow of interstate commerce, any such burdens are firmly outweighed by the Act's demonstrated local benefits. These benefits include, among others, increased recycling rates, greater diversion of waste from landfills, revenue generation, investment in Oregon recycling infrastructure, stabilization of costs for ratepayers, and environmental benefits.

---

public will be injured" by the loss of low-priced gas stations "relates to the wisdom of the statute, not to its burden on commerce"); *Pac. Nw. Venison Producers v. Smitch*, 20 F.3d 1008, 1017 (9th Cir. 1994) (dormant Commerce Clause did not protect investment of "considerable time and money in an economic endeavor"); *Exxon*, 437 U.S. at 127 (rejecting petitioner's claim that a challenged law violated the dormant Commerce Clause, notwithstanding that the law may have "interfered with the natural functioning of the interstate market either through prohibition or through burdensome regulation" (quotation marks omitted)).

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 11

**A. Because the Act lacks a discriminatory purpose and does not regulate instrumentalities of interstate commerce, NAW's dormant Commerce Clause challenge under *Pike* is likely foreclosed as a matter of law.**

As matter of law, NAW cannot prevail under the first two strands of dormant Commerce Clause jurisprudence identified by the Ninth Circuit—i.e., direct (or "facial") discrimination, or extraterritorial control.[17] In addition, for reasons explained below, NAW's claim under the third strand—*Pike* balancing—is likely foreclosed as a matter of law.

The *Pork Producers* majority identified two categories of cases in which the Supreme Court had invalidated laws under *Pike*. The first category involves laws that, although not facially discriminatory, have "practical effects" that reveal the presence of an *actual* discriminatory purpose. *See Pork Producers II*, 598 U.S. at 377. As to these laws, "*Pike* serves to ' "smoke out" a hidden' protectionism." *Id.* at 379 (quoting R. FALLON, THE DYNAMIC CONSTITUTION 311 (2d ed. 2013)). A second category—which may overlap with the first, *see id.*

---

[17] This amicus brief focuses on the dormant Commerce Clause challenge brought under *Pike*. To the extent that NAW asserts a dormant Commerce Clause claim under the first two of the three strands of dormant Commerce Clause theories identified in *Flynt*, that claim fails.

Under the first strand (direct discrimination), a challenger must show that a law is facially discriminatory. Because the Act treats in-state and out-of-state producers alike, NAW cannot meet that burden here. That is so even if, as a practical matter, the law affects more out-of-state business than in-state businesses. *See, e.g.*, *Exxon*, 437 U.S. at 125-26 (law did not favor in-state businesses over out-of-state businesses, even where identified burdens fell "solely on interstate companies"); *see also Tracy*, 519 U.S at 298 ("any notion of discrimination assumes a comparison of substantially similar entities").

Under the second strand (extraterritorial operation), a challenger must show *direct regulation* of out-of-state entities—not merely effects on those entities. *See Pharm. Rsch.*, 768 F.3d at 1040-41(citing *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986)); *Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 432 (9th Cir. 2014)). Given that the Act imposes no direct regulation on out-of-state businesses, that theory is foreclosed under Ninth Circuit law. *See Pharm. Rsch.*, 768 F.3d at 1040-41 (finding extraterritorial control absent where challenged extended producer responsibility ordinance did not require any action to be taken by any entity that did not engage in relevant business activity outside of jurisdiction of issuing jurisdiction, and did not require implementation of product stewardship plans in any outside jurisdiction).

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 12

at 379 n.2—involves laws that regulate "instrumentalities of interstate transportation—trucks, trains, and the like." *Id.* In such cases, the Supreme Court has invalidated laws that "undermined a *compelling need* for national uniformity in regulation." *Tracy*, 519 U.S. at 298 n.12 (emphasis added); *see also Pork Producers II*, 598 U.S. at 379 n.2 (construing *Tracy*). Such a need is found "only when a lack of national uniformity would impede *the flow* of interstate goods." *See Pork Producers II*, 598 U.S. at 379 n.2 (emphasis in *Pork Producers*) (quoting *Exxon*). Cases in the above categories fall within "*Pike*'s heartland." *See id.* at 379-80; *see also id.* at 389 n.4 (plurality opinion) ("When it comes to *Pike*, a majority [of Supreme Court Justices] agree that heartland *Pike* cases seek to smoke out purposeful discrimination in state laws (as illuminated by those laws' practical effects) or seek to protect the instrumentalities of interstate transportation.").

