Steven Wilker, OSB No. 911882
  Direct:  503.802.2040
  Email:  steven.wilker@tonkon.com
Maureen S. Bayer, OSB No. 214905
  Direct:  503.802.2115
  Email:  maureen.bayer@tonkon.com
Tonkon Torp LLP
1300 SW Fifth Ave., Suite 2400
Portland, OR 97201
Facsimile:  503.274.8779

    Attorneys for Oregon Business and Industry Association, Northwest Grocery
    Association, and Food Northwest

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

(PORTLAND DIVISION)

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS,<br><br>Plaintiff,<br><br>v.<br><br>LEAH FELDON, DIRECTOR, OREGON DEPARTMENT OF ENVIRONMENTAL QUALITY, in her official capacity,<br><br>Defendant. | Civil No. 3:25-cv-01334-SI<br><br>**AMICI CURIAE BRIEF OF OREGON BUSINESS AND INDUSTRY ASSOCIATION, NORTHWEST GROCERY RETAIL ASSOCIATION, AND FOOD NORTHWEST** |

AMICI CURIAE BRIEF OF OREGON BUSINESS AND INDUSTRY ASSOCIATION,
NORTHWEST GROCERY RETAIL ASSOCIATION, AND FOOD NORTHWEST

**TABLE OF CONTENTS**

INTEREST OF AMICI CURIAE..................................................................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ...................................................2

ARGUMENT................................................................................................................................3

    I.      THE ACT VIOLATES THE DORMANT COMMERCE CLAUSE......................3

           A.     The Act Fails the Pike Balancing Test, and Therefore Imposes
                  Excessive Burdens on Interstate Commerce.................................................3

                1.       The Burdens the Act Imposes are Excessive .......................................... 3

                2.       Local Benefits Under the Act are Minimal in Relation to the
                      Excessive Burdens ................................................................................. 6

           B.     The Act Discriminates against Interstate Commerce.................................8

                  1.       The Act Constitutes an Impermissible Tax/Tariff to Fund an In-
                      State Program...................................................................................... 8

                  2.       Risk of Double Counting/Inability to Follow the Sales—
                      Uniquely an Interstate Problem that those Operating Solely In-
                      State Do Not Face............................................................................... 9

                  3.       Packaging Cannot be Easily Modified to Conform to Different
                      States' Requirements ......................................................................... 11

    II.     THE ACT VIOLATES THE DUE PROCESS CLAUSE BY
           UNLAWFULLY DELEGATING REGULATORY AUTHORITY.....................12

CONCLUSION...........................................................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Comptroller of Treasury of Md.v. Wynne,*
   575 U.S. 542 (2015)...........................................................................................................9

*K.W. ex rel. D.W. v. Armstrong,*
   298 F.R.D. 479 (D. Idaho 2014), aff'd 789 F.3d 962 (9th Cir. 2015) ....................................14

*Eubank v. City of Richmond,*
   226 U.S. 137 (1912)..........................................................................................12, 13, 14

*F.C.C. v. Fox Television Stations,*
   567 U.S. 239 (2012)......................................................................................................13

*Flynt v. Bonta,*
   131 F.4th 918 (9th Cir. 2025) ...........................................................................................8

*Goldberg v. Kelly,*
   397 U.S. 254 (1970).................................................................................................14, 15

*Pike v. Bruce Church, Inc.,*
   397 U.S. 137 (1970).........................................................................................................3

*Rocky Mountain Farmers Union v. Corey,*
   730 F.3d 1070 (9th Cir. 2013) ...........................................................................................8

**Statutes**

ORS 459A.866(1)(a)............................................................................................................8

Producers under Oregon's Plastic Pollution and Recycling Modernization Act............................1

**Other Authorities**

U.S. Const. art. I § 8, cl. 3....................................................................................................3

**INTEREST OF AMICI CURIAE**

Oregon Business and Industry Association ("OBI") is a Salem-based business advocacy group founded in 2017 when Associated Oregon Industries and the Oregon Business association merged. OBI's mission is to strengthen Oregon's economy to achieve a healthy, prosperous, competitive state for the benefit of present and future generations. OBI has approximately 1,600 members across every region in Oregon. Members are businesses of every size and represent virtually every industry and sector, employing more than 250,000 Oregonians. OBI is the Oregon affiliate of the National Association of Manufacturers and the National Retail Federation.

