NAOMI SHEFFIELD, OSB 170601
Chief Deputy City Attorney
naomi.sheffield@portlandoregon.gov
EMILY LOHMAN, OSB No. 195571
Deputy City Attorney
emily.lohman@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR 97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Counsel for* Amicus Curiae *City of Portland*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS, <br><br> PLAINTIFF, <br><br> v. <br><br> OREGON DEPARTMENT OF ENVIRONMENTAL QUALITY; OREGON ENVIRONMENTAL COMMISSION; DANIEL A. RAYFIELD, in his official capacity, and DOES 1 through 25, <br><br> DEFENDANTS. | Case No. 3:25-cv-01334-SI <br><br> **BRIEF OF *AMICUS CURIAE* CITY OF PORTLAND** |

Page i  –  BRIEF OF *AMICUS CURIAE* CITY OF PORTLAND

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 3

    I.     The RMA is facially neutral. ................................................................... 4

    II.    The RMA is nondiscriminatory in its effects and evenhandedly regulates similarly situated producers both in and out of state. ........... 5

    III.   *Pike* balancing is inapplicable because the RMA does not disrupt national uniformity in the flow of interstate commerce. ........................ 8

         A.     The RMA does not regulate packaging. ...................................... 10

         B.     National uniformity in product packaging is not required to ensure the flow of interstate goods. ............................................ 10

         C.     Policy disagreements are not evidence of discrimination or grounds for judicial review under the dormant Commerce Clause ................................................................................................ 16

CONCLUSION .................................................................................................... 18

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Ass'n des Eleveurs de Canards et d'Ois du Quebec v. Harris,*
729 F.3d 937 (9th Cir. 2013) ................................................................................. 18

*Bibb v. Navajo Freight Lines, Inc.,*
359 U.S. 520 (1959) ................................................................................... 21, 22

*Brown–Forman Distillers Corp. v. N.Y. State Liquor Auth.,*
476 U.S. 573 (1986) ........................................................................................ 7

*Dep't of Revenue of Ky. v. Davis,*
553 U.S. 328 (2008) ............................................................................. 3, 19, 26

*Flynt v. Bonta,*
131 F.4th 918 (9th Cir. 2025) ................................................................... *passim*

*Granholm v. Heald,*
544 U.S. 460 (2005) ........................................................................................ 5

*Monarch Content Mgmt. LLC v. Ariz. Dep't of Gaming,*
971 F.3d 1021 (9th Cir. 2020) ..................................................................... 13

*Nat'l Ass'n of Optometrists & Opticians v. Harris,*
682 F.3d 1144 (9th Cir. 2012) ................................................................. 18, 25

*Nat'l Pork Producers Council v. Ross,*
6 F.4th 1021 (9th Cir. 2021) ..................................................................... 16, 25

*Nat'l Pork Producers Council v. Ross,*
598 U.S. 356 (2023) ................................................................................. *passim*

*Pharm. Rsch. & Mfrs. of Am. v. Cnty. of Alameda,*
768 F.3d 1037 (9th Cir. 2014) ....................................................................... 6

*Pike v. Bruce Church, Inc.,*
397 U.S. 137 (1970) ........................................................................................ 5

*Southern Pacific Co. v. Ariz. ex rel. Sullivan,*
325 U.S. 761 (1945) ............................................................................. 19, 20, 21

*Truesdell v. Friedlander,*
80 F.4th 762 (6th Cir. 2023) ........................................................................ 16

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

**Federal Statutes**

U.S. Const. art. I, § 8, cl. 3........................................................................................ 3

**State Statutes**

ORS § 459A.860 ............................................................................................... 11, 18

ORS § 459A.863 ............................................................................................... 10, 24

ORS § 459A.866 ..................................................................................................... 10

ORS § 459A.884 ............................................................................................... 11, 17

**Other Authorities**

*Instrumentality*, Webster's Third New Int'l Dictionary (2002 unabridged ed.) ........ 14

*Means*, Webster's Third New Int'l Dictionary (2002 unabridged ed.) ....................... 14

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

## INTRODUCTION

The City of Portland ("City") is the largest municipality in the State of Oregon. The City works closely with the State of Oregon ("State") to facilitate and improve recycling, access to waste systems, and waste reduction opportunities. The City specifically regulates and administers waste and recycling collections systems on behalf of both residential and commercial customers throughout the City.

