DAN RAYFIELD
Attorney General
SARA D. VAN LOH #044398
Senior Assistant Attorney General
ALEXANDER C. JONES #213898
YOUNGWOO JOH #164105
Assistant Attorneys General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Sara.VanLoh@doj.oregon.gov
        Alex.Jones@doj.oregon.gov
        YoungWoo.Joh@doj.oregon.gov

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS , <br><br> Plaintiff, <br><br> v. <br><br> LEAH FELDON, DIRECTOR, OREGON DEPARTMENT OF ENVIRONMENTAL QUALITY, in her official capacity, <br><br> Defendant. | Case No. 3:25-CV-01334-SI <br><br> DEFENDANT'S POST-TRIAL BRIEFING |

DEFENDANT'S POST-TRIAL BRIEFING
SV1/jc4/1027192367

**TABLE OF CONTENTS**

I.      INTRODUCTION.................................................................................................... 1

II.     TRIAL EVIDENCE.............................................................................................. 1

        A.      Witnesses and Their Testimony.............................................................. 2

        B.      Key Exhibits............................................................................................ 3

III.    ARGUMENT.......................................................................................................... 4

        A.      The dormant Commerce Clause allows the states of the Union to require
                producers to take responsibility for their packaging, paper, and food
                serviceware waste. ................................................................................... 4

                1.      The Recycling Modernization Act treats similarly situated in-state
                        and out-of-state producers even-handedly. ................................... 5

                2.      The Act does not have impermissible extraterritorial effects. ................... 6

                3.      The Act does not regulate instrumentalities of interstate commerce. ......... 6

                4.      The Act does not impede the flow of items across state borders. ............... 7

                5.      The putative local benefits are significant, and any burdens on
                        interstate commerce are not "clearly excessive." ...................................... 8

                        a.      NAW's anecdotal evidence of the cost of compliance does
                                not establish a substantial burden on interstate commerce. ........... 8

                        b.      Extended producer responsibility is a tool for governments
                                to respond to modern waste management challenges. .................... 9

        B.      There is no due-process violation. ........................................................ 10

                1.      NAW has not identified any protected interest that has been, or
                        will imminently be taken by, the Department of Environmental
                        Quality......................................................................................... 11

                2.      Regardless, the Recycling Modernization Act provides ample
                        process before deprivation of a protected interest could occur................. 12

                3.      The arbitration clause in the Oregon Addendum does not change
                        the result....................................................................................... 16

SV1/jc4/1027192367

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

a.     The Recycling Modernization Act does not require producers to join CAA or to agree to any arbitration provision. .................................................................................... 17

b.     NAW relies on a facially erroneous reading of the clauses. ......... 18

c.     The clauses do not enable CAA to bypass the enforcement framework for the Recycling Modernization Act. ....................... 19

d.     In any event, NAW failed to adduce any evidence that the clauses would necessarily deprive it of due process. ................... 21

e.     The enforceability of arbitration provisions in government contracts demonstrates that arbitration does not necessarily violate due process. ....................................................... 23

4.     The use of third-party producer responsibility organizations for membership administration is a permissible policy choice by the Oregon Legislature. ............................................................... 23

C.     Under *Burford*, the Court should abstain from reaching the question of whether Appendix G's purported confidentiality affects due-process rights. .................................................................................... 27

1.     CAA's fee-setting methodology is subject to inspection or review under three established processes, each subject to judicial review. .......... 28

2.     The confidentiality of Appendix G is inextricably intertwined with state law issues regarding the Recycling Modernization Act and public-records law. ............................................................... 28

3.     Federal intervention on this issue would disrupt the coherence of state policy. .......................................................................... 29

4.     Alternatively, *Pullman* abstention applies. .............................. 29

5.     In any event, the due-process claim would fail, because confidentiality of Appendix G would be immaterial in the appropriate agency proceeding. .............................................. 30

6.     The due-process claim would fail also because producers are not forced to register with and pay fees to CAA. ............................ 31

D.     Any remedy must be narrowly tailored to the constitutional infirmity. .............. 32

**IV.     CONCLUSION** ................................................................................. 33

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Ass'n of Am. Physicians & Surgeons, Inc. v. Rouillard*,
      392 F. Supp. 3d 1151 (E.D. Cal. 2019)................................................................22

*Ass'n to Preserve & Protect Local Livelihoods v. Sidman*,
      147 F.4th 40 (1st Cir. 2025)..............................................................................7

*Bibb v. Navajo Freight Lines, Inc.*,
      359 U.S. 520 (1959)..........................................................................................7

*Blumenkron v. Multnomah Cnty.*,
      91 F.4th 1303 (9th Cir. 2024) ...................................................................27, 28

*Board of Regents v. Roth*,
      408 U.S. 564 (1972)........................................................................................11

*Buckingham v. Sec'y of U.S. Dep't of Agric.*,
      603 F.3d 1073 (9th Cir. 2010) ....................................................................13, 15

*Carmack v. Chase Manhattan Bank (USA)*,
      521 F. Supp. 2d 1017 (N.D. Cal. 2007) .......................................................21, 22

*College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
      527 U.S. 666 (1999)........................................................................................11

*Concrete Pipe & Products of Calif., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*,
      508 U.S. 602 (1993).......................................................................................22

*Crowell v. Benson*,
      285 U.S. 22, 46 (1932)....................................................................................22

*Dobbs v. Jackson Women's Health Org.*,
      597 U.S. 215 (2022)........................................................................................24

*Duffield v. Robertson Stephens & Co.*,
      144 F.3d 1182 (9th Cir. 1998) .........................................................................17

*Exxon Corp. v. Governor of Maryland*,
      437 U.S. 117 (1978).............................................................................5, 6, 7, 8

*Fed. Deposit Ins. Corp. v. Air Fla. Sys., Inc.*,
      822 F.2d 833 (9th Cir. 1987) .......................................................................17, 23

Page iii -   DEFENDANT'S POST-TRIAL BRIEFING
                SV1/jc4/1027192367

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*Fireman's Fund Ins. Co. v. City of Lodi*,
　　302 F.3d 928 (2002)................................................................................................29

*Flynt v. Bonta*,
　　131 F.4th 918 (9th Cir. 2025) *cert den.*, 146 S. Ct. 1490 (2026)................................6, 8, 9

*Gen. Motors Corp. v. Tracy*,
　　519 U.S. 278 (1997)..................................................................................................5

*Gilbertson v. Albright*,
　　381 F.3d 965 (9th Cir. 2004) ...................................................................................30

*Hardware Dealers' Mut. Fire. Ins. Co. of Wis. v. Glidden Co.*,
　　284 U.S. 151 (1931)...........................................................................................21, 22

*Hollingsworth v. Perry*,
　　570 U.S. 693 (2013)................................................................................................15

*Interior Glass Sys., Inc. v. United States*,
　　927 F.3d 1081 (9th Cir. 2019) .................................................................................15

*Lee v. Walters*,
　　433 F.3d 672 (9th Cir. 2005) ...................................................................................32

*Lyeth v. Chrysler Corp.*,
　　929 F.2d 891 (2d Cir. 1991)......................................................................................21

*Mathews v. Eldridge*
　　424 U.S. 319 (1976)..................................................................................12, 13, 15, 21

*Minn. v. Clover Leaf Creamery Co.*,
　　449 U.S. 456 (1981)..................................................................................................9

*Nat'l Pork Producers Council v. Ross*,
　　6 F.4th 1021 (9th Cir. 2021) ......................................................................................8

*Nat'l Pork Producers Council v. Ross*,
　　598 U.S. 356 (2023).........................................................................................5, 6, 7, 8

*Nat'l Spiritual Assembly of Bahai's v. Nat'l Spiritual Assembly of Bahai's*,
　　628 F.3d 837 (7th Cir. 2010) ...................................................................................32

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*,
　　439 U.S. 96 (1978)..................................................................................................11

*New State Ice Co. v. Liebmann*,
　　285 U.S. 262 (1932)..................................................................................................1

SV1/jc4/1027192367

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*Or. Firearms Fed'n v. Kotek*,
    682 F. Supp. 3d 874 (D. Or. 2023) ......................................................................15

*Perry v. Brown*,
    671 F.3d 1052 (9th Cir. 2012) .............................................................................15

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970)...............................................................................................8

*Roberts v. AT&T Mobility LLC*,
    877 F.3d 833 (9th Cir. 2017) ...............................................................................17

*Schwarm v. Craighead*,
    552 F. Supp. 2d 1056 (E.D. Cal. 2008)...........................................................11, 12

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc.*,
    925 F.2d 1136 (9th Cir. 1991) .............................................................................23

*Tucson Women's Clinic v. Eden*,
    379 F.3d 531 (9th Cir. 2004) ...............................................................................24

*Ulrich v. City & County of San Francisco*,
    308 F.3d 968 (9th Cir. 2002) ...............................................................................12

*Wash. ex rel. Seattle Title Trust Co. v. Roberge*,
    278 U.S. 116 (1928)..............................................................................................24

## STATUTES, REGULATIONS, RULES

9 U.S.C. § 2.................................................................................................................21

Fed. R. Civ. P. 65.......................................................................................................32

Fed. R. Evid. 201 .......................................................................................................14

ORS 28.020.................................................................................................................16

ORS 174.040................................................................................................................32

ORS 183
    .310.................................................................................................................14, 30
    .482.................................................................................................................14, 31
    .484.............................................................................................................16, 30–31
    .745.......................................................................................................................14

ORS 459A
    .884.................................................................................................................5, 16

Page v -    DEFENDANT'S POST-TRIAL BRIEFING
    SV1/jc4/1027192367

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

.860....................................................................................................................5, 9, 10, 14

.863....................................................................................................................6, 7

.869....................................................................................................................12, 17

.875....................................................................................................................17, 24, 25

.878....................................................................................................................16, 30, 31

.881....................................................................................................................24

.884....................................................................................................................5, 16

