Darin Sands, OSB No. 106624
dsands@bradleybernstein.com
BRADLEY BERNSTEIN SANDS LLP
1211 NW Glisan St., Ste 204
Portland, OR 97209
Telephone: +1 503-734-2480

David R. Carpenter*
drcarpenter@sidley.com
Caleb J. Bowers*
cbowers@sidley.com
SIDLEY AUSTIN LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213 896 6000

Gordon D. Todd*
gtodd@sidley.com
Richard W. Smith*
rwsmith@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736 8000

* *Pro hac vice*

Attorneys for Plaintiff NATIONAL
ASSOCIATION OF WHOLESALER-
DISTRIBUTORS

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS, <br><br> Plaintiff, <br><br> v. <br><br> LEAH FELDON, DIRECTOR, OREGON DEPARTMENT OF ENVIRONMENTAL QUALITY, in her official capacity, <br><br> Defendant. | Case No. 3:25-cv-01334-SI <br><br> **PLAINTIFF'S POST-TRIAL BRIEF** <br><br> **Complaint Filed: July 30, 2025** |

**TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................................................... 1

FACTS ESTABLISHED AT TRIAL ....................................................................... 3

SUMMARY RESPONSE TO THE COURT'S SIX QUESTIONS ............................ 6

ARGUMENT ............................................................................................................ 9

I.      NAW HAS STANDING TO PURSUE ITS CLAIMS. ................................. 9

II.     THE RMA VIOLATES THE DUE PROCESS CLAUSE OF THE
        FOURTEENTH AMENDMENT. ............................................................... 11

        A.      NAW's Members Have Protected Due Process Interests. ................ 11

        B.      The RMA Unlawfully Delegates State Authority to a Private Entity
                Without Adequate Safeguards for Transparency or Accountability. ... 13

                1.      CAA is a self-interested private entity. ............................... 15

                2.      CAA exercises regulatory fee-setting authority without DEQ
                        review or approval of the fees or the underlying model, together
                        with extensive private enforcement authority. ....................... 18

                3.      Producers have no feasible alternative to joining CAA. ......... 22

        C.      The RMA Compounds the Private-Delegation Problems Through
                Retrospective Fee Setting and the Inadequate Review of Fee Assessment. ....... 23

                1.      Retrospective and unpredictable fee-setting means that producers
                        engage in liability-creating conduct before knowing the fees that
                        will attach. ...................................................................... 24

                2.      The RMA fails to provide producers a meaningful opportunity to
                        contest mandatory fee assessments. .................................... 26

III.    THE RMA VIOLATES THE DORMANT COMMERCE CLAUSE ............ 31

        A.      The RMA Discriminates Against Interstate Commerce. ................... 31

        B.      The RMA Substantially and Unreasonably Burdens Interstate Commerce
                in Multiple Ways. ......................................................................... 38

                1.      The RMA imposes substantial burdens on interstate commerce. ... 39

                2.      The putative benefits to Oregon cannot justify these burdens. ... 47

        C.      The RMA Imposes Unreasonable Regulatory Fees on Producers Operating
                in Interstate Commerce. ................................................................. 49

i

IV.    NAW IS ENTITLED TO DECLARATORY RELIEF AND A PERMANENT
       INJUNCTION.................................................................................................53

CONCLUSION.................................................................................................................57

PLAINTIFF'S POST-TRIAL BRIEF

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)...................................................................................................25

*Agendia, Inc. v. Azar*,
    420 F. Supp. 3d 985 (C.D. Cal. 2019) ......................................................................14

*Am. Airlines, Inc v. Mass. Port Auth.*,
    560 F.2d 1036 (1st Cir. 1977)....................................................................................52

*Am. Diabetes Ass'n v. U.S. Dep't of the Army*,
    938 F.3d 1147 (9th Cir. 2019) ...................................................................................10

*Ass'n of Am. Railroads v. U.S. Dep't of Transp.* (*AAR III*),
    821 F.3d 19 (D.C. Cir. 2016).........................................................................11, 13, 18

*Ass'n of Am. Railroads v. U.S. Dep't of Transp.* (*AAR IV*),
    896 F.3d 539 (D.C. Cir. 2018)....................................................................................18

*Ass'n to Preserve & Protect Local Livelihoods v. Sidman*,
    147 F.4th 40 (1st Cir. 2025)........................................................................................45

*Assoc. Indus. of Mo. v. Lohman*,
    511 U.S. 641 (1994)....................................................................................................37

*Bibb v. Navajo Freight Lines, Inc.*,
    359 U.S. 520 (1959)....................................................................................................43

*Blanchette v. Conn. Gen. Ins. Corps.*,
    419 U.S. 102 (1974)....................................................................................................10

*Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*,
    567 F.3d 79 (2d Cir. 2009)..........................................................................................52

*Burlington N. R. Co. v. Dep't of Pub. Serv. Regul.*,
    763 F.2d 1106 (9th Cir. 1985) ....................................................................................40

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
    520 U.S. 564 (1997)..............................................................................................33, 37

*Carter v. Carter Coal Co.*,
    298 U.S. 238 (1936)............................................................................................. *passim*

PLAINTIFF'S POST-TRIAL BRIEF

*Cent. Delta Water Agency v. United States*,
  306 F.3d 938 (9th Cir. 2002) ............................................................................................10

*Charles v. Portfolio Recovery Assocs.*,
  2024 WL 1672350 (9th Cir. Apr. 18, 2024) ......................................................................27

*Cheer Pack N. Am., LLC v. Valley Forge Ins. Co.*,
  2017 WL 1552315 (D. Mass. Apr. 28, 2017) ....................................................................43

*Comptroller of Treasury of Md. v. Wynne*,
  575 U.S. 542 (2015) ...........................................................................................................34

*CSX Transp., Inc. v. Ala. Dep't of Revenue*,
  562 U.S. 277 (2011) ...........................................................................................................32

*Currin v. Wallace*,
  306 U.S. 1 (1939) ...............................................................................................................22

*Czyzewski v. Jevic Holding Corp.*,
  580 U.S. 451 (2017) .............................................................................................................9

*Davis v. SEVA Beauty LLC*,
  2017 WL 11921334 (W.D. Wash. Sept. 13, 2017) ............................................................28

*Dohrmann v. Intuit, Inc.*,
  823 F. App'x 482 (9th Cir. 2020) ......................................................................................28

*Dolan v. City of Tigard*,
  512 U.S. 374 (1994) .............................................................................................................1

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ...........................................................................................................56

*Edwards v. Hartford Ins. Co. of the Midwest*,
  823 P.2d 439 (Or. Ct. App. 1992) .....................................................................................27

*EEOC v. Waffle House, Inc.*,
  534 U.S. 279 (2002) ...........................................................................................................30

*El Rescate Leg. Servs., Inc. v. Exec. Off. of Immigr. Rev.*,
  959 F.2d 742 (9th Cir. 1992) .............................................................................................11

*Family Winemakers of Cal. v. Jenkins*,
  592 F.3d 1 (1st Cir. 2010) ..................................................................................................33

*Farr v. Acima Credit LLC*,
  2021 WL 2826709 (N.D. Cal. July 7, 2021) ......................................................................28

PLAINTIFF'S POST-TRIAL BRIEF

*FCC v. Consumers' Rsch.*,
  606 U.S. 656 (2025)..............................................................................................13, 14, 19, 21

*Flynt v. Bonta*,
  131 F.4th 918 (9th Cir. 2025) ...........................................................................................38

*Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)............................................................................................................9

*Frost & Frost Trucking Co. v. R.R. Comm'n of Cal.*,
  271 U.S. 583 (1926)..........................................................................................................12

*Fulton Corp. v. Faulkner*,
  516 U.S. 325 (1996)..........................................................................................................35

*GateGuard, Inc. v. MVI Sys. LLC*,
  2021 WL 4443256 (S.D.N.Y. Sept. 28, 2021).................................................................28

*Gen. Elec. Co. v. N.Y. State Dep't of Lab.*,
  936 F.2d 1448 (2d Cir. 1991)...........................................................................................11

*Gen. Electric Co. v. EPA*,
  53 F.3d 1324 (D.C. Cir. 1995)..........................................................................................25

*Greene v. McElroy*,
  360 U.S. 474 (1959)..........................................................................................................29

*Horne v. Dep't of Agric.*,
  576 U.S. 350 (2015)..........................................................................................................12

*Hunt v. Wash. State Apple Adver. Comm'n*,
  432 U.S. 333 (1977).......................................................................................................9, 33

*Industria Y Distribucion De Alimentos v. Trailer Bridge*,
  797 F.3d 141 (1st Cir. 2015).......................................................................................50, 52

*Int'l Union v. Brock*,
  477 U.S. 274 (1986)..........................................................................................................10

*Japan Line, Ltd. v. County of Los Angeles*,
  441 U.S. 434 (1979)..........................................................................................................44

*Johnson v. Mich. Milk Mktg. Bd.*,
  295 Mich. 644 (1940) .......................................................................................................12

*Kassel v. Consol. Freightways Corp. of Del.*,
  450 U.S. 662 (1981) (plurality opinion) ...............................................................32, 36, 47

v

*Lil' Man in the Boat, Inc. v. City & Cnty. of S.F.*,
   2017 WL 3129913 (N.D. Cal. July 24, 2017)............................................................52

*M-J-M-A- v. Hermosillo*,
   822 F. Supp. 3d 1147 (D. Or. 2026) ......................................................................56

*Maine v. Taylor*,
   477 U.S. 131 (1986)...............................................................................................37

*McGautha v. California*,
   402 U.S. 183 (1971) (Brennan, J., dissenting)........................................................13

*McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco*,
   496 U.S. 18 (1990).......................................................................................... *passim*

*McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery*,
   226 F.3d 429 (6th Cir. 2000) ..................................................................................41

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) ..................................................................................56

*Morse Bros. Prestress v. City of Lake Oswego*,
   640 P.2d 645 (Or. Ct. App. 1982)...........................................................................27

*Mullane v. Central Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950)................................................................................................29

*Murphy v. NCAA*,
   584 U.S. 453 (2018)................................................................................................55

*Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*,
   53 F.4th 869 (2022).................................................................................................21

*National Pork Producers Council v. Ross*,
   598 U.S. 356 (2023).................................................................................38, 39, 43, 45

*NCAA v. Miller*,
   10 F.3d 633 (9th Cir. 1993) ....................................................................................46

*Nw. Airlines, Inc. v. County of Kent*,
   510 U.S. 355 (1994)............................................................................................49, 50

*Outdoor Media Dimensions, Inc. v. Dep't of Transp.*,
   132 P.3d 5 (Or. 2006) .............................................................................................54

*Pac. Nw. Venison Prods. v. Smitch*,
   20 F.3d 1008 (9th Cir. 1994) .........................................................................39, 45, 46

PLAINTIFF'S POST-TRIAL BRIEF

*Peck Ormsby Constr. Co. v. City of Rigby*,
2013 WL 5274221 (D. Idaho Sept. 17, 2013) ........................................................................30

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970) ..................................................................................38, 45, 49, 50

*Pittston Co. v. United States*,
368 F.3d 385 (4th Cir. 2004) .................................................................................14

*Pollin v. Dep't of Revenue*,
952 P.2d 537 (Or. 1998) .......................................................................................55

*Project Veritas v. Schmidt*,
125 F.4th 929 (9th Cir. 2025) ................................................................................54

*Rocky Mountain Farmers Union v. Corey*,
730 F.3d 1070 (9th Cir. 2013) ...........................................................................32, 33

*Rodriguez v. Robbins*,
715 F.3d 1127 (9th Cir. 2013) .................................................................................56

*S. Pac. Co. v. Arizona*,
325 U.S. 761 (1945) ...........................................................................................43

*Satellite Broad. Co. v. FCC*,
824 F.2d 1 (D.C. Cir. 1987) ..................................................................................25

*Washington ex rel. Seattle Title Tr. Co v. Roberge*,
278 U.S. 116 (1928) ...........................................................................................12

*Selevan v. N.Y. Thruway Auth.*,
584 F.3d 82 (2d Cir. 2009) ...................................................................................49

*Spectrum Pac. W., LLC v. Imperial Irrigation Dist.*,
2025 WL 2462443 (S.D. Cal. Aug. 26, 2025) ...............................................................13

*Sunshine Anthracite Coal Co. v. Adkins*,
310 U.S. 381 (1940) .......................................................................................13, 18

*Ting v. AT&T*,
319 F.3d 1126 (9th Cir. 2003) .................................................................................29

*Union Pac. R. Co. v. Pub. Util. Comm'n*,
899 F.2d 854 (9th Cir. 1990) .................................................................................49

*Union Pac. R. Co. v. United States*,
99 U.S. 700 (1878) ...........................................................................................13

PLAINTIFF'S POST-TRIAL BRIEF

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
    550 U.S. 330 (2007)................................................................................................37, 48, 50

*United States v. City of Renton*,
    2012 WL 1903429 (W.D. Wash. May 25, 2012)...................................................................50

*Vasquez Perdomo v. Noem*,
    148 F.4th 656 (9th Cir. 2025) .........................................................................................9, 10

*W. Lynn Creamery, Inc. v. Healy*,
    512 U.S. 186 (1994)...............................................................................................................36

*Walgreen Co. v. Rullan*,
    405 F.3d 50 (1st Cir. 2005)...................................................................................................33

**Statutes**

42 U.S.C. § 1988............................................................................................................................57

OR. REV. STAT. § 174.040..............................................................................................................54

OR. REV. STAT. § 459A.860(3)–(4) ...............................................................................................54

OR. REV. STAT. § 459A.863(32) .....................................................................................................50

OR. REV. STAT. §§ 459A.863(32)(b), 459A.872...........................................................................32

OR. REV. STAT. § 459A.863(32)(c).................................................................................................35

OR. REV. STAT. § 459A.863(32)(f)–(g) ..........................................................................................33

OR. REV. STAT. § 459A.863A(6)(b)(H).........................................................................................44

OR. REV. STAT. § 459A.866(3) .......................................................................................................34

OR. REV. STAT. § 459A.869..................................................................................................9, 12, 18, 23

OR. REV. STAT. § 459A.878......................................................................................................10, 55

OR. REV. STAT. § 459A.884.......................................................12, 15, 18, 19, 21, 26, 35, 54, 55

OR. REV. STAT. § 459A.962 ...................................................................................................10, 18, 19

OR. REV. STAT. § 468.130................................................................................................................10, 26

Plastic Pollution and Recycling Modernization Act, OR. REV. STAT.
    §§ 459A.860–459A.975......................................................................................................57

**Other Authorities**

2021 Reg. Sess. (Apr. 13, 2021) ...................................................................................................54

Federal Rule of Civil Procedure 54(d)(1) ....................................................................................57

OR. ADMIN. R. § 340-090-0700(4)(b) .........................................................................................24

OR. ADMIN. R. § 340-090-0750(1), (2) ........................................................................................19

OR. ADMIN. R. § 340-090-0840(1)(A) .........................................................................................44

Oregon Constitution.....................................................................................................................32

PLAINTIFF'S POST-TRIAL BRIEF

Plaintiff National Association of Wholesaler-Distributors ("NAW") respectfully submits this closing brief in support of its claims challenging the constitutionality of Oregon's Plastic Pollution and Recycling Modernization Act (the "RMA").

## **INTRODUCTION**

This case is about transparency and accountability. The RMA is a form of "extended producer responsibility" ("EPR") law designed to fund new statewide recycling and waste-management infrastructure while pushing the costs disproportionately onto overwhelmingly out-of-state "Producers" in lieu of direct funding from taxpayers. To implement this scheme, the RMA delegates extensive regulatory authority to a third-party Producer Responsibility Organization ("PRO")—Circular Action Alliance ("CAA")—that is governed by some of the nation's largest companies. The PRO, in turn, is able to set and change fees pursuant to a confidential methodology and undisclosed algorithm—without meaningful agency review of either the ultimate fees or the underlying model, and with no public visibility or accountability. NAW has no quarrel with Oregon's goals. But "a strong public desire to improve the public condition will not warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Dolan v. City of Tigard*, 512 U.S. 374, 396 (1994) (alterations adopted). The RMA not only imposes unconstitutional burdens on the regulated companies but also on interstate commerce itself. And as shown at trial, these burdens are structural to the Act and program overall.

