**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS**,<br><br>Plaintiff,<br><br>v.<br><br>**LEAH FELDON**, Director, Oregon Department of Environmental Quality, in her official capacity,<br><br>Defendant. | Case No. 3:25-cv-1334-SI<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

David R. Carpenter and Caleb J. Bowers, SIDLEY AUSTIN LLP, 350 South Grand Avenue, Los Angeles, CA 90071; Gordon D. Todd and Richard W. Smith, SIDLEY AUSTIN LLP, 1501 K Street, NW, Washington, DC 20005; and Darin M. Sands, BRADLEY BERNSTEIN SANDS LLP, 1211 NW Glisan Street, Suite 204, Portland, OR 97209. Of Attorneys for Plaintiff.

Dan Rayfield, Oregon Attorney General; Sara D. Van Loh, Senior Assistant Attorney General; and Alexander C. Jones and YoungWoo Joh, Assistant Attorneys General, OREGON DEPARTMENT OF JUSTICE, 100 SW Market Street, Portland, OR 97201. Of Attorneys for Defendant.

Molly Tack-Hooper, EARTHJUSTICE, 810 Third Avenue, Suite 610, Seattle, WA 98104; and Christopher A. Meyer, EARTHJUSTICE, 48 Wall Street, Floor 15, New York, NY 10005. Of Attorneys for *Amicus Curiae* Professor Sarah J. Morath.

Christina M. Martin, PACIFIC LEGAL FOUNDATION, 4440 PGA Boulevard, Suite 307, Palm Beach Gardens, FL 33410. Of Attorneys for *Amici Curiae* Pacific Legal Foundation and National Federation of Independent Business Small Business Legal Center, Inc.

Steven Wilker and Maureen S. Bayer, TONKON TORP LLP, 1300 SW Fifth Avenue, Suite 2400, Portland, OR 97201. Of Attorneys for *Amici Curiae* Oregon Business and Industry Association, Northwest Grocery Retail Association, and Food Northwest.

Maureen S. Bayer, TONKON TORP LLP, 1300 SW Fifth Avenue, Suite 2400, Portland, OR 97201. Of Attorneys for *Amici Curiae* Air-Conditioning, Heating, and Refrigeration Institute; American Lighting Association; and Association of Home Appliance Manufacturers.

Samantha K. Pitsch, STOKES LAWRENCE PS, 1420 Fifth Avenue, Suite 3000, Seattle, WA 98101; and Nancy Sims and Benjamin W. Turner, BAKER & MCKENZIE LLP, 10250 Constellation Boulevard, Suite 1850, Los Angeles, CA 90067. Of Attorneys for *Amici Curiae* International Franchise Association and Restaurant Law Center.

Victor Y. Xu, MARTEN LAW LLP, 1050 SW Sixth Avenue, Suite 2150, Portland, OR 97204; and James B. Pollack, MARTEN LAW LLP, 920 Fifth Avenue, Suite 2700, Seattle, WA 98104. Of Attorneys for *Amicus Curiae* The Recycling Partnership, Inc.

Olivier Jamin, DAVIS WRIGHT TREMAINE LLP, 560 SW Tenth Avenue, Suite 700, Portland, OR 97205. Of Attorneys for *Amici Curiae* Wine Institute and Distilled Spirits Council of the United States.

Naomi Sheffield, Chief Deputy City Attorney; and Emily Lohman, Deputy City Attorney, PORTLAND CITY ATTORNEY'S OFFICE, 1221 SW Fourth Avenue, Room 430, Portland, OR 97204. Of Attorneys for *Amicus Curiae* City of Portland.

Amy Edwards and Rachelle D. Collins, STOEL RIVES LLP, 760 SW Ninth Avenue, Suite 3000, Portland, OR 97205. Of Attorneys for *Amicus Curiae* American Forest & Paper Association.

Erica A. Clausen, MILLER NASH LLP, 1140 SW Washington Street, Suite 700, Portland, OR 97205. Of Attorneys for Circular Action Alliance and Kimberly Holmes.

Introduction .................... 4
Findings of Fact .................... 8
A. Oregon's Plastic Pollution and Recycling Modernization Act ("RMA") .................... 8
1. Covered Products .................... 11
2. Producers .................... 13
3. Producer Responsibility Organizations .................... 15
4. DEQ Enforcement .................... 20
B. Implementing the RMA .................... 22
1. Membership Fees .................... 24
2. DEQ's Review and Approval Process .................... 26
3. CAA's Approved Plan .................... 26
4. CAA National's Agreement and CAA's Oregon Addendum .................... 30
C. National Association of Wholesaler-Distributors .................... 31
Conclusions of Law .................... 37
A. Dormant Commerce Clause .................... 37
1. Discrimination .................... 39
a. Purpose .................... 39
b. Facial .................... 41
c. Effects .................... 46
2. User Fees .................... 49
3. *Pike* Balancing: Excessive Burden Versus Local Benefits .................... 51
B. Due Process .................... 53
1. Threshold Requirement of a Protected Liberty or Property Interest .................... 53
2. NAW's "Private Delegation" Argument .................... 60
3. Processes Related to Assessing and Collecting Membership Fees .................... 67
Conclusion .................... 71

**Michael H. Simon, District Judge.**

## INTRODUCTION

"Companies that choose to sell products in various States must normally comply with the laws of those various States." *National Pork Producers Council v. Ross*, 598 U.S. 356, 363 (2023). This principle, combined with the wisdom that "[t]o stay experimentation in things social and economic is a grave responsibility," *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting), underpins the Court's conclusion after a five-day trial: Oregon's Plastic Pollution and Recycling Modernization Act ("RMA")[1] does not violate either the dormant Commerce Clause or the Due Process Clause of the United States Constitution. "It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory, and try novel social and economic experiments without risk to the rest of the country." *Id.*

Oregon has been a pioneer in waste prevention, reuse, and recycling legislation for more than half a century. In 1971, the state adopted the nation's first bottle deposit law (Bottle Bill) to "reduce Oregon's growing litter problem and to conserve resources."[2] With the RMA, Oregon continues to show innovative leadership toward solving serious local, national, and even international problems caused by plastic and other forms of waste and packaging pollution.

As Professor Sarah J. Morath stated in her *amicus curiae* brief, the "accumulation of plastic waste in the environment threatens human safety" and "children are especially

---

[1] Or. Rev. Stat. ("ORS") §§ 459A.860-459A.975.

[2] ECF 169 at 8, citing Or. Sec'y of State, *Oregon Bottle Bill Records*, https://perma.cc/DT5D-Z453.

vulnerable."[3] She adds: "The health effects of plastic waste are especially pronounced in coastal states like Oregon. One study of thirty different aquatic sites in Oregon—both inland and on the coast—found microplastic contamination at every one of them."[4] According to Professor Morath, Oregon's RMA "is a proportionate response to an urgent and mounting plastic pollution crisis."[5] Several other states, including California and Washington, have enacted similar laws. Continuing with Justice Brandeis's metaphor of "states-as-laboratories," these different state laws can help identify what forms of regulation work best and where improvement may be needed. Congress, through the Constitution's Supremacy Clause (U.S. CONST. art. VI, cl. 2) and the power of federal preemption, can always provide a backstop if national uniformity is found to be the preferred approach. Judicial intervention, however, is not needed in this case.

Plaintiff, National Association of Wholesaler-Distributors ("NAW"), originally sued the Oregon Department of Environmental Quality ("DEQ"); the Oregon Environmental [Quality] Commission; and Oregon Attorney General Daniel A. Rayfield.[6] In its First Amended Complaint, which is the operative pleading, NAW named as defendants only Leah Feldon, the Director of the DEQ, and four individual members of the Oregon Environmental Quality Commission ("EQC Defendants"), all in their official capacities.[7] NAW sought declaratory and injunctive relief against enforcement of the RMA. NAW alleged that the RMA violates the dormant Commerce Clause of the United States Constitution (U.S. CONST. art. I, § 8), the Due

---

[3] ECF 57-1 at 7.

[4] *Id.* at 7-8.

[5] *Id.* at 5.

[6] Complaint, ECF 1.

[7] First Amended Complaint, ECF 26.

Process Clause of the Fourteenth Amendment (U.S. CONST. amend. XIV), the Equal Protection Clause of the Fourteenth Amendment (U.S. CONST. amend. XIV), the Unconstitutional Conditions Doctrine, Oregon's so-called "Due Process Clause" (OR. CONST. art. I, § 10), Oregon's Equal Privileges and Immunities Clause (OR. CONST. art. I, § 20), and Oregon's Nondelegation Doctrine (OR. CONST. art. 1 § XXI, art. III, § I, art. IV, § I).[8]

Defendants moved to dismiss the lawsuit, and NAW moved for a preliminary injunction. On February 6, 2026, the Court dismissed all claims asserted against the EQC Defendants, leaving Ms. Feldon as the only remaining Defendant.[9] The Court also dismissed NAW's claim under the Equal Protection Clause of the Fourteenth Amendment, NAW's claim of Unconstitutional Conditions, and all claims brought by NAW under the Oregon Constitution.[10] Although the Court gave NAW leave to amend,[11] NAW chose not to replead any of the dismissed claims. The Court also granted preliminary injunctive relief in favor of NAW on its dormant Commerce Clause and Due Process Clause claims, finding that "serious questions" existed going to the merits, there was a likelihood of irreparable injury, and the balance of

---

[8] *Id.*

[9] ECF 88. From this point forward, the Court will refer to Ms. Feldon simply as "Defendant."

[10] *Id.* NAW conceded that its Unconstitutional Conditions claim is "just a different analysis of the Commerce Clause or Due Process Clause." ECF 155 at 33:18-34:7.

[11] ECF 88.

hardships tipped sharply in favor of NAW and its members.[12] *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011).[13]

From July 13 to 17, 2026, the Court held a five-day bench-trial on NAW's two remaining constitutional claims. NAW presented testimony from eight witnesses: Kimberly Holmes, Executive Director for Circular Action Alliance Oregon; Brian Wild, Chief Government Relations Officer for NAW; Corey Rodriguez, Vice President of Sales for the West Region for RJ Schinner Co.; James Winkle, Executive Vice President for Harbor Foods; Ed Allen, President of WCP Solutions; Rick Tomlinson, President of the California Strawberry Commission; Douglas Thomas, Ph.D., Henry E. McWayne Professor of Business Administration at the Darden School of Business at the University of Virginia; and Calvin Lakhan, Ph.D., Director of the Circular Innovation Hub at York University's Faculty of Environmental and Urban Change.

In addition to soliciting direct examination testimony from Ms. Holmes during NAW's case-in-chief, Defendant presented trial testimony from five witnesses: Nicole Portley, DEQ's Program Lead for the RMA; Erin Saylor, DEQ's Manager of the Office of Compliance and Enforcement; David Allaway, DEQ's Senior Policy Analyst; Scott Cassell, Ph.D., Chief Executive Officer of the Product Stewardship Institute, Inc.; and Reid J. Lifset, Research Scholar and Resident Fellow in Industrial Ecology at the Yale University School of the Environment. The Court received in evidence 57 exhibits and reviewed additional deposition testimony from Ms. Holmes and Ms. Portley. The Court also received and read nine briefs filed by sixteen *amici curiae.*

---

[12] *Id.*

[13] The Court later clarified that Defendant was only precluded from enforcing the RMA against NAW and its members as of February 6, 2026. ECF 134.

The facts that the Court relies on in these Findings of Fact and Conclusions of Law are supported in the record by a preponderance of the evidence. The Court notes that few material facts are truly disputed by the parties and that the issues in this case are, for the most part, questions of law. Unless otherwise noted, when evidence was the subject of an objection and the Court has relied on that evidence, the Court has overruled the evidentiary objection for the reason or reasons identified either by the Court on the record or, if the Court is silent, by the party offering the evidence in response to the other side's objection. Whenever the Court has declined to consider evidence after an objection, the Court has expressly indicated and stated the basis for sustaining the evidentiary objection. All other objections to evidence that the Court has not relied on or cited in these Findings of Fact and Conclusions of Law are overruled or denied as moot.

After reviewing the entire record, the Court makes the following Findings of Fact and Conclusions of Law, under Rule 52(a) of the Federal Rules of Civil Procedure. Any Finding of Fact that constitutes a Conclusion of Law is hereby adopted as a Conclusion of Law, and any Conclusion of Law that constitutes a Finding of Fact is hereby adopted as a Finding of Fact.

## FINDINGS OF FACT

### A. Oregon's Plastic Pollution and Recycling Modernization Act ("RMA")

Enacted in 2021, Oregon's RMA (ORS §§ 459A.860-975) is an extended producer responsibility ("EPR") law, designed to shift "end-of-life" costs of a product onto its producer.[14]

---

[14] *See* Trial Transcript ("Tr.") at 524 (Dr. Thomas). In addition, as *amicus curiae* Professor Morath explains: "EPR laws have an established pedigree in the United States. The first state-level EPR efforts began in the early 1990s, when Minnesota and several other states adopted legislation requiring producers to take back spent lithium-ion batteries. Now, almost forty years later, there are more than 146 state-level EPR laws in thirty-five states. Those laws cover more than a dozen product categories, including pharmaceuticals, paint, carpets, mattresses, mercury thermostats, batteries, and electronic waste. Since 2021, seven states (including Oregon) have passed EPR laws for plastic packaging waste, partially in response to

Stated another way, EPR laws are intended to ensure that, among other things, the prices charged for products include their hidden or unintended costs, rather than force third parties to deal with the total cost of placing a product into the stream of commerce. In economic terms, this is known as requiring that the price of a product reflect, or internalize, its "externalities," which are costs (or benefits) borne by third parties who did not directly participate in the manufacture, distribution, sale, or purchase of that product.[15] Without governmental intervention, an economic actor directly participating in a transaction neither pays (nor receives) compensation for externalities. Further, when a self-interested economic actor does not consider externalities, "[s]elf-interested behavior may not always be in the best interest of society."[16]

"One government strategy for dealing with externalities is to encourage decision makers to internalize the externalities by taxing the production of negative externality goods . . . ."[17] "Where a building proposal would substantially increase traffic congestion, for example, officials might condition permit approval on the owner's agreement to deed over the land needed

---

China's ban on further plastic waste exports."). ECF 57-1 at 10-11. *See also* SARAH J. MORATH, OUR PLASTIC PROBLEM AND HOW TO SOLVE IT 71 (Cambridge Univ. Press 2022) (stating that EPR principles "would require plastic manufacturers to design, manage, and finance for the end-of-life management of their products before the time of sale").

