Darin Sands, OSB No. 106624
dsands@bradleybernstein.com
BRADLEY BERNSTEIN SANDS LLP
1211 NW Glisan St., Ste 204
Portland, OR 97209
Telephone: +1 503-734-2480

David R. Carpenter*
drcarpenter@sidley.com
Caleb J. Bowers*
cbowers@sidley.com
SIDLEY AUSTIN LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213 896 6000

Gordon D. Todd*
gtodd@sidley.com
Richard W. Smith*
rwsmith@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736 8000

* *Pro hac vice*

Attorneys for Plaintiff NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS,<br><br>Plaintiff,<br>v.<br><br>LEAH FELDON, DIRECTOR, OREGON DEPARTMENT OF ENVIRONMENTAL QUALITY, in her official capacity,<br><br>Defendant. | Case No. 3:25-cv-01334-SI<br><br>**PLAINTIFF'S MOTION FOR STAY PENDING APPEAL**<br><br>**Complaint Filed: July 30, 2025** |

## L.R. 7-1(A) CERTIFICATION

Counsel for Plaintiff National Association of Wholesaler-Distributors ("NAW") conferred with counsel for Defendant Leah Feldon, in her official capacity as Director of the Oregon Department of Environmental Quality ("DEQ"), on October 16, 2026, regarding this motion. The parties were unable to resolve the issues.

## MOTION FOR STAY PENDING APPEAL

Pursuant to Federal Rule of Civil Procedure 62(d), Plaintiff National Association of Wholesaler-Distributors respectfully moves to stay the judgment and reinstate the preliminary injunction this Court entered on February 6, 2026, pending appeal.

## INTRODUCTION

In January 2027, months before the Ninth Circuit will hear argument on the merits in Plaintiff's appeal, CAA will issue its next invoices to NAW's members. Members who pay will have no way to recover the money if the RMA is held unconstitutional; and members who do not will accrue compounding late fees and expose themselves to enforcement action by DEQ. As the Court has already found once, members caught in this double bind face irreparable harm whichever way they choose. That is no less true today.

The Court also need not reconsider its findings of fact and conclusions of law, or even find that reversal is likely, for a stay to issue. Rather, it is enough that an appeal presents "serious legal questions" on the merits. *Leiva-Perez v. Holder*, 640 F.3d 962, 968 (9th Cir. 2011). NAW respectfully submits that this appeal does exactly that. The issues on appeal turn on complex questions of law—some of which the Court recognized as "close" and "unclear," Dkt. 205 ("Trial Order") at 59–60—about the reach of *Pike* balancing after *Pork Producers*, the voluntariness of participation in a scheme enforced by civil penalties, and the degree of state oversight the private nondelegation doctrine requires. On each, the unsettled state of the doctrine and the novelty of the RMA's regulatory structure suggest that reasonable jurists could disagree.

The balance of hardships tips sharply in favor of NAW and thus supports a stay. As the evidence at trial showed, CAA Oregon currently has approximately $90 million in reserves, having significantly over-collected in fees compared to what it has spent. Continuing a stay of DEQ enforcement as to NAW's members will not affect the Oregon program in any way. Further, CAA has continued to invoice NAW's members throughout the injunction period and remains free to pursue those fees if the judgment is affirmed. NAW's members, by contrast, are at risk of not being able to recover what they paid if the program is found unconstitutional.

Because the harm to NAW's members is imminent and irreversible while Defendant faces no harm whatsoever, the Court should stay the judgment and restore the status quo that governed from February through August until the appeal is resolved.

## LEGAL STANDARD

Federal Rule of Civil Procedure 62(d) authorizes a district court to "restore[ ] or grant an injunction" while "an appeal is pending from [a] . . . final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction." Fed. R. Civ. P. 62(d). Courts generally consider four factors in evaluating the propriety of a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009). Where, as here, the government is the opposing party, the third and fourth factors "merge." *Id.* at 435.

The Ninth Circuit balances these factors on a "sliding scale," such that "a stronger showing of one element may offset a weaker showing of another." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020); *see also Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) ("If anything, a flexible approach is even more appropriate in the stay context."). An applicant for a stay thus "need not demonstrate that it is more likely than not that they

will win on the merits." *Leiva-Perez*, 640 F.3d at 966. So long as the applicant can establish that irreparable injury is "probable," a stay should issue upon a showing of "either: (a) a strong likelihood of success on the merits and that the public interest does not weigh heavily against a stay; or (b) a substantial case on the merits and that the balance of hardships tips sharply in the petitioner's favor." *Id.* at 970.