This case falls well outside *Pike*'s heartland. First, NAW's Amended Complaint includes no substantive assertion that the Act's actual, discriminatory purpose is revealed by "the presence . . . of discrimination in practice"—i.e., "purposeful discrimination against out-of-state businesses," "in favor of in-state business," *see id.* at 378-79. Rather, NAW focuses entirely on *incidental* effects on out-of-state businesses (e.g., that out-of-state business "must disaggregate Oregon-bound products from shipments with other destinations," Am. Compl. at 19 ¶ 70 (ECF 26),[18] and that out-of-state business "are more likely to be double-charged or erroneously treated as the responsible producer," *id.*).[19] Even if NAW provides evidence of these incidental

---

[18] It is unclear to amicus how this requirement would burden an out-of-state business that ships products to Oregon and other jurisdictions, but not an in-state business that does that same. The Act's allocation of reporting and payment responsibility to a "producer" does not turn on physical presence in the state. *See* ORS § 459A.866(1)(a)(A), (b)(A) (assigning responsibility to product brand holder as producer).

[19] NAW's subsequent briefing on its dormant Commerce Clause claim also offers no substantive argument that the real purpose of the Act is to discriminate against out-of-state

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 13

effects, it can conjure no plausible argument that the *real* purpose of the Act—which burdens in-state and out-of-state businesses alike—is to favor in-state businesses by discriminating against out-of-state businesses that are *direct competitors* to those in-state businesses, as required to show discrimination for purposes of a dormant Commerce Clause claim. *See Pork Producers II*, 598 U.S. at 378; *Tracy*, 519 U.S. at 300 (failure to show competition between supposedly disfavored out-of-state entities and supposedly favored in-state entities is fatal to a dormant Commerce Clause claim).

Nor does this case involve "instrumentalities of transportation." As Chief Justice Roberts has observed, packaging—even packaging used only for transporting and distributing goods—is not an instrumentality of transportation. *See Pork Producers II*, 598 U.S. at 396 (Roberts, C.J., concurring in part and dissenting in part) ("Nor have our cases applied *Pike* only where a State regulates the instrumentalities of transportation. *Pike* itself addressed an Arizona law regulating cantaloupe packaging."). Nor, for that matter, can NAW plausibly argue that there is a "compelling need for national uniformity," *see id.* at 379 n.2 (majority opinion), such that the Act (and every similar law imposing costs on packaging producers) should be struck down under *Pike*; it is possible for producers to comply with the Act and with packaging regulations in other jurisdictions. *See Nat'l Pork Producers Council v. Ross* (*Pork Producers I*), 6 F.4th 1021, 1031-32 and n.3 (9th Cir. 2021) (rejecting plaintiff's claim that law "pose[d] a risk of inconsistent regulations that undermine[d] a compelling need for national uniformity" under *Tracy*, reasoning that because compliance with different sets of regulations was possible, the regulations were not in conflict (quotation marks omitted)), *aff'd* 598 U.S. 356; *see also Pork*

---

businesses that are direct competitors to in-state businesses. *See* Pl.'s Mot. for Prelim. Inj. at 23-25 (ECF 33); Pl's Reply in Supp. of Mot. for Prelim. Inj. at 23-29 (ECF 29); Pl's Opp'n to Mot. to Dismiss at 23-25 (ECF 68).

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 14

*Producers II*, 598 U.S. at 364 ("Companies that choose to sell products in various States must normally comply with the laws of those various States."). That is so even if the Act imposes "burdensome regulations" that "interfere[] with the natural functioning of the interstate market." *See Exxon*, 437 U.S. at 127.

Concurring in part and dissenting in part in *Pork Producers*, Chief Justice Roberts identified a third category of cases: one in which the Supreme Court had "applied *Pike* to invalidate nondiscriminatory state laws that do not concern transportation." 598 U.S. at 396 (Roberts, C.J., concurring in part and dissenting in part). But even if the Supreme Court has not closed the door to such cases, they are rare. Chief Justice Roberts could identify only one such case: *Edgar v. MITE Corp.*, 457 U.S. 624 (1982). *Id.* Justice Sotomayor could do no better. *Id.* at 392 (Sotomayor, J., concurring in part) (citing *Edgar*).