Northwest Grocery Retail Association ("NWGRA") is a trade organization that advocates for grocery, retail and food suppliers in the Pacific Northwest, representing Washington, Oregon and Idaho. Collectively, NWGRA members employ more than 122,000 people at nearly 1,000 locations. NWGRA members have over 409 retail locations in Oregon employing over 44,100 people.  NWGRA represents a diverse membership of chain and independent grocers, grocery vendors and suppliers, and delivery partners. NWGRA's mission is to advocate state and local legislatures on issues that impact the grocery industry in the Pacific Northwest.

Food Northwest is a 501(c)(6) nonprofit trade organization representing the interests of food manufactures and related companies in Oregon, Idaho and Washington. Food Northwest advocates for the Pacific Northwest food industry's ability to produce and deliver safe, wholesome food. Its membership includes over 60 food manufacturing companies and subsidiaries and over 140 companies that supply products or services to food manufacturers.

A significant number of Amici members are obligated Producers under Oregon's Plastic Pollution and Recycling Modernization Act ("the Act") and regulations promulgated thereunder. As Producers under the Act, as that term is defined in the Act, Amici members are subject to all of the same obligations as Plaintiff's members, including registering with Circular Action Alliance ("CAA") as the sole approved Producer Responsibility Organization ("PRO"), calculating and reporting the weights of all packaging sold into Oregon, and paying fees based

PAGE 1 –    AMICI CURIAE BRIEF OF OREGON BUSINESS AND INDUSTRY
ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
NORTHWEST

on material specific rates and environmental impact modifiers. In support of their missions and obligations to their members, all three organizations have advocated in the Oregon legislature for sensible amendments to the Act to lessen the extreme burdens on businesses operating in Oregon. In addition, OBI and NWGRA have petitioned the Oregon Department of Environmental Quality ("DEQ") to delay enactment of the program in order to give its members additional time to gather the required data.

Like Plaintiff's members, Amici members play a critical role in the supply and movement of goods nationwide and in Oregon. The Act subjects Amici members to significant compliance obligations, even though they frequently have little or no control over the design or composition of the packaging they distribute, let alone where its products are sold.  As a result, they are required to assume financial and logistical responsibilities that do not correspond to their role in the product life cycle. As "Producers," under the Act, Amici members are subject to all of the same obligations and harm as Plaintiff's members.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The Act is an attempt by Oregon to revamp the state's recycling program and shift the costs for recycling away from municipalities and onto businesses by way of an extended producer responsibility ("EPR") program for packaging. While its intentions are admirable, the Act on its face and as implemented creates impermissible barriers to interstate commerce violating the dormant Commerce Clause. The Act also violates due process by impermissibly delegating regulatory power to a private entity, and by stripping regulated entities of the right to be heard. Amici are similarly situated to Plaintiff and come before the Court to ask that the Act and all implementation regulations be deemed unconstitutional.

/ / /

/ / /

/ / /

/ / /

PAGE 2 –    AMICI CURIAE BRIEF OF OREGON BUSINESS AND INDUSTRY
ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
NORTHWEST

## ARGUMENT

## I.   THE ACT VIOLATES THE DORMANT COMMERCE CLAUSE

The dormant Commerce Clause prohibits state laws that unduly restrict interstate commerce, even if there is no conflicting governing statute. U.S. Const. art. I § 8, cl. 3. Under the dormant Commerce Clause, state laws 1) may not impose undue burdens on interstate commerce, and 2) may not discriminate against interstate commerce.  The Act does both, and as such it violates the dormant Commerce Clause.