Oregon's Plastic Pollution and Recycling Modernization Act ("RMA") was passed as a critical response to the disruption in recycling markets. It was designed to modernize and invest in improvements in collection and sorting of waste materials. The City was involved in this process, recognizing the need for significant investments to improve access to recycling and to reduce recycling contamination in order to enhance meaningful recycling of waste materials.

Successfully ensuring that recycling can be managed responsibly at the end of its life requires more than just education to end users regarding recycling. It also requires meaningful participation and support from producers of packaging for items that are sold or distributed in Oregon. The RMA addresses the shared responsibilities of everyone within Oregon's recycling system—residents, businesses, local governments and their designated service providers, commingled recycling processing facilities, recycling end markets, and producers of packaging.

Here, Plaintiff—representing producers of the very packaging that the City and other local governments are ultimately tasked with responsibly recycling or otherwise disposing of at the end of its life—seeks to sidestep its role and shirk any

Page 1  –  BRIEF OF *AMICUS CURIAE* CITY OF PORTLAND

responsibility for improving recycling systems.

The RMA's extended producer responsibility ("EPR") for packaging materials is not dissimilar to requirements for other products that operate under an EPR model. Ultimately, the funding that is obtained through the Producer Responsibility Organization ("PRO") is necessary for the City, and other local governments, to conduct needs assessments and determine gaps in the current recycling system. Portland, along with other local governments, has been incurring costs that are eligible for reimbursement by a PRO under the RMA in order to plan and implement contamination reduction efforts and expand collection of recyclable glass. The City has budgeted for and hired staff to implement the contamination reduction and has set garbage and recycling fees for over 150,000 recycling customers in the City in reliance on incentives for glass recycling from Circular Action Alliance ("CAA"), currently the only authorized PRO.

The RMA addresses packaging that residents, businesses, and local governments in Oregon are tasked with addressing when it becomes waste. It creates a system so that this waste can, to the extent possible, be recycled and disposed of responsibly at end-of-life. The RMA does not dictate specific packaging requirements for products sold in Oregon. The RMA does not impose obligations on producers related to packaging that merely travels through Oregon to other states. It does not regulate interstate commerce. It does not discriminate against out-of-state producers. It does not seek to engage in extraterritorial regulation of products or commerce outside of the State. Instead, the RMA addresses a traditional area of

Page 2 – BRIEF OF *AMICUS CURIAE* CITY OF PORTLAND

local concern—disposal of packaging materials that terminate in Oregon. And, at most, it imposes additional costs on producers in connection with their packaging that is ultimately discarded in Oregon.

The dormant Commerce Clause is not a catch all to prevent state or local regulation that increases the costs of doing business in a particular state—even if those cost increases are ultimately significant. The narrow limitations imposed by the dormant Commerce Clause are designed to address economic protectionism and interstate discrimination. These simply do not exist under the RMA. Businesses can disagree with how states and local governments choose to regulate general health and welfare. But allegations that a state's regulation would burden certain businesses due to increased costs, regardless of the significance of those costs, are not the purview of the dormant Commerce Clause; it is the realm of the legislative branch of government. The Court should, therefore, enter judgment for the Defendants on Plaintiff's dormant Commerce Clause claim.

## ARGUMENT

The Commerce Clause is an affirmative grant of power to Congress to regulate interstate commerce. U.S. Const. art. I, § 8, cl. 3. The United States Supreme Court has long inferred a prohibition on state actions limiting interstate commerce, known as the "dormant" Commerce Clause. *See Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008) (discussing history of dormant Commerce Clause jurisprudence). The dormant Commerce Clause prevents states from adopting economic protectionist measures that burden out-of-state competitors. *See*

Page 3 – BRIEF OF *AMICUS CURIAE* CITY OF PORTLAND

*Nat'l Pork Producers Council v. Ross ("Pork Producers II")*, 598 U.S. 356, 368–69 (2023). Preventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of extreme delicacy, something courts should do only where the infraction is clear. *Id.* at 390.