.962....................................................................................................................12, 13, 16, 19, 20

ORS 468.130....................................................................................................................14

ORS 192

.345....................................................................................................................28

.411....................................................................................................................28

.431....................................................................................................................28

OAR 340-011

0530....................................................................................................................14, 31

0545....................................................................................................................13, 14

0550....................................................................................................................31

0573....................................................................................................................14

0575....................................................................................................................14

OAR 340-012

0038....................................................................................................................13

0041....................................................................................................................14

0045....................................................................................................................13

0140....................................................................................................................13

0145....................................................................................................................14

OAR 340-090

0720....................................................................................................................16, 17, 31, 32

0750....................................................................................................................16

## OTHER AUTHORITIES

11A Fed. Pract. & Proc. Civ. § 2956 (3d ed.)....................................................................................................................32

DEQ, *SB 582-1 Staff Measure Summary*, 81st. Legis. Assem., Reg. Sess. (Or. Feb. 23, 2021), https://olis.oregonlegislature.gov/liz/2021R1/Downloads/Committee MeetingDocument/232321 ....................................................................................................................14, 15

*Public Hearing on SB 14, SB 581, SB 582 Before S. Comm. on Energy and Env't*, 81st Legis. Assem., Reg. Sess., at 29:55 (Or. Feb. 23, 2021) (statement of Abby Boudouris, Legis. Analyst, DEQ), https://olis.oregonlegislature.gov/liz/ mediaplayer/?clientID=4879615486&eventID=2021021310 ....................................................................................................................25, 26

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*Public Hearing on SB 581 and SB 582 Before S. Comm. on Energy and Env't*, 81st Legis. Assem., Reg. Sess. (Or. Apr. 8, 2021) (written statement of Chris Parrill, SunChemical), https://olis.oregonlegislature.gov/liz/2021R1/Downloads/ PublicTestimonyDocument/23746 ..................................................................................26

*Public Hearing on SB 581 and SB 582 Before S. Comm. on Energy and Env't*, 81st Legis. Assem., Reg. Sess. (Or. Apr. 8, 2021) (written statement of Flexible Packaging Ass'n), https://olis.oregonlegislature.gov/liz/2021R1/Downloads/ PublicTestimonyDocument/23920 ............................................................................26, 27

Res. Recycling Sys., *Evaluation of Five Legal and Relational Framework Scenarios: A Report to the Oregon Recycling Steering Committee* (Jan. 28, 2020), https://www.oregon.gov/deq/recycling/Documents/In-DepthEvalReport.pdf ..................26

*Recycling Steering Comm. Meeting Summary* (June 18, 2020), https://www.oregon.gov/deq/recycling/Documents/RSCSummary61820.pdf..................26

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## I.    INTRODUCTION

In 2021, Oregon enacted the Plastic Pollution and Recycling Modernization Act to modernize its outdated recycling system and to address the growing problems with managing waste from packaging, printing and writing paper, and single-use food serviceware within the state. Over the past five years, Oregon's Department of Environmental Quality has diligently worked on rulemaking and guidance to implement the Act, including by engaging with an array of stakeholders and experts. NAW seeks to invalidate the Act, claiming that its extended producer responsibility framework violates the dormant Commerce Clause, and that various aspects of implementation violate the Due Process Clause.

NAW did not meet its burden to prove its claims at trial. There is no dormant Commerce Clause concern with a state requiring producers of waste to share in the responsibility of managing that waste when it is discarded in Oregon. And as with all state legislation, specific requirements may vary between states, but that is the nature of our federal system. *See New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory … ."). As for the due-process claim, NAW has no protected property interest in "access to the Oregon market," and its concerns about civil penalties are belied by the ample process required under Oregon law.

NAW has not met its burden for its claims, and this Court should find in favor of Defendant Feldon.

## II.    TRIAL EVIDENCE

Trial took place from July 13 through 17, 2026. This section contains a brief summary of the witness testimony presented and a description of some of the key exhibits admitted into evidence.

Page 1 -    DEFENDANT'S POST-TRIAL BRIEFING
SV1/jc4/1027192367

## A.    Witnesses and Their Testimony

Kimberly Holmes, executive director of Circular Action Alliance Oregon, testified as a witness called by both NAW and DEQ. Ms. Holmes testified about the operations of Circular Action Alliance Oregon and the national Circular Action Alliance organization, and about CAA's interactions with DEQ and with producers. (Holmes Testimony, July 13, 2026.)

On July 13 and 14, representatives of NAW and some of its member companies testified about the effects of the Recycling Modernization Act on their organizations. (Wild Testimony, July 13 (NAW); Rodriguez Testimony, July 13–14 (RJ Schinner Co.); Winkle Testimony, July 14 (Harbor Foods); Allen Testimony, July 14 (WCP Solutions).) Also on July 14, Rick Tomlinson, President of the California Strawberry Commission, testified regarding the Act's effects with regard to packaging used by producers of California strawberries. (Tomlinson Testimony, July 14.)

NAW's expert witnesses testified on July 14 and 15. Dr. Douglas Thomas testified regarding his opinions on the effect that the Recycling Modernization Act will have on commerce. (Dr. Thomas Testimony, July 14–15.) Dr. Calvin Lakhan testified regarding his opinions on the effects that the Act will have on Oregon's recycling system and on producers and consumers. (Dr. Lakhan Testimony, July 15.)

DEQ's witnesses began testifying on July 15. Nicole Portley, DEQ's Producer Responsibility Organization Program Plan Lead for the Recycling Modernization Act, testified about DEQ's implementation of the Act, DEQ's review and approval of CAA's program plan, and DEQ's engagement with producers and with CAA. (Portley Testimony, July 15–16.) Erin Saylor, Manager of DEQ's Office of Compliance and Enforcement, testified regarding DEQ's formal enforcement processes and how those processes relate to the enforcement of the Recycling Modernization Act. (Saylor Testimony, July 16.) David Allaway, DEQ Senior Policy Analyst, testified regarding DEQ's understanding and assessment of the environmental benefits associated with implementation of the Recycling Modernization Act. (Allaway Testimony, July

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

16.) Mr. Allaway also testified regarding DEQ's communications with CAA and with producers during Ms. Portley's leave of absence, including DEQ's review and approval of program plan amendments. (Allaway Testimony, July 16–17.)

DEQ's expert witnesses testified on July 17. Scott Cassel, founder and CEO of the Product Stewardship Institute, testified regarding his opinion on the growing waste management problem, on the effectiveness of extended producer responsibility programs to address that problem, and that the structure and implementation of the Recycling Modernization Act align with best practices for EPR policies, which are based on data and information from successful EPR programs. (Cassel Testimony, July 17.) Reid Lifset, Research Scholar at the Yale University School of the Environment, testified regarding his opinions rebutting the opinions of Dr. Thomas and Dr. Lakhan. (Lifset Testimony, July 17.)

## B.    Key Exhibits

Key exhibits introduced at trial included documents pertaining to the producer responsibility program plan administered by CAA. Those documents included the currently effective version of the Oregon Program Plan for program years 2025 through 2027. (Ex. 15 (Oregon Program Plan (2025–2027), Amended Version, May 4, 2026).) The documents also included Appendix G to the Program Plan, which contains detailed information on the fee-setting methodology for the program. (Ex. 12 (Appendix G); Ex. 13 (Appendix G, Updated March 2026).) Also admitted were the producer fee schedules for program years 2025 and 2026, listing the fee rates for each material category of covered product. (Ex. 42 (2025 Oregon Producer Fee Schedule); Ex. 43 (2026 Oregon Producer Fee Schedule).) The exhibits also included copies of contracts that producers have signed when they register with CAA: the Participant Producer Agreement between the producer and CAA, as well as the Oregon Addendum between the producer and CAA Oregon. (Ex. 34 (Participant Producer Agreement); Ex. 70 (Oregon Addendum to Participant Producer Agreement).)

SV1/jc4/1027192367

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Also admitted were DEQ documents pertaining to the interpretation and implementation of the Recycling Modernization Act. Those documents included DEQ guidance for producers, as well as internal guidance for DEQ employees who review and evaluate draft producer responsibility program plans. (Ex. 519 ("Determining Producer Obligations and Definitions"); Ex. 520 ("Frequently Asked Questions: Recycling Modernization Act Exemptions"); Ex. 531 ("Internal Management Directive: Oregon Recycling Modernization Act PRO Program Plans").) Also included is an internal DEQ guidance document regarding procedures for enforcement of the Recycling Modernization Act. (Ex. 69 (Table 5A, Product Stewardship Violations Guidance).)

## III.    ARGUMENT

NAW has not met its burden to show that the Recycling Modernization Act violates the dormant Commerce Clause or the Fourteenth Amendment's Due Process Clause. Section A of this argument addresses the trial evidence as it relates to the dormant Commerce Clause claim. Section B addresses the due-process claim, including this Court's requested briefing on the existence of a protected interest and whether it is relevant that the Act could have been designed with traditional direct regulation by DEQ. Section C addresses this Court's question regarding the lack of a public-records request for Appendix G, in the form of an argument for *Burford* abstention. And lastly, Section D addresses this Court's question regarding the appropriate remedy if the Court identifies due-process violations with respect to the CAA contracts.

**A.    The dormant Commerce Clause allows the states of the Union to require producers to take responsibility for their packaging, paper, and food serviceware waste.**

NAW claims that the Recycling Modernization Act violates the dormant Commerce Clause by discriminating against interstate commerce, imposing impermissible extraterritorial effects, regulating instrumentalities of interstate commerce, and imposing a burden on interstate commerce that is clearly excessive in relation to its putative local burdens. The record here shows otherwise.

Page 4 -    DEFENDANT'S POST-TRIAL BRIEFING
SV1/jc4/1027192367

1.      **The Recycling Modernization Act treats similarly situated in-state and out-of-state producers even-handedly.**

The "core" of the dormant Commerce Clause is the "antidiscrimination principle." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023). The Clause prohibits the enforcement of state laws "driven by economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.* (internal quotation marks and alterations omitted). The Recycling Modernization Act is not such a law.