This Post-Trial Brief begins by reviewing the facts that NAW said it would prove at trial, and which it did prove. It then provides a summary of responses addressing each of the Court's six questions. Lastly, we review our Due Process and Commerce Clause claims and the evidence in more detail.

As to the Due Process claim, the RMA impairs both liberty and property interests by unconstitutionally delegating regulatory fee-setting authority to a private entity without adequate oversight, while simultaneously compelling Producers to enter into non-negotiable contracts with that private entity if they want to do business in the state. Contrary

1

to Defendant's suggestion, Producers have no realistic opportunity to form a competing PRO. And the problems arising from this unconstitutional delegation are only compounded by the retrospective fee setting and lack of any meaningful administrative process or judicial process to challenge fee assessments. Further, the scheme subjects Producers to a form of double jeopardy, where CAA is legally empowered to enforce its contractual rights separate and independent of DEQ's enforcement authority (and vice versa). For these reasons, NAW has established its Due Process claim, and because the problems go to the heart of how the RMA's program is structured and run, NAW is entitled to declaratory and injunctive relief as to the law and program itself.

NAW has also established its claim for violation of the dormant Commerce Clause. While the Commerce Clause issues have been thoroughly addressed in prior briefing, it bears emphasizing that Defendant offers essentially no evidence to rebut NAW's showing that the RMA significantly burdens interstate commerce. And the RMA in fact implicates the core dormant Commerce Clause concerns in numerous ways. The RMA discriminates against interstate commerce, including through its exemptions and structural features that favor local interests, by both design and in effect. It directly regulates instrumentalities of interstate commerce; imposes obligations that have market-wide consequence on distribution networks and supply chains; and establishes a regime in which fees inevitably are passed onto consumers in other states. The scheme also constitutes an impermissible regulatory fee, under which predominantly out-of-state Producers bear a disproportionate burden, for creating new statewide infrastructure. In other words, the RMA does not merely impose costs on Producers selling into the State; rather, it regulates and burdens interstate distribution networks and supply chains themselves.

These problems will also magnify as states like California roll out their own EPR programs with inconsistent requirements and multi-billion-dollar budgets generated by fees spread out across interstate markets. Just as Californians are now paying for Oregon's

new recycling infrastructure, Oregonians will soon be paying for California's (much larger) program, and the citizens of Nevada and Idaho (and beyond) will be paying for both.

Accordingly, NAW should prevail on both of its claims. And each claim provides a separate and independent basis for this Court to issue a declaratory judgment that the RMA is unconstitutional and permanently enjoin the program.

<u>**FACTS ESTABLISHED AT TRIAL**</u>

In its Pre-Trial Statement of the Case, NAW identified key facts that it expected to establish at trial. The evidence now demonstrates each point.

**Confidential fee-setting methodology**. Producer fees are set pursuant to a confidential methodology that is not publicly disclosed, and where neither the key algorithm nor the inputs and data have been shared *even with DEQ*. *See, e.g.*, Portley Dep. 145:22–146:5, 231:12–19, 236:15–19; Day 1 Sealed Tr. 13:11–24, 17:21–25 (Holmes); Day 4 Tr. 40:20–43:16 (Portley); Day 5 Tr. 15:23–16:5 (Allaway). As David Allaway admitted, DEQ does not have the information that would allow it to recreate how CAA sets its fees. By changing its inputs and assumptions, CAA can "turn the dials" in ways that change the fees. DEQ does not know how those dials are turned; indeed, DEQ does not even know what all the dials are. Day 5 Tr. 51:7–19 (Allaway). NAW expert Dr. Calvin Lakhan confirmed that one would need the model to verify how fees are set, and further that such a model is subject to manual manipulation. Day 3 Tr. 137:10–18, 138:10–18 (Lakhan); Day 5 Tr. 178:4–179:23 (Lakhan). Without the model and inputs, DEQ lacks the necessary information to effectively supervise CAA's assessment of fees required by the RMA and the Due Process clause.

**Fees can be changed without DEQ approval**. Although DEQ reviewed and approved CAA's Program Plan, CAA's fee schedules are not part of the Program Plan, and CAA may change and has changed them unilaterally without requiring DEQ approval. *See, e.g.*, Portley Dep. 194:10–24, 277:23–278:16; Day 1 PM Tr. 17:1–18:25 (Holmes); Day 4 Tr. 120:3–121:14 (Portley). Indeed, DEQ did not even *receive* the 2025 base fee schedule

until *after* CAA had issued invoices based on it. Portley Dep. 273:7–274:11. Accordingly, Producers are subject to unpredictable changes in fees across program years without prior notice or the opportunity to participate in the rate-adjustment process. *See, e.g.*, Day 1 PM Tr. 7:5–19 (Holmes); Day 2 Tr. 122:1–123:1 (Allen) (describing 47% increase in fees year-to-year, based on the same volume); *compare* Ex. 45 (2025 fee schedule), *with* Ex. 46 (2026 fee schedule); *see also* Day 5 Tr. at 94:1–16, 131:20–132:18 (Lakhan) (explaining how confidentiality of model and immaturity of Oregon's system result in speculative and unpredictable fees).[1] As DEQ admitted at trial, Oregon opted for this structure specifically to avoid public hearings, debate, and other democratic process on the imposition of taxes and fees. Day 4 Tr. 119:8–16 (Portley).

**Retrospective and unreasonable fees**. Fees are imposed retrospectively and unreasonably, at times exceeding the profit margins on the products being distributed. *See, e.g.*, Day 1 PM Tr. 122:15–124:5 (Rodriguez); Day 2 Tr. 135:11–23, 136:1–15 (Allen); Day 3 Tr. 6:2–11, 7:3–10 (Thomas); *see also* Day 1 PM Tr. 34:16–35:7 (Wild) (explaining impact of fees in context of businesses that operate on low margins of 1–3%). The retrospective nature of the fees defeats the ability to plan and accrue them in connection with ongoing sales, particularly for Producers with a broad and variable range of SKUs. *See, e.g.*, Day 1 PM Tr. 72:1–19 (Wild), 124:15–125:17 (Rodriguez); Day 2 Tr. 122:1–123:16 (Allen); Day 3 Tr. 5:17–6:7 (Thomas). Moreover, the fees often are imposed on Producers (including distributors and wholesalers) who do not control packaging decisions. *E.g.*, Day 1 Tr. 110:21–111:15 (Rodriguez); Day 2 Tr. 51:1–21 (Winkle); Day 3 Tr. 16:2–17:11 (Thomas). In many cases, these excessive fees are imposed on packaging that is already optimally designed, that must comply with regulatory standards, and/or cannot be

---

[1] Those fee fluctuations are the result of the model being complex and subject to numerous variables, assumptions, and inputs that, if changed, result in changes to the cost-to-manage index values and fee schedule. *See*, *e.g.,* Portley Dep. 236:7–10, 239:19–240:15, 242:14–243:2; Day 1 Sealed Tr. 42:23–43:15 (Holmes); Day 4 Tr. 121:8–12 (Portley); *see also* Day 3 Tr. at 92:24–93:25 (Lakhan) (explaining generally how such models work).

modified without impairing functionality. *E.g.,* Day 2 Tr. 180:24–184:20 (Tomlinson). Even when the legally obligated Producer is a brand manufacturer with packaging control, companies with greater bargaining power can push the fees down the supply chain onto others. Day 3 Tr. 23:1–24:18, 32:22–33:9 (Thomas); Day 3 Tr. 117:17–118:2, 139:1–13, 147:11–148:8 (Lakhan); *see also* Day 2 Tr. 126:8–133:13 (Allen); Ex. 26. The scheme also ensures that many Producers will have to spread the fees out across unrelated product lines and territories, including passing them onto consumers in other states. *E.g.*, Day 1 PM Tr. 78:20–79:24 (Wild); Day 2 Tr. 135:19–136:19 (Allen); Day 3 Tr. 115:19–125:14 (Lakhan). Indeed, DEQ *expects* that fees will be passed onto consumers in other states, a fact it cited favorably as *mitigating* the impact on the Oregon public. Ex. 107 at 17; Day 5 Tr. 28:22–29:13 (Allaway).

**No accountability for the program costs or impact**. At no point did DEQ conduct any meaningful review of CAA's cost assessments or of the impact of the program on businesses and consumers. Defendant's own expert, Mr. Cassel, admitted that it is not even DEQ's role to assess the reasonableness of costs. Day 5 Tr. 116:6–117:2 (Cassel). That lack of oversight and structural bias toward overcollection has manifested in CAA, for Fiscal Year 2025, extracting $110 million more in Producer fees than what it spent and needed for the program year. Day 5 Tr. 180:21–181:8 (Lakhan); Day 4 Tr. 169:4–9 (Portley); Ex. 97 at 63. That overcollection—along with exemptions favoring local interests and other free riding problems—also confirms that the RMA does not merely impose fees proportional to a given Producer's waste-management costs or environmental impact. Rather, the RMA exists as a means to *create* entirely new statewide infrastructure for Oregon's benefit, while pushing those estimated costs disproportionately onto a select and disfavored set of entities, onto interstate commerce, and then onto consumers in other states. Day 3 Tr. 104:1–8, 105:11–106:4 (Lakhan); Day 1 PM Tr. 78:22–79:15 (Wild).

**SUMMARY RESPONSE TO THE COURT'S SIX QUESTIONS**

Before proceeding to the argument, NAW will provide summary responses to the six questions posed by the Court at the end of trial relating specifically to NAW's due process claims.

1. *Is there a constitutionally protected property or liberty interest at stake here?* Yes, there is. The *Carter Coal* line of cases recognizes that the delegation of regulatory authority to self-interested private parties implicates protected liberty and property interests. Moreover, the RMA's imposition of compelled fees on Producers as a condition for doing business in Oregon, as well as the statute's guarantee that fees be set in accordance with the approved Program Plan, implicate protected property interests. *See* Argument, Section II.A, *infra*.

2. *Assuming there is a property interest, what process is due?* NAW's Due Process claim involves two related but independent points. The first is the unconstitutional delegation of regulatory authority to CAA without adequate safeguards. *See* Argument, Section II.B, *infra*. That problem is only compounded by the retrospective fee setting and lack of a meaningful opportunity to challenge fee assessments—NAW's "traditional" procedural due process challenge. *See* Argument, Section II.C, *infra*.

If this program were run by DEQ, for example, there would be greater transparency and accountability into the fee-setting administrative process, as well as a greater opportunity for judicial and administrative review. *See also* Response to Question 5. Contrary to Defendant's contention, the *theoretical* opportunity to form a competing PRO does not cure the problem where there is no feasible opportunity to do so. *See* Argument, Section II.B.3, *infra*. Further, due process requires a procedure that lets Producers challenge the assessment before a neutral decisionmaker, with access to the methodology, inputs, and underlying data necessary to test the charge, and with a remedy that fully vacates or refunds any unlawful assessment. A process administered by a private competitor does not satisfy that standard, especially where the same entity both sets the fee

PLAINTIFF'S POST-TRIAL BRIEF

and defends it, and where the only available dispute mechanism is a private arbitration that does not bind DEQ or provide complete relief of fees wrongfully assessed.

3. *Does the State's use of arbitration agreements in government contracting inform the analysis or issues?* No. When a business contracts with the State, the business has the freedom to choose whether or not to pursue that specific business opportunity. Here, the RMA conditions a Producer's ability to do business in the State at all on the Producer's submitting to a non-negotiable contract with one specific private entity. *See, e.g.*, Day 1 AM Tr. 28:3-17 (Holmes); Day 1 PM Tr. 66:2–10 (Wild); Exs. 34, 70. Worse, that non-negotiable contract provides no remedy for recovering wrongfully charged fees and the only remedy given to Producers—termination of the contract—would leave the Producer outside of compliance with the RMA and subject to a DEQ enforcement action if it continued to sell covered products in Oregon. *See* Ex. 34 § 2.5; Argument, Section II.C.2, *infra*.

4. *If the Court concludes there is a problem with a particular provision of CAA's contracts but that the RMA is otherwise constitutional, what is the result?* CAA's contracts are a symptom, not the root cause, of the problems with the RMA. As the State's witnesses admitted at trial, DEQ has not approved CAA's contracts, which are not part of its Program Plan, and CAA can amend those contracts in its own unfettered discretion. *See, e.g.*, Portley Dep. 179:21–181:23, 192:3–15; Day 4 Tr. 129:9–130:22 (Portley). At the same time, those agreements take various requirements imposed under the RMA and turn them into contractual obligations for Producers, while sharply restricting Producers' recourse and remedies. None of this is subject to DEQ oversight; indeed, DEQ disclaims any involvement in CAA's contractual relationship with its members. The Court's question thus highlights the structural problem with delegating authority to a private third party. Because the RMA compels Producers to join a PRO and permits that PRO to impose binding contractual terms without meaningful State review or control, the constitutional defect lies in the statute itself. The Court cannot cure that defect by adding safeguards that

the Legislature chose not to include. Instead, the appropriate remedy is to enjoin enforcement of the RMA. *See* Argument, Part IV, *infra.*

5. *What is the legal significance, if any, of the fact that the RMA uses a third party PRO model rather than having the functions being handled directly by a state agency?* This question goes to the core issues of transparency and accountability. If DEQ ran the program directly, the law would require greater democratic and procedural safeguards for the implementation of the program and fee-setting process. That would require DEQ to have final control of all aspects of the RMA's implementation, to publicly report its bases for fee assessments before they became due, and to provide a neutral forum for Producers to petition for refunds of fees unlawfully assessed. Ms. Portley and Mr. Allaway both admitted in their testimony that DEQ *could* run the program if it wanted to. It would just be less convenient—which simply means that DEQ would have to comply with the formal democratic procedures created to protect against arbitrary and unreasonable administrative action.[2] Delegating essential regulatory authority to a private entity creates a regime of secret and preferential law, where the methodology underlying Producers' fees is kept confidential, guidance with the force of law is placed behind a paywall, and large companies receive privileges—including a dedicated customer representative and influence over the organization—that others do not. *See* Argument, Section II.B, *infra.*

6. *Are NAW's claims premature to the extent that no public records request has been made for the fee model?* For several reasons, NAW's Due Process claim does not require that a public records request first be made. A post-hoc records request does not change the fact that the fee methodology was confidential when the Program Plan was approved, and thus was not subject to public notice and comment and scrutiny. A request for DEQ's records also would not help, insofar as DEQ does not have the actual fee model. DEQ has a generic text description of portions of the methodology, some "Toy Charts,"

---

[2] Of course, changing who runs the program or the dispute resolution process would not resolve the dormant Commerce Clause problem.

and the unadorned Cost-to Manage Index values, but it has neither the actual model nor the inputs necessary to test and verify the rates. And even if a member of the public—after extensive litigation—somehow managed to obtain any of this, that would not address the problem that CAA is allowed to change the model and the resulting fees without DEQ review and approval.

For these reasons and as further explained below, the Court's questions illustrate the structural problems underlying the RMA and why NAW has established its claims.

## ARGUMENT

### I.    NAW HAS STANDING TO PURSUE ITS CLAIMS.

NAW has standing to assert its claims challenging the legality of the RMA, both on behalf of its members and in its own right.