[15] *See* Tr. at 1089-90, 1095 (Dr. Cassell discussing internalizing externalities); *see also* HENRY N. BUTLER, CHRISTOPHER R. DRAHOZAL & JOANNA SHEPHERD, ECONOMIC ANALYSIS FOR LAWYERS 185 (Carolina Acad. Press 3d ed. 2014) ("BUTLER") (discussing the economic concept of externalities); BETH GARDINER, PLASTIC INC.: THE SECRET HISTORY AND SHOCKING FUTURE OF BIG OIL'S BIGGEST BET 46 (Avery Imp. 2026) (discussing how extended producer responsibility "remains at the center of bitter fights over who should bear the true costs of disposability" and stating that "[t]he companies making so much money from throwaway packaging were not prepared to give it up"). Ultimately, the question comes down to whether cost externalities should persist or whether governmental regulation may compel them to be internalized into a product's price and true cost.

[16] BUTLER at 185.

[17] *Id.* at 217.

to widen a public road."[18] Thus, as the Supreme Court remarked in the land-use context, "[i]nsisting that landowners internalize the negative externalities of their conduct is a hallmark of responsible land-use policy, and we have long sustained such regulations against constitutional attack."[19]

In keeping with these principles, the stated purpose of Oregon's RMA is to "preserve public health, safety and welfare and conserve energy and natural resources" by minimizing the "unintended consequences" of the state's recycling policies "across the entire life cycle of products," including the "increased levels of pollution, greenhouse gas emissions that contribute to global climate change and reductions in human well-being."[20] To this end, the Oregon legislature found it "necessary to adopt a policy . . . that will require producers of packaging and printed paper sold or distributed in Oregon to help finance the management of, and ensure an environmentally sound stewardship program for, their products."[21]

The RMA identifies certain "covered products," and requires "producers" of those products to join a "producer responsibility organization" ("PRO"), which is an organization created by producers that works with DEQ to levy individualized fees that are roughly proportional to the annual cost of the waste that each producer places into Oregon's recycling

---

[18] *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 605 (2013).

[19] *Id.* (citing *Vill. of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365 (1926)). *See also* ECF 57-1 at 6-7 (Professor Morath discussing the economic incentives to produce and use virgin plastic made from petrochemicals and noting that "the inputs for virgin plastic are underpriced" because of governmental subsidization of fossil-fuel extraction and processing and that consumers can freely discard plastic products and shift waste management costs to states and municipalities, resulting in producers designing and marketing products that have high end-of-life waste management costs "without facing any penalty" for doing so).

[20] *See* ORS § 459A.860 (Legislative Findings).

[21] *Id.* at (3).

system. Next, the Court describes the products and producers covered under the law, the duties of a PRO, and DEQ's approval and enforcement authorities.

**1. Covered Products**

The RMA applies to three categories of "covered products": packaging, printing and writing paper, and food serviceware.[22] "Packaging" is:

> (A) Materials used for the containment or protection of products, including but not limited to paper, plastic, glass or metal or a mixture thereof; (B) Single-use bags, including but not limited to shopping bags; and (C) Nondurable materials used in storage, shipping or moving, including but not limited to packing materials, moving boxes, file boxes and folders.[23]

"Printing and writing paper" includes "newspaper, magazines, flyers, brochures, booklets, catalogs, telephone directories and paper used for copying, writing or other general use."[24] "Food serviceware"

> means paper or plastic plates, wraps, cups, bowls, pizza boxes, cutlery, straws, lids, bags, aluminum foil or clamshells or similar containers: (a) That are generally intended for single use; and (b) That are sold to a retailer or a dine-in food establishment or a take-out food establishment, regardless of whether the item is used to prepackage food for resale, is filled on site for food ordered by a customer or is resold as is.[25]

Although they otherwise would qualify as "covered products," the RMA categorically excludes certain items from the RMA's reach,[26] including, as relevant to this lawsuit:

---

[22] ORS § 459A.863(6)(a) (defining "Covered product").

[23] *Id.* at (18)(a).

[24] *Id.* at (20).

[25] *Id.* at (7).

[26] For a full list of exempted items, see ORS § 459A.863(6)(b).

> (D) Rigid pallets used as the structural foundation for transporting goods lifted by a forklift, pallet jack or similar device.
>
> . . .
>
> (G) A material that the producer demonstrates is exempt under ORS 459A.869 [the private recycling rule].
>
> (H) Pallet wrap or similar packaging used to secure a palletized load if added by a person that is not the producer of the palletized covered products.
>
> . . .
>
> (J) Any item that is not ultimately discarded inside this state, whether for purposes of recovery or disposal.
>
> . . .
>
> (Q) Packaging for products:
>
>> (i) That are required under 40 C.F.R. 156.140, or other federal regulation pertaining to toxic or hazardous materials, to state on the label or container that the packaging should not be recycled or should be disposed of in a manner other than recycling; or
>>
>> (ii) Identified by the commission by rule as product that is required by law to state on the label or container that the packaging should not be recycled or should be disposed of in a manner other than recycling.
>
> (R) Any other material, as determined by the commission by rule, after consultation with the Oregon Recycling System Advisory Council.[27]

The private recycling rule permits more items otherwise covered by the Act to be exempt. Under the private recycling rule, a "producer may demonstrate to [DEQ] that a material is exempt" if the material: (1) "[i]s collected through a recycling collection service not provided

[27] *Id.* (cleaned up).

under the opportunity to recycle"; (2) "[d]oes not undergo separation from other materials at a commingled recycling processing facility"; and (3) "[i]s recycled at a responsible end market."[28]

**2. Producers**

A "producer" is "a person that is determined to be the producer of a covered product" (and conversely, an entity that is not responsible for any covered product is not a "producer").[29] "Producer" has a different definition for food serviceware, packaging, and paper. For food serviceware, the producer is the person that first sells the item into Oregon.[30]

The rules for packaging are more nuanced. For "primary" packaging of items sold at a physical retail location in Oregon,[31] there is a three-tiered hierarchy to identify the obligated producer.[32] If the item is sold under the manufacturer's own brand (or in brandless packaging), the producer is the manufacturer.[33] If, however, the item is manufactured by someone other than the brand owner, the producer is the licensee of the brand under which the item is sold or distributed into Oregon. If neither of these more specific rules apply to the product, the producer is the first importer of the product into the United States for sale or distribution in Oregon.

Different rules apply to secondary or tertiary packaging. For items sold by remote sale or distribution, the producer of the packaging used to ship the item to a consumer (like a box or

[28] ORS § 459A.869(13).

[29] ORS § 459A.863(22); *see also* ORS § 459A.866 (determining producers of covered products).

[30] ORS § 459A.866(3).

[31] Primary packaging, like a plastic mayonnaise tub or a glass wine bottle, is packaging that makes direct contact with the usable or consumable item being sold.

[32] Tr. at 1106-07 (Mr. Cassell).

[33] ORS § 459A.866(1)(a).

mailer) is the person that packages and ships the item.[34] Putting these concepts together, a box that contains a packaged, branded widget shipped from Boise, Idaho to a consumer in Portland, Oregon would have two producers: the entity that packed the item would be the producer of the outer box, whereas the brand owner of the widget would be the producer of the widget's primary packaging. For printing and writing paper that is used for publications,[35] the producer is the publisher.[36] For other printing and writing paper (sold in the consumer context), the producer scheme follows the three-tiered system outlined above for packaging.[37]

Just as certain products are exempt, certain producers (collectively labeled "small producers") are also exempt from the RMA.[38] An entity is a small producer, and therefore is not obligated to become a member of a PRO, if it:

> (a) Is a nonprofit organization;
>
> (b) Is a public body, as defined in ORS 174.109;
>
> (c) Has a gross revenue of less than $5 million for the organization's most recent fiscal year;
>
> (d) Sold in or into Oregon less than one metric ton of covered products for use in this state in the most recent calendar year;
>
> (e) Is a manufacturer of a beverage sold in a beverage container, as those terms are defined in ORS 459A.700, that sold in or into Oregon less than five metric tons of covered products, including but not limited to secondary and tertiary packaging for beverage containers, for use in this state in the most recent calendar year;

---

[34] *Id.* at (1)(b).

[35] The statute provides as examples a "magazine, newspaper, catalog, telephone directory or similar publication." *Id.* at (2)(a).

[36] *Id.*

[37] *Id.* at (2)(b).

[38] ORS § 459A.872(1).

(f)

(A) Is a restaurant, food cart or similar business establishment that primarily sells to members of the public food that is generally intended to be consumed immediately and without the need for further preparation, either on or off the premises; and

(B) Is not a producer of food serviceware as described in ORS 459A.866; or

(g) Operates a single retail sales establishment, has no online sales and is not supplied or operated as part of a franchise or a chain.[39]

The RMA requires all producers to register with and become a member of a PRO.[40] As a member, a producer is obligated to report to the PRO the volume of covered products it brings into Oregon and to pay membership fees based on those volumes.

**3. Producer Responsibility Organizations**

A PRO is a "nonprofit organization established by a producer or group of producers to administer a producer responsibility program."[41] A PRO must represent "at least 10 percent of the total combined market share of all producers of covered products" in Oregon.[42] The PRO acts as a liaison between producers and DEQ to administer the RMA. There may be more than one PRO administering the RMA at a given time.[43]

---

[39] ORS § 459A.863(32) (cleaned up).

[40] ORS § 459A.869(1).

[41] ORS § 459A.863(23).

[42] *See* ORS § 459A.869(12).

[43] *See id.* at (9).

To become a PRO, an organization applies to DEQ by submitting a proposed Producer Responsibility Program Plan ("Plan").[44] A Plan outlines how the PRO will operationalize its duties under the RMA. A PRO applicant pays $150,000 to DEQ to review a proposed Plan.[45] If DEQ approves the proposal, DEQ will charge the PRO an administration fee of $4 million per year for each of the first four years of the program (2025-2028) and $3 million per year for each subsequent year of the program.[46] Within 120 days of receiving a proposed Plan, DEQ must: (1) "solicit feedback" on the Plan from the Oregon Recycling System Advisory Council ("Advisory Council"); (2) make the Plan available for public comment for no less than 30 days; and (3) render a decision on the Plan by approving (with or without conditions) or denying it.[47] If DEQ denies a proposed Plan, the PRO applicant may submit a revised proposal.[48] An approved Plan is valid for five years.[49]

A Plan must, "[u]sing objective and measurable criteria whenever possible," describe how the PRO will administer its program, including by providing information about the structure

[44] *See* ORS § 459A.875(2). The PRO must describe its proposed methods for, among other things, collecting covered products, calculating and charging fees to producers, incentivizing producers to reduce the environmental and human health impacts of their products, disposing of the collected covered products in a "responsible" manner, providing public outreach and education on state-wide recycling efforts, and facilitating communication between producers, DEQ, local governmental entities, and the public.

[45] Oregon Administrative Rule ("OAR") 340-090-0690(1).

[46] *Id.* at (2).

[47] ORS § 459A.878(1)(a), (2).

[48] Additional procedures govern subsequent denials. *See id.* at (1)(b)-(e).

[49] *Id.* at (3).

of the PRO itself, the PRO's fee structure, recycling goals, and how the PRO will communicate with producers and DEQ.[50] A PRO may exercise authority only in accordance with the Plan.[51]

Regarding membership fees, a proposed Plan must: (1) describe how the PRO will "[e]stablish, calculate and charge membership fees, including incentives, as described in ORS 459A.884"[52]; (2) "[e]ncourage producers to make continual reductions in the environmental and human health impacts of covered products through a graduated fee structure"[53]; (3) "[i]nclude projections on recycling rates for plastic"[54]; (4) "[d]escribe the membership fee structure of the producer responsibility organization, including a schedule of the membership fees actually charged to members"[55]; and (5) "[d]emonstrate that the membership fees collected by the producer responsibility organization will provide adequate revenue to fund all costs associated with the producer responsibility program."[56]

In addition to what the PRO must propose in its Plan, the RMA sets forth certain substantive requirements regarding membership fees. The PRO must charge a "uniform membership fee" to members that had gross revenues of less than $10 million for the organization's most recent fiscal year or sold in or into Oregon less than five metric tons of

---

[50] *See generally* ORS § 459A.875(2).

[51] ORS § 459A.884.

[52] ORS § 459A.875(2)(a)(E).

[53] *Id.* at (2)(a)(F).

[54] *Id.* at (2)(f).

[55] *Id.* at (2)(h).

[56] *Id.* at (2)(i).

covered products for use in Oregon in the most recent calendar year.[57] For all other producers, the PRO must charge membership fees based on a statutory formula. First, the PRO must create "material-specific base fee rates for all covered products sold or distributed in or into" Oregon.[58] In setting this base fee rate, the PRO cannot "cross-subsidize" materials. Cross-subsidization refers to the practice of charging higher prices for one material to artificially reduce the cost of another. The RMA prohibits cross-subsidization to ensure that producers of easy-to-recycle materials do not bear the costs of harder-to-recycle materials.[59] Thus, "[m]embership fees charged for different covered product types, materials and formats must be proportional to the costs to the [PRO] for that covered product type, material or format."[60] After the PRO sets material-specific base fees, it calculates membership fees by multiplying the material-specific base fee rate by the total amount of covered products of each material sold or distributed by the producer in or into Oregon.[61] Finally, the PRO also must "incentivize producers to continually reduce the environmental and human health impacts of covered products by offering fee adjustments to producers that make or have made changes to the ways in which they produce, use and market covered products."[62] The parties refer to this process as awarding "eco-modulation bonuses or maluses."[63]

---

[57] ORS § 459A.884(6).

[58] *Id.* at (2).

[59] Tr. at 40.

[60] ORS § 459A.884(1).

[61] *Id.*

[62] *Id.* at (4).

[63] *See, e.g.*, Tr. at 810.