## I. NAW'S MEMBERS ARE LIKELY TO SUFFER IRREPARABLE INJURY IN THE ABSENCE OF A STAY.

The likelihood of irreparable injury is at least as strong now as it was when the Court entered preliminary relief earlier this year, and is only further strengthened by the facts learned at trial and since.

CAA will issue its next invoices to NAW's members in January 2027. *See* Ex. A ("Allen Decl.") ¶ 6; Ex. B ("Rodriguez Decl.") ¶ 6; Ex. C ("Winkle Decl.") ¶ 6. Those invoices will come due while the appeal is pending. Absent a stay, each member will have to decide, months before the Ninth Circuit rules, whether to pay CAA or to withhold payment. Neither course avoids irreparable harm.

On the one hand, paying fees now subjects members to irreparable harm because those funds likely could not be recovered even if NAW prevails on appeal. *See Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1305 (2010) ("If expenditures cannot be recouped, the resulting loss may be irreparable."). No monetary relief would be available from DEQ, which neither receives nor holds the producer fees and, in any event, cannot be sued for damages under the doctrine of sovereign immunity. *See Pittman v. Or., Emp't Div.*, 509 F.3d 1065, 1071–73 (9th Cir. 2007); *see* I Trial Tr. 80:20–81:6 (Holmes). Nor is there any clear path to recovery from CAA, whose contracts make termination a producer's "sole and exclusive remedy" for CAA's failure to administer the program as approved. *See* Trial Order at 30 (quoting Ex. 34 § 2.5). Even if members could assert a claim for damages against CAA, if the program is ruled unconstitutional and CAA Oregon winds down or declares bankruptcy, CAA's members could at best hope to recover only a share of what they

paid, taking into account CAA's ongoing expenditures and amounts that could be directed to refund other members or satisfy other creditors. *See Philip Morris USA*, 561 U.S. at 1304–05 (finding irreparable harm where it is probable that "a substantial portion" of fees paid now "will be irrevocably expended" before ruling on the merits); *Friends of the Everglades, Inc. v. Sec'y of U.S. Dep't of Homeland Sec.*, 2025 WL 2598567, at *11 (11th Cir. Sept. 4, 2025) (finding irreparable harm because "[a]ny funds that have been spent are . . . unrecoverable"). To date, CAA has identified no mechanism by which a member could recover fees paid under a statute later held unconstitutional, and NAW's members are aware of none. Allen Decl. ¶ 9; Rodriguez Decl. ¶ 5; Winkle Decl. ¶ 11. Where, as here, a party has no legal avenue to recoup a compelled payment, the resulting loss is irreparable. *See Philip Morris USA*, 561 U.S. at 1304–05.

On the other hand, members who withhold payment are assessed compounding late fees of one percent per month—which CAA continued to impose throughout the injunction period and has not indicated it will waive—and expose themselves to enforcement. *See* Allen Decl. ¶¶ 4–5; Rodriguez Decl. ¶ 4; Winkle Decl. ¶ 3. The Ninth Circuit has "routinely held that this double bind"—that is, the Hobson's choice between violating the law and facing liability for noncompliance, or complying and suffering unrecoverable costs—"constitutes irreparable harm." *County of King v. Turner*, 2026 WL 2489361, at *14 (9th Cir. Aug. 25, 2026) (collecting cases); *see Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). This Court reached the same conclusion when it granted preliminary relief. *See* Feb. 6, 2026 Hr'g Tr. 97:23–25.

Enforcement of the RMA also undermines key business relationships cultivated by NAW members. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *see also Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1324 (9th Cir. 1994) (recognizing "loss of business opportunity" as irreparable harm). Even prior to judgment, members had already lost customers to the

RMA. Harbor Foods, for example, lost CKE (the parent company of Carl's Jr.) as a customer after CKE took the position that its products were not subject to the RMA. Winkle Decl. ¶ 10. And when RJ Schinner announced a price increase to offset RMA fees in 2025, customers told it they would be "shopping elsewhere," I Trial Tr. 283:8–12 (Rodriguez) and its largest Oregon food-serviceware distributor responded that it "[a]int paying it," Ex. 16.