For some courts, including the Ninth Circuit, a determination that a *Pike* claim "falls well outside *Pike*'s heartland" may alone be dispositive. *See Triumph Foods, LLC v. Campbell*, 156 F.4th 29, 50 (1st Cir. 2025) ("follow[ing] the rationale" of *Pork Producers*, rejecting *Pike* claim after finding that the law at issue " 'f[ell] well outside *Pike*'s heartland' " (quoting *Pork Producers*)); *see also Pac. Nw. Venison Producers v. Smith*, 20 F.3d 1008, 1015 (9th Cir. 1994) (laws that burden interstate commerce but do not promote Balkanization "arguably are not subject to invalidation" under *Pike* (noting circuit split favoring this approach)); *Am. Fuel & Petrochemical Mfrs. v. O'Keeffe*, 903 F.3d 903, 910 (9th Cir. 2018) (noting the dormant Commerce Clause "is driven by concern about economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." (quotation marks omitted)).

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 15

In any event, the Act is a far cry from the state law at issue in *Edgar*—again, seemingly the only case in which the Supreme Court has found a nondiscriminatory statute to violate the dormant Commerce Clause under *Pike*. In fact, *Edgar* provides a helpful counterpoint that illuminates why this Court should decline NAW's invitation to invalidate the Act under *Pike*. *Edgar* involved a far-reaching Illinois law that regulated corporate takeovers—specifically, tender offers (i.e., publicly made invitations to a corporation's shareholders to tender their shares for sale at a specified price). 457 U.S. at 626-30, 626 n.1. The law regulated takeovers not only of Illinois corporations, but also of any corporation for which 10% of the outstanding shares were held by Illinois residents. *Id.* at 627. Under the law, tender offers related to such corporations were subject to review and potential denial by the state. *Id.* As the Court explained, the law was one of "nationwide reach [that] puport[ed] to give Illinois the power to determine whether a tender offer may proceed anywhere." *Id.* at 643.[20] In contrast, the Act involves no similar, far-reaching restriction on nationwide activities with such a limited nexus to the state. *Cf. id.* at 644 ("[T]he state has no legitimate interest in protecting nonresident shareholders.").

*Edgar* is distinguishable in a second respect. There, the Supreme Court found the state's assertions about the law's local benefits to be highly dubious—at best. *See id.* at 644 (noting loophole in law for corporations' own stock buybacks was "at variance with Illinois' asserted legislative purpose"); *id.* at 645 (finding state's asserted interest in regulating corporations incorporated under the state's laws "incredible"). In this case, however, NAW cannot point to any similar basis for giving the hairy eyeball to Oregon's asserted interests in enacting the Act.

---

[20] A four-justice plurality concluded that the law was invalid on the sole ground that it "purport[ed] to regulate directly and to interdict interstate commerce, including commerce wholly outside the State." *Edgar*, 457 U.S. at 643 (plurality opinion).

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 16

In any event, even if this Court concludes that the door is open for NAW to assert a *Pike* claim here despite the Act's absence of an express or hidden discriminatory purpose, that claim fails. As discussed, the Supreme Court has imposed a strong presumption against invalidating any state laws under the dormant Commerce Clause—and an even stronger presumption against invalidating state laws that involve waste disposal. *Pork Producers II*, 598 U.S. at 380, 390; *United Haulers*, 550 U.S. at 344. Even absent these presumptions, NAW cannot demonstrate a "substantial burden" to the flow of interstate commerce. *See Pharm. Rsch.*, 768 F.3d at 1044-45. And even if NAW clears that hurdle, that burden is not "clearly excessive" in relation to the Act's demonstrated and anticipated local benefits. *See Flynt*, 131 F.4th at 932. The brief outlines those benefits below.

**B.  The Act provides significant local benefits cognizable under *Pike*.**

Under *Pike*, a state receives a strong presumption of local benefit: the Court need only find that a law's claimed benefits are not "illusory." *See id.* at 931 ("Unless the benefits of the state's law are illusory, courts typically accept the state's articulation of the law's claimed benefits." (cleaned up)). Moreover, as the Ninth Circuit has explained, "if the state produces *some* evidence showing the purported benefits exist, [the benefits of a] challenged statute will not be considered illusory even if there is strong countervailing evidence." *Optometrists*, 682 F.3d at 1156 n.17 (emphasis added) (citing *CTS Corp.*).