### A.   The Act Fails the Pike Balancing Test, and Therefore Imposes Excessive Burdens on Interstate Commerce

Courts use a two-pronged test to assess whether a law unduly burdens interstate commerce. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  To pass the *Pike* test, a state law first must have "legitimate local public interest and its effects on interstate commerce must be only incidental." *Id.* Second, courts will strike down the statute if the "burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.* The Act fails the *Pike* balancing test because it imposes substantial burdens on interstate commerce that are "clearly excessive in relation to the putative local benefits." *Id.*

#### 1.   The Burdens the Act Imposes are Excessive

##### i.   Fees Under the Act Are Excessive and Unpredictable.

The Act's fee structure burdens Amici members selling products in interstate commerce. Members of Amici report having received invoices from CAA for exorbitant fees that they have no way of budgeting for due to their retroactive nature. Fees charged by CAA under the Act for 2024 were invoiced in July 2025, and CAA did not provide the 2025 fee schedule until June 2025. Likewise, fees in 2026 are based on packaging sold into Oregon in 2025. This retrospective approach makes it nearly impossible for Producers to budget for fees charged under the Act and project economic impacts accurately.

PAGE 3 –   AMICI CURIAE BRIEF OF OREGON BUSINESS AND INDUSTRY ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD NORTHWEST

As Plaintiff has pointed out, "[t]he retrospective and nontransparent nature of the fee structure also makes it impossible to predict what the fees will be or to account for them in sales." Dkt. 33 at 18. For example, members of the California Strawberry Commission, which is a member of NWGRA, lack visibility into future sales, particularly due to the extreme volatility in the strawberry market which bears upon climate and weather factors. This makes it impossible to project economic impacts accurately.

A member of NWGRA reported that EPR-related fees for one product were greater than twice the typical profit margin for that product.  Another NWGRA member reported several dozen items where the EPR fee exceeded the profit margin at a customer level, and among those products, the EPR fee caused the profit margins to be negative.

Further, certain members of the California Strawberry Commission are obligated producers under the Act. Strawberries are packed into clamshells made of recycled plastic on the farm where they are grown, then transported to a "cooler" before being transported by truck all over the country within 48-hours. The costs to package, cool, transport, market, and sell strawberries are deducted from what the farmers receive for the sale of the strawberries. The fees under the Act are now also deducted from that amount, leaving farmers with virtually no return for the sale of the strawberries that they grow. This is a clear demonstration of a burden so excessive that it could discourage sales into the State of Oregon.

The exorbitant and burdensome fees will continue if the Act is upheld; DEQ states that "those unreasonable fees will continue to apply in most cases, but nearly half of the categories will see *significant* increases of 25% [or] more," Dkt. 33 at 17 (emphasis in original), which impacts all producers. Moreover, DEQ appears not to care the authority it has delegated to CAA may cause irreparable harm, stating in the hearing on Plaintiff's Motion for Preliminary Injunction, "[i]f the fees are more expensive than the profit margins, then that's just the reality of the situation." Dkt, 112-1, Exhibit A at 45:5-9.

PAGE 4 –    AMICI CURIAE BRIEF OF OREGON BUSINESS AND INDUSTRY ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD NORTHWEST

Burdens include pressure on employees to identify their company's compliance and fee obligations under the program. Meanwhile neither DEQ nor CAA would or could answer questions about business-to-business exemptions, material classifications, the possibility of double counting materials, and other programmatic details. Interpretations of category types in the program make a material difference in the fees owed. These distinctions can mean a difference of hundreds of thousands of dollars per year. The fee assessment was not disclosed early enough to allow companies to estimate or budget for the fees, putting cost pressure on companies' mid-budget cycle. CAA did not provide adequate mechanisms for late-registering companies to get into the program and "make good" on their fees and therefore left the full costs of the program on the shoulders of those companies that did register and pay timely.

### ii.    The Burden on Producers to Collect Data Under the Act is Excessive.

Calculating and reporting the weights of all packaging sold into Oregon, and paying fees based on material specific rates has resulted in extreme hardships to Amici members. For example, a member of OBI has hundreds of packaging types, and it took the company two months to gather the necessary data, including weighing each type of packaging. To meet the Act's data-gathering and reporting obligations, Pacific Coast Producers' ("PCP") Director of Regulatory Affairs estimates she spent 30 percent of her time in 2025 ensuring that reporting obligations under the Act were met. In addition, PCP had to dedicate one financial analyst to create a reporting system to extract data from other systems and compile data provided by other functions within PCP. Data collection efforts included compilation of packaging materials and configurations for each product, compilation of the weight of each packaging component in each product, and creation of the ability to aggregate this data. The packaging material types also needed to be mapped to the material classifications published by DEQ under the Act. This information must be maintained and updated on an on-going basis due to packaging changes and

PAGE 5 –    AMICI CURIAE BRIEF OF OREGON BUSINESS AND INDUSTRY ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD NORTHWEST

product additions. The Act's added logistical hurdles burden Producers, who must divert time, money, and staff to ensure compliance.