In recent years, "three key strands of dormant Commerce Clause jurisprudence have emerged" that are relevant to this case. *Flynt v. Bonta*, 131 F.4th 918, 923 (9th Cir. 2025), *cert. denied*, 146 S. Ct. 1490 (2026). Specifically, the first line of cases bar laws that facially discriminate against interstate commerce. *Granholm v. Heald*, 544 U.S. 460, 476 (2005) (explaining that state laws that discriminate against interstate commerce face a virtually *per se* rule of invalidity).

In the second group are cases that concern state laws that operate extraterritorially beyond the state's borders. *Flynt*, 131 F.4th at 924. The third group are, state laws that "regulate[] even-handedly to effectuate a legitimate local public interest" and may be evaluated under the balancing test set forth *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). *See Flynt*, 131 F.4th at 923–25 (discussing the three lines of jurisprudence). The three lines of analysis follow.

## I.     The RMA is facially neutral.

Plaintiff and *Amici* have not asserted a facial discrimination challenge to the RMA, which, by its text, makes no distinction between in-state and out-of-state producers. *See Pharm. Rsch. & Mfrs. of Am. v. Cnty. of Alameda*, 768 F.3d 1037, 1040–41 (9th Cir. 2014) (setting out grounds for a direct discrimination challenge under the dormant Commerce Clause). The Court need not reach this issue.

Page 4  –  BRIEF OF *AMICUS CURIAE* CITY OF PORTLAND

II.   **The RMA is nondiscriminatory in its effects and evenhandedly regulates similarly situated producers both in and out of state.**

Plaintiff and *Amici* focus on two aspects of allegedly impermissible "effects" of the RMA on interstate commerce: (1) the discriminatory effects under the "extraterritoriality doctrine" and (2) the nondiscriminatory, but incidental effects according to an "undue burden" balancing test. (ECF 33 at 23; ECF 77 at 10, 13, 16; ECF 159 at 3, 11, 7). This section addresses the extraterritorial effects.

Courts recognize that the body of dormant Commerce Clause jurisprudence has not always provided a clear framework for evaluating whether state measures are discriminatory in effect, as opposed to creating an incidental burden on interstate commerce. *See Brown–Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986) (recognizing "that there is no clear line" separating legislation with *discriminatory* effects from legislation with *indirect* effects).

In *Pork Producers II*, the Supreme Court affirmed the trial court's dismissal of a dormant Commerce Clause challenge to a California law forbidding the in-state sale of pork from pigs "confined in a cruel manner." 598 U.S. at 365–66. The Court recognized that answering whether a state measure posed a discriminatory effect on interstate commerce turned on whether the challenged measure was shown to have "an impermissible discriminatory purpose," and not on any broader, freestanding extraterritoriality principle. *Id.* at 373. The Court emphasized that purposeful discrimination must be shown to "benefit in-state economic interests by burdening out-of-state competitors." *Id.* at 369.

Moreover, the petitioners in *Pork Producers II* challenged the law prohibiting

Page 5  –  BRIEF OF *AMICUS CURIAE* CITY OF PORTLAND

the sale of certain pork products under an extraterritorial theory. *Id.* at 371. The plaintiffs did so based on the fact that almost all pork eaten in California is shipped in from elsewhere. The petitioners, therefore, alleged that the dormant Commerce Clause forbid enforcement of such a state law that would have the discriminatory effect of "controlling commerce" outside the state. *Id.* In the challengers' view, California's law was unconstitutional because it would "impose substantial new costs on out-of-state pork producers who wish to sell their products in California." *Id.*

Here, exactly like the petitioners in *Pork Producers*, *Amici* assert that the effect of the RMA on its members is prohibited extraterritorial regulation. (*See* ECF 77 at 12). *Amici* maintain that the cost of compliance with the RMA results in an impermissible effect, because most producers "are based largely outside Oregon." (ECF 77 at 16). The Supreme Court rejected that same argument in *Pork Producers II*. The Court explained that a key component of precedential cases analyzing extraterritoriality under the dormant Commerce Clause was that the out-of-state reach was forbidden if the challenged law "deliberately prevented out-of-state firms from undertaking competitive pricing or deprived businesses and consumers in other States of whatever competitive advantages they may possess." 598 U.S. at 374 (cleaned up and internal quotation marks omitted). But none of this means, as *Amici* argue, that *any* question about the ability of a state to project its power extraterritorially must yield to an "almost *per se*" rule under the dormant Commerce Clause. *Id.* at 376.