Nothing on the face of the Act discriminates against out-of-state interests. The law applies to covered products "sold or distributed in or into this state," regardless of whether the producer is located inside or outside the state. *See* ORS 459A.884(2).

Nor does the Act have a discriminatory purpose. The purposes of the Act are to modernize Oregon's recycling system; reduce negative impacts of production, consumption, and end-of-use management of products and packaging across their life cycle; and to have producers share in the responsibility to reduce those impacts. (Allaway Testimony, July 16, 2026; ORS 459A.860(4).) That has nothing to do with protectionism for in-state businesses.

Lastly, the Act is not even discriminatory in effect. There is no evidence that the Recycling Modernization Act favors in-state interests over their "similarly situated" out-of-state competitors. *See Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298–99 (1997) ("[A]ny notion of discrimination assumes a comparison of substantially similar entities. … [T]here is a threshold question whether the companies are indeed similarly situated for constitutional purposes."). NAW's own evidence included testimony from both out-of-state and in-state producers who face compliance costs due to the Act. (*See* Allen Testimony, July 14 (testifying that WCP Solutions' hub is in Portland). In any event, increased compliance costs are not discrimination against interstate commerce, even if they are incurred largely by out-of-state businesses. *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 125–26 (1978) ("The fact that the burden of a

Page 5 -    DEFENDANT'S POST-TRIAL BRIEFING
        SV1/jc4/1027192367

state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce.").

### 2.    The Act does not have impermissible extraterritorial effects.

NAW alleges that the Recycling Modernization Act "has an impermissible extraterritorial effect of compelling out-of-state distributors to alter packaging design and sourcing decisions made entirely outside of Oregon." (Am. Compl., Dkt. No. 26¶ 70.) This argument fails as a matter of law, for two reasons. First, the Act does not compel anyone to alter packaging or sourcing decisions; rather, it requires producers to help pay for the end-of-use management of products and packaging, based on what they sell in or into the state. Second, the Act applies only to items that are discarded in Oregon; covered products do not include "[a]ny item that is not ultimately discarded inside this state, whether for purposes of recovery or disposal." ORS 459A.863(6)(b)(J). To the extent that such a law might affect the decision-making of out-of-state businesses who sell items into the state, those effects do not amount to impermissible extraterritorial regulation. *See Flynt v. Bonta*, 131 F.4th 918, 929 (9th Cir. 2025) ("[E]ven when state law has significant extraterritorial effects, it passes [dormant] Commerce Clause muster when, as here, those effects result from the regulation of in-state conduct."), *cert den.*, 146 S. Ct. 1490 (2026).

### 3.    The Act does not regulate instrumentalities of interstate commerce.

The Recycling Modernization Act does not regulate instrumentalities of interstate commerce. Instrumentalities are the means of transportation or transmission in interstate commerce, not the *items* transported in commerce by those means. (Def.'s Br. on Instrumentalities of Interstate Com., Dkt. No. 174.) Instrumentalities include vehicles, as well as permanent infrastructure used for transmission of energy or information. *See, e.g., Pork Producers*, 598 U.S. at 379 n.2 (referring to regulations on "instrumentalities of interstate transportation—trucks, trains, and the like"). Here, the Act applies to packaging, printing and

Page 6 -    DEFENDANT'S POST-TRIAL BRIEFING
SV1/jc4/1027192367

writing paper, and food serviceware. ORS 459A.863(6). Each of those is an item that is transported in commerce, not a means of transportation.

### 4. The Act does not impede the flow of items across state borders.

Whether a particular regulation violates the dormant Commerce Clause depends less on whether its objects can be characterized as instrumentalities and more on whether the regulation "impedes the *flow* of commerce." *See Pork Producers*, 598 U.S. at 379 n.2 ("[T]his Court 'has only rarely held that the Commerce Clause itself preempts an entire field from state regulation, and then only when a lack of national uniformity would impede *the flow* of interstate goods.'" (Quoting *Exxon*, 437 U.S. at 128; emphasis in *Pork Producers*.)); *see also Ass'n to Preserve & Protect Local Livelihoods v. Sidman*, 147 F.4th 40, 57 (1st Cir. 2025) ("In each of those three cases, the challenged regulation required an instrumentality of interstate commerce—whether a train in *Bibb* and *Southern Pacific*, or a truck in *Raymond*—to either comply with that regulation or not pass through the regulating jurisdiction at all ... . Each regulation thus prevented the continuous flow of interstate commerce *through* the regulating jurisdiction and not merely *to* it.").

The Recycling Modernization Act does not impede the flow of interstate goods. The Act applies to products only if they are *discarded* in Oregon, and it does not attempt to regulate *how* those products are moved. To the extent that the Act impacts decisions about what packaging to use for products discarded in Oregon, it requires only that producers take responsibility for the costs of managing that packaging waste. And unlike the "instrumentality" line of cases, the Act does not even require producers to make any changes to that packaging. *Cf. Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 523, 527, 529 (1959) (invalidating state law prohibiting straight mudflaps, because it "place[d] an unconstitutional burden on interstate commerce" by requiring trucks to change mudflaps when entering or crossing the state for inconclusive safety purpose). Most crucially, the Act imposes no responsibility for packaging on products that are

Page 7 -    DEFENDANT'S POST-TRIAL BRIEFING

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

simply moving through and are not discarded in Oregon. Because the Act does not impede the flow of commerce, there is no dormant Commerce Clause violation.

> **5.     The putative local benefits are significant, and any burdens on interstate commerce are not "clearly excessive."**

"Under what has been termed *Pike* balancing, state laws that regulate even-handedly to effectuate a legitimate local public interest will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Flynt*, 131 F.4th at 925 (cleaned up) (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). Cases applying *Pike* balancing often "turn[] in whole or in part on the discriminatory character of the challenged state regulations." *Pork Producers*, 598 U.S. at 377. "[T]he *Pike* line serves as an important reminder that a law's practical effects may also disclose the presence of a discriminatory purpose." *Id.*

The record here shows that NAW did not meet its burden under *Pike*. The putative local benefits are substantial, and the incidental burdens on commerce fall far short of the "clearly excessive" hurdle for invalidating a state law. *See Pike*, 397 U.S. at 142. Thus, in light of the Act's substantial benefits, the law's practical effects do not "disclose the presence of a discriminatory purpose." *See Pork Producers*, 398 U.S. at 377.

> **a.     NAW's anecdotal evidence of the cost of compliance does not establish a substantial burden on interstate commerce.**

As a threshold matter, NAW did not meet its burden to "demonstrate that a challenged law imposes a 'substantial' or 'significant' burden on interstate commerce before *Pike* balancing can occur." *Flynt*, 131 F.4th at 925. NAW presented anecdotal evidence of compliance burdens faced by particular NAW members. But "*Pike* 'protects the interstate market, not particular interstate firms, from ... burdensome regulations.'" *Id.* at 932 (quoting *Exxon*, 437 U.S. at 127–28). Even if compliance with the Recycling Modernization Act imposes "increased costs" on producers or "higher costs to consumers," neither of those results "qualif[ies] as a substantial burden on interstate commerce." *Nat'l Pork Producers Council v. Ross*, 6 F.4th 1021, 1033 (9th Cir. 2021), *aff'd*, 598 U.S. 356 (2023).

Page 8 -    DEFENDANT'S POST-TRIAL BRIEFING
SV1/jc4/1027192367

NAW attempted to meet its burden through expert testimony, but that attempt likewise failed. Dr. Thomas's conclusions depended on conversations with a handful of companies chosen by NAW's counsel rather than a representative sampling. (Dr. Thomas Testimony, July 15.) And as Mr. Lifset noted, NAW's experts did not assess the magnitude or frequency of the burdens imposed by the Recycling Modernization Act on distribution and wholesale as a commercial sector. (Lifset Testimony, July 17.) At best, NAW has shown that a small number of companies are facing compliance burdens, with some unquantified broader impact to distribution and wholesale attributable to the Act.

Because NAW "ha[s] not made this required showing under the first part of the *Pike* framework, ... [the Court] need not determine whether the benefits of the challenged law are illusory." *Flynt*, 131 F.4th at 933 (internal quotation marks omitted).

### b.     Extended producer responsibility is a tool for governments to respond to modern waste management challenges.

In any event, the benefits of the Recycling Modernization Act are real and substantial. Oregon has a legitimate interest in protecting the environment, including "easing solid waste disposal problems." *See Minn. v. Clover Leaf Creamery Co.*, 449 U.S. 456, 462 (1981). The Act furthers that interest by "prioritiz[ing] practices that prevent and reduce the negative environmental, social, economic and health impacts" caused by covered products across their life cycle. *See* ORS 459A.860(4). Extended producer responsibility programs further those interests by, for example, mitigating the competitive disadvantage of moving to sustainable packaging. (Cassel Testimony, July 17.) While NAW's witnesses questioned the degree of effectiveness of the Act at motivating changes in packaging, those are ultimately *policy* arguments, not legal ones.

Further, improving packaging sustainability is not the only purpose of the law. The Recycling Modernization Act also improves the quantity and quality of recycling itself, such as by increasing the amount of material recycled by improving collection and expanding the

Page 9 -     DEFENDANT'S POST-TRIAL BRIEFING

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

number of materials collected. (Allaway Testimony, July 16.) The Act, as implemented through the approved program plan, serves those goals by providing funding for local governments and their service providers, establishing recycling depots and drop-off centers, funding the transportation of covered products, and funding educational resources and promotional campaigns. (Holmes Testimony, July 13; Ex. 15 at 20–189 ("Operations Plan" section of CAA Program Plan).)

By providing for those benefits through a producer responsibility organization, the Act requires producers "to share in the responsibility to reduce [the] impacts" of covered products sold in or into Oregon. *See* ORS 459A.860(4). Specifically, the Act requires producers to share in the costs of managing the waste they create in Oregon rather than passing the financial and social costs on to governments and ratepayers. (Cassel Testimony, July 17.)