An association has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

The evidence offered at trial demonstrates that "[a]t least some of [NAW's] members would have standing to sue in their own right." *Vasquez Perdomo v. Noem*, 148 F.4th 656, 676 (9th Cir. 2025). A plaintiff has Article III standing if "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

Here, the record shows that many NAW members are regulated Producers under the RMA and have suffered concrete economic injury from the mandatory Producer fees it imposes. *See* OR. REV. STAT. §§ 459A.869(2), 459A.884; *see Czyzewski v. Jevic Holding*

*Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"). For example, NAW member WCP Solutions paid $71,438.43 in fees under the RMA in 2025 and is facing a $105,000 bill for 2026. *See* Ex. 30; Day 2 Tr. 121:18–122:9 (Allen). NAW members Harbor Foods and RJ Schinner have likewise been invoiced substantial fee assessments, with Harbor charged more than half a million dollars and RJ Schinner assessed nearly $2 million. *See* Ex. 91; Day 1 PM Tr. 128:4–15 (Rodriguez); Day 2 Tr. 61:1–4 (Winkle); *cf. Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 143 (1974) (explaining a plaintiff need not "await the consummation of threatened injury to obtain preventive relief"). Those injuries are directly traceable to Oregon's EPR program, which DEQ administers and enforces. OR. REV. STAT. §§ 459A.878, 459A.962, 468.130. An order enjoining DEQ from enforcing the challenged RMA provisions against NAW's members would thus redress those injuries. *See Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002).

The interests NAW seeks to protect are germane to its purpose as a "national trade association that represents the wholesaler-distributors industry." Day 1 PM Tr. 34:5–6 (Wild). Finally, because NAW seeks prospective declaratory and injunctive relief rather than individualized damages, "individual participation is not necessary for effective relief." *Vasquez Perdomo*, 148 F.4th at 677; *see Int'l Union v. Brock*, 477 U.S. 274, 288–90 (1986). NAW therefore has associational standing to pursue its claims.

In the alternative, NAW itself has standing to challenge the RMA. An organization like NAW establishes "injury in fact if it can demonstrate: (1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular conduct in question." *Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147, 1154 (9th Cir. 2019) (cleaned up). The RMA has overtaken NAW's ordinary advocacy agenda, becoming "topic one" in nearly every member meeting and generating hundreds or thousands of member conversations. Day 1 PM Tr. 48:25–49:12 (Wild). That burden frustrates NAW's mission of representing its diverse membership through advocacy regarding "laws and

regulations impacting the wholesaler-distributors sectors in all 50 states[.]" *Id.* at 93:19–94:7 (Wild). As a result, NAW has had to "change[ ] [its] priorities" to redirect more resources to RMA-related work and even has reassigned staff hired for other purposes to focus on the RMA "full-time." Day 1 PM Tr. 49:17–23 (Wild); *id.* at 100:4–5 ("If anything this has been a tax on our resources . . . [and] a revenue loser for us."). Because the RMA required NAW to expend resources it "otherwise would spend in other ways," NAW has organizational standing as well. *El Rescate Leg. Servs., Inc. v. Exec. Off. of Immigr. Rev.*, 959 F.2d 742, 748 (9th Cir. 1992).

## II.    THE RMA VIOLATES THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.

The RMA violates the Due Process Clause, both because it unlawfully delegates regulatory authority to CAA and because it imposes unpredictable and retrospective fees on Producers without providing adequate procedures to challenge those assessments.

### A.    NAW's Members Have Protected Due Process Interests.

NAW's due-process challenge rests on two related, independently sufficient grounds. First, the RMA subjects Producers to regulatory authority exercised by a financially interested private organization—CAA. Second, the RMA authorizes CAA to impose individualized, retrospective fees without adequate notice or a meaningful opportunity to contest the legal and factual bases for those assessments.

The private-delegation problem implicates the liberty and property interests protected by the Due Process Clause. As the Supreme Court recognized in *Carter Coal*, a statute that confers on a private entity the power to regulate its competitors necessarily implicates "an intolerable and unconstitutional interference with personal liberty and private property." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *see also Ass'n of Am. Railroads v. U.S. Dep't of Transp.* (*AAR III*), 821 F.3d 19, 27–29 (D.C. Cir. 2016) (finding that freight operators had due process interest implicated by asserted delegation of regulatory control to Amtrak); *Gen. Elec. Co. v. N.Y. State Dep't of Lab.*, 936 F.2d 1448,

1455 (2d Cir. 1991) (reversing denial of summary judgment on a due process delegation claim involving private delegation of price fixing authority to labor groups); *Johnson v. Mich. Milk Mktg. Bd.*, 295 Mich. 644, 660 (1940) (finding due process violation where state impermissibly conferred legislative and adjudicative authority over price fixing to a Milk Marketing Board, whose members were composed of industry participants). It would have been no response in *Carter Coal* or its progeny to argue that those who did not want to submit to private regulatory control could simply leave the industry or the state.[3]

NAW's members have protected interests in the use of their property and the conduct of their affairs free from mandatory financial obligations formulated by an interested private organization without meaningful governmental control. *See Washington ex rel. Seattle Title Tr. Co v. Roberge*, 278 U.S. 116, 121–23 (1928) (holding private delegation constituted an "unnecessary and unreasonable [restriction] upon the use of private property or the pursuit of useful activities" and thus was "repugnant to the due process clause of the Fourteenth Amendment" (collecting cases)). These interests in personal liberty, private property, and the pursuit of lawful commercial activity are sufficient to invoke the protections of the Due Process Clause.

NAW's members also have a conventional property interest supporting their procedural due-process claim as CAA's "membership fees" implicate a protected property interest. The RMA requires Producers to pay "membership fees" as a condition of participating in the Oregon market. OR. REV. STAT. § 459A.869(4), (5); *id.* § 459A.884.

---

[3] Caselaw in other contexts similarly recognizes that laws may indeed violate due process where they impose unreasonable conditions on access to the jurisdiction or the ability to do business. *See Frost & Frost Trucking Co. v. R.R. Comm'n of Cal.*, 271 U.S. 583, 593–594 (1926) (invalidating state law that required private carriers working on state highways to submit to common carrier regulations: "[C]onsistently with the due process clause of the Fourteenth Amendment, a private carrier cannot be converted against his will into a common carrier by mere legislative command"); *Horne v. Dep't of Agric.*, 576 U.S. 350, 366 (2015) (explaining that selling products "in interstate commerce, although certainly subject to reasonable government regulation," is not something "that the Government may hold hostage, to be ransomed by the waiver of constitutional protection").

Money in a person's possession—irrespective of the legitimacy of the state's claim to it—implicates a protected property interest. *Cf. McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco*, 496 U.S. 18, 36 (1990) ("[E]xaction of a tax constitutes a deprivation of property[.]"). Moreover, because fees assessed pursuant to the RMA must be "calculated according to a specific formula," Producers also have a "'legitimate claim of entitlement' to [a] fee that is set pursuant" to that schedule, "which 'is sufficient to trigger procedural due process protection.'" *Spectrum Pac. W., LLC v. Imperial Irrigation Dist.*, 2025 WL 2462443, at *6 (S.D. Cal. Aug. 26, 2025) (citing *Armstrong v. Reynolds*, 22 F.4th 1058, 1076–77 (9th Cir. 2022)); *see also Union Pac. R. Co. v. United States*, 99 U.S. 700, 746 (1878) ("To coerce a delivery of the money is to coerce without right a delivery of that which is not the property of the government, but the property of the companies"). NAW's members therefore possess protected property interests both in the money the RMA requires them to pay and in having their fees determined according to the statutory requirements governing those assessments.

### B.    The RMA Unlawfully Delegates State Authority to a Private Entity Without Adequate Safeguards for Transparency or Accountability.

The Due Process Clause prohibits the government from delegating regulatory authority to a private entity. *Carter Coal*, 298 U.S. at 311; *see also McGautha v. California*, 402 U.S. 183, 272 n.22 (1971) (Brennan, J., dissenting) ("[D]ue process places limits on the manner and extent to which a state legislature may delegate to others powers which the legislature might admittedly exercise itself." (collecting cases)), *vacated sub nom.*, *Crampton v. Ohio*, 408 U.S. 941 (1972). While private actors may *advise* the government in administering a public program, due process requires the state to retain control over binding decisions, such that the private entity "function[s] subordinately" to the agency. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940); *see FCC v. Consumers' Rsch.*, 606 U.S. 656, 692–94 (2025); *AAR III*, 821 F.3d at 35–36. A delegation of government power is especially suspect where the private entity exercising regulatory

authority is self-interested or composed of market participants whose interests may be adverse to those they regulate. *See Carter Coal*, 298 U.S. at 311 ("[O]ne person may not be [e]ntrusted with the power to regulate the business of another, and especially of a competitor."); *Pittston Co. v. United States*, 368 F.3d 385, 394 (4th Cir. 2004) ("Any delegation of regulatory authority 'to private persons whose interests may be and often are adverse to the interests of others in the same business' is disfavored." (quoting *Carter Coal*, 298 U.S. at 311)).

Distilling these principles, due process is violated where "(1) a self-interested private party (2) is given power . . . to regulate other private parties who may have adverse interests." *Agendia, Inc. v. Azar*, 420 F. Supp. 3d 985, 992 (C.D. Cal. 2019) (citing *Ass'n of Am. Railroads v. U.S. Dep't of Transp.* (*AAR IV*), 896 F.3d 539, 545 (D.C. Cir. 2018)), *rev'd in part on other grounds sub nom.*, *Agendia, Inc. v. Becerra*, 4 F.4th 896 (9th Cir. 2021). The RMA fails on both fronts: It delegates fee-setting authority to CAA—a self-interested private regulator controlled by market participants competing with the Producers it governs—and it allows CAA to exercise that authority in critical respects without DEQ approval or meaningful public control.

The RMA thus differs markedly from the public-private partnership the Supreme Court recently upheld in *FCC v. Consumers' Research*, 606 U.S. 656 (2025)*. There, the FCC delegated a limited advisory role to a private administrator to recommend quarterly "initial projections" for fees that telecommunications carriers are obligated to contribute under the federal "Universal Service Fund" program. *See id.* at 664–670, 693–94. The FCC, however, retained ultimate decision-making power and control over both the private administrator and the program: the FCC controlled the administrator's board and budget; required the administrator to publicly report its projections (and their underlying calculations) before the fees took effect; could unilaterally reject or revise the administrator's recommendations; and allowed regulated entities to challenge any action of the administrator before the FCC itself. *See id.* at 692–95. None of those features is

14

present here. Indeed, the RMA does the *opposite* by giving CAA unilateral authority to assess post-hoc fees that are based on a confidential methodology and are shielded from administrative approval or review. That type of delegation is "clearly a denial of rights safeguarded by the due process clause[.]" *Carter Coal*, 298 U.S. at 311–12 (collecting cases).

### 1. CAA is a self-interested private entity.

CAA is the only PRO approved to operate in Oregon. CAA is governed by a National Board of Directors consisting of one voting representative from each of CAA's "Founding Member" companies. Ex. 15 at 15. CAA's Founding Members comprise some of the largest corporations in the United States. *Id.* at 9. These companies include suppliers to, customers of, and large wholesaler-distributors in direct competition with, NAW members. *See* Day 1 PM Tr. 68:6–21 (Wild).

The risk that the firms running CAA have "conflicting and even antagonistic interests" to the competitors it is allowed to govern is manifest. *See Carter Coal*, 298 U.S. at 311. The Founding Members' role on CAA's Board inherently gives them special influence over the organization and therefore the rules for how the system will operate. *See* Day 3 Tr. 138:22–139:17 (Lakhan); *see also* Day 5 Tr. 113:5–5 (Cassel) (agreeing that Founding Members' role on CAA's Board give them influence). CAA is financially dependent on its Founding Members, who have loaned CAA $41,250,000, nearly all of which remains outstanding. Day 1 AM Tr. 47:12–48:11 (Holmes); Ex. 14 at 19. That dependence heightens the risk of self-interested control. Under the Program Plan, "[d]ecisions relating to program budgeting and producer fees . . . reside with the National Board." Ex. 15 at 16; *see also* Day 1 PM Tr. 9:20–22 (Holmes) (explaining "the national board of directors really does oversee the financial and governance obligations of the national organization"). Given that the RMA mandates that program fees assessed against Producers "must be sufficient to meet the financial obligations" of the PRO, OR. REV. STAT. § 459A.884(1), the National Board's control over CAA's budget gives it direct

15

dominion over "one of the critical inputs to the fee setting process." Day 1 PM Tr. 10:2–3 (Holmes). The fact that the fee model is confidential only makes matters worse. The model can be adjusted in subtle ways to shift costs among material classes, and DEQ does not have the underlying algorithm or inputs needed to test CAA's judgments in any meaningful way. *See* Day 5 Tr. at 178:4–179:23 (Lakhan); Day 1 Sealed Tr. 13:1–18, 16:21–18:5 (Holmes). Rather, the fee-setting process is left to a handful of executives hired by, responsive to, and financially dependent on the same CAA Board Members competing in the market.

It is no surprise, then, that CAA's operations are structured to give its Founding Members a competitive advantage in navigating the very program they oversee. CAA board members may access confidential information, including that specific to CAA's Producer "members." Ex. 38 at 1; *see* Day 1 AM Tr. 49:20–50:20 (Holmes). Individual board members are free to share any confidential materials and information learned from CAA with the respective Founding Members they represent, *see* Ex. 38 at 1; Day 1 AM Tr. 51:20–52:1 (Holmes). The remaining 2600 companies compelled to join CAA are not given access to that information. *See* Day 1 AM Tr. 52:2–8 (Holmes). CAA's insistence that its Founding Members cannot access certain types of information is cold comfort, as those restrictions are self-imposed and discretionary, not commanded by any Oregon law or regulation, and are again entirely lacking in transparency or accountability. *See, e.g.*, Day 1 PM Tr. 27:3–28:7 (Holmes); Day 4 Tr. 126:22–127:4 (Portley). DEQ's reliance on antitrust law as an external check only further demonstrates that the RMA provides no public, transparent, appealable fee-setting process. Antitrust law may police anti-competitive conduct after the fact, but it does nothing to provide the public, transparent fee-setting process due process requires. Day 1 PM Tr. 27:3–28:7 (Holmes); Day 4 Tr. 126:22–127:4 (Portley).

The confidentiality of the model also increases the unpredictability of the fees (and stands in contrast to Dr. Lakhan's example of the public model in Canada that users could

interact with to see how changes in inputs would affect their fees). *See* Day 3 Tr. 94:1–16, 129:10–15, 131:7–19 (Lakhan). Moreover, larger companies generally speaking are far better positioned to handle unpredictable fees: they can better absorb the fees year-to-year, spread them across a larger base of products and services, and push the fees onto others in the supply chain. Relatively smaller companies and companies with highly variable product offering (like NAW's members) have far less ability to handle such fluctuations.

The procedures CAA employs to interface with its constituent companies also disproportionately favor its Founding Members. The RMA has generated much confusion among regulated entities as to their responsibilities under the law. *See, e.g.*, Day 1 AM Tr. 65:8–10 (Holmes) ("Q. You get a lot of questions from a lot of companies, right? A. Yes."); Day 1 PM Tr. 53:19–22 (Wild) (explaining NAW faced "widespread compliance questions that our members had on both whether they were or were not a producer or what they were a producer of, how to register"); For most Producers, those questions must be posed to CAA via email, *see* Day 1 AM Tr. 65:11–24 (Holmes)—which often does little to clarify individualized concerns, *see, e.g.*, Day 1 PM Tr. 54:21–22 (Wild) ("We were directed to participate in public webinars[.]"). By contrast, the largest Producers by volume—many of which are CAA Founding Members, *see* Day 1 AM Tr. 48:16–23 (Holmes); Exs. 40, 45— as well as Producers in "certain industry segments" are assigned a "dedicated rep" who they can call on a private phone number. *See* Day 1 AM Tr. 65:22–66:12 (Holmes).