Two special rules about fee collection are relevant to this litigation. First, notwithstanding its fee obligations, a producer that does not sell any covered products in Oregon in a calendar year is not responsible to pay membership fees for that year. Second, a PRO must accept from newspaper and magazine publisher-members "the value of print and online advertising services" in lieu of membership fees and, in so doing, the PRO "may consider the in-state reach of the advertising when determining the value of the advertising."[64]

A PRO may amend an approved Plan by submitting a formal amendment to DEQ. An amendment is required when, among other things, the PRO "chang[es] methods used to establish membership fees under ORS 459A.884."[65] Not all changes require formal amendment, however. At least once per calendar quarter, the PRO "shall provide written notice" to DEQ and the Advisory Council "of any changes made during the previous month to a producer responsibility program plan that are changes for which an amendment is not required."[66] No amendment is required when a PRO makes "routine, annual updating of base fee rate amounts to align with the most recent supply information received from member producers or updated material cost allocations from related studies."[67]

[64] ORS § 459A.884(7).

[65] ORS § 459A.881(1)(b). The PRO also must propose a formal amendment when seeking to change its obligations under an approved Plan. *See generally id.* at (1).

[66] *Id.* at (2).

[67] OAR 340-090-0750(1).

#### 4. DEQ Enforcement

DEQ may enforce the RMA against both PROs and producers.[68] Against PROs, DEQ may suspend or revoke a PRO Plan if DEQ determines that: (1) "[a] violation or repeated violations of [the RMA] present a risk to the environment or public health"; (2) "[a] violation has had a material impact on the implementation and administration of the [Plan]"; or (3) a PRO's members no longer make up at least 10% of the market share.[69] Before suspending or revoking a Plan, DEQ must commence a contested case proceeding against the affected PRO.[70] The contested proceeding process is described below in connection with producer enforcement.

To enforce the RMA against producers, the PRO shall act as a whistleblower to DEQ to monitor producers' compliance with the RMA. The PRO must propose a process in its Plan for notifying DEQ of a producer's noncompliance with the RMA. Noncompliance can include failure to register with the PRO, pay membership fees, or pay the correct amount of membership fees. On a quarterly basis, the PRO must send to DEQ a list of producers that are out of compliance with the RMA. After DEQ is notified by the PRO of the producer's noncompliance, DEQ may elect to commence formal enforcement proceedings. Although DEQ has received a list of noncompliant producers from the only PRO currently approved in Oregon, DEQ has not yet begun a formal enforcement proceeding against a producer.[71]

In addition, DEQ will send a warning letter to a noncompliant producer before beginning formal enforcement proceeding and offer the producer an opportunity to cure the

---

[68] ORS § 459A.962.

[69] ORS §§ 459A.962(5), 459A.869(12).

[70] ORS §§ 459A.962(3), (5).

[71] Tr. at 843-44 (Ms. Portley).

noncompliance.[72] The affected producer may then comply or provide more information to explain that no violation has occurred.[73] If the producer is and remains noncompliant, DEQ may issue a pre-enforcement notice and refer the matter to DEQ's Office of Compliance and Enforcement ("OCE") for formal enforcement proceedings.[74] After referral, the enforcement office will review the file to determine whether there is sufficient evidence to show a violation of the RMA.[75] If it finds sufficient evidence, the office may then calculate a civil penalty.

DEQ "may issue civil penalties for violations of the provisions" of the RMA, including a producer's refusal to pay membership fees, up to $25,000 per day.[76] Calculation of the penalty begins with a base penalty.[77] The base penalty for failure to register or pay fees begins a penalty matrix established by regulation, under which the relevant base penalties range from $375 to $3,000 per day.[78] DEQ then considers aggravating and mitigating factors and economic benefit in accordance with separate regulatory provisions.[79] After calculating the civil penalty, DEQ issues a Notice of Civil Penalty Assessment and Order.[80]

---

[72] *See* Ex. 69 ("Table 5A Product Stewardship Violations Guidance"); *see also* Tr. at 840 (Ms. Portley).

[73] *See* Ex. 69.

[74] Tr. at 843 (Ms. Portley).

[75] *Id.* at 939-42 (Ms. Saylor); OAR 340-011-0545(2).

[76] ORS § 459A.962(4).

[77] OAR 340-012-0045.

[78] OAR 340-012-0140(4).

[79] OAR 340-012-0145, -0150.

[80] OAR 340-012-0041(2); Tr. at 942 (Ms. Saylor).

Upon receiving a Notice of Civil Penalty Assessment and Order, a producer has 20 days to request a hearing and must either admit or deny DEQ's factual allegations and assert any defenses.[81] DEQ would also invite the producer to discuss a potential settlement.[82] If no settlement is reached, DEQ may refer the matter to the Office of Administrative Hearings, which would assign an administrative law judge ("ALJ") to preside over a hearing, at which DEQ would have the burden to prove a violation by a preponderance of evidence.[83] Any final decision by the ALJ would then be subject to review by the Environmental Quality Commission[84] and then by the Oregon Court of Appeals.[85] No payment is due until all appeals have been exhausted.[86] DEQ also may request the Oregon Department of Justice to bring an enforcement action, asking a court to prohibit the sale of a covered product in Oregon against any producer that violates the RMA.[87]

**B. Implementing the RMA**

Circular Action Alliance ("CAA National") is a national nonprofit organization with several state subsidiary organizations that serve as PROs in several states with EPR laws. CAA National operates under a shared services model, meaning that the organization provides

[81] OAR 340-011-0530(1).

[82] Tr. at 948 (Ms. Saylor).

[83] OAR 340-011-0545.

[84] OAR 340-011-0573(1), -0575(2), (4).

[85] ORS § 183.482(1) (providing for judicial review of "contested cases").

[86] ORS § 183.745(2).

[87] ORS § 459A.962(6).

centralized services to its state subsidiaries.[88] These "shared services" include creating state-level budgets and providing human resource assistance and website and producer registration portal servicing.[89]

CAA National's Board of Directors ("National Board") is responsible for governance and fiduciary oversight of the national organization.[90] The National Board is "involved in helping to develop and review program plans," including by reviewing budgeting for the national organization and state-level subsidiaries.[91] Every National Board Member must sign a confidentiality agreement[92] and a conflict-of-interest policy acknowledgment form.[93] National Board members, however, may "share materials and information discussed in Board meetings within their Founding Member company when related to Circular Action Alliance's business or their duties as Board Members."[94]

CAA Oregon is the Oregon subsidiary of CAA National.[95] For purposes of these Findings of Fact and Conclusions of Law, the Court refers to CAA Oregon simply as "CAA." CAA also has a Board of Directors ("Oregon Board"). Its members are Niagara Bottling, McDonald's USA, L'Oreal, Mars, Coca-Cola, Nespresso (Nestle), General Mills, Oregon Winegrowers,

---

[88] Tr. at 54-55 (Ms. Holmes).

[89] *Id.*

[90] *Id.* at 50.

[91] *Id.*

[92] *Id.* at 50-51; Ex. 38 (Confidentiality Agreement).

[93] Ex. 37 (Conflict of Interest Policy).

[94] Ex. 38.

[95] Tr. at 12 (Ms. Holmes).

Target, and PepsiCo.[96] Other than Oregon Winegrowers, each founding member company on the Oregon Board is represented on the National Board.[97]

CAA is the only PRO that DEQ currently has approved to implement the RMA.[98] In March 2024, CAA submitted its proposed Plan to DEQ.[99] DEQ approved the Plan after extended discussions with CAA in February 2025.[100] As approved by DEQ in CAA's Plan, CAA uses a specific proprietary formula to calculate membership fees ("Fee Equation"). CAA also requires each producer to sign two standard-form contracts as a condition of joining CAA's PRO, as described below.

**1. Membership Fees**

To set its membership fees using its proprietary Fee Equation, CAA first determines the annual total Oregon system cost. The annual total system cost is detailed in Appendix E of CAA's Plan and accounts for all materials disposed of and recycled in the Oregon system, including exempted materials or covered materials disposed of by exempted entities.[101] Neither CAA nor DEQ has quantified the impact of the RMA's producer or covered product exemptions on the annual total system cost or membership fees.[102]

---

[96] *Id.* at 53-54; Ex. 44 (List of Oregon Board Members).

[97] Tr. at 13 (Ms. Holmes).

[98] *Id.*

[99] *Id.* at 159.

[100] *Id.* at 159.

[101] Tr. at 815-18 (Ms. Portley); *see also* Ex. 12 (confidential, visual representation of membership fee equation).

[102] Tr. at 33-34 (Ms. Holmes).

CAA's Fee Equation[103] proceeds in three steps: First, CAA assigns each recyclable or waste material a "Cost-to-Manage" ("CTM") value. The CTM value represents the price a given material costs to recycle. There are 60 materials currently listed in CAA's CTM schedule. Second, CAA determines the "non-material management costs," which are costs not associated with a specific material, and allocates those costs across all materials. If CAA awards any eco-modulation bonuses or maluses, those credits or deductions are also factored in at this step. This leaves CAA with a base fee rate, which is stated in a price-per-pound rate sheet for each of the 60 materials listed in the schedule. Third, CAA generates member invoices by multiplying the member's past, self-reported volumes by the fee rate for each material they bring into Oregon.

CAA's membership fees operate on what CAA refers to as a "fee cadence."[104] This means that there is a two-year lag from the time of a producer's reported sales to when the producer is invoiced for those sales under the RMA. For example, if Producer A brought 100 tons of material X into Oregon in 2025, the producer would pay fees under the RMA for that tonnage of material X in 2027. CAA sets its fees for an upcoming calendar year during the fall of the year before.[105] CAA will thus set its 2027 rates in the fall of 2026. Putting these principles together, a producer will be charged fees in 2027 at a rate set in the latter part of 2026 based on volumes of material brought into Oregon in 2025. Because a producer that sells no covered materials in Oregon is not responsible for RMA fees for a calendar year, the fee cadence means

[103] CAA does not, however, use the Fee Equation for those producers that are entitled to pay a uniform membership fee because of their gross revenue or annual tonnage of covered products. *See* ORS § 459A.884(6).

[104] Tr. at 828 (Ms. Portley).

[105] *Id.* at 1020 (Mr. Allaway).

that a producer that sold no covered products in Oregon in 2025 likely would not be invoiced in 2027 for any RMA fees.[106]

**2. DEQ's Review and Approval Process**

Between the first submission of CAA's proposed Plan and its eventual approval, representatives from CAA and DEQ met regularly to discuss CAA's proposal. CAA also presented its proposed Plan to the Advisory Council.[107] After DEQ approved CAA's Plan, CAA issued two fee schedules: one for 2025, and one for 2026.[108] Both fee schedules are now publicly available.[109] CAA's 2025 budget covered only six months of program implementation; accordingly, the 2026 budget, which covers a full year of program implementation, increased by 35% from the 2025 budget.[110]

**3. CAA's Approved Plan**

With its proposed Plan, CAA included a detailed overview of how CAA will calculate membership fees ("Appendix G"), described below. In addition to this description, Appendix G lists the specific CTM values for each covered category of material. Appendix G, however, does not include the proprietary formula, or datapoints, that CAA used to generate the specific CTM values. Moreover, DEQ did not request, and has never reviewed, the proprietary formula underlying CAA's CTM values.[111] DEQ currently treats as confidential Appendix G because it

---

[106] *Id.* at 632-33 (Mr. Thomas).

[107] *Id.* at 159-60 (Ms. Holmes).

[108] *Id.* at 145-48.

[109] *Id.* at 61:4-17.

[110] *Id.* at 830 (Ms. Portley)

[111] *Id.* at 109 (Ms. Holmes).

considers that document to be CAA's proprietary information.[112] Both as of the filing of this lawsuit and through the conclusion of trial, no party had requested that DEQ release Appendix G under Oregon's public records request process.[113]

DEQ's employee Mr. Allaway assessed whether CAA's proposed membership fees comply with the statutory prohibition against cross-subsidization. Before reviewing CAA's proposed fees, Mr. Allaway, on behalf of DEQ, employed Cascadia Consulting ("Cascadia") in 2020 to evaluate several scenarios representing different ways that materials can move through Oregon's recycling system. Cascadia created a model ("Cascadia Model") of Oregon's waste stream, which included modeling how many tons of different types of materials would move through the state and which would be ultimately disposed of or recycled in Oregon.[114] Cascadia then took into account the number of garbage and recycling trucks, gallons of fuel, and processing costs required to dispose of the materials.[115] The result of the Cascadia Model was determined at the time to be the ratepayer's cost per material.[116] DEQ then took the results of the Cascadia Model and included that data into its own environmental assessment model, which

[112] Under the RMA, "[p]roprietary information furnished to [DEQ] . . . may be designated confidential," and any "[i]nformation designated confidential is not subject to public disclosure." ORS § 459A.962(9).

[113] After the trial proceedings concluded, DEQ received a public records request for Appendix G. *See* ECF 197-1.

[114] Tr. at 976-78 (Mr. Allaway).

[115] *Id.*

[116] *Id.*

looked at approximately a dozen environmental "life cycle impacts," including, among other things, emissions produced and depletion of airborne toxins.[117]

Further, DEQ performs its own "waste composition studies" and "material recovery surveys." DEQ performs a waste composition study every three to five years.[118] DEQ takes hundreds of samples at 200 pounds each and sorts the samples into 80 or more categories of waste to give the agency a better understanding of how much of each type of material, measured in tonnage, is in the garbage, or land fill. The material recovery survey identifies every entity in Oregon that collects, processes, or receives materials, and, unless exempted by statute, DEQ requires those individuals to report the tonnage processed by material type. DEQ also provides this information to Cascadia for its periodic modeling.

DEQ also retained Cascadia to revise its 2020 model for 2022, when DEQ was performing its rulemaking under the RMA.[119] Mr. Allaway was the project lead and assisted in this process. He verified Cascadia's work and performed a detailed review of the actual analytical model used by Cascadia.

To determine whether CAA's proposed CTM values complied with the RMA's prohibition against cross-subsidization, Mr. Allaway examined whether approximate proportionality was being maintained in the allocation of material management costs, non-material management costs, and in the various eco-modulation modifiers.[120] Mr. Allaway reviewed the CTM values themselves and concluded that he did not need to see the underlying

---

[117] *Id.*

[118] *Id.* at 981-82.