These losses will only grow over the coming months. All three producer-members who testified at trial expect their firms to change their Oregon pricing before the end of the year. Allen Decl. ¶ 8; Rodriguez Decl. ¶¶ 9–10; Winkle Decl. ¶ 9. Price increases of that kind have cost members customers once already, and will only continue to result in NAW's members losing "a substantial amount of Oregon business." *See* Rodriguez Decl. ¶ 9; *see also Novedades Y Servicios, Inc. v. Fin. Crime Enf't Net.*, 181 F.4th 961, 978–79 (9th Cir. 2026) (finding irreparable harm where customers "planned to go" to competitor). Other members have begun dropping products altogether rather than continue paying fees their competitors avoid. *See* Allen Decl. ¶ 7 (describing decision to discontinue a private label paper product, which "shifts the reporting and fee obligation to [the manufacturer]" and "removes the cost disadvantage WCP has carried against" competitors that are exempt or "not reporting to CAA"). Decisions like these—raising prices, dropping products, shifting obligations to suppliers—unsettle the relationships on which distributors depend, inflicting irreparable harm on the goodwill members have spent years building. C*f. Vital Distribs., LLC v. Pepperidge Farm, Inc.*, 2024 WL 1484198, at *16 (E.D. Cal. Apr. 6, 2024) (finding irreparable harm where disruption of a longstanding distribution relationship threatened loss of goodwill and created "friction with retailers resulting from substantial uncertainty"). Members should not be forced to incur lasting damage to their business relationships before the Ninth Circuit has decided whether the law that imposes those costs is constitutional.

With the preliminary injunction dissolved, NAW's members face the same choice the Court found intolerable in February—forfeit substantial sums with no realistic prospect

of recovery, or withhold payment and invite DEQ enforcement—on top of the mounting threat to key business relationships. Members should not have to choose between restructuring their businesses and paying fees they may never recover before the Ninth Circuit has ruled, and "Damocles's sword does not have to actually fall" for relief to be warranted. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). The Court should thus reinstate the injunction to prevent these harms from becoming irreversible while the Ninth Circuit considers the appeal.

## II. NAW HAS A SUBSTANTIAL CASE ON THE MERITS FOR APPEAL.

The Court need not reconsider its conclusions in the Trial Order or determine that reversal is even more likely than not. *See Leiva-Perez*, 640 F.3d at 967 ("[T]his stay factor does not require the moving party to show that her ultimate success is probable."). For a stay to issue, it is enough that an applicant puts forth "a substantial case on the merits" in which "serious legal questions are raised." *Id.* at 967–68 (cleaned up). NAW respectfully submits that, as the Court initially found in issuing the preliminary injunction, the pending appeal at least raises substantial questions as to the constitutionality of the RMA under both the dormant Commerce Clause and the Due Process Clause.

### A. NAW Has a Substantial Case that the RMA Violates the Dormant Commerce Clause under *Pike*.

The first question concerns the proper treatment of the RMA's effects on interstate distribution networks. Under *Pike*, a plaintiff must first establish a "substantial" burden on interstate commerce and, once that threshold is met, show that the burden is "clearly excessive" in relation to the asserted local benefits. *Flynt v. Bonta*, 131 F.4th 918, 931–32 (9th Cir. 2025). The Ninth Circuit has long identified several effects as particularly important to that inquiry, including "the disruption of travel and shipping due to a lack of uniformity in state laws." *Pac. Nw. Venison Prods. v. Smitch*, 20 F.3d 1008, 1015 (9th Cir. 1994); *see Flynt*, 131 F.4th at 932.

The trial record contained substantial evidence as to the RMA's deleterious effects on interstate supply chains. The pressure begins with the magnitude of the fees themselves, which in some instances approach or exceed the margins earned on covered products—making existing distribution practices unsustainable. *See, e.g.*, II Trial Tr. 423:15–424:16 (Allen). That problem is compounded by the fact that distributors often cannot know whether products passing through Oregon will ultimately be disposed of there, making it difficult to confine those costs to Oregon commerce in the first place. *See* II Trial Tr. 347:14–348:25 (Winkle); *id.* at 397:14–398:6 (Allen); Trial Order at 33.

Were the evidence to end there, NAW's claim likely would have little merit. As the Trial Order correctly recognized, the dormant Commerce Clause "protects the interstate market, not particular interstate firms from . . . burdensome regulations." Trial Order at 52 (quoting *Flynt*, 131 F.4th at 932). NAW fully appreciates that loss to a particular firm cannot establish a substantial burden "without more" evidence that the law "impedes substantially the free flow of commerce from state to state." *Flynt*, 131 F.4th at 932 (quoting *Burlington N. R.R. Co. v. Dep't of Pub. Serv. Regul.*, 763 F.2d 1106, 1114 (9th Cir. 1985)). But there is at least a substantial question whether the RMA's disruption to supply chains provides that "more" here.

Distributors generally operate through regional hubs built to serve several States at once, and thus cannot isolate Oregon-bound products without "completely blowing up a system and a model that is built on efficiency and optimization." II Trial Tr. 346:16–25 (Winkle). The combination of substantial Oregon-specific fees and the inability to segregate the products subject to them leaves firms with little practical choice but to reconfigure the interstate networks through which their products move. Indeed, several NAW members have accordingly altered "distribution pathways in response to obligations imposed by the RMA," with at least one ceasing its Oregon operations altogether. Ex. 521 at 14; *see also* Trial Order at 52 (recognizing that "wholesalers and distributors may need to re-route operations"). Such retraction of national supply networks requires firms across the market to

"redesign how [they] think about operating and optimizing [their] network," producing "less dense routes," "less inventory pooling," and "less efficiency" throughout the system as a whole. III Trial Tr. 578:13–579:15 (Thomas).