Courts have recognized a broad set of relevant local benefits cognizable under *Pike*. These include revenue that is generated to finance waste disposal services, increased financial returns to in-state industries, and increased recycling rates and attendant environmental benefits. *See Pharm. Rsch.*, 768 F.3d at 1045-46 ("[E]ven if the Ordinance did nothing other than save the county money, that is not equivalent to 'no public benefit.'" (citing *United Haulers* plurality opinion recognizing local benefit of providing financing for waste disposal services)); *Pike*, 397

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 17

U.S. at 143 (state law that seeks to "maximiz[e] the financial return to an industry within [the state]" promotes a cognizable local interest); *United Haulers*, 550 U.S. at 346-47 (four-justice plurality recognizing local benefits of revenue generation, increased recycling, and environmental benefits); *id.* at 368 (three-justice dissent similarly acknowledging "legitimate goals" served by challenged ordinances, including revenue generation and environmental benefits); *see also O'Keeffe*, 903 F.3d at 916 (recognizing "substantial state interest" in mitigating greenhouse gas-related environmental effects (quoting *Clover Leaf*)).

The Act was designed to achieve a range of local benefits in Oregon. It increases recycling rates, reduces waste disposal and reliance on landfills, generates revenue for investment in Oregon recycling infrastructure, stabilizes prices for Oregon ratepayers, and produces a broad set of additional environmental and public health benefits. These benefits reinforce one another—increased recycling rates reduce reliance on landfills, and investment in recycling infrastructure stabilize supply chains and material streams, increasing the quantity and quality of bales which in turn increases recycling rates and revenue for the recycling system. These are all local benefits cognizable under *Pike*, and they materialize through successful policy design that supports an effective and functional recycling system. NAW's assertion that the Act's benefits are nothing more than "speculative or marginal reductions to in-state waste," Am. Compl. at 20 ¶ 72, fails under basic scrutiny. Rather, the state's demonstrated and anticipated local benefits far outweigh any burden to the flow of interstate commerce contemplated under *Pike*. What's more, these benefits are all related to waste disposal—a "local government function" with which courts should be "particularly hesitant" to interfere in the name of the dormant Commerce Clause. *United Haulers*, 550 U.S. at 344 (quotation marks omitted).

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 18

1.  **The Act increases recycling rates while reducing waste disposal and reliance on landfills, resulting in a range of environmental and economic benefits.**

As discussed in Part III, the Oregon Legislature designed the Act to address a measured decline in recycling rates over the preceding years. In particular, the Legislature found that Oregon's statewide material recovery rate had declined each year between 2013 and 2018 and that the state was "not on track to meet the statewide waste recovery and generation goals" it had set for both plastic and non-plastic packaging. *See* ORS § 459A.860(1). There are many possible interventions that could increase recycling rates. As discussed above, The Recycling Partnership has identified five Functional Requirements with a demonstrated positive impact on recycling rates: (1) packaging must be recyclable; (2) households need access to recycling from their home; (3) residents need to fully engage in recycling; (4) recycling facilities need to effectively process material; and (5) recycling facilities need sufficient end markets for recycled materials. The Act contains several interventions that directly support these conditions. The increased recycling that results provides a range of local benefits to Oregon.

a.  **The Act's fee structure incentivizes packaging changes that improve recyclability and reduce costs to the recycling system.**

Consistent with the first Functional Requirement, packaging materials must be compatible with local recycling infrastructure for the material to be successfully recycled. Designing for recyclability means that companies must ensure that package components and constituents do not introduce contaminants into the recycling process. Contaminants, which may include labels, lids, additives, liners, differentiated material layers, and other non-recyclable materials can reduce the value of recycled material bales. Depending on the ease of removal, they may result in labor costs to remove those contaminants, decrease the amount of viable recyclable materials available for processing, and can even reduce the performance of recycled content. Many industry guides, such as the Consumer Goods Forum Golden Design Rules

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 19

(among others),[21] help brands understand how to design packaging for recyclability, However, these guides are just that—guides; they do impose tangible financial incentives and disincentives to spur meaningful evolution in packaging design. EPR programs, however, can achieve those outcomes through fee structures that incentivize recyclability.

The Act's fee structure contains several mechanisms to increase packaging recyclability. The Act explicitly requires the selected PRO to set higher fees for nonrecyclable covered materials than for recyclable covered materials. ORS § 459A.884(3). Further, the Act mandates a fee structure that will "offer[] fee adjustments to producers that make or have made changes to the ways in which they produce, use and market covered products," thereby "continually reduc[ing] the environmental and human health impacts of [packaging waste]." ORS § 459A.884(4).