### iii.    Inability to Pass on Fees

Just like Plaintiff, members of Amici are limited with respect to passing on EPR fees because of pre-existing contracts, refusal by upstream suppliers to take on EPR liability, and competition considerations. There is also a very significant disproportionate impact between companies based on their size and position in the marketplace. For example, a large, national or multi-national Producer with strong bargaining power, integrated distribution, and vertical integration may have the ability to absorb EPR fees. However, smaller regional companies may have no choice but to raise the price of products, cut production, and limit services, all of which affects their ability to be competitive in the marketplace.

### 2.    Local Benefits Under the Act are Minimal in Relation to the Excessive Burdens

The Act's fee structure has the deleterious effect of incentivizing packaging that is more difficult to recycle, such as lightweight plastics and Styrofoam, because the fee formula is based on weight. "Thus, if the more sustainable packaging (e.g., recyclable glass) is significantly heavier than the non-recyclable plastic alternative, the formula may penalize producers who switch to more sustainable packaging." Dkt. 33 at 18–19, footnote and citation omitted.

By charging $0.11 per pound for easily recycled glass bottles and $0.12 per pound for rigid plastic, one OBI member that bottles their beverage products in glass is incentivized to switch to plastic bottles because plastic is much lighter than glass, and the company's fees would likewise be significantly less. The same goes for any lightweight, environmentally detrimental forms of packaging such as foams and plastics, over heavier packaging materials like glass and cardboard. For example, PCP produces fruit and tomatoes in cans and other packaging that are grown in Central and Northern California. PCP investigated making plastic bowls for fruit out of lighter weight plastic. As a result, the paperboard sleeves around the bowls needed to be heavier

PAGE 6 –    AMICI CURIAE BRIEF OF OREGON BUSINESS AND INDUSTRY
        ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
        NORTHWEST

to adequately protect the packaging integrity ultimately making the product heavier, increasing shipping costs, and likely increasing greenhouse gas emissions during transport. In addition, the CAA Program Plan sets forth a budget that includes $24.6 million (13%) the first year (2025) for PRO management and administration and start-up costs. Therefore, the local benefits under the Act are largely illusory, and the scheme is more about collecting money—particularly on the front end—than it is about diverting waste in Oregon.

Related pre-*Pike* cases additionally invalidated state laws that directly "regulat[ed] the instrumentalities of interstate transportation," such as trucks and trains. *Natn'l Pork Producers Couns.*, 598 U.S. at 380; Id. at n. 2 (citing *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 523 30 (1959) (regulating mud flaps for trucks and trailers); *Southern Pacific Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 763–82 (1945) (regulating train length)). Packaging, like trucks and trains, is an instrumentality of interstate commerce because products and goods cannot move in interstate commerce without the packaging that the Act requires. For example, 1.2% of all strawberries grown in California are shipped for sale to Oregon. Strawberries only have a 15-day shelf life and must be packed and transported carefully to address quality and food safety concerns. The clamshell packaging used for strawberries is made of recycled plastic and was carefully designed to promote food safety, prevent damage, and reduce food waste by preventing spoliation in transit. The Act regulates this packaging and requires California strawberry farms to pay a weight-based fee for all clamshells sold in Oregon, despite the fact that without this packaging the product could not move at all in interstate commerce.

Likewise, PCP manufactures shelf-stable fruit and tomato products. These products are packaged in cans, glass and plastic jars, plastic bowls, and pouches which move in interstate commerce to grocery stores, hotels, schools, restaurants, and institutions nationwide. PCP's products must remain intact from the manufacturer to a truck, in transit to at least one warehouse, in transit again from a warehouse to a retailer, where it is loaded, stored, and loaded again onto a shelf for the customer, and then transported by the customer. If the weight or strength of the

PAGE 7 –    AMICI CURIAE BRIEF OF OREGON BUSINESS AND INDUSTRY
            ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
            NORTHWEST

packaging is reduced, then there is a greater risk of exposing the public to foodborne illness or of having to dispose of spoiled product when the packaging fails during transportation. As such, packaging is an instrumentality of interstate commerce upon which the Act's requirements impose significant burdens in violation of the dormant Commerce Clause.