Page 6  –  BRIEF OF *AMICUS CURIAE* CITY OF PORTLAND

Plaintiff's argument contains the same error the Supreme Court identified in *Pork Producers II*, that is—Plaintiff and *Amici* allege the extraterritorial reach of the RMA is unlawful but fail to identify any economic protectionism. The RMA provides no advantage for in-state producers while disadvantaging out-of-state competing producers. All producers, regardless of location, are treated as a uniformly defined group. *See* ORS § 459A.863(22) *and* ORS § 459A.866 (defining "Producer").

Further, the extraterritorial effects cited by Plaintiff and *Amici* misrepresent the text of the RMA. *Amici* assert that the State improperly "hook[s]" a "nominal in-state connection" to control out-of-state conduct. (ECF 77 at 6). But the volume of packaging discarded in Oregon is not "nominal." It is heavily anchored to in-state impacts. ORS § 459A.860(4) (finding that the state has an obligation to prevent negative environmental, social, economic and health impacts of production, consumption and end-of-use management of products and packaging).

Also contradicting Plaintiff's claims, the RMA does not unlawfully "control" the conduct of out-of-state producers, rather, it allocates the in-state costs of cleaning up producer's discarded packages. The cost of doing business in Oregon is a practical effect, not a discriminatory measure. This is undeniable when the RMA requires all fees to be calculated on the same basis for all producers. ORS § 459A.884; ORS § 459A.884. Plaintiff does not point to any facts or evidence that the RMA is discriminatory in effect. *Amici* fail to explain how the RMA discriminates against out-of-state producers compared with in-state producers.

Page 7  –  BRIEF OF *AMICUS CURIAE* CITY OF PORTLAND

Instructive in analyzing the "extraterritoriality doctrine" is the Ninth Circuit's decision in *Flynt v. Bonta,* which discussed and applied the Supreme Court's holding in *Pork Producers II. See generally Flynt,* 131 F.4th 918 (discussing *Pork Producers II,* 598 U.S. 356). The Ninth Circuit determined that, under *Pork Producers I,* California could regulate conduct within the state, namely, the operation of California cardrooms, even when the regulation of in-state conduct resulted in "extraterritorial spillover effects" on out-of-state cardroom operators. *Flynt,* 131 F.4th at 929.

In its conclusion, the court appropriately characterized the effects of California's challenged regulation as "a function of California's non-discriminatory terms of doing business . . . in the state." *Flynt,* 131 F.4th at 929 (quoting *Monarch Content Mgmt. LLC v. Ariz. Dep't of Gaming*, 971 F.3d 1021, 1031 (9th Cir. 2020)). The court rejected the petitioner's request to invalidate California law merely because it had the "practical effect of controlling [out-of-state] commerce." *Id.* Because Plaintiff fails to identify any discriminatory effect of the RMA, this Court should likewise reject Plaintiff's arguments which fail to demonstrate any discriminatory effect under the extraterritoriality doctrine.

III.    ***Pike* balancing is inapplicable because the RMA does not disrupt national uniformity in the flow of interstate commerce.**

Turning to the third line of relevant dormant Commerce Clause jurisprudence, Plaintiff misconceives the breadth of applicability of balance shifting under *Pike* and its progeny in the absence of any discrimination. Plaintiff asks this Court to subject all laws that result in economic burdens on out-of-state companies

Page 8  –  BRIEF OF *AMICUS CURIAE* CITY OF PORTLAND

to a balancing analysis by this Court. This is not the correct analysis under current dormant Commerce Clause precedent. Here again, Plaintiff's argument mirrors the faulty argument that the Supreme Court soundly rejected in *Pork Producers II*. Plaintiff, like petitioners in *Pork Producers II*, "overstate[s] the extent to which *Pike* and its progeny depart from the antidiscrimination rule that lies at the core of [the Court's] dormant Commerce Clause jurisprudence." 598 U.S. at 377.