The record here demonstrates that EPR programs, such as the Recycling Modernization Act, are effective tools to further the environmental goals identified by the Oregon Legislature. (Cassel Testimony, July 17 (opining that the Act furthers the goals); Lifset Testimony, July 17 (same).) At best, Dr. Lakhan (one of NAW's experts) could only opine that the Act is "not likely" to achieve four goals that he identified as "canonical" for EPR programs. (Dr. Lakhan Testimony, July 15.) But Dr. Lakhan's testimony is largely built on his own body of work advocating against EPR programs, rather than on the work of credible experts in the field. And as Dr. Lakhan himself admitted, his opinion was focused on those four goals, rather than the array of goals identified by the legislature. Whatever weight is due to Dr. Lakhan's testimony, it does not meet the burden required to establish that the putative local benefits are illusory.

For those reasons, any burdens on commerce attributable to the Recycling Modernization Act are not "clearly excessive" in relation to the local putative benefits under *Pike*.

## B.     There is no due-process violation.

NAW also claims that the Recycling Modernization Act violates the Due Process Clause of the Fourteenth Amendment by failing to provide adequate procedural protections against

Page 10 -   DEFENDANT'S POST-TRIAL BRIEFING

deprivation of property and by delegating unreviewable control over the program to private parties. Again, the record here shows otherwise.

> **1.    NAW has not identified any protected interest that has been, or will imminently be taken by, the Department of Environmental Quality.**

NAW's procedural due-process claim fails at the outset, because it does not identify a protected interest for which they are entitled to due process. Specifically, NAW asserts that the Recycling Modernization Act deprives producers of property without due process of law. (Am. Compl. ¶ 81–85; Pl.'s Pre-Trial Statement of Case, Dkt. No. 165 at 4–5.) But the Due Process Clause itself does not create property interests. *Board of Regents v. Roth*, 408 U.S. 564, 576 (1972). Rather, property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Id.* at 577. There is no qualifying property interest here for NAW's due-process arguments.

If NAW relies only on its "interest in access to the Oregon market" (Am. Compl. ¶ 83), then that is fatal to its claim. An interest in carrying out a particular business is not a property right. *See College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999) ("[B]usiness in the sense of *the activity of doing business*, or *the activity of making a profit* is not property in the ordinary sense ... ."). And even if NAW's members had asserted a liberty interest in doing business, it would be a qualified one, which may be conditioned by "reasonable restrictions." *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 439 U.S. 96, 106 (1978). State legislatures "have broad scope to experiment with economic problems," and "the right to conduct a business, or to pursue a calling, may be conditioned ... ." *Id.* at 107. Requiring a producer to pay fees proportional to the cost of managing the waste they sell in or into Oregon is wholly reasonable.

Moreover, a producer's payment of membership fees is not an involuntary deprivation of a property interest. "A deprivation of property does not occur when individuals voluntarily relinquish their property rights." *Schwarm v. Craighead*, 552 F. Supp. 2d 1056, 1083 (E.D. Cal.

SV1/jc4/1027192367

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

2008) (citing *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 974 (9th Cir. 2002)); *see id.* at 1083–84 (plaintiffs who paid fees to enroll in a voluntary diversion program rather than face possible criminal proceedings were not deprived of property interests). The Recycling Modernization Act does not force producers to pay membership fees to CAA or to any particular producer responsibility organization. Producers have other options too, such as avoiding the registration requirement by privately recycling their covered products, ORS 459A.869(13), and avoiding fees for a particular year by not selling covered products in Oregon in that year. (Portley Testimony, July 16.) Membership fees are due to CAA only if a producer *chooses* to sell covered products for that year and to fulfill its obligations as a producer by joining CAA.

With regard to civil penalties, Defendant agrees that due process is required. But DEQ has not even begun the first formal step for seeking civil penalties for any producer, much less a NAW member. (Portley Testimony, July 16.) And putting aside the Article III standing and ripeness concerns for that premature claim, Oregon's procedure for DEQ civil penalties far exceeds what is required by the Due Process Clause. That procedure is described in the following section.

2.      **Regardless, the Recycling Modernization Act provides ample process before deprivation of a protected interest could occur.**

The Recycling Modernization Act, together with the Oregon Administrative Procedures Act, provides ample process before any producer could be deprived of a protected interest. The three-factor test from *Mathews v. Eldridge*, 424 U.S. 319 (1976), governs this analysis. As explained above, the only protected interest that could be claimed here is NAW members' property interest in the civil penalties imposed by DEQ after formal enforcement. But putting aside the lack of standing, Oregon law provides for extensive process before any producer could be required to pay civil penalties. That process amply satisfies the *Mathews* factors.[1]

---

[1]      This section does not address ORS 459A.962(6), under which DEQ may request that the Department of Justice "bring an action seeking to prohibit the sale of a covered product in or into this state against any producer that sells, offers to sell or distributes a covered product in or into this state in violation of ORS 459A.869." That is because, as explained in the previous section,

Page 12 -   DEFENDANT'S POST-TRIAL BRIEFING

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*Mathews* provides the controlling test for what process is due to adequately protect a liberty or property interest. Under *Mathews*, the court "must balance: (1) the private interest that will be affected by the action, (2) the risk of an erroneous deprivation of that interest through the procedures used and the value of additional or alternative safeguards, and (3) the government's interest, including the additional costs and administrative burdens that additional procedures would entail." *Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073, 1081–82 (9th Cir. 2010) (citing *Mathews*, 424 U.S. at 335).

In turn, Oregon's process for DEQ to impose civil penalties is well-established. Before a formal enforcement proceeding can begin against a producer who has failed to register or pay fees, DEQ sends out warning letters with a 30-day opportunity to correct. (Portley Testimony, July 16; Ex. 69 at 1, 3.) The respondent producer can comply or provide information to explain that no violation occurred. (Portley Testimony, July 16.) If the producer remains noncompliant after the correction period, DEQ issues a pre-enforcement notice and refers the matter to its Office of Compliance and Enforcement for formal enforcement proceedings. (*Id.*; Saylor Testimony, July 16; Ex. 69 at 1, 3); *see* OAR 340-012-0038(2) (defining "pre-enforcement notice").

After referral, the enforcement office reviews the file to ensure that the evidence is sufficient to establish a violation by a preponderance of the evidence in an agency hearing. (Saylor Testimony, July 16); OAR 340-011-0545(2). The office further reviews to ensure that DEQ has followed its internal guidance. (Saylor Testimony, July 16.) If there is sufficient evidence, the office proceeds with calculating the civil penalty for the violation. (*Id.*) Calculation of the penalty begins with the base penalty. (*Id.*); OAR 340-012-0045. In turn, the base penalty for failure to register or pay fees begins with the $3,000 penalty matrix in OAR 340-012-0140(4), under which the relevant base penalties range from $375 to $3,000 per day, depending

there is no protected interested in "access to the Oregon market." In any event, there is no evidence that any action under ORS 459A.962(6) is imminent or threatened.

Page 13 -   DEFENDANT'S POST-TRIAL BRIEFING
SV1/jc4/1027192367

on magnitude. (Saylor Testimony, July 16.) From there, DEQ considers aggravating and mitigating factors and economic benefit, in accordance with the detailed provisions in OAR 340-012-0145 and -0150. ORS 468.130 further provides that the civil penalty cannot exceed $25,000 per day.

After calculating the civil penalty, DEQ issues a Notice of Civil Penalty Assessment and Order. (Saylor Testimony, July 16); OAR 340-012-0041(2). The respondent producer then has 20 days to request a hearing. OAR 340-011-0530(1). In that request, the producer must admit or deny DEQ's factual allegations and assert any defenses. *Id.* § (2). As a matter of practice, DEQ offers to discuss settlement with the producer at this point. (Saylor Testimony, July 16.) If no settlement can be reached, DEQ refers the matter to the Office of Administrative Hearings, which assigns an administrative law judge. (*Id.*) The matter then proceeds to a hearing in which DEQ would have the burden to prove the violations by a preponderance of the evidence. OAR 340-011-0545(1), (2). After the hearing, the administrative law judge issues a proposed order, which is subject to review, if requested, by the Environmental Quality Commission. OAR 340-011-0573(1); OAR 340-011-0575(2). The resulting final order is subject to judicial review by petition to the Oregon Court of Appeals. ORS 183.482(1) (providing for judicial review of "contested cases"); *see* ORS 183.310(2)(a) (defining "contested case"). No payment is due until appeals are exhausted. ORS 183.745(2).

Turning back to the *Mathews* factors, nobody disputes Oregon's substantial interest in addressing a growing waste management problem, which was accelerated by China closing its recycling markets to the United States in 2018. (Allaway Testimony, July 16, 2026; Cassel Testimony, July 17, 2026); *see also* ORS 459A.860 (legislative findings); DEQ, *SB 582-1 Staff Measure Summary*, 81st. Legis. Assem., Reg. Sess. (Or. Feb. 23, 2021)[2] (describing impacts of

---

[2] https://olis.oregonlegislature.gov/liz/2021R1/Downloads/CommitteeMeetingDocument/232321

The Staff Measure Summary is legislative history for the Recycling Modernization Act. It is thus a legislative fact that this Court is entitled to access regardless of if and how it is presented. *See* Fed. R. Evid. 201 advisor committee's notes on proposed rules (stating that "judicial access to legislative facts" should be governed by the view that, "[i]n determining the

Page 14 -  DEFENDANT'S POST-TRIAL BRIEFING
SV1/jc4/1027192367

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

China's actions to Oregon). Even NAW "supports the goal of building a circular economy." (Pl.'s Mot. for Prelim. Inj., Dkt. No. 33 at 9; *see also* Wild Testimony, July 13 (accord).)