CAA's own Conflict of Interest Policy does not even attempt to mitigate this glaring structural defect in its governance, as it simply excuses this particular conflict of interest. *See* Ex. 37 at 1 ("If you are member of the Board of Directors or member of State Board you do not need to disclose an exception [to the CAA Conflict of Interest Policy] based solely on your employment relationship with producer or CAA member company."). Nor does the RMA itself do anything to rein in potential conflicts of interest. Indeed, DEQ had no knowledge of CAA's internal policies for handling sensitive information until shortly before trial. *See* Day 4 Tr. 126:19–21 (Portley) ("We did not have awareness of what

17

CAA's policy is."). Nor was DEQ aware that much of CAA's DEQ-approved guidance sits behind CAA's membership paywall. Day 1 PM Tr. 55:20–56:6 (Wild); Day 4 Tr. 126:19–21 (Portley).

In effect, DEQ has delegated implementation of the RMA "to an entity that is designed to be the *opposite* of 'presumptively disinterested.'" *AAR III*, 821 F.3d at 34 (quoting *Carter Coal*, 298 U.S. at 311). By entrusting management of Oregon's EPR program to a select few market competitors, DEQ has transformed its responsibility to implement the RMA into an unconstitutional exercise that "transgresses 'the very nature of governmental function.'" *Id.* at 31 (alteration adopted) (quoting *Carter Coal*, 298 U.S. at 311).

### 2. CAA exercises regulatory fee-setting authority without DEQ review or approval of the fees or the underlying model, together with extensive private enforcement authority.

In turn, DEQ has delegated binding regulatory authority over fee assessments to CAA. The RMA prohibits a Producer from selling or distributing covered products in Oregon unless it is a member of an approved PRO and complies with that PRO's program plan. OR. REV. STAT. § 459A.869(4), (5). DEQ has approved only one PRO to operate in Oregon: CAA. So Producers must join CAA—and agree to the terms of CAA's Participant Producer Agreement and Oregon Addendum, *see* Exs. 34, 70—or face enforcement consequences from DEQ, including civil penalties of up to $25,000 per day. OR. REV. STAT. § 459A.962.

Once the RMA places authority in CAA's hands, the critical issue becomes whether the RMA contains sufficient safeguards to ensure CAA remains "subordinate" to DEQ in exercising that authority. *See Sunshine*, 310 U.S. at 399; *AAR IV*, 896 F.3d at 545. It does not. The RMA and its implementing regulations give CAA substantial unchecked control over fee setting. The statute defines only the most general standards, requiring that base fee rates be "approximately proportional to the covered products' relative contribution to the financial obligations of the producer responsibility organization," OR. REV. STAT.

§ 459A.884(3)(b), and requiring "eco-modulation" adjustments, *id.* § 459A.962(3)–(4). But the statute does not prescribe any uniform methodology for calculating those fees, instead leaving that to the discretion of the PRO.

True, DEQ had to approve CAA's Program Plan before CAA was allowed to begin operations. But DEQ's review of CAA's fee-setting methodology was limited to the narrative explanation in the Program Plan and Confidential Appendix G. *See* Day 5 Tr. 43:2–18 (Allaway); Day 1 Sealed Tr. 14:20–24 (Holmes). Appendix G gives only a general overview of how final fee rates are set and lists the initial "Cost to Manage" factors for each covered material category. Ex. 12; Day 5 Tr. 40:20–43:18 (Allaway). It does not include the "thousands" of data points, inputs, or algorithm used to calculate those factors. Day 1 Sealed Tr. 13:3–11 (Holmes); Day 4 Tr. 121:8–12 (Portley). DEQ therefore neither reviewed nor approved the underlying fee model. In fact, DEQ has never seen it. Day 1 Sealed Tr. 13:21–24 (Holmes).

The RMA's implementing regulations, however, allow CAA to change the inputs that feed the underlying algorithm without DEQ approval. OR. ADMIN. R. § 340-090-0750(1), (2). And—as DEQ's own witness acknowledged—when inputs change, outputs change. Day 5 Tr. 42:3–4 (Allaway). In fact, so long as it purports to be following the same methodology, CAA could even change the underlying algorithm as no formula is set forth in the approved program plan. *Id.* at 43:2–18 (Allaway). CAA is therefore free to set both how much will be collected in Producer fees via its budget, *see* OR. REV. STAT. § 459A.884(1), and alter how those fees will be distributed across covered materials—all without oversight from DEQ. In making these alterations to the fee methodology, then, CAA is not merely submitting non-binding recommendations or "projections" for DEQ to review and "formally promulgate[.]" *See Consumers' Rsch.*, 606 U.S. at 693–95. Rather, CAA itself can alter the underlying fee inputs without DEQ's approval and directly invoice Producers for the resulting fees. While the RMA euphemistically dubs these "membership fees," these monies used to fund municipal recycling programs are functionally targeted

19

taxes (and certainly a replacement for taxes). *See* Day 1 PM 70:21–71:5 (Wild); Day 3 Tr. 105:9–106:4 (Lakhan); Day 4 Tr. 117:18–118:4 (Portley).

Related to CAA's ability to set fees is its private authority to enforce them. Compelling Producers to join CAA means compelling them to agree to CAA's contractual agreements (which DEQ also was not required to approve). *See* Portley Dep. 179:21–181:23; 195:2–8, 215:19–217:5; Day 1 AM Tr. 28:3–17 (Holmes); Day 1 PM Tr. 65:22–66:10 (Wild), 113:1–18 (Rodriguez); Day 4 Tr. 129:9–133:1 (Portley). As it pertains to Producers' reporting obligations and the payment of invoices, CAA has the authority to assess late fees (1% per month, compounded monthly) and inaccurate reporting charges, *see* Ex. 70 § 5.6; and to conduct audits, the costs of which are borne by the Producer unless the discrepancy falls below a certain threshold, *id.* § 4.2. *See* Day 1 PM Tr. 79:1–20 (Wild); Portley Dep. 198:11–199:18; Day 4 Tr. 133:2–25, 135:8–24 (Portley).

Failure to pay fees or report accurately thus subjects a Producer to private enforcement independent of potential referral to and enforcement by DEQ (as evidenced by CAA's issuing invoices with late fees as to Producers covered by the injunction in this case, *see* Day 1 PM Tr. 67:1–12 (Wild)). *See also* Section II.C.2, *infra*. CAA of course retains discretion on how to resolve disputes, and notwithstanding DEQ's enforcement authority, it is CAA that sends the referral in the first instance—creating a heightened risk of preferential treatment, including that CAA would show favoritism toward its Founding Members who are in fact CAA's *creditors*. The privatization of enforcement is also reflected in the fact that CAA offers guidance on reporting obligations and fee calculations—i.e., how to fulfill Producers' *legal* obligations—but that guidance is not officially approved by DEQ, and it is often located behind the CAA firewall meaning that only members can access it. *See* Day 1 AM Tr. 63:24–65:4 (Holmes); Day 1 PM Tr. 55:12–56:7 (Wild); Day 4 Tr. 141:18–143:10 (Portley).

To make matters worse, the RMA does not include any provision under which a Producer can petition DEQ to substantively review and overturn CAA's fee-assessment

determinations. *Cf. Consumers' Rsch.*, 606 U.S. at 693 (upholding delegation in part because "anyone aggrieved by an action of the Administrator [could] seek de novo review by the Commission"); *Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*, 53 F.4th 869, 886 (2022) (holding delegation unlawful where agency's oversight procedures did "not include reviewing the substance of the rules themselves"). Because the RMA delegates the calculation and assessment of Producer fees to the PRO, any challenge to those fees would have to be brought against CAA—the only PRO approved to operate in Oregon—rather than DEQ. *See* OR. REV. STAT. § 459A.884; Day 4 Tr. 134:2–136:16 (Portley). As explained in greater detail below, *see* Section II.C, *infra*, a dispute concerning the specific assessment of Producer fees arises from CAA's performance of its contractual obligations under the Participant Producer Agreement and Oregon Addendum—and is thus governed by the review process and remedy restrictions outlined therein. *See* Ex. 70 § 8. At trial, DEQ attempted to present itself as available to consult on disputes between CAA and its members, but that would occur entirely in DEQ's discretion; DEQ representatives— including its enforcement manager—concede no rule, written guidance, or formal process exists. Day 4 Tr. 196:13–197:21 (Saylor); *see also* Portley Dep. 199:23–200:1, 201:4–18; Day 4 Tr. 29:3–30:10, 135:15–136:22 (Portley); *see generally* Saylor Dep.

All of the foregoing shows that the RMA undermines transparency and public accountability with respect to the legal obligations that are most salient to Producers— namely, the setting and collecting of fees. And the violation of Producers' liberty and property interests also undermines transparency and accountability for the public itself. If Oregon had to fund its infrastructure through a tax or even a point-of-sale fee, the costs of the program would be transparent to the public. But by laundering the obligations through CAA and an opaque fee-setting regime, the costs to consumers and public can be hidden, allowing RMA fees to function, in effect, as a stealth tax.

*    *    *

21

PLAINTIFF'S POST-TRIAL BRIEF

The RMA squarely presents a "case where a group of producers may make the law and force it upon" the rest of the industry. *Currin v. Wallace*, 306 U.S. 1, 15–16 (1939) (citing *Carter Coal*, 298 U.S. at 310). Compounding that constitutional concern, DEQ has allowed Oregon's EPR program to be implemented at the behest of a select few with "adverse . . . interests of others in the same business" it oversees. Ninety years ago, the Supreme Court derided that combination of private interest and public power as "legislative delegation in its most obnoxious form[.]" *Carter Coal*, 298 U.S. at 311. That principle is no less true today.

### 3. Producers have no feasible alternative to joining CAA.

CAA's protestations notwithstanding, membership in CAA is hardly "voluntary." *See* Ex. 70 at 1. Under the statutory scheme invalidated in *Carter Coal*, a producer also was not *formally* required to accept the privately adopted Bituminous Coal Code regulating the industry. But refusal carried severe consequences, including exposure to an "excise tax" and forfeiture of federal contracts. 298 U.S. at 310–11. The Court rejected the argument that the existence of a formal alternative to adopting the Code satisfied due process, explaining that "[t]o 'accept,' in these circumstances, is not to exercise a choice, but to surrender to force." *Id.* at 311. So too here.

It is of no moment that the RMA theoretically allows multiple PROs to operate. DEQ has only approved CAA and no other putative PRO is waiting in the wings. *See* Day 3 Tr. 198:20–199:3 (Portley); Day 4 Tr. 111:19–112:9 (Portley). It is not clear that a new PRO even could capture the required ten-percent market share in the first place, given that CAA already controls roughly 90 to 95 percent of the market and a Producer could not leave CAA in the interim without incurring significant penalties. See Day 1 AM Tr. 72:5–72:7 (Holmes). Assuming that threshold could somehow be met, a putative PRO then would need to develop a program plan that meets the extensive and demanding requirements of the statute and rules, pay an application fee of $150,000, and engage in a nearly yearlong review process to even have a chance at approval. *See* Day 4 Tr. 113:1–5

(Portley). Finally, *if* that program plan were eventually approved, the PRO would still need to pay millions of dollars to DEQ, enlist "appropriate specialists" to actually manage the organization, *see* Day 4 Tr. 6:2–25 (Portley), and coordinate between "hundreds of companies" to "set up a board"—something the "average producer is not specialized" to do. Day 3 Tr. 33:11–34:4 (Thomas). It would also have to work with end markets to satisfy the statute's collection and recycling requirements, *see* OR. REV. STAT. § 459A.869(7), which would duplicate work CAA already performs through its statewide and interstate reach.[4]

Indeed, it is hardly coincidental that, in each of the seven states to adopt packaging EPR legislation, CAA is the only approved PRO. Day 5 Tr. 110:8–10 (Cassel). As Defendant's expert also acknowledges, other states (like California) only allow one PRO for the first several years. *Id.* at 110:11–23. Thus, across multiple states, CAA is now locked in as a statutory monopoly, which it wields as a competitive advantage by promoting its nationwide shared-services cost model. *Id.* at 110:24–111:7. And on top of all of that, CAA Oregon is now sitting on about $100 million in reserves through the excess funding it collected in 2025. Regardless of whether there is a hypothetical legal opportunity to form a new PRO, there is no practical or feasible alternative. In these respects, Oregon not only unconstitutionally delegates regulatory authority to CAA, but—together with other states—is positioning CAA as an *interstate* monopoly and rate-setting regulator.

C.    **The RMA Compounds the Private-Delegation Problems Through Retrospective Fee Setting and the Inadequate Review of Fee Assessment.**

The RMA establishes no procedure through which a Producer can pursue review of a fee assessment by DEQ or in a court of law. Instead, CAA requires Producers to sign non-negotiable private agreements governing their participation in the program. *See* Day 1 AM Tr. 28:3–17 (Holmes); Day 1 PM Tr. 66:2–10 (Wild). Like the RMA itself, the

---

[4] Nor is it clear that competition would actually solve the delegation problem, if the competing PRO was simply being formed by other large companies, and without addressing the problems of the lack of oversight, transparency, and accountability.

Participant Producer Agreement and Oregon Addendum (collectively, the "CAA Contracts") require Producers to enroll with CAA and pay fees calculated by CAA based in part on the volume of covered materials the Producer shipped into Oregon in the preceding calendar year. *See* Exs. 34, 70. CAA also warrants that the program will be administered and operated in material compliance with the Program Plan and creates an exclusive remedy for breach of that warranty. Ex. 34 § 2.5. A dispute concerning Producer fees therefore would arise from CAA's performance of its contractual obligations and would be subject to the CAA Contracts' selected dispute-resolution mechanisms. Moreover, a Producer's "sole and exclusive remedy" for CAA's breach of its warranties is to terminate its agreement, *see* Ex. 34 § 2.5—which would immediately place the Producer out of compliance with the law and prohibit it from selling into Oregon.

That structure gives rise to two related procedural defects. First, the RMA attaches financial consequences to conduct undertaken before Producers know the rates and allocation rules that will determine their liability. Second, once CAA assesses the resulting fees, the RMA provides no process that affords Producers both "a fair opportunity to challenge the accuracy and legal validity" of the assessment and a "clear and certain remedy" for amounts unlawfully collected. *McKesson Corp.*, 496 U.S. at 39 (internal quotation marks omitted). Oregon may choose when and how to provide review, but it must provide a procedure that prevents the assessment from resulting in a "permanent unlawful deprivation of property." *Id.* at 40. The RMA provides no such procedure.

### 1. Retrospective and unpredictable fee-setting means that producers engage in liability-creating conduct before knowing the fees that will attach.

The RMA does not provide Producers adequate notice of the financial obligations that attach to their conduct. Membership fees are calculated retrospectively using supply data reflecting sales from years prior to the invoices being issued. OR. ADMIN. R. § 340-090-0700(4)(b). Producers therefore make all relevant business decisions before they know the precise rates that CAA will later apply. *See* Day 3 Tr. 6:2–7:11 (Thomas). By the time

CAA determines the final charge, the relevant sales year has ended and Producers can no longer alter their conduct, renegotiate prices, change packaging, or adjust distribution practices to avoid or offset the assessment.

That structure is inconsistent with the basic due-process principle that "regulated parties should know what is required of them so they may act accordingly." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Due process does not permit the government to impose liability through standards so uncertain that regulated parties are left to guess at the financial consequences of their conduct. *See Gen. Electric Co. v. EPA*, 53 F.3d 1324, 1328–29 (D.C. Cir. 1995) (due process requires regulated parties to receive "fair notice" of the agency's interpretation before liability attaches); *Satellite Broad. Co. v. FCC*, 824 F.2d 1, 3–4 (D.C. Cir. 1987) ("Traditional concepts of due process incorporated into administrative law preclude an agency from penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule."). But the RMA does just that. Notwithstanding that they were both based on the same "methodology" and the same 2024 volumes, Producer fees for many categories changed significantly between 2025 and 2026. *See* Day 1 PM Tr. 7:5–19 (Holmes); *see* Exs. 42–43. As a result of not knowing the extent of their liability until long after the covered products are shipped into the state, Producers are left unable to adjust the prices for those goods to account for the fees. *See* Day 3 Tr. 5:22–7:10 (Thomas).