[119] *Id.* at 985.

[120] *Id.* at 820 (Ms. Portley).

formula that CAA used to generate the CTM values.[121] Mr. Allaway reached this conclusion because throughout the review process CAA discussed its CTM values and methodology with Mr. Allaway and also because CAA agreed to accept Mr. Allaway's suggested revisions.[122] CAA also told Mr. Allaway that CAA had used the outputs from DEQ's 2022 Cascadia Model to create CAA's CTM values. Mr. Allaway learned that CAA had used the results of a recent, major survey of Oregon's recycling systems, in which CAA surveyed local governments, to generate its CTM values. Finally, Mr. Allaway knew and had confidence in several of the employees at CAA who were working on the model, based on Mr. Allaway's earlier DEQ work or other professional relationships.

Based on his initial review, most of the CTM values made sense to Mr. Allaway and seemed "directionally reasonable."[123] That is, they aligned with Mr. Allaway's understanding of the relative costs associated with each material. For materials with CTM values that did not appear at first to be reasonable, Mr. Allaway asked CAA to explain those values. Mr. Allaway testified that "[e]verything [CAA] said not only made sense but demonstrated to me that their model was designed appropriately and was generating rational outputs, outputs that aligned with the statutory requirement that . . . the fees charged on different materials be . . . approximately proportional to each other."[124] After DEQ approved the Plan, including Appendix G, CAA

[121] *Id.* at 1027-28 (Mr. Allaway).

[122] *Id.*

[123] *Id.* at 1033-34.

[124] *Id.* at 1034.

submitted three proposed amendments. CAA did not submit a Plan amendment each time that it changed the fee schedule, based on CAA's authority to do so under the RMA.[125]

**4. CAA National's Agreement and CAA's Oregon Addendum**

To become a member of CAA, a producer must sign two contracts: a Producer Participant Agreement ("National Agreement")[126] and an Oregon Addendum.[127] The Oregon Addendum incorporates the National Agreement. DEQ did not review either contract. Under the National Agreement, members agree to pay producer fees.[128] CAA National agrees to provide producers 90-days' notice of any fee adjustments.[129] CAA National further warrants that its PRO program will be administered and operated in material compliance with the applicable state-approved Plan.[130] For any breaches of this warranty, a producer's "sole and exclusive remedy" is to terminate the agreement.[131] Under the National Agreement, CAA National agrees to provide "guidance to assist [members] in understanding their obligations" under specific state statutes.[132] "To implement that obligation, CAA has hosted webinars and published guidance."[133]

---

[125] *Id.* at 161 (Ms. Holmes).

[126] Ex. 34.

[127] Ex. 70.

[128] Ex. 34 § 3.3.

[129] *Id.*

[130] *Id.* § 2.5.

[131] *Id.*

[132] Ex. 34 § 2.4.2.

[133] Tr. at 63 (Ms. Holmes).

The Oregon Addendum allows CAA to collect membership fees from members. Late or unpaid membership fees are subject to a one percent per month late fee, which compounds monthly.[134] Under the Oregon Addendum, CAA and each producer member agree to submit their disputes to binding arbitration.[135] The parties, however, retain the right to seek injunctive relief from a court "ordering compliance with the Agreement . . . or enjoining and restraining the continuation of a breach of the Agreement."[136]

**C. National Association of Wholesaler-Distributors**

NAW is a trade federation that represents members in the wholesaler-distributor industry.[137] NAW represents 57 trade associations and approximately 35,000 wholesaler or distributor companies.[138] Although most of these companies generate annual revenues ranging from $10 million to several hundred million dollars, the size of wholesalers and distributors typically is measured by the number of products a company manages, typically referred to as "SKUs," or "stock keeping units."[139] NAW's member companies typically manage tens of thousands of SKUs, although some members manage more than one million SKUs in "distribution centers" and some have thousands of SKUs in a single warehouse.[140]

---

[134] Ex. 70 § 5.6.

[135] *Id.* § 8.

[136] *Id.*

[137] Tr. at 184 (Mr. Wild).

[138] *Id.*

[139] *Id.* at 189.

[140] *Id.*

A wholesaler is a company that buys product in bulk from a manufacturer, stores the product in a warehouse, and "breaks bulk," which is the process of transporting goods in smaller units down the supply chain.[141] A wholesaler often operates on a low profit margin, sometimes earning only one to three percent profit margin.[142] A distributor is similar to a wholesaler, in that the distributor also purchases SKUs in bulk and stores them in a warehouse.[143] In addition, a distributor often has a relationship with a manufacturer providing that distributor with exclusive right to distribute that manufacturer's products in a specific region or to specific customers. The main difference between a wholesaler and a distributor—although some of NAW's members operate as both—is that a wholesaler is not typically bound to a specific manufacturer, or brand, unlike a typical distributor.[144]

A supply chain is the chain that connects a manufacturer of a product to the end-user, or ultimate consumer.[145] Wholesalers and distributors operate in the interior of a supply chain. Many wholesalers and distributors have regional hubs that serve multiple states within a 300-mile radius.[146] Any change to packaging while a product is working its way through a supply chain would likely create additional cost, increase the chance of product damage, or both.[147]

---

[141] *Id.* at 179-180.

[142] *Id.*

[143] *Id.* at 182-83.

[144] *Id.* at 183.

[145] *Id.* (Wild); *see also id.* at 511-13 (Dr. Thomas).

[146] *Id.* at 516 (Dr. Thomas).

[147] *Id.* at 522-23.

Because of the way that the RMA defines "producer" and "covered product," NAW asserts, its members have experienced difficulty in knowing whether and for which products they are obligated to pay fees under the RMA. Taking the definition of "covered product," for example, Mr. Allen, the President of NAW Member WCP Solutions, testified that it is "exponentially impossible to figure out" where its products are ultimately used or thrown away.[148] This impossibility, Mr. Allen testified, is because of the sheer volume of information—WCP Solutions has about 3,500 customers in Oregon alone—and because customers typically do not tell wholesalers or distributors detailed information about where their products ultimately are sold, either for security or competitive reasons.[149]

NAW asserts that another challenge for NAW's members under the RMA is their ability to absorb PRO membership fee costs. Because of CAA's fee cadence, NAW's members cannot adjust the volumes they sell into Oregon in anticipation of membership fees. Also, because wholesalers and distributors often operate on thin profit margins, unexpected membership fee amounts may cause a member hardship, or even to go out of business.[150] Although wholesalers or distributors could, at least in theory, pass through to their customers the costs imposed by membership fees, NAW presented evidence that at least some members who have tried to do so have received resistance from customers.[151] NAW argues that larger companies are better

[148] *Id.* at 397-98 (Mr. Allen)

[149] *See id.*

[150] Mr. Rodriguez, the VP of Sales for NAW Member RJ Schinner Co., testified to this problem as it related to R.J. Schinner. In 2024, the company's Oregon-related sales were about $5.2 million, with a gross profit of roughly $1.2 million. The company's CAA invoice on these 2024 sales (levied in 2026) was about $884,000, reducing its profit margin to $316,000. *See id.* at 272-73 (Mr. Rodriguez).

[151] *See, e.g.*, Ex. 16 (email from customer).

positioned to absorb RMA fees (or EPR costs more generally) by paying them outright or spreading the costs more widely across more SKUs. Further, Mr. Wild testified that the private recycling rule is not a realistic option for many wholesalers and distributors because they operate in the middle of a supply chain and thus do not control how or where their products are ultimately disposed.

Additionally, because CAA levies membership fees based on unique CTM values for more than 60 covered materials, wholesalers and distributors must collect information about the material composition of its SKUs properly to report its "covered products" and estimate their forthcoming membership fees. At R.J. Schinner, the company directed interns to disassemble cases of each SKU to weigh the covered materials. For a box of plastic cups packaged in plastic sleeves, for example, interns weighed the corrugate cardboard, plastic sleeves, and plastic cups for each SKU and multiplied the applicable CTM rates by the weights of the packaging materials to estimate the company's cost-per-SKU.[152] Because wholesalers' and distributors' SKUs change frequently, this calculation is a considerable undertaking. Further, because CTM values can change year-to-year and membership fees operate on a fee cadence, these SKU fee estimates are imperfect. Additionally, Mr. Allen testified that the fee on a 16-oz plastic soda cup, based on the weight of the covered materials used in the product and its packaging, was close to a 50% fee on the total cost of the SKU.[153]

NAW's expert witnesses also opined at trial that the RMA creates adverse economic effects nationwide. Dr. Thomas testified that, among other things, the costs imposed by EPR laws like the RMA could require companies in the supply chain to replan their supply chain

---

[152] Tr. at 265-66 (Mr. Rodriguez); *see also* Ex. 20 at Bates 2941.

[153] Tr. at 423 (Mr. Allen).

networks.[154] Dr. Thomas also testified that the incentives of the RMA are not properly aligned because wholesalers and distributors are not positioned to change the packaging of the products they purchase, nor do they have complete information to be able to report accurate volumes to CAA.[155] Additionally, Dr. Thomas and Dr. Lakhan testified that the RMA's exemptions will likely create "free riding" issues. Free riding occurs when a party receives a benefit for which it does not pay.[156] As applied to the RMA, NAW's expert witnesses testified that exempted producers can "free ride" on Oregon's recycling system because they will receive the benefits from Oregon's improved recycling system without having to pay membership fees to an Oregon PRO. The same is true for producers paying a "flat membership fee," whose "covered products" place a greater burden on Oregon's recycling system than would be covered by the flat fee. Dr. Thomas testified that these types of free riding may place some producers at a competitive disadvantage because they will have to pay RMA membership fees while their competitors may not have to pay.[157]

NAW did not raise these concerns before the Oregon Legislature or DEQ during the RMA's legislative and rulemaking processes.[158] After the RMA and other state's EPR law were passed, however, NAW began to shift its resources toward instructing its members about compliance and also toward bringing lawsuits against these laws. According to NAW, it now

---

[154] *See generally id.* at 578-79 (Dr. Thomas).

[155] *Id.* at 567-68.

[156] *Id.* at 580-81.

[157] *Id.* at 582.

[158] *Id.* at 194-95 (Mr. Wild). NAW, however, submitted some regulatory comments after the passage of the RMA. *See id.* at 197.

spends more resources on these issues than on any other, devoting hundreds of hours and more than $2 million to EPR compliance and litigation.[159] NAW adds that it asked DEQ for clarification on the RMA's definitions of "producer" and "covered product," and DEQ referred NAW and its members to CAA, which then advised NAW and its members to attend CAA's webinars. In addition, some NAW members have had fee disputes with CAA. WCP Solutions, for example, requested that CAA adjust an invoice for its 2025 fees because CAA included weights for food serviceware for which WCP Solutions was not the "first sale" into Oregon.[160] CAA initially directed WCP Solutions to pay the invoice in full. After WCP Solutions paid its invoice in part and under protest, CAA gave WCP Solutions credit for the disputed amount.[161]

Similarly, Harbor Foods contacted CAA about a charge based on volumes that Harbor Foods believed was double-reported to CAA by Harbor Foods and another company.[162] CAA told Harbor Foods that, if it discovered any material errors in an initial report, the company timely could amend its report to CAA without incurring any penalties or maluses.[163] CAA also informed Harbor Foods that it would need to file with CAA "a formal adjustment request" to begin the amendment process for its membership fee assessment.[164] Harbor Foods did not submit these forms but did reach a private settlement with the other company.[165]

---

[159] *Id.* at 196.

[160] *See* Ex. 535.

[161] *See id.*

[162] Ex. 90.

[163] Ex. 536.

[164] Ex. 565.

[165] Tr. at 353-56 (Mr. Winkle).

## CONCLUSIONS OF LAW

At trial, NAW challenged the RMA only under the dormant Commerce Clause and the Due Process Clause. For the reasons explained below, neither challenge has merit.

### A. Dormant Commerce Clause

The Commerce Clause of the United States Constitution vests in Congress the power to "regulate Commerce . . . among the several States." U.S. CONST. art. I, § 8, cl. 3. As the Supreme Court has explained, "the Commerce Clause not only vests Congress with the power to regulate interstate trade; the Clause also 'contain[s] a further, negative command,' one effectively forbidding the enforcement of "certain state [economic regulations] even when Congress has failed to legislate on the subject.'" *Pork Producers*, 598 U.S. at 368 (quoting *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995)) (alterations in original); *see also Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019); *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 549 (2015).

But "[p]reventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of 'extreme delicacy,' something courts should do only 'where the infraction is clear.'" *Pork Producers*, 598 U.S. at 390 (quoting *Conway v. Taylor's Ex'r*, 66 U.S. (1 Black) 603, 634 (1861)). That is because "the Commerce Clause by its own force restricts state protectionism," *see Tenn. Wine*, 588 U.S. at 515, by allowing Congress to impose national uniformity if Congress sees fit. *See Pork Producers*, 598 U.S. at 390. The Court, therefore, heeds the "clear instruction" from both the Supreme Court and the Ninth Circuit to exercise judicial restraint in this area. *See Flynt v. Bonta*, 131 F.4th 918, 926 (9th Cir. 2025) (noting "the Supreme Court's clear instruction, repeated in *Pork Producers*, that extreme caution is warranted before a court deploys its implied authority to reject a state law under the dormant Commerce Clause") (clean up).

As the Supreme Court also has stated, an "antidiscrimination principle lies at the 'very core' of our dormant Commerce Clause jurisprudence." *Pork Producers*, 598 U.S. at 369 (quoting *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 581 (1997)); *see also Peridot Tree WA, Inc. v. Wash. St. Liquor & Cannabis Control Bd.*, 162 F.4th 1179, 1184 (9th Cir. 2026) ("The very core of the dormant Commerce Clause is that States may not discriminate against interstate commerce through regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.") (quotation marks omitted).