The Trial Order, however, characterized this evidence of disruption across interstate supply chains as an "unsuccessful[ ] attempt[ ] to revive the 'almost per se' rule against laws with extraterritorial effects that was explicitly rejected in *Pork Producers*." Trial Order at 52 (citing *Nat'l Pork Prods. Council v. Ross*, 598 U.S. 356, 374–75 (2023)). That appears to collapse two distinct strands of dormant Commerce Clause jurisprudence. As *Flynt* explains, one "line of cases concerns state laws that operate extraterritorially beyond the state's borders," 131 F.4th at 924. It is this doctrine that *Pork Producers* largely limited. *See* 598 U.S. at 374–75. But separate and apart from the dormant Commerce Clause's bar on discriminatory or extraterritorial regulation, the *Pike* line of cases focuses instead on whether the law "impedes substantially the free flow of commerce from state to state." *Flynt*, 131 F.4th at 932; *see also Pork Producers*, 598 U.S. at 396 (Roberts, C.J., concurring) ("As a majority of the Court agrees, *Pike* extends beyond laws either concerning discrimination or governing interstate transportation."). And it is that strand of the doctrine that has long recognized a substantial constitutional injury where one State's regulations force interstate actors to reconfigure how goods move across state lines. *See, e.g.*, *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 527–29 (1959); *Kassel v. Consol. Freightways Corp.*, 450 U.S. 662, 674–75 (1981) (plurality opinion).

Under the framework the Ninth Circuit articulated in *Flynt*, the RMA's effects on interstate distribution networks pose a serious question as to the existence of a cognizable *Pike* injury to interstate commerce. Evidence that the RMA is causing distributors to reconfigure and retract national supply chains goes to the free flow of goods across state lines, not to Oregon's authority over conduct beyond its borders, and the Ninth Circuit has never suggested *Pork Producers* removed such harms from the *Pike* inquiry. The Trial Order's contrary characterization presents a substantial legal question on appeal.

The Trial Order's analysis of the RMA's asserted local benefits raises similar questions. *Pike* directs courts to consider whether the local interest "could be promoted as well with a lesser impact on interstate activities." 397 U.S. at 142. The Trial Order, however, proceeded from recognizing Oregon's legitimate interest in waste management and public health directly to the conclusion that the burdens were not "clearly excessive," resting "particularly" on the observation that other environmental laws have survived *Pike* review. Trial Order at 53. But others have not. *See, e.g.*, *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 405–07 (1994) (O'Connor, J., concurring) (concluding that waste ordinance imposed a burden "clearly excessive" in relation to its local benefits); *Diamond Waste, Inc. v. Monroe County*, 939 F.2d 941, 945–46 (11th Cir. 1991) (same). And the record here suggests Oregon has yet to quantify many of the RMA's anticipated environmental benefits, while alternatives exist for funding recycling infrastructure without forcing the same changes to interstate distribution networks. *See* Dkt. 196 at 58–59. *Pike* balancing is necessarily case-specific, and the fate of other environmental regimes says little about how the balance should be struck on this record. *Cf. Diamond Waste*, 939 F.2d at 946 ("[U]nder the *particular circumstances at issue*, the fact that less restrictive alternatives are available . . . makes the burden . . . clearly excessive in relation to the local benefits created." (emphasis added)). The Trial Order thus leaves open serious questions as to whether the RMA's demonstrated burdens are justified by benefits Oregon has yet to measure.

### B. NAW Has a Substantial Case that the RMA Violates the Due Process Clause.

Plaintiff's due-process claim similarly raises substantial questions for appeal, both as to the constitutionality of the delegation of state authority to CAA and the lack of adequate procedures for contesting membership fees.

1. *Protected Interests*. The Trial Order acknowledged that the threshold question of whether NAW sufficiently identified a protected liberty or property interest sufficient to

sustain its theories of a due-process violation was a "close call." Trial Order at 59; *see Blumenkron v. Multnomah County*, 91 F.4th 1303, 1314 (9th Cir. 2024). Although the Court stated that it "agrees with Defendant that there is no statutory basis for finding a threatened property or liberty interest in the RMA," it "nonetheless" decided to "assume without deciding that NAW had satisfied the threshold requirement of showing a protected property interest." Trial Order at 60. While the Trial Order itself demonstrates that this threshold issue at least raises serious questions, it is worth noting the range of sources from which those interests may derive.