The Act's fee structure mandates packaging changes that have been proven to achieve those goals.  Examples from the Golden Design Rules include packaging changes that improve sortability (such as the removal of black plastic that is not detected by traditional optical sorters), reduce contamination from labels and liners, increase the use of recyclable materials, and increase the use of mono-materials, which are more easily recycled. Each of these changes have been proven to improve recycling rates. They have also been shown to ultimately reduce costs to the recycling system through higher material revenues, lower collection and sorting costs, and better recycling yields. Producers may choose not to redesign their packaging, but the fee structure outlined in the Act incentivizes producers to use packaging that incorporates the sort of

---

[21] The CONSUMER GOODS F., GOLDEN DESIGN RULES (2022), https://perma.cc/BE59-SRRE; *see also, e.g.*, ASS'N OF PLASTIC RECYCLERS, APR DESIGN GUIDE, https://plasticsrecycling.org/apr-design-hub/apr-design-guide-overview/ (last visited June 26, 2026) (interactive guide).

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 20

packaging changes discussed above and is therefore considered more recyclable by DEQ. In short, the Act's fee structure incentivizes the transition to more recyclable packaging, thereby increasing recycling rates and, at the same time, reducing costs to the recycling system.[22]

### b. The Act funds education demonstrated to decrease contamination of recycled material.

Material will not be recycled without resident participation in the recycling system. However, that participation must align with the capability of that system. When residents place nonrecyclable materials out for collection it can create significant costs for the recycling system. Because contamination in the form of nonrecyclable materials decrease the value of recycled materials later processed by CRPFs, contaminants must be sorted out by CRPFs—at a cost. Contaminants in the form of nonrecyclable materials therefore decrease the overall profitability of the recyclable material collected alongside the nonrecyclable material. At the same time, the weight and volume of non-recyclable material increases transportation costs. The contaminants interfere with Functional Requirements four and five, as recycling facilities can no longer effectively process collected material, and end markets are less interested in contaminated outputs.

Proper resident education can reduce contamination. The Recycling Partnership's grantmaking efforts demonstrate the power of anticontamination educational programming. For example, a targeted contamination education program in Orange County, Florida, helped

---

[22] *Cf.* Frithjof Laubinger et al., *Modulated fees for Extended Producer Responsibility schemes (EPR)* 3.2 (OECD Env't, Working Paper No. 184, 2021), https://dx.doi.org/10.1787/2a42f54b-en (presenting early evidence from France's EPR program showing decreases in disruptive packaging where high fees target that packaging, and noting increases in producers applying for bonuses indicating improved packaging practices).

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 21

decrease the county's contamination rate by 29%.[23] That, in turn, increased truckloads of recyclable material sent to the county's collection and sorting facilities by tenfold.[24] Similarly, The Recycling Partnership's engagement with over 200 communities in Michigan, which included data-driven education on contamination reduction, has helped increase the state's recycling rate from 14% to 25% over a six-year period.[25]

The Act's drafters were aware of the link between contamination rates and education. Oregon DEQ data demonstrated an increase in contamination rates over the years leading up to the Act.[26] In light of this trend, the Act requires the PRO to develop comprehensive educational programming, ORS § 459A.893, and provide per capita funding for contamination reduction to each community, ORS § 459A.890(4)(b). That education programming has begun. Since the program has launched, CAA has printed 410,000 pieces of educational material in Oregon and launched a statewide recycling education campaign, RecycleOn.[27] The RecycleOn campaign includes radio and TV ads, and translation of educational materials into more than ten languages.[28] The Act has also funded contamination reduction education efforts between The Recycling Partnership, the City of Portland, and Deschutes County.[29] Experience in other states

---

[23] The Recycling P'ship, *Improving the Quality of Recyclables in Orange County – Case Study* (June 15, 2022), https://perma.cc/F8BT-KKQC.

[24] *Id.* In Florida CRPFs are known as "material recovery facilities" (or MRFs).

[25] The Recycling P'ship, *Scaled Action to Increase Recycling Rates Across the U.S.*, https://perma.cc/6JC3-2M9H.

[26] Or. Dep't of Env't Quality, *Fact Sheet: Composition of Inbound Comingled Recycling* (2024), https://perma.cc/GWJ8-JQGP.

[27] RecycleOn Oregon Homepage, https://perma.cc/V8BK-APKP.

[28] *Id.*

[29] Press Release, Deschutes County, *Deschutes County Solid Waste launches program to help reduce recycling contamination* (May 13, 2026), https://perma.cc/LX25-3D2T; The

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 22

has demonstrated that the decreased contamination and increased resident awareness that has resulted and will continue to result from these efforts will increase rates of recycling in each of these jurisdictions.