### B.    The Act Discriminates against Interstate Commerce

The Act broadly applies to all product types, packaging, and chain-of-commerce participants. As a result, the scheme unlawfully discriminates against interstate commerce by impermissibly benefiting in-state economic interests and burdening out-of-state businesses. *Flynt v. Bonta*, 131 F.4th 918, 923 (9th Cir. 2025). State laws that so discriminate "face 'a virtually per se rule of invalidity.'" *Id.* (quoting *South Dakota v. Wayfair,* 585 U.S.162, 173 (2018)). "If a statute discriminates against out-of-state entities on its face, in its purpose, or in its practical effect, it is unconstitutional unless it "serves a legitimate local purpose, and this purpose could not be served as well by available nondiscriminatory means." *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013) (quoting *Maine v. Taylor*, 477 U.S. 131, 138 (1986)).

### 1.    The Act Constitutes an Impermissible Tax/Tariff to Fund an In-State Program

It is without question that the Act is only designed to benefit the State of Oregon because it creates a new statewide recycling infrastructure but provides no benefits to those outside of Oregon. Nonetheless, the Act is built to make those in the chain of commerce furthest from the point of sale in Oregon pay for this new recycling infrastructure, including members of Amici such as the California Strawberry Commission and PCP. Under the tiered definition of Producer, ORS 459A.866(1)(a) provides that for items sold in packaging under the manufacturer's own brand at a physical retail location in Oregon, the packaging Producer obligated to report the weight of packaging and pay fees under the Act "is the person that manufactures the packaged item." Other obligated producers include distributors, importers, and the first to sell certain

PAGE 8 –    AMICI CURIAE BRIEF OF OREGON BUSINESS AND INDUSTRY
ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
NORTHWEST

products into the State. As such, "the scheme is designed to shift costs away from instate consumers and in-state retailers while imposing disproportionate logistical and economic burdens on those who operate in interstate supply chains." Dkt. 33 at 27.

Under the Act, nearly all interstate commerce involving packaged goods is subject to fees that are akin to a tax or tariff imposed upon those selling goods into Oregon. State laws have been invalidated where they amount to a state tariff. *See Comptroller of Treasury of Md.v. Wynne*, 575 U.S. 542, 545 (2015). The Act does not call the fees that producers are required to pay a "tax," but rather "membership fees," which are paid to a private third party (CAA) to pay "for the recycling and processes of those materials, including by funding and reimbursing services provided by local governments." Dkt. 33 at 25. The fees under the Act are invalid because they are not a fair approximation of the costs reasonably attributable to members of Amici. Dkt. 33 at 26-27.

The Act dresses up the imposed taxes as membership fees, but its effect is the same; producers and manufacturers must assume they are regulated by the Act or face an unknown penalty. By shifting the burden to manufactures, The Act forces producers to choose between the financial burden they know and the tax they do not. Manufacturers now must know the destination of their products, which introduces new costs and logistics, ones that, although excessive, can be foreseen. If Manufactures cannot afford to do so, they will have to pay a third party "membership fees" that are subject to revision.  Because the Act imposes excessive fees upon Producers, it imposes burdens excessive to the Act's relative purpose.

### 2.    Risk of Double Counting/Inability to Follow the Sales—Uniquely an Interstate Problem that those Operating Solely In-State Do Not Face

One of the most significant burdens that the Act imposes on commerce is the requirement that Producers follow the packaging to its ultimate destination to determine whether it must be reported.  Failure to do so can result in double-counting.  In a state like Oregon, which is bordered by three other states, two of which have larger economies than Oregon (California and

PAGE 9 –    AMICI CURIAE BRIEF OF OREGON BUSINESS AND INDUSTRY
ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
NORTHWEST

Washington) products necessarily move through the State in a manner difficult for Producers to track, particularly since producers are those furthest from the retail point of sale in the chain of commerce. There is further pressure on companies without visibility into the final point of sale for their products, leading to an opportunity to overpay. Products often leave a food manufacturer and are then moved through an independent distributor or a major retailer's distribution network. The point of final sale is proprietary to the distributor and/or retailer and therefore is often not shared with the manufacturer who then has no way of knowing what products end up sold in Oregon.