At bottom, the "*Pike* test" serves primarily to "disclose the presence of a discriminatory purpose" that may not be apparent on the face of a law. *Id*. In *Pork Producers II*, however, the petitioners "nowhere suggest that an examination of Proposition 12's practical effects in operation would disclose purposeful discrimination against out-of-state businesses." *Id*. at 379. Their burden-on-interstate-commerce claim accordingly fell "well outside *Pike*'s heartland," and the Ninth Circuit correctly dismissed it. *Id*.

As the Ninth Circuit recently recognized, "[t]he Supreme Court 'has not invalidated a law under *Pike* in more than 30 years." *Flynt*, 131 F.4th at 931 (quoting *Truesdell v. Friedlander*, 80 F.4th 762, 773 (6th Cir. 2023)). Importantly, "most statutes that impose a substantial burden on interstate commerce do so because they are discriminatory." *Id*. (quoting *Nat'l Pork Producers Council v. Ross ("Pork Producers I")*, 6 F.4th 1021, 1032 (9th Cir. 2021)).

Here, Plaintiff  skirts around the first two hurdles—identifying discrimination on the face of the law or discrimination in its effects—and skips straight to *Pike* balancing analysis. (ECF 33 at 23–25). Plaintiff attempts to justify

Page 9  –  BRIEF OF *AMICUS CURIAE* CITY OF PORTLAND

flouting the discrimination inquiry by asserting that (1) packaging is the type of product that Oregon cannot regulate; (2) packaging is an instrumentality of interstate commerce subject to the need for national uniformity which the State cannot regulate; and (3) generally speaking, the overall burden is too costly. These three arguments fail.

### A.     The RMA does not regulate packaging.

First, the RMA does not regulate what packaging producers can use. Instead, it imposes financial obligations associated with the costs of responsibly disposing of this packaging. ORS § 459A.884(2) (setting the "material-specific base fee rate," which is calculated "by the total amount of covered products of each material sold or distributed by the producer in or into this state"). The RMA is not aimed at regulating standards for interstate supplies. It addresses a specific local concern— allocating financial responsibility for the disposal or recycling of packaging *in Oregon*. The RMA states, "It is necessary to adopt a policy that will minimize such unintended consequences across the entire life cycle of products and that will require producers of packaging and printed paper sold or distributed in Oregon to help finance the management of, and ensure an environmentally sound stewardship program for, their products." ORS § 459A.860(3). Plaintiff's assertions that the RMA regulates packaging are incorrect and should be disregarded.

### B.     National uniformity in product packaging is not required to ensure the flow of interstate goods.

Second, Plaintiff asserts that the RMA will disrupt standards for "national uniformity" and that packaging is an "instrumentality" for purposes of interstate

Page 10  –  BRIEF OF *AMICUS CURIAE* CITY OF PORTLAND

commerce. (ECF 173 at 2). But the cases Plaintiff relies on do not support its extraordinary position that the RMA's payment requirements impose a significant burden due to "inconsistent regulation of activities that are inherently national or require a uniform system of regulation." *Ass'n des Eleveurs de Canards et d'Ois du Quebec v. Harris*, 729 F.3d 937, 952 (9th Cir. 2013) (quoting *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012)).

Instead, Plaintiff and *Amici* have only put forth arguments that complying with the RMA will be costly. But, as addressed later, costly regulation, without more, does not trigger a balancing analysis under the dormant Commerce Clause.

As in the other analyses, the Supreme Court's discussion in *Pork Producers II* is significant in addressing the limited non-discriminatory cases where national uniformity may drive the need for a dormant Commerce Clause balancing. There, the Court noted that, notwithstanding the "modern cases," there remains a body of older dormant Commerce Clause cases that were never explicitly overruled and that theoretically have "left the courtroom door open to challenges premised on even nondiscriminatory burdens[.]" 598 U.S. at 369, 379 (quoting *Davis*, 553 U.S. at 353; internal quotation marks omitted). As the Court explained, however, that "line of cases … originated before *Pike*" and involved "trucks, trains, and the like." *Id.* at 379 n.2. Aside from being of doubtful continuing validity, those decisions applied "only when a lack of national uniformity" in means of transportation "would impede *the flow* of interstate goods" across state borders. *Id.* (emphasis in original).