In contrast, NAW members' private interest in avoiding civil penalties is low. Indeed, in the analogous tax penalty context, the Ninth Circuit has held that a taxpayer's "interest in the lost use of its property for the pendency of" an action challenging the Internal Revenue Service's tax penalty assessment was "noteworthy, but not that substantial." *Interior Glass Sys., Inc. v. United States*, 927 F.3d 1081, 1086 (9th Cir. 2019). And unlike here, the taxpayer's right to judicial review was contingent on paying the penalty *first*. *Id.* But the taxpayer's interest in avoiding the tax penalty was "not that substantial," because the taxpayer would be entitled to "full retroactive relief" and did not "face[] abject poverty" during pendency of the action. *Id.* If that private interest is "not that substantial," then any interest in avoiding civil penalties *after* a hearing is even less "substantial."

The risk of erroneous deprivation is also minimal. The administrative processes described above provide respondent producers notice of the violations alleged, a prescribed process for written responses, and requests for hearing, an opportunity to an evidentiary hearing at which DEQ must prove its case by a preponderance of the evidence, and more. That is well beyond the constitutional minimum for the interests at stake here. *See Mathews*, 424 U.S. at 334 (collecting cases, including one in which "notice of the action sought, a copy of the charge, reasonable time for filing a written response, … an opportunity for an oral appearance," and an evidentiary hearing was sufficient); *id.* at 343 (holding, for disability benefits, "that something less than an evidentiary hearing is sufficient"); *Buckingham*, 603 F.3d at 1084 (accord in context of grazing permit).

---

content or applicability of a rule of domestic law, the judge is unrestricted in his investigation and conclusion"); *Or. Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 886 (D. Or. 2023) (discussing difference between adjudicative and legislative facts); *Perry v. Brown*, 671 F.3d 1052, 1075 (9th Cir. 2012) (same), *vacated on other grounds sub nom.*, *Hollingsworth v. Perry*, 570 U.S. 693 (2013).

Page 15 -  DEFENDANT'S POST-TRIAL BRIEFING
SV1/jc4/1027192367

To the extent that NAW's due-process arguments continue to rely on its allegations of unpredictable and unreasonable fees charged by CAA, that reliance is misplaced. The Recycling Modernization Act and DEQ's rules circumscribe CAA's assessment and adjustment of membership fees. *See, e.g.*, ORS 459A.884 (listing requirements related to membership fees); OAR 340-090-0750(1) (authorizing annual updates to fee rate that "align with the most recent supply information received from member producers or updated material cost allocations"). And CAA lacks any meaningful ability to compel a member producer to pay fees that transgress those circumscriptions. NAW's members can raise those issues in the processes described above or by participating in public comment for program-plan approval, ORS 459A.878(2); seeking judicial review of an approval, ORS 183.484; filing a declaratory judgment action to determine rights and legal relations with CAA, ORS 28.020; requesting DEQ enforcement against CAA, *see, e.g.*, ORS 459A.962(2), (4), (5)(c) (providing for various forms of DEQ enforcement against producer-responsibility organizations); or forming a separate producer-responsibility organization, *see* OAR 340-090-0720(3). In short, the process available to NAW's members far exceeds the constitutional minimum guaranteed by the Due Process Clause.

**3.      The arbitration clause in the Oregon Addendum does not change the result.**

NAW argues that the Recycling Modernization Act violates due process by requiring producers to join CAA and to "agree to binding arbitration without judicial re[c]ourse." (Pl.'s Pre-Trial Statement at 3.) This argument fails for multiple reasons. First, the Act does not require producers to join CAA, and a producer's agreement to arbitration with CAA does not amount to the state action requisite for a due-process claim. Second, even if a producer *were* required to join CAA, the contracts expressly allow for judicial review, notwithstanding the arbitration provisions. Third, the dispute-resolution clauses of those contracts are not part of the enforcement framework for the Act and do not override DEQ's authority to determine whether and how to enforce the law—both against producers and the producer responsibility

Page 16 -  DEFENDANT'S POST-TRIAL BRIEFING

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

organization. And fourth, NAW's speculation about what CAA might do with the arbitration clauses is not a basis to invalidate the law.

> **a.      The Recycling Modernization Act does not require producers to join CAA or to agree to any arbitration provision.**

As an initial matter, NAW's argument about arbitration incorrectly assumes that the Recycling Modernization Act requires producers to join CAA. To the contrary, producers have multiple alternatives, including forming another producer responsibility organization or privately recycling their covered products. *E.g.*, ORS 459A.875(1); ORS 459A.869(13); OAR 340-090-0720(3). Thus, the law does not require a producer to join a producer responsibility organization at all, let alone require a producer to agree to any dispute resolution provisions in CAA's contracts.

NAW's due-process claim thus also fails because there is no requisite state action. When a law does not require a party to agree to arbitration, "[n]either private arbitration nor the judicial act of enforcing it ... constitutes state action." *Roberts v. AT&T Mobility LLC*, 877 F.3d 833, 844 (9th Cir. 2017). And without state action, there is no viable due-process claim. *Fed. Deposit Ins. Corp. v. Air Fla. Sys., Inc.*, 822 F.2d 833, 842 n.9 (9th Cir. 1987).

The arbitration clauses here are not distinguishable from the clauses that the Ninth Circuit held as non-state action in *Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182 (9th Cir. 1998). The arbitration provisions in that case were adopted by private national securities exchanges as mandatory rules. *Id.* at 1200–02. Notably, the Securities and Exchange Commission specifically approved those rules, a formal approval as compared to DEQ's informal review of CAA's Oregon Addendum here. Despite the federal agency's approval of the rule, the Ninth Circuit held that "[n]o federal law required [the plaintiff] to waive her right to litigate employment-related disputes by signing [an agreement to abide by the arbitration rules], and no state action is present in simply enforcing that agreement." *Id.* at 1201.

Page 17 -   DEFENDANT'S POST-TRIAL BRIEFING
SV1/jc4/1027192367

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Here, the law does not require producers to join CAA, and it does not require any producer to enter into contracts containing arbitration provisions. If a producer chooses to sell covered products, and if it chooses to fulfill its obligations under the Act by joining CAA, then the producer's agreement to arbitrate with CAA does not amount to state action. There is thus no due-process violation on that basis.

### b.    NAW relies on a facially erroneous reading of the clauses.

NAW's assertion that producers must "agree to binding arbitration without judicial re[c]ourse" also flatly contradicts the text of CAA's contracts. (*See* Pl.'s Pre-Trial Statement at 3.) Each of the contracts expressly allows a producer "to seek injunctive relief from a court." (Ex. 34 at 9; Ex. 70 at 10.)

Producers who join CAA sign a Participant Producer Agreement with CAA. (Holmes Testimony, July 13; Ex. 34.) The Participant Producer Agreement provides for non-binding mediation between a producer and CAA, and provides that if mediation fails, either party may pursue any other remedies, including "instituting an appropriate proceeding before a court of competent jurisdiction." (Ex. 34 at 8.) The agreement goes on to provide that any party may seek injunctive relief in a court, notwithstanding anything in the dispute resolution section:

> Notwithstanding the foregoing, nothing in this Section 5 shall limit the ability of Party to seek injunctive relief from a court of competent jurisdiction ordering compliance with this Agreement or enjoining and restraining the continuation of breach of this Agreement.

(Ex. 34 at 8–9.)

Producers who join CAA also sign an Oregon Addendum with CAA Oregon. (Holmes Testimony, July 13; Ex. 70 (Oregon Addendum).) The Addendum provides that if the parties cannot resolve a dispute themselves or through non-binding mediation, disputes shall be resolved by arbitration. (Ex. 70 at 10.) The Addendum then follows that provision with substantially the same language as the Participant Producer Agreement regarding "the ability of a Party to seek injunctive relief from a court of competent jurisdiction." (Ex. 70 at 10.)

Page 18 -  DEFENDANT'S POST-TRIAL BRIEFING
SV1/jc4/1027192367

Thus, both contracts expressly allow producers to seek a court order enjoining a breach of the contract or compelling compliance with the contract. And CAA's duties under the contracts include compliance with the Recycling Modernization Act in how CAA administers the program and assesses fees. (*See* Ex. 34 at 3 ("CAA shall be responsible for administering each Program, in accordance with Applicable Law."), 4 ("CAA shall develop fee structures under the Program Plans in accordance with Applicable EPR Laws ... ."), 9 ("CAA represents and warrants to Company that ... CAA will comply with all Applicable Laws applicable to its performance of its obligations hereunder and as a PRO ... ."); Ex. 70 at 7 ("CAA Oregon will assess such Producer Fees in accordance with the Oregon EPR Law, the Oregon Program Plan, and Fee Setting Methodology, as set out in the Oregon Program Plan.")). Therefore, if CAA assesses fees in a manner that is not "in accordance with the [Recycling Modernization Act]," (*see* Ex. 70 at 7), the contracts expressly provide that a producer may sue for an injunction requiring CAA to comply with the Act. NAW is thus incorrect that the contracts require its members to relinquish judicial remedies.

### c.    The clauses do not enable CAA to bypass the enforcement framework for the Recycling Modernization Act.

NAW's arguments frame the contracts' dispute-resolution provisions as though they are mechanisms for CAA to bypass DEQ's enforcement authority. That is wrong.

The Recycling Modernization Act vests enforcement authority in DEQ, not producer responsibility organizations. (Holmes Testimony, July 13; Portley Testimony, July 16; Saylor Testimony, July 16; ORS 459A.962.) Enforcement takes place through a multi-step process initiated by DEQ and subject to multiple layers of review, including judicial review. (Saylor Testimony, July 16); *see* ORS 459A.962(3)–(4) (citing ORS Chapter 183); *see generally* ORS Chapter 183 (Administrative Procedures Act). CAA's Oregon Addendum itself provides that its duties include escalating cases of alleged noncompliance *to DEQ* for enforcement. (Ex. 70 at 9.) For example, if a producer fails to report, register, or pay fees, CAA notifies the producer, and if

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

the producer has not cured the noncompliance after 90 days, CAA refers the producer to DEQ for potential enforcement. (Holmes Testimony, July 13.)