The uncertainty surrounding a Producer's obligations under the law is compounded by CAA's refusal to secure and disclose the fee-setting methodology. *See* Day 1 Sealed Tr. 13:3–24, 15:23–16:1 (Holmes); Day 5 Tr. 43:2–18 (Allaway). NAW members have been unable to obtain the formulas and other inputs necessary to understand how their obligations are determined. Day 1 PM Tr. 70:1–20 (Wild). CAA also did not disclose to DEQ the adjustments it makes to Producer-reported data to arrive at the weights used to calculate rates and assign fees to each material class. Day 1 Sealed Tr. 6:23–7:17, 37:7–39:8 (Holmes); Portley Dep. 227:15–228:13, 229:25–230:7; 231:12–232:15. Nor can

25

Producers estimate their liability by tracking the volume of covered products they supply. *See, e.g.*, Day 2 Tr. 10:18–11:17 (Rodriguez); Day 3 Tr. 11:22–12:15 (Thomas); Day 4 Tr. 26:23–27:14 (Portley). So their ultimate obligations depend on allocation choices made after the relevant conduct has occurred and according to a methodology they cannot inspect. Producers thus lack meaningful notice both when they engage in the conduct that creates liability and when CAA later calculates the amount due.

### 2. The RMA fails to provide producers a meaningful opportunity to contest mandatory fee assessments.

A State must "provide procedural safeguards against unlawful exactions," *McKesson*, 496 U.S. at 36, by providing "a fair opportunity to challenge the accuracy and legal validity" of the obligation and a "clear and certain remedy" for amounts unlawfully collected. *Id.* at 39 (internal quotation marks omitted). The RMA provides neither.

As also described above, the RMA places Producers in a public-private enforcement system that exposes Producers to overlapping risks of liability from *both* DEQ and CAA without providing an effective remedy against either. The statute itself imposes obligations on both the PRO and Producers: the PRO is delegated authority to assess and collect producer fees, and must exercise that authority in accordance with the program plan approved by DEQ, *see* OR. REV. STAT. § 459A.884; and Producers must join a PRO and pay the fees assessed by the PRO. *See id.* § 459A.869. Failure to comply with those requirements exposes Producers to enforcement actions by DEQ, including civil penalties of up to $25,000 per day. *See id.* §§ 459A.995, 468.130.

CAA—the only PRO operating in Oregon—also requires Producers to sign private agreements governing their participation in the program. Like the RMA, the Participant Producer Agreement and Oregon Addendum require Producers to enroll with CAA and pay fees calculated by CAA. CAA also warrants that the program will be administered in material compliance with the Program Plan. But those same agreements channel disputes over CAA's performance into private contractual remedies and binding arbitration.

This structure denies Producers both a public forum for contesting CAA's assessments and a guaranteed means of recovering fees unlawfully collected. CAA—not DEQ—issues the invoices, so a Producer cannot use the Oregon Administrative Procedure Act to challenge the fee assessment as a final order of DEQ. *See Morse Bros. Prestress v. City of Lake Oswego*, 640 P.2d 645, 646 (Or. Ct. App. 1982) ("[T]he Administrative Procedures Act (APA) specifically applies only to state agencies."); Day 1 AM Tr. 56:2–4 (Holmes) ("Q. . . . In CAA's view you are not an Oregon state agency? A. We are not."). Nor does the RMA provide any other formal mechanism for administrative review of fee assessments by DEQ.

Instead, fee disputes are governed by the terms set in the mandatory, non-negotiable contracts Producers must sign in order to join CAA and comply with the requirements of the RMA. CAA's Oregon Addendum channels that dispute into mandatory arbitration. The Oregon Addendum requires "any dispute, controversy, or claim arising out of or relating to this Oregon Addendum, including the interpretation, scope, or breach thereof or the extent of the Parties' obligations under the Oregon EPR Law," to be resolved through "binding arbitration." Ex. 70 § 8. That language readily encompasses a dispute over the fees a Producer must pay under the CAA Contracts. *See Charles v. Portfolio Recovery Assocs.*, 2024 WL 1672350, at *2 (9th Cir. Apr. 18, 2024) ("'This presumption [of arbitrability] carries particular force where the arbitration clause is phrased in broad and general terms' . . . covering 'any claim, dispute, or controversy' that 'arises from or relates to' . . . [the] agreement." (quoting *Westinghouse Hanford Co. v. Hanford Atomic Metal Trades Council*, 940 F.2d 513, 517 (9th Cir. 1991))). So a Producer cannot pursue damages or declaratory relief concerning that dispute in court. *See Edwards v. Hartford Ins. Co. of the Midwest*, 823 P.2d 439, 485 (Or. Ct. App. 1992).

The Oregon Addendum's limited preservation of "injunctive relief" does not create a judicial forum for resolving the merits of a fee dispute or recovering amounts unlawfully collected. Ex. 70 § 8. Courts interpreting contracts that combine a broad arbitration clause

27

with language permitting injunctive relief distinguish between a carveout for a *remedy* and a carveout for a *claim*. Where the contract merely recognizes the right to seek "injunctive *relief*," courts will construe that provision as allowing a court to issue an injunction "in aid of arbitration" while leaving the underlying dispute for the arbitrator. *See, e.g.*, *Farr v. Acima Credit LLC*, 2021 WL 2826709, at *5 n.2 (N.D. Cal. July 7, 2021) (collecting cases); *GateGuard, Inc. v. MVI Sys. LLC*, 2021 WL 4443256, at *6–7 (S.D.N.Y. Sept. 28, 2021) (collecting cases). That reading properly effectuates both clauses by honoring the decision to arbitrate the *claim* and the carveout for residual injunctive *relief* to "maintain the status quo between the parties" pending arbitration. *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482, 485 (9th Cir. 2020); *cf. Davis v. SEVA Beauty LLC*, 2017 WL 11921334, at *3 (W.D. Wash. Sept. 13, 2017) ("A party may not, however, circumvent the arbitration clause by simply seeking equitable *remedies* for *claims* that are squarely within the scope of matters to be arbitrated." (emphases added)). By contrast, "[c]ourts have typically only found an equitable relief provision to serve as a carve-out when the provision says that all 'claims' or 'actions' seeking equitable relief are exempted from arbitration." *GateGuard*, 2021 WL 4443256, at *6.

Here, Section 8 of the Oregon Addendum sends "any dispute, controversy, or claim" arising thereunder to arbitration with no right of appeal and separately preserves the parties' ability to seek specified "injunctive relief" in court. Ex. 70 § 8. The former assigns disputes to arbitration; the latter preserves only a limited judicial remedy for compelling compliance or restraining an ongoing breach in the interim—but it does not remove equitable claims from arbitration generally or create a judicial forum for resolving the merits of a fee dispute. *See Dohrmann*, 823 F. App'x at 485 ("If the parties intended to carve out an exception to arbitration for all equitable claims, they could have done so[.]" (internal quotation marks omitted)). The plain text of Section 8 thus preserves access to injunctive relief pending arbitration while maintaining arbitration as the forum CAA selected for resolving the fee dispute.

A Producer contesting its invoice in an isolated arbitration must proceed without access to the information underlying the calculation of the fee assessment in question. CAA has withheld from the public not only the confidential description of its fee-setting methodology but also the underlying algorithm and data one would need to replicate the calculation. Day 1 Sealed Tr. 13:3–24, 15:23–16:1 (Holmes). An opportunity to appear before a decisionmaker is not meaningful unless the affected party receives sufficient information to understand and answer the basis for the deprivation. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (notice must afford interested parties an adequate "opportunity to present their objections"); *Greene v. McElroy*, 360 U.S. 474, 496 (1959) ("[T]he evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue."). A Producer cannot meaningfully challenge whether CAA correctly applied its methodology when CAA alone possesses that methodology.

The confidentiality and one-at-a-time nature of arbitration magnify that informational imbalance. Each Producer sees only its own invoice and its own proceeding, while CAA participates in every fee dispute. As the Ninth Circuit has recognized, confidential arbitration favors the "repeat player," which can "accumulate a body of knowledge" while ensuring that its opponents lack access to precedent and the "information needed to build a case." *Ting v. AT&T*, 319 F.3d 1126, 1151–52 (9th Cir. 2003). Here, CAA enters each arbitration armed with both exclusive access to the fee algorithm and the results of every prior dispute. The individual Producer, by contrast, sees none of that information. Arbitration cannot provide a fair opportunity to challenge the "accuracy" of an assessment when the information necessary to establish inaccuracy remains exclusively in the possession of the entity defending the charge. *McKesson*, 496 U.S. at 39.

The RMA also fails to provide a "clear and certain remedy" for Producers to recoup amounts unlawfully collected. Section 2.5 of the Participant Producer Agreement provides

that a Producer's "sole and exclusive" remedy for breach is to "terminate its participation in the applicable Program Plan." Ex. 34 § 2.5; *see* Ex. 70 § 6.3 (incorporating that section into the Oregon Addendum). Nothing in the RMA guarantees repayment of unlawfully collected fees. Nothing authorizes DEQ to order CAA to refund an overassessment. And nothing in the CAA Contracts clearly guarantees that an arbitrator may award complete restitution, with interest, for a fee imposed through an unlawful methodology or contrary to the RMA. To the contrary, the sole and exclusive remedy provided in the Participant Producer Agreement is for a Producer to terminate its contract with CAA, an action that would immediately subject it to enforcement for failure to be enrolled with a PRO. Day 1 AM Tr. 59:9–15, 70:4–14, 71:9–13 (Holmes); Day 4 Tr. 134:14–18 (Portley). In other words, that exclusive remedy is no remedy at all. A remedial scheme cannot be "clear and certain" when the governing agreement appears to affirmatively provide for a "permanent unlawful deprivation" of the fees wrongly charged. *McKesson*, 496 U.S. at 40.

Nor can arbitration necessarily provide complete relief from the RMA's enforcement provisions. DEQ is not a party to the CAA Contracts, and "[i]t goes without saying that a contract cannot bind a nonparty." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002); *see also Peck Ormsby Constr. Co. v. City of Rigby*, 2013 WL 5274221, at *1 (D. Idaho Sept. 17, 2013) (explaining an arbitrator's decision "will not be binding as to those not parties to the arbitration" (citing *Contracting N.W., Inc. v. City of Fredericksburg*, 713 F.2d 382, 387 (8th Cir. 1983)). An arbitrator deciding a dispute between a Producer and CAA therefore cannot bind DEQ or prevent DEQ from nonetheless taking an enforcement action against that Producer based on its own assessment of noncompliance. *See* Day 4 Tr. 134:2–22 (Portley).

The scheme thus divides a single dispute between a private arbitrator with authority over the contracting parties and a state agency that retains statutory enforcement authority. The arbitrator may decide whether CAA complied with its contractual obligations, but DEQ retains authority to enforce the statutory obligation that gave rise to the contract. No

identified decisionmaker has express authority both to determine the assessment's "accuracy and legal validity" and to grant complete relief from the resulting statutory obligation. *McKesson*, 496 U.S. at 39. A collection of partial proceedings, none of which can conclusively decide the whole dispute and afford complete relief, is not the clear and certain remedy due process requires.

The availability of arbitration therefore does not cure the RMA's procedural defects. Producers must contest their assessments without access to the methodology or inputs necessary to test them. CAA possesses the information and institutional knowledge from every fee dispute, while each Producer proceeds in isolation. DEQ does not review individualized assessments, the arbitrator necessarily cannot bind DEQ, and the CAA Contracts do not clearly authorize repayment of unlawfully collected amounts. The RMA accordingly provides neither a fair opportunity to challenge the accuracy and legal validity of CAA's assessments nor a clear and certain remedy capable of preventing a permanent unlawful deprivation of Producers' property.

## III. THE RMA VIOLATES THE DORMANT COMMERCE CLAUSE.

Independent of the Due Process problem, the RMA violates the dormant Commerce Clause. It does so in three distinct ways. First, the RMA discriminates against interstate commerce, including through exemptions that favor local interests while shifting the costs onto out-of-state Producers and consumers. Second, the RMA imposes substantial burdens on interstate commerce by disrupting multistate shipping, routing, and supply-chain decisions—and by knowingly pushing costs onto consumers in other states—in ways that are clearly excessive relative to any local benefit. Third, the RMA charges fees on interstate distribution that are neither fairly apportioned to the costs they purport to recoup nor reasonable in relation to the benefits conferred.

### A. The RMA Discriminates Against Interstate Commerce.

The RMA discriminates against interstate commerce in both text and operation. The dormant Commerce Clause prevents a state from according differential treatment to in-

state and out-of-state economic interests in a manner that benefits the former and burdens the latter. *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013). Discrimination may appear "on [the law's] face, in its purpose, or in its practical effect." *Id.* A discriminatory law is *per se* invalid "unless it 'serves a legitimate local purpose, and this purpose could not be served as well by available nondiscriminatory means.'" *Id.* (quoting *Maine v. Taylor*, 477 U.S. 131, 138 (1986)).

In smoking out discrimination, the Supreme Court has paid special attention to statutory exemptions that expressly or practically benefit local interests at the expense of interstate actors, *see CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 287–88 (2011) (collecting cases), as such carveouts often reveal a scheme that gives locals the benefits of regulation without requiring them to bear its full cost, *see Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 676 (1981) (plurality opinion). The RMA, including through its exemptions, operates the same way.

To begin, the RMA's exemption for Oregon governmental bodies facially discriminates in favor of the State itself. The RMA treats a "public body, as defined in ORS 174.109" as a "Small Producer" that does not need to register with a PRO. OR. REV. STAT. §§ 459A.863(32)(b), 459A.872; *see also id.* § 174.109 ("[A]s used in the statutes of this state 'public body' means state government bodies, local government bodies and special government bodies."). The cross-referenced statutory definitions make clear that this exemption is available only to *Oregon* governmental entities. *See id*. §§ 174.111–.114 (defining "state government" by reference to the executive, legislative, and judicial branches established under the Oregon Constitution); *id.* § 174.116 (defining "local government" to mean "all cities, counties and local service districts located *in this state*" (emphasis added)); *id.* § 174.117 (defining "special government body" to include a "public corporation created under a statute of this state," a public charter school established under Oregon law, an Oregon community-college district, and Oregon's public universities). CAA Oregon's Executive Director confirmed as much. *See* Day 1 AM Tr. 28:20–23

32

(Holmes). Thus, for example, an Oregon public university that sells branded packaged merchandise, packages items for online sales, or publishes a magazine or newspaper is categorically exempt, while out-of-state public universities selling or distributing materials into Oregon are not. That is textbook discrimination. *See Rocky Mountain*, 730 F.3d at 1089 (finding discrimination where coverage is "based on state boundaries alone").

Other exemptions to the RMA are also discriminatory in their effect by "chang[ing] the competitive balance" to the "acute competitive disadvantage" of interstate businesses. *Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 5, 12 (1st Cir. 2010). A classification need not expressly turn on in-state presence to discriminate against interstate commerce. *See Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 567, 579–80 (1997) (invalidating law "operated *principally* for the benefit of nonresidents" as discriminatory (emphasis added)). Rather, a state law that "falls by design in a predictably disproportionate way on out-of-staters" is equally repugnant to the Commerce Clause as one "targeting out-of-staters alone." *Id.* at 579–80. The court thus must look beyond formal neutrality to determine whether a statute's chosen criteria shelter local businesses from burdens borne principally by interstate competitors. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 350–53 (1977); *Walgreen Co. v. Rullan*, 405 F.3d 50, 55–58 (1st Cir. 2005).

***Foodservice ware***. The RMA's hierarchy for foodservice ware and carveouts for restaurants and single retailers do exactly that. The RMA exempts "restaurants, food carts and similar business establishments" that primarily sell food intended for immediate consumption, as well as "single retail sales establishment[s]" that are not part of a franchise or chain and do not sell through an online marketplace. OR. REV. STAT. § 459A.863(32)(f)–(g). Those criteria inherently select for businesses with a fixed, locally confined Oregon presence. *See* Day 1 AM Tr. 31:3–32:2 (Holmes); Day 1 PM Tr. 112:13–25 (Rodriguez); Day 3 Tr. 41:13–42:18 (Thomas); *see also* Amicus Br. of Int'l Franchise Ass'n & Rest. L. Ctr. at 10, Dkt. 146 ("Two retailers identical in revenue, covered-product volume, Oregon

footprint, and single-establishment operation receive different treatment based solely on whether one of them is affiliated with a franchise brand.").