Thus, when considering a challenge to a state law under the dormant Commerce Clause, a court must first determine whether the law discriminates against interstate commerce. *Day v. Henry*, 152 F.4th 961, 970 (9th Cir. 2025). A discriminatory law is "'virtually *per se invalid*' and will survive only if it 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) (quoting *Or. Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 101 (1994)). There are, however, other related dormant Commerce Clause theories, although each is still animated by the antidiscrimination principle. One theory prohibits states from imposing disproportionate and unreasonable "user fees" for public facilities. *See Nw. Airlines, Inc. v. County of Kent*, 510 U.S. 355, 369 (1994). Another theory provides that "laws that 'regulat[e] even-handedly to effectuate a legitimate local public interest . . . will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *S. Dakota v. Wayfair*, 585 U.S. 162, 173 (2018) (alterations in original) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). This latter theory is sometimes referred to as "*Pike* Balancing.")

NAW argues that the RMA violates the dormant Commerce Clause under each of these three theories, by: (1) discriminating against interstate commerce; (2) imposing an unreasonable

"user fee;" and (3) placing an undue burden on interstate commerce; in other words, by failing the *Pike* Balancing test. The Court will discuss each theory in turn.[166]

**1. Discrimination**

In the context of the dormant Commerce Clause, "[d]iscrimination means 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Day*, 152 F.4th at 970 (quoting *Or. Waste Sys.,* 511 U.S. at 99).

**a. Purpose**

One way to prove discrimination is to show purposeful discrimination. To prove discriminatory purpose, a plaintiff must present evidence that suggests the law was intended to protect businesses located within a state from out-of-state competition. *See Flynt*, 131 F.4th at 926; *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 525 (9th Cir. 2009) (no discriminatory purpose where the evidence suggests that the purpose of a law was to protect California optometrists and ophthalmologists from commercial interests generally rather than specific "out-of-state interests").[167]

NAW argues that the purpose of the RMA is impermissible economic protectionism. In support of this argument, NAW presents internal DEQ documents that discuss the potential

[166] Before trial, the parties briefed whether packaging materials are "instrumentalities" of interstate commerce for purposes of the dormant Commerce Clause. *See* ECF 173 and ECF 174. They are not and thus need not be discussed further. Instrumentalities of interstate commerce are the *means* of transportation or transmission in interstate commerce, not the items transported by those means. *See Pork Producers*, 598 U.S. at 379 n.2 (referring to "instrumentalities of interstate transportation" for purposes of the dormant Commerce Clause as "trucks, trains, and the like").

[167] A law that is designed to protect in-state businesses from "commercial interests generally" does not have a discriminatory purpose. *See Flynt*, 131 F.4th at 926 (quoting *LensCrafters*, 567 F.3d at 525).

economic effects of the RMA. In a November 2023 statement describing the "fiscal and economic impact" of the RMA, DEQ stated:

> Any fiscal impact of proposed rules on PROs will be paid by producer members. One potential negative impact on the public depends on whether and how producers pass on additional costs to consumers in Oregon. This has been difficult to estimate. Economic theory predicts that a portion of producer costs will be passed on to consumers in the form of higher shelf prices, although *producers that sell into multiple states may recover these costs across consumers in multiple states*, *thereby reducing price impacts on the public in Oregon*.[168]

NAW contends that this statement suggests that the Oregon legislature intended the RMA to decrease costs for in-state companies and consumers while increasing costs for out-of-state businesses and consumers. This argument fails for two reasons.

First, NAW mischaracterizes DEQ's statement. DEQ predicted that the RMA would *increase* consumer costs in Oregon, not that it would "benefit in-state economic interests." *See Dep't of Revenue of Ky.*, 553 U.S. at 337-38. DEQ's statement that "producers that sell into multiple states may recover these costs across consumers in multiple states, thereby reducing price impacts on the public in Oregon" means that Oregon consumer costs would likely still rise, just by a lesser degree. This statement does not show a protectionist purpose.

Second, the statement was made by an agency two years after the RMA was passed. *See Maine v. Taylor*, 477 U.S. 131, 150 (1986) ("Furthermore, the comments were made by a state administrative agency long after the statute's enactment and thus constitute weak evidence of legislative intent in any event."). NAW identifies no evidence contemporaneous with the RMA's passage that the Oregon legislature intended the law to benefit the Oregon marketplace to the detriment of interstate competition. Indeed, the only evidence from that time is the expressly

[168] Ex. 107 at 17-18 (emphasis added).

stated legislative purpose of the RMA: to "preserve public health, safety and welfare and conserve energy and natural resources" by minimizing the "unintended consequences" of the state's recycling policies "across the entire life cycle of products," including the "increased levels of pollution, greenhouse gas emissions that contribute to global climate change and reductions in human well-being."[169] Because there is no evidence that the RMA was enacted with a protectionist purpose at the time of its passage, "there is little reason in this case to believe that the legitimate justifications the State has put forward for its statute are merely a sham or a '*post hoc* rationalization.'" *Maine*, 477 U.S. at 148-49 (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 338 n.20 (1979)).

**b. Facial**

Another way to prove discrimination is to show what is referred to as "facial discrimination." A law facially discriminates against interstate commerce when, by its express terms, it treats in-state and out-of-state entities differently. *See, e.g.*, *Granholm v. Heald*, 544 U.S. 460, 467 (2005) ("The differential treatment between in-state and out-of-state wineries constitutes explicit discrimination against interstate commerce."). But "[c]onceptually, of course, any notion of discrimination assumes a comparison of substantially similar entities." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298-99 (1997). Thus, under the dormant Commerce Clause, a state law is *per se* invalid only when it treats differently "persons or entities who are similarly situated" because of their in-state or out-of-state status. *Day*, 152 F.4th at 969 (cleaned up); *see also Tracy*, 519 U.S. at 298.

NAW argues that the RMA is facially discriminatory because of the "small producer" exemption for all Oregon state, local, and "special" governmental bodies, including Oregon

[169] *See* ORS § 459A.860.

public universities.[170] In practice, NAW contends, the exemption would apply to the University of Oregon's sale of branded, packaged merchandise but not to Washington State University's similar products.[171] Thus, NAW asserts, the exemption is unconstitutional facial discrimination because it "advantage[s] in-state firms or disadvantage[s] out-of-state rivals." *Pork Producers*, 598 U.S. at 370. There are several flaws in NAW's argument.

First, NAW lacks Article III standing to challenge this exemption in the RMA.[172] A plaintiff bears the burden of establishing standing for every claim asserted and every form of relief sought. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). Asserting associational standing, NAW must show that its members have standing on their own. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). To establish Article III standing, a plaintiff must establish: (1) an injury in fact that is "concrete and particularized" and "actual or imminent"; (2) "that the injury was caused by the defendant"; and (3) that "the injury will likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). "The injury must be concrete to ensure that it is real and not abstract, and particularized so that it

---

[170] ORS §§ 459A.863(32)(b); 174.109-.117 (defining "public body").

[171] Washington State University has a regional campus in Vancouver, Washington, so the school may publish literature in Oregon or ship branded merchandise into Oregon.

[172] This rule is consistent with the standing doctrine in the equal protection context, where a plaintiff must demonstrate "the denial of equal treatment." *See Braunstein v. Ariz. Dep't of Transp.*, 683 F.3d 1177, 1184 (9th Cir. 2012) (quoting *Ne. Fla. Ch. of Assoc. Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993)). Indeed, the "normal definition of discrimination" is "differential treatment." *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005) (quoting *Olmstead v. L.C.*, 527 U.S. 581, 614 (1999) (Kennedy, J., concurring in judgment)).

affects the plaintiff in a personal and individual way as opposed to a generalized grievance." *Kumar v. Koester*, 131 F.4th 746, 751-52 (9th Cir. 2025) (cleaned up).

NAW argues that its members will suffer higher membership fees because of "free riding" by exempted governmental entities. NAW, however, presented no evidence at trial proving this point, and injury in fact must be "supported adequately by the evidence adduced at trial." *Lujan*, 504 U.S. at 561 (quotation omitted). Because "[i]njury in fact is the threshold requirement for standing," *Kumar*, 131 F.4th at 751, this conclusion does not violate the principle that, in the facial discrimination context, "there is no *de minimis* defense to a charge of discriminatory taxation under the Commerce Clause." *Camps Newfound*, 520 U.S. at 581 n.15 (quoting *Fulton Corp.*, 516 U.S. at 333 n.13 (1996)).[173] Under the dormant Commerce Clause, Defendant may not argue that there is no facial discrimination because the law does not materially or significantly discriminate. The Constitution, however, does not preclude Defendant's argument that NAW has failed to substantiate its claimed injury-in-fact with evidence. Indeed, the Court cannot evaluate the merits of NAW's facial discrimination challenge before NAW has shown that it has standing to make that argument.

Second, NAW lacks standing to challenge the public entity exemption because the interest that NAW seeks to vindicate falls outside the zone of interests protected by the dormant Commerce Clause. *See Yakima Valley Mem. Hosp. v. Wash. St. Dep't of Health*, 654 F.3d 919,

---

[173] *See also New Energy Co. v. Limbach*, 486 U.S. 269, 276 (1988) (rejecting the argument that a statute "should not be considered discrimination against interstate commerce because its practical scope is so limited," because, "where discrimination is patent, . . . neither a widespread advantage to in-state interests nor a widespread disadvantage to out-of-state competitors need be shown"); *Assoc. Indus. of Mo. v. Lohman*, 511 U.S. 641, 650 (1994) ("[A]ctual discrimination, wherever it is found, is impermissible, and the magnitude and scope of the discrimination have no bearing on the determinative question whether discrimination has occurred.").

932 (9th Cir. 2011). In the Ninth Circuit, "a party's claims must fall within 'the zone of interests to be protected . . . by the constitutional guarantee in question.'" *Washington v. Trump*, 145 F.4th 1013, 1024 (9th Cir. 2025) (quoting *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474-75 (1982)), *cert. denied*, --- S. Ct. ----, 2026 WL 1871300 (June 30, 2026). In the context of the dormant Commerce Clause, "[t]he ultimate question . . . is whether [the plaintiff's] claims 'bear more than a marginal relationship to claims addressing a state or county's effort to erect barriers to interstate commerce.'" *Yakima Valley*, 654 F.3d at 932 (quoting *City of L.A. v. County of Kern*, 581 F.3d 841, 847 (9th Cir. 2009)). To meet this requirement, a plaintiff's "alleged injury 'must somehow be tied to a barrier imposed on interstate commerce.'" *Id.* (quoting *City of L.A.*, 581 F.3d at 848).

NAW argues that its injury is caused by RMA bestowing exemptions and thereby creating free riding. Any such free riding, however, would be created because the law exempts certain entities and products. Free riding has no connection to whether the law exempts in-state or out-of-state entities. Indeed, NAW's free riding injury would be the same if the RMA exempted only out-of-state entities and made Oregon public entities register as producers. Because NAW's claimed injury bears only a marginal relationship to the "discriminatory" element of the public entity exemption, its challenge falls outside the zone of interests.

Third, even if NAW had standing, the public entity exemption would still pass constitutional muster. Oregon's public entities, which pay taxes supporting the state's waste management infrastructure and related public programming, are not "similarly situated" to out-of-state public entities, which do not support Oregon's infrastructure. *See Day*, 152 F.4th at 969;

*see also Tracy*, 519 U.S. at 298.[174] Thus, the RMA legitimately excuses Oregon governmental entities from membership fees to advance Oregon's policy goal of shifting its recycling costs from governmental entities to producers.

As the Supreme Court has explained, "[l]aws favoring local government," unlike laws favoring "in-state business over out-of-state competition," "may be directed toward any number of legitimate goals unrelated to protectionism." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 343 (2007). Further, the RMA's public entity exemption does not violate the "central rationale" of the dormant Commerce Clause, which "is to prohibit state or municipal laws whose object is local economic protectionism." *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994); *see also Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 948 (9th Cir. 2013) (a law that "'treat[s] all *private companies* exactly the same' does not discriminate against interstate commerce." (emphasis added) (quoting *United Haulers*, 550 U.S. at 342)). For each of these alternative reasons, NAW's facial discrimination challenge fails.[175]

---

[174] The Ninth Circuit's recent decision in *PacifiCorp v. Sixkiller*, --- F.4th ----, 2026 WL 2277099 (9th Cir. Aug. 7, 2026), is not inconsistent with this conclusion. *See id.* at *8 (where entities producing energy for in-state customers are subject to additional state regulatory burdens, in-state energy producers are "not similarly situated" to out-of-state energy producers "because they are subject to entirely different statutory schemes").

[175] As discussed, the Court concludes that there is no facial discrimination because out-of-state public entities are not similarly situated to in-state public entities. If, however, a higher court were to disagree, the proper remedy in the context of a narrow exemption such as this one would be to extend the exemption to all out-of-state public entities. *See, e.g.*, *Tracy*, 519 U.S. at 311 (rejecting the argument that a tax is facially discriminatory because of the possibility that a state court would "extend the challenged exemption to out-of-state utilities," and "[o]ut-of-state public utilities may therefore also qualify for Ohio's sales and use tax exemption").

**c. Effects**

Finally, a law enacted without either purposeful or facial discrimination, still *might* discriminate if it is discriminatory in its effects. *See Black Star Farms LLC v. Oliver*, 600 F.3d 1225, 1234-35 (9th Cir. 2010). A plaintiff, however, challenging a facially neutral law must present evidence that the law, in fact, has a discriminatory effect. "The mere fact that a statutory regime has a discriminatory *potential* is not enough to trigger strict scrutiny under the dormant commerce clause." *Id.* (quoting *Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 37 (1st Cir. 2007) (emphasis in original)).

Further, "an effect is not discriminatory, in violation of the dormant commerce clause, if it results from natural conditions." *Id.* (brackets omitted) (quoting *Baldacci*, 505 F.3d at 38 n.7). Thus, unlike in the context of facial discrimination, "[t]he *de minimis* standard . . . . cannot sensibly be used to answer the different question of whether discriminatory effect exists." *Baldacci*, 505 F.3d at 38; *see also Black Star Farms*, 600 F.3d at 1235 (affirming grant of summary judgment because plaintiff "adduced no evidence that the in-person exemption causes wine produced by Arizona wineries to constitute a larger share of the total sales in the market"); *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 216 (2d Cir. 2003) (finding a "de minimis advantage to in-state [companies] . . . insufficient to establish a discriminatory intent").