As the Supreme Court explained in *Roth*, "property interests . . . are not created by the Constitution," but instead arise from "existing rules or understandings that stem from an independent source such as state law." 408 U.S. 564, 577 (1972). The Ninth Circuit has been clear that "[a]lthough an explicit statutory provision may indeed be a *sufficient* condition to the creation of a constitutionally cognizable property interest, *it assuredly is not a necessary one* . . . [as] property rights can—and often do—exist wholly independently of statutes recognizing them as such." *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1200 (9th Cir. 1998) (emphases added); *see also id.* ("The *Roth* Court's recognition of the unremarkable proposition that state law may affirmatively create constitutionally protected 'new property' interests in no way implies that a State may by statute or regulation roll back or eliminate traditional 'old property' rights."). In other words, a protected interest can arise either from a "new" entitlement affirmatively created by state law or "core" liberty and property interests that arise from background principles of common law and exist independently of any statutory grant. *See Schneider*, 151 F.3d at 1200–01; *cf. Roth*, 408 U.S. at 571–72 (extending due-process interests "beyond" core common-law protections for "actual ownership of real estate, chattels, or money").

With that distinction in view, the liberty and property interests implicated by the RMA readily follow. To begin, NAW's members have a property interest in money in their possession that CAA requires them to pay as a condition of participating in the Oregon

market—an interest that "exist[s] wholly independently" from any statutory guarantee. *Schneider*, 151 F.3d at 1200; *see also Shinault v. Hawks*, 782 F.3d 1053, 1057 (9th Cir. 2015) ("An individual's property is a fundamental example of a protected interest."); *Thomas v. County of Humboldt*, 2024 WL 5242613, at *2 (9th Cir. Dec. 30, 2024) (recognizing a protected interest in plaintiffs' "finances and the full use and enjoyment of their property" (citing *Roth*, 408 U.S. at 571–72)); *cf.* Trial Order at 59. So too do they derive from the "very nature" of ordered government protectable interests in "the use of private property" and the lawful "pursuit of useful activities." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *Washington ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116, 121–23 (1928); *see also Corfield v. Coryell*, 6 Fed. Cas. 546, 551–52 (C.C.E.D. Pa. 1823) (including "right to acquire and possess property" among the fundamental rights "which belong, of right, to the citizens of all free governments"). Such fundamental common-law rights are no less robust when they are threatened by a private actor exercising governmental power, *see Carter Coal*, 298 U.S. at 311—be it at the federal or State level, *see, e.g.*, *Roberge*, 278 U.S. at 121–23 (holding that a private delegation of State power imposed an "unnecessary and unreasonable" restriction on "the use of private property or the pursuit of useful activities" and was therefore "repugnant to the due process clause of the Fourteenth Amendment").

But even if all protectable interests did have to arise from a statute, NAW has a substantial case for satisfying that more demanding standard. A regulated party has a "legitimate claim of entitlement" to have a fee assessed according to mandatory legal criteria, *Spectrum Pac. W., LLC v. Imperial Irrigation Dist.*, 2025 WL 2462443, at *6 (S.D. Cal. Aug. 26, 2025) (quoting *Armstrong v. Reynolds*, 22 F.4th 1058, 1076–77 (9th Cir. 2022)). Distinguishing *Spectrum Pacific*, the Trial Order observed that the RMA "does not provide any specific formula by which membership fees in a PRO must be calculated." Trial Order at 59 n.192. But the scheme in *Spectrum Pacific* did not fix particular rates either. Instead, it merely "prescribe[d] mandatory criteria that [the agency] must follow when calculating

pole access fees," such as limits on recoverable costs and how they must be calculated. *Spectrum Pac.*, 2025 WL 2462443, at *6.

The RMA operates the same way. As the Trial Order found, the RMA specifies mandatory "criteria for the PRO's decision-making," including that "base fee rates [must] be 'approximately proportional to the covered products' relative contribution to the financial obligations of the [PRO],'" Trial Order at 67 (quoting OR. REV. STAT. § 459A.884(3)(b)), and it specifies the costs fees may recover and how those costs must be allocated among covered materials and producers, *see* OR. REV. STAT. § 459A.884(1)–(4). Given the parallels between the two laws, there is at minimum a substantial question as to whether the Trial Order correctly distinguished *Spectrum Pacific* in rejecting NAW's claim of entitlement on this basis as well.

2. *<u>Alternatives to Joining a PRO</u>*. The Trial Order's rejection of both due-process theories implicates the common premise that participation in CAA is voluntary, since producers could form a new PRO, privately recycle all covered products, or exit the Oregon market altogether. *See* Trial Order at 61–63, 68. Whether those apparent alternatives constitute a legally sufficient choice presents a substantial question for appeal.