### c. The Act reduces waste disposal and reliance on landfills.

Recycling diverts waste from other potential disposal pathways, including landfills, incinerators, and litter, resulting in local environmental and economic benefits.[30] The increase in the amount of recyclable materials collected, sorted, and processed for reuse spurs a parallel decrease in wasteful, costly, and environmentally harmful disposal methods such as landfilling. As discussed in Part III, Oregon's waste management regulations have long been motivated by a perceived shortage of landfill space in the state.[31] The Act's drafters wisely focused on recycling as a tool to divert waste away from landfills and understood that diversion as a local benefit.

Diverting materials towards the recycling system and away from landfills promotes a range of well-documented benefits. These include environmental benefits, such as reductions in air and water pollution and greenhouse gas emissions;[32] economic benefits for local governments in the form of reduced waste disposal costs; and avoided economic harms to property owners

---

Recycling P'ship, *The Recycling Partnership Builds a Roadmap for Cleaner Recycling in Portland* (2025), https://perma.cc/SM5Q-RBCN.

[30] EPA, *Sustainable Materials Management: Non-Hazardous Materials and Waste Management Hierarchy* (Dec. 19, 2025), https://perma.cc/JWK8-MCGT.

[31] SANDY THIELE-CIRKA, OR. STATE LEGIS. COMM. SERVS., BACKGROUND BRIEF ON RECYCLING (Nov. 2006), https://perma.cc/CA2W-8SYD.

[32] On greenhouse gas emissions in particular, U.S. EPA estimated that recycling 1 ton of paper prevents the release of 1 metric ton of carbon equivalent greenhouse gas emissions. *See* U.S. EPA, *Common Wastes & Materials – Paper Recycling* (Feb. 21, 2016), https://perma.cc/8PUG-TFT9.

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 23

who face property value reductions from landfill siting.[33] Economic benefits also inure to

Oregon households as a result of reduced reliance on landfilling as a waste disposal strategy—a

major cost center for ratepayers who fund those landfill fees. Unlike recycling, there is no

potential to recoup costs of landfilling through resale of landfilled materials. The Act implements

a comprehensive waste disposal policy that promotes recycling while decreasing the

unrecoverable expenses of landfilling.

    2.   **The Act generates revenue for investment in Oregon recycling infrastructure.**

Consistent with the second Functional Requirement, all households need access to

recycling pickup, or drop-off sites, for material to be collected. Without access to either curbside

pickup or a drop-off location, recycling is simply not possible. Only an estimated 66% of Oregon

households recycle.[34] The Recycling Partnership's experience in other states has demonstrated

that the key to increasing that figure is expanded access.[35] While any increase in access can

improve recycling system performance, The Recycling Partnership has found through its

grantmaking that certain types of access are more effective than others. Data from programs

funded by these grants indicates that implementing curbside collection increases recycling

collection by 243 pounds/household/year; the transition from drop-off to curbside collection

increases recycling collection by 229 pounds/household/year; the transition from bins to carts

---

[33] The Recycling P'ship, *The Hidden Cost of Landfilling vs. Recycling* (Jan. 23, 2023), https://perma.cc/LFN3-SZHF.

[34] THE RECYCLING P'SHIP, STATE OF RECYCLING: THE PRESENT AND FUTURE OF RESIDENTIAL RECYCLING IN THE U.S. 16 (2024), https://perma.cc/CJ8F-XZWQ.

[35] The Recycling P'ship, *Scaled Action to Increase Recycling Rates Across the U.S.*, https://perma.cc/6JC3-2M9H.

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 24

increases recycling collection by 81 pounds/household/year; and subscriptions to universal collection increases recycling collection by 249 pounds/household/year.[36]

Consistent with those findings, the Act directly spurs the types of investments that increase recycling access and, therefore, recycling rates. Key to these investments are the Act's provisions governing the collection of fees from producers. ORS § 459A.869(2). These funds are then deployed for a comprehensive set of recycling program expansions—including those that promote access. The Act requires that the PRO invest in local collection infrastructure and transportation, as well as existing and new depots for collection of recyclables. ORS §§ 459A.890(1), 459A.896(1). CAA budgeted for $38.3 million in pre-program and 2025 investments in local government collection service expansion, transportation, and depots—and it plans to expand those investments to $92.1 million in FY2026 and $125.2 million in FY2027.[37] These recycling system expansion investments are already taking effect. With funds collected under the Act, Communities including Baker City,[38] The Dalles,[39] Roseburg,[40] Boardman, Hermiston, and Umatilla[41] have each expanded or introduced new recycling collection infrastructure. In all, over 70,500 new recycling carts have been provided to Oregon

---

[36] These increases are based on internal The Recycling Partnership data.