Plaintiff has provided copious evidence of the issue of product-tracking, which is particularly burdensome on those in the middle of the chain of commerce. But it is likewise burdensome for other types of Producers, including Amici members. PCP, for example, is a member of Food Northwest and an agricultural cooperative manufacturing fruit and tomatoes in cans and other packaging. PCP is the responsible Producer under the Act for all the products it manufactures under its own brands, the significant majority of which are sold to national or regional distributors, not directly to retailers. As such, PCP has no control over where its products are sold, and no reasonable way to find out.

The Act also requires Amici members to report packaging for products that move through Oregon but that may not be sold or used in Oregon due to lack of transparency in the stream of commerce.  Information about the ultimate destination of products is not customarily shared by PCP's customers, nor is it customary for manufacturers to seek this information from their customers, because it is proprietary, competitive information. If granular distribution information were required to underpin public reports, then other distributors and manufacturers could determine market share of products, which is information that could be used for anticompetitive purposes.  Since PCP cannot obtain state-specific sales data, it is forced to use a population-based formula to generate a sales estimate. PCP knows that this method generates an inaccurate estimate, because population of a particular state has little to do with its sales. PCP has no way to

PAGE 10 –    AMICI CURIAE BRIEF OF OREGON BUSINESS AND INDUSTRY
ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
NORTHWEST

know the exact quantity of its products sold in Oregon because the products may ship to a distributor in Oregon that then transports the product for sale into a neighboring state. Since PCP's products are shelf-stable, products shipped in one calendar year may be sold in a later year. As such, there is a very significant risk of under- or over-reporting.

One of OBI's members is a frozen food manufacturer that sells to a customer who has no distribution centers in Oregon, and yet they are aware that their products end up being sold in Oregon. Similarly, a member of NWGRA reported that many of its products are manufactured outside of Oregon at one of its many facilities in other states. They also sell to distributors and private label customers at a distribution center level who may bring the product into Oregon. This member has had disputes arise with distributors and private label customers as to who is the designated "Producer," and the member company does not have visibility to these sales. Additionally, though this member has provided packaging information to its private label customers, they have no visibility as to whether their customers have properly reported.

### 3. Packaging Cannot be Easily Modified to Conform to Different States' Requirements

A common misconception underpinning the Act is that Producers have wide discretion to manage choices around packaging and therefore can control the fees by simply reducing the amount or changing the type of packaging used. However, that is simply not the case. Members of NWGRA have reported that packaging changes must be considered at a nationwide level, and do not have the ability to provide different packaging for the same item across states. As such, packaging changes for all states with packaging EPR programs, including Oregon, will impact all states. Even attempting to use state-specific packaging would drastically drive up the cost of goods.

Strawberries have a short shelf life, bruise easily, and must be refrigerated. The "clamshell" containers that strawberries are sold in have been a responsible end-market for PET beverage containers since 2000 and are 100% recycle-ready, as defined by the Association of

PAGE 11 –    AMICI CURIAE BRIEF OF OREGON BUSINESS AND INDUSTRY
ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
NORTHWEST

Plastic Recyclers' guide. A Life Cycle Analysis indicated that PET berry clamshells have a lower environmental impact than fiber containers and switching from recycled plastic clamshells to paperboard would consume 1,000 acres of trees annually. As such, packaging for strawberries has already been optimized, and there is no additional opportunity to revise packaging to reduce fees under the Act.

For PCP, packaging fruit into plastic bowls uses specialized packaging machinery that can only use certain types of materials and must also adhere to food safety standards. Any attempt to change this packaging is a multi-year effort involving international travel, production trial runs, tests to ensure products are shelf stable and can be loaded and remain intact through the entire chain of production, from manufacture to consumer. Even when limited testing was conducted on using lighter weight plastic for fruit bowls, a heavier cardboard was required to ensure that the packaging stayed intact, making the overall packaging heavier, and increasing environmental impacts. The Act forces Producers like PCP to pick between ensuring a quality product and trying to conform to the Act, which in many cases is costly or impossible.