Additionally, Plaintiff's position that "[p]ackaging used in interstate

Page 11  –  BRIEF OF *AMICUS CURIAE* CITY OF PORTLAND

shipment of goods squarely qualifies as an instrumentality of interstate commerce," (ECF 173 at 4), does not square with this historical line of cases that the Court recognized in *Pork Producers II*.

In *Southern Pacific Co. v. Ariz. ex rel. Sullivan*, 325 U.S. 761, 763 (1945), the state of Arizona had enacted a law providing that no railroad train could enter or operate in Arizona if it was longer than fourteen cars (for passenger trains) or seventy cars (for freight trains). *Id*. In concluding that the Arizona law contravened the dormant Commerce Clause, the Supreme Court first noted that the trial-court findings showed that "the operation of … trains of more than fourteen passenger and more than seventy freight cars, is standard practi[c]e over the main lines of the railroads of the United States," and that Arizona was a clear outlier from that national standard. *Id*. at 771. The evidence further showed that, consequently, the Arizona law required the wholesale "breaking up and remaking [of] long trains upon entering and leaving the state in order to comply with the law." *Id*. at 772, 774–75. Those adverse consequences were borne almost entirely by two interstate carriers, since more than 90% of all rail traffic in Arizona was interstate, with minimal in-state rail service. *Id*.

The "unchallenged findings" as a whole left "no doubt" that the Arizona law imposed a "serious burden" on the flow of interstate commerce by "materially imped[ing] the movement of . . . interstate trains" crossing the Arizona border. *Id*. at 773, 774–75. Significantly, that burden constituted "a substantial obstruction to the national policy proclaimed by Congress, to promote adequate, economical and

Page 12  –  BRIEF OF *AMICUS CURIAE* CITY OF PORTLAND

efficient railway transportation service." *Id.* (citing Interstate Commerce Act of 1887). Accordingly, after its "examination of all the relevant factors," the Court concluded that Arizona's interest in the "slight and dubious advantage" of its law as a putative safety measure was "outweighed by the interest of the nation in an adequate, economical and efficient railway transportation service, which must prevail." *Id.* at 779, 783–84. The Arizona law was held to contravene the dormant Commerce Clause.

Similarly, in *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520 (1959), the state of Illinois had enacted a law requiring a certain type of rear fender and mudguard for all trucks entering or operating in Illinois. Meanwhile, the state of Arkansas mandated a conflicting design, which "rendered the use of the same motor vehicle equipment in both States impossible." *Id.* at 522–23. The Illinois law also differed from the standard design "legal in at least 45 states," making it unlawful for interstate trucks so equipped to enter Illinois. *Id.* at 523.

As a result of those conflicting standards, trucks traveling from Arkansas to Illinois would have to swap out mudguards between states, which is a lengthy and sometimes dangerous process requiring welding. *Id.* at 527. The Court concluded that the evidence showed a "rather massive . . . burden on interstate commerce" as a result. *Id.* at 528. Crucially, the state *did not dispute* that its law indeed "severely burdens interstate commerce." *Id.* Instead, Illinois argued that, as a valid exercise of the state's police power, the Court "must sustain the validity of the statute notwithstanding the extent of the burden it imposes on interstate commerce." *Id.*

Page 13  –  BRIEF OF *AMICUS CURIAE* CITY OF PORTLAND

However, the Court rejected Illinois' argument, noting that "[t]he conflict between the Arkansas regulation and the Illinois regulation" illustrates that "regulation of mudguards is not one of those matters admitting of diversity of treatment, according to the special requirements of local conditions[.]" *Id.* at 529 (citation and internal quotation marks omitted). And, the Court explained, Illinois had not made a showing sufficient to outweigh "the clear burden on commerce" created by its law. *Id.* at 529–30. The Court concluded that "[t]his is one of those cases—few in number—where local safety measures that are nondiscriminatory place an unconstitutional burden on interstate commerce." *Id.* at 529.