DEQ then determines whether and how to initiate enforcement action against a producer. (Holmes Testimony, July 13; Saylor Testimony, July 16.) And the dispute-resolution clauses do not limit, bind, or alter DEQ's enforcement authority. (Ex. 34; Ex. 70; Portley Testimony, July 16.) DEQ is not bound by any arbitration between CAA and a producer, or by any other provision of the CAA contracts. And while DEQ does use information from CAA regarding producers' compliance, CAA cannot force DEQ to initiate an enforcement action or assess penalties. (Holmes Testimony, July 13.)

DEQ may also enforce the Recycling Modernization Act against CAA. (Holmes Testimony, July 13; ORS 459A.962(5).) The contracts between CAA and producers do not override that authority or CAA's own obligations under the Act. If CAA is violating its obligations—such as by improperly assessing fees—DEQ can enforce against CAA, regardless of the contracts and regardless of any arbitration. *See* ORS 459A.962(3) (DEQ "may issue an order requiring compliance with the provisions of [the Recycling Modernization Act]"), (4) (DEQ "may issue civil penalties for violations of [the Recycling Modernization Act]"), (5) (DEQ "may issue an order ... to suspend or revoke a producer responsibility program plan").

Further, neither the arbitration clause nor any other part of the contracts gives CAA the power to unilaterally expel producers from the Oregon market, as NAW has suggested. (Portley Testimony, July 16.) If CAA were to terminate its contracts with a producer and expel that producer without cause, DEQ could take action to require CAA to allow that producer to register. (*Id.*) And it is DEQ, not CAA, that is authorized to file for an injunction to prohibit a producer's sale of covered products, or to assess penalties against that producer. *See* ORS 459A.962(3), (6). NAW's suggestion that CAA can unilaterally expel a producer from the Oregon market is baseless.

Page 20 -   DEFENDANT'S POST-TRIAL BRIEFING
SV1/jc4/1027192367

**d.    In any event, NAW failed to adduce any evidence that the clauses would necessarily deprive it of due process.**

Even if the Recycling Modernization Act had specifically provided for the dispute-resolution provisions in CAA's contracts, NAW needed to do much more to establish a lack of due process. Indeed, courts have held that arbitration clauses *can* provide due process. It was NAW's burden to produce evidence that the contractual dispute-resolution provisions would deny their members' due process. They have not met that minimal burden.

"Due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334. Courts have recognized that arbitration can provide due process, depending on the specifics of the arbitration procedure and the situation where it applies. *See Carmack v. Chase Manhattan Bank (USA)*, 521 F.Supp.2d 1017, 1025 (N.D. Cal. 2007) (citing 9 U.S.C. § 2) ("Federal law and the Federal Arbitration Act evince a strong presumption in favor of arbitration ... ."); *see id.* at 1025–26 (concluding that arbitration service provided appropriate procedural safeguards and "has been recognized by other courts as a viable alternative to the judicial system").

Even when a law requires parties to arbitrate (unlike here), courts have recognized that does not necessarily deprive parties of due process. "In the context of a statutory scheme that involves compulsory arbitration, due process does not guarantee any particular form of state procedure." *Lyeth v. Chrysler Corp.*, 929 F.2d 891, 895 (2d Cir. 1991). Rather, "a state may choose the remedy best adapted, in the legislative judgment, to protect the interests concerned, provided its choice is not unreasonable or arbitrary, and the procedure it adopts satisfies the constitutional requirements of reasonable notice and opportunity to be heard." *Hardware Dealers' Mut. Fire. Ins. Co. of Wis. v. Glidden Co.*, 284 U.S. 151, 158 (1931).

Accordingly, courts have upheld laws requiring various forms of arbitration or other non-judicial adjudication. *See id.* at 157, 159 (upholding Minnesota fire-insurance statute requiring binding arbitration as to the amount of loss, where the arbitrator's determination of the amount was "conclusive upon the parties, unless grossly excessive or inadequate, or procured by fraud");

Page 21 -  DEFENDANT'S POST-TRIAL BRIEFING
SV1/jc4/1027192367

*Concrete Pipe & Products of Calif., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 611, 630 (1993) (upholding law requiring arbitration as to an employer's debt to a multiemployer pension plan, and providing that the arbitrator's findings of fact were "rebuttable only by a clear preponderance of the evidence"); *Crowell v. Benson*, 285 U.S. 22, 46 (1932) (upholding a workers' compensation law that delegated to a commissioner the responsibility to make findings of fact regarding employees' injuries, where the commissioner's findings, "supported by evidence and within the scope of [the commissioner's] authority, shall be final").

The outcomes of those cases have turned on the specifics of the arbitration process and the nature of the issues subject to arbitration. *See Hardware Dealers'*, 284 U.S. at 159 (noting reasons supporting "the exercise of legislative judgment in requiring a more summary method of determining the amount of the loss [for purposes of a fire insurance policy] than that afforded by traditional forms"); *Crowell*, 285 U.S. at 46 (noting that the purpose of the law was to "furnish a prompt, continuous, expert, and inexpensive method for dealing with a class of questions of fact which are peculiarly suited to examination and determination by an administrative agency specially assigned to that task"); *see also Carmack*, 521 F. Supp. 2d at 1025 (listing procedural safeguards that an arbitration agreement must provide to satisfy due process).

A plaintiff cannot show that a particular procedure would violate due process without presenting facts demonstrating how the procedure operates. *See Ass'n of Am. Physicians & Surgeons, Inc. v. Rouillard*, 392 F. Supp. 3d 1151, 1160–61 (E.D. Cal. 2019) (dismissing due process challenge to law mandating an independent dispute resolution process (IDRP), when the plaintiffs failed to allege "facts ... demonstrating how the IDRP operates in each particular case").

Here, NAW has offered no evidence of what arbitration under the Oregon Addendum would look like or of what the likely issues for arbitration would be. The Addendum provides for arbitration "in accordance with the then effective JAMS arbitration rules." (Ex. 70 at 10.) There is no evidence in the record regarding those rules, how those rules work in practice, or whether

SV1/jc4/1027192367

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

they are sufficient for due process. NAW's assertions about hypothetical arbitration of unspecified disputes, without any evidence of what the arbitration would look like, cannot establish a due-process violation as a matter of law.

> **e.     The enforceability of arbitration provisions in government contracts demonstrates that arbitration does not necessarily violate due process.**

At trial, the Court noted that contracts with the federal and state governments often include arbitration clauses. The Court further requested that the parties address what relevance that has to the legal analysis for this case. Defendant's understanding is that, beyond further evidence of the constitutional permissibility of arbitration agreements, there is minimal relevance to the analysis of NAW's claims.

That is because the contracts between producers and CAA are not government contracts, and neither DEQ nor any other state entity is a party to those contracts. (Ex. 34; Ex. 70.) However, the enforceability of arbitration clauses in government contracts does illustrate that arbitration does not necessarily deprive a party of due process, especially when a party voluntarily agrees to such a contract. *See Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc.*, 925 F.2d 1136, 1144 (9th Cir. 1991) (arbitration clauses could be enforced against city governments and municipal water districts who were bound by the agreements containing the clauses); *Air Fla. Sys., Inc.*, 822 F. 2d at 842 n.9 (private arbitration proceedings did not amount to the state action requisite for a due process claim).

> **4.     The use of third-party producer responsibility organizations for membership administration is a permissible policy choice by the Oregon Legislature.**

The Oregon Legislature made a permissible policy call to use third-party producer responsibility organizations to administer aspects of the Recycling Modernization Act. The legislature's policy call was informed by DEQ's analysis of various legislative concepts, and additionally informed by DEQ's experience in administering previously existing EPR programs. Although DEQ could *theoretically* perform the functions of a producer responsibility organization, that is not a factor in the due-process analysis.

Page 23 -   DEFENDANT'S POST-TRIAL BRIEFING
SV1/jc4/1027192367

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

The U.S. Constitution allows states to delegate regulatory authority to third parties. *Tucson Women's Clinic v. Eden*, 379 F.3d 531, 555 (9th Cir. 2004).[3] That allowance is conditional: the delegated authority must still provide for due process. *Id.* For example, when a state delegates regulatory power "uncontrolled by any standard or rule prescribed by legislative action," that breadth of delegated power is "repugnant to the due process clause." *Wash. ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 121–22 (1928). But when the delegated authority is subject to adequate standards, limitations, and state oversight, there is no due-process violation.

*Tucson Women's Clinic* is instructive. In that case, a group of physicians challenged an Arizona law, which required a physician with hospital admitting privileges to be present during abortions. *Tucson Women's Clinic*, 379 F.3d at 555. The result of the regulation was to effectively allow hospitals to control the physicians' ability to perform abortions, due to their control over granting admitting privileges. In holding that that result was not a due-process concern, the Ninth Circuit observed that Arizona law required hospitals to limit their discretion to "reasons related to the hospital's interest," and also to "comport with due process." *Id.* at 555–56. The court found that sufficient to preserve procedural due process.

Like the Arizona laws constraining the hospitals' discretion, the Recycling Modernization Act preserves due process by providing standards and limitations to CAA's fee-setting authority, with direct DEQ oversight. CAA's method of "establish[ing], calculat[ing], and charg[ing] membership fees" is subject to DEQ approval through the program plan. ORS 459A.875(2)(a)(E), (3). And CAA may not change its fee-setting method unless it obtains DEQ approval to amend the program plan. ORS 459A.881(1)(a)(A), (b); OAR 340-090-0750. The trial evidence also confirms that CAA applies the approved fee-setting methodology to determine fee rates once a year. (Ex. 70 at 7; Holmes Testimony, July 13.)

---

[3] *Abrogated by other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022).