Indeed, treatment of foodservice ware reflects an overtly protectionist choice that also goes to the heart of the transparency and accountability issues in this case. As Plaintiff's expert Mr. Cassel admitted, imposing a fee for foodservice ware on restaurants would be fully consistent with the theory of EPR: restaurants and local establishments can choose how much disposable packaging and foodservice ware to provide; they can select what products to buy to lower fees; and they directly profit from the convenience of takeout sales. *See* Day 5 Tr. 117:18–118:14 (Cassel). It would also be straightforward for foodservice ware to incur a point-of-sale fee—similar to a bag fee at the grocery store or the point-of-sale structure of other, historical EPR programs—where the fee would be transparent for all involved and customers would bear responsibility for their own convenience-based choices.

Yet the RMA places foodservice ware fees on the "first importer" into the State, *see* OR. REV. STAT. § 459A.866(3), effectively pushing the fees overwhelmingly onto out-of-state distributors. This scheme has all the trappings of an unlawful state tariff: it protects local interests, is designed to hide the costs from the public, subjects distributors to risks of double counting (especially as other EPR programs come online), and results in distributors bearing fees that are grossly disproportionate to the margins on those products. Day 1 PM Tr. 123:1–20 (Rodriguez); Day 2 Tr. 69:17–70:3 (Winkle); *cf. Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 549 (2015) (calling state tariffs "one of the chief evils" that Constitution was intended to address and invalidating state tax that, in effect, discriminated against interstate commerce). Indeed, similarly situated distributors are treated differently under the RMA depending on where their facility is: a distributor located in Washington is the obligated first importer on foodservice ware shipped into Oregon, but if it were to relocate across the river into Oregon, the legal obligation would shift to the

out-of-state, upstream distributor. Day 1 PM Tr. 112:13–25 (Rodriguez); Day 3 Tr. 41:13–42:18 (Thomas).

*Publishers*. The RMA similarly gives preferential treatment to "publishers" with prominent "in-state reach," who may pay their RMA fees "in kind" through the provision of advertising. OR. REV. STAT. § 459A.884(7). In so doing, the RMA both treats in-state publishers differently, and provides a benefit to a class of entities otherwise well-situated to question the RMA. *See* Day 1 AM Tr. 35:2–16 (Holmes); Portley Dep. 100:1–101:7.

*Small business exemption*. The global-revenue criteria for the small business exemption make the discriminatory effect clearer still. The RMA exempts Producers with less than $5 million in annual revenue, regardless of the amount of covered material they supply in Oregon, but revenue is measured based on a company's *global* operations. OR. REV. STAT. § 459A.863(32)(c). Thus, a company with limited Oregon sales loses the exemption if revenue earned elsewhere pushes its total above $5 million, while an Oregon-only company with $4.95 million in Oregon sales remains exempt. Day 1 AM Tr. 29:1–30:1 (Holmes). Two similarly situated Producers would therefore have the same Oregon sales and impose the same costs on Oregon's recycling system, yet only the Producer with broader interstate operations must pay.

The Supreme Court condemned a closely analogous scheme in *Fulton Corp. v. Faulkner*, 516 U.S. 325, 333 (1996). There, the Court invalidated a North Carolina revenue scheme that taxed corporate stock under a formula that increased a tax as the corporation conducted more business outside the State. That scheme violated the dormant Commerce Clause because its incidence turned on "the degree that [the] corporation participates in interstate commerce" and thereby favored firms with a more local commercial footprint. *Id.* at 333. The RMA's global-revenue exemption operates in the same way. A Producer may lose the exemption because of revenue earned outside Oregon, even though that interstate activity does not increase the recycling costs attributable to its Oregon sales. *See* Day 1 AM Tr. 29:1–30:1 (Holmes). The exemption therefore rewards locally confined

firms and imposes a greater burden on identical Oregon activity when conducted by a business engaged more broadly in interstate commerce. Such "[p]reservation of local industry by protecting it from the rigors of interstate competition is the hallmark of the economic protectionism that the Commerce Clause prohibits." *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 205 (1994).

**Cumulative discriminatory impact and the free-rider problem**. Taken together, these classifications repeatedly use participation in interstate commerce as the basis for imposing greater burdens on otherwise comparable Oregon activity. The global-revenue exemption turns on revenue earned elsewhere; the franchise exclusion turns on affiliation with a national commercial network; and the foodservice-ware rules change the obligated Producer based on what side of the border a distributor receives the product. These exemptions all predictably remove predominantly local establishments from the fee-paying base while denying the same relief to multistate chains, online sellers, and out-of-state publications. The result is a scheme that disproportionately secures local businesses the benefits of Oregon's recycling system while "shunting to neighboring States" the associated costs. *Kassel*, 450 U.S. at 676.

Indeed, the RMA not only has the practical effect of exempting local interests, but those exemptions necessarily *increase* the fees that (predominantly out-of-state) Producers must pay. That's the free rider problem. Fees are set as an allocation of projected total system costs; when entities contribute to total system costs without bearing a fee obligation, everyone else must pay a greater share. Day 1 Sealed Tr. 21:2–23:7 (Holmes); Day 1 PM Tr. 74:10–75:11 (Wild); Day 3 Tr. 29:18–30:14, 62:17–63:19 (Thomas).

On top of all of that, and as further discussed below, the nature and magnitude of the scheme guarantees that the fees will spread through regional and national pricing structures, including being passed onto customers in multiple states. *See* Day 1 PM Tr. 78:20–79:24 (Wild); Day 2 Tr. 135:19–136:19 (Allen); Day 3 Tr. 6:2–7:10, 27:8–29:12 (Thomas); Day 3 Tr. 115:23–118:7 (Lakhan). In fact, DEQ expected that these program

costs would be spread "across customers in multiple states," thereby "**reducing price impacts on the public in Oregon**." Ex. 107 at 17 (emphasis added); Day 5 Tr. 28:10–29:15 (Allaway).

Neither CAA nor DEQ has quantified the impact of these exemptions—many of which apply categorically without regard to the type or volume of covered material the firm brings into Oregon—on Oregon's recycling system. *See* Day 1 AM Tr. 31:16–33:5 (Holmes); Portley Dep. 38:17–25. But the fact that they impose *some* discriminatory cost shifted onto interstate commerce is sufficient to render the scheme invalid. *See* Portley Dep. 39:1–11; *cf. Camps Newfound*, 520 U.S. at 581 n.15 ("[T]here is no de minimis defense to a charge of discriminatory taxation under the Commerce Clause." (cleaned up)); *Assoc. Indus. of Mo. v. Lohman*, 511 U.S. 641, 650 (1994) ("[A]ctual discrimination, wherever it is found, is impermissible, and the magnitude and scope of the discrimination have no bearing on the determinative question whether discrimination has occurred").

In sum, Oregon designed a program in which favored local interests avoid the assessment (despite contributing to the waste stream and benefiting from the covered materials), all while interstate businesses may transmit the resulting costs to consumers in other States. Such interstate cost shifting lies at the core of dormant Commerce Clause scrutiny. *See United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 345 (2007) ("Our dormant Commerce Clause cases often find discrimination when a State shifts the costs of regulation to other States[.]"). By sheltering favored local entities from fees—yet allowing them to capture all the benefits—the RMA creates a burden-shifting scheme the dormant Commerce Clause forbids.

Because the RMA discriminates against interstate commerce, Oregon bears the burden "to demonstrate both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." *Taylor*, 477 U.S. at 138 (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979)). Oregon cannot make that showing. Even accepting Oregon's local purpose in improving its recycling

infrastructure, there are other forms of EPR that operate through different and more transparent fee structures. There are other ways of funding its recycling infrastructure improvements—ways that are more transparent, more accountable, and less protectionist. And even if one believes that entities should bear more responsibility for the waste they create, that still would not explain or justify the RMA's discriminatory exemptions. Because the RMA impermissibly discriminates against interstate commerce, the RMA cannot survive strict scrutiny.

**B.    The RMA Substantially and Unreasonably Burdens Interstate Commerce in Multiple Ways.**

The RMA also violates the dormant Commerce Clause because its burden on interstate commerce is clearly excessive as compared to the local benefits. Courts in this Circuit follow a two-step framework in applying the *Pike* balancing test: "Under *Pike*, plaintiffs must first show that the challenged laws impose a 'substantial burden on interstate commerce'; if so, we determine whether that burden is 'clearly excessive' in relation to the law's putative local benefits." *Flynt v. Bonta*, 131 F.4th 918, 931 (9th Cir. 2025) (first citing *South Dakota v. Wayfair, Inc.*, 585 U.S. 162, 173 (2018); then citing *Nat'l Ass'n of Optometrists & Opticians v. Harris* (*Optometrists II*), 682 F.3d 1144, 1155 (9th Cir. 2012)); *see  Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). In *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023), the Supreme Court rejected a *per se* rule against a state law having extraterritorial effect, but the Court did not abrogate *Pike*, and "[f]or good reason": *Pike* "reflects the basic concern of our Commerce Clause jurisprudence that there be 'free private trade in the national marketplace.'" *Id.* at 395 (Roberts, C.J., concurring). While NAW has shown discriminatory impacts above, "even nondiscriminatory burdens on commerce may be struck down on a showing that those burdens clearly outweigh the benefits of a state or local practice." *Id.* at 395–96.

The RMA substantially burdens interstate commerce because it regulates packaging at the point where goods move through regional, multistate distribution networks; forces

firms to sort, trace, repackage, and reroute product around Oregon; and compounds that disruption as more States adopt their own conflicting EPR regimes. The RMA imposes much more than simply "compliance costs" on Producers selling into Oregon—rather, it imposes broader, consequential "harms to the interstate market itself." *Id.* at 399. In turn, those burdens are not justified by Oregon's asserted benefits: the State's goals are speculative and poorly aligned with the fee design, which shifts Oregon's recycling costs onto multistate firms and then across customers in other States, while the same environmental objectives could be achieved through a more direct funding model with less impact on interstate commerce

### 1.    The RMA imposes substantial burdens on interstate commerce.

The Ninth Circuit has identified several "types of impacts on interstate commerce" that "are of special importance in the balance with the state's putative interest," including "the disruption of travel and shipping due to a lack of uniformity in state laws," "impacts on commerce beyond the borders of the defendant state," and "impacts that fall more heavily on out-of-state interests." *Pac. Nw. Venison Prods. v. Smitch*, 20 F.3d 1008, 1015 (9th Cir. 1994) (collecting cases). Each of those is present here.

***Impact on interstate distribution networks as a whole****.* As established at trial, the RMA's regulation of covered products severely disrupts the flow of interstate shipping not only into Oregon, but also through and around Oregon, a problem that is only compounded by the patchwork of EPR regimes adopted in other states. At the outset, it is important to appreciate the unique scope and nature of the RMA, which unlike prior EPR schemes (or a typical health-and-safety law), is not directed at a discrete product or class of products. *See generally* Exs. 1–4. The RMA covers and thereby imposes fees on virtually all products that are sold in packaging or that use packaging for their distribution—in other words, virtually all products sold and distributed in commerce. Rather than localize the fees at the point-of-sale (like many other EPR programs), the RMA operates specifically by pushing allocated fees and compliance obligations into the interstate supply chain for Producers to

39

bear and/or pass on. Day 5 Tr. 104:12–24, 117:7–16 (Cassel). In this respect—and because products distributed into Oregon overwhelmingly originate from outside the state, *see, e.g.*, Day 1 PM Tr. 109:1–110:8 (Rodriguez); Day 2 Tr. 140:19–141:10 (Allen); Day 2 Tr. 179:8–181:14 (Tomlinson)—the RMA fees function much like a tariff. And as established at trial, the RMA creates both financial and information problems that ripple up, down, and across the supply chain, with implications for distribution networks as a whole. *See, e.g.*, Day 1 PM Tr. 78:20–80:1 (Wild); Day 2 Tr. 216:20–217:6 (Thomas); Day 3 Tr. 6:2–7:10, 27:8–29:12, 39:13–41:6 (Thomas); *cf. Burlington N. R. Co. v. Dep't of Pub. Serv. Regul.*, 763 F.2d 1106, 1114 (9th Cir. 1985) ("[T]he Commerce Clause does not permit a state to cripple . . . interstate operations[.]").

By the very nature of interstate supply chains, Producers cannot segregate products by state without "completely blowing up a system and a model that is built on efficiency and optimization." Day 2 Tr. 57:3–18 (Winkle). That's because interstate shippers operate on a model of "regional hubs that are serving multiple states." Day 2 Tr. 226:6–21 (Thomas); *see* Day 2 Tr. at 135:6–18 (Allen). In other words—and contrary to the simplistic depiction of producer responsibility offered by Defendant's expert Cassel, *see* Day 5 Tr. 102:21–103:16 (Cassel)—a brand manufacturer does not simply distribute products directly to retailers in Oregon. Rather, products flow through a multi-tiered distribution network, meaning that the sweeping burdens imposed by the RMA necessarily affect design, efficiency, and costs of the network as a whole. *E.g.*, Day 1 PM Tr. 37:1–38:7, 44:19–47:8, 58:24–60:10, 78:20–80:1 (Wild); Day 2 Tr. 222:8–224:25, 225:1–227:21 (Thomas); Day 3 Tr. 34:18–35:25, 50:12–24 (Thomas).

Among other things, the RMA's informational and compliance burdens will necessarily require creating entirely new systems for tracking product flows and managing product information and potentially new contracts for assigning responsibility for the fees. *See* Day 1 PM Tr. 78:20–80:1 (Wild); Day 1 PM Tr. 116:4–25 (Rodriguez); Day 2 Tr. 53:1–55:25, 57:1–59:1 (Winkle); Day 2 Tr. 108:6–12, 126:14–15 (Allen). But those

burdens will not and cannot be localized to Oregon sales. Because of the multi-tier nature of national and regional distribution networks, Oregon's RMA necessarily would require changes across the interstate network, including links in the chain that operate outside of Oregon. By way of illustration, if an Idaho distributor needs to terminate a relationship with a manufacturer to comply with Oregon law, that does not just affect the products going into Oregon; it impacts the distributor's operations across the region. Opting out of the Oregon market may be an option (or even necessary for some), but that too impacts the design and efficiency of the network as a whole. Day 3 Tr. 27:8–29:12, 39:13–41:6, 50:12–24 (Thomas). Due to the RMA's network effects, this is not merely "a permissible case of a regulation that incidentally causes a shift of business from an out-of-state firm to an in-state firm; rather, this is an impermissible case of a discriminatory regulation that burdens interstate commerce" itself. *McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery*, 226 F.3d 429, 443 (6th Cir. 2000) (internal quotation omitted).

The evidence at trial also establishes that the RMA impacts commerce flowing through the state. As explained, in a regional distribution network, one distributor may deliver a covered product to a distribution center in Oregon, only for another distributor to carry the product to its final destination. *See* Day 1 PM Tr. 104:12–17 (Rodriguez); Day 2 Tr. 10:15–11:13 (Rodriguez). Although Oregon nominally exempts from fee products discarded elsewhere, Producers often have "no visibility to the end use application of where [the] customers are sending product when they are done." Day 2 Tr. 107:18–108:1 (Allen).