NAW argues that two other "small producer" exemptions—based on either a company's gross revenues or "immediate consumption"—are discriminatory in effect by "chang[ing] the competitive balance" of the Oregon market to the "acute competitive disadvantage" of interstate business. *See Family Winemakers v. Jenkins*, 592 F.3d 1, 5, 12 (1st Cir. 2010). The exemptions read in full:

> "Small producer" means a producer that: . . .

> (c) Has a gross revenue of less than $5 million for the organization's most recent fiscal year; . . .
>
> (f)
>
> > (A) Is a restaurant, food cart or similar business establishment that primarily sells to members of the public food that is generally intended to be consumed immediately and without the need for further preparation, either on or off the premises; and
> >
> > (B) Is not a producer of food serviceware as described in ORS 459A.866 (Determining producers of covered products); or
>
> (g) Operates a single retail sales establishment, has no online sales and is not supplied or operated as part of a franchise or a chain.[176]

At trial, NAW did not present evidence sufficient to trigger strict scrutiny for either the gross revenue exemption or the immediate consumption exemption. Addressing first the gross revenue exemption, NAW states that two hypothetical businesses might have the same effect in Oregon market. If a business that operated only in Oregon had annual gross revenues of less than $5 million, it would qualify for the "small producer" exemption. If another business was part of a larger interstate operation with more than $5 million in annual gross revenues, it would not qualify for that exemption, even if its Oregon-specific operations brought in less than $5 million per year.[177] Regardless of this theoretical possibility, NAW presented no evidence at trial showing that this has occurred. Instead, NAW argues that the Supreme Court invalidated a

---

[176] ORS § 459A.863(32)(c), (f), (g).

[177] NAW hypothesizes two companies that each earn $1 million in gross revenues based on Oregon operations. The first, Company A, operates exclusively in Oregon—and thus qualifies as a "small producer," exempt from the RMA. The second, however, Company B, has interstate operations that earns gross revenues above $5 million. Despite their identical effects in Oregon, NAW argues, Company B must pay fees under the RMA solely because of its interstate operations while Company A is exempt. NAW contends that this is a discriminatory effect.

similar scheme in *Fulton Corp. v. Faulkner*, 516 U.S. 325 (1996), but in that case "[t]here [was] no doubt that the [law] facially discriminate[d] against interstate commerce." *Id.* at 333.[178]

The RMA's gross revenue exemption, however, is more like the law upheld in *Commonwealth Edison Co. v. Montana*, 453 U.S. 609 (1981). In that case, Montana placed a tax on coal that was "computed at the same rate regardless of the final destination of the coal," but 90% of Montana's coal was shipped out-of-state. *Id.* at 613, 618. The Supreme Court rejected the argument that the tax burden was discriminatory in effect because it was borne primarily by out-of-state consumers, explaining that there was no "differential . . . treatment of interstate and intrastate commerce" under the law. *Id.* at 618 (collecting cases). Thus, even if NAW is correct that, practically speaking, more Oregon-only companies may qualify for the gross revenue exemption, that is insufficient to prove discrimination.

Similarly, NAW presented no evidence other than speculation that the immediate consumption exemption would benefit Oregon companies to the disadvantage of out-of-state businesses. Ms. Holmes testified that the immediate consumption exemption "presumably" applied to "Oregon's restaurants and food carts."[179] From this testimony, NAW argues that these exemptions are designed primarily to apply to Oregon businesses. Because the rule applies without regard for where the producer calls home and because NAW presented no evidence that

[178] In *Fulton Corp.*, North Carolina levied an "intangibles tax" on the fair market value of corporate stock owned by North Carolina residents having a business in the state, with residents entitled to calculate their tax liability by taking a taxable percentage deduction equal to the issuing corporation's income subject to tax in North Carolina. 516 U.S. at 327-28.

[179] Tr. at 31-32 (Ms. Holmes).

the exemption actually operated to benefit in-state businesses at the expense of out-of-state competitors, it is not discriminatory in effect.[180]

### 2. User Fees

A user fee is reasonable under the dormant Commerce Clause "if it (1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce." *Nw. Airlines*, 510 U.S. at 369 (citing *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.* ("*Evansville*"), 405 U.S. 707 (1972)). NAW argues under the dormant Commerce Clause that the RMA's membership fees operate as unreasonable user fees for a public facility. Because NAW has failed to show that the RMA discriminates against interstate commerce, only the first two prongs are at issue.

NAW argues that the existence of "free riders" on Oregon's recycling system means that obligated producers necessarily pay more than their fair share of the cost to recycle their goods. In support, NAW cites *Industria Y Distribucion De Alimentos v. Trailer Bridge*, 797 F.3d 141 (1st Cir. 2015), for the proposition that a fee is not fairly apportioned when exemptions occur "with significant frequency." *Id.* at 145. But no one—not DEQ, CAA, or NAW—has attempted to quantify the effect of any exemptions on Oregon's recycling system. The Court cannot

[180] For the same reasons (facial neutrality and lack of evidence demonstrating any actual discriminatory effect), NAW's argument about the value of in-state advertisement also fails. Further, in collecting membership fees, the RMA requires a PRO to accept "the value of print and online advertising services" in lieu of membership fees from newspaper and magazine publisher-members and, in so doing, the PRO "may consider the in-state reach of the advertising when determining the value of the advertising." NAW suggests that an out-of-state publisher would not have the same practical opportunity to qualify for this "advertisement alternative" to membership fees as an in-state publisher. The RMA, however, applies only to products disposed of in Oregon. ORS § 459A.863(6)(b)(J). Thus, an out-of-state publisher *distributing product in Oregon* would likely have the same incentive and opportunity to advertise Oregon's recycling programs as an in-state publisher.

conclude from the mere existence of the RMA's statutory exemptions that any of these exemptions apply "with significant frequency," or that they create a free riding problem that causes a material economic impact on covered producers. Indeed, the *Trailer Bridge* court rejected "conceptually sound" proportionality arguments because "[u]ltimately, . . . the burden lies with [the plaintiffs] to prove that" their concerns were actualized. *Id.* at 145-46. As in *Trailer Bridge*, "[w]hile this record leaves [the Court] unable to definitively hold that the fee *is* a fair approximation . . . , [NAW's] failure to prove the converse requires us to rule against them on this first *Evansville* factor." *Id.* at 146 (emphasis in original).

NAW next argues that the fees are clearly excessive because, according to CAA's 2025 Annual Report, the organization collected $145.5 million but spent only $56.5 million, leaving almost $90 million in excess funds. After reviewing CAA's earmarked reserves, Dr. Lakhan testified that producers "were charged a substantial amount more than the amount that was actually necessary to expand the infrastructure or implement the program."[181] To determine whether fees are "excessive," the Court compares the fees with the "costs incurred in connection with . . . [the] facilities." *Am. Airlines, Inc. v. Mass. Port Auth.*, 560 F.2d 1036, 1038 (1st Cir. 1977). A fee is unconstitutional only if it is "excessive in relation to costs incurred by the taxing authorities." *Evansville*, 405 U.S. at 719.[182] CAA is in only its second year and, as the 2025 Annual Report acknowledges, underspent "due to a variety of factors beginning with

[181] Tr. at 1203 (Dr. Lakhan).

[182] *See also N.H. Motor Transp. Ass'n v. Flynn*, 751 F.2d 43, 47-48 (1st Cir. 1984) (rejecting excessiveness argument because plaintiff "introduced no budget analyses; they did not trace the actual expenditures of the government departments allegedly involved" and therefore did not "satisf[y] their burden of proving the fees constitutionally excessive in relation to costs").

significant uncertainty during the development of the program plan."[183] "The underspend of funds resulted in accelerated Oregon specific operating reserve accumulation and surplus funds for certain program activities, which could reduce Oregon 2026 and 2027 producer fees behind both reduced incremental reserve and program activity funding needs."[184] Given these projections, the Court concludes that NAW did not present evidence sufficient to conclude that the program's fees and budget is "clearly excessive" when compared to the program's needs.

### 3. *Pike* Balancing: Excessive Burden Versus Local Benefits

Because none of the identified provisions of the RMA discriminate against interstate commerce and the law does not impose an unconstitutional user fee, the RMA is constitutional "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Wayfair*, 585 U.S. at 173. As the Supreme Court recently explained in *Pork Producers*, the *Pike* balancing test "has traditionally served as another way to test for purposeful discrimination against out-of-state economic interests." *See Pork Producers*, 598 U.S. at 380.[185] Thus, courts generally do not apply *Pike* balancing unless a statute is discriminatory or the plaintiff makes a threshold showing that the law "imposes a substantial or significant burden on interstate commerce." *Flynt*, 131 F.4th at 925; *Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1146 (9th Cir. 2015).

---

[183] Ex. 97 at 64.

[184] *Id.*

[185] *See also Tracy*, 519 U.S. at 298 n.12 (there is "no clear line" between *Pike* balancing and "facial discrimination," "and several cases that have purported to apply the undue burden test (including *Pike* itself) arguably turned in whole or in part on the discriminatory character of the challenged state regulations"). Thus, the *Pike* test helps courts identify "whether the 'actual purpose,' if not the 'avowed purpose,' of the law was discrimination." *Pork Producers*, 598 U.S. at 378 (quoting *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 474-76 & n.2 (1981) (Powell, J., concurring in part and dissenting in part)).

NAW did not satisfy this threshold requirement of showing that the RMA imposes a substantial or significant burden on interstate commerce. NAW presented anecdotal evidence that its members will face substantial costs to comply with the RMA, but "*Pike* 'protects the interstate market, not particular interstate firms from . . . burdensome regulations.'" *Flynt*, 131 F.4th at 932 (quoting *Exxon Corp. v. Gov. of Md.*, 437 U.S. 117, 127-28 (1978)). That the RMA will impose "increased costs" on producers or "higher costs to consumers" does not "qualify as a substantial burden on interstate commerce." *Nat'l Pork Producers Council v. Ross*, 6 F.4th 1021, 1033 (9th Cir. 2021), *aff'd*, 598 U.S. 356. NAW's expert witnesses did not quantify the theoretical interstate effect of the RMA. At most, they testified that the RMA will impose costs on the supply chain and that, as a result, wholesalers and distributors may need to re-route operations or raise their prices. "In our interconnected national marketplace," however, "many (maybe most) state laws have the 'practical effect' of controlling extraterritorial behavior." *Pork Producers*, 598 U.S. at 374. NAW's evidence that the RMA will affect the supply chain unsuccessfully attempts to revive the "almost *per se*" rule against laws with extraterritorial effects that was explicitly rejected in *Pork Producers*. *See id.* at 374-75.

Moreover, even if NAW had made the requisite threshold showing, the RMA's supply chain burdens are not "clearly excessive" in relation to the putative benefits to Oregon. "Congress itself has recognized local government's vital role in waste management, making clear that 'collection and disposal of solid wastes should continue to be primarily the function of State, regional, and local agencies.'" *United Haulers*, 550 U.S. at 344 (quoting Resource Conservation and Recovery Act of 1976, 90 Stat. 2797, 42 U.S.C. § 6901(a)(4)). Oregon has a great and longstanding interest in protecting its citizens from the externalities created by waste and products at the end of their life, including plastics and other hard-to-recycle materials. In

enacting the RMA, Oregon is exercising two fundamental police powers: mitigating waste pollution and protecting the health and safety of its citizenry. Further, "[e]nvironmental laws often prove decisive when businesses choose where to manufacture goods." *Pork Producers*, 598 U.S. at 374. In conclusion, the RMA does not place burdens on interstate commerce that are "clearly excessive" when compared to the expected benefits, and this is particularly so in the context of other environmental regimes upheld under *Pike* and its progeny.

**B. Due Process**

NAW also contends that the RMA violates the Due Process Clause of the Fourteenth Amendment. First, NAW argues that the RMA constitutes an unconstitutional delegation of regulatory authority to CAA, a private entity that includes many competitors of NAW's members. *See generally Carter v. Carter Coal*, 298 U.S. 238 (1938). Second, NAW argues that the RMA provides insufficient process for NAW's members to challenge CAA's membership fees. After considering a threshold requirement for a claim under the Due Process Clause of the Fourteenth Amendment, the Court will address the substance, or merits, of NAW's two due process challenges.

**1. Threshold Requirement of a Protected Liberty or Property Interest**

Defendant argues that NAW's claim under the Due Process Clause of the Fourteenth Amendment fails at the outset because any such claim requires state action that threatens a claimant's life, liberty, or property. Defendant contends first that no protected interest is implicated by NAW's private nondelegation challenge. Defendant next maintains that the RMA does not create a protected property interest relating to membership fees paid by NAW's members to CAA and thus there in no protected property interest at stake.[186]

---

[186] Defendant concedes that the RMA creates a protected property interest when the DEQ attempts to impose and collect civil penalties but argues that the law provides sufficient process

NAW responds that, in the context of its "private nondelegation" challenge, a regulated competitor has the right to challenge a delegation that is constitutionally offensive without first showing a protected liberty or property interest. The Court rejects NAW's assertion, concluding that state action cannot violate procedural due process unless it risks wrongly depriving a litigant of a protected life, liberty, or property interest. *See Blumenkron v. Multnomah County*, 91 F.4th 1303, 1314 (9th Cir. 2024); *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 571-72 (1972). NAW must, therefore, articulate a protected interest before the merits of its Fourteenth Amendment claims need be addressed, whether under a "private nondelegation" theory or a traditional *Mathews* approach. To explain why the Court has reached this conclusion, the Court begins by recognizing several distinct nondelegation doctrines that have developed. As will be shown, NAW's point may be correct if it were challenging a federal law, namely, an act of Congress. It is incorrect, however, for delegation arguments challenging a state's law.

The "nondelegation doctrine" can refer to any of several constitutional prohibitions of improper delegation of legislative authority.[187] Although stemming from separate constitutional sources (Article I's Vesting Clause, Article II's Appointment Clause, or the Fifth and Fourteenth Amendments' Due Process Clauses), the doctrines are all animated by the same principle: a government body may lawfully exercise only those powers that the people have given to that body. Thus, delegations can generate challenges under several different nondelegation doctrines. *See, e.g.*, *FCC v. Consumers' Research*, 606 U.S. 656, 664, 692 (2025) (evaluating federal law under both Article I nondelegation doctrine and private nondelegation doctrine); *Carter Coal*,

---

to satisfy the balancing test stated in *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976). The Court will address this point below.