On this point, the Trial Order distinguished *Carter Coal* on the ground that the "choice" there—either comply or forfeit all federal contracts and pay a 15% excise tax—"was far more illusory than the ability to form one's own PRO under the RMA." Trial Order at 61; *see Carter Coal*, 298 U.S. at 289, 310–11. But the Trial Order's findings describe an alternative that appears illusory in much the same way. One choice the Trial Order makes available to producers is to "simply not participate in the market" at all. Trial Order at 68. In other words, *forfeit* all contracts with Oregon customers.

Another is to establish a competing PRO, which must represent at least 10% of Oregon's market and pay DEQ $3–4 million annually in administrative fees alone. *Id.* at 15–16. For wholesalers and distributors operating on profit margins as low as 1–3%, *id.* at 32, those costs could be borne only by assembling a sufficiently large group of producers—an

undertaking that, as NAW's expert explained, would require coordinating potentially hundreds of competing firms. III Trial Tr. 584:13–585:5 (Thomas). For many producers, the prohibitive costs of forming an alternative PRO make that option no more realistic—and no less coercive—than paying the excise tax imposed in *Carter Coal*.

More fundamentally, forming a new PRO would not address the delegation concern itself. The RMA requires that every PRO be composed of producers, so a new PRO would simply shift regulation from one set of self-interested competitors to another. OR. REV. STAT. § 459A.863. *Carter Coal* forbids that arrangement all the same. *See, e.g.*, 298 U.S. at 311 ("[O]ne person may not be intrusted with the power to regulate the business of another[.]"). The Trial Order recognizes this difficulty, noting that "any producers running a PRO may have 'conflicting and even antagonistic interests' to the competitor-members it imposes membership fees on." Trial Order at 63 (quoting *Carter Coal*, 298 U.S. at 311).[1] If this alternative does not remove producers from the control of self-interested competitors, it cannot be what makes the delegation constitutional—or what makes CAA's self-interest "not relevant" at all. *See id.* at 62.

The feasibility of the remaining alternative the Trial Order identifies—that a producer could avoid joining a PRO by "privately recycling all 'covered products' for which they are responsible"— is also uncertain on this record. *See* Trial Order at 61–62. To qualify for the private-recycling exemption, a producer is required to demonstrate that the material "is recycled at a responsible end market." *Id.* at 13 (alteration adopted) (quoting OR. REV. STAT. § 459A.869(13)). But as the trial evidence showed, several covered materials—including plastic bags, strawberry clamshells, and paper-laminate coffee cups—do not

[1] The Trial Order addressed this argument on the merits, thus preserving it for appeal. *See* Trial Order at 62–63; *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir. 1992) (argument is preserved if "raised sufficiently for the trial court to rule on it"). And even if it had not done so, NAW would still be free to raise this argument on appeal in support of its due-process claim. *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992) ("Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.").

have responsible end markets. *See* III Trial Tr. 658:25–659:12 (Lakhan); V Trial Tr. 1085:20–23 (Cassel). So this avenue for avoiding PRO membership is unavailable to the many NAW members whose product mix includes even one material that cannot be responsibly recycled. *See, e.g.*, II Trial Tr. 336:5–8 (Winkle).

3. *DEQ Oversight*. At bottom, the Trial Order's disposition of the nondelegation issue turns on its conclusion that DEQ "retains ultimate decision-making authority" while CAA merely "'plays an advisory role.'" Trial Order at 67 (quoting *FCC v. Consumers' Rsch.*, 606 U.S. 656, 693–95 (2025)). That conclusion, in turn, rests on the Trial Order's application of *Consumers' Research*. At the preliminary injunction hearing, the Court had previously noted material distinctions between that the delegation scheme in *Consumers' Research* and the one at issue. While the Court reached a different view following trial, the application of *Consumers' Research* at least raises substantial questions.

In *Consumers' Research*, the Court upheld the delegation as constitutional because, among other controls (including over the entities' board), the agency retained final authority over the private party's recommendations before they had any legally operative effect. *See Consumers' Research*, 606 U.S. at 695 ("It is sufficient in such schemes that the private party's recommendations . . . cannot go into effect without an agency's say-so."). From that principle, the Trial Order reasoned that the RMA's delegation of fee-setting authority to CAA was equally valid since DEQ reviewed Appendix G and ultimately approved CAA's initial fee-setting methodology. Trial Order at 65–67.