[37] CAA, OREGON PROGRAM PLAN (2025 – 2027) at 299, https://perma.cc/UX8M-GGZZ.

[38] Press Release, CAA, *Baker City Launches Curbside Recycling with Producer-Funded Investment* (May 22, 2026), https://perma.cc/WD4Y-WCE9.

[39] Press Release, CAA, *The Dalles Becomes the First Oregon Community to Expand Curbside Recycling Service with Producer-Funded Investment* (Apr. 10, 2026), https://perma.cc/T9Q8-Y7EE.

[40] Press Release, CAA, *Roseburg Disposal to Roll Out 10,000+ New Recycling Carts Starting in April* (Apr. 10, 2026), https://perma.cc/Q7KB-ZVLK.

[41] Press Release, CAA, *Producer Investment Expands Recycling Access for 10,000 Households in Eastern Oregon* (June 22, 2026), https://perma.cc/N53U-NW7B.

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 25

communities.[42] Based on the data described above, these investments will dramatically expand and improve access to recycling. That access will unlock significant local benefits in the form of increased recycling rates, greater diversion of waste from landfills, and the additional attendant benefits discussed below.

###    3.    The Act stabilizes and decreases recycling costs for Oregon ratepayers.

End markets like paper mills, metal smelters, glass beneficiation plants, and plastic reclaimers play a critical role in the recycling system. These end markets not only process material for reuse—they also serve as a critical source of revenue for the recycling system when they purchase commodity materials. This importance of end markets to Oregon specifically came into focus in the wake of China's National Sword policy (which, as explained above, banned the import to China of any bales of material with contamination rates above certain thresholds). As described above, Oregon's recycling system is particularly prone to passing cost increases or revenue shortfalls to ratepayers (households) left to fund the mandatory recycling system in the absence of robust end markets. For that reason, the Legislature made it a priority to "protect ratepayers from cost increases associated with the volatility of commodity markets." ORS § 459A.923(2).[43]

The Act stabilizes collection prices for ratepayers through three primary mechanisms. First, it generates revenue from producers through fees that directly reimburse municipalities for collection and transportation costs. ORS § 459A.890. Second, it directs the PRO to pay CRPFs a Processor Commodity Risk Fee based on the average costs to process recyclable materials by the

---

[42] This estimate aggregates the announced investments, including those discussed above.
[43] *See also* OR. RECYCLING STEERING COMM., PROCESS REPORT 4 (Sep. 2020), https://perma.cc/D3C2-8QN5 (providing that one goal of further recycling reform was to create a resource "recovery system that is strong and resilient to changes in supply and demand").

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 26

facility. ORS § 459A.923. The Act directs the Oregon Environmental Quality Commission to calculate this fee specifically to "reduce the financial impacts on ratepayers" and "protect ratepayers from cost increases associated with the volatility of commodity markets." *Id.* Third, the Act requires the PRO to pay CRPFs a Contamination Reduction Fee. ORS § 459A.920. This fee supports investments by CRPFs in their infrastructure capacity, particularly to remove and dispose of contaminants from recycled materials. Those investments are all directed at the core function of the CRPF: the sorting and sale of recyclable materials. Put simply, the Processor Commodity Risk Fee and Contamination Reduction Fee prevent CRPFs from passing costs downstream to ratepayers—a particular concern in a volatile commodity market when sudden revenue losses could not otherwise be sustained.[44]

Improvements in CRPF operations funded by these fees insulate ratepayers from commodity market fluctuations for a second reason: they increase the volume of potential sales to end markets. The operational success of a CRPF can be measured through its "capture rate"— the proportion of a recyclable material entering a facility that is successfully sorted and shipped to an end market. Data collected by Oregon DEQ prior to implementation of the Act documented sustained declines in capture rates for CRPFs in Oregon.[45] Through its grantmaking activity, The Recycling Partnership has observed the success that infrastructure investments like those enabled by the Act can make in improving capture rates. For example, polypropylene recycling facilities that received grants to invest in material sorting infrastructure were able to double their capture

---

[44] The investment in new recycling infrastructure and technologies will create a supply of high-quality recycled materials at prices that carry a small premium over virgin plastics. The Act includes provisions that will drive additional demand for those materials in the form of so-called "eco-modulated" EPR producers fees based on the amount of recycled in supplied packaging. ORS § 459A.884(4)(a). This policy will help spur sustained ongoing demand for recycled inputs.