## II.    THE ACT VIOLATES THE DUE PROCESS CLAUSE BY UNLAWFULLY DELEGATING REGULATORY AUTHORITY

When government delegates regulatory authority to private entities, significant constitutional due process issues arise. The Supreme Court has long established that such delegations are only permissible when they include strong constitutional safeguards. Delegation of regulatory power to private entities violates due process where the delegating authority does not retain meaningful discretion over the delegee's decisions. *Eubank v. City of Richmond,* 226 U.S. 137, 143–44 (1912) (striking down ordinance allowing two-thirds of property owners to establish building lines for neighboring properties as violation of due process because the delegating municipality failed to retain meaningful oversight and was instead simply implementing private decisions).

PAGE 12 –    AMICI CURIAE BRIEF OF OREGON BUSINESS AND INDUSTRY
             ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
             NORTHWEST

One of the most significant and troubling delegations of power is CAA's ability to freely change fee schedules without DEQ approval, and adjust the fees imposed on individuals without adequate notice and opportunity to be heard. When CAA was approached with questions about the accuracy of its invoices, CAA responded that the Producer would have to conduct verification itself, and if errors were found the producer could request an adjustment. The request for adjustment is approved or denied at CAA's sole discretion Even if CAA approves a fee adjustment, it will result in either an additional invoice or a future credit. In addition, CAA has proclaimed that producers are only allowed one adjustment request for a submitted report.  DEQ is not involved in this process, and there is no opportunity for appeal because under the agreement (which Producers are forced to enter into with CAA), any and all disputes must be resolved through confidential arbitration. This broad and unchecked delegation of authority to an organization made up of the competitors of those being regulated is a clear violation of due process.

Due process additionally requires the delegating authority to establish clear standards to govern private decision-making. *Eubank*, 226 U.S. at 143–44 ("the statute and ordinance, while conferring the power on some property holders to virtually control and dispose of the property rights of others, creates no standard by which the power thus given is to be exercised").  Due process necessitates both that "regulated parties [] know what is required of them so they may act accordingly" and that regulating parties have "precision and guidance" so that they "do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox Television Stations*, 567 U.S. 239, 253 (2012). No such safeguards are provided here, as CAA exercises its broad and unchecked power to develop policies under which it administers the Act without rulemaking authority and without rulemaking process and procedure. As set forth on CAA's website:

> [CAA] is responsible for establishing and maintaining policies that define producer obligations under [EPR] laws and participation in the [PRO]. These policies set forth the specific requirements producers must meet—covering registration, reporting, and fee payment—in order to remain in good standing and fully compliant

PAGE 13 –    AMICI CURIAE BRIEF OF OREGON BUSINESS AND INDUSTRY ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD NORTHWEST

> with both state EPR programs and CAA's participation agreements. CAA retains sole authority to develop, interpret, and amend these policies as needed to uphold regulatory compliance, ensure equitable treatment across producers, and support the effective administration of EPR responsibilities.[1]

This unchecked delegation of authority without required government agency oversight defies principles of due process and should not be permitted to stand. DEQ maintains it is involved in the entire program but also admits it only approves the plans and is not involved in individual interactions. This is precisely the lack of oversight that courts have found to be unconstitutional on due process grounds. *Carter*, 298 U.S. at 311; *Eubank*, 226 U.S. at 143, and *Roberge*, 278 U.S. at 122.