In sum, this prior line of cases involving non-discriminatory laws involved state regulations of specific *means of interstate transportation*—"trucks, trains, and the like."[1] *Pork Producers, II*, 598 U.S. at 369, 379 n.2. Even then, such laws were invalidated rarely and "*only* when a lack of national uniformity" in those means of transportation—*e.g.,* different maximum lengths for trains or conflicting requirements for truck mudguards across different states—would substantially "impede *the flow* of interstate goods" across state borders. *Id.* at 379 n.2 (first emphasis added, second emphasis in original).

Here, Plaintiff goes further and argues that those "instrumentalities of

---

[1] The Court referred to these as "instrumentalities" rather than "means" of transportation, but the two terms are synonymous in this context. *See Instrumentality*, Webster's Third New Int'l Dictionary (2002 unabridged ed.) (defining "instrumentality" in pertinent part as "something by which an end is achieved **:** means"); *Means, id.* (noting that "means" is a synonym of "instrumentality" that is "now the common form in all uses [to designate] anything employed in executing some end," such as a "means of transportation").

Page 14  –  BRIEF OF *AMICUS CURIAE* CITY OF PORTLAND

interstate commerce" that Congress has authority to regulate under its Commerce Clause authority cover the appropriate scope for evaluating which state and local laws are subject to *Pike* balancing under a dormant Commerce Clause analysis. (ECF 173 at 4). However, this dichotomous position—what Congress can regulate under the Commerce Clause, states and local governments cannot under the dormant Commerce Clause—is inconsistent with the Court's analysis in *Pork Producers II. See* 598 U.S. at 368, 390. There the Court explained repeatedly that Congress could, but did not, exercise its power under the Commerce Clause to regulate the interstate trade of pork and preempt state laws like California's law. *Id.* However, the recognized existence of this authority did not lead to a conclusion that California's regulation, was prohibited under the dormant Commerce Clause. In fact, the Court held the opposite.

Here too, the RMA is quite distinct from cases addressing national uniformity necessary for the flow of interstate goods. An initial distinction, as discussed above, is that the RMA does not impose direct requirements on packaging. For example, it does not require that products shipped to Oregon have packaging that is different than products shipped to California. To the contrary, producers are simply obligated to pay certain amounts based on the packaging that the producer elects to use and that is ultimately discarded in Oregon. Because the regulation simply imposes a cost related to the ultimate disposal of packaging, a patchwork of similar laws across multiple states would not disrupt any national uniformity in packaging. Rather, it would impose costs on producers to address the disposal of that uniform

Page 15 – BRIEF OF *AMICUS CURIAE* CITY OF PORTLAND

packaging.

And importantly, the RMA only applies to packaging that is ultimately discarded in Oregon. A "covered product" does *not* include "[a]ny item that is not ultimately discarded inside this state, whether for purposes of recovery or disposal." ORS § 459A.863(6)(b)(J). Unlike the trains and trucks that would have to adjust traveling through different states, packaging traveling from Washington to California, through Oregon, is not subject the RMA. As the Supreme Court succinctly put it, packaging, like pigs, "[is] not trucks or trains." *National Pork II*, 598 U.S. at 379 n.2.

The mere imposition of increased costs for packaging that terminates in Oregon does not fall within the narrow line of cases applying the dormant Commerce Clause to ensure national uniformity in the flow of interstate commerce.

### C.   Policy disagreements are not evidence of discrimination or grounds for judicial review under the dormant Commerce Clause.

Third, *Amici* dedicate much ink to signaling disapproval of the policies adopted in the RMA. For example, *Amici* maintain that the cost of participating in a PRO is too expensive. (ECF 85 at 7; ECF 159 at 4). They assert that producers shipping heavy products are charged higher fees than producers that ship smaller, lighter products. (ECF 85 at 7–8; ECF 159 at 7) ("Because the Act charges Producers for packaging based on the weight . . . the Act disproportionately impacts manufacturers of . . . water heating equipment, household appliances, and lighting.")). And they argue that "Oregon's approach does not account for industry-

Page 16 – BRIEF OF *AMICUS CURIAE* CITY OF PORTLAND

specific realities and instead creates uniform obligations that impose outsized costs on packaging-intensive industries." (ECF 159 at 8). Though *Amici* characterize these complaints as "disproportionate and undue burdens on companies operating across state lines," the examples given evince a greater burden on products that require more packaging—regardless of where those products are being shipped from. (*Id.* at 7).[2] Plaintiff does not explain how a recycler charging by weight is unconstitutional under the dormant Commerce clause.