Page 24 -   DEFENDANT'S POST-TRIAL BRIEFING
SV1/jc4/1027192367

Throughout trial, NAW speculated about the propriety of CAA's fees through the first two years of the program. For example, NAW's member-witnesses testified as to difference in fees between the first year and the second. But CAA's Program Plan made it clear that costs were expected to shift year-to-year, showing increased cost estimates for 2026 and 2027 as compared to 2025—in large part because 2026 was the first full year of the program. (Portley Testimony, July 16; Ex. 15 at 306; *see* Allaway Testimony, July 17 (explaining that DEQ expects fees to change year to year with program costs).) Much like Dr. Lakhan directly comparing the partial first year of British Columbia's EPR program to 2023 costs, NAW's speculation is "misleading." (Dr. Lakhan Testimony, July 15.)

NAW also speculated about the propriety of CAA collecting more in fees than it has spent. But that too is explained in the Program Plan. Specifically, the difference in collection and expenditure is in part to cover the accumulation of program reserves, which will be used for operating risks presented by cost overruns or revenue shortfalls. (Ex. 15 at 210, 229–30, 306, 309–10; Ex. 95 at 213, 232–33, 309, 312–13); *see* ORS 459A.875(2)(m) (requiring program plan to provide for "reserve funds or other contingency plans"). And CAA's 2025 Annual Report further explains why particular actual expenditures were less than forecasted in the program plan, such as because of "less contingency needed than anticipated" and investment delays. (Ex. 97 at 63.) The report additionally explains how CAA will manage the additional reserve through the 2027 program year. (*Id.* at 64–68.)

Ultimately, the choice to delegate various functions to producer-responsibility organizations, including fee-setting, was a reasoned policy choice by the Oregon Legislature to give producers more agency over managing their responsibility over recycling and waste-management of their products. On that point, the legislative facts for the Recycling Modernization Act include the work of the Recycling Steering Committee, which was convened in 2018 by DEQ to study the challenges faced in Oregon and to recommend legislation for modernizing the state's recycling system. *Public Hearing on SB 14, SB 581, SB 582 Before S.*

Page 25 -  DEFENDANT'S POST-TRIAL BRIEFING
SV1/jc4/1027192367

*Comm. on Energy and Env't*, 81st Legis. Assem., Reg. Sess., at 29:55 (Or. Feb. 23, 2021) (statement of Abby Boudouris, Legis. Analyst, DEQ)[4]; (Allaway Testimony, July 16). The steering committee enlisted Resource Recycling Systems to evaluate several potential frameworks for an EPR program, including ones with DEQ retaining full regulatory responsibility. RRS, *Evaluation of Five Legal and Relational Framework Scenarios: A Report to the Oregon Recycling Steering Committee* 5 (Jan. 28, 2020)[5]; (Allaway Testimony, July 16).

With respect to that "classic" regulatory model, steering committee members raised concerns that it would "create stranded assets, create obstacles for industry, and add an additional layer of bureaucracy." *Recycling Steering Comm. Meeting Summary* 3 (June 18, 2020)[6]. DEQ committee members also shared their experience with utilizing producer-responsibility organizations to manage the producers' obligations for other programs. *Id.* at 7. In particular, DEQ noted as benefits that the framework "provides the oversight entity and solid waste businesses with a manageable number of entities to interact with; negotiate terms; accept payments; simplify the flow of funds; strengthen accountability; and reduce the burden on smaller producers." *Id.* Notably, at the legislative stage, numerous producers argued that producer-responsibility organizations should have *less* DEQ oversight. *See, e.g.*, *Public Hearing on SB 581 and SB 582 Before S. Comm. on Energy and Env't*, 81st Legis. Assem., Reg. Sess. (Or. Apr. 8, 2021) (written statement of Chris Parrill, SunChemical)[7] (opposing bill as "giv[ing] far too broad authority to [DEQ] to dictate the terms of the program instead of the Producer Responsib[ility] Organization"); *Public Hearing on SB 581 and SB 582 Before S. Comm. on Energy and Env't* 3, 81st Legis. Assem., Reg. Sess. (Or. Apr. 8, 2021) (written statement of

---

[4] https://olis.oregonlegislature.gov/liz/mediaplayer/?clientID=4879615486&eventID=2021021310 (relevant portion at 29:55)

[5] https://www.oregon.gov/deq/recycling/Documents/In-DepthEvalReport.pdf

[6] https://www.oregon.gov/deq/recycling/Documents/RSCSummary61820.pdf

[7] https://olis.oregonlegislature.gov/liz/2021R1/Downloads/PublicTestimonyDocument/23746

Page 26 -   DEFENDANT'S POST-TRIAL BRIEFING

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Flexible Packaging Ass'n)[8] ("a true EPR program would allow the PRO to assess the current infrastructure in the state and then dictates its own terms and path forward"). The EPR framework adopted by Oregon thus reflects its legislature's careful consideration of the policy arguments.

In sum, it is well-established that the Due Process Clause allows states to delegate authority to third parties, so long as the delegation preserves due process. The fact that DEQ *could* take on the regulatory burden delegated to the producer-responsibility organizations is a matter for the Oregon Legislature's consideration, not the federal court. And because the delegation includes sufficient safeguards on CAA and future producer-responsibility organizations' exercise of authority, the Recycling Modernization Act preserves due process, and NAW's claim fails.

## C.   Under *Burford*, the Court should abstain from reaching the question of whether Appendix G's purported confidentiality affects due-process rights.

NAW's and its members' failure to seek disclosure of Appendix G under Oregon's public-records laws weighs strongly against federal judicial intervention under *Burford* abstention. The doctrine "protect[s] complex state administrative processes from undue federal interference." *Blumenkron v. Multnomah Cnty.*, 91 F.4th 1303, 1312 (9th Cir. 2024). Under these circumstances, this Court should abstain.

"*Burford* abstention requires: (1) that the state has chosen to concentrate suits challenging the actions of the agency involved in a particular court; (2) that federal issues could not be separated easily from complicated state law issues with respect to which the state courts might have special competence; and (3) that federal review might disrupt state efforts to establish a coherent policy." *Id.* (quotation marks omitted). All three requirements are met here.

---

[8] https://olis.oregonlegislature.gov/liz/2021R1/Downloads/PublicTestimonyDocument/23920

Page 27 -   DEFENDANT'S POST-TRIAL BRIEFING
SV1/jc4/1027192367

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

1.    **CAA's fee-setting methodology is subject to inspection or review under three established processes, each subject to judicial review.**

NAW's due-process claim based on the confidentiality of Appendix G easily satisfies the first *Burford* requirement. For this requirement, courts also consider the adequacy of the state-court review. *See id.* at 1313. The bar for adequacy is met when state law provides for judicial review in state court, even when that review is limited to an administrative record. *Id.* Here, Oregon has provided for adequate state-court review of the confidentiality of Appendix G.

NAW or its members could seek disclosure of Appendix G in a public-records request. On receipt of a public-records request, DEQ would determine whether CAA's assertion of trade-secret protection is warranted and, if so, whether the public interest nonetheless requires disclosure. ORS 192.345(2). If DEQ were to subsequently deny inspection, then the requester would be entitled to petition the Attorney General for review of the denial. ORS 192.411(1). The losing party is entitled to *de novo* judicial review in the state trial court, at which DEQ would have the burden to sustain its action. ORS 192.411(2), 192.431(1). The trial court's resulting judgment is likewise subject to appeal as of right. *See* ORS 192.431(3) (referring to "trial" and "appeal"). It is undisputed that only one public-records request has ever been submitted for Appendix G, and that the requester did not follow through. (Portley Testimony, July 16, 2026.) The fee for that request was $1,512. (*Id.*)[9]

The well-established procedures for judicial review of that confidentiality easily satisfy the first *Burford* requirement. The fact that NAW and its members have eschewed that opportunity should not prevent application of *Burford*.

2.    **The confidentiality of Appendix G is inextricably intertwined with state law issues regarding the Recycling Modernization Act and public-records law.**

There is no serious dispute here that the confidentiality of Appendix G is inextricably intertwined with both statutory interpretation of the Recycling Modernization Act and Oregon's public-records law. With respect to the latter, ORS 192.345 provides that trade secrets may be

---

[9]    If DEQ were to determine that the public interest required public disclosure, CAA would be able to challenge DEQ's determination by filing its own action in state trial court.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

made public record if the public interest requires disclosure. And that question is likewise intertwined with statutory construction of the Recycling Modernization Act and the extent to which the Oregon Legislature intended to protect the proprietary work product of CAA in a multi-producer-responsibility-organization system. NAW and its members could likewise raise similar challenges to DEQ's approval of a future program plan or amendment that includes a confidentially submitted fee-setting methodology. The second *Burford* requirement is satisfied.

### 3.    Federal intervention on this issue would disrupt the coherence of state policy.

Finally, with respect to confidentiality of Appendix G, federal intervention would seriously disrupt Oregon's efforts to establish a coherent policy. By reaching the issue of confidentiality before public-records litigation, this Court would assume that the entirety of Appendix G is unavailable to the public. But DEQ or a reviewing state court might determine that all or portions of Appendix G are not proprietary. And both DEQ and a reviewing state court would have to consider the state public-records policy in light of the Recycling Modernization Act's multi-producer-responsibility-organization framework. Federal intervention here would short-circuit those efforts, and ultimately result in having this Court set state policy applicable to any future program plan submissions. That is a result that the *Burford* doctrine is designed to avoid. The third requirement is met here, and this Court should abstain on this aspect of NAW's due-process claim.

### 4.    Alternatively, *Pullman* abstention applies.

If this Court were to hold that *Burford* abstention is not applicable, it should alternatively stay the due-process challenge based on the confidentiality of Appendix G under the *Pullman* abstention doctrine. Under that doctrine, abstention is appropriate if (1) the claim "involve[s] a sensitive area of social policy that is best left to the states to address; (2) a definitive ruling on the state issues by a state court could obviate the need for federal constitutional adjudication by the federal court; and (3) the proper resolution of the potentially determinative state law issue is uncertain." *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 939–40 (2002) (brackets and

Page 29 -   DEFENDANT'S POST-TRIAL BRIEFING
SV1/jc4/1027192367

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

quotation marks omitted). "*Pullman* abstention applies whether or not a state proceeding is pending … ." *Gilbertson v. Albright*, 381 F.3d 965, 970 n.6 (9th Cir. 2004). For the same reasons argued above, those requirements are met in this case.