There are several reasons for this lack of visibility. *First*, given the sensitivity of customer data, downstream distributors have no incentive—and no obligation—to share that information with their competitors elsewhere in the supply chain. *See id.* at 108:6–10 (Allen); Day 3 Tr. 9:13–10:18 (Thomas). *Second*, Producers—many of whom have thousands of customers and tens of thousands of discrete SKUs—simply cannot realistically bear the extraordinary, recurring costs of not only devising the data necessary to discern the reportable volumes of their products but also somehow tracking the end user

41

of each. *See* Day 1 PM Tr. 116:4–25 (Rodriguez); Day 2 Tr. 108:6–12 (Allen); Day 2 Tr. 126:14–15 (Allen). *Third*, even if the distributor had perfect information regarding the downstream customer, it still would have no way of knowing whether a given product was ultimately discarded in Oregon or ultimately employed in a manner exempt from coverage under the RMA. *See* Day 1 AM Tr. 18:9–20:6 (Holmes); Day 2 Tr. 58:24–59:1 (Winkle). That is especially problematic given that the RMA expressly requires Producers to pay fees for products the ordinary purpose of which is to be sent or carried somewhere else. *See* Day 2 Tr. 116:12–13 (Allen) ("[Envelopes] are designed to travel where ever they need to."); Day 2 Tr. 59:5–11 (Winkle); Amicus Br. of Am. Forest & Paper Ass'n at 7 ("AFPA Br."), Dkt. 177 ("[M]oving and storage products are used for just that—moving and/or storage of other items[.]" (citing OR. REV. STAT. § 459A.863(6)(b)(J))).

Even DEQ acknowledges that the natural consequence of Producers being unable to track where a covered product is discarded is that Producers often "end up reporting more than [they] had to." Day 4 Tr. 26:23–27:14 (Portley). In an industry where profit margins are "razor thin," Day 2 Tr. 123:4–7 (Allen); *see* Day 1 PM Tr. 37:3–10 (Wild), that risk of "double counting" poses a significant barrier on distributors operating across state lines.

Moreover, even if a distributor could have visibility into where its products are ultimately discarded, that may still not avoid the problem. As the testimony showed, where a regional distributor is located in Oregon, a brand manufacturer may simply presume that all products sold into the state will incur an EPR fee. As long as that brand manufacturer has sufficient market power, it may pass on Oregon EPR fees for all sales onto the distributor, or the brand manufacturer may adopt an across-the-board price hike that is likewise passed on, regardless of where the products later go. Day 2 Tr. 258:8–260:9 (Thomas).

As a result of the foregoing, firms have already begun to reroute shipments around Oregon distribution centers. DEQ's own evidence shows that multiple NAW members

"have altered distribution pathways in response to obligations imposed by the RMA," with at least one firm having "ceased selling products in or into Oregon" altogether as a direct result of the RMA. Ex. 521 at 9, 14.

***Instrumentalities of commerce***. This burden is pronounced across all covered products. But it is perhaps most salient with respect to the RMA's coverage of packaging. The Supreme Court has long recognized that, even absent facial protectionism, a state law substantially burdens interstate commerce when it subjects the instrumentalities of interstate commerce to state-specific regulatory requirements that interfere with the efficient movement of goods across state lines. *See Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 527–29 (1959) (invalidating Illinois's unique mudguard requirement because forcing interstate trucks to alter equipment at state lines imposed an "onerous" burden on the free flow of commerce); *S. Pac. Co. v. Arizona*, 325 U.S. 761, 771–75 (1945) (invalidating Arizona's train-length restriction because the national rail system requires uniformity and state-specific rules materially impeded interstate traffic). Under this line of cases, "a state may not regulate interstate commerce so as substantially to affect its flow or deprive it of needed uniformity in its regulation." *S. Pac. Co.*, 325 U.S. at 779–80 (collecting cases).[5]

But the RMA does exactly that. Like the trucks and trains that convey it, packaging is an integral instrumentality of interstate commerce. *See, e.g.*, *Cheer Pack N. Am., LLC v. Valley Forge Ins. Co.*, 2017 WL 1552315, at *7 (D. Mass. Apr. 28, 2017) (observing

---

[5] DEQ's assessment of these cases—that "whether a particular regulation runs afoul of the dormant Commerce Clause depends less on whether it is an instrumentality of interstate commerce and more on whether the regulation prevents the continuous flow of interstate commerce through the state," Supp. Br. 3, Dkt. 174—misses the point. Although the inquiry is not limited to instrumentalities, a regulation of an instrumentality makes that interruption far more likely. The regulations at issue in *Bibb* and *Southern Pacific* do not present a "special concern" simply because they involved trucks and trains. *See Nat'l Pork Prods. Council v. Ross*, 598 U.S. 356, 379–80 & n.2 (2023) (Gorsuch, J.). Rather, those regulations drew unique constitutional ire precisely because regulating the means by which goods move through interstate commerce inherently disrupts that process.

packaging is "essential to the process by which [goods are] made marketable"); *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 446–48 & n.9 (1979) (holding shipping containers used for the transportation of cargo are "instrumentalities of foreign commerce"). Packaging is necessary for the effective transportation of products and storage in regional warehouses; indeed, packaging in many cases may be subject to federal regulations and is necessary for consumer safety as well as the safety of the workers handling the products. Day 1 PM Tr. 46:16–47:3 (Wild); Day 2 Tr. 52:8–53:9 (Winkle); Day 2 Tr. 180:1–181:14 (Tomlinson); Day 2 Tr. 227:18–228:25, 230:13–231:25 (Thomas); *see also* Amicus Br. of Air-Conditioning, Heating & Refrigeration Inst. et al. at 6–7, Dkt. 159 ("AHRI Br.") (outlining federal and safety standards for packaging). As a further example, the RMA imposes fees on shipping labels, OR. ADMIN. R. § 340-090-0840(1)(A), which—to use Defendant's own framing—constitute a *means* for shipping and are not the product itself.[6]

The need for uniformity in packaging is clear. As Professor Thomas explained, "any standardization of product packaging, in fact, is fundamental to efficient networks working," Day 2 Tr. 229:7–12, 229:24–230:2 (Thomas). A product's packaging is generally set by the manufacturer or brand owner at the national level, meaning that distributors have no ability to alter packaging to respond to state-specific regulatory burdens. *See* Day 2 Tr. 51:1–21 (Winkle); Day 2 Tr. 113:1–15 (Allen).[7] And, due to federal regulations, Producers of many covered products would not be able to change the packaging they use even if they did have that ability. *See* Day 2 Tr. 52:8–53:9 (Winkle);

---

[6] During trial, Defendant often referred to an exemption for pallet wrap, but that exemption only applies to pallet wrap "if added by a person that is not the producer of the palletized covered products." OR. REV. STAT. § 459A.863A(6)(b)(H).

[7] This phenomenon is not confined to any one particular industry either. *See* Amicus Br. of Or. Bus. & Indus. Ass'n et al. at 11, Dkt. 185 ("Members of NWGRA have reported that packaging changes must be considered at a nationwide level, and do not have the ability to provide different packaging to the same item across states."); AHRI Br. at 8 (explaining manufacturers' packaging redesigns "are expensive and do not scale across states").

Day 2 Tr. 227:18–228:25, 230:13–231:25 (Thomas); *see also* AHRI Br. at 11 (explaining how federal regulations often require use of "specific, unavoidable packaging"). By imposing fees that approach or even *exceed* profit margins, *see, e.g.*, Day 2 Tr. 134:13–135:5 (Allen), the RMA leaves Producers looking down the very dilemma the dormant Commerce Clause protects against: "comply with that regulation or not pass through the regulating jurisdiction at all." *See Ass'n to Preserve & Protect Local Livelihoods v. Sidman*, 147 F.4th 40, 57 (1st Cir. 2025).

*Sweeping out-of-state impacts*. Regardless of whether packaging is considered an instrumentality, the RMA has the market-wide impacts described above and, for related reasons, also effectuates "impacts on commerce" far "beyond the borders" of Oregon. *Pac. Nw. Venison Prods.*, 20 F.3d at 1015; *see also Pork Producers*, 598 U.S. at 400 ("We have found such sweeping extraterritorial effects, even if not considered as a per se invalidation, to be pertinent in applying *Pike*.") (Roberts, C.J., concurring). In addition to the impacts on distribution logistics and facilities described by Professor Thomas, Oregon's EPR fees inevitably are passed onto companies and consumers in other states.

The nature of the fee-setting process contributes to the necessity of fees being passed on to sales outside of Oregon. As Professor Thomas explained, the two-year lag between material reporting and invoicing (especially combined with the magnitude and opacity of the fees) creates "a structural challenge for firms to try to figure out how to embed prices or change products or change their supply chain flows"; once the bill arrives, it is "impractical, near impossible" to go back and recover the cost from the original sale. Day 3 Tr. 5:22–7:10 (Thomas). The result is that Oregon's costs are absorbed through a broader pricing structure nationwide and passed on to consumers in other states. Day 2 Tr. 135:11–23, 136:1–15 (Allen). DEQ's own staff report anticipated the same result, explaining that multistate Producers may recover Oregon's costs "across customers in multiple states," thereby "reducing price impacts on the public in Oregon." Day 5 Tr. 28:22–29:13 (Allaway); *see* Ex. 107. While the precise magnitude of the consumer pass-through may

45

be debated, it is undoubtedly significant and not confined to Oregon consumers. *See* Day 3 Tr. 115:19–125:14 (Lakhan).

That spillover is the very means by which the RMA purposely shifts Oregon's recycling costs onto interstate commerce. As the new costs cut into margins, firms have to rethink "the optimization of our network," because those networks are not "an Oregon network and an Idaho network." The consequence is "less dense routes," "less inventory pooling," and less efficiency across the broader system. Day 3 Tr. 27:14–28:15 (Thomas). So the burden is not just that Oregon imposes a fee. It is that the fee is designed to be carried through regional and national supply chains, where it alters pricing, routing, and inventory decisions well beyond Oregon's borders.

**Disproportionate impact**. It is also clear that the impacts of Oregon's EPR program "fall more heavily on out-of-state interests." *Pac. Nw. Venison Prods*, 20 F.3d at 1015. As explained above, as firms respond to EPR regimes across states, they have to "deal with compliance and tracking which product goes where and the information burden compounds," especially since "a regional distributor might have a larger mix of products than a wholly local Oregon business." Day 3 Tr. 28:20–29:12 (Thomas). The in-state Oregon distributor, by contrast does not have to layer Oregon's requirements on top of other States' regimes, track the same product across multiple jurisdictions, or reconcile conflicting reporting obligations as it moves through a regional network.

**Compounding problems with patchwork state regulations**. These burdens are only further compounded as other states adopt their own disparate EPR regimes. *See NCAA v. Miller*, 10 F.3d 633, 639 (9th Cir. 1993) (finding burden on interstate commerce where inconsistent regulation across states "could easily subject the [regulated entity] to conflicting requirements"). If fee categories and reporting requirements differ across states—which they do, *see* Day 1 AM Tr. 76:23–77:8 (Holmes)—firms must also reconcile different packaging and fee rules across jurisdictions in ways that require restructuring existing supply networks. This cannot be done through state-by-state variation in

46

packaging, since manufacturers—not distributors—control the packaging for a product. Day 1 PM Tr. 115:10–25 (Rodriguez). Rather, distributors using Oregon as the situs of their regional distribution network must alter their supply chains to adjust for the market distortion caused by state-specific rules that force interstate firms to reorganize distribution, routing, and packaging around state lines rather than a uniform market. *See* Day 3 Tr. 28:20–29:12, 44:11–46:7 (Thomas); Day 2 Tr. 135:11–136:15 (Allen). The amplified disruption brought on by other states is not even disputed: DEQ's expert agreed that differing laws make compliance "more complex" and "add[ ] cost," and that the same product may have a different obligated Producer in different states. Day 5 Tr. 107:2–108:8 (Cassel). And as more states (and larger states like California) adopt similar regimes, EPR fees and compliance costs will continue to spread through nationwide supply chains, inevitably impacting sellers and consumers operating wholly outside of those EPR states.

In short, the RMA forces multistate firms to rework packaging, routing, inventory, pricing, and reporting decisions around Oregon's state-specific regime. In so doing, the RMA imposes a substantial burden on interstate commerce, and the patchwork scheme of EPR programs arising in other states will only exacerbate those burdens.

### 2. The putative benefits to Oregon cannot justify these burdens.

On the other side of the ledger, Oregon's purported goals "to modernize Oregon's recycling system" and "to improve environmental outcomes," Day 4 Tr. 227:1–25 (Allaway), cannot save the statute given its crushing burden on interstate commerce. These may be well-intentioned goals. But "[l]ess deference to the legislative judgment is due" where, as here "the local regulation bears disproportionately on out-of-state residents and businesses" or contains "exemptions" that secure to the local population the benefits of the scheme while placing its costs on other States. *Kassel*, 450 U.S. at 675–76.

Through the RMA, Oregon wanted to rebuild its recycling system while avoiding a direct tax, and it also declined to follow the more transparent point-of-sale fee structures used in many traditional EPR programs. Instead, the RMA assesses fees at upstream points

in the supply chain, all while acknowledging that those costs are likely to be spread "across customers in multiple states," thereby "reducing price impacts on the public in Oregon." Ex. 107 at 17; Day 5 Tr. 28:10–29:15 (Allaway). Oregon's intent to shift costs out of state is also evident in its gerrymandered rules for assigning "Producer" responsibility: most notably, the foodservice-ware rule places responsibility on the first seller into Oregon—often an out-of-state distributor—rather than on the Oregon restaurant that chooses and uses the disposable ware. *See* Day 1 PM Tr. 112:13–25 (Rodriguez); Day 3 Tr. 41:13–42:18 (Thomas); Day 5 Tr. 117:17–118:16 (Cassel). Such blatant cost shifting onto other states is especially troubling, for when "the burden of state regulation falls on interests outside the state, it is unlikely to be alleviated by the operation of those political restraints normally exerted when interests within the state are affected." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 345 (2007) (quoting *S. Pac. Co.*, 325 U.S. at 767–68 n.2).

Moreover, the record confirms that the asserted local benefits are speculative. DEQ conceded that it does not yet have enough data to quantify the program's actual benefits. *See* Day 4 Tr. 227:25–228:25 (Allaway). And its own expert informed DEQ in 2024 that the RMA's scheme of ecomodulation bonuses and maluses is not based on "any research at all . . . , just opinions and assertions." Ex. 35; Day 5 Tr. 152:9–153:9 (Lifset); *see also id.* at 153:9–154:1 (Lifset) (agreeing with NAW expert Dr. Thomas that a study of European packaging EPR programs found that EPR fees have "had limited effect in reducing packaging and no systematic substitution effect"). Ecomodulation schemes like the one used here have shown only "weak linkages to environmental outcomes" and tend to make EPR regimes more costly as states adopt disparate requirements. *Id.* at 168:14–170:3 (Lifset). The fee structure also directs behavior toward reducing fee exposure rather than improving recyclability, creating "unintended environmental outcomes." *Id.* at 5:1–

48

6:25 (Allaway).[8] The testimony of expert Dr. Lakhan further shows that packaging EPR programs using the PRO model experience escalating costs without corresponding benefits, are not structurally efficient, and are not a primary driver of innovation. *E.g.*, Day 3 Tr. 105:11–108:8 (Lakhan).

Even on Oregon's own terms, these goals "could be promoted as well with a lesser impact on interstate activities." *Pike*, 397 U.S. at 142. As Dr. Lakhan explained, the environmental benefits Oregon seeks to achieve could be realized more efficiently through a system of direct funding. Day 3 Tr. 113:1–8 (Lakhan). Instead of forcing Producers to reorient their "supply chain around subregions where there is regulation" as a result of the EPR scheme, *id.* at 48:17–49:7 (Thomas), Oregon could have adopted a direct funding model or even a point-of-sale EPR fee model. Those approaches would promote transparency and accountability, and without the inherent disruption to interstate distribution networks.