[187] *See* ALEXANDER VOLOKH, *The Myth of the Federal Private Nondelegation Doctrine*, 99 NOTRE DAME L. REV. 203, 207-08 (2023).

298 U.S. at 240 (using Article I and private nondelegation principles). Challenging a federal delegation from Congress, however, is distinct from challenging a state delegation from a state legislature. NAW's assertion that it need not identify a protected liberty or property interest conflates the necessary showing under Article I's nondelegation doctrine and the Fourteenth Amendment's private nondelegation doctrine.

The private nondelegation doctrine can trace its roots in *Carter Coal*,[188] a case in which the Supreme Court struck down a federal statute that conferred on a private entity the power to regulate its competitors. 298 U.S. at 311. In the Bituminous Coal Conservation Act, Congress prohibited the United States (or any other contractor) from purchasing bituminous coal from any mine that did not comply with certain wage and hour requirements, but the statute did not articulate those requirements. *Id.* at 310. Instead, the federal law delegated the authority to set those requirements to the producers of more than two-thirds of the tonnage production for the preceding calendar year and "more than one-half the mine workers employed." *Id.* "Put simply, the [law] endowed these majority producers and employers with the authority to set wage and hour requirements the minority producers and employers had to comply with or else forfeit all their customers." *Ass'n of Am. Railroads v. U.S. Dep't of Transp.* ("*AAR III*"), 821 F.3d 19, 28 (D.C. Cir. 2016).

"In the Court's view, for the minority producers 'to accept, in these circumstances was not to exercise a choice, but to surrender to force.'" *Id.* (alterations adopted) (quoting *Carter*

[188] *But see McGautha v. California*, 402 U.S. 183, 272 n.22 (1971) (Brennan, J., dissenting) ("At least since *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)," the Supreme Court has "indicated that due process places limits on the manner and extent to which a state legislature may delegate to others powers which the legislature might admittedly exercise itself."). This line of cases, however, plays no role in considering whether a Fourteenth Amendment due process challenges to a state law first requires a threat to life, liberty, or property.

*Coal*, 298 U.S. at 311). The law "'subjected the dissentient minority . . . to the will of the stated majority,' and conferred on that majority 'the power to regulate the affairs of the unwilling minority.'" *Id.* (alteration in *AAR III*) (quoting *Carter Coal*, 298 U.S. at 311). The Supreme Court invalidated the statute, remarking that it was "legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business." *Carter Coal*, 298 U.S. at 311. The Court continued:

> The difference between producing coal and regulating its production is, of course, fundamental. The former is a private activity; the latter is necessarily a governmental function, since, in the very nature of things, one person may not be [e]ntrusted with the power to regulate the business of another, and especially of a competitor. And a statute which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal liberty and private property.

*Id.*

From *Carter Coal* and its progeny, NAW asserts that an entity suffering from an unfair private delegation made by a state need not identify a specific protected liberty or property interest before challenging that state law under the Due Process Clause of the Fourteenth Amendment. NAW argues that because the delegation may constitute an "unnecessary and unreasonable [restriction] upon the use of private property or the pursuit of useful activities," the very fact that its members are subject to the delegation creates a right to challenge it. *See Wash. ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116, 121 (1928) ("Legislatures may not, under the guise of the police power impose restrictions that are unnecessary and unreasonable upon the use of private property or the pursuit of useful activities.").

As noted earlier, NAW's argument might be correct if a federal delegation by Congress were being challenged under Article I. "The nondelegation doctrine bars Congress from

transferring its legislative power to another branch of Government." *Gundy v. United States*, 588 U.S. 128, 132 (2019). Because "the separation of powers is designed to preserve the liberty of all the people," *Collins v. Yellen*, 594 U.S. 220, 245 (2021), "individuals sustain discrete, justiciable injury from actions that transgress separation-of-powers limitations," *Bond v. United States*, 564 U.S. 211, 222 (2011). Thus, an individual has a "right to challenge the legality of [federal government] conduct on separation-of-powers grounds." *See Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 909 (9th Cir. 2011); *Collins*, 594 U.S. at 245 (remarking that the "right" is "[held] in common with all other citizens who have standing"). Consistent with NAW's position, an improper congressional delegation likely would create a right to sue whenever an individual is harmed by the violation of the separation of powers (and assuming the other standing requirements have been satisfied). *See Collins*, 594 U.S. at 245; *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (collecting cases for proposition that private parties can sue to enjoin federal government officials from violating the Constitution, including under a "separation-of-powers claim").

But the procedural side of the Due Process Clause of the Fourteenth Amendment does not create property rights; it merely protects them. *Roth*, 408 U.S. at 576-77.[189] "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Id.* at 576. As the Supreme Court has explained:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their

[189] *See also Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (observing that "the Constitution protects rather than creates property interests").

> daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

*Id.* at 577.[190]

Thus, unlike an improper *congressional* delegation, a private delegation under state law does not implicate *federal* separation-of-powers principles. The text of the Fourteenth Amendment prohibits only unlawful deprivations of "life, liberty, or property, without due process of law." *See* U.S. CONST. amend. XIV, § 1. Reading that provision in the private delegation context, there can be no "intolerable and unconstitutional interference with personal liberty and private property" stemming from a state law without proof that there is, indeed, some implicated liberty or property. *See Carter Coal*, 298 U.S. at 311. That principle might not be readily apparent from *Carter Coal* or *Consumers' Research*, because, as explained above, the Supreme Court drew from multiple nondelegation doctrines (relying on separation-of-powers and due process principles) to evaluate the *congressional* delegations in those cases. Here, however, because NAW challenges a state law under the Fourteenth Amendment, NAW must first show that it has a protected liberty or property interest before it may invoke the protections of the Fourteenth Amendment, either under a private nondelegation theory or under a *Mathews* theory.[191]

In attempting to satisfy this standard, NAW argues that there is a protected property interest in retaining money that is in a person's possession—irrespective of the legitimacy of the

[190] NAW does not argue that the RMA violates any "substantive due process" rights of NAW or its members.

[191] In addition, at least one other court performed a threshold protected interest inquiry before evaluating a private nondelegation challenge to a state law. *See Gen. Elec. Co. v. N.Y. State Dep't of Labor*, 936 F.2d 1448, 1453 (2d Cir. 1991).

state's claim to it. *Cf. McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco*, 496 U.S. 18, 36 (1990) ("[E]xaction of a tax constitutes a deprivation of property . . . ."); *see Schwarm v. Craighead*, 552 F. Supp. 2d 1056, 1083 (E.D. Cal. 2008) ("[I]t is undisputed that money constitutes a property interest protected by the Fourteenth Amendment."); *Thomas v. County of Humboldt*, 2024 WL 5242613, at *1-2 (9th Cir. Dec. 30, 2024) (unpublished) (reversing dismissal of procedural due process claim challenging law imposing "administrative penalties and fees," in part because plaintiffs plausibly alleged property interest in "finances and the full use and enjoyment of their property"). Defendant responds only by stating that there is no statutory basis for finding a property interest in the RMA.

Typically, to determine whether there is a protected property interest, a court looks to "the language of the statute" that allegedly creates the property interest "and the extent to which the entitlement is couched in mandatory terms." *Dudley v. Boise State Univ.*, 152 F.4th 981, 990-91 (9th Cir. 2025) (quoting *Redd v. Guerrero*, 84 F.4th 874, 893 (9th Cir. 2023)). But property interests also can be "defined by existing rules or understandings that stem from an independent source such as state law." *Roth*, 408 U.S. at 577. *Roth* suggests that "actual ownership of . . . money" is a core "property interest protected by procedural due process." *See id.* at 571-72.

This question presents a close call, but the Court agrees with Defendant that there is no statutory basis for finding a threatened property or liberty interest in the RMA.[192] The Court understands, however, that actual ownership of money is a core property interest protected by

[192] The Court has considered and rejects NAW's second proffered property interest—that, because fees assessed pursuant to the RMA must be "calculated according to a specific formula," producers have a "'legitimate claim of entitlement' to [a] fee that is set pursuant to" that schedule. *See Spectrum Pac. W., LLC v. Imperial Irrigation Dist.*, 2025 WL 2462443, at *6 (S.D. Cal. Aug. 26, 2025) (quoting *Armstrong v. Reynolds*, 22 F.4th 1058, 1076-77 (9th Cir. 2022)). Unlike the fee schedule in *Spectrum Pacific West*, however, the RMA does not provide any specific formula by which membership fees in a PRO must be calculated.

procedural due process. Nevertheless, application of that principle to the facts here is unclear. Based on the Court's analysis of the merits of NAW's due process arguments, however, which the Court rejects as explained below, the Court will assume without deciding that NAW had satisfied the threshold requirement of showing a protected property interest.

**2. NAW's "Private Delegation" Argument**

As noted, the Due Process Clause is violated when a self-interested private entity is "[e]ntrusted with the power to regulate the business . . . of a competitor." *Carter Coal*, 298 U.S. at 311. Private parties, however, may assist an agency, provided that the private entity "functions subordinately to" the agency and is subject to its "authority and surveillance." *See Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940); *Consumers' Research*, 606 U.S. at 692 (quoting same). Thus, when a private entity "plays an advisory role" to an agency, the legislature or agency sets criteria for the private entity's decision-making, and the agency retains ultimate "decision-making authority," the law is constitutional. *See Consumers' Research*, 606 U.S. at 693-95; *see also Gen. Elec. Co.*, 936 F.2d at 1455 ("[A] legislative body may not constitutionally delegate to private parties the power to determine the nature of rights to property in which other individuals have a property interest, without supplying standards to guide the private parties' discretion."). Private parties do not act subordinately to an agency when they "occupy positions of authority" and the agency is "powerless to overrule" the private party. *See Ass'n of Am. Railroads v. U.S. Dep't of Transp.* ("*AAR IV*"), 821 F.3d 19, 35 (D.C. Cir. 2016).

NAW argues that the RMA violates the private nondelegation doctrine because of four characteristics of CAA and its implementation: (1) CAA is a self-interested private entity; (2) DEQ's review of CAA's fee-setting methodology did not include the specific formula used to generate the CTM values; (3) CAA has "extensive private enforcement authority" through its contracts, which allow for private arbitration over fee disputes; and (4) producers have no

feasible alternative to joining CAA. But the RMA does not require that producers join CAA; producers may form their own PRO or avail themselves of the RMA's private recycling rule.

NAW argues that creating a different PRO is not feasible, meaning that joining CAA "in these circumstances, is not to exercise a choice, but to surrender to force." *See Carter Coal*, 298 U.S. at 311. The "choice" described in *Carter Coal*, however, was far more illusory than the ability to form one's own PRO under the RMA. The *Carter Coal* law required that any noncompliant coal producer forfeit all federal contracts and incur a 15% excise tax on all bituminous coal. *Id.* at 289, 310-11. NAW argues that there is no feasible alternative to joining CAA because CAA is the only approved PRO and, if it is not a member of a PRO, NAW is subject to civil penalties. DEQ, however, has never denied any PRO application (including one from any of NAW's members). Indeed, witnesses from DEQ testified that only CAA has completed the regulatory application and approval process. Thus, based on the trial record, the Court cannot conclude that joining CAA is akin to "surrendering to force." Despite the practical difficulties identified by NAW's members in forming their own PRO,[193] the option exists under the RMA.[194]

Even if forming a PRO were difficult in the manner described by NAW, producers can avoid joining a PRO by privately recycling all "covered products" for which they are

---

[193] NAW states that a putative PRO would have to pay DEQ $150,000 to review its proposed Plan, engage in a lengthy review process, and pay millions of dollars in annual fees to DEQ to operate if accepted. Also, a producer "must register with and be a member of a [PRO] that administers a producer responsibility program," ORS § 459A.869(1), so a producer's leaving CAA to join another PRO would temporarily place it out of compliance with the RMA and subject it to regulatory penalties. Tr. at 59-60 (Ms. Holmes).

[194] For this reason, the Court need not address NAW's arguments that CAA gives its founding members a competitive edge through CAA's confidentiality rules or the personal representatives to which the "large producers" have access.

responsible.[195] This private recycling rule exempts products from the RMA's reach.[196] If an entity were privately to recycle all otherwise "covered products" for which they were responsible, they would no longer meet the definition of "producer,"[197] and for that reason, they would not be obligated under the RMA to register with a PRO.[198] Thus, because the RMA does not obligate NAW's members to join CAA, CAA's self-interestedness, DEQ's review of CAA's fee-setting methodology, and CAA's contracts are not relevant to NAW's due process challenge.

In addition, NAW raises the argument that having multiple PROs, or "competition" among several PROs, might not "actually solve the delegation problem, if the competing PRO was simply being formed by other large companies, and without addressing the problems of the lack of oversight, transparency, and accountability."[199] NAW made this argument in a footnote, and generally, a party must specifically and distinctly argue an issue in its opening brief to present the issue for consideration. *See, e.g.*, *Crime Just. & Am., Inc. v. Honea*, 876 F.3d 966, 978 (9th Cir. 2017) ("Issues raised in a brief which are not supported by argument are deemed abandoned." (quoting *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988))); *Ventress v. Japan Airlines*, 747 F.3d 716, 723 n.8 (9th Cir. 2014) (declining to address an "undeveloped

---

[195] *See* ORS § 459A.869(13).

[196] Compare *id.* ("A producer may demonstrate to the department that a material is exempt . . .") with *id.* at (1), (4) (describing scenarios under which "a producer is not required to be a member") and ORS § 459A.872 (exempting small producers from member requirement).

[197] *See* ORS 459A.863(22).

[198] If, however, "only a portion of the material sold in or into this state by a producer meets the criteria of [the private recycling rule], the portion that meets the criteria is exempt and the portion that does not meet the criteria is a covered product," requiring the producer to register as a member with a PRO. ORS § 459A.869(13)(b).

[199] ECF 196 at 33 n.4 (int. p. 23).

argument . . . not supported by citations to the record, argument, or any legal authority”). The Court nevertheless considers whether the structure of the RMA itself is constitutionally defective in this manner. As explained below, it is not.