DEQ's initial approval of a high-level methodology, however, is not the same as retaining authority over the fees ultimately assessed. The RMA and its implementing regulations allow CAA to change the inputs used to calculate a material's CTM values—and even "adjust the CTM value formula itself"—without obtaining DEQ approval. *Id.* at 64–65 (citing OR. ADMIN. R. § 340-090-0750(1)). CAA has exercised that unilateral authority multiple times: since the Plan was approved, CAA has issued two separate fee schedules and "did not submit a Plan amendment" either time. *Id.* at 27, 29–30. The problem thus is

not that DEQ's approval of CAA's methodology was simply a "rubber stamp[ ]" or that its review occurred "behind the scenes." *See id.* at 65–66 (quoting *Consumers' Rsch.*, 606 U.S. at 695). It is that since February 2025 DEQ has not approved the new fees assessed *at all*, even as CAA has changed producers' legal obligations under the RMA. True, the RMA "requires only that base fee rates be 'approximately proportional to the covered products' relative contribution" to the PRO's costs. *Id.* at 66 (quoting OR. REV. STAT. § 459A.884(3)(b)). But the Due Process Clause requires that the fees resulting from that approximation—whatever they may be—ultimately be determined by DEQ. *See Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940) (finding private entities "function subordinately to the [agency]" where "[the agency], not the [private entities], determines the prices"). The RMA's statutory guidance alone is no substitute for final agency approval. *Cf. Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*, 53 F.4th 869, 885 (5th Cir. 2022) ("To be sure, Congress also included various 'considerations' and other factors to guide the Authority's development of the rules. But that only underscores the point that it is the Authority, not the agency, that is tasked with weighing policies that go into formulating rules.").

CAA's revisions to the values that drive every member's fee are not mere "recommendations" but binding changes to producers' obligations that "go into effect without an agency's say-so." *See Consumers' Rsch.*, 606 U.S. at 695. That distinguishes this case from the scheme *Consumers' Research* upheld and leaves a substantial issue for appeal.

4. *Procedure for Contesting Membership Fees*. The Trial Order also concluded that, even assuming a property deprivation, the RMA "affords sufficient procedural safeguards" against erroneous fee assessments. Trial Order at 68. Under *McKesson*, a State that compels payment before adjudicating liability must provide either a meaningful predeprivation hearing or a "clear and certain" postdeprivation remedy. 496 U.S. at 36–39. NAW respectfully submits that a serious question remains as to whether either exists.

The Trial Order identifies two formal procedural mechanisms: DEQ penalty proceedings and private arbitration under the Oregon Addendum. *See* Trial Order at 69–70. Each addresses part of a fee dispute, but neither appears to provide complete relief.

DEQ's enforcement process permits a producer to contest a *civil penalty* before an administrative law judge, but the Trial Order identified no authority allowing that decisionmaker to revise CAA's invoice, bind CAA as to the amount owed, or order repayment of an unlawful fee. Moreover, that process is available only if DEQ elects to bring an enforcement action in the first place, which under the Trial Order's account occurs "only . . . after the PRO notifies DEQ of an infraction." *Id.* at 70; *cf. Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434–36 (1982) (due process violated where claimant's opportunity to be heard was lost through the agency's failure to act, "a matter beyond [the claimant's] . . . control"). And the Supreme Court has long recognized the due-process concern with schemes under which a party can obtain a hearing on a disputed obligation only "upon the condition that if unsuccessful he must suffer . . . fines." *Ex parte Young*, 209 U.S. 123, 148 (1908); *see Free Enter. Fund v. PCAOB*, 561 U.S. 477, 490 (2010) (parties are not ordinarily required to "bet the farm" to test a legal obligation (quotation omitted)). So a defensive enforcement proceeding, before an agency without authority to order that fees be repaid, is not obviously the "meaningful" predeprivation hearing *McKesson* contemplates.

Arbitration does not obviously fill that gap either. As a threshold matter, it is not clear that the observation that the arbitration requirement "is not derived from the RMA" resolves the question. Trial Order at 70. On the one hand, DEQ approved the Oregon Addendum—including its arbitration and late-fee provisions—as part of CAA's Plan, *see id.* at 68, which suggests that the arbitration process is properly viewed as part of the procedural scheme the State has established rather than a purely private arrangement. *Cf. Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982) (explaining that a "procedural scheme created by the statute obviously is the product of state action"); *N. Ga. Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 606–08 (1975) (holding that private garnishment pursuant to

state statute violated due process). And the CAA contracts do not clearly guarantee repayment of an unlawful assessment; to the contrary, the Participant Producer Agreement makes termination the producer's "sole and exclusive remedy" for breach of CAA's warranty to administer the program consistently with the approved Plan. Ex. 34 § 2.5; *see* Trial Order at 30. On the other hand, if the Oregon Addendum is not part of the process the State provides, then the only process attributable to the State is the DEQ penalty proceeding described above—which offers no avenue for adjudicating the amount of a fee at all.