[45] Or. Dep't of Env't Quality, *Fact Sheet: Composition of Outbound Comingled Recycling* (2024), https://perma.cc/3JNH-QW92.

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 27

rates.[46] In other jurisdictions where EPR programs have spurred both private and PRO investment in similar infrastructure, similar benefits have materialized.[47] The same process is underway in Oregon. Waste Management, the largest recycler in North America, recently opened a state-of-the-art CRPF in Portland Metro, citing the Act as a key consideration in the investment.[48] These investments in capacity to sort and remove contamination, which promote end-market use of material that would otherwise end up landfilled or incinerated, protect ratepayers through this improved revenue stream.

### 4. The Act produces other environmental and public health benefits.

Finally, the Act continues a half-century effort in Oregon to deliver environmental and public health benefits through increased recycling. The Act was intended to broadly "preserve public health, safety and welfare and conserve energy and natural resources," ORS § 459A.860(1), and address the "deterioration of natural systems regionally." ORS § 459A.860(2). This intent extends from the initial diversion from landfill, as discussed above, to the selection of end markets. The Act requires that CRPFs and the PRO work to ensure that

---

[46] These increases are based on internal The Recycling Partnership data.

[47] One example is Quebec. Following the province's recent adoption of a more robust EPR program, it has seen the procurement of two state-of-the-art primary sorting facilities, *see* Press Release, Éco Entreprises Québec, *A New Materials Recycling Sorting Centre to Be Built for the Eastern Townships in 2028* (Oct. 30, 2024), https://perma.cc/FF5C-GYRN; Press Release, Éco Entreprises Québec, *Change is on the way - Éco Entreprises Québec mandates Matrec – GFL for the construction and operation of a new sorting centre to serve the east end of Montreal* (May 8, 2023), https://perma.cc/UD6D-VFFV; and major upgrades to four existing primary sorting facilities and upgrades to fifteen other existing sorting facilities, *see* Eco Entreprises Québec, 2025 Review on the Modernized Curbside Recycling System (Feb. 2026), https://perma.cc/DT5E-4P4J.

[48] *See* Waste Mgmt., *WM Portland Recycling Facility* (Aug. 2025), https://perma.cc/ER9A-E4PP ("Now, as the state modernizes its recycling system in far-reaching ways, W[aste] M[anagement]'s high tech facility is helping accelerate implementation of the state's new system under the Recycling Modernization Act.").

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 28

recycled materials are sent to "responsible end markets" where "recycling or recovery of materials or the disposal of contaminants is conducted in a way that benefits the environment and minimizes risks to public health and worker health and safety." ORS § 459A.863(29). These requirements apply to end-markets located in Oregon.

The Act's mechanisms that increase recycling and decrease reliance on landfills together have a measurable impact on natural resource use and the quality of the local environment. The production of recycled materials takes significantly less energy than production of new materials.[49] The impact of increased recycling on local energy use can be significant. Further, landfills can result in a wide range of environmental and public health harms to local communities. The environmental, public health, and quality-of-life issues associated with landfilling—including increased industrial traffic, litter, odors, and air pollution—have contributed to well-documented local disputes in Oregon.[50] Increased recycling rates will mean reduced harms, and fewer disputes.

## VI. CONCLUSION

For all the above reasons, this Court should reject NAW's dormant Commerce Clause challenge to Oregon's Plastic Pollution and Recycling Modernization Act.

---

[49] For example, the U.S. EPA's waste reduction model projects that recycling just 10 plastic bottles saves enough energy to power a laptop for more than 25 hours. *See* Am. Geosciences Inst., *How does recycling save energy?*, https://perma.cc/AB9S-DXJE.

[50] Jaclyn Moyer, *Where the Garbage Goes*, HIGH COUNTRY NEWS (June 1, 2025), https://www.hcn.org/issues/57-6/where-the-garbage-goes/.

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 29

Dated: June 30, 2026

s/ Victor Y. Xu
Victor Y. Xu, Oregon State Bar No. 223323
vxu@martenlaw.com
Marten Law LLP
1050 SW 6th Ave, Suite 2150
Portland, OR 97204-1158
Phone: 503.241.2641

s/ James B. Pollack
James B. Pollack (*pro hac vice*)
jpollack@martenlaw.com
Marten Law LLP
920 5th Ave, Suite 2700
Seattle, WA 98104-1189
Phone: 206.292.2600

Attorneys for *Amicus Curiae*
The Recycling Partnership, Inc.

AMICUS BRIEF OF THE
RECYCLING PARTNERSHIP, INC. - 30