CAA and DEQ's collective refusal to make available the details behind its fee-setting methodology also violates due process. DEQ considers CAA's fee-setting methodology to be confidential so that CAA is protected from competition from other potential PROs, which the Court identified as "private-sector oriented and for the benefit of the Board of Directors of CAA. Dkt. 112-1, Exhibit A at 36:22 – 38:22; 40:1-20. The Court had never seen a law approved constitutionality "where, No. 1, the methodology of how they determine the fees is kept confidential; [and] No. 2 there isn't any way to even appeal individual fee determinations back up to the State." *Id*. at 41:14-21. Due process requires regulated parties be given "more than the general explanation that several factors may have affected their individual [determinations]." *K.W. ex rel. D.W. v. Armstrong*, 298 F.R.D. 479, 490 (D. Idaho 2014), aff'd 789 F.3d 962, 968 (9th Cir. 2015). Such lack of specificity "does not explain which combination of factors affect[s] each [regulated party's determination] on an individualized level[,]" *id*., and without it parties are denied "an effective opportunity to defend" against those decisions. *Goldberg v. Kelly*, 397 U.S.

---

[1] Circular Action Alliance website, Producer Policies, available at https://circularactionalliance.org/producer-policies (last accessed on June 28, 2026).

PAGE 14 –    AMICI CURIAE BRIEF OF OREGON BUSINESS AND INDUSTRY ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD NORTHWEST

254, 267-68 (1970). Such a denial is "fatal to the constitutional adequacy of the procedures." *Id*. at 268.

CAA did not publish, or even have, a fee structure in place in time for Producers to budget for the fees, let alone change their packaging. Because of this, the Act sets enforcement mechanisms which can't be checked by regulatory bodies, thus violating due process. The fees came at the same time as most companies were under tremendous inflationary pressure in their materials and labor costs. The retroactive effect of the Act further caused excessive hardship on regulated companies. These companies must navigate new requirements and fees at the same time those requirements and fees were finalized outside the normal process for public comment and without the transparency required of public entities. The ramp-up time was greatly compressed by CAA, which increased pressure on companies to attempt to operate in a system that was not fully designed. Essentially, the CAA is designing, changing, and enforcing the fee structure at the same time, which all but guarantees uncertainty and high costs for regulated companies.

The Act requires the PRO to first estimate the total system costs and then allocate those costs in various ways to be covered by Producers. This sets up a system whereby the more participants in the program, the less each individual has to pay. Furthermore, this also allows for fee-paying members to cover the costs for those who are exempt or those who are recalcitrant. The "free rider" problem identified by Plaintiff also impacts Amici's members: the "covered products" of those who choose not to participate adds to the total amount of materials that must be managed by the State's recycling system. Therefore, those in compliance necessarily pay for their competitors who are "free riders," which increases their prices and costs of doing business putting those in compliance with the Act at a competitive disadvantage.

Interpretations of material types in the program make a significant difference in the fees owed. These distinctions can mean a difference of hundreds of thousands of dollars per year. The fee assessment was not disclosed early enough to allow companies to estimate or budget for

PAGE 15 –   AMICI CURIAE BRIEF OF OREGON BUSINESS AND INDUSTRY
ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD
NORTHWEST

the fees putting cost pressure on companies' mid-budget cycle. CAA did not provide adequate mechanisms for late-registering companies to get into the program and "make good" on their fees and therefore left the full costs of the program on the shoulders of those companies that did register and pay timely. The Act's unclear fee structure and lack of oversight violate due process.

## CONCLUSION

The Act violates the Constitution and must be overturned. The Act violates the dormant Commerce Clause both by discriminating against interstate commerce and imposing burdens on interstate commerce. Further, the Act unlawfully delegates regulatory authority in violation of the due process clause. Amici members face the impossible task of changing packaging to conform with the Act and guessing the fees faced if they cannot. The Act impacts not just Plaintiffs, but all industries regulated; any judgment must reflect the Act's broad scope and apply to all parties regulated.

DATED:  July 10, 2026

TONKON TORP LLP


By:    *s/ Maureen S. Bayer*
            Steven Wilker, OSB No. 911882
                Direct:  503.802.2040
                Email:  steven.wilker@tonkon.com
            Maureen S. Bayer, OSB No. 214905
                Direct:  503.802.2115
                Email:  maureen.bayer@tonkon.com

*Attorneys for Amici Oregon Business and Industry Association, Northwest Grocery Association, and Food Northwest*

039545\00002\19727709v7

PAGE 16 –    AMICI CURIAE BRIEF OF OREGON BUSINESS AND INDUSTRY ASSOCIATION, NORTHWEST GROCERY ASSOCIATION, AND FOOD NORTHWEST