Plaintiff similarly argues that, in many cases "the EPR fees exceed the profit margins associated with the products being distributed[.]" (ECF 33 at 24). Though Plaintiff's and *Amici's* concerns about costs are couched in terms of "undue burdens" on interstate commerce, neither Plaintiff nor *Amici* dispute that in-state producers are subject to the same terms and fees as out-of-state producers.

Contradicting Plaintiff's arguments, "[A] non-discriminatory regulation that 'precludes a preferred, more profitable method of operating in a retail market' [does not] place a significant burden on interstate commerce" within the meaning of *Pike*. *Pork Producers I*, 6 F.4th at 1032 (citing *Nat'l Ass'n of Optometrists,* 682 F.3d at

---

[2] *Amici* also suggest that imposing the costs on producers, as opposed to retailers, is discrimination between in-state and out-of-state interests. (ECF 77 at 11 ("By exporting the costs of its regulatory program to out-of-state producers and distributors—while exempting in-state retailers—Oregon weakens the political safeguards that ordinarily constrain state regulation and interferes with the policy choices of sister states.")). This is a red-herring and misunderstands the discrimination analysis. The additional costs are imposed on all producers—those located in Oregon and those located outside of Oregon—if the packaging is ultimately discarded in Oregon. Similarly, the costs are not imposed on retailers—either in-state or out-of-state. Instead of comparing in-state and out-of-state interests, A*mici* attempt to compare discrimination between different parts of the supply chain. Notably they cite no cases in support of this type of comparison.

Page 17 – BRIEF OF *AMICUS CURIAE* CITY OF PORTLAND

1154–55). Thus, "even a state law that imposes heavy burdens on some out-of-state sellers does not place an impermissible burden on interstate commerce." *Id*. (further explaining that "cost increases to market participants and customers do not qualify as a substantial burden to interstate commerce for purposes of the dormant Commerce Clause," and "harm to the consuming public [pertains] to the wisdom of the statute, not to a burden on interstate commerce." (citations omitted)).

Plaintiff's assertion that this Court must engage in burden shifting under *Pike* is no different to the assertion the Supreme Court rejected in *Pork Producers II,* 598 U.S. at 389. In declining to engage in the requested balancing, multiple justices remarked that allegations about "burdens on commerce" do not provide judges "a roving license" to reassess the wisdom of state legislation in light of every conceivable out-of-state burden, economic or otherwise. *Id*. (quoting *Davis*, 553 U.S. at 353). Put differently, as Justice Gorsuch summarized, courts should hesitate to "displace the cost-benefit analyses embodied in democratically adopted legislation." *Id*. at 382.

## CONCLUSION

The RMA does not discriminate against in-state and out-of-state producers—either on its face or due to extraterritorial effects. Nor does the RMA interfere with the flow of interstate commerce. Instead, the RMA places responsibility on producers for helping to address a problem that directly arises from their packaging—sound means of recycling or disposal of that packaging in Oregon. Such a regulation is not susceptible to dormant Commerce Clause review.

Page 18 – BRIEF OF *AMICUS CURIAE* CITY OF PORTLAND

DATED:  July 10, 2026

Respectfully submitted,

*/s/ Naomi Sheffield*
NAOMI SHEFFIELD, OSB No. 170601
Chief Deputy City Attorney
naomi.sheffield@portlandoregon.gov
EMILY LOHMAN, OSB No. 195571
Deputy City Attorney
emily.lohman@portlandoregon.gov

*Counsel for* Amicus Curiae *City of Portland*

Page 19  –  BRIEF OF *AMICUS CURIAE* CITY OF PORTLAND