      **5.**       **In any event, the due-process claim would fail, because confidentiality of Appendix G would be immaterial in the appropriate agency proceeding.**

Even if this Court were to reach the issue, NAW's due-process claim on this basis would fail. That is because, regardless of whether Appendix G is protected from public disclosure, NAW and its members would have access through counsel in the appropriate agency proceeding. Specifically, producers can challenge program plan approvals under the Oregon Administrative Procedures Act, and obtain attorney's-eyes-only copies of fee-setting methodology to argue violations of the applicable standards. And likewise if DEQ were to formally enforce against a producer for failing to pay membership fees. Given those opportunities, NAW's due-process claim on this basis fails as a matter of law.

For program-plan challenges, producers could have obtained an attorney's-eyes-only copy of Appendix G in proceedings for judicial review of DEQ's approval of CAA's program plan. *See* ORS 459A.878(1)(a) (providing that program plans are subject to DEQ's approval). As part of the approval process, DEQ made CAA's program plan "available for public comment for a period of not less than 30 days" before deciding whether to approve. *Id.* § (2). In addition to participating in public commenting, NAW could have also independently sought judicial review of the final approval under ORS 183.484. *See* ORS 183.310(2) (defining "contested case"), (6) (defining "final order"); ORS 183.484(1) (authorizing judicial review of final orders in "other than contested cases" in state trial court). In that proceeding, as occurred in this litigation, producers may request attorney's-eyes-only copies of any proprietary fee-setting methodology to challenge compliance with the applicable fee-setting standards.

Although NAW and its members did not seek judicial review for the current program plan, they will have a new opportunity on approval of the next plan or plan amendment. *See* ORS

Page 30 -  DEFENDANT'S POST-TRIAL BRIEFING
SV1/jc4/1027192367

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

183.484(2) (providing for 60 days to seek review or reconsideration); ORS 459A.878(1) (providing for same procedure for plan amendments), (3) (providing that approved plans are valid for three years), (4) (requiring new plan submission 180 days before program plan expires). That is currently expected to occur no later than the middle of next year. *See* OAR 340-090-0720 (providing that the first program plan will run "to December 31, 2027").

The same applies in a formal enforcement action by DEQ. If DEQ were to initiate formal enforcement against a producer and assess a civil penalty, the producer would be entitled to an agency hearing, if requested. *See* OAR 340-011-0530(1) (providing for hearing). In that hearing, the producer may assert the defense that a producer responsibility organization's fee-setting methodology violates the applicable standards. *See id.* § (2) (requiring respondent to assert its defenses). Notably, under OAR 340-011-0550(1)(a), a respondent producer must first attempt to obtain the proprietary fee-setting methodology through a public-records request. But if the methodology could not be made public, then the producer could again obtain an attorney's-eyes-only copy as part of its defense in the agency hearing. The resulting final order would be subject to review in the Oregon Court of Appeals. ORS 183.482(1).

In short, NAW and its members have remedies under the Oregon Administrative Procedures Act for their asserted concerns with regard to Appendix G. They neglected to exercise their remedy prior to program plan approval. As a result, their due-process claim based on the putative confidentiality of Appendix G is without merit.

6. **The due-process claim would fail also because producers are not forced to register with and pay fees to CAA.**

NAW's due-process claim based on Appendix G would fail also because it is incorrectly premised on the assumption that they are required to register with CAA and pay its membership fees. Putting aside that there is no property or liberty interest in access to the Oregon market, NAW's members are not required to register with CAA to have that access. Indeed, NAW itself could attempt to form its own producer responsibility organization, despite being outside of

Page 31 -   DEFENDANT'S POST-TRIAL BRIEFING

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

DEQ's program calendar. *See* OAR 340-090-0720(3) (authorizing "midstream" program plan submissions by prospective new producer responsibility organizations). NAW's claim regarding Appendix G thus also fails as based on an incorrect premise.

**D.     Any remedy must be narrowly tailored to the constitutional infirmity.**

The Court specifically requested remedy briefing for the scenario in which it held that CAA's contracts result in a violation of due process. That analysis is complicated because the Agreements are neither authorized or prohibited by statute or rule. Nor are the agreements addressed in meaningful detail in the DEQ-approved program plan. (Ex. 15.) Perhaps most importantly, the contracts are not a result of any DEQ action and do not directly implicate DEQ's oversight responsibilities; rather, they are the result of CAA's interactions with producers, and CAA is not a party to this litigation.[10]

Defendant cannot conceive of any injunctive relief that the Court could fashion that would be within its equitable powers. Injunctions cannot bind nonparties unless they are in "active concert" with a bound party or if there is privity. *Nat'l Spiritual Assembly of Bahai's v. Nat'l Spiritual Assembly of Bahai's*, 628 F.3d 837, 848–49 (7th Cir. 2010) (discussing Fed. R. Civ. P. 65(d)(2)); *see also* 11A Fed. Pract. & Proc. Civ. § 2956 (3d ed.) (accord). Neither circumstance applies here as to CAA. Without CAA as a party, this Court cannot issue injunctive relief as to the contracts that could redress NAW's alleged due-process injuries.

NAW may argue that the Court could order DEQ to bring an enforcement action to require CAA to amend its contracts. But that relief would go far beyond ordering DEQ to comply with the law and effectively result in this Court seizing the reins of DEQ's enforcement office. That seizure would offend principles of federalism and comity. Particularly when NAW could have simply named CAA as an additional defendant at the outset. Further, because the

---

[10]     Because the arbitration-clause issue does not implicate a statute or rule, severability does not apply. With that said, in Oregon law "there is a presumption of severability." *Lee v. Walters*, 433 F.3d 672, 676 (9th Cir. 2005); *see* ORS 174.040 (severability provision).

Page 32 -   DEFENDANT'S POST-TRIAL BRIEFING
          SV1/jc4/1027192367

injunction would not bind CAA or a reviewing state court, it is uncertain that the enforcement action would result in relief to NAW's members if CAA were to seek judicial review.

Although CAA's nonparty status remains an issue for declaratory relief, the federalism and comity concerns are significantly mitigated. If it is the case that the arbitration clauses in fact impose a due-process injury to NAW's members, then a declaration to that effect may provide some limited redress, even if CAA is not bound. For example, it could provide a basis for DEQ to require that CAA make changes to its contracts. But again, any declaratory relief must be tailored to the specific constitutional violation found by the Court.

If this Court is to find a constitutional violation for other aspects of the Recycling Modernization Act, Defendant requests an opportunity to be heard on the issue of appropriate remedy.

## IV.    CONCLUSION

For the above reasons, this Court should find in favor of Defendant Leah Feldon on NAW's dormant Commerce Clause and Due Process Clause claims.

DATED July 31st, 2026.

Respectfully submitted,

DAN RAYFIELD
Attorney General

_s/ YoungWoo Joh_
SARA D. VAN LOH #044398
Senior Assistant Attorney General
ALEXANDER C. JONES #213898
YOUNGWOO JOH #164105
Assistant Attorneys General
Trial Attorneys
Tel (971) 673-1880
Fax (971) 673-5000
Sara.VanLoh@doj.oregon.gov
Alex.Jones@doj.oregon.gov
YoungWoo.Joh@doj.oregon.gov
Of Attorneys for Defendant

Page 33 -  DEFENDANT'S POST-TRIAL BRIEFING
SV1/jc4/1027192367

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

**CERTIFICATE OF SERVICE**

I certify that on July  31st , 2026, I served the foregoing by email **DEFENDANT'S**

**POST-TRIAL BRIEFING** upon the parties hereto by the method indicated below, and

addressed to the following:

| | |
|---|---|
| Darin Sands | ___ HAND DELIVERY |
| Bradley Bernstein Sands LLP | ___ MAIL DELIVERY |
| 1211 NW Glisan Street, Ste 204 | ___ OVERNIGHT MAIL |
| Portland, OR 97209 | ___ TELECOPY (FAX) |
| *Of Attorneys for Plaintiff* | _x_ E-MAIL |
| | ___ E-SERVE |
| | *dsands@bradleybernsteinllp.com* |

| | |
|---|---|
| David R. Carpenter | ___ HAND DELIVERY |
| Caleb J. Bowers | ___ MAIL DELIVERY |
| Sidley Austin LLP | ___ OVERNIGHT MAIL |
| 350 South Grand Avenue | ___ TELECOPY (FAX) |
| Los Angeles, CA 90071 | _x_ E-MAIL |
| *Of Attorneys for Plaintiff* | ___ E-SERVE |
| | *drcarpenter@sidley.com* |
| | *cbowers@sidley.com* |

| | |
|---|---|
| | ___ HAND DELIVERY |
| | ___ MAIL DELIVERY |
| Gordon D. Todd | ___ OVERNIGHT MAIL |
| Richard W. Smith | ___ TELECOPY (FAX) |
| Sidley Austin LLP | _x_ E-MAIL |
| 1501 K Street, N.W. | ___ E-SERVE |
| Washington, DC 20005 | *gtodd@sidley.com* |
| *Of Attorneys for Plaintiff* | |

_____  *s/ YoungWoo Joh*  _____
SARA VAN LOH #044398
Senior Assistant Attorney General
ALEXANDER C. JONES #213898
YOUNGWOO JOH #164105
Assistant Attorneys General
Trial Attorneys
Tel (971) 673-1880
Fax (971) 673-5000
Sara.VanLoh@doj.oregon.gov
alex.jones@doj.oregon.gov
Of Attorneys for Defendants

Page 1 -    CERTIFICATE OF SERVICE
SV1/jc4/996799836