### C.    The RMA Imposes Unreasonable Regulatory Fees on Producers Operating in Interstate Commerce.

The imposition of fees under the RMA violates the dormant Commerce Clause for an additional distinct reason. The Producer fees imposed pursuant to the RMA constitute unlawfully excessive regulatory fees. Although a State may levy fees "designed to recoup the costs of a regulatory program from members of the industry regulated," *Union Pac. R. Co. v. Pub. Util. Comm'n*, 899 F.2d 854, 859 (9th Cir. 1990), the dormant Commerce Clause likewise limits the extent to which such fees may burden interstate commerce, *see Nw. Airlines, Inc. v. County of Kent*, 510 U.S. 355, 367–73 (1994); *see also Selevan v. N.Y.*

---

[8] For instance, because fees are determined by weight, manufacturers are tempted with the "perverse incentive" of substituting lighter plastic packaging for heavier, highly recyclable materials like paper or glass. *See* Amicus Br. of Wine Inst. & Distilled Spirits Council of U.S. at 11, Dkt. 180; Day 5 Tr. 5:1–6:25 (Allaway). Cutting down of packaging volume to reduce costs also increases the risk of products being damaged in transit—requiring the product to be shipped a second time, and increasing packaging waste and emissions as a result. *See* AHRI Br. at 7.

*Thruway Auth.*, 584 F.3d 82, 96–98 (2d Cir. 2009) (explaining that the *Northwest Airlines* test reaches the same end as *Pike*). Such a fee is valid only if it is (1) "based on some fair approximation of use of the facilities" and (2) "is not excessive in relation to the benefits conferred." *Nw. Airlines*, 510 U.S. at 368–69; *see also United States v. City of Renton*, 2012 WL 1903429, at \*7 (W.D. Wash. May 25, 2012) (outlining broad application of *Northwest Airlines* test to assess "the reasonableness of regulatory charges"). The Producer fees satisfy neither prong.

*First*, Producer fees are not based on any "fair approximation" of Producers' use of the Oregon market. An access fee fails the fair-approximation inquiry if the government does not "reasonably draw[ ] a line between those it is charging and those it is not," or fails to "charg[e] each individual entity a fee that is reasonably proportional to the entity's use[.]" *Industria Y Distribucion De Alimentos v. Trailer Bridge*, 797 F.3d 141, 145 (1st Cir. 2015) (*citing Nw. Airlines*, 510 U.S. at 368). As an initial matter, it is impossible to affirm that the fees are set fairly and proportionally, as CAA has refused to disclose—to DEQ previously or to NAW in this litigation—its actual fee-setting methodology and supporting data. *See* Day 1 Sealed Tr. 13:3–24, 14:20–24, 15:23–17:18 (Holmes); Day 5 Tr. 13:1–18, 15:23–16:3, 30:1–31:7, 42:3–18 (Allaway); Day 3 Tr. 137:10–18, 138:10–18 (Lakhan). Other evidence, however, demonstrates conclusively that they cannot be. Indeed, the various exemptions to the RMA undermine any claim that the fees are fairly apportioned. *See Trailer Bridge*, 797 F.3d at 145 (explaining fee is not fairly apportioned where exemptions occur "with significant frequency").

The RMA creates a system of "free riding" in several distinct ways, including by exempting entire classes of *firms* as "small producers," *see* OR. REV. STAT. § 459A.863(32); by exempting entire classes of *waste* from the definition of "covered product," *see id.* § 459A.863(6)(b); and by imposing fees on a retrospective basis, meaning that firms that exit the Oregon market would not be required to pay fees in their final year of operation, even though their prior-year volumes would be reflected in the total system

costs, *see* Day 4 Tr. 159:21–160:3 (Portley). In all these scenarios, waste enters Oregon's recycling stream and thus is factored into the total system cost from which fees are apportioned. *See* Day 1 Sealed Tr. 21:19–22:4 (Holmes). But because fees are distributed only amongst the registered Producers that remain in the fee base, the excess costs are necessarily shifted to those Producers. Day 1 PM Tr. 74:1–75:9 (Wild); Day 3 Tr. 62:15–64:10 (Thomas).

CAA fully acknowledges that free riding is bound to occur in various forms. Ex. 12 at 12. Yet neither CAA nor DEQ has attempted to quantify the measure of these exceptions or the materials to which they relate. Indeed, for the most part they apply without regard to what materials exempted entities would otherwise be responsible for, a remarkable feature of the RMA given the statute's otherwise focus on making sure that the costs of more expensive and difficult to recycle materials are not cross-subsidized by other classes of materials. Day 1 Sealed Tr. 23:8–24 (Holmes); Portley Dep. 38:3–8.

Yet, faced with this, CAA's solution is not to reduce fees proportionally, but to instead levy *higher* charges on the remaining registered Producers so they absorb the costs of exempt and excluded users and materials. Ex. 12 at 12. Worse, neither DEQ nor CAA can even quantify the free riding each concedes exists. Day 1 Sealed Tr. 23:8–24 (Holmes); Portley Dep. 38:3–8. That is especially troubling given the marked year-to-year shifts in material base fees and the fact that classes of goods move together from one year to the next, which suggests the fee schedule is being recalibrated category-wide rather than tracking a stable, transparent measure of a particular material's impact on the Oregon system. *See* Day 5 Tr. 46:5–51:19 (Allaway). In any event, without access to the underlying algorithm and data, DEQ cannot assess whether the resulting distribution is appropriate or whether the burdens are being shifted in a way that bears any relation to actual use. *Id.* at 43:2–18 (Allaway). Oregon thus has done nothing to "indicate how the portion of . . . costs borne by the [payers] compares to the costs, if any, borne by" other users of the same

system, dooming the fee under the fair-approximation test. *Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 567 F.3d 79, 88 (2d Cir. 2009).

*Second*, the fees are clearly excessive in relation to the costs of running the program overall. This prong "focus[es] on whether the revenue raised by the fee roughly approximates the cost of providing the facilities and services." *Am. Airlines, Inc v. Mass. Port Auth.*, 560 F.2d 1036, 1038 (1st Cir. 1977) (collecting cases); *see also Trailer Bridge*, 797 F.3d at 146 (explaining the excessiveness prong compares the fee to the "*costs* incurred by the taxing authorities" (citing *Evansville*, 405 U.S. at 719)). CAA's financial statements confirm they do not.

In the program's first year, CAA collected approximately $145.5 million from Producers and spent $56.5 million in Oregon, leaving almost $90 million in excess funds taken in. *See* Day 4 Tr. 169:4–9 (Portley); Ex. 97 at 63. CAA's "[e]armarked reserves went from zero to [$51.1 million]" and Producers "were charged a substantial amount more than the amount that was actually necessary to expand the infrastructure or implement the program." Day 5 Tr. 180:21–181:8 (Lakhan). CAA also exacts fees from the Oregon market to fund its national operations and services in other states. *See* Day 1 AM Tr. 54:2–22 (Holmes); Day 1 Sealed Tr. 26:16–18 (Holmes).

In spending only thirty-nine cents of every fee dollar and banking the difference, CAA has departed markedly from the ratios between intake and expenditures courts have found reasonable. *Cf. Trailer Bridge*, 797 F.3d at 146 (finding fee not to be excessive where "spent 97% of th[e] money on costs related to the [service]"); *Lil' Man in the Boat, Inc. v. City & Cnty. of S.F.*, 2017 WL 3129913, at *5 (N.D. Cal. July 24, 2017) (finding fee excessive where city was "realizing a profit from the . . . fees"). As the Second Circuit has observed, "it could not be seriously maintained that a . . . fee, producing revenue in excess of the cost of operating the [service,] could be used to pay" for other purposes without violating the dormant Commerce Clause. *Bridgeport*, 567 F.3d at 87. But the Oregon fee structure does exactly that by allowing CAA to hoard nearly double what it spends on

implementing the RMA. Remarkably, in a full week of trial, the State had precisely zero to say about this, declining to ask any witness about it. Such rent seeking is clearly excessive to any reasonable assessment of the costs of operating the program in Oregon.[9]

*      *      *

The RMA favors local interests and shifts costs to out-of-state Producers and consumers. It also imposes substantial burdens on interstate commerce through unfairly apportioned fees that disrupt multistate distribution networks and reprice goods far beyond Oregon. For all these reasons, the RMA thus violates the dormant Commerce Clause.

## IV.   NAW IS ENTITLED TO DECLARATORY RELIEF AND A PERMANENT INJUNCTION.

Each of these constitutional violations is sufficient to justify declaratory and injunctive relief barring DEQ from enforcing the RMA in its entirety. The RMA is a comprehensive, integrated funding and regulatory scheme that was enacted as a single package to govern covered products and finance Oregon's EPR program. The constitutional defects NAW has shown run through that structure.

The due process violation flows from the statute's own design. The RMA vests binding authority in a private PRO, but it gives DEQ no real mechanism to supervise how that authority is exercised: no control over the fee inputs, no review of the underlying model, and no substantive check on the PRO's assessments before they are imposed on Producers. The constitutional defect, therefore, lies in the RMA's fundamental flaw of abdicating regulatory authority to a private party while failing to subordinate that power to meaningful state oversight. That defect may only be remedied by enjoining DEQ from enforcing the RMA as written.

---

[9] To the extent it would even be possible to form a competing PRO—and it is not, *see* Section II.B.3, *supra*—this war chest would allow CAA to behave like a classic monopolist, opportunistically lowering rates in future years to stave off potential new entrants before restoring monopoly pricing.

53

The dormant Commerce Clause violations are structural as well. The burden on commerce does not turn on regulation of any one covered material in isolation, because the RMA uses all covered products to fund a single statewide program under a single PRO, with a single fee structure and unified reporting and performance obligations. That burden also does not depend on whether the statute is applied to packaging, paper, or foodservice ware in particular; the supply-chain disruption comes from the same state-specific reporting, routing, and fee machinery that applies across the program as a whole. And because the RMA requires fees to be "approximately proportional" to each covered product's relative contribution to the PRO's obligations, OR. REV. STAT. § 459A.884(3)(b), reformulating the program plan to remove one covered product would force the remaining covered products to absorb costs the statute assigns across the entire program, not just the product being removed. Removing one material category would therefore require the rest of the program to be redrawn.

Ultimately, Oregon's severability doctrine turns on legislative intent. A statute falls as a whole where "the parts of the statute are so interconnected that it appears likely that the remaining parts would not have been enacted without the unconstitutional part," or where "the remaining parts are incomplete and cannot be executed in accordance with legislative intent." *Outdoor Media Dimensions, Inc. v. Dep't of Transp.*, 132 P.3d 5, 18 (Or. 2006); *see* OR. REV. STAT. § 174.040; *Project Veritas v. Schmidt*, 125 F.4th 929, 958 (9th Cir. 2025). The RMA's own text confirms that the program it creates was built as a single integrated scheme, such that one part cannot stand without the others.

The Legislature enacted the RMA against the backdrop of declining recycling rates and the influx of plastic waste after China restricted imported plastic scrap. *See* Or. Bill Summary, S.B. 582, 2021 Reg. Sess. (Apr. 13, 2021); Day 4 Tr. 201:1–202:1 (Allaway). It responded by making "Producers" of packaging, paper, and foodservice ware financially responsible for the life-cycle impacts of those materials and by directing DEQ to "modernize Oregon's recycling system." OR. REV. STAT. § 459A.860(3)–(4). The statute's

unified structure shows that the Legislature enacted a single statewide EPR program, not separate programs that could be severed from one another. The RMA defines packaging, paper, and foodservice ware collectively as "covered products," and its core provisions all turn on that unified definition. *See id.* §§ 459A.863(6), 459A.869, 459A.875, 459A.878, 459A.884, 459A.887, 459A.893, 459A.896. The statewide recycling targets do the same. *See id.* § 459A.926. The statute's financing and performance rules all depend on the same covered-product base, so changing one part would require reworking the rest of the program, not merely excising a discrete provision. Taken together, the RMA's integrated structure makes clear that the Legislature intended one integrated program for all covered products, and a partial rewrite would leave a scheme materially different from the one enacted. *Murphy v. NCAA*, 584 U.S. 453, 483 (2018).

The remaining program would also be impossible to execute in accordance with legislative intent. The RMA requires the PRO to set fees "sufficient to meet the financial obligations" of the organization and to calculate those fees using material-specific base rates for "all covered products" sold or distributed in or into Oregon. OR. REV. STAT. § 459A.884. Those fees fund the PRO's obligations to compensate local governments and carry out the other duties imposed by the statute. *Id.* §§ 459A.890, 459A.893, 459A.896. The approved Program Plan was built around that same universe of covered products. *See id.* §§ 459A.875, 459A.878. Removing any one covered material or provision would force a recalculation of the fee base, a reallocation of fixed program costs, a revision of Producer market shares, and a reformulation of collection, processing, and recycling assumptions that incorporate all covered products. *Id.* §§ 459A.884, 459A.890, 459A.926. It would also require a materially different Program Plan, with DEQ approval, showing that the reduced program could still satisfy the statute's funding and performance requirements. *See id*. The statute gives no direction for making those choices. Nor can the Court rewrite the statute to supply a different fee structure or increased administrative oversight without altering the program the Legislature actually enacted. *See Pollin v. Dep't of Revenue*, 952 P.2d 537,

539 (Or. 1998). The result would be a patchwork program the Legislature did not enact and DEQ could not administer as written.

The Court should therefore grant permanent relief enjoining enforcement of the RMA in full. To receive a permanent injunction, a plaintiff "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Each prong is met here.

First, NAW and its members necessarily have suffered an irreparable injury as a result of the RMA's violation of their constitutional rights. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." (internal quotation marks omitted)). Second, no remedies available at law could remedy that ongoing irreparable harm. *See M-J-M-A- v. Hermosillo*, 822 F. Supp. 3d 1147, 1183 (D. Or. 2026) ("Irreparable harm is 'harm for which there is no adequate legal remedy.'" (quoting *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014))). Finally, the balance of the equities and public interest strongly favor an injunction. Third and fourth, a permanent injunction is sought against the government, meaning the last two factors merge "because any harm to the public interest impacts the balance of the equities." *Id.* (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). NAW has the clear advantage here, since it is "always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (internal quotation marks omitted), and the government "cannot suffer harm from an injunction that merely ends an unlawful practice," *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

NAW has satisfied the standard for permanent injunctive relief. The RMA inflicts ongoing constitutional injury, money damages cannot cure that harm, the equities favor

NAW, and the public interest lies in preventing the continued enforcement of an unlawful statutory scheme. The Court should therefore enter declaratory relief and enjoin DEQ from enforcing the RMA against NAW and its members.

## **CONCLUSION**

For these reasons, NAW respectfully requests that the Court enter final judgment in favor of the Plaintiff on Counts I and III of the Amended Complaint; declare that the Plastic Pollution and Recycling Modernization Act, OR. REV. STAT. §§ 459A.860–459A.975, violates the Commerce Clause and Due Process Clause of the Fourteenth Amendment; and permanently enjoin Defendant Leah Feldon, and all other officers, agents, servants, employees, or other persons who are in active concert or participation with the Defendant, from enforcing the Plastic Pollution and Recycling Modernization Act against NAW and its members. NAW also requests that the Court set a briefing schedule to determine the amount of costs and fees to be awarded to Plaintiff pursuant to Federal Rule of Civil Procedure 54(d)(1) and 42 U.S.C. § 1988.

DATED July 31, 2026                                  SIDLEY AUSTIN LLP

By: *David R. Carpenter*
David R. Carpenter*
drcarpenter@sidley.com

Caleb J. Bowers*
cbowers@sidley.com
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213 896 6000
Facsimile: +1 213 896 6600

Gordon D. Todd*
gtodd@sidley.com
Richard W. Smith*
rwsmith@sidley.com
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736 8000
Facsimile: +1 202 736 8711
*Pro hac vice*

BRADLEY BERNSTEIN SANDS
LLP
Darin Sands, OSB No. 106624
1211 NW Glisan St., Ste 204
Portland, OR 97209
Telephone: +1 503-734-2480

Attorneys for Plaintiff
NATIONAL ASSOCIATION OF
WHOLESALER-DISTRIBUTORS

PLAINTIFF'S POST-TRIAL BRIEF