NAW’s argument that any delegation, either to CAA or to another PRO, would be unconstitutional is a facial challenge to the RMA. *See Gen. Elec. Co.*, 936 F.2d at 1456. A facial challenge “is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exist under which the [a]ct would be valid.” *United States v. Salerno*, 481 U.S. 739, 745 (1987). To evaluate a facial challenge, the Court relies on the record demonstrating one application of the statute. *See, e.g.*, *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (affirming constitutionality of statute under facial challenge because “the provision is constitutional as applied to the facts of Rahimi’s own case”); *Gen. Elec. Co.*, 936 F.2d at 1457 (looking to “the record in this case” to evaluate facial challenge).

A PRO must be an organization made up of producers, and “[t]he power to self-interestedly regulate the business of a competitor is, according to *Carter Coal*, anathema to ‘the very nature of things,’ or rather, to the very nature of government function.” *AAR III*, 821 F.3d at 29 (quoting *Carter Coal*, 298 U.S. at 311). As in *Carter Coal*, any producers running a PRO may have “conflicting and even antagonistic interests” to the competitor-members it imposes membership fees on. *See Carter Coal*, 298 U.S. at 311. Taking CAA, for example, NAW highlights that CAA’s Founding Members have loaned CAA more than $41 million[200] and that, under the Plan, “[d]ecisions relating to program budgeting and producer fees . . . reside with the National Board.”[201] Because the RMA mandates that membership fees “must be sufficient to

[200] Tr. at 48-49 (Ms. Holmes).

[201] Ex. 15 at 16.

meet the financial obligations" of the PRO,[202] the National Board has both a statutory basis for and an economic interest in charging members higher membership fees to recoup the funds that CAA owes its Founding Members.[203]

But the potential self-interest of a delegee is not the end of the private nondelegation analysis. A self-interested delegee may assist an agency, so long as the government body retains ultimate decision-making authority. *See Sunshine Anthracite*, 310 U.S. at 388, 399. The law in *Sunshine Anthracite*, for example, allowed private coal producers to propose minimum prices for coal. In upholding the delegation, the Supreme Court noted that the industry "function[ed] subordinately to the Commission" which ultimately "determine[d] the prices" under the law and "ha[d] authority and surveillance over the activities of the" producers. *Id.* at 399. Thus, even if a PRO would be self-interested in administering the RMA, the relevant question is whether DEQ retains appropriate oversight over the entity.

Elsewhere in its brief, NAW argues that the RMA fails to provide producers with a meaningful opportunity to contest membership fees. NAW states that the RMA does not statutorily require a PRO to provide DEQ with all information necessary to ensure that a PRO will comply with the RMA, including the RMA's prohibition against cross-subsidization. In CAA's case, DEQ's review of the fee-setting methodology was limited to CAA's explanation in the Plan, including Appendix G. That appendix, however, does not include the specific formula, or the "thousands" of datapoints that CAA used to generate the CTM values, and DEQ has never reviewed this information.[204] Further, by regulation, CAA (or any PRO) may change these inputs

---

[202] ORS § 459A.884(1).

[203] In addition, in *Carter Coal*, the delegation was made to a single competitor.

[204] *See* Tr. at 887 (Ms. Portley).

without filing a formal amendment with DEQ, for "[a] producer responsibility organization's routine, annual updating of base fee rate amounts to align with . . . updated material cost allocations from related studies does not constitute a method change and will not require a program plan amendment."[205] In addition, because no algorithm or formula to calculate the CTM values must be set forth in the Plan, a PRO could adjust the CTM value formula itself without DEQ approval, provided the PRO follows the same methodology and approach outlined in its approved Plan for calculating *membership fees*.[206]

With this argument, NAW appears to concede that DEQ must approve a PRO's Plan which, in CAA's case, included the CTM values for each covered material. Because DEQ lacks information about how CAA calculates the CTM values, NAW contends, DEQ cannot adequately review the propriety of the values. The Supreme Court, however, rejected a similar challenge in *Consumers' Research*. *See* 606 U.S. at 695. The statute there required a private, for-profit corporation owned by an association of carriers to estimate the expenses for the Universal Service Fund by totaling individual carrier projections submitted to it by applying FCC rules to the figures. The challenger conceded that the agency approved the corporation's projections but argued that "the problem instead is that the approval is . . . simply rubber-stamping." *Id.* (cleaned up). In rejecting the argument, the Supreme Court explained that "[i]t is sufficient in such schemes that the private party's recommendations . . . cannot go into effect without an agency's say-so, regardless of how freely given." *Id.* The Court explained that the FCC may not formally reject the corporation's figures because the corporation "informally shares its projections with

---

[205] OAR 340-090-0750(1) ("A producer responsibility organization's routine, annual updating of base fee rate amounts to align with . . . updated material cost allocations from related studies does not constitute a method change and will not require a program plan amendment.").

[206] *See id.* at (1), (2).

the Commission before it publicly submits them, so that much of the discussion between the [corporation and agency] occurs behind the scenes." *Id.* (internal quotation marks omitted).

The evidence presented at trial shows that the RMA's Plan review process by DEQ proceeds similarly. Ms. Portley testified that DEQ reviewed Appendix G during the Plan approval process and directed that CAA make several substantive changes to its fee methodology, both the public facing Plan and in Appendix G.[207] Further, when reviewing Appendix G, DEQ did its own calculations to ensure that the CTM values reflected the RMA's rule against cross-subsidization and that non-recyclables were charged more expensive fees than recyclables. Mr. Allaway served as DEQ's "technical specialist for vetting that Appendix G," and he fulfilled DEQ's statutory requirement against cross-subsidization.[208] He testified that his review of the CTM values was an iterative process, during which he asked CAA about any CTM values where he did not initially understand the underlying calculations. And Mr. Allaway relied on his familiarity with the Cascadia model and individuals working at CAA. In this manner, CAA "informally share[d] its projections" about the CTM model with DEQ before the agency approved the Plan, "so that much of the discussion . . . occurr[ed] behind the scenes." *Consumers' Research*, 606 U.S. at 695. What matters for the constitutional inquiry is that DEQ is the body that ultimately approved the fee-setting methodology, including the CTM values. *See id.*

The law also requires only that base fee rates be "approximately proportional to the covered products' relative contribution to the financial obligations of the [PRO]."[209] Although

[207] Tr. at 809 (Ms. Portley).

[208] *Id.* at 811.

[209] ORS § 459A.884(3)(b).

NAW argues that DEQ cannot know for certain whether the material costs are truly proportionally allocated, the text of the RMA does not require that level of precision. Although NAW prefer that the RMA had different demands, "[t]hose matters . . . relate to questions of policy, to the wisdom of the legislation, and to the appropriateness of the remedy chosen—matters which are not [the Court's] concern." *See Sunshine Anthracite*, 310 U.S. at 394. Because the PRO "plays an advisory role" to DEQ, the RMA sets criteria for the PRO's decision-making, and DEQ retains ultimate "decision-making authority," the RMA does not violate the private nondelegation doctrine. *See Consumers' Research*, 606 U.S. at 693-95.

**3. Processes Related to Assessing and Collecting Membership Fees**

Finally, NAW argues that the RMA fails to provide procedural safeguards against unlawful assessments and exactions of membership fees, because there is no "fair opportunity to challenge the accuracy and legal validity" of the fees assessed and no "clear and certain remedy" for amounts unlawfully collected. *See McKesson Corp.*, 496 U.S. at 36, 39. Because the state's interests play a role in determining the procedural safeguards that the state must provide to illegally or erroneously deprived taxpayers, *see id.* at 50, the Court evaluates this argument by considering the *Mathews* factors: "(1) the private interest affected; (2) the risk of erroneous deprivation through the procedures used, and the value of additional procedural safeguards; and (3) the government's interest, including the burdens of additional procedural requirements." *Diamond S.J. Ent., Inc. v. City of San Jose*, 100 F.4th 1059, 1069 (9th Cir. 2024) (quoting *Yagman v. Garcetti*, 852 F.3d 859, 864 (9th Cir. 2017)).

Even assuming NAW had identified a sufficient property interest in the money its members may pay as membership fees, Defendant argues that the Court need not engage in any *Mathews* balancing because a "deprivation of property does not occur when individuals voluntarily relinquish their rights." *Schwarm*, 552 F. Supp. 2d at 1083 (citing *Ulrich v. City &*

*County of S.F.*, 308 F.3d 968, 974 (9th Cir. 2002)). This principle is well-settled in the employment context.[210] In *Schwarm*, the Eastern District of California applied it in a regulatory fee context, holding that there was no property deprivation when a law allows a plaintiff either to enroll in a voluntary diversion program to pay a fee or "face the possibility of a criminal proceeding conducted in accordance with due process." 552 F. Supp. 2d at 1083 (quoting *Hamilton v. Am. Corrective Counseling Servs., Inc.*, 2006 WL 3332828, at *4 (N.D. Ind. Nov. 14, 2006) and collecting cases for same proposition). The court in *Schwarm* also explained that "unlike cases where the government garnishes a plaintiff's wages or levies the plaintiff's bank account, plaintiffs in this case voluntarily sent payments to [the government contractor]." *Id.* The Court agrees that NAW's members' participation in CAA is voluntary, because they could otherwise form their own PRO, engage in private recycling, avoid their obligations under the RMA together and subject themselves to civil fees, or simply not participate in the market.[211] Thus, there is no property deprivation associated with membership fees.

But even assuming that there is a property deprivation, the RMA affords sufficient procedural safeguards under *Mathews*. For purposes of this analysis, the Court assumes that NAW's members' property interest in PRO membership fees is substantial. In resolving how much process is due to protect that interest, NAW asks the Court to consider CAA's fee cadence and the private arbitration provision contained in the CAA contracts. DEQ's approval of these features of CAA's Plan does not render the RMA unconstitutional.

---

[210] *See Garcia v. City of Albuquerque*, 232 F.3d 760, 770 (10th Cir. 2000) (no deprivation of property interest in continued employment when plaintiff voluntarily resigned); *Hargray v. City of Hallandale*, 57 F.3d 1560, 1567 (11th Cir. 1995) (same); *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172-73 (4th Cir. 1988) (same).

[211] Defendant also argues that there is no state action associated with CAA's private enforcement of its contracts.

NAW first argues that RMA membership fees are improperly "retrospective" and as a result its members have no meaningful opportunity to alter their conduct to avoid or offset these fees. *Retroactive* legislation implicates similar due process concerns on an even greater scale, yet the Supreme Court "repeatedly" has upheld retroactive tax measures against due process challenges. *See United States v. Carlton*, 512 U.S. 26, 30 (1994) (collecting cases). In *Carlton*, for example, the Supreme Court rejected the argument that a retroactive tax violated due process because a taxpayer detrimentally relied on a pre-amendment version of the tax code. *Id.* at 33. The Supreme Court explained that the taxpayer's "reliance alone is insufficient to establish a constitutional violation." *Id.* Rather, the Court stated, "[p]rovided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches . . . ." *Id.* at 30-31 (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729-30 (1984)). Here, the Court received evidence at trial that the fee cadence is a rational means to further a legitimate legislative purpose. Because the RMA is designed adequately to fund an updated recycling system and require producers to internalize their cost externalities, the fee cadence ensures that the PRO is collecting enough money to account for the volumes of covered product brought into the state and placed into the state's recycling system. Also, as explained below, a producer has adequate process before it must pay a membership fee to CAA.

NAW next argues that there is insufficient procedure through which a producer can pursue review of its membership fee assessment because of the mandatory and binding arbitration provision contained in the Oregon Addendum. At the outset, the Court notes that arbitration before a neutral decisionmaker can provide sufficient due process. *See, e.g.*, *Lyeth v.*

*Chrysler Corp.*, 929 F.2d 891, 895 (2d Cir. 1991) ("In the context of a statutory scheme that involves compulsory arbitration, due process does not guarantee any particular form of state procedure."). Indeed, "a state may choose the remedy best adapted, in the legislative judgment, to protect the interests concerned, provided its choice is not unreasonable or arbitrary, and the procedure it adopts satisfies the constitutional requirements of reasonable notice and opportunity to be heard." *Hardware Dealers' Mut. Fire. Ins. Co. of Wis. v. Glidden Co.*, 284 U.S. 151, 158 (1931) (upholding Minnesota insurance law requiring binding arbitration as to amount of loss). The Court need not reach the issue of whether arbitration itself constitutes sufficient process here, however, because the arbitration requirement is not derived from the RMA.

NAW argues that the Oregon Addendum, under which CAA may collect a one percent penalty, subjects it to a second enforcement regime in which it is also entitled to due process. When a producer has a dispute with CAA about a payment that may be due, the Oregon Addendum permits the producer to go to court to seek to enjoin arbitration proceedings until after any civil penalty proceedings with DEQ have been exhausted. If the producer is correct that CAA has miscalculated its fee, this order of operations would likely relieve the producer of any contractual late fee associated with the miscalculated fee amount. Indeed, the evidence received at trial shows that CAA, DEQ, and individual producers, such as Harbor Foods and WCP Solutions, have been able successfully to resolve fee disputes informally.

Finally, the only enforcement mechanism that the law itself provides—civil penalties assessed by DEQ—has substantial procedural protections. Although DEQ may assess civil penalties up to $25,000 per day, the risk of erroneous deprivation is minimal. Although NAW characterizes the civil enforcement scheme as distinct from the PRO's penalty collection process, DEQ will only pursue civil enforcement after the PRO notifies DEQ of an infraction. Before

DEQ, a producer is entitled to a notice-and-cure period, a hearing before an ALJ, and a court appeal. Further, no penalty payment is due to DEQ until all appeals have been exhausted. This process is more than adequate under the Fourteenth Amendment.

## CONCLUSION

For the reasons stated in these Findings of Fact and Conclusions of Law, after a five-day court-trial, the Court concludes that Oregon's Plastic Pollution and Recycling Modernization Act does not violate either the dormant Commerce Clause or the Due Process Clause of the United States Constitution.

**IT IS SO ORDERED**.

DATED this 27th day of August, 2026.

Michael H. Simon
United States District Judge