The Trial Order ultimately reasoned that, if a producer could prove CAA had miscalculated its fee, the sequence of informal negotiations, arbitration, and enforcement proceedings would "likely" relieve the producer of a contractual late fee. Trial Order at 70. But *McKesson* requires a "clear and certain remedy" capable of preventing a "permanent unlawful deprivation of property." 496 U.S. at 39–40; *see Reich v. Collins*, 513 U.S. 106, 108 (1994). Where, as here, no neutral authority has the power both to adjudicate the "accuracy and legal validity" of CAA's assessment and to grant complete relief from it, *McKesson*, 496 U.S. at 39, there is at least a serious question whether ad hoc negotiations and the hope that relief will follow from proceedings before decisionmakers who cannot order it are constitutionally sufficient to meet the standards due process requires.

* * *

The Trial Order addressed each of these questions with care, and NAW does not suggest otherwise. But they are close questions, and on each the Ninth Circuit could reasonably reach a different conclusion. Under *Leiva-Perez*, that is enough for this factor to favor a stay.

## III. THE BALANCE OF THE EQUITIES WEIGHS SHARPLY IN FAVOR OF A STAY.

This Court has already once determined that the balance of the equities and public interest tipped "sharply in favor of NAW and its members." Trial Order at 7. Nothing about entry of final judgment transforms the practical consequences of enforcement. Reinstating

the injunction, simply restores the status quo under which Defendant has operated since February.

The past eight months have demonstrated that the burden on DEQ and CAA is minimal, as Oregon's EPR program has apparently proceeded unaffected even without collecting fees from NAW's members. And CAA is certainly more than able to withstand a temporary continuation of that arrangement. By its own account, CAA is sitting on roughly $90 million in "Oregon specific operating reserve accumulation and surplus funds," a safety net so large CAA projects it "could reduce Oregon 2026 and 2027 producer fees." Trial Order at 50–51 (quoting Ex. 97). Whatever else those reserves show, they confirm that CAA continuing to temporarily forego collecting fees from NAW members poses no threat to the organization's viability or to the program's operation.

CAA ultimately stands to lose nothing from a stay if the judgment is affirmed. CAA has continued to invoice members—and assess compounding late fees—throughout the period covered by the preliminary injunction, *see* II Trial Tr. 295:13–21 (Rodriguez); Trial Order at 31; Allen Decl. ¶¶ 4–5; Rodriguez Decl. ¶ 4; Winkle Decl. ¶ 3, and would have the opportunity to pursue any balances properly due should Defendant prevail on appeal. By contrast, NAW's members run the serious risk of never being able to recover fees paid now, even if they receive a favorable judgment down the line, *see* Allen Decl. ¶ 9; Rodriguez Decl. ¶ 5; Winkle Decl. ¶ 11—an asymmetry that pushes the balance of the harms "heavily in their favor." *See Mori v. Int'l Bhd. of Boilermakers*, 454 U.S. 1301, 1303 (1981).

A temporary stay also would further the public interest. Because "it is always in the public interest to prevent the violation of a party's constitutional rights," *Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012), the public interest would be best served by avoiding "premature enforcement" of the judgment and allowing the Ninth Circuit to "bring considered judgment to bear" on the serious constitutional questions this case presents. *See Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 9–10 (1942); *Nken*, 556 U.S. at 427. And

given that Oregon's EPR program has operated and will continue to operate as usual, merely deferring a portion of fees would not prevent any of the RMA's asserted environmental benefits from being realized in the meantime.

The Court struck this balance once before and found it tipped sharply toward NAW. Nothing in the intervening months—least of all a trial record confirming the severity of the harm to NAW's members and DEQ's ability to operate the EPR program without difficulty—supplies a reason to strike it differently now.

## CONCLUSION

For these reasons, the Court should stay the enforcement of the RMA against NAW and its members pending resolution of the appeal of this case on the merits.

DATED October 16, 2026

SIDLEY AUSTIN LLP

By: */s/ David R. Carpenter*

David R. Carpenter*
drcarpenter@sidley.com

Caleb J. Bowers*
cbowers@sidley.com
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213 896 6000
Facsimile: +1 213 896 6600

Gordon D. Todd*
gtodd@sidley.com
Richard W. Smith*
rwsmith@sidley.com
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736 8000
Facsimile: +1 202 736 8711
**Pro hac vice*

BRADLEY BERNSTEIN SANDS LLP
Darin Sands, OSB No. 106624
1211 NW Glisan St., Ste 204
Portland, OR 97209
Telephone: +1 503-734-2480

Attorneys for Plaintiff
NATIONAL ASSOCIATION OF
WHOLESALER-DISTRIBUTORS